# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

SHIWA NAHADI individually, and as representative for the estate of ESTATE OF OMER MAHMOUDZADEH, TARA MAHMOUDZADEH, LOMMIE BLACKMON, CYNTHIA HARMON, TONI ALEXANDER, BROCK JOHNSON, AHMED ALSAGAR, SHANERRIA BARBER, PATRICK BEN, BADEKEMI BILADJETAN, EINREB BISMANOS, JULIUS BRISCO, MELISSA BRISCO, T.B. by and through his next friend Julius Brisco, J.M. by and through his next friend Melissa Brisco, ALI BROWN, TIMOTHY BROWN, JAMES CARSON, MACKENZIE KAMMERER, JARON CARTER, OLIVIA CARTER, J.C. by and through her next friend Jaron Carter, THOMAS CAUDILL, ADRIENNE CAUDILL, L.H.C. by and through his next friend Thomas Caudill, L.T.C. by and through his next friend Thomas Caudill, O.C. by and through his next friend Thomas Caudill, R.C. by and through her next friend Thomas Caudill, DOLPHISE COLOMB, M.W. by and through his next friend Dolphise Colomb, NECOLLIER DANIELS, SARAH DANIELS, C.N.D. by and through his next friend Necollier Daniels, C.T.D. by and through his next friend Necollier Daniels, JACOB DEER, SAMANTHA DEER, J.A.D. by and through his next friend Jacob Deer, J.C.D. by and through his next friend Jacob Deer, COREY FAUCETT, THOMAS FELDSCHNEIDER, COURTNEY FELDSCHNEIDER, J.F. by and through his next friend Thomas Feldschneider, JULIE FERGUSON, MITCHELL FERGUSON, MIGUEL FIGUEROA, AARON FUTRELL, STEVEN GARRETT, HEATHER GARRETT, S.G. by and through his next friend Steven Garrett, BRANDON GODWIN, DUSTIN GRAHAM, MALISSA GRAHAM, H.G. by and through her next friend Dustin Graham, STEPHON GREEN, MENTORIA GREEN, A.G. by and through his next friend Stephon Green, S.G. by and through her next friend Stephon Green, NATHAN GROSSE, BRETT GUSTAFSON, AMANDA GUSTAFSON, L.G. by and through his next friend Brett Gustafson, GEOFFREY HANSEN, ALLIE HANSEN, KENDRA HAWKINS, JOHN HERGERT, ALYSSA HERGERT, C.H. by and through his next friend John

Case No.: 1:26-cv-274

Hergert, COSTIN HERWIG, JENNIFER DEAVER, J.H. by and through his next friend Costin Herwig, J.B.R.D. by and through his next friend Jennifer Deaver, J.M.D. by and through his next friend Jennifer Deaver, BRANDON HITCHINGS, SUZANNE HODGES, BYRON HOGAN, KERRY HOWARD, ANDREW JENKINS, MEGAN JENKINS, A.J. by and through her next friend Andrew Jenkins, S.J. by and through her next friend Andrew Jenkins, P.J. by and through his next friend Andrew Jenkins, ALAN JOHNSON, TERI LARSON-JOHNSON, J.J. by and through his next friend Alan Johnson, CARLY MESSMAN, ABBY SIGURDSON, SAMUEL SIGURDSON, TREMAYNE JOINER, ROBERT JONES, DAUNTE KELLER, ALEXANDER KNOWLES, DAINE KVASAGER, C.K. by and through his next friend Daine Kvasager, R.K. by and through his next friend Daine Kvasager, REBECCA KVASAGER, L.K. by and through her next friend Rebecca Kvasager, KENNETH LEWIS, TAMMY SENECAL-LEWIS, K.L. by and through her next friend Kenneth Lewis, R.L. by and through her next friend Kenneth Lewis, R.A.L. by and through his next friend Kenneth Lewis, TAVERA GREEN, DENNIS LICON, LEIGHTON LIM, DEANNA LUCCHESI, JOSHUA LUCCHESI, ANASTASIA LUCCHESI, H.L. by and through her next friend Deanna Lucchesi, Z.L. by and through her next friend Deanna Lucchesi, JOHN MAGEE, MAZIN MAHDI, DARIUS MARTIN, AMANDA MARTIN, M.M. by and through his next friend Darius Martin, DARLINA MARTIN, CAYLEIGH MARTIN, ARMANDO MARTINEZ IV, ISAAC MARTZ, TORRIN MCDOUGLE, PHILLIP MENDOZA, MELCHI MENDOZA, ALEXANDER MENDOZA, ZACHARY MERRILL, CAROLINA MERRILL, C.M. by and through her next friend Zachary Merrill, JULIAN MITCHELL, JAMES MORGAN, SARAH MORGAN, C.M. by and through her next friend James Morgan, RYAN NOLAN, BRITTANY NORFLEET, ANTHONY SHAPPY, A.S. by and through her next friend Brittany Norfleet, K.S. by and through her next friend Brittany Norfleet, JOSE ORTIZ, ANTHONY PANCHOO, ALEXIS PANCHOO, A.P. by and through her next friend Anthony Panchoo, ZACHARY PARKER, CARLOS PORRES JR., K.L.P. by and through her next friend Carlos Porres Jr., K.R.P. by and through her next friend Carlos Porres Jr.,

MICHAEL PRIDGEON, REBECCA PRIDGEON, A.P. by and through her next friend Michael Pridgeon, MILLS PRIDGEON, T.P. by and through his next friend Michael Pridgeon, PATRICIA PURANDA, RACHEL QUINN, FRANCINE RIOS individually, and as representative for the estate of ESTATE OF JASON QUITUGUA II, KAEDINN QUITUGUA, MCKENZIE-JAE QUITUGUA, SUMMER QUITUGUA, RODNEY RAGIN, NILSA RIVERA-VILLEGAS, MASON SCARBROUGH, JACOB SCHMIDT, JARON SCHNEIDER, ASHLEY SCHNEIDER, COLLIN SHEPARD, KAITLIN SHEPARD, FREDERICK SHILKE, STEPHANIE SHILKE, W.S. by and through his next friend Frederick Shilke, M.C.R. by and through his next friend Stephanie Shilke, M.D.R. by and through her next friend Stephanie Shilke, MICHAEL SMITH, CORISIA SMITH, A.S. by and through her next friend Michael Smith, A.D. by and through her next friend Corisia Smith, GREGORY SORENSEN, HUGH SPEARS JR., BRANDON SPEARS, JOHNATHAN STARK, KEVIN STEVENS, CASEY STEVENS, DOLORES SYRELL, WILLIAM TABER, DAGMAR TABER, LOUIS PALLA, SAMIRA PALLA, A.T. by and through her next friend William Taber, NICOLAUS TRIVELPIECE, SANDRO VICENTE, LUIS VILLEGAS, HAILEY WEBSTER, JOHN GOETZ, JEREMY WINKLER, TYLA WINKLER, M.A.W. by and through his next friend Jeremy Winkler, M.I.W. by and through his next friend Jeremy Winkler, M.Z.W. by and through her next friend Jeremy Winkler, MASON WRIGHT, and RAM ZAMEL,

*Plaintiffs*,

v.

BRITISH AMERICAN TOBACCO P.L.C., and BRITISH-AMERICAN TOBACCO MARKETING (SINGAPORE) PRIVATE LIMITED,

*Defendants*.

**COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

DEFENDANTS ................................................................................................................... 4

JURISDICTION AND VENUE ......................................................................................... 5

SOURCING ........................................................................................................................ 5

FACTUAL ALLEGATIONS ............................................................................................. 6

I.     NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST
ALLIES IN AN "AXIS OF RESISTANCE" SINCE THE 1980s .................................... 6

     A.    North Korea, The IRGC, And Hizballah Forged An "Axis Of Resistance"
Against The United States ..................................................................................... 6

     B.    North Korea—A Designated State Sponsor Of Terrorism—Operates As A
Global Criminal Enterprise To Proliferate Weapons ............................................ 7

     C.    The IRGC Operates As A Global Terrorist Organization Dedicated To
Targeting The United States .................................................................................. 9

     D.    Hizballah Functions As The IRGC's Primary Terrorist Proxy............................ 11

II.    DEFENDANTS ILLEGALLY ENGAGED WITH NORTH KOREA, DESPITE
ITS DECADES-LONG PARTNERSHIP WITH THE IRGC AND HIZBALLAH,
TO DEVELOP AND DEPLOY WEAPONS TARGETING AMERICANS .................. 12

     A.    North Korea, The IRGC, And Hizballah Entered A Joint Venture To
Produce And Deploy Missiles In Terrorist Attacks Against Americans .............. 13

     B.    North Korea Exported Its Missile Technology And Expertise To The
IRGC And Hizballah........................................................................................... 16

     C.    The IRGC And Hizballah Integrated North Korean Weapons Systems Into
Their Attacks...................................................................................................... 22

     D.    Cigarette Revenues Provided Vital Financing For Attacks Enabled
Through The North Korea-IRGC-Hizballah Joint Weapons Venture .................. 23

     E.    The North Korea-IRGC-Hizballah Joint Weapons Venture Produced The
*Qiam-* And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs.............. 27

III. DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES ............................................ 29

    A.     Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties............................................ 29

    B.     Defendants Formed A Joint Venture With A North Korean Front Called Daesong, Operated By Office 39 ........................................ 33

    C.     Defendants Lied About Exiting The Joint Venture In 2007 ................ 37

    D.     Defendants' Venture With Office 39 Became A Key Source Of Funding For North Korea's Weapons Collaboration With The IRGC And Hizballah ....... 44

    E.     Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty For Their Misconduct ............................................ 47

IV. DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS ........ 49

    A.     Defendants Monitored Sanctions And Warnings About North Korea's Role In Financing Terrorists ................................................ 49

    B.     Defendants' Compliance And Intelligence Teams Received Repeated Notices That Cigarette Smuggling Was Funding Terrorism ................ 53

V. DEFENDANTS PROVIDED ESSENTIAL AND LASTING SUPPORT TO THE NORTH KOREA-IRGC-HIZBALLAH JOINT WEAPONS VENTURE ................ 56

    A.     Defendants' Cash And In-Kind Support Enabled Development Of Weapons Used In Terrorist Attacks ................................................ 56

    B.     Defendants' Assistance Was Extensive And Continuous .................... 63

VI. THE IRGC AND HIZBALLAH, WITH NORTH KOREAN SUPPORT, USED DEFENDANTS' RESOURCES TO CARRY OUT ATTACKS THAT KILLED AND INJURED AMERICANS ................................................ 66

    A.     January 8, 2020 Missile Attack in Iraq ................................ 66

    B.     September 28, 2022 Attack in Iraqi Kurdistan .................... 68

VII. DEFENDANTS' CONDUCT TARGETED THE UNITED STATES AND THE EASTERN DISTRICT OF VIRGINIA, AND HAD A SUBSTANTIAL NEXUS TO THIS DISTRICT ................................................ 68

    A.     Defendants' Conduct Targeted The United States, Including The Eastern District of Virginia ................................................ 68

B.     Defendants' Conduct Had A Substantial Nexus To The United States ................ 71

C.     Defendants' Misconduct Implicates Important U.S. Interests, Permitting Jurisdiction In U.S. Courts .................................................................................... 77

VIII.  PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY DEFENDANTS' CONDUCT ............................................................................................ 77

A.     Lommie Blackmon and Cynthia Harmon ............................................................. 78

B.     Plaintiffs Associated With the January 8, 2020 Al Asad Attack ......................... 78

C.     The Mahmoudzadeh Family ................................................................................. 83

CLAIM FOR RELIEF ............................................................................................................. 84

COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) ...................................................................................................................... 84

JURY DEMAND ...................................................................................................................... 86

PRAYER FOR RELIEF ........................................................................................................... 86

<u>**INTRODUCTION**</u>

1.       Plaintiffs are 196 victims of two terrorist attacks committed in Iraq. Defendants are British American Tobacco p.l.c. ("**BAT**") and its subsidiary British-American Tobacco Marketing (Singapore) Private Limited ("**BAT Singapore**"). From 2007 through 2017, Defendants operated a secret cigarette manufacturing joint venture with a North Korean government-owned entity that the U.S. Treasury Department designated in 2010 for "facilitating North Korean trafficking in arms." Despite publicly claiming they had exited North Korea— because North Korea was a global pariah sponsoring terrorism by proliferating arms— Defendants covertly supplied valuable business equipment and inputs to the same cash-starved North Korean entities that were procuring and sending weapons to terrorists. For these criminal acts, Defendants were prosecuted by the United States for sanctions violations and bank fraud. In 2023, those proceedings culminated with a guilty plea, settlement, and deferred prosecution agreement—including BAT's agreement to pay over $629 million to U.S. authorities—which was "the largest North Korean sanctions penalty in the history" of the United States.

2.       North Korea, also known as the Democratic People's Republic of Korea ("**DPRK**"), is among the most heavily sanctioned regimes in the world because it is a leading proliferator of weapons of mass destruction, including the specific missiles used to attack and injure Plaintiffs. For decades, North Korea has collaborated with Iran's Islamic Revolutionary Guard Corps ("**IRGC**") and Hizballah to develop, proliferate, finance, smuggle, secure, and deploy missiles and rockets in the Middle East. This collaboration has been documented by the U.S. government, the United Nations, and a U.S. District Court, which found North Korea enabled violence through the North Korea-Iran-Hizballah weapons partnership. As a 2008 U.S. report explained, there was a "continuing relationship between North Korea and the IRG[C], including a kind of joint venture partnership to develop missiles inside Iran."

3.      U.S. government officials found that BAT's misconduct financed and enabled North Korea's missile and rocket programs. The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury determined that BAT's violations "helped North Korea establish and operate a cigarette manufacturing business—a sector that has reportedly netted over $1 billion per year for the Government of the DPRK," which is "known to use funds generated through international trade to support its nuclear and missile programs." The Assistant Attorney General of the U.S. Department of Justice's ("DOJ") National Security Division confirmed to Congress in December 2023 that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, generating revenue used to advance North Korea's weapons program." A senior State Department official described the enforcement action against BAT as "part of our ongoing efforts to impede revenue generation by the DPRK that flows into their illegal unlawful WMD programs." And senior Department of Justice officials explained that "[o]ur investigation exposed BAT . . . as [an] important component[] in funding North Korea's WMD proliferation program," and confirmed that the profits BAT helped generate went "directly to the North Korean government, its military, and its WMD program." These findings confirm what was broadly known and frequently publicized before and throughout Defendants' scheme: North Korea uses cigarette manufacturing and smuggling to facilitate missile and rocket proliferation in the Middle East.

4.      It was also well-known that North Korea's primary customers for missiles and rockets include the IRGC and Hizballah, which used those weapons to attack Americans in the Middle East. Defendants knew—or recklessly disregarded—that by operating an illicit joint venture with a North Korean state-owned tobacco company, they were financing the missile and rocket attacks carried out by the IRGC and Hizballah against Americans. For at least a decade,

Defendants persisted in this scheme, funneling hundreds of millions of dollars to North Korean terrorist fronts financing missiles used to attack Americans, including Plaintiffs, and defying repeated warnings that their conduct would enable these attacks.

5.     Plaintiffs are the victims of the North Korea-IRGC-Hizballah weapons venture. Plaintiffs include American servicemembers and civilians—who were killed or wounded in attacks by the IRGC and Hizballah using North Korean-designed missiles—and their families. As Plaintiffs allege in great detail, BAT's conduct enabled the North Korea-IRGC-Hizballah weapons venture to finance, develop, and refine the exact type of missiles and rockets—including *Qiam*- and *Fateh*-class missiles—that were deployed to deadly effect in the attacks against Plaintiffs. BAT knowingly provided direct assistance to the development of these particular weapons by illegally helping DPRK terrorist fronts generate over $400 million in seed capital during a period that was crucial to the development and manufacture of those weapons.

6.     Accordingly, Plaintiffs seek civil damages under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). JASTA seeks "to provide civil litigants with the broadest possible basis … to seek relief against" anybody that has "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States," including those who act "knowingly or recklessly" and support terrorism "directly or indirectly." JASTA § 2(a)(6), (b). More recently, Congress reaffirmed the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No.

116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). This case advances these vital national interests.

## DEFENDANTS

7. Defendant **British American Tobacco p.l.c.** is a British multinational company that manufactures and sells cigarettes, tobacco, and other nicotine products. BAT is headquartered in London, United Kingdom, but it is involved in the trade and production of tobacco products around the world. It is the largest tobacco firm worldwide based on net sales. According to BAT, the "forerunner to British American Tobacco, BATCo, was founded in 1902 as an international joint venture between American Tobacco in the USA and Imperial Tobacco in the UK." "Today," as BAT explained in 2000, "the new British American Tobacco has active businesses in more than 180 countries, manufacturing facilities in over 100 countries, employs some 120,000 people worldwide and has a total brand portfolio which now comprises over 320 brands. The new British American Tobacco is also the market leader in 68 markets."

8. BAT is a globally integrated firm that has emphasized a centralized leadership structure with direct involvement in local markets. BAT explained in 2000, for example, that "[t]he Global Structure" of "British American Tobacco" was "globally integrated, based on Regions with self-sufficient Management Units, guided and supported by Central Functions and Services." Further, "[c]entralised services, for example, Central Leaf and Procurement, are also based at head office" and "act as suppliers to the End Markets, leveraging the advantages of economies of scale."

9. Defendant **British-American Tobacco Marketing (Singapore) Private Limited** is an indirect subsidiary of BAT located in Singapore. During the relevant period, BAT controlled BAT Singapore and received income generated by BAT Singapore through its direct and indirect sales of products to North Korea.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C.

§ 1331. Personal jurisdiction exists over each Defendant under Federal Rule of Civil Procedure

4(k)(1) and/or 4(k)(2), and 18 U.S.C. § 2334(a). *See infra* ¶¶ 238-270. Venue is proper in the

Eastern District of Virginia under 18 U.S.C. § 2334(a) because Plaintiffs Shiwa Nahadi and Tara

Mahmoudzadeh reside in—and the Estate of Omer Mahmoudzadeh is located in—the

Alexandria Division of this District. Venue is also proper because acts furthering BAT's scheme

targeted entities and persons located in this District. *See infra* ¶¶ 238-246.

## SOURCING

11.     Plaintiffs' allegations are based in substantial part on three sources: (1) BAT's

deferred prosecution agreement, (2) BAT Singapore's Plea Agreement, and (3) BAT's regulatory

settlement with OFAC. *See* Statement of Offense, *U.S. v. British American Tobacco, et al.*, No.

23-cr-118 (D.D.C. Apr. 25, 2023), Dkt. 11 ("Statement of Offense"); Plea Agreement, *U.S. v.

British American Tobacco, et al.*, No. 23-cr-118 (D.D.C. Apr. 25, 2023) ("Plea Agreement"),

Dkt. 12; Settlement Agreement of British-American Tobacco and OFAC (Apr. 17, 2023) ("BAT

OFAC Settlement"); U.S. Dep't of Treas., *OFAC Settles with British American Tobacco p.l.c. for

$508,612,492 Related to Apparent Violations of the North Korea and Weapons of Mass

Destruction Proliferators Sanctions Regulations* (Apr. 25, 2023) ("OFAC Enforcement

Release"). Each provides extensive evidence of Defendants' misconduct. And Defendants have

stipulated that the facts in these documents are true. *E.g.*, Statement of Offense at 1 (Defendants

"agree and stipulate to the below factual basis"). Unless otherwise indicated, Plaintiffs have

added all emphases in the quotes herein.

**FACTUAL ALLEGATIONS**

I.  **NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST ALLIES IN AN "AXIS OF RESISTANCE" SINCE THE 1980s**

    A.  **North Korea, The IRGC, And Hizballah Forged An "Axis Of Resistance" Against The United States**

12.    North Korea, the IRGC, and Hizballah are part of the "Axis of Resistance," a terrorist alliance dedicated to undermining U.S. foreign policy and killing Americans. For decades, they have collaborated to harm U.S. interests through the transfer of advanced arms, use of shared financial networks, training in terrorist tradecraft, and construction of underground attack tunnels. As North Korea scholars Professors Bruce E. Bechtol Jr. and Anthony N. Celso observed in their 2025 book, *Rogue Allies: The Strategic Partnership Between Iran and North Korea*, both Iran and North Korea "as a matter of doctrine, have an obsessive hatred of the United States—and that is what they most have in common." As Drs. Bechtol and Celso explained in the same book, "[t]he North Korea–Iran nexus involves weapons proliferation, political cooperation, money laundering, and robust support to state and nonstate actors in the Middle East," and "the strategic relationship between North Korea and Iran and a host of criminal and terrorist networks" comprised a "nexus between criminal-terrorist networks and rogue states" in which "[t]he Iran–North Korea alliance" had "ominous consequences" for "Middle Eastern security"; "the North Korea–Iran nexus" also "include[d] key … nonstate actors" and involved "the intertwining of their policy moves" against the United States.

13.    Iran is the world's leading state sponsor of terrorism. North Korea is its primary weapons supplier, including with respect to missiles and rockets.

**B. North Korea—A Designated State Sponsor Of Terrorism—Operates As A Global Criminal Enterprise To Proliferate Weapons**

14. North Korea is hostile to the United States as a matter of regime policy. As the Department of Defense ("DoD") noted in an analysis published in 2004, the regime "view[s] the United States as its primary and immediate external security threat" and "has never attempted to conceal the fact that it believes the United States is its principal enemy." To accomplish its anti-American objectives, the DPRK has long supported terrorist groups to undermine U.S. foreign-policy objectives. Congress thus has found that North Korea "poses an imminent threat" to "the security of the United States and its allies" and to "the safety of members of the United States Armed Forces." North Korea Sanctions and Policy Enhancement Act of 2016, Pub. L. No. 114-122, § 1(a), 130 Stat. 93, 22 U.S.C. § 9201(a)(9) (Feb. 18, 2016) (findings).

15. Unlike other nations, North Korea is organized as a "mafia state." As senior U.S. official Dr. David Asher publicly warned in 2005, it is the "only government in the world … actively involved in directing crime as a central part of its national economic strategy," resembling "an organized crime family more than a normal nation." Reports published by the DoD in 2013 and the Library of Congress in 2008 confirmed that the regime operates under a *Songun*, or "Military First," philosophy prioritizing the development of nuclear and missile capabilities "at the expense of" economic recovery, while its leadership rules through "a mixture of terror and the world's most intense personality cult."

16. **Kim Jong-Il** (Supreme Leader 1994–2011) and **Kim Jong-Un** (Supreme Leader 2011–Present) have long controlled North Korea's government and economy, directing state revenues to fund weapons development rather than for economic or other policy initiatives. In 2021, for example, the U.N. Panel of Experts reported that the DPRK "continues to prioritize the stability and continuity of the Kim family regime over all other national priorities, including

health and medical services and food security" and "has 'almost certainly' … diverted" any "humanitarian assistance" it received from foreign partners (purportedly to feed people) to Kim's inner circle "to meet the needs of the leadership."

17.     A central pillar of this network is **Office 39** (a/k/a **Daesong**). As BAT always knew, Daesong is sometimes spelled "Daesung" or "Taesong," among other ways, and Office 39 was sometimes referred to as "Bureau 39." As Treasury found on November 18, 2010, Office 39/Daesong is a "secretive branch of the government" of North Korea that manages the regime's illicit economic activities, "slush funds," and revenue generation. Treasury has designated Office 39 and its conglomerate, Daesong, as "key component[s]" of the regime's network supporting "arms and related materiel" trafficking.

18.     Office 39 operates closely with its front, Green Pine Associated Corporation ("Green Pine"), which Treasury (in 2023) and the U.N. Panel of Experts (in 2015) both found was responsible for about half of DPRK arms and related material exports, including technical assistance and weapons to IRGC-affiliated firms.

19.     The Reconnaissance General Bureau ("**RGB**") works in tandem with Office 39. Treasury sanctioned the RGB on April 19, 2011, having found that it is North Korea's "premier intelligence organization" and primary terrorist arm. As DoD reported in 2021, the RGB oversees "businesses in foreign countries, which are used as fronts for espionage, currency generation, … [and] weapon sales." DoD further reported that RGB operatives are highly trained in "explosives" and "assassinations."

20.     To move funds and arms, the DPRK (through Office 39/Daesong) uses Korea Mining Development Corporation ("**KOMID**"), Tanchon Commercial Bank ("**Tanchon**"), Korea Kwangson Banking Corporation ("**KKBC**"), and Foreign Trade Bank ("**FTB**").

21. These entities do not operate in silos; Office 39 and the RGB work together to assist the IRGC and Hizballah, including through KOMID, Tanchon, KKBC, and FTB.

22. The United States designated North Korea as a State Sponsor of Terrorism from 1988 to 2008, and redesignated it in 2017 after determining, as State reported to Congress in 2018 and 2023, that the regime "repeatedly provided support for acts of international terrorism," including the "shipment of weapons to terrorists and state sponsors of terrorism." North Korea's transfer of missiles and rockets to terrorists poses a paramount risk to America. As DoD found in 2006, North Korea may "threaten the United States … indirectly by transferring weapons or expertise to terrorists."

23. The IRGC was chief among North Korea's terrorist partners. According to DoD, North Korea maintained a "core group of recipient countries including … Iran" from 2002 to at least 2020. As noted in DoD reports to Congress in 2012, 2016, and 2018, through the Office 39/RGB network, North Korea exported "missile-related equipment, components, materials, and technical assistance" to the IRGC and Hizballah. Due to these missile threats, the United States has consistently employed a "maximum pressure" sanctions campaign targeting the DPRK's weapons proliferation and illicit finance networks.

24. To facilitate these missile exchanges, Office 39 flouted U.S. counterterrorism rules. In 2010, for example, the U.S. State Department ("State") reported to Congress that the DPRK "has not taken any steps to establish and implement a viable anti-money laundering/counterterrorist financing regime."

   **C. The IRGC Operates As A Global Terrorist Organization Dedicated To Targeting The United States**

25. Since April 1979, the IRGC has operated as a global terrorist organization targeting the United States. Unlike the armed forces of a nation, the IRGC is an "ideological

army" mandated by Article 150 of Iran's constitution to "export the Islamic Revolution" through "Jihad, for God's sake." To accomplish this goal while avoiding armed conflict with the United States, the IRGC often sponsors terrorist attacks against Americans through proxies.

26.     From 2007 through 2022, the IRGC sponsored thousands of terrorist attacks and attempted attacks throughout the world—including in, among other places, Iraq, Syria, Türkiye, Israel, Iran, Yemen, Saudi Arabia, Oman, Egypt, Afghanistan, India, the United Kingdom, France, Belgium, the Netherlands, Albania, Bulgaria, Kenya, Somalia, Thailand, and the United States. These attacks featured a wide array of arms and attack types, including by improvised explosive device, explosively formed penetrator, bomb, hostage-taking, cyber, small arms, sniper, mine, mortar, uncrewed aerial vehicle ("UAV"), rocket, and missile. While IRGC-sponsored rocket and missile attacks tended to be higher profile than most other attack types (as they usually targeted American diplomatic facilities or military bases in the Middle East), even in core IRGC-sponsored attack geographies in Iraq and Afghanistan, substantially less than ten percent of IRGC-backed attacks involved rockets, and less than one percent involved missiles.

27.     The IRGC operates through five primary branches: (1) the IRGC Qods Force ("IRGC-QF" or "Qods Force"), which plans and finances external terrorist operations; (2) the IRGC Intelligence Organization ("IRGC-IO"), the regime's most lethal intelligence arm; (3) the IRGC Aerospace Force ("IRGC-ASF"), responsible for missile and UAV attacks; (4) the Basij, a domestic paramilitary force; and (5) the IRGC Navy, which smuggles weapons and funds.

28.     The IRGC controls Iran's missile, rocket, and UAV programs.

29.     The United States has repeatedly documented the IRGC's terrorist attacks on Americans. On October 25, 2007, the United States designated the IRGC-QF as a Specially Designated Global Terrorist for providing "lethal support" to Iraqi terrorists targeting Coalition

forces. On April 15, 2019, the United States designated the entire IRGC (including its Qods Force) as a Foreign Terrorist Organization, finding that its "support for terrorism is foundational and institutional" and that it was responsible for killing at least 603 American servicemembers in Iraq. Congress similarly found that the IRGC is Iran's "primary arm … for executing its policy of supporting terrorist and insurgent groups." Countering America's Adversaries Through Sanctions Act ("CAATSA") § 105(a), Pub. L. No. 115-44, 131 Stat. 906, 22 U.S.C. § 9404(a)(2) (Aug. 2, 2017). As BAT always knew, when the United States, United Nations, media, or scholars described "Iran" in the context of terrorism, including its missiles and rockets, such references were to the IRGC (inclusive of its proxies) because the IRGC had exclusive control of the Iranian regime's terrorism portfolio, including its sponsorship of missile and rocket attacks.

### D. Hizballah Functions As The IRGC's Primary Terrorist Proxy

30.     In 1982, the IRGC founded Hizballah in Lebanon, establishing the group as its most important terrorist partner. Hizballah's 1985 "Manifesto" confirmed its subservience to the Iranian regime, declaring that the group "abide[s] by the orders" of the Ayatollah and that its "military apparatus is not separate from our overall social fabric." Consistent with this ideology, Hizballah's primary goal is the destruction of the United States (the "Great Satan") and Israel (the "Little Satan"). Every Hizballah operative swore a religious oath of loyalty to Ayatollah Khamenei during the relevant period.

31.     Hizballah functions as an IRGC division. Secretary General Hassan Nasrallah led it until he died in 2024, and he coordinated attacks with the IRGC. As State reported to Congress in 2015, the IRGC has "integrated" Hizballah into these operations to such an extent that the IRGC-ASF Commander admitted, "[t]he IRGC and Hizballah are a single apparatus jointed together." Nasrallah publicly admitted in 2015, "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran."

32.     Hizballah interfaces between the IRGC and Shia proxies in Iraq, including Kataib Hizballah, with whom Hizballah and the IRGC attacked Plaintiffs. In Iraq, Hizballah created Jaysh al-Mahdi ("JAM") and its Special Groups (including Kataib Hizballah) specifically to inflict mass casualties on Americans. Hizballah deployed instructors to prepare JAM for attacks against Americans, working alongside designated terrorists like Kataib Hizballah leader Abu Mahdi al-Muhandis to populate the terrorist cells that committed every attack against Plaintiffs.

33.     Hizballah has a formal role within Iran's missile and rocket enterprise. The IRGC transferred North Korean missiles and rockets (specifically 107mm and 122mm variants) to Hizballah. This collaboration allowed Hizballah to serve as a force multiplier, recruiting local members in high-terrorism-risk zones and equipping them with IRGC-supplied, North Korean-designed weaponry to target Americans in Iraq and Syria.

II.     **DEFENDANTS ILLEGALLY ENGAGED WITH NORTH KOREA, DESPITE ITS DECADES-LONG PARTNERSHIP WITH THE IRGC AND HIZBALLAH, TO DEVELOP AND DEPLOY WEAPONS TARGETING AMERICANS**

34.     For decades, North Korea, the IRGC, and Hizballah have collaborated in a joint weapons venture to develop, manufacture, and deploy missiles and rockets in anti-American terrorist attacks. The North Korea-IRGC-Hizballah joint weapons venture produced the specific missiles used to harm Plaintiffs—including *Qiam*- and *Fateh*-class missiles.

35.     The North Korea-IRGC-Hizballah joint arms venture was not a formal entity or enterprise. Rather, it was a joint effort by these terrorist actors to develop, refine, deploy, and use missiles and rockets against Americans and their allies. Defendants' misconduct aided those efforts specifically.

**A. North Korea, The IRGC, And Hizballah Entered A Joint Venture To Produce And Deploy Missiles In Terrorist Attacks Against Americans**

36.    The joint arms venture began during the Iran–Iraq War in the 1980s, when Iran purchased missiles and rockets from North Korea in a barter arrangement in which the two nations exchanged oil for weapons. During this period, North Korea provided technical aid to help Iran build a domestic missile production facility, which North Korea operated and staffed.

37.    From the 1990s through at least 2022, North Korea collaborated with Hizballah in the same way. Throughout, as was widely reported in real-time, North Korea regularly hosted delegations of high-ranking IRGC and Hizballah terrorists to negotiate weapons sales, receive training in terrorist tactics, and coordinate weapons development. For instance, Hizballah's former Secretary General Nasrallah, as well as its security and counterespionage chiefs, traveled to North Korea for training. Likewise, high-ranking IRGC commanders traveled to Pyongyang to negotiate missile purchases.

38.    By the late 2000s, this relationship had solidified. As DPRK scholar Larry Niksch testified before Congress in 2015, North Korea maintained "working ties with Iranian companies responsible for producing missiles," and regularly dispatched "missile experts" to upgrade the accuracy, lethality, and security of the IRGC's arsenal. IRGC officials, in turn, frequently visited North Korea to observe missile tests throughout the 2000s and 2010s. As the U.N. reported in 2020, North Korea "remains very active in the provision of services in the field of artillery rocket system improvement" and is "known for transferring blueprints" to its partners.

39.    Congress found that "cooperation between North Korea and Iran" included the "transfer of goods, services, technology, or intellectual property" relating to their respective missile and conventional weapons programs. CAATSA § 316(a).

40.     On July 23, 2014, a federal court likewise found, based on expert testimony, that

the DPRK (via Office 39), IRGC, and Hizballah collaborated as part of a joint arms venture:

> With respect to the rocket attacks, the Court finds that Iran assisted Hezbollah in the same respects North Korea did, most generally by providing the funds for the assistance. … [T]his whole thing [*i.e.*, DPRK missiles and rockets supplied to Hizballah,] was financed by Iran. If you would like to know how specifically that worked, the ***financing part of it came from what's called office number 39*** …. Office number 39 works directly with the [Islamic Revolutionary] Guard Corps, and then the funds and weapons are actually funneled out through them.

*Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014).

41.     Senior U.S. officials have publicly confirmed that North Korea, the IRGC, and

Hizballah operated a joint missile and rocket venture that directly threatened American

servicemembers in Iraq. In 2008, for example, Senator Joe Lieberman publicly warned:

> The Congressional Research Service … in a report earlier this year said, … 'North Korea's relationship with the Islamic Revolutionary Guard Corps … appears to be in two areas: ***Coordination in support for Hezbollah, and cooperation in ballistic missile development.***' … A detailed report in the *Los Angeles Times* … stated that many North Koreans are working on nuclear missile projects in Iran. … [A] recent study completed and issued by the U.S. Army Combined Arms Center … on the 2006 Lebanon War … found evidence that North Korea had provided various forms of support to the Lebanese Hezbollah, including weapons and technical support. … North Koreans' bad record here [raises substantial concerns whether] they really have stopped supporting some of the ***groups such as the IRGC that, according to evidence presented by the U.S. Army, is responsible for training and equipping Iraqi extremists*** who, in turn, are responsible ***for murdering hundreds of American soldiers***.

42.     In a 2013 congressional hearing entitled *Breaking the Iran, North Korea, and*

*Syria Nexus*, former CIA Director R. James Woolsey similarly testified that "North Korea helps

develop Iranian . . . ballistic missiles. ***North Korea and Iran effectively have a joint missile***

***program together***." And he explained that "the United States" was at risk of "***potential attacks***

***by the Iran-Syria-North Korea nexus and their terrorist proxies***" because "Iran and North

Korea have been able to maintain such a ***close relationship*** in the development" of "missile

programs, ***even extending it***" to "***Hezbollah***."

43.     Scholars have further detailed the mechanics of this partnership. In 2016, Ilan Berman testified to Congress that the "centerpiece of the budding Iran-North Korea relationship" was "***collaboration on strategic capabilities***." This included joint development of Iran's Shahab missile series, which is "closely based on North Korea's nuclear-capable No Dong medium range missile." Berman testified that "Iranian scientists and technicians . . . have had a front-row seat to the DPRK's ballistic missile development, regularly attending its missile launches since at least the early 1990s." And this partnership extended to the IRGC's "***terror proxy of choice: Lebanon's Hezbollah***," with the DPRK collaborating with Hizballah in constructing "elaborate underground tunnels in southern Lebanon."

44.     In 2021, Drs. Bechtol and Celso similarly observed that the "Iran–North Korea partnership" created a "vast technological and scientific infrastructure" through which "[m]uch of Iran's formidable arsenal of conventional and missile weaponry (much of it based on North Korean designs) has ***with Pyongyang's assistance been transferred to Tehran's regional proxies in Syria, Iraq, [and] Lebanon***," and this "***armament nexus***" enabled Iran to "develop[] Hezbollah into a formidable fighting force" capable of attacking the United States. In 2025, likewise, Drs. Bechtol and Celso observed that, with respect to "the role of North Korea in the modernization of Tehran's armaments industry" regarding "Iran's growing conventional capability and the role of the IRGC in the development of Lebanese Hezbollah" and "Iraqi Popular Mobilization Forces (PMF)"—always led by Kataib Hizballah—"***[m]any of these groups have been trained and equipped with North Korean arms*** by the IRGC elite Quds Force. In short, the ***North Korea–Iran nexus has enhanced the fighting capability of a host of Middle Eastern terror groups*** that threaten vital American security interests in the Middle East."

45.     The United States regularly warned (including during the 2013 congressional hearing titled *Breaking the Iran, North Korea, and Syria Nexus*) that this "joint missile program" between North Korea, Iran, and Hizballah posed a direct threat to American forces. As early as 1999, the House North Korea Advisory Group reported that North Korea's missile proliferation activities to the IRGC "***created an immediate, serious and growing threat to U.S. forces, interests, and allies … in the Middle East.***" And in 2010, DoD warned that as North Korea and Iran fielded new missile systems, "U.S. forces deployed forward will no longer enjoy the relative sanctuary that they have had in conflicts since the end of the Cold War."

46.     To combat this threat, the United States imposed robust sanctions on the North Korean entities proliferating weapons to the IRGC. As senior Treasury counterterrorism official Daniel Glaser publicly testified to Congress in 2006, the financial attack against proliferators was "***related to our effort to combat terrorism***," as state sponsors like North Korea and Iran "intentionally obscure the nature of their financial activities … through the use of front companies and intermediaries." Despite these sanctions, the North Korea-IRGC-Hizballah joint arms venture continued throughout the period relevant to this Complaint. In 2008, for example, the Congressional Research Service published an analysis highlighting North Korea's and Iran's "***joint venture partnership to develop missiles inside Iran***." In 2025, likewise, Drs. Bechtol and Celso observed that, with respect to how "the strategic partnership between Pyongyang and Tehran" created "dire security implications" for "Middle Eastern security," the West's "financial sanctions" sought to "weaken the ***North Korean–Iranian weapons-for-money nexus***."

### B. North Korea Exported Its Missile Technology And Expertise To The IRGC And Hizballah

47.     North Korea played at least four key roles in the joint arms venture that supplied the missile, rocket, and UAV-related weapons, training, and tunnels used to attack Plaintiffs.

### 1. Procurement and Export of Advanced Weaponry

48.     First, North Korea procured and exported missiles, rockets, UAVs, components, and technology to the IRGC and Hizballah.

49.     Decades of reports published by the United States, United Nations, media outlets, and scholars confirmed that there was an inextricable nexus between the DPRK (including through Office 39) and Iran (through the IRGC and Hizballah, among others) supporting missile and rocket attacks targeting the United States in the Middle East. In 2001, for example, the *Washington Times* reported that "North Korea sends missile parts, [and] technology to Iran," and the National Intelligence Council reported that North Korea "has helped countries to acquire technologies to serve as the basis for domestic development efforts—as with Iran's reverse-engineering of the No Dong in the Shahab-3 program." In 2003, similarly, the Congressional Research Service reported that Iran is "reliant on foreign suppliers" for "critical technology" for its "missiles," for which one critical "foreign supplier[]" is "North Korea."

50.     Similar reports confirming this inextricable nexus were common throughout Defendants' decade-long partnership with the DPRK, including, but not limited to, as follows:

a.      2008: State transmitted a cable (as published online) noting that Pyongyang "continues to sell ballistic missile-related technology" to Iran, offering everything from "complete systems" to "production technology," and that "Iran is one of North Korea's key missile customers," having incorporated North Korean technology into the Shahab-3, which is based on the North Korean No Dong missile.

b.      2010: the U.N. Panel of Experts reported that North Korea has "provid[ed] missiles, components, and technology to . . . the Islamic Republic of Iran."

c.      2011: in an analysis entitled *The Hizballah-North Korean Nexus*, scholar Carl Wege observed that the "mutually beneficial relationship that developed between Iran and North Korea secondarily benefits Hizballah with Iran financing North Korean efforts that strengthen Iran's Lebanese ally" through which "Hizballah receives assistance from North Korea that could not be readily furnished otherwise by Iran."

d.      2013: in the *Breaking the Iran, North Korea, and Syria Nexus* congressional hearing, Dr. David Albright testified that "the ***threats posed by … the Iran-Syria-North Korea***

***proliferation nexus*** " could "facilitate ... missile advances by both countries," *i.e.*, Iran and the DPRK.

e.     2013: in the *Breaking the Iran, North Korea, and Syria Nexus* congressional hearing, Representative Steve Chabot warned that the DPRK is "a one-stop shop for missile ... technology," which it shared "with the likes of Iran," with which it has a "long and enduring relationship."

f.     2015: in the congressional hearing entitled *The Iran-North Korea Strategic Alliance*, scholar Ilan Berman testified that "Asia's position as a hub for defense technology, including ***critical assistance to Iran's ballistic missile ... programs*** " supplied the "context" in which "North Korea has emerged as what is arguably Iran's most important regional ally."

g.     2015: Representative Ted Deutsch observed during a congressional hearing that "legislative efforts to strengthen Iran, North Korea, Syria Nonproliferation Act" [INKSNA] sought to "focus on the ***nexus between these three regimes and their quest for weapons*** " because "the ***relationship between Iran and North Korea with respect to illicit procurement is vital to the Iranian regime['] s efforts to circumvent international sanctions*** "; "INKSNA was enacted and subsequently amended to shut down illicit procurement and transfers."

h.     2016: John R. Haines, a scholar at the Foreign Policy Research Institute, noted that the "existence of an ***Iran-North Korean nexus around missile technology is indisputable*** ."

## 2.     Institutional Collaboration and Development

51.     Second, North Korean specialists collaborated with the IRGC and Hizballah to develop and produce missiles and rockets, sharing technical expertise and exchanging test data.

52.     Decades of reports published by the United States, United Nations, media outlets, and scholars confirm that point. In 2003, for example, the *Los Angeles Times* reported that "North Korean technicians worked for years helping Iran develop the Shahab-3 missile, unveiled last month in Tehran. A foreign intelligence official and a former Iranian intelligence officer said the Koreans are now working on a longer-range Shahab-4." In 2006, the *New York Times* reported that "[f]or years North Korea has supplied Iran with missile technology," and "[t]he North Koreans know the Iranians, and their weapons programs, intimately." And in 2009,

similarly, the Congressional Research Service reported that "[m]any experts believe that Iran's Shahab-3" was "a derivative of the North Korean No-Dong 1 ballistic missile."

53.    IRGC specialists frequently visited North Korea to collaborate on weapons development. In 2010, for example, the Congressional Research Service reported that "Iranian delegations of missile experts and Iranian Revolutionary Guard officials reportedly attended the July 2006 and April 2009 test launches of the Taepong II long range missile." And in 2017, an Iranian democracy group with extensive contacts inside Iran, the National Council of Resistance of Iran ("NCRI"), reported that "delegations of the IRGC's aerospace constantly travel to North Korea and exchange knowledge, information and achievements with North Korean [missile and rocket] specialists" and "since nuclear negotiations in 2013, this trend has not stopped and North Korea's experts constantly travel to Iran while the IRGC's missile experts visit North Korea."

### 3.    Embedded Operatives in the Middle East

54.    Third, North Korean operatives embedded directly into IRGC and Hizballah arms procurement, research, and manufacturing units. By 2003, as the *Los Angeles Times* reported, there were so many North Koreans working on missile projects in Iran that many Iranian facilities, including a Tehran hotel and a Caspian Sea resort, were reserved for their sole use.

55.    As scholar Larry Niksch testified to Congress in 2015, this "institutional collaboration" involved at least "several hundred" North Korean specialists embedded with IRGC and Hizballah units throughout the 2010s. Scholar Dr. Andrea Berger also reported in 2015 that Office 39 front Green Pine and arms dealer KOMID maintained offices in Iran and Syria that were regarded as "permanent arrangements." By 2017, the *Washington Times* reported that Iran played "permanent host" to North Korean scientists, establishing residences in Tehran for DPRK technicians who aided the IRGC's missile design, testing, and development.

56.     NCRI confirmed in 2017 that IRGC missile sites were based on "North Korean models and blueprints." According to the same NCRI report, North Korean experts trained IRGC personnel and maintained a "continuous presence" in key industries, including building warheads and guidance systems. The U.N. corroborated this, reporting in 2019 that KOMID and Green Pine "maintain active offices in the Islamic Republic of Iran" and that at least three KOMID representatives remained in Iran under diplomatic cover. Through this cooperation, North Korea and Iran jointly produced missiles for the IRGC and Hizballah.

57.     From 2007 through 2023, a network of North Korean operatives acting on behalf of Office 39 and the RGB operated in Iran, Lebanon, and Syria, using financial and commercial fronts to support North Korea's missile-proliferation activities.

58.     One such front was Hong Kong Electronics, an Office 39-controlled entity based on Iran's Kish Island that exploited the island's notorious status as an IRGC logistics hub to facilitate IRGC-sponsored attacks. On June 30, 2009, Treasury designated Hong Kong Electronics under EO 13382, which "freezes the assets of designated proliferators." Treasury determined that "Hong Kong Electronics, located in Kish Island, Iran, has been designated for providing support to North Korea's Tanchon Commercial Bank (Tanchon) and Korea Mining Development Trading Corporation (KOMID)," and explained that "North Korea uses front companies like Hong Kong Electronics and a range of other deceptive practices to obscure the true nature of its financial dealings." Treasury further concluded that the designation was "part of our overall effort to prevent North Korea from misusing the international financial system to advance its … missile programs and to sell dangerous technology around the world," and specifically found that "Hong Kong Electronics has also facilitated the movement of money from Iran to North Korea on behalf of KOMID."

59.     The same DPRK network that facilitated IRGC missile and rocket purchases also relied on Green Pine, which had a substantial on-the-ground presence in Iran. Key resident operatives included Kang Kyong Il and Ri Sung Il (Green Pine representatives in Tehran); Jang Yong Son, Kim Yong Chol, Ha Won Mo, Kim Hak Chol, and Ri Hyong Thae (Iran-based agents for KOMID); and Pak Sin Hyok and Ri Kuk Myong (Tehran-based Office 39 agents operating under fake diplomatic cover). In Syria, Office 39 agents Jo Yong Chol and Kang Ryong facilitated arms sales delivered to Hizballah via the Assad regime.

60.     Senior North Korean officials regularly traveled to Iran to coordinate this aid. This included Ri Jong Chol (Chief of KOMID 1st Office), Kang Myong Chol (Chair of KOMID), and Ri Hak Chol (President of Green Pine). Beyond leadership, the U.N. reported in 2021 that at least thirteen other DPRK specialists traveled to Iran to support KOMID.

61.     North Korean missile specialists thus provided systemic instruction and training to their IRGC and Hizballah allies on how to develop, refine, and deploy missiles and rockets to deadly effect.

### 4.     Underground Fortifications

62.     Fourth, throughout the 2000s and 2010s, North Korea constructed extensive underground fortifications for the IRGC and Hizballah. Modeled after North Korean sites, these tunnels allowed the IRGC and Hizballah to clandestinely store missiles and rockets, protecting their arsenals from U.S. strikes while providing secure launch locations.

* * *

63.     In sum, North Korea provided the essential hardware, know-how, and personnel that allowed the IRGC to target U.S. forces, without which the IRGC's missiles would have been less accurate, effective, and secure. *See infra* ¶¶ 85-91, 215-225. As Professors Bechtol and Celso concluded in 2018, the "overwhelming majority" of Iranian missiles tested or used to

attack others "have had their genesis in North Korea." And as they summarized the decades-long

pattern in 2025, "if you see it in North Korea today, you will see it in Iran tomorrow."

### C. The IRGC And Hizballah Integrated North Korean Weapons Systems Into Their Attacks

64.     The joint weapons venture enabled the IRGC's terrorist attacks against Plaintiffs.

From the 2000s through at least 2022, a cadre of IRGC and Hizballah terrorists partnered with

DPRK operatives to facilitate attacks targeting the United States and allies, including:

a.      <u>IRGC Leadership</u>: Qasem Soleimani (Qods Force Commander until 2020), Esmail Qaani (Qods Force Commander post-2020), Amir Ali Hajizadeh (IRGC Aerospace Force Commander), and Mohsen Rezai (former IRGC Commander-in-Chief).

b.      <u>Foundation for the Oppressed</u>: Mohsen Rafiqdoost (IRGC Founder and self-identified "father of the Iranian missile program"), Mohammed Forouzandeh (former IRGC Commander-in-Chief), and Parviz Fattah (senior IRGC terrorist).

c.      <u>Missile & Research Officials</u>: Asghar Esma'ilpur (Shahid Hemmat Industrial Group (SHIG) Department 7500), Mohammad Gholami (SHIG research official), and Seid Mir Ahmad Nooshin (key negotiator with the DPRK).

65.     In 2006 in Lebanon, for example, the IRGC and Hizballah made prolific use of

missiles and rockets that relied on North Korean assistance. A 2010 Congressional Research

Service report noted that Israel's Mossad had concluded "'vital missile components' of

Hezbollah missiles fired into Israel … came from North Korea."

66.     A federal court confirmed these facts in 2014. Based on "clear and convincing

evidence," the Court found:

> North Korea worked in concert with Iran … to provide rocket and missile components to Hezbollah. ... These rocket and missile components were intended by North Korea and Hezbollah to be used and were in fact used by Hezbollah to carry out rocket and missile attacks against Israeli civilian targets. ... As a result of North Korea's provision of material support and resources, Hezbollah was able to implement and further goals shared by Hezbollah and North Korea.

*Kaplan*, 55 F. Supp. 3d at 193. The Court found the DPRK gave Hizballah "advanced weapons,

expert advice and construction assistance in hiding these weapons in underground bunkers, and

training in utilizing these weapons and bunkers to cause terrorist rocket attacks." *Id*. at 200.

67.     This collaboration has persisted. Secretary of Defense Robert Gates publicly confirmed in 2010 that, "North Korea continues to smuggle missiles and weapons" to "Iran" and "Hezbollah." Writing in 2025, Professors Bechtol and Celso observed that Hizballah had become "increasingly dependent on North Korean weapons and expertise" since the late 2000s.

### D.  Cigarette Revenues Provided Vital Financing For Attacks Enabled Through The North Korea-IRGC-Hizballah Joint Weapons Venture

68.     Authoritative sources confirmed the tight connection between North Korea's illicit cigarette trade and the DPRK's ability to support missile and rocket attacks.

69.     In 2006, during a congressional hearing entitled *North Korea: Illicit Activity Funding the Regime*, Peter Prahar, a senior official at State's Bureau for International Narcotics and Law Enforcement Affairs, testified that "cigarette counterfeiting … may be the single most lucrative item in [North Korea's] portfolio" and is a "major source of income to the regime." Prahar also testified that this illicit revenue "contribute[s] to the financing of DPRK weapons development by a state that is listed as a state supporter of terrorism."

70.     In 2007, Professor Bechtol explained that "North Korea's illicit economic activities," including "the manufacturing and distribution" of "cigarettes," "finance Kim Chong-il's military (including … missile programs)."

71.     During the roll-out of enhanced sanctions in August 2010, Treasury Under Secretary Stuart Levey warned that North Korea's "belligerent behavior"—including "its missile launches"—was "facilitated by a lifeline of cash generated through a range of illicit activities," including "selling counterfeit cigarettes."

72.     During a House hearing in 2013, Representative Eliot Engel warned that the "North Korean regime's criminal conduct" included "weapons trafficking, the sale of … missile

technology" to "Iran," and "the counterfeiting of … cigarettes"; and that "[p]roceeds from these criminal activities … [a]re also invested in North Korea's military programs."

73.     This connection between cigarettes and weapons was by design: the same entity—**Office 39**—was responsible for both endeavors. Office 39 served as the central node for operating North Korea's foreign-currency-earning activities. As a 2004 DoD analysis explained, Office 39 was "the nerve center of Pyongyang's legal and illegal ventures" and oversaw the "apparatus for securing foreign currency for Kim Chong-il's use."

74.     Office 39 operated as a "network of networks." As Dr. Sheena Chestnut explained in 2007: "Operating through front companies and illicit affiliates, Bureau 39 is one of several Central Committee offices that procure luxury items for party and military elites, obtain technology and components for arms programs, and pursue illicit activity to fund the first two tasks. In network theory terms, Bureau 39 is the core node of the North Korean–directed wheel network." In 2025, Dr. Bechtol reported that "all of North Korea's . . . illicit activities, including military proliferation," were "ultimately controlled by the infamous Office 39."

75.     Office 39 was controlled directly by the North Korean leadership. As DPRK scholars Daniel Tudor and James Pearson reported in 2015, Office 39 was established by Kim Jong-Il himself to serve as the heart of the DPRK's "Soprano economy." Accordingly, as Dr. Bechtol observed in 2007, Office 39 has always "been under the supervision and guidance of the 'Dear Leader.'" Indeed, according to Dr. Bechtol and Celso's analysis in 2025, Office 39's mission is simple: "to generate funds for the regime." Defectors report that Office 39 "monopolised" any profitable sector, accounting for "30 to 40 per cent of the total economy," with profits ending up "in the coffers of the Kim family regime," according to a report published

by the Australian Broadcasting Corporation in 2018. As DPRK scholar Paul Rexton Kan observed in 2017, Office 39 is often called "Kim's Cashbox."

76. Office 39 utilized a network of front companies known as the **Daesong** conglomerate (or Daesong group) to conduct its operations. For example, according to an analysis by Kan and others published by the U.S. Army in 2010, "Office #39 and all of its subordinate organizations have become known within North Korea as the Daesung Conglomerate." The *Wall Street Journal* reported in 2010 that "Office 39 also runs legal businesses under a state-owned shell corporation known as the Daesong Group."

77. Because Daesong was a component of Office 39, there was a direct line of control from the Kim regime to Daesong front companies. As DoD noted in an analysis published in 2004, "Bureau 39 personnel" were "part of an elite with information, money, and a pivotal role in the Kim Jong-il regime." In the same DoD-published analysis in 2004, a former Office 39 operative confirmed: "if it goes to Bureau 39, it is the same as sending it to Kim Jong-il."

78. Through Daesong, Office 39 directed North Korea's cigarette manufacturing and smuggling. A 2010 U.S. Army report noted that Office 39 "directs illicit activities" including "the manufacture and distribution of counterfeit cigarettes." A 2009 investigative report by *Vanity Fair* similarly warned that Office 39 was "at the center" of the trade, with its elite headquarters staff supervising "large-scale facilities such as … cigarette factories."

79. BAT's cigarette joint venture in North Korea was part of this Daesong group: the joint venture company was named "**Daesong-BAT**." *See infra* Part III(B). Profits from this joint venture flowed to Office 39.

80. From there, these profits financed North Korea's missile development and the North Korea-IRGC-Hizballah missile joint venture. A 2010 U.S. Army analysis explained that,

"[t]hrough its offices in Pyongyang, [Office 39] operates through government and KWP-run front companies such as Daesung. … This Office, in turn, answers directly to Kim Jong-il," who "has maintained direct supervision over Office #39." According to the Army, Kim "task[ed] it with the mission of earning foreign currency to fund regime maintenance," including "providing funds for Kim Jong-il's personal use; and providing for luxury goods that Kim Jong-il uses to reward the regime's military … as well as the needs of the regime security agencies." But, as the Army explained, "[j]ust as importantly, … for … U.S. policy on North Korea, ***at least a portion of the foreign currency funds that Office #39 generates for Kim Jong-il go to investing in North Korea's … missile programs***."

81. The same U.S. Army analysis featured a flow-chart confirming that "Office #39" profits generated funds for Kim as Supreme Leader.

 

82. In 2006, the Congressional Research Service reported that Office 39 uses its profits to "procure overseas components for North Korea's weapons of mass destruction programs." Office 39 thus operated as a "vast criminal enterprise" set up to "finance [North Korea's] nuclear-weapons and ballistic-missile programs," as *Vanity Fair* reported in 2009.

83. Office 39 also transmitted the proceeds of North Korea's weapons sales to Iran. As the *Vancouver Sun* reported in 2006, "Room 39 … is also the laundry for the proceeds of drug trafficking and the sale of weapons, including missiles … to countries such as Iran." Professor Bechtol explained in 2023 that "'[t]he money coming from the sale of knowledge or

products to Iran is managed by 'Office 39' …. This money goes, among other things, to military projects and nuclear development.'"

84.     Office 39 was responsible for "all crime-for-profit activity" in North Korea and its coordination of this system was "exercised at the top," as the Congressional Research Service reported in 2006. An analysis published by the U.S. Army in 2010 concluded that the "crimes organized by Office #39" aimed to "prop up" North Korea's "armed forces and to fund its military programs." In this way, North Korea operated like "criminally financed insurgent groups like the Revolutionary Armed Forces of Colombia (FARC), or the Taliban." As DPRK scholar Paul Rexton Kan explained in 2017, profits generated by Office 39 have given "the regime enough economic vitality to pursue nuclear weapons and ballistic programs." Indeed, according to Kan, Office 39 "financ[es] the weapons' programs of the regime," and "[t]his nexus between illicit finances and sophisticated weapons programs appears to have become tighter under the leadership of Kim Jong Un."

### E.  The North Korea-IRGC-Hizballah Joint Weapons Venture Produced The *Qiam*- And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs

85.     Office 39's illicit tobacco profits did not sit idle. The DPRK regime reinvested these illicit proceeds directly into the North Korea-IRGC-Hizballah joint weapons venture, funding the development of missiles and related technology used to harm Plaintiffs.

86.     In July 2020, the U.S. Army published an intelligence analysis confirming that the specific missiles the IRGC fired in its January 8, 2020 Attack against Plaintiffs had been upgraded with DPRK aid. According to that analysis, the attack revealed the IRGC's capability to fire missiles with "better precision," achieving an accuracy of within 12 meters compared to previous estimates of 250 meters. These missiles, equipped with satellite navigation and

maneuverable reentry vehicles ("MaRV"), showed how the IRGC "leverage[s] countries like North Korea . . . to extend missile variety and range."

87.     The IRGC achieved this improved accuracy by retrofitting older models with guidance systems to "vastly improve accuracy," as the *Washington Post* reported in 2020. This included the *Qiam* missile and the *Fateh-110*, a model provided to Hizballah, which were refitted to "zero in on highly specific targets." According to an analysis in 2020 by Behnam Taleblu, of the Foundation for Defense of Democracies, these missiles, components for which are supplied by Iran Electronics Industries ("IEI"), reflected "more than a decade of investment" and North Korean collaboration.

88.     *Fateh* missiles are relatively light-weight, solid-fuel missiles. As *Military Watch* reported in 2018, their solid-fuel design means they can "be stored fully fuelled" and thus have a reduced "required launch time," which makes them "highly practical" and "particularly favoured" by the IRGC and Hizballah.

89.     North Korea played a vital role in developing those missiles for the IRGC. As *Military Watch* reported in 2018, the IRGC received North Korean assistance to develop the *Fateh*, including upgrades like a "new composite body" and "superior fuel composite." The National Council of Resistance of Iran similarly reported in 2017 that the *Fateh-110* was "modeled after North Korean" missiles. This aid allowed the IRGC to unveil the *Fateh-313*, which offered improved precision sufficient to target U.S. bases.

90.     *Qiam* missiles are also the product of deep DPRK-IRGC collaboration. Based on the North Korean Scud-C, the *Qiam* was "likely enhanced with North Korean assistance," according to Dr. Bechtol's 2020 analysis. First tested in 2010—at the height of BAT's scheme— the *Qiam* was designed specifically to strike U.S. military bases in the Middle East.

91.     Between 2010 and 2020, North Korea helped the IRGC upgrade the *Qiam* to add a MaRV, drastically improving its accuracy.

## III.    DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES

92.     For decades, while the United States and the international community worked to prevent North Korea's weapons proliferation—issuing warnings and escalating economic sanctions—BAT undermined those efforts by deliberately operating a cigarette-manufacturing joint venture with DPRK fronts.

93.     BAT's guilty plea and settlement agreements in 2023 confirmed what the United States and United Nations had warned for decades: cigarette smuggling directly finances DPRK missile proliferation to the IRGC and Hizballah. Despite these warnings, BAT operated its scheme with North Korea for nearly two decades. BAT's scheme began and evolved against the backdrop of increasingly urgent warnings from the United States and U.N. about the direct link between cigarette smuggling and DPRK missile proliferation to the IRGC and Hizballah.

### A.    Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties

94.     BAT's illicit cigarette joint venture traces back to the mid-1990s, when the company sought to capture the untapped North Korean market. Internal documents confirm that BAT viewed North Korea as a critical opportunity to hook new smokers, despite simultaneously recognizing the regime as a hotbed for cigarette counterfeiting and weapons proliferation.

95.     In June 1994, BAT executive Patrick O'Keeffe laid out the strategy in an internal memorandum. He proposed exporting a "trial order" of 4 million State Express cigarettes to "a North Korean Company" not merely for revenue, but to establish "trademark use" that would enable BAT's legal department to "apply pressure against the counterfeiters currently manufacturing and exporting from North Korea." O'Keeffe noted that the opportunity "would

provide us with a reason to visit North Korea," even while acknowledging that doing business there was "***obviously sensitive given the current political issues on Nuclear bombs existing between North Korea and the USA***."

96.     O'Keeffe's memo coincided with the U.S. announcement in June 1994 seeking a mandatory arms embargo against North Korea due to its nuclear proliferation. President Clinton publicly warned that North Korea "deal[s] with a lot of rogue states that support terrorism," and U.S. officials identified Iran as "the most likely customer for North Korean nuclear materials."

97.     Undeterred, BAT accelerated its plans. An October 1994 BAT memorandum highlighted that it was "actively progressing long term business opportunities" in North Korea, noting that "a new route for direct shipments to Pyongyang has started." By November 1994, BAT's smuggling partner, Singapura United Trading Ltd. ("**SUTL**"), confirmed in writing to BAT it had "identified a customer for 555 [brand cigarettes] for North Korea" and that BAT employees would visit Pyongyang the following February.

98.     By March 1996, senior BAT executives were negotiating directly with high-ranking North Korean officials. Consistent with the regime's practice of using regime officials to manage lucrative joint ventures, BAT worked closely with **Choe Tae-Bok**, a notorious regime insider and Secretary of the Workers' Party of Korea Central Committee.

99.     In a March 1996 telex to BAT, Choe informed Defendants that he had "spent alot of time to discuss market-occupation for [BAT's] 555 ciga[rette] . . . and, at last, succeeded to get authorization from [the DPRK] government." He emphasized BAT's exclusivity, stating the company "can not deal with other Korean compan[ies]," and referenced an upcoming visit by a BAT delegation to Pyongyang. At the time of this correspondence, Choe was widely known as

the spokesman who announced North Korea's exit from the Nuclear Nonproliferation Treaty and as a vocal supporter of Iran's anti-American stance.

100. At the same time, BAT's internal monitoring confirmed that the entities BAT sought to partner with were involved in illicit activities. In June 1996, BAT's in-house technology department's testers identified counterfeit cigarettes manufactured by Daesong—the Office 39-managed conglomerate that would later become BAT's joint venture partner.

101. On September 23, 1996, Congress passed the Defense Against Weapons of Mass Destruction Act, Pub. L. 104–201, 110 Stat. 2715, identifying North Korea and Iran as hostile states possessing WMDs and warning that they could transfer such weapons to terrorist movements. Two months later, BAT's subsidiary, Brown & Williamson, presented a plan to BAT's managing board stating that despite high tensions, "we will position ourselves to capitalize on any opportunities."

102. Throughout 1997, according to a contemporaneous BAT document, Defendants continued to "monitor the entities involved in the North Korean counterfeit operation," specifically fearing that counterfeiters were procuring materials to counterfeit BAT's brands.

103. Around the same time, in 1998, the CIA publicly warned that the DPRK was the "world's biggest missile exporter," selling missiles to rogue regimes in the Middle East.

104. In November 1999, a House North Korea Advisory Group report alerted BAT about the risk that its partnership with Daesong would result in DPRK-backed, Iranian sponsored missile attacks targeting American servicemembers in the Middle East. Among other things, the House North Korea Advisory Group publicly reported:

a. "North Korea ranks … as one of the ***greatest missile threats*** in the world due to: the progress made over the past five years in improving its missile capabilities; [and] its record as a leading proliferator of ballistic missiles and missile technology."

b.   North Korea had "***produced, deployed and exported missiles to Iran***," and in doing so, "North Korea undermined regional stability in the Middle East" and its "proliferation activities pose an increasing threat to American and allied interests globally," including "in the Middle East."

c.   North Korea "continues to harbor terrorists."

d.   After receiving DPRK weapons, Iran could, in turn, "***export missiles to other countries or even subnational groups***"—*i.e.*, its terrorist proxies, such as Hizballah. Thus, North Korea's proliferation of missiles to Iran and its terrorist allies "created an immediate, serious and growing threat to U.S. forces, interests, and allies ... ***in the Middle East***," and "***increase[d] the chance that the United States and its allies could face missile attacks***."

e.   "Press reports citing North Korean defectors indicate that North Korea created an office specifically to bring in foreign currency. This so-called '***Bureau No. 39'*** functions under the ruling Korean Worker's Party, which is headed by North Korean Leader Kim Jong Il. The office is in charge of … criminal activity including: smuggling [and] counterfeiting … The ***money earned is used to … finance military activity – particularly technology and electronic purchases for intelligence and military purposes***."

The House North Korea Advisory Report was widely republished by media outlets in real time, including, but not limited to, reports published that month by the *Associated Press*, *United Press International*, *Philadelphia Inquirer*, *Cleveland Plain Dealer*, *St. Louis Post Dispatch*, *Kansas City Star*, *Boston Globe*, *Sinocast*, and others.

105.   Unfazed, BAT pushed ahead. The same month the House North Korea Advisory Report warned that Daesong enabled the IRGC's and Hizballah's missile threat against American servicemembers in the Middle East, BAT published an internal order that business "activity in North Korea should be increased."

106.   By 2000, BAT was actively managing the fallout from accusations that it facilitated smuggling. A handwritten note from that year documented BAT's "cover-up themes," noting that sales through SUTL didn't "nec. [necessarily] imply knowledge of smuggling" and characterizing allegations of BAT-sponsored smuggling as "well founded but lacking context."

107.   In July 2000, amidst media reports that BAT's smuggling profits were allegedly "used to fund the terrorist group Hizbullah," BAT Chairman Martin Broughton blithely

dismissed the concerns, telling *Newsweek*: "***I don't think it's our responsibility to act as a policeman.***" Months later, according to BAT's meeting minutes, its board discussed "potential contract manufacture in North Korea" and ultimately approved the joint venture with the regime.

### B. Defendants Formed A Joint Venture With A North Korean Front Called Daesong, Operated By Office 39

108.    From 2001 through 2017, the United States, the United Nations, and the global media issued high-profile warnings that North Korea was using its revenue to finance missile and rocket proliferation to the IRGC and Hizballah. North Korea's own public acts—including nuclear tests and arms exports to terrorists—corroborated these warnings.

109.    BAT knew of these facts and the sanctions designed to address them. Rather than cut ties with North Korea, Defendants responded by conducting hundreds of millions of dollars in clandestine cigarette manufacturing. For at least a decade, BAT operated in secret partnership with Office 39 and the RGB, using deceptive front companies and DPRK banks notoriously connected to the weapons proliferation that targeted Americans.

110.    In 2001, BAT's wholly owned Singapore subsidiary, **BAT Singapore**, commenced a joint venture cigarette manufacturing business in Pyongyang with Korea Sogyong Chonyonmul Trading Corporation (identified in DOJ documents as North Korean Tobacco Company or "**NKTC**"). The joint venture was named **Daesong-BAT**.

111.    BAT Singapore held a 60% stake in the joint venture, supplying the machinery, tobacco, and technical management. The remaining 40% was held by NKTC, a state-owned entity controlled by Office 39.

112.    As BAT brought this venture online, the United States designated North Korea's proliferation network as a threat to America, citing its support for Iran. On January 30, 2001, the United States sanctioned Changgwang Sinyong Corporation (a/k/a KOMID) for violating the

Iran Nonproliferation Act by exporting missile technology to Iran. The BBC reported the sanction in a piece titled "US Imposes Sanctions On North Korean Firm Over Ties With Iran."

113.     By January 2002, President Bush declared North Korea and Iran part of an "axis of evil" warning that "North Korea is a regime arming with missiles" while Iran, in turn, "aggressively pursues these [North Korean] weapons and exports terror," a pronouncement that received global media coverage that BAT monitored. According to a February 2002 *Reuters* report, for example, "Bush aides say North Korea is pursuing biological arms and selling ballistic missile technology to Iran."

114.     Despite these warnings, BAT continued operations in North Korea as the United States tightened sanctions on the very network BAT was funding.

115.     On December 1, 2004, the United States imposed new sanctions on KOMID for supplying missile goods to the IRGC, which State announced with a press release entitled "U.S. Penalizes Chinese and North Korean Firms for Missile Aid to Iran." BAT knew of these designations through its monitoring of U.S. sanctions announcements and international press reports, including those by the *Associated Press*, *Voice of America*, and *Fox News*.

116.     On June 28, 2005, President Bush issued **Executive Order 13382**, which designated key nodes in the North Korea–Iran arms network, including KOMID (the DPRK's primary arms dealer), Tanchon (its financial arm), and IRGC-affiliated armorers Shahid Hemmat Industrial Group ("SHIG") and Shahid Bakeri Industrial Group ("SBIG"). As Treasury later observed in 2007, E.O. 13382 "put[] the international community on notice about the threat" these North Korean and Iranian firms "pose to global security as a result of their activities."

117.     On September 20, 2005, Treasury designated Banco Delta Asia ("BDA") as a Primary Money Laundering Concern under the USA PATRIOT Act. Treasury found that BDA

was a "willing pawn" for North Korean front companies engaged in "smuggling counterfeit tobacco products." 70 Fed. Reg. 55,214. This action directly affected BAT, which had funds frozen at BDA. Recognizing the threat, BAT and NKTC executives met in October 2005 to discuss how U.S. sanctions targeting the DPRK-Iran arms trade would jeopardize their ability to repatriate profits from the cigarette joint venture.

118.    BAT's partnership with Office 39 soon became a scandal. On October 17, 2005, *The Guardian* revealed that BAT had "secretly been operating a factory in North Korea" via a joint venture with Office 39. In response to concerns about "North Korea's human rights record," a BAT "company spokeswoman told the *Guardian*: 'It is not for us to interfere with the way governments run countries'" and promised that "BAT could 'lead by example' and assist the [DPRK]'s development." Another BAT spokesperson responded more candidly: "'Business with North Korea?' … 'Where there are no human rights?'"

119.    Similar concerns soon arose for BAT's role in Office 39's missile transfers to DPRK allies like the IRGC. On February 8, 2006, *Asia Times* published a detailed exposé titled "Smoke Signals from BAT's North Korea Venture," connecting BAT's partner, NKTC, to Office 39 and WMD proliferation. *Asia Times* reported that NKTC shared contact information with entities associated with North Korean weapons programs and warned that "***the black-market trade of cigarettes could have a tangible impact on North Korea's [arms] financing***." *Asia Times* further identified that the "Daesong" name in the joint venture linked it to the Daesong General Trading Corp., a known Office 39 front tied to missile and rocket proliferation.

120.    On June 13, 2006, Treasury, acting under E.O. 13382, publicly designated multiple companies for supplying missile-related and dual-use components to IRGC missile and rocket programs, expressly identified Iranian missile systems including *Fateh*-class missiles, and

tied those programs to North Korean-designed arms produced under license. Treasury further warned that such conduct—often carried out through third-country intermediaries—constituted sanctionable support for missile and rocket proliferation networks.

121. In July 2006, the DPRK launched multiple missiles. Congress responded with the North Korea Nonproliferation Act of 2006, Pub. L. 109-353, 120 Stat. 2015 (Oct. 13, 2006), aimed at penalizing North Korea, Iran, and Syria for their arms cooperation.

122. On October 9, 2006, North Korea tested a nuclear weapon. The U.N. Security Council responded with Resolution 1718, which, among other measures, banned the export of "luxury goods" to North Korea. This ban was designed to squeeze Kim Jong-Il, Office 39, and military leaders—all of whom used imported cigarettes to fund the DPRK's terrorist activities.

123. By early 2007, the U.S. Department of Commerce implemented strict export controls barring the export of luxury goods to North Korea, including tobacco. 72 Fed. Reg. 3722. The United States intended those controls to deprive North Korean officials of the capacity to continue their missile belligerence. BAT was not deterred by these sanctions. It recognized that they would create scarcity that fueled the black market. Consistent with its internal findings that "consumer demand for international brands stimulates smuggling and counterfeiting" whenever legal supply is constrained, BAT embraced illicit networks to keep its products flowing to the regime.

124. As other Western multinationals exited the market in response to these sanctions and the nuclear test, BAT remained. From 2007 through 2017, BAT was the ***only*** Western multinational firm that consciously chose to defy U.S. antiterrorism sanctions by operating a joint venture in North Korea with DPRK terrorist fronts. Plaintiffs are not aware of any other

Western firm that partnered with Office 39, or any other DPRK entity, from 2007 through 2017 while BAT did so. Simply put, BAT was an extreme outlier amongst multinational firms.

### C. Defendants Lied About Exiting The Joint Venture In 2007

#### 1. BAT Engaged in a Sham Divestment of its North Korean Interests

125.    Confronted with the rising tide of sanctions and international pressure on North Korea, BAT began looking for ways to publicly dissociate itself from Daesong-BAT, while surreptitiously continuing its illegal joint venture. BAT determined that the best way to facilitate the appearance of an exit would be to sell its stake in Daesong-BAT to a "friendly" third party that would serve as a front for BAT to continue partnering with the DPRK.

126.    BAT chose **SUTL**, a Singapore-based cigarette distributor, as this sham third party. BAT had a longstanding business relationship with SUTL, in large part related to BAT's extensive cigarette smuggling operations in Asia. (Defendants' settlements with the DOJ label SUTL as "Company 1.")

127.    In April 2007, BAT's Standing Committee—including BAT's Chief Executive Officer, Chief Operating Officer, and Financial Director—approved a series of corporate transactions designed to create the appearance of a complete BAT divestment from North Korea while secretly retaining *de facto* control over Daesong-BAT. BAT OFAC Settlement at 2; OFAC Enforcement Release at 1. The plan was reviewed and approved by BAT's Central Finance Office and multiple BAT regional headquarters. BAT OFAC Settlement at 3.

128.    On June 8, 2007, BAT executed the public face of this deception. The company issued a press statement announcing that it was exiting its North Korea business by selling its stake in Daesong-BAT to SUTL. This announcement was materially false, made with the purpose and effect of deceiving the outside world, including the United States and U.S. financial institutions, into believing that BAT was done doing business with North Korea. BAT

Information ¶¶ 35-37; *see also* BAT, *British American Tobacco to Sell Its Share in Democratic People's Republic of Korea Business* (June 8, 2007) ("British American Tobacco has agreed in principle to sell its share in Taesong BAT, a joint venture cigarette business in Pyongyang with the Korea Sogyong Chonyonmul Trading Corporation, a state-owned company. The prospective purchaser is a company within the SUTL group of companies, a Singapore-based trading group that invests in various business ventures in South East Asia.").

129.    Within days of Defendants' sham press release, BAT reached into the United States to conceal its scheme in response to media scrutiny. On June 18, 2007, *Forbes* reported on BAT's ongoing North Korea business, highlighting that:

> British American Tobacco will peddle cigarettes nearly anywhere on the planet, North Korea included. For the last six years it's churned out millions of them from . . . Pyongyang . . . . Much of the revenue from [BAT's] joint venture with a [DPRK] outfit lands in the coffers of one of the world's most . . . vile regimes. But Paul Adams, [BAT]'s chief executive, doesn't mind. "Why shouldn't we sell there?" he shrugs . . . . "We will sell where it's legal, where we can operate to our own international standards, and where we can make money.'"

130.    But on July 23, 2007, *Forbes* published a follow-up retracting the story based on a false statement sent by BAT, through a spokesman, to *Forbes*, which BAT sent to persons whom it knew to be in the United States. BAT lied to *Forbes*, claiming its decision to "quit[] North Korea" was "not made as a result of political pressure, but 'for business reasons and to manage future business risk.'" By tricking *Forbes* into publishing this retraction, BAT caused its lies to be widely disseminated to U.S. audiences, including shareholders and regulators.

131.    The ostensible transfer was consummated in August 2007. SUTL purchased BAT DPRK for **one (1) Euro**—far less than the market value of the business. At the same time, a BAT subsidiary acquired a call option to repurchase BAT DPRK for one Euro, which BAT planned to exercise if the political climate improved. BAT Singapore agreed to continue supplying Daesong-BAT with cigarette ingredients exactly as it had prior to the "divestment."

*See* Statement of Offense ¶¶ 37, 39, 41. Under BAT's revised JV with Office 39, shares in Daesong-BAT were reallocated: BAT DPRK (now nominally owned by SUTL) would own 50% (down from 60%), and NKTC would hold 50% (up from 40%). *See* Statement of Offense ¶ 37.

132.    As the atypical terms suggest, this was not a routine business deal but a BAT sham designed to evade U.S. sanctions. Information ¶ 46. In reality, Defendants retained effective control over Daesong-BAT. As BAT admitted, even after the transaction, "[BAT Singapore] and BAT (by virtue of being [BAT Singapore's] ultimate parent company) maintained control of all relevant aspects of the North Korea business." Statement of Offense ¶ 35. An internal email described the deal as "a vehicle for BAT to bring out the JV money and distribute it to BAT. [SUTL] will have no beneficial interest in" BAT DPRK. Information ¶ 42.

133.    Internal documents confirm this control. One BAT Singapore employee who moved to SUTL explained, "I am still working for BAT business though BAT is not directly dealing in DPRK . . . . Though the contract is under [SUTL], the business is run under BAT interests." Information ¶ 43. Another document described BAT holding "de facto control," ensuring it continued to exercise significant influence over Daesong-BAT and directly benefitted from DPRK sales. Information ¶ 44.

### 2.    BAT Laundered Hundreds of Millions of Dollars Through its Ongoing North Korea Joint Venture

134.    As agreed, SUTL acted principally as an intermediary to launder the flow of funds from North Korea to BAT. BAT Singapore shipped goods (primarily cigarette components) to Daesong-BAT in the care of SUTL, invoicing SUTL. SUTL forwarded the invoices to NKTC. NKTC then paid SUTL—in U.S. dollars, typically using Chinese front companies—and SUTL remitted almost the entire amount to BAT, minus a small commission. These practices persisted at least through August 2016. Information ¶ 45.

135.    Over the years, BAT's scheme generated hundreds of millions of dollars, split 50/50 between Daesong and BAT. According to BAT's enforcement resolution with U.S. authorities and based on the amounts paid to BAT Singapore, BAT's scheme enabled NKTC to generate **over $400 million**. *See* Statement of Offense ¶ 54.

136.    To move these funds, the conspirators knowingly used North Korean banks Tanchon, KKBC, and FTB.

137.    At a 2007 meeting, NKTC proposed using "export earnings" to pay SUTL. Information ¶ 44(a). This euphemism referred to money NKTC generated abroad that could not be repatriated due to banking restrictions. Instead, NKTC and BAT agreed to launder payments through Chinese intermediaries. For example, Dandong Hongxiang Industrial Development Company ("DHID"), a front company for the North Korean government, sent approximately $125 million to SUTL between 2007 and 2014—money intended for BAT Singapore. Information ¶ 44(c)-(d). (On September 16, 2016, Treasury sanctioned DHID for acting for or on behalf of KKBC. *See* Information ¶ 44(e).) In total, 50 other front companies moved at least $216 million in U.S. dollars to SUTL; all were remittances for BAT. Information ¶ 44(f).

138.    These funds cleared through correspondent accounts at U.S. banks. Because U.S. banks refused to process transactions for North Korea, BAT and its co-conspirators structured the payments to mask the source, making them appear to come from legitimate Chinese businesses. This was done "with the intent to deceive U.S. financial institutions." Information ¶¶ 46-47. BAT stipulated that at least four U.S. banks unknowingly processed these transactions. Information ¶ 30.

### 3. BAT Continued Its North Korean Joint Venture Despite Knowledge of North Korea's Weapons Proliferation and Terrorism

139.    While BAT unlawfully funneled money to the North Korean government, the United States and United Nations consistently highlighted North Korea's vital role in missile and rocket proliferation to the IRGC and Hizballah.

140.    Although the United States de-listed North Korea as a state sponsor of terrorism in 2008 during nuclear negotiations,[1] it continued to enforce strict counterproliferation sanctions, recognizing that preventing DPRK terrorism remained a key element of its anti-terror strategy. Indeed, North Korea was so heavily sanctioned—"one of the heaviest sanctioned countries around," according to a 2015 colloquy between Representative Bill Keating and senior State official Hillary Batjer Johnson—that the State Sponsor of Terror designation "would not enhance or necessarily alter any of the current sanctions that are applicable to the DPRK at this time."

141.    In April 2009, thirty American citizens residing in Israel sued North Korea and Hizballah, alleging North Korea provided the missiles and rockets used in 2006 attacks carried out by Hizballah. *See Kaplan, et al. v. Hezbollah and Democratic People's Republic of Korea*, No. 09-cv-646, ECF 1 (D.D.C. filed Apr. 8, 2009). The lawsuit was widely reported.

142.    In May 2009, North Korea conducted another nuclear test, and the U.N. Security Council adopted Resolution 1874, condemning the test and demanding member states prevent North Korea from accessing financial resources for its missile program. A few months later, in August 2009, Ambassador Philip Goldberg, coordinating U.S. sanctions implementation, warned banks worldwide to look for transactions involving North Korean entities.

---

[1] As State reported to Congress in 2023, on November 20, 2017, "the Secretary of State designated [North Korea] as a State Sponsor of Terrorism" after the Secretary "determined [that] the DPRK had repeatedly provided support for acts of international terrorism in the nine years since its designation had been rescinded," and the DPRK has remained so designated ever since.

143.     Around the same time, the U.S. and U.N. sanctioned the entities involved in North Korea's proliferation to the IRGC. On June 30, 2009, they sanctioned Hong Kong Electronics, a front company in Iran facilitating money movement for KOMID. In July 2009, as the U.N. reported in real-time, UAE authorities intercepted a shipment of DPRK weapons bound for Iran containing 2,030 detonators for Grad rockets—the exact type the IRGC supplied to Hizballah.

144.     On August 11, 2009, Treasury designated **KKBC**—the very bank participating in BAT's scheme—for providing financial services to the DPRK missile program. BAT knew of this designation and knew KKBC's role in its own scheme, yet continued to use the bank. *See* Statement of Offense ¶¶ 59-62.

145.     In December 2009, another arms shipment was intercepted: 35 tons of North Korean rockets and surface-to-air missiles aboard a transport aircraft bound for Iran and likely Hizballah. Had this shipment not been stopped, 35 tons of materiel would have likely been used in attacks targeting Americans in the Middle East.

146.     On August 30, 2010, President Obama signed **Executive Order 13551**, blocking property of persons involved in North Korea's proliferation. 75 Fed. Reg. 53837. And the same day, Treasury and State designated both Office 39 and Korea Taesong Trading Company (*i.e.*, BAT's partner Daesong) for their role in the "counterfeiting of goods," "illicit activities," and "facilitating North Korean trafficking in arms." Treasury explained that Office 39 provides "critical support to North Korean leadership" through illicit economic activities. Under Secretary Levey explicitly identified "selling counterfeit cigarettes" as a key piece of this illicit funding.

147.     Executive Order 13551 also authorized blocking the property of anyone who imported "luxury goods," including tobacco, into North Korea.[2] BAT knew of these prohibitions but deliberately undermined them.

148.     On November 18, 2010, the U.S. designated **Daesong Bank** and **Korea Daesong General Trading Corporation**—entities linked to BAT's "Daesong" joint venture—as key components of Office 39's financial network supporting proliferation.

149.     In 2011, Treasury warned multinationals that North Korea was one of only two jurisdictions in the world subject to Financial Action Task Force countermeasures due to substantial terrorist financing risks.

150.     In December 2012, North Korea conducted an illegal long-range rocket test, followed by a nuclear test in February 2013. The U.N. Security Council reacted with Resolution 2087 demanding that North Korea "suspend[] all activities related to its ballistic missile program" and stop "evad[ing] sanctions" and highlighting North Korea's role as an "exporter of goods and equipment related to ballistic missiles."

151.     On March 11, 2013, Treasury designated the **Foreign Trade Bank ("FTB")**, North Korea's primary foreign exchange bank, as a "key financial node" in the weapons proliferation apparatus. BAT knew FTB played a central role in its cigarette scheme. Statement of Offense ¶¶ 63-69. BAT also learned that FTB facilitated missile sales to the IRGC. Yet, BAT continued to rely on FTB to move its illicit profits.

152.     In January 2016, North Korea kidnapped 22-year-old U.S. citizen, and University of Virginia student, Otto Warmbier. The regime took Otto hostage to coerce the United States

---

[2] The Executive Order adopted the definition of "Luxury Goods" from 15 C.F.R. 746.4(b)(l) and Supplement No. 1 to part 746 and similar items, which included tobacco as a luxury good. *See* Exec. Order 13551 §4(f).

into concessions—a blatant act of state-sponsored terrorism. His kidnapping was covered intensely by global media, including the U.K. outlets BAT monitored, including at least four separate *Guardian* reports that year. The regime paraded Warmbier for forced confessions, using him as a pawn while BAT continued its partnership with the government torturing him. Warmbier was returned to the U.S. in a comatose state in 2017 and died shortly thereafter.

153.     On February 18, 2016, Congress enacted the North Korea Sanctions and Policy Enhancement Act, highlighting that North Korea "has sponsored acts of international terrorism," and "urg[ing] the President, in the strongest terms" to "immediately designate North Korea as a jurisdiction of primary money laundering concern." Pub. L. 114-122, 130 Stat. 93.

154.     On June 2, 2016, Treasury issued a formal Notice further highlighting the role of **KKBC** and **FTB**—two of BAT's banking partners—in supporting missile proliferation. 81 Fed. Reg. 35441. Later that year, as part of the imposition of a special measure against North Korea as a jurisdiction of primary money laundering concern, Treasury formally prohibited U.S. financial institutions from opening or maintaining correspondent accounts for, or on behalf of, North Korean banking institutions. 81 Fed. Reg. 78715.

155.     Despite the kidnapping of an American student, the designation of its banking partners as missile proliferators, and the finding that its host country was a primary money laundering concern, BAT continued to partner with Office 39 through at least late 2017. BAT's misconduct enabled Office 39 to finance the specific missiles that killed and maimed Plaintiffs.

### D. Defendants' Venture With Office 39 Became A Key Source Of Funding For North Korea's Weapons Collaboration With The IRGC And Hizballah

156.     In the 2000s and 2010s, as DoD reported in 2018, North Korea remained a pariah state, "unable to significantly expand ties because of international sanctions and the stigma of gross human rights violations." But, according to the same DoD report, the regime's skill in

navigating black markets and its "no-questions-asked" philosophy made it an attractive partner for actors willing to prioritize profit over legality.

157. Enter BAT. In announcing BAT's record-setting resolution, the United States confirmed that BAT's misconduct enabled North Korean missile assistance to its most critical partner, the IRGC. As OFAC explained, "BAT's apparent violations helped North Korea establish and operate a cigarette manufacturing business—a sector that has reportedly netted over $1 billion per year for the Government of the DPRK." The DPRK Government "is known to use funds generated through international trade to support its nuclear and missile programs and weapons proliferation." And BAT's "conspiracy" with the DPRK "involved entities designated by OFAC for their proliferation activities and provided them with opportunities to evade U.S. sanctions." OFAC Enforcement Release at 4.

158. In 2023, the U.S. Attorney's Office for the District of Columbia emphasized the sheer scale of this funding, noting that for every dollar invested in cigarette production, North Korea realized $20 of revenue for its "government, its military, and its WMD program." The Principal Associate Deputy Attorney General confirmed that the investigation "exposed BAT . . . as [an] important component[] in funding North Korea's WMD proliferation program."

159. Given the Kim regime's criminal structure, licit transactions with DPRK commercial firms sponsor terrorism just as illicit ones do. As Under Secretary Levey warned in 2006, "the line between North Korea's licit and illicit money is nearly invisible." In the same warning, Levey detailed the "multifaceted problems and threats posed by state sponsors of terror Iran, Syria, and North Korea": "North Korea, the world's foremost proliferator of ballistic missile technology . . . continues to develop ballistic missiles of increasing sophistication and

range. Iran lies at the dangerous intersection of terrorism and weapons of mass destruction . . . providing financial and material support to terrorist groups, like Hizballah."

160. Congress codified these findings in the North Korea Sanctions and Policy Enhancement Act of 2016, explicitly codifying Levey's warning that "the line between illicit and licit North Korean money is nearly invisible." 22 U.S.C. § 9221(a)(1)(A)(i) (Feb. 18, 2016).

161. The United States has long recognized that financial support to state sponsors of terrorism supports catastrophic attacks. As Under Secretary Levey noted in 2006, Treasury's mission to "sever the lines of financial support to international terrorists" and to weapons proliferators is predicated on the understanding that "financial networks . . . underlie all of these threats."

162. North Korea uses the international financial system to disguise weapons sales behind a "veil of legitimacy," utilizing fronts and intermediaries to evade detection. As Under Secretary Levey explained in 2006, the designation of Banco Delta Asia as a primary money laundering concern was a direct response to this threat, aimed at cutting off the "willing partner" handling North Korea's "dirty business."

163. Commercial transactions enabling terrorists to profit from counterfeiting directly aid terrorist attacks. Congress has found that "ties have been established between counterfeiting and terrorist organizations that use the sale of counterfeit goods to raise and launder money." Stop Counterfeiting in Manufactured Goods Act, Pub. L. 109-181, § 1(a)(2)(E), 120 Stat 285 (Mar. 16, 2006) (18 U.S.C. § 2320 Note).

164. Specifically regarding the tobacco trade, Congress found that "Hezbollah, Hamas, al Qaeda, and other terrorist organizations have profited from trafficking in illegal cigarettes" and that such involvement will continue to grow "because of the large profits such organizations

can earn." Prevent All Cigarette Trafficking Act of 2009, Pub. L. 111-154, § 1(b)(2)-(3), 124 Stat. 1087 (Mar. 31, 2010) (15 U.S.C. § 375 Note).

165.    By partnering with the world's most prolific state-sponsor of cigarette counterfeiting, BAT knowingly fed a revenue stream that Congress had identified as a primary enabler of terrorist attacks.

166.    At all times, Defendants knew that a foreseeable consequence of improving the IRGC's missile and rocket capability was that those weapons would be used in anti-American terrorist attacks by Hizballah and Kataib Hizballah. As repeatedly confirmed in U.S. government reports and announcements that Defendants actively monitored, Defendants knew that: Hizballah and Kataib Hizballah were both striking arms of the IRGC; members of Hizballah and Kataib Hizballah swore fealty to Ayatollah Khamenei; and many Hizballah and Kataib Hizballah terrorists were members of the IRGC, too, including notorious terrorists Imad Mugniyeh and Abu Mahdi al-Muhandis.

### E.    Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty For Their Misconduct

167.    BAT's years of culpable misconduct produced what the U.S. Department of Justice called "the largest North Korean sanctions penalty in the history of the Justice Department." On April 25, 2023, DOJ announced a $629 million settlement with BAT for its illegal tobacco sales to North Korea. BAT and BAT Singapore engaged "in an elaborate scheme to circumvent U.S. sanctions and sell tobacco products to North Korea," thus causing "funds to illegally flow into the coffers of the Democratic People's Republic of Korea (DPRK)." For years, according to DOJ, BAT partnered with the regime to operate a cigarette business that relied on "financial facilitators linked to North Korea's weapons of mass destruction proliferation network." The Assistant Attorney General of the Justice Department's National Security

Division confirmed to Congress in December 2023 that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, generating revenue used to advance North Korea's weapons program."

168.     On the day DOJ announced the record-breaking settlement, OFAC also settled its civil enforcement action against BAT. Underscoring the severity of the misconduct, OFAC imposed the "statutory maximum civil monetary penalty," determining that BAT's violations were "egregious" and "not voluntarily self-disclosed." OFAC Enforcement Release at 1.

169.     As part of this resolution, BAT Singapore pleaded guilty to a Criminal Information charging conspiracy to commit bank fraud and conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"). BAT entered into a deferred prosecution agreement ("DPA") based on the same charges, which included "conspiracy to commit bank fraud" and "conspiracy to violate [IEEPA]" through "sales of tobacco products to the Democratic People's Republic of Korea . . . between in or around February 2009 until in or around June 2017." Information ¶ 1.

170.     In the DPA and Statement of Offense, Defendants admitted facts establishing their culpable intent beyond any doubt. They admitted that "BAT and [BAT Singapore] had knowledge of U.S. sanctions . . . including the sanctions on designated North Korean entities, and willfully disregarded those sanctions." Statement of Offense ¶ 55. And Defendants confessed to structuring transactions to obfuscate sales to North Korea, causing U.S. financial institutions to process illegal transactions, as BAT Singapore "inten[ded] to deceive U.S. financial institutions." Statement of Offense ¶¶ 45-46.

171.     Defendants' admissions confirmed that this conspiracy reached the highest levels of BAT. OFAC found that "BAT management had actual knowledge regarding the apparent

48

conspiracy from its inception through its termination," noting that this "knowledge extended to BAT's Standing Committee, which signed off on the ostensible divestment from the Joint Venture." OFAC Enforcement Release at 3.

172. To maintain their illegal terrorist financing, BAT and BAT Singapore engaged in active deception. When banks raised questions about wire transfers, BAT Singapore simply canceled the transactions and re-routed them through more sympathetic institutions, knowing their partner SUTL was deceiving those banks about the funds' origin. Information ¶¶ 71-72. As OFAC detailed, BAT "concealed their North Korea-related business by purporting to exit the Joint Venture and receiving payments through a complex remittance structure that relied on an opaque series of front companies and intermediaries." OFAC Enforcement Release at 3. BAT further "ignored requests for information from banks, and asked its counterparty to remove any mention of North Korea from transactional documents." *Id.*

## IV. DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS

### A. Defendants Monitored Sanctions And Warnings About North Korea's Role In Financing Terrorists

173. As a sophisticated, integrated, multinational corporation operating in a highly regulated industry with a substantial presence in the United States, the Middle East, and East Asia, Defendants maintained a rigorous surveillance regime to monitor "geopolitical and economic policy developments worldwide." As part of BAT's formal "risk modelling" and "external risk assessments," Defendants specifically tracked "[g]eopolitical tensions . . . international sanctions . . . [and] terrorism" capable of "disrupt[ing] [BAT]'s business in multiple markets." Thus, BAT actively monitored:

a.    every official United States and United Nations sanctions designation, including associated press releases, reports, and findings targeting North Korea, Iran, the IRGC, and Hizballah; and

b.    other public sources—including articles published by mainstream media outlets, non-governmental organizations, investigative journalists, scholars, and others—that published data relevant to tobacco products and geographies where BAT operated.

174.    Defendants executed this monitoring through an internal network comprising compliance, anti-illicit trade, media monitoring, strategic communications, and intelligence personnel, as well as thousands of BAT's and BAT Singapore's employees and agents stationed in the United States, North Korea, East Asia, Iran, and the Middle East. The knowledge possessed by these employees and agents is imputed to Defendants.

175.    Internal documents confirm that this system functioned as designed, delivering real-time intelligence regarding terrorist financing risks. For example, a July 25, 2000 internal BAT "blast" email summarized twelve separate media reports alerting BAT executives that "Cigarette Smuggling May Link to Terrorists" and warning that illicit sales in the U.S. were being "funneled to" the "Mideast" to "fund Hezbollah."

176.    BAT supplemented its internal capabilities by retaining lobbyists and law firms in the United States and United Kingdom to monitor U.S. government and U.N. policy changes and legislation in real time. This institutional commitment to sanctions monitoring was not new; internal documents reveal that BAT was actively analyzing sanctions announcements—such as those targeting Southern Rhodesia—as early as the 1960s. Accordingly, BAT possessed actual, real-time knowledge of every relevant U.S. and U.N. sanctions designation, press release, and finding published before or during the conduct alleged herein. *See, e.g.*, Statement of Offense ¶¶ 31, 34, 55, 57 (discussing Defendants' knowledge of U.S. sanctions on North Korea); Information ¶ 55.

177.    BAT and BAT Singapore also possessed unique private knowledge of the relevant facts. As one of the world's largest tobacco firms with billions of dollars in annual sales, BAT had access to proprietary data regarding its partners, supply chains, and markets that exceeded

what was available to regulators or the public. Consequently, BAT was aware of pertinent facts regarding the North Korean joint venture and its partners well before they became public, and possessed critical information that never became public.

178.    Specifically, Defendants knew that Iran was Office 39's largest arms customer and was aware of an overwhelming consensus of reports from the U.S., U.N., U.K., and international media that confirmed that North Korea and Iran were collaborating to strengthen each other's missile programs—with the United States as their shared primary target.

a.    2002: President Bush declared that North Korea and Iran comprised an "axis of evil," warning they could work together to provide WMDs to terrorists.

b.    2006: Treasury sanctioned numerous firms for enabling IRGC missile and rocket development, including the *Fateh-110* missile, and emphasized that such Iranian programs relied upon direct North Korean support.

c.    2006: DoD warned that North Korea had sold long-range missiles to other states of concern, while Iran's support for terrorism raised concerns about its intentions.

d.    2008: The Congressional Research Service reported that North Korea's relationship with the IRGC involved coordination in support for Hizballah and cooperation on missiles.

e.    2010: The Defense Intelligence Agency confirmed that Iran received assistance from North Korea in developing its missile program and continued to increase the range, lethality, and accuracy of these systems.

f.    2010: The U.N. Panel of Experts reported multiple interdictions of North Korean arms shipments bound for Iran, including rockets and surface-to-air missiles.

g.    2011: *Small Wars Journal* detailed how North Korea provided advanced commando training to Hizballah field commanders following the 2006 war.

h.    2013: DoD reported that North Korea had exported missile technology to countries including Iran.

i.    2016: The *Jerusalem Post* reported that North Korea helped Iran build the Safir and Sejil missiles and funneled weapons to Hizballah via the IRGC trafficking network.

j.    2017: Congress codified recognition of North Korea-Iran cooperation on nuclear and ballistic missile development in the Countering America's Adversaries Through Sanctions Act. CAATSA, § 316(a).

179.     Beyond the general alliance, Defendants knew—or recklessly disregarded—that their partnership and transactions with their specific North Korean counterparties, including Daesong, Tanchon, FTB, and KOMID, directly financed DPRK-IRGC missile collaboration.

a.     1999: The House North Korea Advisory Group warned that North Korea, through Office 39 (*i.e.*, BAT's partner, Daesong), was one of the greatest missile threats in the world and had "exported missiles to Iran" that foreseeably threatened U.S. servicemembers in the Middle East.

b.     2001: Treasury sanctioned KOMID for violating the Iran Nonproliferation Act by exporting missile technology to Iran.

c.     2004: Commerce designated the DPRK as a terrorist-supporting regime, warning that dual-use items offered significant aid to its ability to support terrorism.

d.     2004: the United States imposed more sanctions on KOMID for its "Missile Aid to Iran."

e.     2009: Treasury sanctioned Tanchon Commercial Bank (a BAT partner) for its vital role in DPRK supply of assistance to IRGC missile efforts.

f.     2010: Treasury designated Office 39 (*i.e.*, BAT's partner, Daesong), for the vital aid that Office 39 supplied to DPRK missile proliferation efforts.

g.     2010: The U.N. reported that Tanchon managed financial transactions related to missile deals between KOMID and Iranian entities.

h.     2012: The U.S. Mission to the U.N. confirmed that Tanchon plays a role in financing North Korea's ballistic missile sales to Iran.

i.     2014: State confirmed that Tanchon acts as the financial arm of KOMID, facilitating missile sales to Iran's SHIG.

j.     2016: Treasury confirmed that KOMID representatives in Iran continued to sell weapons, with payments often funneled through fronts operating at the direction of DPRK banks.

180.     The IRGC's deployment of *Qiam*- and *Fateh*-class missiles against U.S. forces and civilians was not an independent or unforeseeable intervening act. It was the precise and intended use of the missile capabilities Defendants helped create. Defendants knew—or recklessly disregarded—that Office 39's revenues were directed to North Korea's missile enterprise and that those weapons would be supplied to the IRGC and its proxies for use in

attacks against Americans. The resulting missile strikes were therefore a foreseeable—if not inevitable—consequence of Defendants' illegal conduct.

**B. Defendants' Compliance And Intelligence Teams Received Repeated Notices That Cigarette Smuggling Was Funding Terrorism**

181. BAT's support for IRGC and Hizballah attacks occurred against a backdrop of decades of intense global scrutiny regarding the extreme risk that tobacco-related crimes—including illicit cigarette sales, smuggling, counterfeiting, and intellectual property theft—financed terrorist attacks.

182. As early as 2003, the U.S. Government Accountability Office reported that "[t]errorists have earned assets through the highly profitable illicit trade in cigarettes" and that "Hizballah" had "earned assets through trafficking in contraband cigarettes or counterfeit cigarette tax stamps." In 2004, the FBI Director warned during remarks to the Hong Kong American Chamber of Commerce that "We are seeing … terrorists engaged in cigarette smuggling … to raise money for their operations."

183. Since 2004, DOJ has published a report by a senior American intelligence analyst alerting the industry that "[t]raffickers of cigarettes in the United States and the United Kingdom are providing material support to the Hezbollah …, among other terrorist groups." The report warned that "[b]ecause of the huge profits in the illicit cigarette trade, as well as the potentially low penalties for getting caught, illicit cigarette trafficking now rivals drug trafficking as the method of choice to fill the bank accounts of terrorists." It concluded that these schemes "provide the terrorist groups with millions of dollars annually, which fund the purchasing of firearms and explosives to use against the United States, its allies, and other targets."

184. These warnings issued steadily throughout BAT's illicit venture. In 2008, the U.S. House Committee on Homeland Security published *Tobacco and Terror: How Cigarette*

*Smuggling Is Funding Our Enemies Abroad*, a report which concluded that the illicit tobacco trade was "one of the most lucrative smuggling operations in the United States and around the globe," with a "large percentage of the money … financ[ing] groups such as Hezbollah." The report estimated that "[i]n just two months of illicit cigarette trade operations, a motivated terrorist cell could generate sufficient funds to carry out another September 11th style attack."

185.     In 2015, the U.S. Departments of State, Justice, Treasury, Homeland Security, and Health and Human Services jointly published *The Global Illicit Trade in Tobacco: A Threat to National Security*. This interagency report alerted BAT that "trafficking in illicit tobacco products" continued to grow as a threat to national security because "cigarette smuggling" was a "lucrative crime for some terrorist groups and a potential revenue source to finance acts of terror," citing "specific links between cigarette smuggling and terrorist organizations, such as … Hizballah." Mainstream media outlets, including the *Wall Street Journal*, *NBC News*, and the International Consortium of Investigative Journalists, reinforced these warnings, alerting BAT that Hizballah used cigarette crimes to fund attacks.

186.     BAT possessed actual knowledge of these risks. Its in-house personnel closely monitored U.S. government and media reports, and its own corporate filings confirm it was acutely aware of the terrorist finance risks presented by the illicit cigarette trade.

187.     In 2013, BAT admitted in an annual sustainability report that it knew "Interpol … states that criminal gangs that traffick drugs, arms and people are also behind the illegal tobacco and alcohol trades," and that the U.S. Department of Justice believed these organizations had "ties to terrorist organisations." In 2016, BAT similarly admitted in its annual sustainability report that "up to 12% of global tobacco sales" were illegal, and that "[i]ncreasingly, this black market" was "being linked to the financing" of "terrorism," allowing extremist groups to

"diversify their revenue streams in order to carry out their horrific attacks." In March 2017, BAT again admitted that the "black market in tobacco," involving "counterfeit cigarettes" and "cross border smuggling," "fund[ed] terrorism."

188.   BAT's social media statements confirm this knowledge. Within the same period when BAT was engaged in the conduct described in the DOJ and OFAC enforcement resolutions, BAT publicly acknowledged the terrorism-cigarette smuggling nexus. On April 12, 2013, BAT acknowledged on its official Twitter account (@BATplc) that "Interpol says terrorist groups including … Al-Qaeda profit from illegal cigarettes #dontsupportterrorism #tobaccotrafficking." On September 2, 2013, BAT tweeted that the "UK & Ireland are hotbeds of illicit tobacco, raising fears trade is funding terrorism."

189.   BAT's specific intelligence about North Korea reinforced that knowledge. At all relevant times, BAT deployed a sophisticated in-house corporate intelligence arm capable of placing investigators on the ground inside North Korea—an access level that even the U.S. intelligence community struggled to achieve. Armed with this intelligence, BAT knew that North Korea (through Office 39 and the RGB) supplied Hizballah and the IRGC with core terrorist tactics, techniques, and procedures ("TTP"). Because the RGB directly trained Hizballah and indirectly trained them through the IRGC, BAT knew that its counterparty's TTP included financing attacks through criminal schemes. Accordingly, BAT's knowledge of the general link between Hizballah and illicit cigarettes, combined with its specific knowledge of the RGB's operations, alerted BAT that its own crimes with North Korean fronts risked financing the very attacks that injured Plaintiffs.

## V. DEFENDANTS PROVIDED ESSENTIAL AND LASTING SUPPORT TO THE NORTH KOREA-IRGC-HIZBALLAH JOINT WEAPONS VENTURE

### A. Defendants' Cash And In-Kind Support Enabled Development Of Weapons Used In Terrorist Attacks

190.     From 2007 through 2017, BAT and BAT Singapore engaged in a series of illegal transactions with North Korean counterparties engaged in the regime's proliferation activities. This culpable misconduct funneled hundreds of millions of dollars directly to the DPRK's arms-proliferation program, enabling missile transfers to the IRGC and Hizballah and substantially assisting the development of the specific *Qiam* and *Fateh* missiles used to harm Plaintiffs.

#### 1. BAT Provided Direct Financial Support to the DPRK's Arms Efforts

191.     Daesong-BAT generated massive revenues that enabled North Korea's proliferation activities. According to DOJ, BAT's scheme "allow[ed] funds to illegally flow into the coffers" of the DPRK and enabled "financial facilitators linked to North Korea's weapons of mass destruction proliferation network." By conservative estimates, BAT's misconduct supplied Office 39 with at least $50 million in illicit profits annually from 2007 through at least 2017.

192.     These funds did not vanish into the general economy; they funded the North Korea-IRGC-Hizballah joint weapons venture. BAT's payments financed the supply, testing, deployment, and operation of advanced weapons systems—and the terrorist TTP required to use them—in Iran, Syria, and Lebanon.

193.     North Korea's cigarette trade with BAT generated blockbuster profits that directly funded the DPRK's military-first agenda. As senior U.S. State Department official David Asher warned in 2005, analysts agreed that illicit trading activities provide critical support to North Korea's "military-first" economy. Counterfeit cigarettes, he noted, "may well be North Korea's largest containerized export sector." And as BAT knew, and the U.N. confirmed, tobacco sales have long comprised one of the DPRK's top five sources of import-related cash flow.

194.    A fixed percentage of every dollar BAT generated funded the regime's arms programs. As the U.S. Institute of Peace reported in 2009, the most critical role of DPRK state trading firms was to route "a designated percentage of all revenues . . . directly into Kim Jong Il's personal accounts," a primary use of which was to implement missile programs.

195.    This programmatic funding mechanism meant that hard currency from BAT's illicit profits was effectively siloed within Office 39 for weapons procurement. As the U.S. Institute of Peace warned in 2009, the system was driven by "foreign currency revenue generation bases" that funneled goods and profits up the chain of command to the highest levels of the Worker's Party and the National Defense Commission.

196.    This meant that the cash BAT generated stayed in-house with Kim and Office 39—the two actors most directly responsible for financing DPRK aid to IRGC and Hizballah missile attacks—and a substantial share of these funds supported the North Korea-IRGC-Hizballah joint missile venture. For example, Professors Bechtol and Celso observed in 2025 that the DPRK used a "large portion of these funds" for missiles during the 2010s.

197.    North Korea needed hard currency from BAT to: (i) train and pay its missile specialists in Iran; (ii) fund trips to Syria for collaboration with Hizballah; (iii) procure missile components like gyroscopes; (iv) maintain assembly facilities; and (v) transport weapons to Iran. BAT's support supplied vital financial lubrication to attacks enabled by the DPRK-IRGC-Hizballah joint weapons venture. Under the custom and practice of the joint arms venture, even though the IRGC "paid" Office 39 for DPRK weapons and services, most such IRGC-to-DPRK "payments" were denominated in barter trade, rather than U.S. dollars, *e.g.*, oil. For that reason, Office 39's (and BAT's other DPRK partners') ability to access dollars and the U.S. financial system was vital to the success of BAT's participation in the joint weapons venture. The DPRK

needed lots of cash on the front end to supply the turnkey support it provided to IRGC and Hizballah rocket attacks in the Middle East. The DPRK was not getting cash on the back end from the IRGC and thus could not rely on Iranian payments for their money, especially as sanctions on both ramped up dramatically beginning in the mid-2000s.

198.    When BAT funded DPRK fronts, it financed the very individuals serving as logistics officers for the IRGC and Hizballah. From the early 2000s through 2025, North Korea maintained hundreds of RGB, Office 39, and KOMID agents on the ground in Iran, where they were dual-hatted as experts seconded to the IRGC for its missile programs. *See supra* ¶¶ 54-61. These North Korean experts maintained a "continuous presence" in key Iranian industries, building warheads and guidance systems for the very missiles that harmed Plaintiffs.

199.    North Korea's (and thus BAT's) role in this venture was critical. For example, during a 2013 Congressional hearing entitled *Breaking the Iran, North Korea, and Syria Nexus*, former CIA Director R. James Woolsey testified that Iran's power in the region is "underpinned by North Korean arms and technology," which are "underwritten by Iran, [and] supplied by North Korea." During the same hearing, proliferation scholar Dr. David Albright explained that "stopping the money flows that pay for . . . missile related goods" is vital to preventing attacks that deployed missiles developed by the North Korea-IRGC-Hizballah joint missile venture.

200.    BAT's role was pivotal. Senior U.S. government officials have confirmed that hard currency is the "Achilles' heel" of the terror network. In 2017, for example, Representative Ed Royce noted that North Korea's advanced weapons programs rely on foreign technology that requires "an inordinate amount of money," and senior Treasury official Marshall Billingslea testified that year that Kim Jong-Un has two key financial vulnerabilities: the need for revenue to maintain missile programs and access to the global financial system to acquire hard currency.

201.    When North Korea is squeezed financially, its ability to proliferate arms is constrained. Defectors confirmed that when hard currency was scarce, missile production lines shut down for months because they could not buy necessary components like gyroscopes on the black market. For example, during a 2013 hearing entitled *North Korea's Criminal Activities: Financing the Regime*, witnesses testified to this effect.

202.    By enabling Office 39 to generate hundreds of millions of dollars, BAT remedied this vulnerability, keeping the missile lines running. In 2017, David Luna, former chair of the OECD Task Force on Countering Illicit Trade, observed that the illegal tobacco trade helped prop up Kim Jong-Un's nuclear program. Those profits did not merely line the pockets of corrupt officials; they purchased the engines, guidance systems, and fuel that powered the specific *Qiam* and *Fateh* missiles launched at Plaintiffs.

### 2.    BAT Provided Critical Cover and Concealment for the Terror Network

203.    BAT's illicit joint venture also augmented the support for IRGC and Hizballah attacks by supplying vital cover and concealment, which are cornerstones of every successful terrorist operation.

204.    From 2007 through at least 2022, BAT provided this concealment by engaging in the exact behaviors the United Nations identified as key vulnerabilities in the sanctions regime. As the U.N. found in 2017, North Korea's ability to trade in "lucrative military technologies" relied on the use of "non-nationals of the [DPRK] as facilitators" and companies registered by foreign agents. In 2018, the U.N. reported that "corporate service providers present a key vulnerability," allowing the DPRK to create front companies that "leverage the assistance of non-nationals" to move money worldwide. In 2018, the U.N. also reported: "Joint ventures with foreign companies have further generated hard currency through overseas companies with no

overt links to designated entities or interests of the [DPRK]." This same report found that the RGB "benefits heavily" from the cooperation of foreign businesses. By 2019, the U.N. concluded that the "deceptive practices of the [DPRK]" enabled it to access the financial system by making use of "complicit foreign nationals to obfuscate their activities" specifically to "raise money for the country's weapons of mass destruction programmes."

205.     When BAT helped Office 39 and the RGB conceal their scheme, it directly increased the flow of aid to IRGC and Hizballah attacks. As Congress has found, the United States relies on financial intelligence to disrupt terror networks. 9/11 Commission Implementation Act of 2004, 22 U.S.C. § 2656 Note, Pub. L. 108-458, Title VII, § 7118, 118 Stat. 377 (Dec. 17, 2004). For at least fifteen years, BAT's conduct willfully obstructed these key efforts, ensuring the financial channels for terror remained open.

### 3.     BAT Bolstered North Korea's Arms Smuggling Network

206.     BAT's illicit venture also strengthened the criminal infrastructure North Korea used to move weapons. The BAT-Daesong secret joint venture helped North Korea deepen its ties with global smuggling networks, which it initially leveraged to move cigarettes but subsequently used for proliferation. As the Director of the U.S. Army's Strategic Studies Institute noted in 2010, Office 39 exercised "what is essentially criminal sovereignty," using state tools to perpetrate schemes like cigarette smuggling abroad.

207.     In 2006, the *Wall Street Journal* reported that supplying counterfeit cigarettes had "cemented North Korea's ties to crime organizations," giving the country access to a vast smuggling network capable of moving "almost anything – from forged U.S. banknotes to weapons." According to the *Journal*, a senior Bush administration official warned that "The North Koreans could import technology and export strategic goods and weapons. It's a big deal."

208.    Office 39 and the RGB applied the expertise gained from BAT-enhanced cigarette smuggling directly to their arms sales. As Dr. Chestnut observed in 2007, North Korea applied tools developed in criminal activities—such as the use of middlemen, fronts, and complicated financial arrangements—to proliferation. The regime "transferred its ability to compartmentalize, camouflage operations, and adapt rapidly to enforcement from illicit activity to proliferation." This transfer of expertise was facilitated by personnel overlap: the same Office 39 agents involved in cigarette smuggling were often involved in missile and rocket proliferation.

209.    BAT's products provided physical cover for contraband, including weapons. In 2017, the U.N. reported instances where North Korea used "cigarette packaging" to disguise shipments of military radio communications products and weapons components. Similarly, as Dr. Chestnut warned in 2007, the regime used cigarette cartons to smuggle counterfeit dollars that funded its weapons sales. By bolstering this smuggling infrastructure that Office 39 used interchangeably for cigarettes and weapons, BAT enabled North Korea to transport the missiles and weapons components used in the attacks against Plaintiffs.

210.    At all relevant times, BAT knew that a substantial portion of the materials it exported to North Korea were diverted to cigarette counterfeiting or smuggling operations. North Korea—and particularly Office 39—is infamous for smuggling branded and counterfeit cigarettes to exploit the margin between production costs and taxes.

211.    BAT actively monitored North Korea's illicit cigarette smuggling. Indeed, after examining a confidential report prepared by BAT and other tobacco companies, the *Wall Street Journal* and *Time* reported in 2006 that BAT knew that the DPRK's cigarette scheme was "all sanctioned by the state" and could generate up to **$720 million annually**.

212.    Internal BAT documents confirm it closely monitored this illicit trade. A 2009 BAT presentation explicitly highlighted North Korea as a hotbed of illicit cigarettes (first), and that BAT knew the DPRK was smuggling cigarettes globally, including into America (second):





213.    Some of that contraband production and smuggling was BAT's own. As reported by *Daily NK* in 2006, a defector stated, "I am sure that they are producing counterfeit cigarettes more easily since they started the cooperation with a foreign company [BAT], and they must be exporting the products through secret routes." Another defector confirmed awareness that the "Daesung Cigarette Factory" was counterfeiting brands like Marlboro. Investigative journalist Julian Rademeyer reported in 2017 that despite BAT's purported withdrawal, the plant remained in operation. A former DPRK import-export manager stated: "They still have the BAT factory in Pyongyang . . . They are making various kinds of cigarettes including Dunhill and Benson and sometimes they are smuggling it" outside the DPRK.

214.    Based on Office 39's custom and practice, BAT's prior history with Daesong (including awareness of smuggling), and the DPRK's reliance on cigarette counterfeiting and smuggling, a substantial number of cigarettes produced by Daesong-BAT, or with BAT's assistance, were likely counterfeited and smuggled, generating additional revenues that enabled North Korea's missile proliferation activities and the specific missile attacks on Plaintiffs.

## B.    Defendants' Assistance Was Extensive And Continuous

215.    Defendants' sustained assistance to the North Korea-IRGC-Hizballah joint weapons venture functioned as a financial lifeline for the world's most dangerous proliferation network. BAT's substantial assistance enabled its joint venture partner, Office 39, to power IRGC, Hizballah, and proxy attacks targeting the United States in Iraq and Syria from 2007 through at least 2022.

216.    Defendants' joint venture with Office 39 remained active and highly lucrative throughout the 2010s, generating over $400 million—the decade when Iran's *Qiam* and *Fateh* programs matured from experimental prototypes into lethal, precision-guided systems used to attack Plaintiffs.

217.     The *Qiam* missile's development tracks the height of BAT's scheme. The *Qiam-1* was first successfully test-fired in August 2010—the same year BAT was actively expanding its illicit sales and navigating the new U.S. sanctions regime targeting Office 39.

218.     As BAT continued to move funds through SUTL and sanctioned banks between 2010 and 2015, the *Qiam* underwent significant modifications, including the removal of stabilizing fins (a DPRK design signature) and the integration of a MaRV. During this period, IRGC media outlets boasted that the *Qiam* missile was "specifically built to target U.S. bases in the region," as IRGC media arm *Fars* reported in 2014.

219.     By 2017, the *Qiam* had been perfected, stockpiled, and transferred to the IRGC's arsenal, ready for IRGC terrorist attacks.

220.     Similarly, the *Fateh* program achieved its most lethal milestones while BAT served as a primary revenue source for North Korea. North Korea and the IRGC upgraded the *Fateh-110* throughout the early 2010s. And in 2015—when BAT Singapore admittedly was facilitating fraudulent wire transfers for the joint venture—Iran unveiled the *Fateh-313*, the variant offering improved precision sufficient to target specific military hangars.

221.     Missile programs are capital-intensive. They require a steady stream of hard currency to pay for foreign components, specialized labor, and testing. When funding dries up, production lines stall. By providing a consistent revenue stream, BAT ensured that the North Korea-IRGC-Hizballah joint weapons venture faced no such interruptions, providing the financial runway necessary for these weapons to reach maturity.

222.     The hundreds of millions of dollars BAT funneled to Office 39 functioned as **seed capital** for a military-industrial infrastructure that operates on multi-year production cycles. The capital BAT injected into the regime during the height of the scheme was converted into durable

assets—missile factories, underground bunkers, and procurement networks—that continued to churn out weapons long after BAT formally sold its North Korean business interests.

223.    Specifically, the missiles that struck Plaintiffs in 2020 and 2022 were developed, secured, and stockpiled during the time when BAT was providing hundreds of millions of dollars to Office 39. Missile development requires multi-year production cycles; the R&D, component procurement, and assembly of the arsenals deployed by the IRGC and Hizballah occurred during the 2007-2017 period when BAT partnered with Office 39/Daesong. The arms built during this period remained operational and were used against Americans, including Plaintiffs, years later.

224.    Furthermore, the illicit trade infrastructure BAT fortified proved resilient. The smuggling routes and cash equivalent cigarette economy BAT established continued to generate liquidity for the regime, allowing DPRK operatives embedded in Iran and Syria to maintain their operations through 2023. By hardening these logistical arteries, BAT allowed the North Korea-IRGC-Hizballah joint weapons venture to survive the tightening of international sanctions.

225.    The missiles launched at Al Asad Air Base in January 2020 and in Iraqi Kurdistan in September 2022 were not developed overnight. They were the product of years of prior design, testing, production, and stockpiling—processes that occurred while Defendants were generating revenue for Office 39 and its arms-proliferation partners for at least a decade. Defendants' provision of manufacturing infrastructure and sustained revenue during this critical development window ensured that the *Qiam*- and *Fateh*-class systems used to attack Plaintiffs reached operational readiness.

226.    Defendants' provision of support to the North Korea-IRGC-Hizballah weapons venture was not episodic (like a series of isolated payments) or incidental, but sustained and critical. Defendants constructed a durable commercial enterprise with a predictable and recurring

revenue stream for at least a decade—precisely the type of financial continuity required to support the costly work of long-term missile development, production, and deployment. Indeed, DOJ publicly confirmed in 2025, as a core tenet of counterterrorism policy, that terrorists "often cannot carry out their operations [*i.e.*, attacks] without assistance from foreign companies and financial networks."

227.     Plaintiffs do not allege that BAT's misconduct necessarily enabled all IRGC-sponsored terrorism anywhere in the world at any time. Plaintiffs instead allege that BAT was responsible for a discrete subset of IRGC-sponsored terrorism: missile and rocket attacks in the Middle East from 2007 through 2022, which were a natural and virtually inevitable consequence of BAT's extraordinary misconduct. Plaintiffs expressly disclaim any allegation that BAT's conduct assisted any IRGC attack type in any geography other than IRGC-sponsored attacks in the Middle East from 2007 to 2022 that had a nexus to the deployment of missiles or rockets.

## VI.     THE IRGC AND HIZBALLAH, WITH NORTH KOREAN SUPPORT, USED DEFENDANTS' RESOURCES TO CARRY OUT ATTACKS THAT KILLED AND INJURED AMERICANS

### A.     January 8, 2020 Missile Attack in Iraq

228.     On January 8, 2020, a combined terrorist group comprised of IRGC terrorists in Iran (drawn from the Qods Force, Intelligence Organization, and Missile Command) and a joint Hizballah/Kataib Hizballah cell in Iraq committed a complex attack targeting the United States at Al Asad Air Base in Anbar, Iraq, and at Erbil Air Base in Erbil, Iraq.

229.     Hizballah played a vital role in the attack. Its leadership—including Secretary General Hassan Nasrallah, and senior Iraq-operations leaders Mohammad Kawtharani and Yusuf Hashim—commanded the operation in Iraq. Hizballah pulled together the disparate elements of the attack, coordinating the on-the-ground intelligence collection, surveillance drone operators, and spotters, with the missile batteries in Iran that IRGC agents controlled. Hizballah assumed

this prominent role for two primary reasons. First, under long-standing custom and practice, Hizballah was responsible for leading high-profile proxy attacks against the United States in Iraq. Second, the U.S. counterterrorism strike on January 3, 2020, which killed Qasem Soleimani and Abu Mahdi al-Muhandis, created an immediate operational void. Hizballah was the only credible option capable of coordinating the various terrorist components needed to execute such a complex attack in the chaotic five-day window between Soleimani's death and the retaliation.[3]

230.    The attack began around 1:30 A.M. local time and lasted more than three hours. It was a well-planned strike reflecting extensive preparation, including the use of Kataib Hizballah terrorists performing pre-attack intelligence gathering.

231.    The attack relied heavily on the North Korean-IRGC-Hizballah joint weapons venture. The complex attack included a mix of weapons and technologies, including but not limited to *Qiam-* and *Fateh*-class missiles; UAVs for surveillance and targeting; electronic warfare devices and GPS jammers; and encrypted communications, including mobile phones, laptops, and Motorola radios reconfigured by Iran Electronics Industries ("IEI"). This was one of the first times the IRGC fired large numbers of *Qiam*-class missiles.

232.    At the same time as the strikes, the IRGC launched a coordinated disinformation campaign targeting American military families. IRGC-controlled media falsely claimed that "more than 80 U.S. forces" had been killed. This tactic was designed to leverage the "fog of war" to terrorize families in the United States before accurate casualty assessments could be released—a signature tactic Hizballah perfected against Israel in 2006.

---

[3] The January 8, 2020 missile attack was part of "Operation Martyr Soleimani," which spanned multiple geographies and modalities of terrorist violence, and killed or injured scores of American service members between January 8-11, 2020.

233.    The attack violated the laws of war. The terrorists wore no uniforms, failed to distinguish themselves as combatants, and indiscriminately placed civilians at risk.

### B. September 28, 2022 Attack in Iraqi Kurdistan

234.    On September 28, 2022, a joint cell comprised of Hizballah and Kataib Hizballah in Iraq and the IRGC in Iran committed a massive missile and UAV attack in Iraqi Kurdistan.

235.    The joint cell launched at least 70 *Fateh*-class missiles and dozens of Shahid-class UAVs at Kurdish refugee camps in Koya, Iraq.

236.    The attack was planned and authorized by the IRGC. It relied on IRGC-supplied weapons, including at least 70 *Fateh*-class missiles—the same arms jointly developed by the IRGC and Office 39. The terrorists used IRGC-supplied intelligence, including satellite imagery and real-time UAV feeds, to target the victims. Consistent with long-standing IRGC, Hizballah, and Kataib Hizballah TTP and custom and practice, Hizballah and Kataib Hizballah were very likely involved in supplying localized, pre-attack intelligence, including pattern of life intelligence that helped maximize attack lethality.

237.    The attack was an indiscriminate act of terror. As confirmed by witness statements and U.S. government condemnations, the attack targeted a civilian area, killing 13 people and injuring several schoolchildren.

## VII.    DEFENDANTS' CONDUCT TARGETED THE UNITED STATES AND THE EASTERN DISTRICT OF VIRGINIA, AND HAD A SUBSTANTIAL NEXUS TO THIS DISTRICT

### A. Defendants' Conduct Targeted The United States, Including The Eastern District of Virginia

238.    Defendants' conduct targeted the United States generally, and the Eastern District of Virginia specifically, through a multi-faceted campaign of terror finance and illicit trade. Defendants targeted U.S. government entities and decision-makers in this District—specifically

the Department of Defense at the Pentagon in Arlington, Virginia—through participation in a "Counterpressure" scheme designed to coerce U.S. policy. And they targeted victims in this District, including Philip Morris USA (headquartered in Richmond, Virginia), by flooding the U.S. market with counterfeit cigarettes that funded the very arms used to attack Americans.

1. **Defendants Targeted the United States by Participating in DPRK-Sponsored Missile Attacks**

239. First, each Defendant targeted the United States by agreeing to become an active participant in the North Korea-IRGC-Hizballah joint weapons venture.

240. BAT and BAT Singapore targeted the United States by partnering with the architects of this venture—Office 39, KOMID, the RGB, and the Kim regime. Defendants operated a complex, integrated scheme to power Hizballah and IRGC missile attacks that they knew targeted the United States. This partnership was not merely commercial; it was a strategic alliance with actors whose primary purpose was to threaten American national security. Indeed, Defendants did so while knowing that a core objective of North Korea's support for Middle Eastern terrorism was to distract U.S. policymakers from its own proliferation. As Dr. Bechtol explained in 2010, supporting terrorists targeting U.S. allies was "an important element in keeping Washington's efforts focused on these terrorist acts—and not on North Korea."

241. Defendants' targeting was knowing. For decades, Congress has warned the world that America exercises broad jurisdiction over conduct sponsoring terrorist attacks against Americans. The Antiterrorism and Effective Death Penalty Act of 1996 enshrined the finding that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States" and that Congress exercises "universal prosecutive jurisdiction" over persons involved in such acts. 18 U.S.C. § 2339B, Stat. Notes, Int'l Terrorist Fundraising Prohibition; Findings and Purpose, Pub. L. 104-132, Title III, § 301(a), 110 Stat. 1247 (Apr. 24, 1996).

### 2. Defendants Targeted the United States and This District by Strengthening Illicit DPRK Cigarette Networks and Profits

242.    Second, each Defendant targeted the United States by facilitating and profiting from illicit DPRK cigarette sales to customers inside the United States—sales that generated the U.S. dollars vital to the North Korean terrorist sponsors.

243.    BAT and BAT Singapore agreed to operate a secret joint venture that relied on illicit sales to the U.S. market. According to a report by *GlobalData* in 2019, North Korean smokers—and smugglers—preferred "American" brands comprising "Virginia" tobacco. As Defendants knew (and the Justice Department later reported in 2015), from 2002 to 2005 alone, counterfeit Marlboro® cigarettes originating from North Korea were detected in 1,300 incidents within U.S. jurisdiction, including incidents of DPRK counterfeits discovered in Virginia.

244.    A substantial volume of BAT-supplied, DPRK-produced counterfeits were smuggled into America. In 2005, U.S. authorities seized over a billion fake cigarettes, many from North Korea. By 2015, as DPRK scholar Dr. David Asher testified to Congress, counterfeit cigarettes were North Korea's "largest export," with trafficking "all over the United States."

245.    This illicit trade created a specific nexus to the Eastern District of Virginia. As Defendants knew, their DPRK partner sold counterfeit Marlboro® cigarettes, committing intellectual property ("IP") crimes in this District. This conduct harmed Philip Morris USA in Richmond, Virginia by misappropriating its IP to enhance the value of illicit DPRK cigarettes.

246.    These IP crimes also funded terrorism. As the Secretary General of Interpol testified to Congress in 2003, there is a "direct connection between financing of terrorism and intellectual property crime," with terrorist organizations using pirated cigarettes to raise millions of dollars. By powering this illicit trade, Defendants directly connected their assistance to the missile attacks against Plaintiffs to the IP crimes committed in this District.

### 3. Defendants Knowingly and Deliberately Targeted the United States

247.    Defendants' targeting of the United States was knowing and deliberate. Defendants knew that U.S. economic sanctions were designed specifically to reduce the threat of violence against America. In 2019, Treasury confirmed that its sanctions were "specifically aimed at countering and neutralizing the DPRK's efforts to undermine U.S. national security."

248.    Furthermore, Defendants knew that North Korean support for terrorist attacks via missiles always targeted the United States as the primary enemy. As DPRK scholar Dr. Victor Cha observed in 2024, North Korea has justified its missile tests and terrorist support for decades by citing the "threat posed by" the "United States." By funding the regime's weapons program, Defendants knowingly participated in a campaign directed at the United States.

### B. Defendants' Conduct Had A Substantial Nexus To The United States

249.    Defendants' engagement with the United States resulted from calculated choices designed to maximize the profitability and sustainability of their illicit joint venture with the DPRK. Defendants deliberately chose to launder at least $251,631,903 through correspondent accounts at U.S. banks in at least 228 unlawful, U.S. dollar-denominated transactions, thus expressly directing their conduct at and through America. *See* OFAC Enforcement Release at 2.

250.    In conceiving and executing their North Korea scheme, BAT and BAT Singapore purposefully engaged in conduct directed at the United States in at least three distinct ways, supplying unique, "only-from-America" value that augmented the killing power Office 39 supplied to IRGC and Hizballah missile and rocket attacks. First, BAT utilized the U.S. financial system to process hundreds of millions of dollars. Second, BAT leveraged its U.S.-based brand, marketing, intellectual property, and R&D to amplify the value of the illicit cigarettes Office 39 sold. Third, BAT and its partners targeted the U.S. market for illicit cigarette sales, generating the revenue that funded the weapons used to attack Americans.

### 1. BAT Deliberately Used the U.S. Financial System to Power its Scheme

251.     BAT and BAT Singapore purposefully engaged in conduct directed at the United States by structuring transactions and issuing public announcements intended specifically to deceive U.S. financial institutions. Their goal was to trick these institutions into processing U.S. dollar transactions for BAT's and Office 39's benefit, in willful violation of U.S. sanctions targeting the DPRK's supply of arms to the IRGC and its proxies.

252.     This deception was successful. BAT's conduct directly caused U.S. dollar transactions worth hundreds of millions of dollars to flow through U.S. banks and the U.S. financial system, ultimately reaching the slush funds that powered the North Korea-IRGC-Hizballah joint weapons venture. "Had the U.S. correspondent banks known that these payments originated in North Korea, they would not have processed the transactions." Information ¶ 54.

253.     BAT and BAT Singapore intentionally concealed their continuing interest in, and control over, the North Korea joint venture for the express purpose of deceiving U.S. banks about the origin of the revenues it generated. The purpose and effect of this conduct was the illicit use of the U.S. financial system to process hundreds of millions of dollars routed through North Korean institutions and fronts, in violation of U.S. law. This conduct was squarely aimed at the United States and was part of an illegal scheme that funded North Korean entities known to support the terrorists who injured Plaintiffs. Specifically, the money and cigarettes flowing from the BAT sanctions evasion scheme went to DPRK entities known for proliferating missiles and associated technology to the IRGC terrorists who used those very missiles to injure Plaintiffs.

254.     In 2023, BAT and BAT Singapore admitted under oath to engaging in "a conspiracy to commit bank fraud and sanctions violations in connection with the provision by North Korean entities and others of false information to U.S. banks processing U.S. dollar

72

transactions on behalf of North Korean entities, and thus causing the export of financial services from the United States to North Korea" without OFAC licenses. Statement of Offense ¶ 30. BAT Singapore pleaded guilty to bank fraud under 18 U.S.C. § 1344, a statute that requires a *mens rea* of "knowing" and applies only to U.S. financial institutions and U.S. branches of foreign financial institutions. *See* 18 U.S.C. § 20 (defining "financial institution").

255.    Through their deception, Defendants purposefully "cause[d] U.S. persons and entities, to wit, financial institutions located in the United States, to export goods and services, to wit, financial services, with and for the benefit of KKBC, FTB, North Korea, and North Korean entities," which constituted bank fraud and violated U.S. sanctions. Information ¶ 79.

256.    While BAT "[d]irect[ed] business from North Korea" through its secret joint venture with DPRK "state-owned entities and banks," it knew that doing so "allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts." 81 Fed. Reg. 35441. BAT knew these funds ultimately reached "[e]ntities in North Korea involved in the proliferation of … ballistic missiles" that "conduct[ed] business in, from, or through North Korea, or at the direction of the North Korean government." 81 Fed. Reg. 35441. Indeed, "[i]n spite of" the designation of North Korean terrorist-sponsoring banks like "KKBC" in 2009, BAT "continued to evade sanctions and [help] process financial transactions that support[ed] the proliferation of . . . ballistic missiles by using front companies to clear U.S. dollar transactions through U.S. correspondent accounts." 81 Fed. Reg. 35441.

257.    BAT's use of the U.S. financial system was always knowing. Among other reasons, BAT's experience in the U.S. financial system, its in-house financial personnel, and agents knowledgeable about the United States (whose knowledge is imputed to BAT) confirm this awareness. Moreover, Treasury publicly warned multinationals like BAT. On June 14, 2007,

for example, the Secretary of the Treasury cautioned that "our financial actions have produced demonstrable impacts on threats" from "terrorist groups" and "dangerous regimes in North Korea and Iran" by leveraging "targeted financial measures" that Treasury could effectively use "because the U.S. is the key hub of the global financial system; we are the banker to the world."

258.    BAT's misconduct directly undermined U.S. efforts to work with American financial institutions to prevent North Korean-sponsored terrorism. As Treasury and State observed in 2020, "the U.S. government's commitment to work with the private sector to prevent" the "facilitation of terrorist activities" with "a focus on Iran" and "North Korea" was a fundamental premise of U.S. foreign policy.

259.    BAT's misconduct enabled North Korean terrorist procurement agents acting on behalf of the IRGC and Hizballah, such as Office 39, to leverage the credibility, reliability, speed, and strength of the U.S. financial system and the U.S. dollar. This turbocharged the attacks that relied upon arms sourced through the North Korea-IRGC-Hizballah joint weapons venture. As BAT always knew, and *Radio Free Asia* reported in 2011, "U.S. dollars were highly sought after by the corrupt [DPRK] officials because the greenback is easy to keep, and can be used for any purpose." Moreover, as BAT knew, the U.N. reported in 2015 that the RGB played important roles in the DPRK's financial system, transporting bulk cash and arranging clandestine activities where "[i]n most cases . . . transactions were made in United States dollars . . . and transferred through corresponding bank accounts in the United States."

260.    BAT also knew that its North Korean counterparts, including Office 39, depended upon access to U.S. dollars for the joint weapons venture to succeed. Because the inputs for the venture (*e.g.*, electronics in Asia) were priced and sold in U.S. dollars, North Korea's ability to reliably access the enormous U.S. dollar stockpile that BAT helped build played a primary role

in powering the attacks perpetrated by Hizballah and the IRGC. As North Korea scholar Dr. Andrea Berger observed in 2015, BAT's counterparts at Office 39 prioritized obtaining U.S. dollars even above maximizing profits, possibly having been "told by their superiors that generating revenue denominated in foreign currencies, rather than profit, is the top priority." Office 39's motivation was simple: profits denominated in North Korean *won* did not finance the joint weapons venture because the missiles and rockets required U.S. dollars for procurement.

261.    As BAT knew, the U.S. dollar was always the most important foreign currency to the regime. A 2008 Library of Congress study observed that "more than 60 percent" of foreign currency in North Korea "was in U.S. dollars." North Korea's ability to access the U.S. financial system was vital to the DPRK's ability to pursue the illicit ends for which it was sanctioned. *Compare* 22 U.S.C. § 9222(a)(4)-(5) (Findings), Pub. L. 114-122, Title II, § 202 ("Ensuring the consistent enforcement of United Nations Security Council resolutions and financial restrictions on North Korea"), 130 Stat. 104 (Feb. 18, 2016) ("Congress makes the following findings: . . . (4) All member states share a common interest in protecting the international financial system from the risks of money laundering and illicit transactions emanating from North Korea. (5) The United States dollar and the euro are the world's principal reserve currencies, and the United States and the European Union are primarily responsible for the protection of the international financial system from the risks described in paragraph (4)."), *with* U.S. Dep't of Treas., *Imposition of Special Measure Against North Korea as a Jurisdiction of Primary Money Laundering Concern*, 81 Fed. Reg. 78715 (Nov. 9, 2016) ("North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives. . . . [T]hese deceptive practices have allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts.").

262.    Moreover, the joint weapons venture depended upon Office 39's ability to access the U.S. financial system through illicit partnerships. In 2014, the U.N. found that the DPRK used "confidential business dealings" to "pool funds in accounts that, in turn, could help to advance prohibited programmes or disguise earnings from arms or proliferation-related transfers . . . through joint ventures where a foreign partner could hold funds on behalf of or for the benefit of designated entities." This is exactly what happened here, with BAT and SUTL serving as the foreign partners holding U.S. dollars for Office 39/RGB.

**2.    BAT Reached into the United States to Conceal the Scheme**

263.    BAT also reached into the United States to conceal the scheme by, among other things, transmitting fraudulent statements to banks and media organizations in America, including, but not limited to, BAT's transmission of false statements to *Forbes* in the United States in 2007. *Supra* ¶ 130. These affirmative acts of concealment targeted U.S. audiences, regulators, and shareholders, further deepening the nexus to this forum.

**3.    BAT Leveraged Marketing Value Derived from BAT's U.S. Contacts**

264.    BAT leveraged its U.S. contacts to power the branding, marketing, and R&D that enhanced Office 39's ability to sell BAT's tobacco. BAT supplied Daesong with brand and IP advantages. As BAT touted in 2000, it controlled "valuable equity in international brands . . . symbolised to the public through the trademarks," which carried a "reputation for manufacturing high quality cigarettes."

265.    BAT depended upon its U.S. contacts to protect its brand through the extensive use of the U.S. IP system.

266.    According to BAT, Defendants powered the resale value of Daesong's cigarette sales through BAT's status as an "American" company selling "American" tobacco vetted by the U.S. Food and Drug Administration ("FDA"). Such U.S. regulatory approvals directly increased

the resale value of the cigarettes BAT jointly produced with Daesong. Among other reasons, the FDA was universally recognized around the world as the "gold standard" for product safety.

267.    According to BAT, Defendants also leveraged BAT research centers in the United States to continually test, refine, and enhance the tobacco every BAT subsidiary and affiliate sold worldwide—necessarily including Office 39/Daesong.

### C.    Defendants' Misconduct Implicates Important U.S. Interests, Permitting Jurisdiction In U.S. Courts

268.    Defendants' misconduct violated multiple U.S. laws, including sanctions on North Korea designed to prevent violence against Americans in the United States and abroad.

269.    Defendants' misconduct also implicates JASTA's finding that "entities … that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA § 2(a)(6). For years, Defendants willfully provided exactly such direct and indirect support to North Korea, the IRGC, and Hizballah.

270.    Plaintiffs, who are U.S. nationals and the family members of U.S. nationals, have a strong interest in pursuing justice in a U.S. forum.

## VIII.    PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY DEFENDANTS' CONDUCT

271.    Except where otherwise specified, each Plaintiff was a U.S. national at the time of the attack that injured them and remains one today (or, was a U.S. national at death).

### A. Lommie Blackmon and Cynthia Harmon

272.     Plaintiffs Lommie Blackmon and Cynthia Harmon were in Iraq working as civilian contractors for KBR at the time of the January 8, 2020 Erbil Air Base Attack. Both were severely wounded in the attack, which caused severe physical and/or psychological injuries. As a result of the attack and their respective injuries, each of these Plaintiffs has experienced severe physical and emotional pain and suffering.

### B. Plaintiffs Associated With the January 8, 2020 Al Asad Attack

273.     Each of the Direct Victim Plaintiffs in the table below was severely wounded by the January 8, 2020 Al Asad Attack, resulting in severe physical and/or psychological injuries, including, but not limited to, one or more of the following: Traumatic Brain Injury ("TBI"); post-concussion syndrome; injuries to head, shoulders, knees, elbows, and back; PTSD; anxiety; acute stress disorder; depression, including major depression disorder; panic disorder; sleep disorders, including insomnia and sleep apnea; tinnitus; hearing loss; migraines/headaches; panic disorders; eye convergence insufficiency; psoriasis and psoriatic arthritis; cognitive communication disorder; autonomic dysfunction; benign proximal placement vertigo; audio processing disorder; resulting problems with balance, speech, memory, and concentration; severe alcohol abuse disorder; bilateral vestibular system damage and dysfunction; cervicalgia; cervical lymphadenopathy; thyroid nodules; fibromyalgia, lumbar degenerative disc disease; and exacerbation of existing conditions (including multiple sclerosis, thyroid toxicosis paralysis, hyperthyroidism, and Graves' disease). Each Direct Victim Plaintiff below has experienced severe mental anguish, as well as severe physical and emotional pain and suffering, as a result of the January 8, 2020 Al Asad Attack and their respective injuries.

| Direct Victim Plaintiff | Associated Family Member Plaintiff(s) |
|---|---|
| Staff Sergeant (SSG) Toni Alexander | Sergeant First Class (SFC) Brock Johnson (Husband) |
| Ahmed Alsagar | |
| Sergeant (SGT) Shanerria Barber | |
| Specialist (SPC) Patrick Ben | |
| SPC Badekemi Biladjetan | |
| SPC Einreb Bismanos | |
| SGT Julius Brisco | Melissa Brisco (Wife) |
| | T.B., by and through his next friend SGT Brisco (Son) |
| | J.M., by and through his next friend Melissa Brisco (Stepson)[4] |
| SPC Ali Brown | |
| SGT Timothy Brown | |
| SPC James Carson | SPC Mackenzie Kammerer (Ex-Wife)[5] |
| SPC Jaron Carter | Olivia Carter (Wife) |
| | J.C., by and through her next friend SPC Carter (Daughter) |
| Chief Warrant Officer 2 (CW2) Thomas Caudill | Adrienne Caudill (Wife) |
| | L.H.C.; L.T.C., and O.C., each by and through their next friend CW2 Caudill (Sons) |
| | R.C., by and through her next friend CW2 Caudill (Daughter) |
| CW2 Dolphise Colomb | M.W., by and through his next friend CW2 Colomb (Son) |
| SPC Necollier Daniels | Sarah Daniels (Wife) |
| | C.N.D. and C.T.D., each by and through his next friend SPC Daniels (Sons) |
| SGT Jacob Deer | Samantha Deer (Wife) |
| | J.A.D. and J.C.D., each by and through his next friend SGT Deer (Sons) |
| SPC Corey Faucett | |
| Thomas Feldschneider | Courtney Feldschneider (Wife) |
| | J.F., by and through his next friend Thomas Feldschneider (Son) |
| SGT Julie Ferguson | |
| SGT Mitchell Ferguson | |
| SPC Miguel Figueroa | |

[4] J.M. and every other Associated Family Member Plaintiff that is a stepchild of a Direct Victim Plaintiff lived in the same household as such Direct Victim Plaintiff and considered him the functional equivalent of a biological father.

[5] SPC Kammerer and every other Associated Family Member Plaintiff that is an ex-spouse of a Direct Victim Plaintiff was such Direct Victim Plaintiff's spouse at the time of the January 8, 2020 Al Asad Attack.

| Direct Victim Plaintiff | Associated Family Member Plaintiff(s) |
|---|---|
| SSG Aaron Futrell | |
| SGT Steven Garrett | Heather Garrett (Wife) |
| | S.G., by and through his next friend SGT Garrett (Son) |
| Private Second Class (PV2) Brandon Godwin | |
| SGT Dustin Graham | Malissa Graham (Wife) |
| | H.G., by and through her next friend SGT Graham (Daughter) |
| SGT Stephon Green | Mentoria Green (Wife) |
| | A.G. and S.G., each through their next friend SGT Green (Children) |
| SPC Nathan Grosse | |
| SPC Brett Gustafson | Amanda Gustafson (Wife) |
| | L.G., by and through his next friend SPC Gustafson (Son) |
| Captain (CPT) Geoffrey Hansen | Allie Hansen (Wife) |
| Kendra Hawkins | |
| CW2 John Hergert | Alyssa Hergert (Wife) |
| | C.H., by and through his next friend CW2 Hergert (Son) |
| SSG Costin Herwig | Jennifer Deaver (Ex-Wife) |
| | J.H., by and through his next friend SSG Herwig (Son) |
| | J.B.R.D. and J.M.D., each by and through his next friend Jennifer Deaver (Stepsons) |
| Private First Class (PFC) Brandon Hitchings | |
| SGT Suzanne Hodges | |
| PFC Byron Hogan | |
| SPC Kerry Howard | |
| SSG Andrew Jenkins | Megan Jenkins (Wife) |
| | A.J. and S.J., each by and through her next friend SSG Jenkins (Daughters) |
| | P.J., by and through his next friend SSG Jenkins (Son) |
| Major (MAJ) Alan Johnson | Teri Larson-Johnson (Wife) |
| | J.J., by and through his next friend MAJ Johnson (Son) |
| | Carly Messman (Stepdaughter) |
| | Abby Sigurdson (Stepdaughter) |
| | Samuel Sigurdson (Stepson) |
| SFC Brock Johnson | SSG Toni Alexander |
| PFC Tremayne Joiner | |
| SPC Robert Jones | |
| SPC Mackenzie Kammerer | SPC James Carson (Ex-Husband) |
| SPC Daunte Keller | |
| SPC Alexander Knowles | |

| Direct Victim Plaintiff | Associated Family Member Plaintiff(s) |
|---|---|
| SFC Daine Kvasager | C.K. and R.K., each by and through his next friend SFC Kvasager (Sons) |
| SSG Rebecca Kvasager | L.K., by and through her next friend SSG Kvasager (Daughter) |
| SGT Kenneth Lewis | Tammy Senecal-Lewis (Wife) |
| | K.L. and R.L., each by and through her next friend SGT Lewis (Daughters) |
| | R.A.L., by and through his next friend SGT Lewis (Son) |
| | TaVera Green (Stepdaughter) |
| Dennis Licon | |
| SGT Leighton Lim | |
| SSG Deanna Lucchesi | Joshua Lucchesi (Husband) |
| | Anastasia Lucchesi (Daughter) |
| | H.L. and Z.L., each by and through her next friend SSG Lucchesi (Daughters) |
| SGT John Magee | |
| Mazin Mahdi (contractor) | |
| SGT Darius Martin | Amanda Martin (Wife) |
| | M.M., by and through his next friend SGT Martin (Son) |
| | Darlina Martin (Mother) |
| | Cayleigh Martin (Sister) |
| SSG Armando Martinez IV | |
| SPC Isaac Martz | |
| SSG Torrin McDougle | |
| SGT Phillip Mendoza | Melchi Mendoza (Wife) |
| | Alexander Mendoza (Son) |
| SGT Zachary Merrill | Carolina Merrill (Wife) |
| | C.M., by and through her next friend SGT Merrill (Daughter) |
| Corporal (CPL) Julian Mitchell | |
| SGT James Morgan | Sarah Morgan (Wife) |
| | C.M., by and through her next friend SGT Morgan (Daughter) |
| SPC Ryan Nolan | |
| SGT Brittany Norfleet | Anthony Shappy (Husband) |
| | A.S. and K.S., each by and through her next friend SGT Norfleet (Daughters) |
| SPC Jose Ortiz | |
| SGT Anthony Panchoo | Alexis Panchoo (Ex-Wife) |
| | A.P., by and through her next friend SGT Panchoo (Daughter) |
| Zachary Parker (contractor) | |
| SFC Carlos Porres Jr. | K.L.P. and K.R.P., each by and through her next friend SFC Porres (Daughters) |

| Direct Victim Plaintiff | Associated Family Member Plaintiff(s) |
|---|---|
| CW2 Michael Pridgeon | Rebecca Pridgeon (Wife) |
| | A.P., by and through her next friend CW2 Pridgeon (Daughter) |
| | Mills Pridgeon (Son) |
| | T.P., by and through his next friend CW2 Pridgeon (Son) |
| Patricia Puranda (contractor) | |
| Technical Sergeant (TSgt) Rachel Quinn | |
| SGT Jason Quitugua II[6] | Francine Rios (Mother), bringing claims both in her personal capacity and in her capacity as representative of SGT Quitugua's estate. |
| | Kaedinn Quitugua (Sister) |
| | Mckenzie-Jae Quitugua (Sister) |
| | Summer Quitugua (Sister) |
| SGT Rodney Ragin | |
| SPC Nilsa Rivera-Villegas | |
| SPC Mason Scarbrough | |
| SSG Jacob Schmidt | |
| PFC Jaron Schneider | Ashley Schneider (Wife) |
| PFC Collin Shepard | Kaitlin Shepard (Wife) |
| SGT Frederick Shilke | Stephanie Shilke (Wife) |
| | W.S., by and through his next friend SGT Shilke (Son) |
| | M.C.R., by and through his next friend Stephanie Shilke (Stepson) |
| | M.D.R., by and through her next friend Stephanie Shilke (Stepdaughter) |
| PFC Michael Smith | Corisia Smith (Ex-Wife) |
| | A.S., by and through her next friend PFC Smith (Daughter) |
| | A.D., by and through her next friend Corisia Smith (Stepdaughter) |
| SPC Gregory Sorensen | |
| Hugh Spears Jr. (contractor) | Brandon Spears (Son) |
| SPC Johnathan Stark | |
| SGT Kevin Stevens | Casey Stevens (Wife) |
| Dolores Syrell (contractor) | |

---

[6] SGT Quitugua, who suffered from a TBI and PTSD that were caused by the January 8, 2020 Al Asad Attack, committed suicide on October 7, 2021 as a result of those injuries. The Plaintiff members of the Quitugua Family are the survivors and/or heirs of SGT Quitugua and are entitled to recover for the damages he sustained to his person and/or property.

| Direct Victim Plaintiff | Associated Family Member Plaintiff(s) |
|---|---|
| William Taber (contractor) | Dagmar Taber (Wife)[7] |
| | Louis Palla (Son) |
| | Samira Palla (Daughter) |
| | A.T., by and through her next friend Mr. Taber (Daughter) |
| SPC Nicolaus Trivelpiece | |
| SSG Sandro Vicente | |
| SPC Luis Villegas | |
| First Lieutenant (1LT) Hailey Webster | John Goetz (Husband) |
| SGT Jeremy Winkler | Tyla Winkler (Wife) |
| | M.A.W. and M.I.W., each by and through his next friend SGT Winkler (Sons) |
| | M.Z.W., by and through her next friend SGT Winkler (Daughter) |
| SPC Mason Wright | |
| Ram Zamel | |

274.     Each Associated Family Member Plaintiff in the table above has experienced severe mental anguish and emotional pain and suffering as a result of the January 8, 2020 Al Asad Attack and the injuries suffered by the Direct Victim Plaintiffs to whom they are related.

### C. The Mahmoudzadeh Family

275.     Omer Mahmoudzadeh was in Iraq helping refugees in camps near the Democratic Party of Iranian Kurdistan headquarters. He was killed in the September 28, 2022 Attack.

276.     Plaintiff Shiwa Nahadi, Mr. Mahmoudzadeh's widow, brings claims in both her personal capacity and as the representative of his estate. Plaintiff Tara Mahmoudzadeh, Mr. Mahmoudzadeh's daughter, joins in these claims. As a result of this terrorist attack, the Mahmoudzadeh family has experienced severe mental anguish, emotional pain, and the permanent loss of Omer's society, companionship, and counsel.

---

[7] Dagmar Taber, Louis Palla, and Samira Palla are German citizens. However, as the heirs and/or survivors of Mr. Taber—who *is* a U.S. national—they are entitled to recover for the damages he sustained as a result of the January 8, 2020 Al Asad Attack.

**277.** Moreover, as Mr. Mahmoudzadeh's heirs and/or survivors, the Plaintiff members of Mr. Mahmoudzadeh's family are entitled to recover for the damages he sustained to his person and/or property as a result of the September 28, 2022 Attack.

## CLAIM FOR RELIEF

## COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2)
### (All Plaintiffs: Secondary Liability; Aiding and Abetting)

278. Plaintiffs incorporate their factual allegations above.

279. To establish a claim for aiding and abetting under the Justice Against Sponsors of Terrorism Act, 18 U.S.C. § 2333(d)(2), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by an organization that had been designated as a Foreign Terrorist Organization at the time of the act of international terrorism; (4) that Defendants were generally aware that they were playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that Defendants knowingly provided substantial assistance.

280. Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

281. The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

a.     the attacks involved violent and dangerous acts that violated the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f;

b.    the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, the United States, and other nations, (ii) to influence the policy of the U.S., Iraqi, and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Iraqi, and other governments by mass destruction, assassination, and kidnapping; and

c.    the attacks occurred primarily outside the territorial jurisdiction of the United States.

282.    The United States has designated Hizballah, Kataib Hizballah, and the IRGC as Foreign Terrorist Organizations, doing so in 1997, 2009, and 2019, respectively.

283.    Each attack was committed, planned, or authorized by the Hizballah, Kataib Hizballah, and/or the IRGC. All three groups were designated Foreign Terrorist Organizations when the terrorist attacks that killed or injured Plaintiffs occurred.

284.    Defendants were generally aware that they were playing a role in illegal and tortious activity that supported and facilitated terrorist organizations and terrorist violence, as evidenced by their guilty pleas admitting to years of criminal misconduct including bank fraud and sanctions evasion.

285.    The terrorist attacks that injured Plaintiffs were a natural, probable, and foreseeable consequence of Defendants' unlawful activity. Years of authoritative public sources established that facilitating illicit tobacco production in North Korea financed missile proliferation to the IRGC and Hizballah, which would use those missiles to attack Americans.

286.    Defendants provided assistance knowingly and culpably, and not innocently or inadvertently. Defendants did so with knowledge of, or deliberate indifference to, the fact that they were providing assistance to terrorist organizations engaged in violent attacks against Americans.

287.    Defendants' assistance was substantial in both a quantitative and qualitative sense. By providing hundreds of millions of dollars that financed missile technology and

weapons capabilities that made the attacks possible, Defendants contributed significantly to the attacks' success.

288.    Defendants' assistance was pervasive and systemic. The assistance involved years of willful misconduct and tremendous sums of money that provided critically important assistance to the Foreign Terrorist Organizations that killed or injured Plaintiffs and their family members.

289.    As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

290.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

291.    Wherefore, Plaintiffs pray this Court:

a.    Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b.    Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c.    Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d.    Award Plaintiffs prejudgment interest; and

e.    Award Plaintiffs any such further relief the Court deems just and proper.

Dated: January 29, 2026                       Respectfully submitted,

*/s/ Raj Parekh*

Raj Parekh (Va. Bar No. 101209)
Anthony Asuncion (*pro hac vice* forthcoming)
Matthew J. Fisher (*pro hac vice* forthcoming)
Adam J. Goldstein (*pro hac vice* forthcoming)
Kathryn L. Rakoczy (*pro hac vice* forthcoming)
Devin Charles Ringger (*pro hac vice* forthcoming)
Tejinder Singh (*pro hac vice* forthcoming)
Ryan R. Sparacino (*pro hac vice* forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
raj.parekh@sparacinopllc.com
anthony.asuncion@sparacinopllc.com
matt.fisher@sparacinopllc.com
adam.goldstein@sparacinopllc.com
kate.rakoczy@sparacinopllc.com
devin.ringger@sparacinopllc.com
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*