**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| SHIWA NAHADI, individually, and as representative for the estate of ESTATE OF OMER MAHMOUDZADEH, TARA MAHMOUDZADEH, LOMMIE BLACKMON, CYNTHIA HARMON, TONI ALEXANDER, BROCK JOHNSON, AHMED ALSAGAR, SHANERRIA BARBER, PATRICK BEN, BADEKEMI BILADJETAN, EINREB BISMANOS, JULIUS BRISCO, MELISSA BRISCO, T.B. by and through his next friend Julius Brisco, J.M. by and through his next friend Melissa Brisco, ALI BROWN, TIMOTHY BROWN, JAMES CARSON, MACKENZIE KAMMERER, JARON CARTER, OLIVIA CARTER, J.C. by and through her next friend Jaron Carter, THOMAS CAUDILL, ADRIENNE CAUDILL, L.H.C. by and through his next friend Thomas Caudill, L.T.C. by and through his next friend Thomas Caudill, O.C. by and through his next friend Thomas Caudill, R.C. by and through her next friend Thomas Caudill, DOLPHISE COLOMB, M.W. by and through his next friend Dolphise Colomb, NECOLLIER DANIELS, SARAH DANIELS, C.N.D. by and through his next friend Necollier Daniels, C.T.D. by and through his next friend Necollier Daniels, JACOB DEER, SAMANTHA DEER, J.A.D. by and through his next friend Jacob Deer, J.C.D. by and through his next friend Jacob Deer, COREY FAUCETT, THOMAS FELDSCHNEIDER, COURTNEY FELDSCHNEIDER, J.F. by and through his next friend Thomas Feldschneider, JULIE FERGUSON, MITCHELL FERGUSON, MIGUEL FIGUEROA, AARON FUTRELL, STEVEN GARRETT, HEATHER GARRETT, S.G. by and through his next friend Steven Garrett, BRANDON GODWIN, DUSTIN GRAHAM, MALISSA GRAHAM, H.G. by and through her next friend Dustin Graham, STEPHON GREEN, MENTORIA GREEN, A.G. by and through his next friend Stephon Green, S.G. by and through her next friend Stephon Green, NATHAN GROSSE, BRETT GUSTAFSON, AMANDA GUSTAFSON, L.G. by and through his next friend Brett Gustafson, GEOFFREY HANSEN, ALLIE HANSEN, KENDRA HAWKINS, JOHN HERGERT, ALYSSA HERGERT, C.H. by and through his next friend John | Case No.: 1:26-cv-274 |

Hergert, COSTIN HERWIG, JENNIFER DEAVER, J.H. by and through his next friend Costin Herwig, J.B.R.D. by and through his next friend Jennifer Deaver, J.M.D. by and through his next friend Jennifer Deaver, BRANDON HITCHINGS, SUZANNE HODGES, BYRON HOGAN, KERRY HOWARD, ANDREW JENKINS, MEGAN JENKINS, A.J. by and through her next friend Andrew Jenkins, S.J. by and through her next friend Andrew Jenkins, P.J. by and through his next friend Andrew Jenkins, ALAN JOHNSON, TERI LARSON-JOHNSON, J.J. by and through his next friend Alan Johnson, CARLY MESSMAN, ABBY SIGURDSON, SAMUEL SIGURDSON, TREMAYNE JOINER, ROBERT JONES, DAUNTE KELLER, ALEXANDER KNOWLES, DAINE KVASAGER, C.K. by and through his next friend Daine Kvasager, R.K. by and through his next friend Daine Kvasager, REBECCA KVASAGER, L.K. by and through her next friend Rebecca Kvasager, KENNETH LEWIS, TAMMY SENECAL-LEWIS, K.L. by and through her next friend Kenneth Lewis, R.L. by and through her next friend Kenneth Lewis, R.A.L. by and through his next friend Kenneth Lewis, TAVERA GREEN, DENNIS LICON, LEIGHTON LIM, DEANNA LUCCHESI, JOSHUA LUCCHESI, ANASTASIA LUCCHESI, H.L. by and through her next friend Deanna Lucchesi, Z.L. by and through her next friend Deanna Lucchesi, JOHN MAGEE, MAZIN MAHDI, DARIUS MARTIN, AMANDA MARTIN, M.M. by and through his next friend Darius Martin, DARLINA MARTIN, CAYLEIGH MARTIN, ARMANDO MARTINEZ IV, ISAAC MARTZ, TORRIN MCDOUGLE, PHILLIP MENDOZA, MELCHI MENDOZA, ALEXANDER MENDOZA, ZACHARY MERRILL, CAROLINA MERRILL, C.M. by and through her next friend Zachary Merrill, JULIAN MITCHELL, JAMES MORGAN, SARAH MORGAN, C.M. by and through her next friend James Morgan, RYAN NOLAN, BRITTANY NORFLEET, ANTHONY SHAPPY, A.S. by and through her next friend Brittany Norfleet, K.S. by and through her next friend Brittany Norfleet, JOSE ORTIZ, ANTHONY PANCHOO, ALEXIS PANCHOO, A.P. by and through her next friend Anthony Panchoo, ZACHARY PARKER, CARLOS PORRES JR., K.L.P. by and through her next friend Carlos Porres Jr., K.R.P. by and through her next friend Carlos Porres Jr.,

MICHAEL PRIDGEON, REBECCA PRIDGEON, A.P. by and through her next friend Michael Pridgeon, MILLS PRIDGEON, T.P. by and through his next friend Michael Pridgeon, PATRICIA PURANDA, RACHEL QUINN, FRANCINE RIOS, individually, and as representative for the estate of ESTATE OF JASON QUITUGUA II, KAEDINN QUITUGUA, MCKENZIE-JAE QUITUGUA, SUMMER QUITUGUA, RODNEY RAGIN, NILSA RIVERA-VILLEGAS, MASON SCARBROUGH, JACOB SCHMIDT, JARON SCHNEIDER, ASHLEY SCHNEIDER, COLLIN SHEPARD, KAITLIN SHEPARD, FREDERICK SHILKE, STEPHANIE SHILKE, W.S. by and through his next friend Frederick Shilke, M.C.R. by and through his next friend Stephanie Shilke, M.D.R. by and through her next friend Stephanie Shilke, MICHAEL SMITH, CORISIA SMITH, A.S. by and through her next friend Michael Smith, A.D. by and through her next friend Corisia Smith, GREGORY SORENSEN, HUGH SPEARS JR., BRANDON SPEARS, JOHNATHAN STARK, KEVIN STEVENS, CASEY STEVENS, DOLORES SYRELL, WILLIAM TABER, DAGMAR TABER, LOUIS PALLA, SAMIRA PALLA, A.T. by and through her next friend William Taber, NICOLAUS TRIVELPIECE, SANDRO VICENTE, LUIS VILLEGAS, HAILEY WEBSTER, JOHN GOETZ, JEREMY WINKLER, TYLA WINKLER, M.A.W. by and through his next friend Jeremy Winkler, M.I.W. by and through his next friend Jeremy Winkler, M.Z.W. by and through her next friend Jeremy Winkler, MASON WRIGHT, and RAM ZAMEL,

*Plaintiffs*,

v.

BRITISH AMERICAN TOBACCO P.L.C., and BRITISH-AMERICAN TOBACCO MARKETING (SINGAPORE) PRIVATE LIMITED,

*Defendants*.

## AMENDED COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

DEFENDANTS ................................................................................................... 5

JURISDICTION AND VENUE ........................................................................... 6

SOURCING ........................................................................................................ 7

FACTUAL ALLEGATIONS .............................................................................. 9

I.     NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST
       ALLIES IN AN "AXIS OF RESISTANCE" TARGETING THE UNITED
       STATES ..................................................................................................... 9

       A.     North Korea Operates As A Global Criminal Enterprise To Proliferate
              Arms................................................................................................... 9

       B.     The IRGC Operates As A Global Terrorist Organization Dedicated To
              Targeting The United States ............................................................. 14

       C.     Hizballah Functions As The IRGC's Lead External Terrorist Arm ...... 15

II.    DEFENDANTS INTENTIONALLY PARTICIPATED IN NORTH KOREA'S
       MISSILE PROLIFERATION NETWORK.................................................... 16

       A.     North Korea, The IRGC, And Hizballah Entered A Joint Venture To
              Produce And Deploy Missiles In Terrorist Attacks Against Americans ...... 16

       B.     North Korea Supplied Its Missile Technology And Expertise To The
              IRGC ................................................................................................ 20

              1.     Procurement and Export of Advanced Missiles....................... 20

              2.     Institutional Missile Collaboration and Development .............. 21

              3.     Embedded DPRK Operatives' Direct Support for IRGC and Hizballah
                     Missile Design, Production, Testing, Storage, and Maintenance Inside
                     Iran ......................................................................................... 22

              4.     Underground Missile Fortifications.......................................... 24

       C.     Through The DPRK-IRGC-Hizballah Joint Arms Venture, The IRGC And
              Hizballah Integrated North Korean Missile Systems Into Their Attacks ............ 24

i

D.      Office 39/Daesong Cigarette Revenues Provided Vital Financing For Attacks Enabled Through The North Korea-IRGC-Hizballah Joint Arms Venture.................................................................................................. 25

E.      The North Korea-IRGC-Hizballah Joint Arms Venture Produced The *Qiam*- And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs.............. 27

III.   DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES............................................. 29

A.      Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties............................................. 29

B.      Defendants Formed A Joint Venture With North Korean Terrorist Arm Office 39 Through An Office 39 Front Called Daesong ..................................... 33

C.      Defendants Lied About Exiting The Joint Venture In 2007 ................................ 38

1.      BAT Engaged in a Sham Divestment of its North Korean Interests ........ 38

2.      BAT Laundered Hundreds of Millions of Dollars Through its Ongoing North Korea Joint Venture and Obstructed FinCEN Operations Designed to Prevent Terrorism ................................................... 41

3.      BAT Continued its North Korean Joint Venture Despite Knowledge of North Korea's Weapons Proliferation and Terrorism.............................. 43

D.      Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty.................................................................................................. 47

IV.   DEFENDANTS PROVIDED ESSENTIAL AND LASTING AID TO IRGC *QIAM* AND *FATEH* MISSILE ATTACKS ENABLED BY THE DPRK-IRGC-HIZBALLAH JOINT ARMS VENTURE.......................................................... 49

A.      Defendants' Funding, Financial, And Logistical Support Enabled Development Of The *Qiam* And *Fateh* Missiles Used To Attack Plaintiffs ........ 49

1.      BAT Provided Financial Support to IRGC *Qiam* and *Fateh* Attacks....... 50

2.      BAT Provided Cover and Concealment for IRGC *Qiam* and *Fateh* Attacks by Helping DPRK Terrorist Fronts Covertly Leverage the U.S. Financial System on Behalf of the DPRK and IRGC .............................. 57

3.      BAT Provided Vital Support to North Korean Cigarette Counterfeiting that Financed Missile Procurement............................................................. 64

ii

B.    Defendants' Assistance To *Qiam* And *Fateh* Attacks Was Extensive And
Continuous, And Aligned Defendants' Profits With Terrorist Violence ............. 68

V.    PLAINTIFFS' EXPERTS HAVE CONFIRMED THE AMENDED
COMPLAINT'S ESSENTIAL CULPABILITY AND NEXUS ALLEGATIONS ........ 72

VI.    THE IRGC AND HIZBALLAH COMMITTED TERRORIST ATTACKS THAT
KILLED AND INJURED AMERICANS USING *QIAM* AND *FATEH*
MISSILES DEVELOPED AND/OR IMPROVED BY DEFENDANTS'
MISCONDUCT ....................................................................................... 80

A.    January 8, 2020 Attack In Iran And Iraq – Operation Martyr Soleimani ............. 80

B.    September 28, 2022 Attack in Iran and Iraqi Kurdistan ...................................... 81

VII.    DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA
ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS ........ 82

A.    Defendants Monitored Sanctions, Reports, And Media Warnings About
North Korea's Role In Financing IRGC and Hizballah Missile Attacks .............. 82

B.    Defendants' Compliance, Corporate Security, And Intelligence Teams
Alerted Defendants That The Illicit Cigarette Trade Was Funding
Terrorism ...................................................................................... 84

VIII.    DEFENDANTS' CONDUCT INVOLVED THE UNITED STATES ............................ 86

A.    Defendants' Conduct Targeted The United States ................................................. 86

B.    Defendants' Conduct Had A Substantial Nexus To The United States ................ 87

1.    BAT Deliberately Used the U.S. Financial System to Power its
Scheme ................................................................................. 87

2.    BAT Reached into the United States to Conceal the DPRK Scheme ....... 89

C.    Defendants' Conduct Implicates Important U.S. Interests, Permitting
Jurisdiction In U.S. Courts ................................................................... 90

IX.    PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY
DEFENDANTS' CONDUCT .......................................................................... 90

A.    Plaintiffs Associated With The January 8, 2020 Erbil Air Base Attack ............... 91

B.    Plaintiffs Associated With The January 8, 2020 Al Asad Air Base Attack .......... 91

C.    The Mahmoudzadeh Family ................................................................. 95

CLAIM FOR RELIEF .................................................................................. 96

COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C.
§ 2333(d)(2) ............................................................................................................... 96

JURY DEMAND .................................................................................................................. 98

PRAYER FOR RELIEF ....................................................................................................... 98

iv

**INTRODUCTION**

1.      Plaintiffs are 196 victims of two terrorist missile attacks committed in Iraq. Defendants are British American Tobacco p.l.c. ("BAT") and its subsidiary British-American Tobacco Marketing (Singapore) Private Limited ("BATMS"). From 2007 through 2017, Defendants knowingly participated in a North Korean sanctions-evasion and proliferation-financing network tied to the same North Korean entities and financial infrastructure that supported Iran's ballistic missile programs. Defendants did so by operating a secret cigarette-manufacturing joint venture with a North Korean government-owned entity designated by the United States for "facilitating North Korean trafficking in arms." Despite publicly claiming they had exited North Korea, Defendants covertly supplied valuable machinery, equipment, raw materials, and technical support to North Korean-linked entities. Defendants' scheme substantially assisted the development, production, procurement, financing, and stockpiling of the *Qiam*- and *Fateh*-class missile systems used in the terrorist attacks alleged herein by helping North Korea generate and access substantial hard currency outside the reach of U.S. sanctions enforcement. Defendants were prosecuted by the United States for sanctions violations and bank fraud, and in 2023, BAT agreed to pay more than $629 million to U.S. authorities—the "largest North Korean sanctions penalty in the history" of the United States.

2.      At all relevant times, North Korea, also known as the Democratic People's Republic of Korea ("DPRK"), was the most heavily sanctioned regime in the world because it was the leading proliferator of weapons of mass destruction to terrorists, including the specific missiles used to attack and injure Plaintiffs. For decades, the DPRK has collaborated with Iran's Islamic Revolutionary Guard Corps ("IRGC") and Hizballah in a joint missile venture. This collaboration has been documented by the United States, United Nations ("U.N."), and a U.S. District Court. Such collaboration was turnkey and solved key chokepoints in the IRGC's and

1

Hizballah's missile programs, such as procuring components and materials necessary for IRGC and Hizballah terrorists to effectively use such arms to attack Americans. Every aspect of the IRGC's missile program production process presented a chokepoint at which the IRGC's missile attacks in Iraq depended upon DPRK support. And that fact also made U.S. sanctions targeting this conduct so impactful because preventing the IRGC from securing North Korea's help at key stages of the process would disrupt, degrade, or prevent the resulting missile attacks. But Defendants flouted these sanctions and knowingly provided substantial assistance to the DPRK-IRGC-Hizballah joint missile venture that helped the IRGC overcome key chokepoints in the development of the *Qiam* and *Fateh*-class missiles that the IRGC used in its attacks against Plaintiffs in Iraq.

3.     The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("Treasury") determined that BAT's violations "helped North Korea establish and operate a cigarette manufacturing business—a sector that has reportedly netted over $1 billion per year for the Government of the DPRK," which is "known to use funds generated through international trade to support" its "missile programs." By helping a notorious sponsor of the IRGC missile attack program—North Korea's Office 39, and its commercial arm, Daesong—"establish and operate a cigarette manufacturing business," Daesong-BAT, Defendants did not just help terrorists source weapons through a terrorist front—Defendants built the front itself.

4.     The Assistant Attorney General of the U.S. Department of Justice's ("DOJ" or the "Justice Department") National Security Division confirmed to Congress in December 2023 that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, generating revenue used to advance North Korea's weapons program." And other senior DOJ officials explained that "our investigation exposed BAT" as an "important component[] in

2

funding North Korea's WMD [Weapons of Mass Destruction] proliferation program," and confirmed that a "substantial portion" of the profits BAT helped generate "is believed to flow back directly to the North Korean government, its military, and its WMD program." These findings confirm what was broadly known and frequently publicized before and throughout BAT's scheme: DPRK cigarette revenues financed missile and rocket threats in the Middle East.

5.    The U.S. government's findings about BAT were reinforced by the U.S. District Court that presided over Defendants' criminal case. At sentencing on April 25, 2023, the Hon. Beryl A. Howell recognized that Korea Kwangson Banking Corporation ("KKBC") and Foreign Trade Bank ("FTB")—DPRK banks implicated in BAT's scheme and used by North Korea to conduct international transactions—"have been designated as WMD proliferators by the Treasury Department," a fact that BATMS "knew." Judge Howell further explained that "North Korea uses KKBC and FTB to mask international financial business of sanctioned proliferators in service of its nuclear ballistic missile and other WMD-related programs that endanger us all." Judge Howell also concluded that Defendants' misconduct "was flagrant and lengthy, over a term of years," involving deliberate efforts to evade U.S. sanctions and deceive U.S. banks while generating "millions and millions of dollars" for DPRK entities.

6.    During their scheme, Defendants knew that Iran and its IRGC were North Korea's number one overall recipient of DPRK ballistic missile assistance and used those weapons to attack Americans in the Middle East. Defendants also knew that by operating an illicit joint venture with a DPRK state entity, Office 39, through the latter's commercial arm, Daesong, to form the Daesong-BAT cigarette joint venture, Defendants were financing the missile and rocket attacks carried out by the IRGC and Hizballah against Americans. For at least a decade,

3

Defendants persisted in this scheme, defying repeated warnings and public reporting that their conduct would enable these attacks.

7.    The connection between BAT's DPRK-joint venture partners and IRGC missiles was repeatedly confirmed through U.S. and other sanctions designations and public government findings issued before and during Defendants' scheme. Throughout the 2007–2017 period of Defendants' misconduct, the United States repeatedly identified the DPRK entities that Defendants knew were involved in their scheme as core components of the DPRK's support for the IRGC's ballistic missile programs. Treasury and other public findings called out ongoing DPRK-IRGC cooperation concerning both liquid- and solid-fueled ballistic missile systems, including the *Qiam* and *Fateh* missile families used to attack Plaintiffs. During the same period, Defendants' scheme generated at least hundreds of millions of dollars in covert hard-currency flows for the very same missile proliferation apparatus delivering these lethal arms to the IRGC.

8.    Contemporary public reporting similarly warned BAT that its North Korean joint venture partner—Daesong—operated within Office 39, which is the hub of North Korea's procurement network for weapons, including missiles. In 2006, *Asia Times* published an exposé specifically warning that BAT's joint venture partner was linked to entities repeatedly sanctioned by the United States for missile-proliferation activities involving Iran. *Asia Times* further cautioned BAT that continued business with Daesong/Office 39 risked "aiding and abetting illicit North Korean financing" of North Korea's WMD programs.

9.    As Plaintiffs allege in great detail, BAT's conduct enabled the DPRK-IRGC-Hizballah joint weapons venture to finance, develop, and refine the exact *Qiam*- and *Fateh*-class missiles that were deployed to deadly effect in the attacks against Plaintiffs. BAT knowingly provided substantial assistance to these attacks by illegally helping DPRK terrorist fronts that

4

collectively served as the IRGC's missile procurement agent and likely generated over $1 billion in seed capital for the DPRK-IRGC-Hizballah joint missile venture during a period crucial to the development, production, and stockpiling of *Qiam-* and *Fateh*-class missiles. Plaintiffs seek relief under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016).

## **DEFENDANTS**

10.     Defendant British American Tobacco p.l.c. is a multinational tobacco company. BAT is headquartered in London, but produces and trades tobacco products globally. It is the largest tobacco firm worldwide based on net sales.

11.     BAT is a globally integrated firm that has emphasized a centralized leadership structure with direct involvement in local markets. BAT explained in 2000, for example, that "[t]he Global Structure" of "British American Tobacco" was "globally integrated, based on Regions with self-sufficient Management Units, guided and supported by Central Functions and Services." "Centralised services," BAT has explained, were "also based at head office" and "act[ed] as suppliers to the End Markets, leveraging the advantages of economies of scale." Through this approach, BAT developed and maintained commercial operations and personnel networks in multiple countries, including: (1) North Korea, where BAT maintained commercial operations from at least 2001 through 2017; (2) Iran, where BAT maintained commercial operations from at least 2003 until August 2021; (3) Iraq, where BAT maintained commercial operations from at least 2015 through 2025; and (4) the United States, where BAT maintained commercial operations at all relevant times. In each of these countries, BAT targeted the market for sales, monitored local media and government announcements, closely followed the local security climate and other factors relevant to BAT's business, and employed local agents fluent in the language to develop data and facilitate information sharing throughout BAT.

5

12. Defendant British-American Tobacco Marketing (Singapore) Private Limited is a subsidiary of BAT. During the relevant period, BAT controlled BATMS and received income generated by BATMS through its sales of products to North Korea.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331. Personal jurisdiction exists over each Defendant under Fed. R. Civ. P. 4(k)(1)(C). The ATA expressly authorizes federal jurisdiction over foreign defendants in civil ATA actions, 18 U.S.C. § 2334(a), and the Supreme Court recently held that the exercise of jurisdiction under such federal statutes is governed by a flexible Fifth Amendment framework. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025). Plaintiffs do not rely on Fed. R. Civ. P. 4(k)(1)(A) or any state's long-arm statute as the basis for personal jurisdiction over Defendants. Plaintiffs certify based on reasonably available information that Defendants are foreign corporations that are not subject to jurisdiction in any state's courts of general jurisdiction with respect to the claims arising from the conduct alleged herein. Accordingly, and in the alternative, personal jurisdiction is proper under Fed. R. Civ. P. 4(k)(2).

14. Venue is proper in the Eastern District of Virginia under 18 U.S.C. § 2334(a) because Plaintiffs Shiwa Nahadi and Tara Mahmoudzadeh reside in—and the Estate of Omer Mahmoudzadeh is located in—the Alexandria Division of this District. Venue is also proper in this District because many anticipated witnesses, discovery sources, and relevant evidence are located in or near the Eastern District of Virginia.[1]

---

[1] Plaintiffs' preliminary investigation confirms that a substantial portion of the anticipated witnesses and discovery is concentrated in or near this District. This includes materials previously collected, reviewed, or produced in connection with Defendants' April 2023 criminal and regulatory resolutions in the United States, as well as evidence maintained by federal agencies located in or near this District. Plaintiffs also believe that many U.S.-based non-party witnesses and experts are located in or near this District. Plaintiffs do not presently anticipate

**SOURCING**

15.    Plaintiffs' allegations are based in substantial part on ten sources: (1) BAT's deferred prosecution agreement ("DPA"); (2) BATMS's plea agreement; (3) BAT and BATMS's criminal Information, as to which Defendants waived indictment; (4) the transcript of Defendants' Plea Colloquy and BATMS's Sentencing; (5) BAT's regulatory settlement with OFAC; (6) United States, U.N., and European Union ("E.U.") sanctions findings of which BAT knew; (7) reports by media outlets that BAT monitored; (8) hearings and reports by Congress; (9) expert analyses; and (10) internal BAT documents. *See United States v. British American Tobacco, et al.*, No. 23-cr-118 (D.D.C. Apr. 25, 2023), Statement of Offense [Dkt. No. 11], Plea Agreement [Dkt. No. 12], Criminal Information [Dkt. No. 1], Transcript of Plea Colloquy and Sentencing [Dkt. No. 21]; Settlement Agreement of BAT and OFAC (Apr. 17, 2023) ("OFAC Settlement");[2] U.S. Dep't of Treas., *OFAC Settles with British American Tobacco p.l.c. for $508,612,492 Related to Apparent Violations of the North Korea and Weapons of Mass Destruction Proliferators Sanctions Regulations* (Apr. 25, 2023) ("OFAC Release").[3] Each provides extensive evidence of Defendants' misconduct. Defendants further stipulated that the facts detailed in the Information and the Statement of Offense "are true and accurate." Unless otherwise indicated, Plaintiffs have added all emphases in quotes herein.

16.    Many of the sources cited herein use terms such as "weapons of mass destruction," "WMD," or "proliferation" in the context of U.S. and U.N. sanctions targeting North Korea. During the relevant period, these words and phrases in the DPRK sanctions context

extensive overseas discovery or numerous overseas non-party witnesses. Plaintiffs expect that much of the relevant evidence will be obtained through party discovery, publicly available materials, expert analysis, and limited targeted discovery from U.S.-based persons and entities.

[2] Available here: https://ofac.treasury.gov/media/931661/download?inline.

[3] Available here: https://ofac.treasury.gov/media/931666/download?inline.

frequently encompassed missile cooperation with Iran and the IRGC. Throughout the same period, the United States repeatedly identified Iran as a principal recipient of DPRK missile technology, procurement assistance, and proliferation-related financial support, and reports identified North Korea as the number one supplier of missile assistance to Iran while Defendants partnered with Daesong. Accordingly, when the sources herein refer to "weapons of mass destruction," "WMD," or "proliferation" in the context of DPRK sanctions and proliferation networks, such references ordinarily include the ballistic missile technology, procurement activity, and related financial infrastructure underlying the DPRK-IRGC-Hizballah joint missile venture alleged in this Amended Complaint. A wide range of sources confirms the point. The U.S. Code, for example, defines "weapon of mass destruction" to include missiles. *See* 18 U.S.C. § 2332a(c)(2). In 2004, likewise, the U.S. Department of State ("State") reported that "Iran" had "received foreign assistance from entities in North Korea" to "develop and expand its ballistic missile program," which was "WMD assistance." And in 2009, similarly, the U.S. government reported that it was working with the U.N. "to convince North Korea to adhere to its pledge not to develop nuclear weapons or other weapons of mass destruction, to include ballistic missiles."

17.    With respect to "Iran" as used by the United States, U.N., media, or scholars described in the terrorism context, including regarding missiles, such references ordinarily meant the IRGC (inclusive of proxy Hizballah) because the IRGC exclusively controlled Iran's terror portfolio, including its missiles, and Hizballah was notoriously the IRGC's lead external arm.

18.    Plaintiffs retained subject-matter experts concerning DPRK proliferation financing, Office 39 operations, DPRK-Iran missile cooperation, and the *Qiam*- and *Fateh*-class missile systems used in the two terrorist attacks against Americans alleged herein. Dr. Sheena Chestnut Greitens is a leading scholar concerning Office 39 and DPRK illicit trade practices,

while Dr. Jeffrey Lewis and Dr. Tom Karako are leading experts concerning DPRK-Iran ballistic missile cooperation and missile proliferation. Following the filing of Defendants' Motion to Dismiss [Dkt. Nos. 30-31], Plaintiffs consulted with these experts regarding issues raised in Defendants' briefing, including missile proliferation, sanctions-evasion financing, operational sustainment, and the relationship between Defendants' sanctions-evasion scheme and the *Qiam*- and *Fateh*-class missile systems. Plaintiffs accordingly incorporated additional factual allegations and expert-supported detail into this Amended Complaint concerning how Defendants' conduct substantially assisted the DPRK-Iran missile-development and proliferation activities that developed, procured, financed, and stockpiled the specific *Qiam*- and *Fateh*-class missile systems used in the terrorist attacks at issue.

**FACTUAL ALLEGATIONS**

I.    **NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST ALLIES IN AN "AXIS OF RESISTANCE" TARGETING THE UNITED STATES**

19.    North Korea, the IRGC, and Hizballah are part of the "Axis of Resistance," a terrorist alliance dedicated to undermining U.S. foreign policy by killing Americans. For decades, they have collaborated to harm U.S. interests through the transfer of advanced arms, use of shared financial networks, training in terrorist tradecraft, and construction of underground missile attack tunnels. During the relevant period, Iran was the world's leading state sponsor of terrorism. North Korea was Iran's primary weapons supplier, including of missiles and rockets.

A.    **North Korea Operates As A Global Criminal Enterprise To Proliferate Arms**

20.    North Korea is hostile to the United States as a matter of regime policy and views the U.S. as its primary enemy—a fact that has been well-known and reported by the U.S. government for decades. To accomplish its anti-American objectives, the DPRK has long supported terrorist groups to undermine U.S. foreign-policy goals. As the U.S. Department of

9

Defense ("DoD") found in 2006, the DPRK may "threaten the United States" by "transferring weapons or expertise to terrorists." In 2016, likewise, Congress found that North Korea "poses an imminent threat to the security of the United States and its allies" and to "the safety of members of the United States Armed Forces." 22 U.S.C. § 9201(a)(9).

21.    At all relevant times, the DPRK was unlike every other nation. As senior U.S. official Dr. David Asher warned in 2005, the DPRK is the "only government in the world today" that "actively" "direct[s] crime as a central part of its national economic strategy and foreign policy," resembling "an organized crime family more than a normal nation." This mafia government does not perform most ordinary governmental functions.

22.    Kim Jong-Il (Supreme Leader 1994–2011) and Kim Jong-Un (Supreme Leader 2011–Present) have long used their control over the DPRK's government and economy to direct state revenues to fund missile development rather than economic or other policy initiatives.

23.    A central pillar of this apparatus is Office 39 (a/k/a Daesong). As BAT always knew, Daesong is sometimes spelled "Daesung" or "Taesong," among other ways, and Office 39 was sometimes referred to as "Bureau 39" or "Room 39." As Treasury found on November 18, 2010, Office 39/Daesong is a "secretive branch" of North Korea's government that manages the regime's illicit economic activities, "slush funds," and revenue generation.

24.    To accomplish its illicit ends, Office 39 utilized a network of fronts known as Daesong. For example, an analysis published by the U.S. Army in 2010 found that "Office #39 and all of its subordinate organizations have become known within North Korea as the Daesung Conglomerate." Since 2010, Treasury has designated Office 39 and its conglomerate, Daesong, as "key components" of the regime's network "facilitating North Korean trafficking in arms."

10

25.    Office 39 directed "all crime-for-profit activity" in the DPRK, as the Congressional Research Service noted in 2007—and its coordination of this system was "exercised at the top," as DPRK scholar Dr. Greitens noted in 2005. In 2010, a U.S. Army-published analysis concluded that the "crimes organized by Office #39 are committed beyond the borders of North Korea by the regime itself, not solely for the personal enrichment of the leadership, but to prop up its armed forces and to fund its military programs."

26.    Office 39 directly financed, and coordinated other DPRK support to, the DPRK-IRGC-Hizballah joint missile venture. In 2007, for example, the Congressional Research Service reported that Office 39 uses its profits to "procure overseas components for North Korea's weapons of mass destruction programs." Office 39 thus operated as a "vast criminal enterprise" that was "set up and used to finance" DPRK "ballistic-missile programs," as *Vanity Fair* reported in 2009. Office 39 was similarly involved in "the sale of weapons, including missiles" to "countries such as Iran," as the *Vancouver Sun* reported in 2006.

27.    Office 39 worked in tandem with the Reconnaissance General Bureau ("RGB"), the DPRK's primary terrorist operations arm. The RGB was sanctioned in Executive Order 13551 on August 30, 2010, and has been described by Treasury as the DPRK's premier intelligence organization and primary arm responsible for DPRK-supported terrorist attacks.

28.    Office 39 and the RGB represented two sides of the same DPRK terrorist sponsorship coin: Office 39 functioned as a global financial, logistics, and operational front directly controlled by leadership, while the RGB functioned as the corresponding operations arm responsible for attacks and associated training and logistical aid to allies like the IRGC and Hizballah. The relationship is analogous to the IRGC's domination of Iran's economy through fronts, which allow the IRGC to use commercial activity to source money, technology, and

11

materiel for terrorist attacks. In this way, the DPRK's use of Office 39 as a terrorist finance and logistics front to source arms, and the RGB as the terrorist operations arm mirrored the longstanding tradecraft of the IRGC and Hizballah that was heavily influenced by DPRK training. The IRGC, for example, operates a global logistics and finance front called the Foundation for the Oppressed that complements the IRGC's official operations arm and is analogous to Office 39's relationship with the RGB.

29.     Office 39, including its commercial arm Daesong, always operated as a notorious terrorist front for DPRK, IRGC, and Hizballah terrorists. It was purpose-built to supply funds to the DPRK's top weapons priorities and served as the procurement arm for North Korean RGB terrorists and Office 39's and the RGB's joint arms venture partners, the IRGC and Hizballah.

30.     The IRGC was chief among Office 39's terrorist partners. As DoD explained in a 2013 report, North Korea maintained a "core group of recipient countries including Iran." As noted in public DoD reports to Congress in 2012, 2016, and 2018, through the Office 39/RGB network, North Korea exported "missile-related equipment, components, materials, and technical assistance" to the IRGC and Hizballah. Due to these missile threats, the United States has consistently employed a "maximum pressure" sanctions campaign targeting the DPRK's weapons proliferation and illicit finance networks since 1994.

31.     To move funds and arms, Office 39 uses Korea Mining Development Corporation ("KOMID"), Tanchon Commercial Bank ("Tanchon"), KKBC, and FTB. These entities do not operate in silos; Office 39 and the RGB work together to assist the IRGC and Hizballah, including through KOMID, Tanchon, KKBC, FTB, and Green Pine Associated Corporation ("Green Pine"), among others. These entities operated as an integrated network of terrorist fronts: Office 39 was the lead partner for the DPRK's primary terrorist arm, the RGB, and served

12

as an exclusive and notorious procurement arm for the IRGC and Hizballah with respect to a litany of weapons and logistics systems, while KOMID, Tanchon, KKBC, FTB, and Green Pine were tightly connected to and directed by Office 39. For example, Dr. Greitens has confirmed in her analysis for Plaintiffs that the Office 39/Daesong-led network functioned as a procurement arm for the IRGC's and Hizballah's missile activities.

32.    To accomplish the above ends, Office 39 utilized a network of fronts known as Daesong to conduct its operations. For example, an analysis by Dr. Paul Rexton Kan and others published by the U.S. Army in 2010 found that "Office #39 and all of its subordinate organizations have become known within North Korea as the Daesung Conglomerate."

33.    Through Daesong, Office 39 directed North Korea's cigarette manufacturing and smuggling. The 2010 U.S. Army report noted that Office 39 "directs illicit activities" including "the manufacture and distribution of counterfeit cigarettes." A 2009 investigative report by *Vanity Fair* similarly warned that Office 39 was "at the center" of the trade, with its elite headquarters staff supervising "large-scale facilities" like "cigarette factories."

34.    BAT's cigarette joint venture in North Korea was part of Office 39's Daesong group: the joint venture was named "**Daesong-BAT**." *See infra* Part III(B). Profits from this joint venture flowed to Office 39 and financed IRGC missile attacks. *Infra* ¶ 123.

35.    Throughout the relevant period, BAT, Office 39/Daesong, KOMID, Tanchon, KKBC, FTB, and Green Pine operated within an interconnected DPRK sanctions-evasion, proliferation-financing, and missile-procurement apparatus that supported IRGC missile attacks. Within that apparatus, BAT's joint venture generated substantial hard-currency flows for Office 39 and its various fronts and agents; Office 39 and Daesong managed and controlled key foreign-currency-generation activities; KOMID and Green Pine operated as principal DPRK arms-

13

procurement entities; and Tanchon, together with KKBC and FTB, facilitated proliferation-related financial transactions and access to the international financial system. These entities operated as coordinated components of a broader DPRK proliferation structure that materially supported DPRK-Iran missile cooperation during the relevant period. The United States similarly identified many of these entities as part of a DPRK proliferation "network," and BAT admitted in its Statement of Offense that its North Korean counterparties operated within such a sanctions-evasion and proliferation-related network. Statement of Offense ¶¶ 7, 9, 32, 44.

36.    On August 30, 2010, President Obama issued Executive Order 13551, which specifically designated "Office 39" (in its Annex) upon "finding that the continued actions and policies of the Government of North Korea, manifested most recently by," *inter alia*, "its missile launches in 2009; its actions in violation of UNSCRs 1718 and 1874, including the procurement of luxury goods; and its illicit and deceptive activities in international markets through which it obtains financial and other support, including money laundering, the counterfeiting of goods and currency," foreseeably could "imperil U.S. Armed Forces." 75 Fed. Reg. 53,837. When Treasury designated Office 39/Daesong in 2010, Treasury found—and publicly warned—that it generated illicit revenue used to support the DPRK (including KOMID) "missile" proliferation to "Iran."

**B.    The IRGC Operates As A Global Terrorist Organization Dedicated To Targeting The United States**

37.    Since April 1979, the IRGC has operated as a global terrorist organization targeting the United States. Unlike the armed forces of a nation, the IRGC is an "ideological army" mandated by Article 150 of Iran's constitution to "export the Islamic Revolution" through "Jihad, for God's sake." To accomplish this goal while avoiding armed conflict with the United States during the relevant period, the IRGC often sponsored proxy attacks against Americans.

14

38.     From 2007 through 2022, the IRGC sponsored thousands of terrorist attacks throughout the world—including in Iraq, where it sponsored the most. These attacks featured a wide array of attack types, including missiles (among others). With respect to the universe of IRGC-backed *Qiam* and *Fateh* missile attacks that resulted in the death or serious physical injury of a U.S. national during the period from 2007 through the present, Plaintiffs are only aware of two IRGC-committed acts of terrorism using *Qiam* and *Fateh* missiles—the January 2020 and September 2022 attacks against Plaintiffs alleged herein. To Plaintiffs' knowledge, Office 39, the RGB, and the IRGC did not commit any other act of terrorism between 2007 and the present that resulted in any American being killed or seriously physically injured by a *Qiam* or *Fateh* missile.

39.     The United States has repeatedly documented the IRGC's terrorist attacks on Americans in Iraq. In 2007, the United States formally found that the IRGC Qods Force, the branch of the IRGC that plans and finances external terrorist operations alongside Hizballah, had partnered with Hizballah to supply "lethal support" to Shiite Iraqi terrorists targeting Americans.

40.     The IRGC has always controlled Iran's ballistic missile and rocket program.

**C.     Hizballah Functions As The IRGC's Lead External Terrorist Arm**

41.     In 1982, the IRGC founded Hizballah in Lebanon, establishing the group as its most important terrorist partner and lead external attack arm. During the relevant period, every Hizballah operative swore a religious oath of loyalty to Ayatollah Khamenei.

42.     Hizballah has a formal role within the IRGC's missile and rocket enterprise. As State reported to Congress in 2015, the IRGC has integrated Hizballah into these operations to such an extent that the Commander of the IRGC Aerospace Force, the IRGC branch responsible for IRGC-led or -sponsored missile and rocket attacks, admitted, "[t]he IRGC and Hizballah are a single apparatus jointed together." The IRGC transferred missiles to Hizballah derived from the DPRK-IRGC-Hizballah joint venture. This collaboration allowed Hizballah to serve as a force

15

multiplier, recruiting local members in high-terror-risk zones and equipping them with IRGC-supplied, DPRK-designed arms to target Americans in Iraq.

43.    Hizballah interfaces between the IRGC and their Shia terrorist proxies in Iraq, including Kataib Hizballah (or "KH"), with whom Hizballah and the IRGC attacked Plaintiffs.

## II.    DEFENDANTS INTENTIONALLY PARTICIPATED IN NORTH KOREA'S MISSILE PROLIFERATION NETWORK

44.    For decades, North Korea, the IRGC, and Hizballah have collaborated in a joint weapons venture to develop, manufacture, and deploy missiles and rockets in anti-American terrorist attacks. The DPRK-IRGC-Hizballah joint weapons venture was not a formal entity. Rather, it was a joint effort by these terrorist actors to develop and use missiles and rockets, including the specific *Qiam* and *Fateh* missiles used to harm Plaintiffs. Defendants' misconduct aided those efforts specifically.

### A.    North Korea, The IRGC, And Hizballah Entered A Joint Venture To Produce And Deploy Missiles In Terrorist Attacks Against Americans

45.    The joint arms venture began during the Iran–Iraq War in the 1980s, when Iran purchased missiles and rockets from North Korea in a barter arrangement in which the two nations exchanged oil for weapons. During this period, North Korea provided technical aid to help Iran build a domestic missile production facility, which North Korea operated and staffed.

46.    From the 1990s through at least 2022, North Korea collaborated with Hizballah in the same way. Throughout, as was widely reported in real-time, North Korea regularly hosted delegations of high-ranking IRGC and Hizballah terrorists to negotiate weapons sales, receive training in terrorist tactics, and coordinate weapons development—including for missiles.

47.    Between 2001 and 2004, the Central Intelligence Agency ("CIA") provided semiannual public reports to Congress that consistently found that the DPRK was helping the IRGC develop its ballistic missile program. During this period, such CIA warnings included that

16

"entities" in "North Korea" were "continu[ing] to supply crucial ballistic missile–related equipment, technology, and expertise to Iran," and that the CIA "believe[d] that such" DPRK ballistic missile-related "assistance" "include[d] equipment, technology, and expertise."

48.     By the late 2000s, the DPRK-IRGC-Hizballah joint arms venture had solidified. In 2008, for example, the Congressional Research Service reported that a wide array of U.S. government, U.N., and media "reports and the State Department's characterization of the IRG[C] as a major player in Iran's missile program point to a likely continuing relationship between North Korea and the IRG[C], including a kind of joint venture partnership to develop missiles inside Iran," that featured supply and coordination with "Hezbollah," including over "rockets and related electric circuits and solid fuel propellant" used by the IRGC and Hizballah to launch attacks. Dr. Greitens, likewise, observed in 2014 that "North Korea has shifted toward exporting missile components rather than full systems and to working on joint development projects with a small handful of partner countries"—which always included Iran. Similarly, DPRK scholar Larry Niksch testified to Congress in 2015 that the DPRK maintained "working ties with Iranian companies responsible for producing missiles," and regularly dispatched "missile experts" to upgrade the accuracy, lethality, and security of the IRGC's arsenal. IRGC officials, in turn, frequently visited North Korea to observe missile tests throughout the 2000s and 2010s.

49.     While Defendants partnered with Daesong from 2007 through 2017, the IRGC was the number one overall recipient of ballistic missile assistance from the DPRK. For example, a study published in 2011 in the *Nonproliferation Review* determined that, at least through 2009—which is during the period of BAT's scheme—the Middle East was the DPRK's most important market, and within that market, Iran was its top customer.

17

50.    Throughout the relevant period, the United States found, and publicly reported, that the DPRK and Iran partnered to sponsor missile attacks. In 2006, for example, Treasury sanctioned firms for enabling IRGC missile threats, including those posed by the *Fateh-110*, and emphasized that IRGC missile programs relied upon direct DPRK aid. In 2010, likewise, the Defense Intelligence Agency found that Iran received DPRK aid in developing its missiles and continued to increase such arms' range, lethality, and accuracy. Similar reports were legion.

51.    Senior U.S. officials have publicly confirmed that North Korea, the IRGC, and Hizballah operated a joint missile and rocket venture that directly threatened Americans in Iraq, like Plaintiffs. In 2008, for example, Senator Joe Lieberman publicly warned that "North Korea's relationship with the Islamic Revolutionary Guard Corps" was "in two areas: Coordination in support for Hezbollah, and cooperation in ballistic missile development," and "North Koreans' bad record here" suggested they had continued "supporting" the "IRGC that, according to evidence presented by the U.S. Army, is responsible for training and equipping Iraqi extremists" who were "responsible for murdering hundreds of American soldiers." In 2013, likewise, former CIA Director R. James Woolsey testified to Congress that "North Korea helps develop Iranian … ballistic missiles. North Korea and Iran effectively have a joint missile program together." And Director Woolsey explained that "the United States" was at risk of "potential attacks by the Iran-Syria-North Korea nexus and their terrorist proxies" because "Iran and North Korea have been able to maintain such a close relationship in the development" of "missile programs, even extending it" to "Hezbollah."

52.    In 2014, a federal district court, citing expert testimony, found that Office 39 partnered with the IRGC in a joint arms venture that supplied missiles and rockets to the IRGC and Hizballah, for which "the financing part of it came from what's called office number 39,"

18

which "works ***directly with the [Islamic Revolutionary] Guard Corps***, and then the funds and weapons are actually funneled out through them." *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014).

53.      In 2017, Congress enacted the Countering America's Adversaries Through Sanctions Act ("CAATSA"), finding "cooperation between North Korea and Iran" included "transfer of goods, services, technology, or intellectual property" "between North Korea and Iran relating to their respective" "ballistic missile development" "programs." CAATSA § 316(a).

54.      The United States regularly warned that this joint missile program between North Korea, Iran, and Hizballah posed a direct threat to American forces. As early as 1999, the House North Korea Advisory Group found, and publicly reported, that North Korea's missile proliferation activities to the IRGC "created an immediate, serious and growing threat to U.S. forces, interests, and allies" in "the Middle East." And in 2010, DoD warned that "North Korea and Iran, as part of their defiance of international norms, are actively testing and fielding new ballistic missile systems," and "[a]s the inventories and capabilities of such systems continue to grow, U.S. forces deployed forward will no longer enjoy the relative sanctuary that they have had in conflicts since the end of the Cold War." That same DoD report presciently warned that "[a]ir bases" and "other assets essential to high-tempo military operations could be at risk."

55.      To combat this threat, the United States imposed robust sanctions on the DPRK entities proliferating missiles to the IRGC. As senior Treasury official Daniel Glaser testified to Congress in 2006, the U.S. financial attack against proliferators was "related to our effort to combat terrorism," as state sponsors like the DPRK and Iran "intentionally obscure the nature of their financial activities" and "hide behind a veil of legitimacy, disguising their activities, such as weapons sales or procurement, through the use of front companies and intermediaries." Despite

19

these sanctions, the DPRK-IRGC-Hizballah joint arms venture continued throughout the relevant period while Defendants participated in it through Daesong-BAT.

### B. North Korea Supplied Its Missile Technology And Expertise To The IRGC

56. North Korea played at least four key roles in the joint arms venture that supplied the missile, rocket, and unmanned aerial vehicle ("UAV")-related weapons, training, and tunnels used to attack Plaintiffs. In sum, Office 39 led the DPRK missile procurement network that supplied the essential hardware, know-how, and personnel that allowed the IRGC to target U.S. forces, without which the IRGC's missiles would have been less accurate, effective, and secure.

#### 1. Procurement and Export of Advanced Missiles

57. First, North Korea procured and exported missiles, rockets, UAVs, components, and technology to the IRGC and Hizballah.

58. In 2008, State transmitted a cable (as published online) noting that the DPRK "remains one of the world's leading suppliers of ballistic missiles and technology, and continues to provide assistance to [] Iran's … ballistic missile programs," offering everything from "complete systems" to "production technology," and that "Iran is one of North Korea's key missile customers," for example, by having incorporated DPRK technology into the IRGC's Shahab-3 missile. (The Shahab is a liquid-fueled ballistic missile. From 2010 through at least 2015, the DPRK-IRGC-Hizballah joint arms venture substantially upgraded the Shahab to create the *Qiam*, which was used by the IRGC to injure Plaintiffs in the January 8, 2020 attack.)

59. There was an inextricable procurement nexus between the DPRK (including through Office 39) and Iran (through the IRGC and Hizballah, among others) supporting missile and rocket attacks targeting the United States in the Middle East. In 2010, for example, the U.N. Panel of Experts reported that North Korea has "continued to provide missiles, components, and technology to certain countries, including … Iran." In 2013, Dr. David Albright testified to

20

Congress that "the threats posed by … the Iran-Syria-North Korea proliferation nexus" could "facilitate … missile advances by" Iran and the DPRK. In 2015, scholar Ilan Berman testified that "Asia's position as a hub for defense technology, including critical assistance to Iran's ballistic missile … programs" was the "context" in which the DPRK "has emerged as what is arguably Iran's most important regional ally."

### 2.    Institutional Missile Collaboration and Development

60.    Second, North Korean specialists collaborated with the IRGC and Hizballah to develop and produce missiles and rockets, sharing technical expertise and exchanging test data.

61.    Decades of reports published by the United States, U.N., media outlets, and scholars confirm that point. In 2006, for example, the *New York Times* reported that "[f]or years North Korea has supplied Iran with missile technology," and "[t]he North Koreans know the Iranians, and their weapons programs, intimately." Other reports made similar findings.

62.    IRGC specialists frequently visited North Korea to collaborate on weapons development and vice versa. In 2010, for example, the Congressional Research Service reported that "Iranian delegations of missile experts and [IRGC] officials reportedly attended the July 2006 and April 2009 test launches of" a ballistic missile. And in 2017, an Iranian democracy group with extensive contacts inside Iran, the National Council of Resistance of Iran ("NCRI"), reported that "delegations of the IRGC's [A]erospace [Force] constantly travel to North Korea and exchange knowledge, information and achievements with North Korean [missile and rocket] specialists," and "since nuclear negotiations in 2013, this trend has not stopped and North Korea's experts constantly travel to Iran while the IRGC's missile experts visit North Korea."

63.    Scholars have detailed the mechanics of this partnership in the specific context of the *Qiam* and *Fateh* missiles used to attack Plaintiffs. In 2015, for example, Ilan Berman testified to Congress that the "centerpiece of the budding Iran-North Korea relationship" was

21

"collaboration on strategic capabilities," which included jointly developing the Shahab missile series—linked to the *Qiam*—which was "closely based on North Korea's nuclear-capable No Dong medium range missile." Berman testified that "Iranian scientists and technicians . . . have had a front-row seat to the DPRK's ballistic missile development, regularly attending its missile launches since at least the early 1990s," and that the joint venture extended to "Hezbollah."

> **3.    Embedded DPRK Operatives' Direct Support for IRGC and Hizballah Missile Design, Production, Testing, Storage, and Maintenance Inside Iran**

64.    Third, North Korean operatives embedded directly into IRGC and Hizballah arms procurement, research, manufacturing, security, and maintenance units.

65.    By 2003, as the *Los Angeles Times* reported, there were so many North Koreans working on missile projects in Iran that many Iranian facilities, including a Tehran hotel and a Caspian Sea resort, were reserved for their sole use. These embedded DPRK operatives deployed on behalf of Office 39 and the RGB, often through fronts they controlled (*e.g.*, KOMID), and provided the key specialized labor spine of every node of the IRGC's and Hizballah's missile infrastructure. Between 2007 and 2022, that network of DPRK operatives oversaw and consulted on missile design and testing, worked key positions within missile factories, coordinated the transfer of DPRK missile-related knowledge and advances to the IRGC and Hizballah, and helped maintain the IRGC's and Hizballah's missile stockpiles.

66.    As scholar Larry Niksch testified to Congress in 2015, this "institutional collaboration" involved at least "several hundred" North Korean specialists embedded with IRGC and Hizballah units throughout the 2010s. Scholar Dr. Andrea Berger also reported in 2015 that Office 39 front Green Pine and arms dealer KOMID maintained offices in Iran that were regarded as "permanent arrangements." By 2017, the *Washington Times* reported that Iran

played "permanent host" to North Korean scientists, establishing residences in Tehran for DPRK technicians who aided the IRGC's missile design, testing, and development.

67.    NCRI confirmed in 2017 that IRGC missile sites were based on "North Korean models and blueprints." According to the same NCRI report, North Korean experts trained IRGC personnel and maintained a "continuous presence" in key industries, including building warheads and guidance systems. The U.N. corroborated this, reporting in 2019 that KOMID and Green Pine "maintain active offices in the Islamic Republic of Iran" and that at least three KOMID representatives remained in Iran under diplomatic cover. Through this cooperation, North Korea and Iran jointly produced missiles for the IRGC and Hizballah.

68.    One such front was Hong Kong Electronics, an Office 39-controlled entity based on Iran's Kish Island that exploited the island's notorious status as an IRGC logistics hub to facilitate IRGC-sponsored attacks. On June 30, 2009, Treasury designated Hong Kong Electronics under E.O. 13382, which "freezes the assets of designated proliferators." Treasury explained that the designation was "part of our overall effort to prevent North Korea from misusing the international financial system to advance its … missile programs and to sell dangerous technology around the world," and specifically found that "Hong Kong Electronics has also facilitated the movement of money from Iran to North Korea on behalf of KOMID."

69.    The same DPRK network that facilitated IRGC missile and rocket purchases also relied on Office 39 affiliate Green Pine, which had a substantial on-the-ground presence in Iran. Key resident operatives included Kang Kyong Il and Ri Sung Il (Green Pine representatives in Tehran); Jang Yong Son, Kim Yong Chol, Ha Won Mo, Kim Hak Chol, and Ri Hyong Thae (Iran-based agents for KOMID); and Pak Sin Hyok and Ri Kuk Myong (Tehran-based Office 39 agents operating under fake diplomatic cover). Senior North Korean officials also regularly

traveled to Iran to coordinate this aid, including heads of KOMID and Green Pine, such as Ri Jong Chol (Chief of KOMID 1st Office), Kang Myong Chol (Chair of KOMID), and Ri Hak Chol (President of Green Pine) and other missile system specialists.

70. North Korean missile specialists thus provided systemic instruction and training to their IRGC and Hizballah allies on how to develop, refine, deploy, and maintain missiles and rockets to deadly effect, including regarding the *Qiam* and *Fateh* missiles used against Plaintiffs.

71. Pursuant to decades of custom and practice, the IRGC and Hizballah always depended upon hundreds of DPRK missile specialists forward deployed in Iran and Lebanon through Office 39/Daesong, who specifically supervised the operations, maintenance, and quality control practices at IRGC and Hizballah missile facilities in Iran and Lebanon. NCRI, for example, reported in 2017 that DPRK specialists played key leadership roles in IRGC missile production inside Iran. Accordingly, when the *Qiam* and *Fateh* missiles were tested, enhanced, and stockpiled inside Iran from 2007 through 2017, forward deployed DPRK personnel were vital to such missiles' construction, quality, and maintenance.

### 4. Underground Missile Fortifications

72. Fourth, throughout the 2000s and 2010s, North Korea constructed extensive underground missile bases for the IRGC and Hizballah. Modeled after North Korean sites, these tunnels allowed the IRGC and Hizballah to clandestinely store missiles and rockets, protecting their arsenals from U.S. strikes while providing secure launch locations.

### C. Through The DPRK-IRGC-Hizballah Joint Arms Venture, The IRGC And Hizballah Integrated North Korean Missile Systems Into Their Attacks

73. The joint weapons venture enabled the IRGC's terrorist attacks against Plaintiffs. From the 2000s through at least 2022, a cadre of notorious IRGC and Hizballah terrorists and/or sponsors partnered with DPRK operatives to facilitate attacks targeting the United States and

24

allies, including, but not limited to: (1) Qasem Soleimani; (2) Esmail Qaani; (3) Amir Ali Hajizadeh; (4) Mohsen Rezai; (5) Mohsen Rafiqdoost; (6) Mohammed Forouzandeh; (7) Parviz Fattah; (8) Asghar Esma'ilpur; (9) Mohammad Gholami; and (10) Seid Mir Ahmad Nooshin.

74. This collaboration persisted throughout the relevant period. In 2006 in Lebanon, for example, the IRGC and Hizballah made prolific use of missiles and rockets that relied on DPRK assistance. A 2010 Congressional Research Service report noted that Israel's Mossad had concluded "'vital missile components' of Hezbollah missiles fired into Israel … came from North Korea." A federal court confirmed these facts in 2014, based on "clear and convincing evidence," *Kaplan*, 55 F. Supp. 3d at 193, upon finding that the DPRK gave Hizballah "advanced weapons, expert advice and construction assistance in hiding these weapons in underground bunkers, and training in utilizing these weapons and bunkers to cause terrorist rocket attacks," *id*. at 200. And in 2010, Secretary of Defense Robert Gates publicly confirmed that "North Korea continues to smuggle missiles and weapons" to "Iran" and "Hezbollah."

**D. Office 39/Daesong Cigarette Revenues Provided Vital Financing For Attacks Enabled Through The North Korea-IRGC-Hizballah Joint Arms Venture**

75. Authoritative sources confirmed the tight connection between Office 39's illicit cigarette trade, which Defendants turbocharged, and the DPRK's ability to support missile and rocket attacks by the IRGC and its terrorist proxies.

76. During the roll-out of enhanced sanctions targeting Office 39/Daesong in August 2010, *supra* ¶ 36, Treasury Under Secretary Stuart Levey warned that North Korea's "belligerent behavior"—including "its missile launches" and proliferation of "missiles" to "Iran"—was "facilitated by a lifeline of cash generated through a range of illicit activities" generated by "Office 39," including "selling counterfeit cigarettes."

77.     This connection between Daesong cigarettes and Office 39 weapons was by design: the same entity—Office 39/Daesong—was responsible for both endeavors. Office 39 served as the central node for operating North Korea's foreign-currency-earning activities. As 2004 DoD analyses explained, Office 39 was "the nerve center of Pyongyang's legal and illegal ventures" and oversaw the "apparatus for securing foreign currency for Kim Chong-il's use."

78.     From 2007 through 2017, Daesong's cigarette sales comprised Office 39's most important foreign currency-earning activity. By 2006, Office 39's revenue from drugs, counterfeit pharmaceuticals, counterfeit currency, and species trading had all declined substantially. Office 39 needed Daesong cigarette sales to fill this missile financing gap. Moreover, Daesong cigarettes were far better for Office 39's support of the joint missile venture than these other sources. Among other reasons, cigarettes offer the largest market in terms of population and geographic reach, the least amount of law enforcement interest, and unique value as cash equivalents that Office 39, the RGB, or other entities in the DPRK missile proliferation network used to pay for goods or labor.

79.     Throughout BAT's scheme, a mine run of other sources confirmed that DPRK cigarette activities (always led by Office 39) played a key role financing missile threats. In 2006, for example, Peter Prahar, a senior State official, testified to Congress that "cigarette counterfeiting" "may be the single most lucrative item in [North Korea's] portfolio" and is a "major source of income to the regime." Prahar also testified that such cigarette-related revenue "could contribute to the financing of DPRK weapons development by a state that is listed as a state supporter of terrorism." Similar reports were legion throughout the relevant period.

80.     While most of the funds Defendants generated flowed to support missile collaboration between the DPRK and IRGC, some funds were also likely used for regime

maintenance, luxury goods, and financing DPRK terrorist arms, *e.g.*, the RGB. Such expenditure did not diminish the potency of Defendants' aid to the IRGC's missile attacks herein for at least three reasons. First, missiles were the regime's number one budget priority during the relevant period and, within that category, the missile types that linked to the *Qiam* and *Fateh* were prioritized. Second, Office 39's non-missile expenses were, collectively, a fraction of the expense of the DPRK's missile collaboration with the IRGC, and such missile expenses also dwarfed the expenses spent on the DPRK's Navy. Third, Office 39's non-missile expenditures themselves augmented the shared DPRK-IRGC missile threat because the expenditures described above comprised bounty awards and prizes, as well as luxury housing and cars, that Office 39 supplied to key DPRK missile scientists, technicians, and managers, as well as key RGB leaders and operatives.

E.    **The North Korea-IRGC-Hizballah Joint Arms Venture Produced The *Qiam*- And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs**

81.    The DPRK regime reinvested Office 39's illicit tobacco profits directly into the DPRK-IRGC-Hizballah joint arms venture, funding the development and stockpiling of the *Qiam* and *Fateh* missiles used to harm Plaintiffs.

82.    In July 2020, the U.S. Army Training and Doctrine Command published an analysis finding that the specific missiles the IRGC fired in "[t]he attack, code named Operation 'Martyr Soleimani,'" *i.e.*, the IRGC's January 8, 2020 Attack against Plaintiffs, had been upgraded with DPRK aid. According to that analysis, the attack revealed the IRGC's capability to fire missiles with "better precision," achieving an accuracy of within 12 meters compared to previous estimates of 250 meters. These missiles, equipped with satellite navigation and maneuverable reentry vehicles ("MaRV"), showed how the IRGC "benefit[ted] extensively from

27

foreign procurement" and had "leverage[d] countries like North Korea" to "extend missile variety and range, and add new generations of ballistic missiles into their force."

83.    The IRGC achieved this improved accuracy by retrofitting older models with guidance systems to "vastly improve accuracy," as the *Washington Post* reported in 2020. The improved models included the *Qiam* and advanced *Fateh*-series missiles, which were refitted to "zero in on highly specific targets." As scholar Behnam Taleblu found in 2020, these missiles reflected "more than a decade of investment" and DPRK collaboration.

84.    North Korea, led by Office 39, played a vital role in developing *Qiam* and *Fateh* missiles for the IRGC during BAT's scheme. In 2010, for example, the *Associated Press* reported the Iranian defense minister's announcement that IRGC "forces have test-fired a new liquid-fueled missile with advanced guidance systems for ground targets" called the "*Qiam*-1." In 2016, likewise, the IRGC tested an upgraded version of the *Fateh* missile, a test that Mr. Taleblu testified to Congress in 2017 was "importan[t]" because it offered "Proof of Iran's continued upgrading of the *Fateh*-110 class" of missiles to include "a submunitions warhead." The IRGC also received DPRK aid to develop the *Fateh*, including upgrades like a new composite body and a superior fuel composite, which allowed the IRGC to unveil the *Fateh-313* missile that offered improved precision sufficient to target U.S. bases in Iraq.

85.    *Qiam* missiles fired against Plaintiffs were also created, tested, and stockpiled by the DPRK-IRGC-Hizballah joint venture during BAT's scheme. First tested in 2010—at the height of BAT's scheme—the *Qiam* was designed specifically to strike U.S. military bases in the Middle East, including Iraq. Between 2010 and 2020, North Korea helped the IRGC upgrade the *Qiam*. Among other ways, they added a MaRV, drastically improving its accuracy and lethality.

28

86.     From 2007 through 2017, North Korea provided lethal aid to the IRGC's *Qiam* and *Fateh* missile threat that was unique from all other potential sources and solved critical procurement and technical chokepoints that differentiated DPRK aid from all other nations. While the Russian and Chinese governments provided some aid to Iran's surface-to-air missile and cruise missile programs during the relevant period, such governments provided only marginal, if any, assistance to the *Qiam* and *Fateh* missiles from 2007 to 2017. Among other reasons, Russian and Chinese assistance was limited during this period because of U.S. diplomatic deals and pressure with both countries. Moreover, only North Korea had a missile joint venture with the IRGC, and only North Korea had hundreds of on-the-ground assets in Iran forward deployed and co-located at IRGC missile facilities.

## III.     DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES

87.     For decades, while the United States and the international community worked to prevent DPRK arms proliferation—issuing warnings and escalating economic sanctions—BAT undermined those efforts by deliberately operating a cigarette-manufacturing joint venture with DPRK terrorist fronts Office 39/Daesong, KKBC, Tanchon, FTB, Green Pine, and KOMID.

88.     BAT's scheme began and evolved against the backdrop of increasingly urgent warnings from the United States and U.N. about the direct link between cigarette smuggling and DPRK missile proliferation to the IRGC and Hizballah. Despite these warnings, BAT operated its scheme with North Korea for nearly two decades.

### A.     Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties

89.     BAT's illicit cigarette joint venture traces back to the mid-1990s, when the company sought to capture the untapped North Korean market. Internal documents published

29

online confirm that BAT viewed North Korea as a critical opportunity to hook new smokers, despite simultaneously recognizing the regime as a hotbed for illicit cigarette and arms sales.

90.     In June 1994, BAT executive Patrick O'Keeffe laid out the strategy in an internal memorandum that touted that opportunity "would provide us with a reason to visit North Korea," even while acknowledging that partnering with a DPRK firm was "obviously sensitive given the current political issues on Nuclear bombs existing between North Korea and the USA."

91.     O'Keeffe's memo coincided with the U.S. announcement in June 1994 seeking a mandatory arms embargo against North Korea due to its nuclear proliferation. President Clinton publicly warned that North Korea "deal[s] with a lot of rogue states that support terrorism," and U.S. officials identified Iran as "the most likely customer for North Korean nuclear materials."

92.     Undeterred, BAT accelerated its plans. In October 1994, the United States and North Korea engaged in a diplomatic crisis over weapons of mass destruction. Simultaneously, an October 1994 BAT memorandum highlighted that it was "actively progressing long term business opportunities" in North Korea, noting that "a new route for direct shipments to Pyongyang has started." By November 1994, BAT's smuggling partner, Singapura United Trading Ltd. ("SUTL"), confirmed in writing to BAT it had "identified a customer for 555 [brand cigarettes] for North Korea" and that BAT employees would visit Pyongyang the following year. That very same month, President Clinton issued Executive Order 12938 finding that the proliferation of nuclear, biological, and chemical weapons and of the means of delivering such weapons constitutes an unusual and extraordinary threat to the national security of the United States. 59 Fed. Reg. 58,099.

93.     BAT persisted. By March 1996, senior BAT executives were negotiating directly with high-ranking DPRK officials known for their close ties to the IRGC. Consistent with the

30

DPRK's practice of using regime officials to manage lucrative joint ventures, BAT worked closely with Choe Tae-Bok, a notorious regime insider and Secretary of the Workers' Party of Korea Central Committee. In a March 1996 telex to BAT, Choe informed BAT that he had "spent alot of time to discuss market-occupation for [BAT's] 555 ciga[rette] . . . and, at last, succeeded to get authorization from our government." He emphasized BAT's exclusivity, stating the company "can not deal with other Korean compan[ies]," and referenced an upcoming visit by a BAT delegation to Pyongyang. At the time of this correspondence, Choe was widely known as the spokesman who announced the DPRK's exit from the Nuclear Nonproliferation Treaty in 1993, and as a vocal public supporter of the IRGC and its anti-American stance. BAT's interactions with Choe further alerted BAT that its counterparty was an avowed IRGC supporter.

94.     At the same time, BAT's internal monitoring confirmed that the entities BAT sought to partner with were involved in illicit activities. In June 1996, BAT's in-house technology department's testers identified counterfeit cigarettes manufactured by Daesong, BAT's future joint venture partner.

95.     On September 23, 1996, Congress passed the Defense Against Weapons of Mass Destruction Act, Pub. L. 104-201, 110 Stat. 2715, identifying North Korea and Iran as hostile states possessing WMDs, and warning that they could transfer WMDs to terrorists. Two months later, BAT's subsidiary, Brown & Williamson, presented a plan to BAT's managing board stating that despite high tensions, "we will position ourselves to capitalize on any opportunities."

96.     In November 1999, a House North Korea Advisory Group report alerted BAT about the risk that the DPRK "continues to harbor terrorists" and its partnership with Daesong would result in DPRK-backed, IRGC-backed missile attacks targeting U.S. servicemembers in the Middle East that could involve Hizballah:

31

a.  "North Korea ranks … as one of the ***greatest missile threats*** in the world due to: the progress made over the past five years in improving its missile capabilities; [and] its record as a leading proliferator of ballistic missiles and missile technology."

b.  North Korea had "***produced, deployed and exported missiles to Iran***," and in doing so, "North Korea undermined regional stability in the Middle East" and its "proliferation activities pose an increasing threat to American and allied interests globally," including "in the Middle East." After receiving DPRK weapons, Iran could, in turn, "export missiles to other countries or even subnational groups"—*i.e.*, terrorist proxies like Hizballah. Thus, DPRK missile proliferation to Iran "created an immediate, serious and growing threat to U.S. forces, interests, and allies" in "the Middle East," and "***increase[d] the chance that the United States and its allies could face missile attacks***."

c.  "Press reports citing North Korean defectors indicate that North Korea created an office specifically to bring in foreign currency. This so-called ***'Bureau No. 39'*** [Office 39/Daesong] functions under the ruling Korean Worker's Party, which is headed by … Kim Jong Il. The office is in charge of … criminal activity including: smuggling [and] counterfeiting … The ***money earned is used to … finance military activity – particularly technology and electronic purchases for intelligence and military purposes***."

The House North Korea Advisory Report was widely republished by the media in November 1999, including, but not limited to, reports published that month by the *Associated Press*, *United Press International*, *Philadelphia Inquirer*, *Boston Globe*, and *Sinocast*, among others.

97.  Unfazed, BAT pushed ahead. The same month the House North Korea Advisory Report warned that Daesong enabled the IRGC's and Hizballah's missile threat against American servicemembers in the Middle East, BAT published an internal order that business "activity in North Korea should be increased."

98.  By 2000, BAT was actively managing the fallout from accusations that it enabled smuggling in Asia. On July 31, 2000, amidst media reports that U.S.-related cigarette smuggling profits were allegedly "used to fund the terrorist group Hizbullah"—and a backdrop of a deluge of similar media and U.S. government warnings on or before that date, including at least a dozen memorialized in a BAT internal media monitoring email on July 25, 2000, *see infra* ¶ 230—BAT Chairman Martin Broughton blithely dismissed the broader concern that tobacco firms needed to exercise corporate responsibility, telling *Newsweek*: "***I don't think it's our responsibility to act***

32

*as a policeman.*" Months later, according to BAT's meeting minutes, its board discussed

"potential contract manufacture in North Korea," which it ultimately approved.

      **B.     Defendants Formed A Joint Venture With North Korean Terrorist Arm Office 39 Through An Office 39 Front Called Daesong**

99.     From 2001 through 2017, the United States, U.N., and global media published

high-profile warnings that North Korea was using its revenue to finance missile and rocket

proliferation to the IRGC and Hizballah. BAT knew of these facts and the sanctions designed to

address them. Rather than cut ties with Office 39, Defendants responded by financing hundreds

of millions of dollars in Daesong cigarette manufacturing that secretly leveraged BAT's

industry-leading expertise, components, and networks. For at least a decade, BAT operated in

secret partnership with Office 39, using deceptive fronts and DPRK banks notoriously connected

to missile proliferation to the IRGC that targeted Americans.

100.     In 2001, BAT's wholly owned Singapore subsidiary, BATMS, commenced a joint

venture cigarette manufacturing business in Pyongyang with Korea Sogyong Chonyonmul

Trading Corporation (identified in DOJ documents as North Korean Tobacco Company or

"NKTC") for a term of 20 years, which was named Daesong-BAT. BATMS held a 60% stake in

Daesong-BAT, supplying the machinery, tobacco, and technical management. The remaining

40% was held by NKTC, an Office 39-controlled firm.

101.     As BAT brought Daesong-BAT online, the United States designated North

Korea's proliferation network as a threat to America, citing its support for Iran. On January 17,

2001, the United States sanctioned Changgwang Sinyong Corporation (a/k/a KOMID) for

violating the Iran Nonproliferation Act by exporting missile technology to Iran. The BBC alerted

BAT to the sanction in a report titled "US Imposes Sanctions On North Korean Firm Over Ties

With Iran." Moreover, as *Reuters* reported in 2001, the "Bush administration" warned that "it

had imposed sanctions against" the "North Korean company, Changgwang Sinyong Corp. [KOMID]" for "helping Iran in violation of international pacts aimed at curbing the spread of deadly weapons" from North Korea "to Iran" that were "designed to head off the spread of missiles" to "Iran" while "Iran" was "the world's most active state sponsor of terrorism."

102. By January 2002, President Bush declared North Korea and Iran part of an "axis of evil" warning that "North Korea is a regime arming with missiles" while Iran, in turn, "aggressively pursues these [North Korean] weapons and exports terror," a pronouncement that received global media coverage that BAT monitored. According to a February 2002 *Reuters* report, for example, "Bush aides say North Korea is … selling [] missile technology to Iran."

103. Despite these warnings, BAT continued operations in North Korea as the United States tightened sanctions on the very network BAT was funding.

104. On December 1, 2004, the United States imposed new sanctions on KOMID for supplying missile goods to the IRGC, which State announced with a press release entitled "U.S. Penalizes Chinese and North Korean Firms for Missile Aid to Iran." BAT knew of these designations through its monitoring of U.S. sanctions announcements and international press reports, including those by the *Associated Press*, *Voice of America*, and *Fox News*.

105. On June 28, 2005, President Bush issued Executive Order 13382, which designated key nodes in the North Korea–Iran arms network, including KOMID (the DPRK's primary arms dealer), Tanchon (its financial arm), and IRGC-affiliated armorers Shahid Hemmat Industrial Group ("SHIG") and Shahid Bakeri Industrial Group ("SBIG"). 70 Fed. Reg. 38,567. As Treasury later noted in 2007, E.O. 13382 "put[] the international community on notice about the threat" these DPRK and Iranian firms "pose to global security as a result of their activities."

34

106.    On September 20, 2005, Treasury designated Banco Delta Asia ("BDA") as a Primary Money Laundering Concern pursuant to its authorities "to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism" under the USA PATRIOT Act. 70 Fed. Reg. 55,214. Treasury found that BDA was a "willing pawn" for North Korean front companies engaged in "smuggling counterfeit tobacco products." *Id*. This action directly affected BAT, which had funds frozen at BDA. Recognizing the threat, BAT and NKTC executives met in October 2005 to discuss how U.S. sanctions targeting the DPRK-Iran arms trade would jeopardize their ability to repatriate profits from the cigarette joint venture. The action against BDA also alerted Defendants that helping its DPRK counterparties acquire cigarette-related income foreseeably financed DPRK missile collaboration with Iran. In 2006, for example, the *Vancouver Sun* reported that the U.S. government's "allegation" against "Banco Delta Asia" was that it was "a major portal through which Room 39"—*i.e.*, BAT partner Daesong/Office 39—laundered "the proceeds" of "the sale of weapons, including missiles" to "countries such as Iran"; on information and belief, the U.S. conveyed the same message directly to BAT. In 2006, likewise, senior Treasury official Stuart Levey testified before Congress: "We also know that North Korean entities engaged in WMD proliferation, including Tanchon Bank - the primary financial facilitator of North Korea's ballistic missile program - held accounts at BDA" and the "regulatory action against a bank facilitating a range of North Korean illicit activities has dealt a blow to Pyongyang's ability to engage in illicit conduct and obtain financial services to facilitate that conduct" thereby "frustrat[ing] North Korea's efforts to conduct proliferation-related transactions."

107.    BAT's then-secret partnership with Office 39/Daesong soon became a scandal. On October 17, 2005, the *Guardian* revealed that BAT had "secretly been operating a factory in

35

North Korea" via a joint venture with Office 39. Regarding "North Korea's human rights record," BAT "told the *Guardian*: 'It is not for us to interfere with the way governments run countries'" and vowed that it "could 'lead by example' and assist the [DPRK]'s development."

108.    Similar concerns soon arose about BAT's role in Office 39's missile transfers to DPRK allies like the IRGC. On February 8, 2006, *Asia Times* published a detailed exposé titled "Smoke Signals from BAT's North Korea Venture," connecting BAT partner NKTC (*i.e.*, Daesong) to Office 39 and WMD proliferation. *Asia Times* reported that Daesong/NKTC shared contact information with entities associated with North Korean weapons programs and warned BAT that the "the company name Daesong-BAT merits attention" because "Japan and other governments have ***prominently featured Daesong for its ties to missile … proliferation***" and the "Daesong" name in the joint venture linked it to a known Office 39 front that had a "pervasive proliferation record" and "links" to a KOMID firm that had "been repeatedly sanctioned by the United States for its ***missile-proliferation activities and sales to Iran***." Accordingly, the same *Asia Times* exposé explicitly cautioned BAT that "the black-market trade of cigarettes could have a tangible impact on North Korea's financing" of missile cooperation between Office 39 and the IRGC and, accordingly, cautioned BAT that such continued economic partnership with Daesong risked "***aiding and abetting illicit North Korean financing that is alleged to fuel Kim Jong-il's slush fund and WMD programs.***" The same *Asia Times* report further alerted BAT about the risks inherent in its joint venture with DPRK entities connected to firms and banks associated with WMD procurement and illicit financial networks, including via shared contacts.

109.    Four months later, on June 13, 2006, Treasury, acting under E.O. 13382, publicly designated multiple companies for supplying missile-related and dual-use components to IRGC missile and rocket programs, expressly identified Iranian missile systems including *Fateh*-class

36

missiles, and tied those programs to North Korean-designed arms produced under license. Treasury further warned that such conduct—often carried out through third-country intermediaries—constituted sanctionable support for missile and rocket proliferation networks.

110.    In July 2006, the DPRK launched multiple missiles. Congress responded with the North Korea Nonproliferation Act of 2006, Pub. L. 109-353, 120 Stat. 2015 (Oct. 13, 2006), aimed at penalizing North Korea, Iran, and Syria for their arms cooperation.

111.    On October 9, 2006, North Korea tested a nuclear weapon. The U.N. Security Council responded with Resolution 1718, which, among other measures, banned the export of "luxury goods" to North Korea. This ban was designed to squeeze Kim Jong-Il, Office 39, and military leaders—all of whom used imported cigarettes to fund DPRK terrorist activities.

112.    On January 9, 2007, Treasury designated Bank Sepah, describing it as "the financial linchpin" of "Iran's missile procurement network" and finding that it had "actively assisted Iran's pursuit of missiles capable of carrying weapons of mass destruction." Treasury explained that Bank Sepah provided financial support and services to Iran's Aerospace Industries Organization ("AIO"), Shahid Hemmat Industries Group ("SHIG"), and Shahid Bakeri Industries Group. Treasury further found that AIO had directed Bank Sepah to "transfer well over half of a million dollars to a North Korean firm associated with Komid, a North Korean entity designated for providing Iran with missile technology." Treasury also found that "SHIG is responsible for Iran's ballistic missile program, most notably the Shahab series of medium range ballistic missiles based on the North Korean-designed No Dong missile," and that "SHIG has received help from China and North Korea in the development of this missile." Notably, the *Qiam* developed during the 2010s is part of the Shahab series—but with dramatically upgraded

components that revolutionized the *Qiam*'s accuracy and lethality. Accordingly, Treasury's warning related to *Qiam* missiles that the IRGC used against Plaintiffs.

113. By early 2007, the Department of Commerce implemented strict export controls barring the export of luxury goods to North Korea, including tobacco. 72 Fed. Reg. 3722. The United States intended those controls to deprive DPRK officials of the capacity to continue their missile threats. BAT was not deterred by these sanctions. It recognized that they would create scarcity that fueled the black market. Consistent with its internal findings that "consumer demand for international brands stimulates smuggling and counterfeiting" whenever legal supply is constrained, BAT embraced illicit networks to keep its products flowing to the regime.

114. As every other Western multinational exited the North Korean market in response to these sanctions and the nuclear test in 2006, BAT remained. As the BBC reported in 2006, "no major Western multinationals beyond British American Tobacco - which has a tobacco plant in the country - operate in North Korea." From 2006 through 2017, BAT was the ***only Western multinational firm*** that consciously chose to defy U.S. antiterrorism sanctions by operating a joint venture in North Korea with DPRK terrorist front Daesong. Plaintiffs are not aware of any other Western firm that partnered with Office 39 through Daesong from 2007 through 2017 aside from BAT. Simply put, BAT was an extreme outlier amongst multinational firms.

## C. Defendants Lied About Exiting The Joint Venture In 2007

### 1. BAT Engaged in a Sham Divestment of its North Korean Interests

115. Confronted with the rising tide of sanctions and international pressure on North Korea, BAT began looking for ways to publicly dissociate itself from Daesong-BAT, while surreptitiously continuing its illegal joint venture. BAT determined that the best way to facilitate the appearance of an exit would be to sell its stake in Daesong-BAT to a "friendly" third party that would serve as a front for BAT to continue partnering with the DPRK.

38

116.    BAT chose SUTL, a Singapore-based cigarette distributor, as this sham third party. BAT had a longstanding relationship with SUTL, in large part related to BAT's extensive cigarette smuggling in Asia. (Defendants' settlements with DOJ label SUTL as "Company 1.")

117.    In April 2007, BAT's Standing Committee—including BAT's Chief Executive Officer, Chief Operating Officer, and Financial Director—approved a series of corporate transactions designed to create the appearance of a complete BAT divestment from North Korea while secretly retaining *de facto* control over Daesong-BAT. OFAC Settlement at 2; OFAC Release at 1. The plan was reviewed and approved by BAT's Central Finance Office and multiple BAT regional headquarters. OFAC Settlement at 3.

118.    On June 8, 2007, BAT executed the public face of this deception. The company issued a press statement announcing that it was exiting its North Korea business by selling its stake in Daesong-BAT to SUTL. This announcement was materially false, made with the purpose and effect of deceiving the outside world, including the United States and U.S. financial institutions, into believing that BAT was done doing business with North Korea. Statement of Offense ¶¶ 32-34; *see also* BAT, *British American Tobacco to Sell Its Share in Democratic People's Republic of Korea Business* (June 8, 2007) ("British American Tobacco has agreed in principle to sell its share in Taesong BAT [*i.e.*, Daesong-BAT]").

119.    Within days of Defendants' sham press release, BAT reached into the United States to conceal its scheme in response to media scrutiny. On June 18, 2007, *Forbes* reported on BAT's ongoing North Korea business, warning that even though "[m]uch of the revenue from [BAT's] joint venture with a [DPRK] outfit lands in the coffers of one of the world's most . . . vile regimes," BAT's then-CEO, Paul Adams, "doesn't mind." BAT then sent a false statement to persons at *Forbes* known to be in the United States that its decision to quit Daesong was "for

business reasons and to manage future business risk." This caused *Forbes* to publish a retraction on July 23, 2007, thereby disseminating BAT's lies to U.S. audiences, including shareholders and regulators, helping conceal the scheme.

120.    The ostensible transfer was consummated in August 2007. SUTL purchased BAT DPRK—a Singapore-incorporated holding company, which BAT indirectly held through a Dutch subsidiary—for one Euro, far less than the market value of the business. BAT DPRK had acquired BATMS's stake in the Daesong-BAT joint venture in 2004 and continued to operate it under those same terms. OFAC Settlement at 3. At the same time, a BAT subsidiary acquired a call option to repurchase BAT DPRK for one Euro, which BAT planned to exercise if the political climate improved. BATMS agreed to continue supplying Daesong-BAT with cigarette ingredients exactly as it had prior to the "divestment." *See* Statement of Offense ¶¶ 37, 39, 41. Under BAT's revised joint venture with Office 39, shares in Daesong-BAT were reallocated: BAT DPRK (now nominally owned by SUTL) would own 50% (down from 60%), and NKTC would hold 50% (up from 40%). *See id.* ¶ 37.

121.    As the atypical terms suggest, this was not a routine business deal but a BAT sham designed to evade U.S. sanctions. Statement of Offense ¶¶ 38-39, 45-47. In reality, Defendants retained effective control over Daesong-BAT. As BAT admitted, even after the transaction, "BATMS and BAT (by virtue of being BATMS's ultimate parent company) maintained control of all relevant aspects of the North Korea business." *Id.* ¶ 35. An internal email described the deal as "a vehicle for BAT to bring out the JV money and distribute it to BAT. [SUTL] will have no beneficial interest in" BAT DPRK. *Id.* ¶ 38. Internal documents confirm this control. *Id.* ¶¶ 39-40.

      **2.**      **BAT Laundered Hundreds of Millions of Dollars Through its Ongoing North Korea Joint Venture and Obstructed FinCEN Operations Designed to Prevent Terrorism**

122.    As agreed, SUTL acted principally as an intermediary to launder the flow of funds from North Korea to BAT. BATMS shipped goods (primarily cigarette components) to Daesong-BAT in the care of SUTL, invoicing SUTL. SUTL forwarded the invoices to NKTC. NKTC then paid SUTL—in U.S. dollars, typically using Chinese front companies—and SUTL remitted almost the entire amount to BAT, minus a small commission. These practices persisted at least through August 2016. Statement of Offense ¶¶ 42-45.

123.    Over the years, Daesong-BAT generated billions in revenue, and at least hundreds of millions of dollars in profit, split 50/50 between Daesong and BAT. According to BAT's enforcement resolution with U.S. authorities and based on the amounts paid to BATMS, BAT's scheme enabled Office 39/Daesong to achieve **over $415 million** in liquidity, *see* Statement of Offense ¶ 54, because BAT enabled Office 39 to deploy financial resources that were effectively trapped under sanctions and otherwise useless to Office 39. Daesong-BAT, in turn, used those components to create at least hundreds of millions in revenue on a per-year basis, and likely substantially more than $1 billion overall. Indeed, Dr. Lewis—citing DOJ's own findings about BAT's scheme—has opined that Daesong-BAT potentially generated more than $8 billion in revenue at the DPRK's prevailing revenue spread of $20 in revenue for every $1 spent on components. *See infra* ¶¶ 156, 219. Moreover, revenue creation, as well as profit, allowed Office 39 what it needed to fulfill its role in the DPRK-IRGC-Hizballah missile procurement network because foreign currency located outside North Korea—which BAT helped Office 39 generate at an industrial scale for more than a decade—was the top priority. *See infra* ¶ 186.

41

124.    To move these funds, the conspirators knowingly used North Korean banks KKBC and FTB, and continued doing so after learning that KKBC and FTB effectively served as arms of Tanchon and KOMID. Statement of Offense ¶ 32(b).

125.    At a 2007 meeting, NKTC proposed using "export earnings" to pay SUTL. Statement of Offense ¶ 44(a). This euphemism referred to money NKTC generated abroad that could not be repatriated due to banking restrictions. Instead, NKTC and BAT agreed to launder payments through Chinese intermediaries. For example, Dandong Hongxiang Industrial Development Company ("DHID"), a front company for the North Korean government, sent approximately $125 million to SUTL between 2007 and 2014—money intended for BATMS. *Id*. ¶ 44(b)-(d). (On September 16, 2016, Treasury sanctioned DHID for acting for or on behalf of KKBC. *See id*. ¶ 44(e).) In total, 50 other front companies moved at least $216 million in U.S. dollars to SUTL; all were remittances for BAT. *Id*. ¶ 44(f).

126.    These funds cleared through correspondent accounts at U.S. banks. Because U.S. banks refused to process DPRK transactions, BAT and its co-conspirators structured the payments to mask the source, making them appear to come from legitimate Chinese firms. This was done "with the intent to deceive U.S. financial institutions." Statement of Offense ¶¶ 45-47. BAT stipulated that at least four U.S. banks unknowingly processed these transactions. *Id*. ¶ 29.

127.    The U.S. banks that BAT manipulated were required under the Bank Secrecy Act to monitor transactions and submit Suspicious Activity Reports to the Financial Crimes Enforcement Network ("FinCEN"), *see* Statement of Offense ¶¶ 14-17, a Treasury bureau headquartered in this District. Defendants carried out a scheme specifically to defeat these reporting mechanisms by routing payments through front companies, stripping DPRK identifiers from wire transfer instructions, advising co-conspirators how to respond to bank compliance

inquiries in ways that concealed the transactions' true origin, and suppressing internal records accurately describing their conduct. *See id.* ¶¶ 20, 33, 35, 47, 49(c), 51, 55, 70-72. Defendants admittedly understood that U.S. banks were required to monitor and report such transactions to FinCEN, and nevertheless caused those banks to process hundreds of millions of dollars in prohibited DPRK transactions without reporting their true nature. *See id.* ¶¶ 14-17, 54. Defendants directly and intentionally deprived FinCEN's centralized reporting and analytical functions in this District of accurate financial intelligence concerning DPRK sanctions evasion. Defendants thus engaged in intentional misconduct calculated to produce effects within this District, which did, in fact, produce such effects.

### 3. BAT Continued its North Korean Joint Venture Despite Knowledge of North Korea's Weapons Proliferation and Terrorism

128.   While BAT unlawfully funneled money to Office 39 and the procurement network it operated for the IRGC's missile program, the United States and U.N. consistently highlighted the DPRK's key role in missile and rocket proliferation to the IRGC and Hizballah.

129.   Although the United States de-listed North Korea as a state sponsor of terrorism in 2008 during nuclear negotiations (redesignating it in 2017, which has continued ever since, *see* 82 Fed. Reg. 56,100), it continued to enforce strict counterproliferation sanctions, recognizing that preventing DPRK terrorism remained a key element of U.S. anti-terror strategy.

130.   In October 2008, State designated the Korea Taesong Trading Company (*i.e.*, BAT partner Daesong/Office 39) under the Iran, North Korea, and Syria Nonproliferation Act, which provides for penalties on entities and individuals for the transfer to or acquire from Iran, North Korea, and Syria equipment and technology that are controlled under multilateral control lists or that otherwise have the potential to make a material contribution to the development of WMD or cruise or ballistic missile systems. 73 Fed. Reg. 63,226.

43

131.    In April 2009, American citizens sued the DPRK, alleging it provided to Hizballah the missiles and rockets used in attacks in the Middle East in 2006. *See Kaplan, supra*, No. 09-cv-646 [Dkt. No. 1] (D.D.C. filed Apr. 8, 2009). The lawsuit was widely reported.

132.    On June 30, 2009, the U.S. and U.N. sanctioned the entities involved in North Korea's proliferation to the IRGC. They did so by sanctioning Hong Kong Electronics, a front company in Iran facilitating money movement for KOMID.

133.    In July 2009, as the U.N. reported in real-time, UAE authorities intercepted a shipment of DPRK weapons bound for Iran containing 2,030 detonators for Grad rockets—the exact type the IRGC supplied to Hizballah.

134.    On August 11, 2009, Treasury designated KKBC—a bank funding BAT's scheme—for being a financier of the DPRK missile program. BAT knew of this and knew KKBC's role in its own scheme, yet continued to use KKBC. *See* Statement of Offense ¶¶ 59-62.

135.    In December 2009, another arms shipment to terrorists was intercepted: 35 tons of North Korean rockets and surface-to-air missiles aboard a transport aircraft bound for Iran and likely Hizballah. Had this shipment not been stopped, 35 tons of materiel would have likely been used in attacks targeting Americans in the Middle East, including Iraq.

136.    As noted above, on August 30, 2010, President Obama signed Executive Order 13551, finding that "the continued actions and policies" of "North Korea," including its missile proliferation activity, "imperil U.S. Armed Forces" and "constitute an unusual and extraordinary threat to the national security" of "the United States." The Executive Order also found that North Korea "obtains financial and other support" for these actions and policies through, among other activities, "the counterfeiting of goods and currency," and explicitly named Office 39 as an entity that should be designated because of its role in supporting this enterprise. That same day,

44

Treasury designated Korea Taesong Trading Company (*i.e.*, BAT partner Daesong) for "supporting North Korea's Weapons of Mass Destruction (WMD) program." Treasury specifically noted that Daesong is used by KOMID for trading purposes and that KOMID "has been sanctioned by the United States repeatedly over the last 10 years for trading in missile technology." Treasury subsequently found, in November 2010, that Office 39 provides "critical support to North Korean leadership in part through engaging in illicit economic activities" and that "Korea Daesong General Trading Corporation is used to facilitate foreign transactions on behalf of Office 39."

137. As Under Secretary Levey put it in announcing the sanctions: "The destructive course that the North Korean government is charting," including its missile proliferation program, "is facilitated by a lifeline of cash generated through a range of illicit activities." Under Secretary Levey explicitly identified "selling counterfeit cigarettes" as a key source of illicit funding for the missile proliferation network upon which the DPRK and IRGC mutually relied.

138. Executive Order 13551 also authorized blocking the property of anyone who imported "luxury goods" into the DPRK, including tobacco. BAT knew of these prohibitions but deliberately undermined them.

139. On November 18, 2010, the U.S. designated Daesong Bank and Korea Daesong General Trading Corporation—entities linked to BAT's "Daesong" joint venture—as "key components of Office 39's financial network" supporting "proliferation."

140. In 2011, Treasury warned multinationals that North Korea was one of only two jurisdictions in the world subject to Financial Action Task Force countermeasures due to substantial terrorist financing risks.

141.    In December 2012, North Korea conducted a missile test, followed by a nuclear test in February 2013. The U.N. Security Council reacted: Resolution 2087 demanded that the DPRK "suspend[] all activities related to its ballistic missile program" and stop "evad[ing] sanctions," and found it was an "exporter of goods and equipment related to ballistic missiles."

142.    On March 11, 2013, Treasury designated FTB, North Korea's primary foreign exchange bank, as a "key financial node" in the weapons proliferation apparatus. BAT knew FTB played a central role in its cigarette scheme. Statement of Offense ¶¶ 63-69. BAT also learned that FTB facilitated missile sales to the IRGC. Yet, BAT continued to rely on FTB to move its illicit profits.

143.    In January 2016, North Korea kidnapped 22-year-old U.S. citizen, and University of Virginia student, Otto Warmbier while he was visiting the DPRK. It took him hostage to coerce the United States into concessions—a blatant act of state-sponsored terror. His ordeal was covered intensely by global media, including the U.K. outlets BAT monitored, including at least four separate *Guardian* reports that year. The regime paraded Warmbier for forced confessions, using him as a pawn while BAT continued its partnership with the government torturing him. Warmbier was returned to the U.S. in a comatose state in 2017 and died shortly thereafter.

144.    On February 18, 2016, Congress enacted the North Korea Sanctions and Policy Enhancement Act, highlighting that North Korea "has sponsored acts of international terrorism," and "urg[ing] the President, in the strongest terms" to "immediately designate North Korea as a jurisdiction of primary money laundering concern." Pub. L. 114-122, 130 Stat. 93.

145.    On June 2, 2016, Treasury issued a Notice further highlighting the role of KKBC and FTB—two partners involved in BAT's scheme—in supporting missile proliferation. 81 Fed. Reg. 35,441. Later in 2016, as part of the imposition of a special measure against North Korea as

46

a jurisdiction of primary money laundering concern, Treasury barred U.S. banks from opening or maintaining correspondent accounts for, or on behalf of, DPRK banks. 81 Fed. Reg. 78,715.

146.    Despite the hostage-taking of an American student, the designation of its banking partners as missile proliferators, and the finding that its host country was a primary money laundering concern, BAT continued to partner with Office 39/Daesong through at least late 2017.

**D.    Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty**

147.    In 2023, BAT's years of culpable misconduct produced what the United States called "the largest North Korean sanctions penalty in the history of the Justice Department." On April 25, 2023, DOJ announced a $629 million settlement with BAT for its illegal DPRK tobacco joint venture. BAT and BATMS engaged "in an elaborate scheme to circumvent U.S. sanctions and sell tobacco products to North Korea," thus causing "funds to illegally flow into the coffers of the Democratic People's Republic of Korea (DPRK)." For years, according to DOJ, BAT and the DPRK jointly operated a cigarette business that relied on "financial facilitators linked to North Korea's weapons of mass destruction proliferation network."

148.    On the day DOJ announced the record-breaking settlement, OFAC also settled its civil enforcement action against BAT. Underscoring the severity of the misconduct, OFAC imposed the "statutory maximum civil monetary penalty," determining that BAT's violations were "egregious" and "not voluntarily self-disclosed." OFAC Release at 1.

149.    As part of this resolution, BATMS pleaded guilty to a Criminal Information charging conspiracy to commit bank fraud and conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"). BAT entered into a DPA based on the same charges, which included "conspiracy to commit bank fraud" and "conspiracy to violate [IEEPA]" through "sales

47

of tobacco products to the [DPRK]" from "in or around February 2009 until in or around June 2017." Information ¶ 1.

150.    In the DPA and Statement of Offense, Defendants admitted facts establishing their culpable intent beyond any doubt. They admitted that "BAT and BATMS had knowledge of U.S. sanctions," including "the sanctions on designated North Korean entities, and willfully disregarded those sanctions." Statement of Offense ¶ 55. And Defendants confessed to structuring transactions to obfuscate sales to North Korea, causing U.S. banks to process illegal transactions, as BATMS "inten[ded] to deceive U.S. financial institutions." *Id*. ¶¶ 45-46.

151.    This conspiracy reached the highest level of BAT. For example, OFAC found that "BAT management had actual knowledge regarding the apparent conspiracy from its inception through its termination," noting that this "knowledge extended to BAT's Standing Committee, which signed off on the ostensible divestment from the Joint Venture." OFAC Release at 3.

152.    To maintain their illegal terrorist financing, BAT and BATMS engaged in active deception. When banks raised questions about wire transfers, BATMS simply canceled the transactions and re-routed them through more sympathetic institutions, knowing their partner SUTL was deceiving those banks about the funds' origin. Statement of Offense ¶¶ 70-72. As OFAC detailed, BAT "concealed their North Korea-related business by purporting to exit the Joint Venture and receiving payments through a complex remittance structure that relied on an opaque series of front companies and intermediaries." OFAC Release at 3. BAT further "ignored requests for information from banks, and asked its counterparty to remove any mention of North Korea from transactional documents." *Id*.

153.    At sentencing, the Honorable Beryl A. Howell emphasized that "[v]iolating U.S. sanctions is, needless to say, a very serious threat to national security, particularly when that

48

violation involves North Korea; a country that has long been subject to U.S. sanctions as a result of its status as a proliferator of weapons of mass destruction." *United States v. British American Tobacco, et al.*, No. 23-cr-118 [Dkt. No. 21 at 31] (D.D.C. Apr. 25, 2023).

## IV.    DEFENDANTS PROVIDED ESSENTIAL AND LASTING AID TO IRGC *QIAM* AND *FATEH* MISSILE ATTACKS ENABLED BY THE DPRK-IRGC-HIZBALLAH JOINT ARMS VENTURE

### A.    Defendants' Funding, Financial, And Logistical Support Enabled Development Of The *Qiam* And *Fateh* Missiles Used To Attack Plaintiffs

154.    As DoD reported in 2018, North Korea in the 2000s and 2010s was a pariah state, "unable to significantly expand ties because of international sanctions." But, according to the same DoD report, the regime's skill in using black markets and its "no-questions-asked" philosophy made it an attractive partner for unscrupulous actors.

155.    Enter, BAT. From 2007 through 2017, Defendants committed a series of illegal transactions with North Korean counterparties engaged in the regime's missile support to the IRGC. This culpable misconduct funneled at least hundreds of millions of dollars, and likely substantially more than $1 billion, directly to the DPRK-IRGC-Hizballah joint weapons venture, thus substantially assisting the development and deployment of the specific *Qiam* and *Fateh* missiles used by the IRGC to attack Plaintiffs.

156.    In 2023, the Executive Branch found that Defendants' illicit partnership with Daesong/Office 39 made a key contribution to the IRGC missile threat against America.

a.    OFAC found that: "BAT's apparent violations *helped North Korea establish and operate a cigarette manufacturing business*—a sector that has reportedly netted *over $1 billion per year* for the Government of the DPRK"; the DPRK "*use[d] funds generated through international trade to support its … missile programs and weapons proliferation*"; and BAT's "conspiracy" with the DPRK "involved entities designated by OFAC for their proliferation activities and provided them with opportunities to evade U.S. sanctions."

b.    The U.S. Attorney's Office for the District of Columbia emphasized the sheer scale of Defendants' aid—and its direct nexus to DPRK-linked missile threats—by noting that for every "dollar" invested in cigarette production materials, North Korea realized "$20" of

49

revenue, and a "substantial portion of this profit is believed to flow back directly to the North Korean government, its military, *and its WMD program*."

    c.    The Assistant Attorney General of the National Security Division confirmed to Congress that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, *generating revenue used to advance North Korea's weapons program*."

    d.    The Principal Associate Deputy Attorney General confirmed that "*BAT*" operated as an "*important component[] in funding North Korea's WMD proliferation program*."

When the U.S. government made the statements above, such findings necessarily included DPRK-backed missile attacks by the IRGC. *See supra* ¶ 16 (WMD nomenclature).

157.    BAT's secret joint venture with Office 39 was likely Office 39's number one overall missile funding source. Without BAT's assistance, the IRGC and Hizballah, through their joint venture with the DPRK (of which Office 39/Daesong was the hub), could not have developed, tested, refined, and stockpiled from 2007 through 2017 the specific *Fateh* and *Qiam* missiles that the IRGC and Hizballah used to attack Plaintiffs.

### 1.    BAT Provided Financial Support to IRGC *Qiam* and *Fateh* Attacks

158.    Daesong-BAT generated massive revenues that enabled North Korea's proliferation activities. According to DOJ, BAT's scheme "allow[ed] funds to illegally flow into the coffers" of the DPRK and enabled "financial facilitators linked to North Korea's weapons of mass destruction proliferation network." Defendants' scheme enabled DPRK terrorist cash flow through two channels: (1) Daesong-BAT profits; and (2) Daesong cigarette counterfeiting. With respect to the former, by conservative estimates, BAT's misconduct supplied Office 39 with at least $50 million in illicit Daesong-BAT joint venture profits annually from 2007 through at least 2017, and likely much more than that. With respect to the latter, given the scale of DPRK cigarette counterfeiting, Daesong/Office 39 likely realized a comparable amount.

159.    BAT's illicit returns did not vanish into the general economy in North Korea. Instead, BAT's payments allowed Office 39 and its financial and logistics arms (Tanchon,

50

KKBC, FTB, and KOMID) to finance the supply, testing, deployment, and operation of the IRGC's and Hizballah's advanced missile production, testing, deployment, and maintenance systems—and the terrorist tactics, techniques and procedures required to use them.

160.    North Korean custom and practice ensured that Office 39's cigarette profits generated by BAT's scheme financed the missile attacks against Plaintiffs by funding North Korea's missile development and the DPRK-IRGC-Hizballah missile joint venture, which necessarily included *Qiam* and *Fateh* missiles, both of which (and their DPRK equivalents) were top priorities for the DPRK and IRGC throughout the relevant period.

161.    A fixed percentage of all funds BAT created for Daesong funded DPRK arms programs, including missiles. For example, the U.S. Institute of Peace reported in 2009, the most vital role of DPRK state trading firms was to route "a designated percentage of all revenues" "directly into Kim Jong Il's personal accounts"—a core use of which was to fund missiles. This programmatic funding mechanism meant that hard foreign currencies from BAT's partnership with Daesong, including hundreds of millions of U.S. dollars, were effectively siloed within Office 39 for arms procurement, necessarily including *Qiam* and *Fateh* missiles given their top priority status for the DPRK and IRGC alike. For example, as Dr. Greitens observed in 2007, these DPRK structures meant that revenues and profits programmatically "***finance[d] DPRK weapons programs***" through Office 39 in a way that did not depend merely upon the fact "that money was fungible once in North Korea's hands" because "illicit activity [] provide[d] the DPRK military and security services with an internally generated, directly accessible source of hard currency for procurement" siloed within Office 39.

162.    This meant that the cash BAT generated stayed in-house with Kim and Office 39—the two actors most directly responsible for financing DPRK aid to IRGC and Hizballah

missile attacks—and a substantial share of these funds supported the DPRK-IRGC-Hizballah joint missile venture. In 2017, for example, DPRK scholar Dr. Kan found that Office 39 profits "financ[e] the weapons' programs of the regime," and "[t]his nexus between illicit finances and sophisticated weapons programs appears to have become tighter under the leadership of Kim Jong Un." In 2025, likewise, Drs. Bechtol and Celso observed that the DPRK used a "large portion of these funds" for missiles during the 2010s.

163.    Indeed, a U.S. Army-published analysis in 2010 has effectively confirmed the inextricable nexus between the foreign currency generation, revenues, and profits that BAT generated for Office 39/Daesong and DPRK-backed missile threats targeting the United States. The analysis found: "Through its offices in Pyongyang, [Office 39] operates through government and KWP-run front companies such as Daesung." "This Office, in turn, answers directly to Kim Jong-il," who "has maintained direct supervision over Office #39." "Just as importantly" for "U.S. policy on North Korea," "at least a portion of the foreign currency funds that Office #39 generates for Kim Jong-il go to investing in North Korea's … missile programs."

164.    North Korean policy, and Office 39 custom and practice, ensured Defendants' Daesong transactions, and resulting Office 39 revenues and profits, financed the IRGC missile attacks against Plaintiffs. North Korea practiced a *Songun*, or "Military First," governing doctrine that ensured BAT's money reached the specific missile programs that injured Plaintiffs. As senior State official David Asher warned in 2005, illicit trading activities provide critical support to North Korea's "military-first" approach for which "cigarettes" were potentially "North Korea's largest containerized export sector." Accordingly, as DoD explained in 2013, the Kim regime believed that its "security" was "disproportionately dependent on military might," and it prioritized its "primary goal of pursuing its nuclear and missile capabilities" at "the

expense of" pursuing "economic recovery and prosperity." Consequently, most of Daesong-BAT's blockbuster revenues directly financed Office 39's support of the DPRK's Military-First agenda—for which missiles were the top priority from 2007 through 2022. *See supra* ¶ 80; *infra* ¶ 186.

165.    From 2007 through 2022, most Office 39 profits flowed to the DPRK military and, within that budget, most such monies flowed to the DPRK missile program, for which the *Qiam* and *Fateh* (and their DPRK equivalents) were always the number one overall budget priority. Among other reasons, the *Qiam* and *Fateh* missiles (and their DPRK analogues) comprised the IRGC's and DPRK's principal means of potentially causing mass casualty attacks against the United States in areas far from the relevant DPRK or IRGC launch site.

166.    True, the DPRK regime also financed a nuclear program, but most such expenditures predated Defendants' scheme. Simply put, the DPRK raced to develop and stockpile nuclear weapons from the early 1990s through 2006—when it conducted its first nuclear test. From 2007 through the present, however, the DPRK's top priority shifted from nuclear weapons—which it had already developed—to bolstering the missile capabilities needed to deliver them. And those same capabilities—and North Korean missile systems—were the foundation for the IRGC's *Qiam* development and *Fateh* enhancements used to attack Plaintiffs.

167.    BAT's support supplied vital financial lubrication to attacks enabled by the DPRK-IRGC-Hizballah joint weapons venture. North Korea needed hard currency created by Office 39's joint venture with BAT to: (i) train and pay its missile specialists in Iran; (ii) fund trips to Syria for collaboration with Hizballah; (iii) procure missile components like gyroscopes; (iv) maintain assembly facilities; and (v) transport weapons to Iran. Under the custom and practice of the joint arms venture, even though the IRGC "paid" Office 39 for DPRK weapons

and services, most such IRGC-to-DPRK "payments" were denominated in barter trade (*e.g.*, oil), rather than U.S. dollars. For that reason, the DPRK needed hard currency, and especially U.S. dollars from the U.S. financial system, from Office 39 on the front end to finance the turnkey support it provided to IRGC and Hizballah rocket attacks in the Middle East.

168.    When BAT funded the DPRK fronts herein, it financed the very individuals serving as logistics officers for the IRGC and Hizballah. From the early 2000s through 2025, North Korea maintained hundreds of RGB, Office 39, and KOMID agents on the ground in Iran, where they were dual-hatted as experts seconded to the IRGC for its missile programs. *See supra* ¶¶ 64-71. These North Korean experts maintained a "continuous presence" in key Iranian industries, building warheads and guidance systems for the very missiles that harmed Plaintiffs.

169.    Office 39's (and thus BAT's) role in this venture was critical. For example, former CIA Director Woolsey testified to Congress in 2013 that the IRGC threat is "underpinned by North Korean arms and technology," which are "underwritten by Iran, [and] supplied by North Korea." During the same hearing, proliferation scholar Dr. David Albright explained that "stopping the money flows that pay" for "missile related goods" is vital to preventing attacks that deployed missiles developed by the DPRK-IRGC-Hizballah joint missile venture.

170.    BAT's role was pivotal. Senior U.S. government officials have confirmed that hard currency is the "Achilles' heel" of the IRGC and DPRK terrorists' shared missile procurement, logistics, and financing networks. In 2017, for example, Representative Ed Royce noted that North Korea's advanced weapons programs rely on foreign technology that requires "an inordinate amount of money," and senior Treasury official Marshall Billingslea testified to Congress that year that Kim Jong-Un has two key financial vulnerabilities: the need for revenue to maintain missile programs and access to the global financial system to acquire hard currency.

54

171.    When the DPRK is squeezed financially, its ability to proliferate missiles is constrained, and the subsequent risk of terrorist missile attacks is reduced. Defectors confirmed that when hard currency was scarce, production lines shut down for months because they could not buy necessary components like gyroscopes on the black market. By enabling Office 39 to generate at least hundreds of millions of dollars, and likely more than $1 billion, BAT remedied this vulnerability, keeping the missile lines upon which the IRGC relied running throughout the scheme. Those profits did not merely line the pockets of corrupt DPRK officials; they allowed Office 39 and the other DPRK entities alleged herein to act as the IRGC's procurement agent and purchase the propulsion systems and components, guidance systems, and materials to make fuel needed by the IRGC, which powered the *Qiam* and *Fateh* missiles that harmed Plaintiffs.

172.    With respect to the BAT-generated Daesong profits involving, or flowing through, Office 39/Daesong, KKBC, FTB, Tanchon, and KOMID, the distinction between "licit" and "illicit" transactions was immaterial. Given the DPRK's unique status as the world's only mafia state, *supra* ¶ 21, there were very few external trading firms and banks, all of which supported missile transactions, *supra* ¶¶ 5, 24-25, 31. BAT accordingly knew that even BAT's purportedly licit transactions with Office 39, Tanchon, KKBC, FTB, or KOMID sponsored IRGC attacks involving DPRK-enabled missiles just as illicit transactions did. For example, as Treasury Under Secretary Levey warned in 2006 and Congress found in 2016, "the line" between North Korea's licit and illicit money "is nearly invisible." 22 U.S.C. § 9221(a)(1)(A)(i). Treasury's same 2006 warning detailed the "multifaceted problems and threats posed by state sponsors of terror Iran, Syria, and North Korea": "North Korea, the world's foremost proliferator of ballistic missile technology … continues to develop ballistic missiles of increasing

55

sophistication and range. Iran lies at the dangerous intersection of terrorism and weapons of mass destruction … providing financial and material support to terrorist groups, like Hizballah."

173.    BAT's role was uniquely potent. Throughout the relevant period, Defendants were always Office 39's number one overall external financier and logistical supporter of missile and rocket attacks sponsored by Office 39's participation in the DPRK-IRGC-Hizballah joint arms venture.

174.    Sanctions designation findings published by the United States, U.N., and E.U. after a rigorous fact-finding process have effectively confirmed the concrete nexus between BAT's partnership with Daesong and the attacks against Plaintiffs. Indeed, official U.S. sanctions findings and releases are made conservatively, and only after all the relevant facts can be proven conclusively to the government's satisfaction. Accordingly, each such U.S. finding should be regarded as strong evidence of the finding's truth. When each such finding was issued, it was specifically based on a determination that commercial transactions with **BAT's specific scheme counterparties** were likely to aid IRGC missile threats enabled by the DPRK.

a.    2001: State sanctioned "Changgwang Sinyong Corporation [KOMID]" under the "*Iran Nonproliferation Act*," finding that it had engaged in "missile" transfers to "Iran."

b.    2004: The United States further sanctioned KOMID for its "*Missile Aid to Iran*."

c.    2007: Treasury sanctioned agents of "*Iran's missile procurement network*" that enabled "Iran's pursuit of missiles capable of carrying weapons of mass destruction," finding that "a North Korean firm associated with [KOMID], a North Korean entity designated for providing Iran with missile technology" and "SHIG is responsible for Iran's ballistic missile program, *most notably the Shahab series of medium range ballistic missiles* based on the North Korean-designed No Dong missile"—linked to the *Qiam*—for which "SHIG has received help" from "North Korea in the development of this missile."

d.    2009: Treasury announced sanctions "target[ing] North Korea's missile proliferation network" shared with "Iran," which included sanctions against Tanchon (a BAT partner) for its vital role in DPRK supply of assistance to Iran's missile efforts, finding that "Tanchon plays a key role in financing the sales of ballistic missiles for KOMID" and "Tanchon" was "involved *in ballistic missile transactions from KOMID to Iran's* Shahid Hemmat Industrial Group (SHIG), which is *the Iranian organization*

56

*responsible for developing liquid-fueled missiles*"—the specific class of IRGC ballistic missiles that included the *Qiam* missiles used against Plaintiffs.

e.    2010: Treasury designated Office 39/Daesong, finding that it generated illicit revenue used to support the DPRK (including KOMID) "missile" proliferation efforts to "Iran."

f.    2010: The United States publicly warned that it issued a "set of designations *targeting Iran's … missile programs*" upon finding that Iran used "the Islamic Revolutionary Guards Corps to carry out and mask proliferation activities" and that IRGC entities "have ties to Iran's ballistic missile programs" designed to threaten the United States in the Middle East, for which "KOMID" and "Tanchon" played a key role.

g.    2010: The U.N. Panel of Experts found that "Tanchon" managed financial transactions related to "missile" deals between KOMID and entities in "Iran."

h.    2011: The E.U. imposed sanctions upon finding that "Tanchon plays a role in financing KOMID's … sales of ballistic missiles and has also been involved in ballistic missile transactions from KOMID to Iran's Shahid Hemmat Industrial Group (SHIG)."

i.    2013: Treasury further sanctioned Tanchon for its key role in DPRK missile aid to the IRGC, finding that "Tanchon" and "KOMID" continued to serve as "*part of the web of banks, front companies and government agencies* that support North Korea's continued proliferation activities" concerning "missiles," and further found that Tanchon continued to "play[] a role in financing KOMID's sales of ballistic missiles and has also been involved in ballistic missile transactions from KOMID to Iran's Shahid Hemmat Industrial Group (SHIG), the U.S. and UN-designated *Iranian organization responsible* for *developing liquid-fueled ballistic missiles*"—the specific class of IRGC ballistic missiles that included the *Qiam* missiles used against Plaintiffs.

j.    2016: Treasury found that KOMID continued to have a direct nexus to IRGC missile threats when the United States designated "entities and individuals involved in procurement on behalf of Iran's ballistic missile program" including "Sayyed Javad Musavi" upon finding that "Musavi is the SHIG commercial director and has worked directly with North Korean officials in Iran from UN- and U.S.-designated Korea Mining Development Trading Corporation (KOMID). SHIG also coordinates KOMID shipments to Iran. *The shipments have included valves, electronics, and measuring equipment* suitable for use in ground testing of *liquid propellant ballistic missiles*"—the specific class of IRGC ballistic missiles that included the *Qiam* missiles against Plaintiffs.

### 2.    BAT Provided Cover and Concealment for IRGC *Qiam* and *Fateh* Attacks by Helping DPRK Terrorist Fronts Covertly Leverage the U.S. Financial System on Behalf of the DPRK and IRGC

175.    BAT's illicit joint venture with Office 39/Daesong also augmented the support for

IRGC and Hizballah *Qiam* and *Fateh* missile attacks by supplying vital access to the U.S.

financial system, and corresponding cover and concealment for such transactions, which are

cornerstones of every successful terrorist operation. In this way, Defendants' conduct was even worse than simply depositing cash directly to Office 39 inside North Korea because BAT helped Office 39 (and, by extension, the IRGC through their joint missile venture) leverage the power of the U.S. financial system through financial sources and accounts outside of North Korea.

176.    BAT's sanctions-evasion, money laundering, and bank fraud-related assistance to Office 39's (and, through it, the IRGC's) missile procurement scheme was extensive, multifaceted, and enduring. *See supra* Part III. Moreover, as BAT knew, its assistance concerned one of the largest potential areas through which North Korean terrorists and their IRGC allies could extract the financial system support, cover, and leverage of U.S. banks in support of their ability to threaten Americans with missiles. The U.N. has confirmed, for example, that tobacco sales have long comprised one of the DPRK's top five sources of import-related cash flow. This also meant that BAT's concealment deprived U.S. counterterrorism authorities, intelligence professionals, and investigators of vast amounts of likely actionable data exposing the missile procurement networks upon which the shared IRGC-DPRK missile threat relied.

177.    From 2007 through at least 2017, BAT provided this concealment to Office 39—and, through it, the IRGC and Hizballah, given Office 39's status as a key missile procurement agent for both FTOs, *e.g.*, *supra* ¶ 26—by engaging in the exact behaviors the U.N. identified as key vulnerabilities in the sanctions regime. As the U.N. found in 2017, North Korea's ability to trade in "lucrative military technologies" relied on the use of "non-nationals of the [DPRK] as facilitators" and companies registered by foreign agents. In 2018, the U.N. reported that "corporate service providers present a key vulnerability," allowing the DPRK to create fronts that "leverage the assistance of non-nationals" to move money worldwide. In 2018, the U.N. also reported: "Joint ventures with foreign companies have further generated hard currency through

58

overseas companies with no overt links to designated entities or interests of the [DPRK]." This same report found that the RGB "benefits heavily" from the cooperation of foreign businesses. By 2019, the U.N. concluded that the "deceptive practices of the [DPRK]" enabled it to access the financial system by making use of "complicit foreign nationals to obfuscate their activities" specifically to "raise money for the country's weapons of mass destruction programmes."

178.    BAT's conduct helped Office 39, Tanchon, KKBC, FTB, and KOMID access the international financial system to disguise missile-related sales behind a "veil of legitimacy," utilizing fronts and intermediaries to evade detection. As Under Secretary Levey explained in 2006, the designation of Banco Delta Asia as a primary money laundering concern was a direct response to this threat, aimed at cutting off the "willing partner" handling North Korea's "dirty business." By secretly continuing its joint venture with Daesong/Office 39 from 2007 through 2017, BAT continued to supply a "veil of legitimacy" to DPRK missile proliferators who needed such cover to enable their continued supply of missile aid to the IRGC.

179.    When Defendants helped Office 39 conceal their scheme, and helped Office 39 and, through it, the IRGC, allow Tanchon, KKBC, FTB, and KOMID to leverage the power of the U.S. financial system, Defendants directly increased the flow of aid to IRGC and Hizballah missile attacks. As Congress has found, the United States relies on financial intelligence to disrupt terror networks. 22 U.S.C. § 2656 Note, Pub. L. 108-458, Title VII, § 7118, 118 Stat. 377 (Dec. 17, 2004). For at least 10 years, BAT's conduct willfully obstructed these key efforts, ensuring the financial channels for the terrorists' missile attacks remained open.

180.    The United States has long recognized that enabling terrorist sponsors to access the global financial system—as BAT did here—supplies direct, key support to terrorist attacks. As Under Secretary Levey noted in 2006, for example, Treasury's mission to "sever the lines of

59

financial support to international terrorists" and to arms proliferators is predicated on the understanding that "[t]here are financial networks that underlie all of these threats."

181.    Indeed, the Executive Branch and Congress have both confirmed that North Korean activities during the relevant period had a causal relationship with terrorist attacks committed by other terrorist groups allied with the DPRK. In 2016, Congress found that the DPRK had "sponsored acts of international terrorism," including the "shipment of weapons to terrorists and state sponsors of terrorism" between 2008 and 2016. 22 U.S.C. § 9201(a)(10)(B) (Feb. 28, 2016). In 2018, likewise, State's annual report on terrorism for the year 2017 found that North Korea had "repeatedly provided support for acts of international terrorism" in the time up to, and including, the reporting period, *i.e.*, in 2017 and the years prior to 2017. In both instances, the relevant U.S. findings encompassed the key period near the end of BAT's scheme—after a decade of BAT aid to the DPRK-IRGC-Hizballah joint missile venture had done its damage.

182.    Moreover, during BAT's sentencing, Judge Howell found that KKBC and FTB—DPRK banks involved in BAT's scheme and used by Office 39 to conduct international financial activity—"have been designated as WMD proliferators by the Treasury," a fact that BATMS "knew." *U.S. v. BAT*, *supra* ¶ 5, at 31. Judge Howell also found that "North Korea uses KKBC and FTB to mask international financial business of sanctioned proliferators in service of its nuclear ballistic missile and other WMD-related programs that endanger us all." *Id.* at 31-32.

183.    BAT has also publicly admitted that it is plausible that illicit cigarettes could have a concrete nexus to financing terrorist attacks. In 2016, for example, BAT admitted in its annual sustainability report that "up to 12% of global tobacco sales" were illegal, and that "[i]ncreasingly, this black market" was "being linked to the financing" of "terrorism," allowing extremist groups to "diversify their revenue streams in order to carry out their horrific attacks."

60

While BAT's quote was about terrorism generally, BAT's rationale applies fully to the revenues generated by BAT's scheme with Office 39/Daesong given the latter's role as a key missile procurement agent for the IRGC and Hizballah.

184.    BAT's misconduct directly undermined U.S. efforts to work with American financial institutions to prevent North Korean-sponsored terrorism. On June 14, 2007, for example, the Secretary of the Treasury cautioned that "our financial actions have produced demonstrable impacts on threats" from "terrorist groups" and "dangerous regimes in North Korea and Iran" by leveraging "targeted financial measures" that Treasury could effectively use "because the U.S. is the key hub of the global financial system; we are the banker to the world." As Treasury and State observed in 2020, likewise, "the U.S. government's commitment to work with the private sector to prevent" the "facilitation of terrorist activities" with "a focus on Iran" and "North Korea" was a fundamental premise of U.S. foreign policy. For well over a decade, BAT frustrated such efforts aimed at halting DPRK-enabled missile threats against Americans.

185.    BAT's misconduct enabled North Korean terrorist procurement agents acting on behalf of the IRGC and Hizballah, such as Office 39, to leverage the credibility, reliability, speed, and strength of the U.S. financial system and the U.S. dollar. This turbocharged the attacks that relied upon arms sourced through the DPRK-IRGC-Hizballah joint weapons venture. As BAT always knew, and *Radio Free Asia* reported in 2011, "U.S. dollars were highly sought after by the corrupt [DPRK] officials because the greenback is easy to keep, and can be used for any purpose." Moreover, as BAT knew, the U.N. reported in 2015 that the RGB played important roles in the DPRK's financial system, transporting bulk cash and arranging clandestine activities where "[i]n most cases … transactions were made in United States dollars … and transferred through corresponding bank accounts in the United States."

61

186.    BAT also knew that its North Korean counterparts, including Office 39, depended upon access to U.S. dollars for the joint weapons venture to succeed. Because the inputs for the venture (*e.g.*, electronics in Asia) were priced and sold in U.S. dollars, North Korea's ability to reliably access the enormous U.S. dollar stockpile that BAT helped build played a primary role in powering the attacks perpetrated by Hizballah and the IRGC. As North Korea scholar Dr. Andrea Berger observed in 2015, BAT's counterparts at Office 39 prioritized obtaining U.S. dollars even above maximizing profits, possibly having been "told by their superiors that generating revenue denominated in foreign currencies, rather than profit, is the top priority."

187.    As BAT knew, the dollar was always the DPRK's most important foreign currency. As a 2008 Library of Congress study noted, "more than 60 percent" of such currency in North Korea "was in U.S. dollars." North Korea's ability to access the U.S. financial system was vital to its ability to pursue the illicit ends for which it was sanctioned. *Compare* 22 U.S.C. § 9222(a)(4)-(5), Pub. L. 114-122, Title II, § 202, 130 Stat. 104 (2016) ("Congress makes the following findings: … (4) All member states share a common interest in protecting the international financial system from the risks of money laundering and illicit transactions emanating from North Korea. (5) The United States dollar and the euro are the world's principal reserve currencies, and the United States and the European Union are primarily responsible for the protection of the international financial system from the risks described in paragraph (4)."), *with* 81 Fed. Reg. 78,715 (Nov. 9, 2016) (findings by Treasury that "North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives…. [T]hese deceptive practices have allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts.").

188.    Moreover, the joint weapons venture depended upon Office 39's ability to access the U.S. financial system through illicit partnerships. In 2014, the U.N. found that the DPRK used "confidential business dealings" to "pool funds in accounts that, in turn, could help to advance prohibited programmes or disguise earnings from arms or proliferation-related transfers . . . through joint ventures where a foreign partner could hold funds on behalf of or for the benefit of designated entities." This is exactly what happened here, with BAT and SUTL serving as the foreign partners holding U.S. dollars for Office 39/RGB.

189.    Office 39 and the RGB also applied the expertise gained from BAT-enhanced illicit cigarette financing activity directly to their missile sales. As Dr. Greitens observed in 2007, North Korea applied tools developed in illicit activities—such as the use of middlemen, fronts, and complicated financial arrangements—to proliferation. The regime "transferred its ability to compartmentalize, camouflage operations, and adapt rapidly to enforcement from illicit activity to proliferation." This expertise transfer was enabled by personnel overlap: the same dual-hatted Office 39 agents involved in cigarette activities were often involved in missile proliferation.

190.    When Defendants helped Office 39—and by extension, the IRGC and Hizballah—evade these efforts, they strengthened the IRGC's ability to attack Americans in the Middle East. *See supra* ¶¶ 55, 178. Indeed, Dr. Greitens observed in 2007 that the DPRK's proliferation network was squarely linked to terrorist threats because "North Korean criminal smuggling" directly "create channels for proliferation that, by their very nature, evade detection" and thereby "provide terrorist organizations" with weapons, "thus enabling them to stage an attack on the United States."

191.    Defendants' financing and concealment aid supplied potent assistance to the IRGC's *Qiam* and *Fateh* attacks against Plaintiffs because the IRGC's ability to propagate such

63

threat, in the first instance, depended upon a vast DPRK-IRGC missile network that required secrecy, sanctions-free funding, and reliable capital—all of which BAT covertly supplied for more than a decade. *See supra* Part III. For example, DPRK scholars Bechtol and Celso observed in 2025 that the "Iran–North Korea partnership" created a "vast technological and scientific infrastructure" through which "[m]uch of Iran's formidable arsenal" of "missile weaponry (much of it based on North Korean designs) has with Pyongyang's assistance been transferred to Tehran's regional proxies" in "Iraq" and "Lebanon" (among other places), and this "*armament nexus*" enabled Iran to "develop[] Hezbollah into a formidable fighting force capable of offensive operations" against the United States in the region.

### 3. BAT Provided Vital Support to North Korean Cigarette Counterfeiting that Financed Missile Procurement

192. BAT's illicit venture also strengthened the criminal infrastructure that Office 39 used to move missiles. Daesong-BAT helped the DPRK dramatically expand cigarette counterfeiting while deepening its ties with global smuggling networks, which Office 39 initially leveraged to move cigarettes but subsequently used for missiles. As the Director of the U.S. Army's Strategic Studies Institute noted in 2010, Office 39 exercised "what is essentially criminal sovereignty," using state tools to execute schemes like cigarette smuggling.

193. In the late 1990s, North Korean counterfeiting of BAT products was extensive, and the DPRK counterfeits were of poor quality. This cost BAT money two ways. First, BAT lost sales. Second, BAT lost customer loyalty when people purchased subpar fake BAT cigarettes made by Daesong. Equally important, North Korean counterfeit cigarettes flowed to three of BAT's most important markets—the U.S., China, and Japan.

194. BAT's competitors chose to confront Daesong's counterfeiting by working with law enforcement. BAT chose differently: it entered a secret 20-year joint venture partnership

with Daesong in 2001. Notably, BAT concealed its Daesong joint venture from 2001 through 2005, only acknowledging it after press reports exposed the scheme.

195.    When BAT partnered with Daesong, it did so, in part, with counterfeiting in mind. In June 1994, for example, BAT executive Patrick O'Keeffe laid out what would ultimately become BAT's successful strategy to partner with Office 39/Daesong in an internal memorandum, which proposed exporting a "trial order" of 4 million BAT cigarettes to "a North Korean Company" not just for revenue, but to establish "trademark use" to enable BAT's lawyers to "apply pressure against the counterfeiters currently manufacturing and exporting from North Korea," which BAT knew by then included Daesong.

196.    Simply put, BAT recognized that its partnership with Daesong was an alternative means to fighting the counterfeiting of BAT's products. BAT knew, or was willfully blind, that its Daesong partners would never abandon cigarette counterfeiting, but would simply leverage the skills, components, expertise, networks, and funds sourced from Daesong-BAT to revolutionize Daesong's cigarette counterfeiting business as well, while Daesong, in turn, minimized the counterfeiting of BAT cigarettes while simultaneously increasing overall counterfeiting activity dramatically, on net, by redirecting (and growing) their counterfeiting of BAT's largest rival, Philip Morris, which was the Coke to BAT's Pepsi. In this way, Defendants' motivation to partner with terrorist sponsors (Office 39 and the RGB) through Daesong-BAT to extract economic benefits—a robust solution to then-existing counterfeiting of BAT's cigarettes—mirrored the logic of protection payments to terrorists: in both contexts, the corporate actor partners with a violent or criminal actor with the understanding, and intention, of redirecting such crimes away from the corporation and towards others.

197.    BAT's counterfeiting strategy worked as intended: as BAT's value to Office 39/Daesong went up, Daesong's counterfeiting of BAT goods went down. Indeed, from 2007 through 2017, Daesong does not appear to have counterfeited BAT products at scale, even though Daesong intensified its counterfeiting of Philip Morris's cigarettes during the same period. Plaintiffs are unaware of any report documenting any instance of BAT's goods having been counterfeited by North Korean state firms during the period from 2007 through 2017. This stands in contrast to significant counterfeiting of Philip Morris's Marlboro® cigarettes by Office 39 through Daesong during the same period.

198.    BAT provided vital assistance to Daesong counterfeiting. Before its partnership with BAT, Daesong was a backwards tobacco firm without the benefit of BAT's industry-leading expertise, technologies, networks, and more. In short, BAT revolutionized Daesong's utility to Office 39 as a tobacco company. That, in turn, meant that Daesong's cigarette counterfeiting became far more potent. Armed with BAT's technical support and expertise, Daesong dramatically expanded its cigarette counterfeiting activities during the precise period when BAT partnered with it. In so doing, Daesong-BAT was an Office 39 front for DPRK sponsorship of missile threats by the IRGC, and an important component of the Iranian ballistic missile procurement network. According to Dr. Greitens, BAT's participation in Daesong-BAT substantially strengthened Office 39's cigarette counterfeiting operations. *See infra* ¶ 218.

199.    The timeline confirms Plaintiffs' allegation. In 2001, BAT executed a 20-year joint venture partnership with Daesong in which BAT supplied technical assistance, know-how, components, and the expertise of the world's largest tobacco firm. In 2002, North Korean cigarette counterfeiting dramatically accelerated. Writing in her 2014 book, Dr. Greitens observed: "Counterfeit cigarettes have been another lucrative trade item for North Korea, linked

66

to the country by both import and export data. This trade is thought to have begun on a small scale in the 1990s, but increased substantially around 2002"—one year after BAT partnered with Office 39. In 2014, she also observed the DPRK's counterfeiting custom and practice to import parts and expertise, reverse-engineer them, and then build a counterfeit export base: the "previous pattern witnessed in the drug trade, where North Korea attempted to import large volumes of a precursor material (ephedrine for the drug trade, packaging for the cigarettes) and was then linked to a series of incidents involving the export smuggling of the finished product (methamphetamine for the drug trade, and counterfeit cigarettes)."

200. Defectors have confirmed it is likely BAT's partnership with Daesong bolstered the latter's cigarette counterfeiting operations. As reported by *Daily NK* in 2006, a defector stated, "I am sure that they are producing counterfeit cigarettes more easily since they started the cooperation with a foreign company [BAT], and they must be exporting the products through secret routes." Another defector confirmed awareness that the "Daesung Cigarette Factory" was counterfeiting brands like Marlboro.

201. At all relevant times, BAT knew that a substantial portion of the materials, technical expertise, and practices it exported to North Korea were diverted to cigarette counterfeiting or smuggling operations. Daesong/Office 39 is infamous for smuggling branded and counterfeit cigarettes to exploit the margin between production costs and taxes.

202. Based on Office 39's custom and practice, BAT's prior history with Daesong (including awareness of smuggling), and the DPRK's reliance on cigarette counterfeiting and smuggling, a substantial number of cigarettes produced by Daesong-BAT, or with BAT's assistance, were likely counterfeited and smuggled, generating additional revenues that enabled North Korea's missile proliferation activities and the specific missile attacks on Plaintiffs. These

67

revenues ultimately flowed through the same Office 39/Daesong channels as did Daesong-BAT currency generation, and were used for the same purpose and to the same effect. Given the scale of DPRK cigarette counterfeiting, its dramatic increase while BAT partnered with Daesong, and the profitability of such conduct, among other reasons, Defendants' counterfeiting-related assistance likely generated currency for the DPRK-IRGC-Hizballah joint missile venture's needs in a comparable, if not greater, amount than what BAT caused through Daesong-BAT.

### B. Defendants' Assistance To *Qiam* And *Fateh* Attacks Was Extensive And Continuous, And Aligned Defendants' Profits With Terrorist Violence

203. Defendants' sustained assistance to the DPRK-IRGC-Hizballah joint arms venture functioned as a financial lifeline for the world's most dangerous proliferation network. BAT's substantial assistance enabled its joint venture partner, Office 39, to power IRGC, Hizballah, and proxy attacks targeting the United States in Iraq from 2007 through at least 2022.

204. Defendants' joint venture with Office 39 was lucrative and easily generated over $400 million, and likely over $1 billion, throughout the 2010s—the period of BAT's scheme when Iran's *Qiam* and *Fateh* programs matured from experimental prototypes into lethal, precision-guided systems used to attack Plaintiffs.

205. And even after Defendants purportedly exited North Korea in late 2017, Defendants' assistance continued to—quite literally—pay financial dividends to Daesong/Office 39 for at least several years thereafter, *i.e.*, into the early 2020s. Among other reasons, Defendants supplied technical expertise, cigarette manufacturing components, and other invaluable sourcing, financing, and counterfeiting infrastructure during BAT's decades-long partnership with Daesong, Office 39 was able to continue profitably manufacturing cigarettes thereafter as a result. As is commonly the case when a decades-long enterprise involving technical collaboration, network augmentation, and skill transfer—which describes Daesong-

68

BAT—the economic value of the venture typically has a multi-year tail even after one partner exits the venture since the relationships, technologies, networks, and the like created during the venture continue to benefit the firm that remained—like here, where Daesong continued selling cigarettes after BAT exited its joint venture, and continued generating cash flow that was directly attributable to the turnkey assistance BAT supplied to Daesong for at least several years after the venture ended attributable to BAT's acts that revolutionized Daesong's financial capabilities.

206.    The *Qiam* missile's development tracks the height of BAT's scheme. The *Qiam-1* was first successfully test-fired in August 2010—the same year BAT was actively expanding its illicit sales and navigating the new U.S. sanctions regime targeting Office 39. As BAT continued to move funds through SUTL and sanctioned banks between 2010 and 2015, the *Qiam* underwent significant modifications, including the removal of stabilizing fins (a DPRK design signature) and the integration of a MaRV. During this period, IRGC media outlets boasted that the *Qiam* missile was "specifically built to target U.S. bases in the region," as IRGC media arm *Fars* reported in 2014. By the end of 2017, the *Qiam* had been developed, stockpiled, and transferred to the IRGC's arsenal, ready for IRGC terrorist attacks.

207.    Likewise, the *Fateh* program achieved its most lethal milestones while BAT served as a primary DPRK revenue source. In 2010, North Korea and the IRGC unveiled the third-generation *Fateh-110*, the variant offering improved precision sufficient to target specific military hangars. And in 2015—when BATMS admittedly was facilitating fraudulent wire transfers for the joint venture—Iran unveiled the *Fateh-313*, which offered longer range.

208.    From 2007 through 2017, the *Qiam* and *Fateh* programs were capital intensive. They required a steady stream of hard currency to pay for foreign components, specialized labor, and testing. When funding dries up, missile production lines stall. By providing a consistent

69

revenue stream, BAT ensured that the DPRK-IRGC-Hizballah joint missile venture faced no such interruptions, providing the financial runway necessary for these weapons to reach maturity.

209.    The hundreds of millions of dollars BAT funneled to Office 39 functioned as seed capital for the IRGC's and DPRK's shared military-industrial missile infrastructure that operates on multi-year production cycles to create and upgrade missiles, including the *Qiam* and advanced *Fateh* series. The capital BAT injected into Office 39 during the scheme was converted into durable assets—procurement networks, component stockpiles, weapons stockpiles, missile factories, and missile bunkers—that continued augmenting IRGC *Qiam* and *Fateh* missile threats to the United States in Iraq long after BAT formally sold its DPRK business.

210.    Specifically, the *Qiam* and *Fateh* missiles that struck Plaintiffs in 2020 and 2022 were developed, secured, and stockpiled during the time when BAT was providing at least hundreds of millions of dollars to Office 39. Missile development requires multi-year production cycles; the R&D, component procurement, and assembly of the arsenals deployed by the IRGC and Hizballah occurred during the 2007-2017 period when BAT partnered with Office 39/Daesong. The *Qiam* and *Fateh* missiles built and stockpiled during this period remained operational and were used against Americans, including Plaintiffs, years later under long-standing "first in, first out" weapons practice, in which one uses their oldest stock first.

211.    The *Qiam* and *Fateh* missiles launched by the IRGC against Plaintiffs were the product of years of design, testing, production, and stockpiling, all funded by revenues generated for Office 39 and its arms-proliferation partners for at least a decade. Defendants' provision of manufacturing infrastructure and sustained revenue during this critical development window ensured that the *Qiam* and *Fateh* missiles used to attack Plaintiffs reached operational readiness.

70

212.    Defendants' provision of support to *Qiam* and *Fateh* attacks enabled by the DPRK-IRGC-Hizballah weapons venture was not episodic (like a series of isolated payments) or incidental, but sustained and critical. Defendants constructed a durable commercial enterprise with a predictable and recurring revenue stream for at least a decade—precisely the type of financial continuity required to support the costly work of long-term missile development, production, and deployment needed for the IRGC's *Qiam* and *Fateh* attacks here.

213.    With respect to *Qiam* and *Fateh* missile attacks by the IRGC that involved North Korean assistance, BAT's conduct was pervasive, systemic, and culpable. While Plaintiffs do not allege that BAT's misconduct necessarily enabled all IRGC-sponsored terrorism anywhere in the world at any time, Defendants are responsible for a discrete subset of IRGC-led attacks that utilized the specific models and types of *Qiam* and *Fateh* missiles that Daesong/Office 39 helped develop and supply to the DPRK's principal missile customer, the IRGC, using proceeds generated through BAT's criminal misconduct. There are only two known terrorist missile attacks that harmed Americans involving those missile systems, and both are alleged herein.

214.    Defendants operated in a joint missile enterprise with the IRGC, Hizballah, and DPRK in which terrorist missile attacks sponsored by Office 39 ordinarily profited BAT. As Defendants always knew, BAT's joint venture counterparty, Daesong/Office 39, was the essential hub of the DPRK-IRGC-Hizballah joint venture responsible for facilitating joint development and deployment of missiles by terrorists armed by such venture. And as BAT also knew, the DPRK's desire to enter into a business partnership with BAT was motivated in substantial part by Office 39's longstanding function of generating hard currency for the DPRK regime's sponsorship of anti-American terrorism, which was the very reason Kim Jong-Il created Office 39 in the first instance.

71

215. Judge Howell concluded at sentencing that BAT and BATMS's misconduct "was flagrant and lengthy, over a term of years," involving deliberate efforts to evade U.S. sanctions and deceive U.S. banks while generating "millions and millions of dollars" for DPRK arms proliferators. *U.S. v. BAT*, *supra* ¶ 5, at 32. While the court observed that the underlying criminal acts involved tobacco, it emphasized that Defendants' misconduct was carried out through sanctioned DPRK bank arms proliferators and involved efforts to conceal the DPRK role in the transactions. For example, when a bank raised concerns about the origin of funds, BATMS and its counterparties discussed submitting "documents that will not show DPRK" and ultimately advised canceling the transfer in response to bank scrutiny—conduct Judge Howell described as "pretty flagrant and well-known." *Id.*

216. Defendants' admitted misconduct was not ordinary commercial activity, but a pervasive, systemic, and culpable scheme to channel funds through the shared DPRK-IRGC sanctions-evading financial network that supports missile attacks sponsored and committed by both. *Supra* ¶¶ 31, 35 (Office 39, Tanchon, KKBC, and FTB acted as logistics agent for IRGC missile deals); ¶ 105 (above DPRK terrorist fronts shared missile-related procurement, financial, and logistical networks with IRGC); ¶ 69 (elements of above DPRK sanctions evasion network with which BAT partnered provided on-the-ground support to IRGC missile efforts inside Iran).

## V.   PLAINTIFFS' EXPERTS HAVE CONFIRMED THE AMENDED COMPLAINT'S ESSENTIAL CULPABILITY AND NEXUS ALLEGATIONS

217. As noted above, Plaintiffs have retained and consulted renowned subject matter experts. *Supra* ¶ 18. Those experts have confirmed that BAT's partnership with Daesong enabled the DPRK-IRGC-Hizballah joint venture to develop and deploy the specific *Qiam* and *Fateh*-class missiles used to attack Plaintiffs. In other words, they have confirmed the veracity and plausibility of Plaintiffs' essential allegations regarding Defendants' culpability and the nexus

72

between Defendants' misconduct and the attacks that injured Plaintiffs.[4] In further support of Plaintiffs' claims, Plaintiffs allege the facts quoted below.

218.    **Dr. Sheena Chestnut Greitens**. Plaintiffs retained and consulted with Dr. Greitens concerning BAT's admissions in its criminal case and guilty plea, DPRK illicit networks, hard-currency-generation activities, sanctions evasion, proliferation-related networks, and Office 39 operations. Dr. Greitens is an Associate Professor at the University of Texas at Austin Lyndon B. Johnson School of Public Affairs and Director of the Asia Policy Program. Dr. Greitens has closely studied North Korea for over two decades. Her scholarship includes "Illicit Activity & Proliferation: North Korean Smuggling Networks," published in *International Security*, and "Illicit: North Korea's Evolving Operations to Earn Hard Currency," published by the Committee for Human Rights in North Korea. She has also held affiliations with the U.S. Army War College, Carnegie Endowment for International Peace, Harvard University's Fairbank Center, Brookings Institution, and Center for Strategic and International Studies. Dr. Greitens has traveled to North Korea for her research, interviewed former DPRK officials concerning its illicit networks, and researched BAT's activities in the region, including an interview with a former BAT executive in South Korea. Dr. Greitens has reviewed portions of this Amended Complaint relevant to her areas of expertise and confirmed that the allegations concerning Office 39 operations, DPRK illicit trade practices, sanctions-evasion financing, and the role of foreign-

---

[4] The factual allegations herein are independently supported by, among other things, Defendants' own admissions and internal documents, public records, sanctions findings, government reports, congressional materials, public reporting, and other sources cited throughout this Amended Complaint. Plaintiffs' expert analyses are included to provide additional factual context and corroboration—grounded in each expert's specialized knowledge, specific evidence, and the detailed factual allegations set forth herein—concerning BAT's April 2023 criminal resolution, missile proliferation, sanctions-evasion financing, and DPRK-IRGC missile cooperation, including issues specifically challenged in Defendants' Motion to Dismiss [Dkt. Nos. 30-31].

currency-generation networks in supporting DPRK proliferation activities are consistent with her

expert analysis and opinions. In her analysis, Dr. Greitens shared specific facts and her opinions,

including as follows:

a.    "North Korea's joint venture with British-American Tobacco (BAT) was not simply a business deal to sell a handful of tobacco and cigarette components to a North Korean Tobacco Company. It provided an otherwise extraordinarily isolated regime with the ability, at scale, to continue funding and developing its missile program during a critical period."

b.    "North Korea's joint venture with BAT provided a key means for North Korea to earn hard currency, at a time (mid-2000s) when other illicit sources of revenue were drying up due to enforcement pressure. Few if any other sources were capable of filling this gap. BAT's joint venture could, simply through its profits, and then also provided significant additional financial benefits through its contribution to North Korea's counterfeit cigarette industry."

c.    "Multiple credible sources assessed that DPRK state-sponsored drug production and trafficking, previously one of its most lucrative hard currency earning operations, decreased significantly in the mid-2000s and onward."

d.    "The BDA finding in September 2005 [*supra* ¶ 106] quoted estimates by the Congressional Research Service that drug production and trafficking alone had generated anywhere from $85 million to $500 million for the regime annually from 1997 to 2005, noting that $200 million a year from the drug trade was an estimate 'widely encountered in the U.S. policy community.' Loss of drug trade income alone, therefore, created a revenue gap of ~$100-$200 million annually in the mid-2000s that North Korea had few options to fill."

e.    "The income provided by North Korea's joint venture with BAT allowed Pyongyang to offset the drop in hard currency income from revenue streams that had been placed under enforcement pressure (such as drug production/trafficking and currency counterfeiting). The BAT joint venture appears to have been the largest revenue source that North Korea used to offset or make up the unexpected shortfall."

f.    "However, BAT's arrangement also provided additional financial benefits to North Korea by sending it the materials, equipment, and know-how to gain a foothold in high-quality cigarette counterfeiting, which by the late 2000s had become North Korea's most lucrative new source of revenue and foreign income/hard currency."

g.    "BAT played a unique role in funding North Korea's 'court economy' at a time when other entities, even Chinese banks that had previously been more risk-acceptant on business with North Korea, were reducing their exposure."

h.    "North Korea has a demonstrated pattern of using joint ventures and front companies to obtain knowledge, precursors, and materials that enable the regime to subsequently engage in sophisticated counterfeiting. This is the model that the BAT joint venture provided for North Korean cigarette counterfeiting."

i.    "Thus the most conservative estimates of the North Korean regime's profits from cigarette counterfeiting in the period relevant to this [amended] complaint approximate or exceed the entire amount previously obtained by drug production/trafficking, possibly by a significant margin."

j.    "The North Korean entities, including Daesong, that BAT partnered with in its joint venture are key organizations in North Korea involved in both illicit activities and arms exports. By the time that BAT/BATMS agreed to covertly continue their joint venture operations, the overlap between North Korean financial institutions and the networks used to support its weapons development and terrorism-related activities were clear. Additional information accumulated on these connections in the first several years of BAT's covert arrangement. These actors form part of a network in which Office 39 acts as the coordinating node: Daesong and KOMID carry out activities directed by Office 39, while Tanchon, KKBC, and FTB provide financial and banking support."

219.    **Dr. Jeffrey Lewis**. Plaintiffs retained and consulted with Dr. Lewis concerning BAT's admissions in its criminal case and guilty plea, missile proliferation, DPRK weapons programs, ballistic missile development, and DPRK-Iran missile cooperation. Dr. Lewis has nearly three decades of experience in proliferation-related issues. He is a Distinguished Scholar of Global Security at Middlebury College and a Distinguished Fellow at the Foreign Policy Research Institute. Dr. Lewis also serves as Director of the East Asia Nonproliferation Program at the James Martin Center for Nonproliferation Studies, is a member of the National Academies of Science, Engineering and Medicine's Committee on International Security and Arms Control, and previously served as a member of the U.S. Department of State's International Security Advisory Board. His publications include numerous works concerning missile proliferation, nonproliferation, Iran, and North Korea. Dr. Lewis has reviewed portions of this Amended Complaint and confirmed that the allegations concerning DPRK-Iran missile cooperation, proliferation financing, and the development, procurement, and sustainment of the *Qiam*- and

75

*Fateh*-class missile systems are consistent with his expert analysis and opinions. In his analysis,

Dr. Lewis shared specific facts and his opinions, including as follows:

a. "Between 2007-2017, British American Tobacco functioned as an arm of the DPRK-Iran cooperative missile venture, a proliferation network sanctioned by the United States and United Nations in which Iran and North Korea worked in concert to develop a new generation of ballistic missiles. BAT's piece of the action, so to speak, was at least $400 million. North Korea was able to launder more than $400 million, which had been frozen by US sanctions at Tanchon Commercial Bank, and use it to establish front companies that generated hard currency from cigarette sales for the missile program. These front companies generated hundreds of millions of dollars at precisely the same time North Korea needed hundreds of millions of dollars to fund its participation in the venture. This money was beyond the reach of the U.S. Treasury, making it especially valuable to finance North Korea's role as a procurement agent for its partners, including Iran. Iran received assistance it could not otherwise acquire in the development, testing, and production of a new generation of ballistic missiles developed and stockpiled during this period, notably the *Qiam* and advanced *Fateh*-series short-range ballistic missiles that were used by the IRGC precisely as they were intended—against American servicemembers."

b. "Each of the parties had an essential role to play in freeing more than $400 million in frozen funds to help finance the development of weapons such as the more than a dozen *Qiam* and advanced *Fateh*-series missiles that injured U.S. persons in 2020 and 2022. Without BAT's and North Korea's contributions, the missile venture would likely have not succeeded."

c. "Had BAT not committed sanctions evasion and bank fraud, North Korea could not have used the funds frozen at Tanchon Commercial Bank and the banks Tanchon controlled. Without the ability to use funds at Tanchon Bank and the banks it controlled, North Korea could not have acted as a procurement agent. North Korea was the only party willing and able to aid Iran in developing these missiles, particularly to act as a procurement broker on its behalf."

d. "The Iranians claim, and photographs and videos of the missiles that I have personally examined support, that the *Qiam* and advanced *Fateh*-series missiles were developed and began production during the period that BAT was committing sanctions evasion and bank fraud. The *Qiam* and advanced *Fateh*-series missiles that Iran developed during the period in which BAT was acting as an arm of the proliferation network were a dramatic improvement over older, less accurate *Scud*-C and early generation *Fateh*-110 missiles. The advances Iran made in missile accuracy shown by the *Qiam* and advanced *Fateh*-series missiles—missiles that the IRGC used to grievous effect on January 8, 2020 and September 28, 2022—occurred during BAT's 2007-2017 scheme with North Korea. Without North Korea's cooperation, again substantially financed by the sanctions evasion and bank fraud scheme with BAT, Iran almost certainly could not have developed the *Qiam* and advanced *Fateh*-series missiles or used them to harm anyone."

76

e.     "During this period, Iran also acquired materials and components that Iran used to produce hundreds of *Qiam* and advanced *Fateh*-series missiles. In general, militaries around the world, including Iran, use the oldest munitions in a stockpile first (a practice called "first-in, first-out"). Prior to 2020, Iran used only a handful of the missiles it produced with North Korean assistance, making it highly likely that, in 2020 and after, Iran continued to draw from stockpiles of missiles produced during the period of BAT's sanctions evasion and bank fraud scheme or using materials and components acquired during the period of BAT's scheme."

f.     "Without access to the financial markets, the North Korean-Iranian missile venture would not have been able to purchase crucial items necessary to design, test, or produce missiles."

g.     "The U.S. intelligence community consistently assessed that Iran was dependent on foreign assistance during this period. North Korea acted as a procurement agent for Iran. During the period of BAT's sanctions evasion and bank fraud scheme, Iran needed to import many of the components of *Qiam* and advanced *Fateh*-series missiles sought by the IRGC, including high-strength materials such as aerospace-grade aluminum for airframes and graphite for jet vanes, precursors for propellant including aluminum powder, and electronic components for guidance systems. Many of Iran's efforts to procure these items were blocked or interdicted. The United States made substantial efforts to interdict shipments of these components in this period. The United States could not, however, interdict every shipment; that is why restricting access to financial markets is a crucial element of any strategy to combat this network. With sufficient funds, North Korea and Iran could make multiple attempts to procure needed materials and goods. Even if some shipments are detected, others will not be. This is also why BAT's assistance is so meaningful."

h.     "Iran was, nonetheless, able to procure those items used as components of *Qiam* and advanced *Fateh*-series missiles. North Korea is known to have acquired the same items at the same time and to have acted as a procurement agent on the part of this network. North Korea almost certainly played a crucial role as a procurement agent for IRGC in this period. Without these items, as well as broader technical assistance from North Korea, Iran could not have developed or stockpiled the *Qiam* and advanced *Fateh*-series missiles used in 2020 and 2022. For North Korea to play this role, it required money and, just as crucially, money that was outside the reach of the long arm of the U.S. Treasury."

i.     "BAT's unique and indispensable role in the network allowed North Korea to turn more than $400 million frozen at a sanctioned bank into many more hundreds of millions of dollars that could be used to pay for missile factories, the tools that go in them, the personnel inside, and the materials and components to make the missiles themselves, to fuel them, and to guide them to their targets. BAT's role in the network was as important to the success of the cooperative missile venture as the functions performed by the other eight entities initially sanctioned in EO [13382]. Indeed, many entities and individuals later designated under EO [13382] appear to have had much smaller financial roles in the network than BAT did between 2007-2017."

77

j.  "During the period of BAT's involvement with the cooperative missile venture, there were materials and components necessary for the *Qiam* and advanced *Fateh*-series that only North Korea could likely provide. These represented 'chokepoints' without which the Iranian missiles would not work and, therefore, without which no one would have been injured. Each party understood what it gained from the network."

k.  "This cooperative missile venture was operating during the development of the *Qiam* and advanced *Fateh*-series missiles. Iran developed the *Qiam* and its current generation of advanced *Fateh*-series missiles between 2010-2017. To support development of their ballistic missiles, North Korea and Iran constructed large infrastructure to design, test and produce ballistic missiles, much of which is placed underground. Iran reportedly aided in construction of the underground portions of these facilities. Iranian and North Korean technicians were reportedly co-located in both countries. UN reports document extensive travel between experts from the two countries."

l.  "These expenses include both the costs of creating the production infrastructure as well as sourcing components and materials. For any missile program such as the *Qiam* or advanced *Fateh*-series, funds are necessary to procure materials, components, tools, computers, and software from abroad, as well as to pay for personnel expenses. North Korean missile experts often receive training abroad, are given special rewards such as luxury watches and foreign cars for their work, and incur expenses traveling to and living in Iran. Creating the production infrastructure likely cost several hundreds of millions of dollars. When North Korea exported production lines to Iran and Pakistan for early generation *Scud*-derived missiles (the precursor to the *Qiam*) in the 1990s, the reported prices were $120 million and $150 million, respectively, or around $200-250 million in 2016 dollars."

m.  "The costs associated with the annual production of *Qiam* and advanced *Fateh*-series missiles would have been on the order of several hundred million dollars each year those missiles were produced. During the period of BAT's sanctions evasion and bank fraud scheme, Iran and North Korea *each* produced at least 100 missiles per year, mostly of these classes of missiles. In 2017, North Korea offered different types of *Scud*-derived missiles for sale for $3 million and $5 million each, suggesting the approximate cost to produce them was somewhat less. Therefore, *Qiam* and advanced *Fateh*-series missiles likely cost a few million dollars each to produce. Overall, North Korea would have required several hundred million dollars a year to fund its role in the cooperative missile venture."

n.  "Absent access to these materials and components, Iran could not have developed and produced these missiles. North Korea had similar requirements and, during this period, sought to procure these items for itself and others. The hundreds of millions of dollars made available to North Korea by BAT's sanctions evasion and bank fraud scheme would have been extraordinarily valuable for this purpose. Essential to North Korea's ability to act as a development partner and procurement agent for the IRGC within the context of the cooperative missile venture was the ability to access funds outside of US sanctions, especially dollars, to pay for the materials that would be sold to Iran and others. For North Korea to purchase items such as aluminum powder, graphite, high-

78

strength aluminum, or electronics associated with missile guidance, either for itself or on behalf of another party such as the IRGC, it needed access to substantial funds outside of sanctions."

o.    "BAT substantially aided North Korea's ability to procure controlled goods for Iran's missile program. The crimes to which BAT pleaded guilty resulted in the laundering of more than $400 million in funds held by the Tanchon Commercial Bank, the commercial arm of North Korea's missile program, and the banks it controlled, like KKBC. These funds were not available to North Korea's missile program until BAT tricked US financial institutions into processing them."

p.    "In exchange, North Korea was able to establish a cigarette manufacturing business, a sector that the U.S. Department of Treasury believes earns North Korea more than $1 billion a year. By Treasury's estimate, North Korea earned 20 dollars for each dollar Tanchon Commercial Bank transferred to BAT, representing more than $8.3 billion. As these funds were held by front companies that were based outside of North Korea, they were uniquely valuable to North Korea, which routinely directs such front companies to make payments on behalf of the missile program. Given the unique role of North Korean front companies, the high priority the regime places on the program, and the role of Tanchon and KKBC in funding the network from the start, a substantial amount of these funds was almost certainly used by North Korea's missile program."

220.    **Dr. Tom Karako**. Plaintiffs retained and consulted with Dr. Karako concerning BAT's admissions in its criminal case and guilty plea, ballistic missile systems, missile proliferation, DPRK missile threats, Iranian missile capabilities, and the operational characteristics of the *Qiam*- and *Fateh*-class missile systems. Dr. Karako has 25 years of experience in missile and missile defense-related issues. Dr. Karako is the Director of the Missile Defense Project with the Defense and Security Department at the Center for Strategic and International Studies ("CSIS"), where his research focuses on missile defense, strategic forces, missile proliferation, nuclear deterrence, and related issues. He previously served with the House Armed Services Committee, where he worked on strategic forces, missile defense, nonproliferation, and NATO policy matters. Dr. Karako has authored or co-authored numerous publications concerning missile defense, North Korean missile threats, missile proliferation, hypersonic weapons, and Iranian missile capabilities and multiple CSIS analyses concerning DPRK missile developments and regional missile-defense architecture. Dr. Karako has reviewed

79

portions of this Amended Complaint relevant to his areas of expertise and confirmed that the allegations concerning DPRK-Iran missile cooperation, ballistic missile proliferation, missile procurement and sustainment networks, and the *Qiam*- and *Fateh*-class missile systems are consistent with his expert analysis and opinions; he did not prepare a written analysis.

**VI.    THE IRGC AND HIZBALLAH COMMITTED TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS USING *QIAM* AND *FATEH* MISSILES DEVELOPED AND/OR IMPROVED BY DEFENDANTS' MISCONDUCT**

**A.    January 8, 2020 Attack In Iran And Iraq – Operation Martyr Soleimani**

221.    On January 8, 2020, a combined terrorist group comprising IRGC terrorists in Iran and a joint Hizballah/Kataib Hizballah cell in Iraq committed a complex missile attack targeting the United States at Al Asad Air Base in Anbar, Iraq, and at Erbil Air Base in Erbil, Iraq (the "2020 Attack"). The 2020 Attack began around 1:30 A.M. local time and lasted approximately three hours. It was a well-planned strike reflecting extensive preparation, including the use of Kataib Hizballah terrorists performing pre-attack intelligence gathering.

222.    The 2020 Attack relied heavily on the North Korean-IRGC-Hizballah joint weapons venture. The attack included a mix of weapons and technologies, including but not limited to over a dozen *Qiam*- and *Fateh*-class missiles that were launched from locations in Iran. At least 11 of those missiles landed at Al Asad Air Base and at least one struck Erbil Air Base. The *Qiam* and *Fateh* missiles detonated during the 2020 Attack, while UAVs supplied targeting assistance. This was one of the IRGC's largest and most direct strikes ever targeting U.S. personnel and facilities since 1979, and was the first time the IRGC fired large numbers of *Qiam* missiles from its stockpile, having only fired one or two *Qiam* missiles previously.

223.    At the same time as the strikes, the IRGC launched a coordinated disinformation campaign targeting American military families. IRGC-controlled media falsely claimed that "more than 80 U.S. forces" had been killed. This tactic was designed to leverage the absence of

80

reliable information to terrorize families in the United States before accurate casualty assessments could be released—a signature tactic Hizballah used against Israel in 2006.

224.    The 2020 Attack violated the laws of war. Among other reasons, the Hizballah and Kataib Hizballah terrorists wore no uniforms, failed to distinguish themselves as combatants, and indiscriminately placed civilians at risk, including airline passengers.

**B.    September 28, 2022 Attack in Iran and Iraqi Kurdistan**

225.    On September 28, 2022, a joint cell comprised of Hizballah and Kataib Hizballah in Iraq and the IRGC in Iran launched at least 70 *Fateh*-class missiles from IRGC sites in Iran and dozens of Shahid-class UAVs, at Kurdish refugee camps in Koya, Iraq (the "2022 Attack"). The 2022 Attack targeted the United States because, among other reasons, the IRGC believed the Kurdish civilian victims to be U.S. allies, and intended to kill and maim them to intimidate the United States while the IRGC was under intense pressure by U.S. sanctions.

226.    The 2022 Attack was planned and authorized by the IRGC. It relied on IRGC-supplied weapons, including at least 70 *Fateh*-class missiles—the same arms jointly developed by the IRGC and Office 39. The terrorists used IRGC-supplied intelligence, including satellite imagery and real-time UAV feeds, to target the victims. Consistent with long-standing IRGC, Hizballah, and Kataib Hizballah tactics, techniques, and procedures and custom and practice, Hizballah and Kataib Hizballah were very likely involved in supplying localized, pre-attack intelligence, including pattern of life intelligence that helped maximize attack lethality.

227.    The 2022 Attack was an indiscriminate act of terror. Among other reasons, the attack targeted a civilian area, killing 13 people and injuring several schoolchildren.

## VII.    DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS

### A.    Defendants Monitored Sanctions, Reports, And Media Warnings About North Korea's Role In Financing IRGC and Hizballah Missile Attacks

228.    As a sophisticated, integrated, multinational corporation operating in a highly regulated industry with a substantial presence in the United States, the Middle East, and East Asia, Defendants (per BAT) maintained a rigorous surveillance regime to monitor "geopolitical and economic policy developments worldwide." According to BAT, as part of BAT's formal "risk modelling" and "external risk assessments," Defendants specifically tracked "[g]eopolitical tensions including international sanctions, social unrest, terrorism and organised crime" capable of "disrupt[ing] [BAT]'s business in multiple markets." Thus, BAT actively monitored:

a.    every official U.S. and U.N. sanctions designation, including associated releases, reports, and findings targeting, *inter alia*, the DPRK, Daesong, Iran, IRGC, and Hizballah; and

b.    other public sources—including articles published by mainstream media outlets, non-governmental organizations, investigative journalists, scholars, and others—that published data relevant to tobacco products and geographies where BAT operated.

229.    Defendants executed this monitoring through an internal network comprising compliance, corporate security, anti-illicit trade, media monitoring, strategic communications, and intelligence personnel, as well as thousands of BAT's and BATMS's employees and agents stationed in the United States, North Korea, East Asia, Iran, and the Middle East. The knowledge possessed by such employees and agents is imputed to Defendants.

230.    Internal BAT documents confirm that this system functioned as designed, delivering real-time intelligence regarding terrorist financing risks. For example, a July 25, 2000 internal BAT "blast" email summarized twelve separate media reports alerting BAT executives that "Cigarette Smuggling May Link to Terrorists" and warning that illicit sales in the U.S. were being "funneled to" the "Mideast" to "fund Hezbollah." Internal BAT documents also

82

specifically confirm that BAT monitored every specific media outlet named in this Complaint through BAT's media monitoring, corporate security, lobbyist, and advertising functions.

231.    BAT supplemented its internal capabilities by retaining lobbyists and law firms in the United States and United Kingdom to monitor U.S. government and U.N. policy changes and legislation in real time. BAT possessed actual, real-time knowledge of every relevant U.S. and U.N. sanctions designation, release, and finding published before or during the conduct alleged herein. *See, e.g.*, Statement of Offense ¶¶ 31, 34, 55, 57 (discussing Defendants' knowledge of U.S. sanctions on North Korea); Information ¶ 55.

232.    Defendants knew that Iran was Office 39's largest arms customer and were aware of an overwhelming consensus of reports from the U.S., U.N., U.K., and international media that confirmed that North Korea and Iran were collaborating to strengthen each other's missile programs—with the United States as their shared primary target.

233.    Beyond the general alliance, Defendants knew that their partnership and transactions with **BAT's specific scheme counterparties,** including Daesong/Office 39, Tanchon, FTB, and KOMID, directly enabled IRGC missile threats against America. Each of the numerous U.S., U.N., and E.U. findings from 1999 through 2016 concerning BAT's counterparties specifically found that a western firm's transactions with such counterparty could enable the IRGC's missile threat against Americans. *See, e.g.*, *supra* ¶¶ 36, 54, 59, 96, 101, 104-105, 112, 130, 142, 174. Defendants knew of each in real time, alerting them that their scheme aided IRGC missile attacks.

234.    Notably, Defendants also persisted in their aid to IRGC-backed missile and rocket attacks in Iran and Iraq enabled by DPRK weapons aid to the IRGC even after IRGC proxies committed dozens of high-profile missile and rocket attacks in Iraq, Israel, and Lebanon from

2006 through 2017, while BAT continued scheming with such terrorists' key armorer. Defendants did so even though a legion of public sources alerted BAT in real-time that such DPRK aid continued to sponsor such terrorist attacks in the Middle East. *See, e.g.*, *supra* ¶¶ 8, 30, 47, 50-51, 54, 74, 96.

235.    The IRGC's deployment of *Qiam*- and *Fateh*-class missiles against U.S. forces and civilians was not an independent or unforeseeable intervening act. It was the precise and intended use of the missiles Defendants helped create and enhance. Defendants knew that Office 39's revenues supplied by BAT's secret partnership with Daesong were directed to North Korean missiles and that those weapons would be supplied to the IRGC and its proxies for use in attacks against Americans. The resulting missile strikes were therefore a foreseeable—if not inevitable—consequence of Defendants' illegal conduct.

236.    At all times, Defendants knew that a foreseeable consequence of improving the IRGC's missile and rocket capability was that those weapons would be used in anti-American terrorist attacks by Hizballah and Kataib Hizballah (or "KH"). As confirmed in U.S. government reports and announcements that Defendants actively monitored, Defendants knew that: Hizballah and KH were both striking arms of the IRGC; members of Hizballah and KH swore fealty to Ayatollah Khamenei; and many Hizballah and KH terrorists were members of the IRGC, too.

**B.    Defendants' Compliance, Corporate Security, And Intelligence Teams Alerted Defendants That The Illicit Cigarette Trade Was Funding Terrorism**

237.    BAT's support for IRGC and Hizballah attacks occurred against a backdrop of decades of intense global scrutiny regarding the extreme risk that tobacco-related crimes— including illicit cigarette sales, smuggling, counterfeiting, and intellectual property theft— financed terrorist attacks. In 2003, for example, the U.S. Government Accountability Office reported that "[t]errorists have earned assets through the highly profitable illicit trade in

84

cigarettes" and that "Hizballah" had "earned assets through trafficking in contraband cigarettes or counterfeit cigarette tax stamps." In 2004, likewise, DOJ published a report by a senior American intelligence analyst alerting the industry that "[t]raffickers [of cigarettes] in the United States and the United Kingdom are providing material support to the Hezbollah," among others, and warning that "[b]ecause of the immense profits in the illicit cigarette trade, as well as the potentially low penalties for getting caught, illicit cigarette trafficking now rivals drug trafficking as the method of choice to fill the bank accounts of terrorists."

238. These warnings issued throughout BAT's illicit venture. In 2008, for example, the U.S. House Committee on Homeland Security published *Tobacco and Terror: How Cigarette Smuggling Is Funding Our Enemies Abroad*, a report which concluded that "[i]n just two months of illicit cigarette trade operations, a motivated terrorist cell could generate sufficient funds to carry out another September 11th style attack." In 2015, likewise, the U.S. Departments of State, Justice, Treasury, Homeland Security, and Health and Human Services published *The Global Illicit Trade in Tobacco: A Threat to National Security*, which alerted BAT that "illicit tobacco" continued to grow as a national security threat because "cigarette smuggling" was a "lucrative crime for some terrorist groups and a potential revenue source to finance acts of terror." (Both reports named Hizballah as an example of the cigarette-terrorist attack nexus.)

239. BAT knew of these risks. Its in-house personnel closely monitored United States and media reports, and its own corporate filings and social media confirm it was acutely aware of the terrorist finance risks presented by the cigarette trade. Moreover, BAT always deployed a sophisticated in-house corporate intelligence arm. Armed with this intelligence, BAT knew that North Korea (through Office 39 and the terrorist operations arm RGB) supplied Hizballah and the IRGC with core terrorist tactics, techniques, and procedures. Because the RGB directly

85

trained Hizballah and indirectly trained them through the IRGC, BAT knew that its counterparty's tactics, techniques, and procedures included financing attacks through criminal schemes. Accordingly, BAT's knowledge of the link between Hizballah and cigarettes, combined with its knowledge of the RGB's operations, alerted BAT that its own crimes with terrorist fronts risked financing attacks.

## VIII.  DEFENDANTS' CONDUCT INVOLVED THE UNITED STATES

### A.    Defendants' Conduct Targeted The United States

240.    First, each Defendant targeted the United States by agreeing to become an active participant in the DPRK-IRGC-Hizballah joint weapons venture, a complex, integrated scheme to power Hizballah and IRGC missile attacks that Defendants knew targeted the United States. This partnership was not merely commercial; it was a strategic alliance with actors whose primary purpose was to threaten American national security. Indeed, Defendants did so while knowing that a core objective of North Korea's support for Middle Eastern terrorism was to distract U.S. policymakers from its own proliferation.

241.    Defendants' targeting was knowing. For decades, Congress has warned the world that America exercises broad jurisdiction over conduct sponsoring terrorist attacks against Americans. The Antiterrorism and Effective Death Penalty Act of 1996 enshrined the finding that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States" and that Congress exercises "universal prosecutive jurisdiction" over persons involved in such acts. 18 U.S.C. § 2339B, Stat. Notes (Apr. 24, 1996).

242.    Defendants knew that U.S. sanctions were designed specifically to reduce the threat of attacks against America. *See*, *e.g.*, *supra* ¶¶ 30, 180 (United States sanctions were specifically aimed at countering DPRK threats to undermine U.S. national security).

86

243.    Furthermore, Defendants knew that DPRK support for terrorist attacks via missiles always targeted the United States as the primary enemy. As DPRK scholar Dr. Victor Cha observed in 2024, North Korea has for decades justified its missile tests and terrorist support by citing the "threat posed by" the "United States." By funding the DPRK's sponsorship of IRGC missiles, Defendants knowingly participated in a campaign directed at the United States.

**B.    Defendants' Conduct Had A Substantial Nexus To The United States**

244.    Defendants purposefully engaged in conduct directed at the United States in at least two ways, supplying unique, "only-from-America" value that augmented the killing power Office 39 supplied to IRGC and Hizballah missile attacks. First, Defendants utilized the U.S. financial system to process hundreds of millions of dollars. Second, Defendants reached into America to conceal their scheme and supply cover and concealment to the DPRK-IRGC-Hizballah joint arms venture's use of the U.S. financial system to raise and move funds, and the Office 39 procurement network's partnership with the world's leading tobacco firm, BAT.

**1.    BAT Deliberately Used the U.S. Financial System to Power its Scheme**

245.    BAT and BATMS purposefully engaged in conduct directed at the United States by structuring transactions and issuing public announcements intended specifically to deceive U.S. financial institutions. Their goal was to trick these institutions into processing U.S. dollar transactions for BAT's and Office 39's benefit, in willful violation of U.S. sanctions targeting the DPRK's supply of arms to the IRGC and its proxies. Thus, Defendants deliberately chose to launder at least $251,631,903 through correspondent accounts at U.S. banks in at least 228 unlawful, U.S. dollar-denominated transactions. *See* OFAC Release at 2. "Had the U.S. correspondent banks known that these payments originated in North Korea, they would not have processed the transactions." Information ¶ 54.

246.    In 2023, BAT and BATMS admitted under oath to engaging in "a conspiracy to commit bank fraud and sanctions violations in connection with the provision by North Korean entities and others of false information to U.S. banks processing U.S. dollar transactions on behalf of North Korean entities, and thus causing the export of financial services from the United States to North Korea" without OFAC licenses. Statement of Offense ¶ 30; Information ¶ 79 (BAT caused the export of financial services "with and for the benefit of KKBC, FTB, North Korea, and North Korean entities" in violation of the bank fraud statute and U.S. sanctions). BATMS pleaded guilty to bank fraud under 18 U.S.C. § 1344, a statute that requires a *mens rea* of "knowing" and applies only to U.S. financial institutions and U.S. branches of foreign financial institutions. *See* 18 U.S.C. § 20 (defining "financial institution").

247.    Treasury warned in 2016 that the DPRK constituted a Jurisdiction of Primary Money Laundering Concern under Section 311 of the USA PATRIOT Act. *See supra* ¶ 145. Like Treasury's general finding, Defendants "[d]irect[ed] business from North Korea" through their secret Daesong-BAT joint venture with DPRK "state-owned entities and banks," while knowing that doing so "allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts." 81 Fed. Reg. 35,441. And like Treasury's fact pattern, Defendants knew these funds ultimately reached "[e]ntities in North Korea involved in the proliferation of … ballistic missiles" that "conduct[ed] business in, from, or through North Korea, or at the direction of the North Korean government," tracking Treasury's DPRK finding. *Id*. Indeed, Defendants' acts also track that finding: "[i]n spite of" the designation of DPRK terrorist-sponsoring banks like "KKBC" in 2009, BAT "continued to evade sanctions and [help] process financial transactions that support[ed] the proliferation" of "ballistic missiles by using front companies to clear U.S. dollar transactions through U.S. correspondent accounts." *Id*.

248.    By accessing the U.S. financial system to transact in U.S.-dollar-denominated transactions, Defendants avoided more costly alternative U.S. dollar-related financial channels in regional financial centers such as Tokyo, Hong Kong, Singapore, and Manila that were available to sanctioned DPRK entities. Even relatively modest increases in transaction costs across hundreds of millions of dollars in transactions would have translated into millions of dollars in additional costs for Defendants and the other missile venture participants. Accordingly, Defendants' contacts with the United States had a direct and substantial impact on the scheme's profitability, liquidity, and operational success.

249.    Defendants supplied cover and concealment to financial activity involving Office 39, Tanchon, KKBC, FTB, and KOMID by using contacts with the United States to avoid scrutiny and detection by U.S. counterterrorism and financial-intelligence professionals at Treasury, including FinCEN, DOJ, and other U.S. government components. Defendants also schemed to cause false information to be supplied to U.S. banks and, necessarily, to FinCEN. Through that conduct, Defendants obstructed U.S. counterterrorism operations targeting the missile threat flowing from the DPRK-IRGC-Hizballah joint missile venture by helping DPRK enablers of IRGC missiles preserve the secrecy of their financial networks while the United States was engaged in a whole-of-government effort to identify and dismantle them.

250.    BAT's use of the U.S. financial system was always knowing. Among other reasons, BAT's experience in the U.S. financial system, its in-house financial personnel, and agents knowledgeable about the United States (whose knowledge is imputed to BAT) confirm this awareness. Moreover, Treasury publicly warned multinationals like BAT.

### 2.    BAT Reached into the United States to Conceal the DPRK Scheme

251.    BAT also concealed the DPRK scheme through affirmative acts of deception involving the United States, including false statements to U.S. financial institutions and media

outlets, such as BAT's false statements to *Forbes* in the United States in 2007. *See supra* ¶ 119. These acts were designed to preserve and continue the DPRK scheme by shielding it from U.S. sanctions scrutiny, regulators, and enforcement authorities.

252. Defendants also knowingly deprived the United States, specifically FinCEN, of key financial intelligence that the United States depended upon to identify and counter terrorist finance networks targeting U.S. interests. *See, e.g., supra* ¶ 127.

### C. Defendants' Conduct Implicates Important U.S. Interests, Permitting Jurisdiction In U.S. Courts

253. Defendants' misconduct violated multiple U.S. laws, including sanctions on North Korea designed to prevent violence against Americans in the United States and abroad. Defendants' misconduct also implicates JASTA's finding that "entities … that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security … of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA § 2(a)(6). For at least a decade, Defendants willfully provided exactly such direct and indirect support to North Korea, the IRGC, and Hizballah. Congress has determined that Plaintiffs, who are U.S. nationals and/or the family members of U.S. nationals, have a strong interest in pursuing justice in a U.S. forum.

### IX. PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY DEFENDANTS' CONDUCT

254. Except where otherwise specified, each Plaintiff was a U.S. national at the time of the attack that injured them and remains one today (or was a U.S. national at death).

### A.      Plaintiffs Associated With The January 8, 2020 Erbil Air Base Attack

255.    Plaintiffs Lommie Blackmon and Cynthia Harmon worked as contractors at Erbil Air Base during the 2020 Attack, which severely wounded both by causing severe physical and/or psychological injuries. As a result of the attack and their respective injuries, each of these Plaintiffs has experienced severe physical and emotional pain and suffering.

### B.      Plaintiffs Associated With The January 8, 2020 Al Asad Air Base Attack

256.    Each Direct Victim Plaintiff in the table below was severely wounded at Al Asad Air Base by the 2020 Attack, resulting in severe physical and/or psychological injuries, including, but not limited to, one or more of the following: Traumatic Brain Injury ("TBI"); post-concussion syndrome; injuries to head, shoulders, knees, elbows, and back; Post-Traumatic Stress Disorder ("PTSD"); anxiety; acute stress disorder; depression, including major depressive disorder; panic disorder; sleep disorders, including insomnia and sleep apnea; tinnitus; hearing loss; migraines/headaches; eye convergence insufficiency; cognitive communication disorder; autonomic dysfunction; benign paroxysmal positional vertigo; auditory processing disorder; resulting problems with balance, speech, memory, and concentration; severe alcohol abuse disorder; bilateral vestibular system damage and dysfunction; cervicalgia; cervical lymphadenopathy; thyroid nodules; fibromyalgia; lumbar degenerative disc disease; and exacerbation of existing conditions (including multiple sclerosis, thyroid toxicosis paralysis, hyperthyroidism, and Graves' disease). Each Direct Victim Plaintiff below has experienced severe mental anguish and severe physical and emotional pain and suffering as a result of the 2020 Attack and their respective injuries.

| Direct Victim Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| SSG Toni Alexander | SFC Brock Johnson (Husband) |
| Ahmed Alsagar | |
| SGT Shanerria Barber | |

| Direct Victim Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| SPC Patrick Ben | |
| SPC Badekemi Biladjetan | |
| SPC Einreb Bismanos | |
| SGT Julius Brisco | Melissa Brisco (Wife) |
| | T.B., through next friend SGT Brisco (Son) |
| | J.M., through next friend Melissa Brisco (Stepson)[5] |
| SPC Ali Brown | |
| SGT Timothy Brown | |
| SPC James Carson | SPC Mackenzie Kammerer (Ex-Wife)[6] |
| SPC Jaron Carter | Olivia Carter (Wife) |
| | J.C., through next friend SPC Carter (Daughter) |
| CW2 Thomas Caudill | Adrienne Caudill (Wife) |
| | L.H.C.; L.T.C., and O.C., through next friend CW2 Caudill (Sons) |
| | R.C., through next friend CW2 Caudill (Daughter) |
| CW2 Dolphise Colomb | M.W., through next friend CW2 Colomb (Son) |
| SPC Necollier Daniels | Sarah Daniels (Wife) |
| | C.N.D. and C.T.D., through next friend SPC Daniels (Sons) |
| SGT Jacob Deer | Samantha Deer (Wife) |
| | J.A.D. and J.C.D., through next friend SGT Deer (Sons) |
| SPC Corey Faucett | |
| Thomas Feldschneider | Courtney Feldschneider (Wife) |
| | J.F., through next friend Thomas Feldschneider (Son) |
| SGT Julie Ferguson | |
| SGT Mitchell Ferguson | |
| SPC Miguel Figueroa | |
| SSG Aaron Futrell | |
| SGT Steven Garrett | Heather Garrett (Wife) |
| | S.G., through next friend SGT Garrett (Son) |
| PV2 Brandon Godwin | |
| SGT Dustin Graham | Malissa Graham (Wife) |
| | H.G., through next friend SGT Graham (Daughter) |
| SGT Stephon Green | Mentoria Green (Wife) |
| | A.G. and S.G., through next friend SGT Green (Children) |
| SPC Nathan Grosse | |
| SPC Brett Gustafson | Amanda Gustafson (Wife) |
| | L.G., through next friend SPC Gustafson (Son) |

[5] J.M. and every other Associated Family Member Plaintiff that is a stepchild of a Direct Victim Plaintiff lived in the same household as such Direct Victim Plaintiff and considered him the functional equivalent of a biological father.

[6] SPC Kammerer and every other Associated Family Member Plaintiff who is an ex-spouse of a Direct Victim Plaintiff was married to that Direct Victim Plaintiff at the time of the Attack.

| Direct Victim Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| CPT Geoffrey Hansen | Allie Hansen (Wife) |
| Kendra Hawkins | |
| CW2 John Hergert | Alyssa Hergert (Wife) |
| | C.H., through next friend CW2 Hergert (Son) |
| SSG Costin Herwig | Jennifer Deaver (Ex-Wife) |
| | J.H., through next friend SSG Herwig (Son) |
| | J.B.R.D. and J.M.D., through next friend Jennifer Deaver (Stepsons) |
| PFC Brandon Hitchings | |
| SGT Suzanne Hodges | |
| PFC Byron Hogan | |
| SPC Kerry Howard | |
| SSG Andrew Jenkins | Megan Jenkins (Wife) |
| | A.J. and S.J., through next friend SSG Jenkins (Daughters) |
| | P.J., through next friend SSG Jenkins (Son) |
| MAJ Alan Johnson | Teri Larson-Johnson (Wife) |
| | J.J., through next friend MAJ Johnson (Son) |
| | Carly Messman (Stepdaughter) |
| | Abby Sigurdson (Stepdaughter) |
| | Samuel Sigurdson (Stepson) |
| SFC Brock Johnson | SSG Toni Alexander (Wife) |
| PFC Tremayne Joiner | |
| SPC Robert Jones | |
| SPC Mackenzie Kammerer | SPC James Carson (Ex-Husband) |
| SPC Daunte Keller | |
| SPC Alexander Knowles | |
| SFC Daine Kvasager | C.K. and R.K., through next friend SFC Kvasager (Sons) |
| SSG Rebecca Kvasager | L.K., through next friend SSG Kvasager (Daughter) |
| SGT Kenneth Lewis | Tammy Senecal-Lewis (Wife) |
| | K.L. and R.L., through next friend SGT Lewis (Daughters) |
| | R.A.L., through next friend SGT Lewis (Son) |
| | TaVera Green (Stepdaughter) |
| Dennis Licon | |
| SGT Leighton Lim | |
| SSG Deanna Lucchesi | Joshua Lucchesi (Husband) |
| | Anastasia Lucchesi (Daughter) |
| | H.L. and Z.L., through next friend SSG Lucchesi (Daughters) |
| SGT John Magee | |
| Mazin Mahdi | |
| SGT Darius Martin | Amanda Martin (Wife) |
| | M.M., through next friend SGT Martin (Son) |
| | Darlina Martin (Mother) |
| | Cayleigh Martin (Sister) |
| SSG Armando Martinez IV | |

93

| Direct Victim Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| SPC Isaac Martz | |
| SSG Torrin McDougle | |
| SGT Phillip Mendoza | Melchi Mendoza (Wife) |
| | Alexander Mendoza (Son) |
| SGT Zachary Merrill | Carolina Merrill (Wife) |
| | C.M., through next friend SGT Merrill (Daughter) |
| CPL Julian Mitchell | |
| SGT James Morgan | Sarah Morgan (Wife) |
| | C.M., through next friend SGT Morgan (Daughter) |
| SPC Ryan Nolan | |
| SGT Brittany Norfleet | Anthony Shappy (Husband) |
| | A.S. and K.S., through next friend SGT Norfleet (Daughters) |
| SPC Jose Ortiz | |
| SGT Anthony Panchoo | Alexis Panchoo (Ex-Wife) |
| | A.P., through next friend SGT Panchoo (Daughter) |
| Zachary Parker | |
| SFC Carlos Porres Jr. | K.L.P. and K.R.P., through next friend SFC Porres (Daughters) |
| CW2 Michael Pridgeon | Rebecca Pridgeon (Wife) |
| | A.P., through next friend CW2 Pridgeon (Daughter) |
| | Mills Pridgeon (Son) |
| | T.P., through next friend CW2 Pridgeon (Son) |
| Patricia Puranda | |
| TSgt Rachel Quinn | |
| SGT Jason Quitugua II[7] | Francine Rios (Mother), bringing claims both in her personal capacity and as representative of SGT Quitugua's estate. |
| | Kaedinn Quitugua (Sister) |
| | Mckenzie-Jae Quitugua (Sister) |
| | Summer Quitugua (Sister) |
| SGT Rodney Ragin | |
| SPC Nilsa Rivera-Villegas | |
| SPC Mason Scarbrough | |
| SSG Jacob Schmidt | |
| PFC Jaron Schneider | Ashley Schneider (Wife) |
| PFC Collin Shepard | Kaitlin Shepard (Wife) |
| SGT Frederick Shilke | Stephanie Shilke (Wife) |
| | W.S., through next friend SGT Shilke (Son) |
| | M.C.R., through next friend Stephanie Shilke (Stepson) |
| | M.D.R., through next friend Stephanie Shilke (Stepdaughter) |

---

[7] SGT Quitugua, who suffered from a TBI and PTSD that were caused by the 2020 Attack, died by suicide on October 7, 2021, as a result of those injuries. The Plaintiff members of the Quitugua Family are the survivors and/or heirs of SGT Quitugua and are entitled to recover for the damages he sustained to his person and/or property.

| Direct Victim Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| PFC Michael Smith | Corisia Smith (Ex-Wife) |
| | A.S., through next friend PFC Smith (Daughter) |
| | A.D., through next friend Corisia Smith (Stepdaughter) |
| SPC Gregory Sorensen | |
| Hugh Spears Jr. | Brandon Spears (Son) |
| SPC Johnathan Stark | |
| SGT Kevin Stevens | Casey Stevens (Wife) |
| Dolores Syrell | |
| William Taber | Dagmar Taber (Wife)[8] |
| | Louis Palla (Son) |
| | Samira Palla (Daughter) |
| | A.T., through next friend Mr. Taber (Daughter) |
| SPC Nicolaus Trivelpiece | |
| SSG Sandro Vicente | |
| SPC Luis Villegas | |
| 1LT Hailey Webster | John Goetz (Husband) |
| SGT Jeremy Winkler | Tyla Winkler (Wife) |
| | M.A.W. and M.I.W., through next friend SGT Winkler (Sons) |
| | M.Z.W., through next friend SGT Winkler (Daughter) |
| SPC Mason Wright | |
| Ram Zamel | |

257. Each Associated Family Member Plaintiff in the table above has experienced severe mental anguish and emotional pain and suffering as a result of the 2020 Attack and the injuries suffered by the Direct Victim Plaintiffs to whom they are related.

### C.    The Mahmoudzadeh Family

258. Omer Mahmoudzadeh was in Iraq helping refugees in camps near the Democratic Party of Iranian Kurdistan headquarters. He was killed in the 2022 Attack. Plaintiff Shiwa Nahadi, Mr. Mahmoudzadeh's widow, brings claims in both her personal capacity and as his estate representative. Plaintiff Tara Mahmoudzadeh, Omer's daughter, joins in these claims. As a result of the 2022 attack, the Mahmoudzadeh family has experienced severe mental anguish,

---

[8] Dagmar Taber, Louis Palla, and Samira Palla are German citizens. However, as the heirs and/or survivors of Mr. Taber—who *is* a U.S. national—they are entitled to recover for the damages he sustained as a result of the 2020 Attack.

emotional pain, and the permanent loss of Omer's society, companionship, and counsel.

Moreover, as Omer's heirs and/or survivors, the Plaintiff members of his family are entitled to

recover for the damages he sustained to his person and/or property as a result of the 2022 Attack.

## CLAIM FOR RELIEF

### COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2)
### (All Plaintiffs: Secondary Liability; Aiding and Abetting)

259.    Plaintiffs incorporate their factual allegations above.

260.    To establish a claim for aiding and abetting under the JASTA, 18 U.S.C.

§ 2333(d)(2), Plaintiffs must show that: (1) they are U.S. nationals, or the estates, survivors, or

heirs of U.S. nationals; (2) they were injured by an act of "international terrorism," as defined by

18 U.S.C. § 2331(1); (3) such act of international terrorism was committed, planned, or

authorized by an organization that had been designated as a Foreign Terrorist Organization

("FTO") at the time of the act of international terrorism; (4) Defendants were generally aware

that they were playing a role in an overall illegal or tortious activity from which an act of

international terrorism was a foreseeable consequence; and (5) Defendants aided or abetted an

act of international terrorism by knowingly providing substantial assistance.

261.    Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

262.    The terrorist attacks that injured Plaintiffs were acts of "international terrorism":

a.      the attacks involved violent and dangerous acts that violated the criminal laws of the
        United States and many States (or would if committed in the U.S.). In particular, each
        attack constituted one or more of murder, attempted murder, conspiracy to murder, and
        arson, in violation of state law; and the destruction of U.S. property by fire or explosive,
        conspiracy to murder in a foreign country, killing and attempted killing of U.S.
        employees performing official duties, damaging U.S. government property, killing U.S.
        nationals abroad, use of weapons of mass destruction, commission of acts of terrorism
        transcending national boundaries, and bombing places of public use, in violation of 18
        U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f;

b.      the attacks, carried out by terrorists bent on expelling the United States and its allies from
        Iraq, appear to have been intended (i) to intimidate or coerce the civilian populations of

96

Iraq and the United States, (ii) to influence the policy of the U.S., Iraqi, and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Iraqi, and other governments by mass destruction and assassination; and

c.      the attacks occurred primarily outside the territorial jurisdiction of the United States.

263.   The United States has designated Hizballah, Kataib Hizballah ("KH"), and the IRGC as Foreign Terrorist Organizations, doing so in 1997, 2009, and 2019, respectively. Each attack was committed by the IRGC and KH, planned by the IRGC, KH, and Hizballah, and authorized by the IRGC and Hizballah, while all three groups were designated FTOs.

264.   Defendants were generally aware that they were playing a role in an overall illegal and tortious activity from which the terrorist attacks alleged herein were a foreseeable consequence. As detailed above, Defendants knowingly participated in a decade-long sanctions-evasion scheme involving DPRK proliferation-linked entities, missile-procurement networks, and designated DPRK financial institutions that were indispensable components within the IRGC's ballistic missile procurement network. Defendants' criminal resolutions further confirm that Defendants understood the unlawful nature of the underlying conduct.

265.   The terrorist attacks that injured Plaintiffs were a natural, probable, and foreseeable consequence of Defendants' unlawful activity. Years of authoritative public sources established that facilitating illicit tobacco production in North Korea financed missile proliferation to the IRGC and Hizballah, which would use those missiles to attack Americans.

266.   Defendants acted knowingly and culpably, and not innocently or inadvertently. Defendants did so with knowledge of the fact that they were providing direct and indirect assistance to terrorist groups engaged in violent attacks against Americans.

267.   Defendants' assistance was substantial in both a quantitative and qualitative sense. By generating at least hundreds of millions of dollars that financed the specific missiles that made the attacks possible, Defendants contributed significantly to the attacks' success.

97

268.    Defendants' assistance was systemic, pervasive, and culpable. The assistance involved years of willful misconduct and tremendous sums of money that provided critically important assistance to the FTOs that killed or injured Plaintiffs and their family members.

269.    As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

270.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

271.    Wherefore, Plaintiffs pray this Court:

a.    Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b.    Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c.    Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d.    Award Plaintiffs prejudgment interest; and

e.    Award Plaintiffs any such further relief the Court deems just and proper.

Dated: May 27, 2026

Respectfully submitted,

*/s/ Raj Parekh*

Raj Parekh (Va. Bar No. 101209)
Anthony Asuncion (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
Adam J. Goldstein (*pro hac vice*)
Kathryn L. Rakoczy (*pro hac vice*)
Devin Charles Ringger (*pro hac vice*)
Tejinder Singh (*pro hac vice*)
Ryan R. Sparacino (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
raj.parekh@sparacinopllc.com
anthony.asuncion@sparacinopllc.com
matt.fisher@sparacinopllc.com
adam.goldstein@sparacinopllc.com
kate.rakoczy@sparacinopllc.com
devin.ringger@sparacinopllc.com
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*