# EXHIBIT 1

## (Redline Comparison of Original Complaint and Amended Complaint)[1]

[1] This redline comparison is attached solely for the convenience of the Court and counsel for Defendants and is not incorporated by reference into the Amended Complaint. As Plaintiffs previously stated in Dkt. No. 38, "Plaintiffs have identified additional factual allegations and evidentiary support that they intend to incorporate into the Amended Complaint, including allegations addressing and clarifying certain issues raised in Defendants' pending motion to dismiss. For the convenience of the Court and counsel for the Defendants, Plaintiffs intend to attach as an exhibit to the Amended Complaint a redline comparison reflecting the changes from the original Complaint." The redline reflects textual changes only; formatting, font, style, and other non-textual changes are not reflected.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

SHIWA NAHADI, individually, and as representative for the estate of ESTATE OF OMER MAHMOUDZADEH, TARA MAHMOUDZADEH, LOMMIE BLACKMON, CYNTHIA HARMON, TONI ALEXANDER, BROCK JOHNSON, AHMED ALSAGAR, SHANERRIA BARBER, PATRICK BEN, BADEKEMI BILADJETAN, EINREB BISMANOS, JULIUS BRISCO, MELISSA BRISCO, T.B. by and through his next friend Julius Brisco, J.M. by and through his next friend Melissa Brisco, ALI BROWN, TIMOTHY BROWN, JAMES CARSON, MACKENZIE KAMMERER, JARON CARTER, OLIVIA CARTER, J.C. by and through her next friend Jaron Carter, THOMAS CAUDILL, ADRIENNE CAUDILL, L.H.C. by and through his next friend Thomas Caudill, L.T.C. by and through his next friend Thomas Caudill, O.C. by and through his next friend Thomas Caudill, R.C. by and through her next friend Thomas Caudill, DOLPHISE COLOMB, M.W. by and through his next friend Dolphise Colomb, NECOLLIER DANIELS, SARAH DANIELS, C.N.D. by and through his next friend Necollier Daniels, C.T.D. by and through his next friend Necollier Daniels, JACOB DEER, SAMANTHA DEER, J.A.D. by and through his next friend Jacob Deer, J.C.D. by and through his next friend Jacob Deer, COREY FAUCETT, THOMAS FELDSCHNEIDER, COURTNEY FELDSCHNEIDER, J.F. by and through his next friend Thomas Feldschneider, JULIE FERGUSON, MITCHELL FERGUSON, MIGUEL FIGUEROA, AARON FUTRELL, STEVEN GARRETT, HEATHER GARRETT, S.G. by and through his next friend Steven Garrett, BRANDON GODWIN, DUSTIN GRAHAM, MALISSA GRAHAM, H.G. by and through her next friend Dustin Graham, STEPHON GREEN, MENTORIA GREEN, A.G. by and through his next friend Stephon Green, S.G. by and through her next friend Stephon Green, NATHAN GROSSE, BRETT GUSTAFSON, AMANDA GUSTAFSON, L.G. by and through his next friend Brett Gustafson, GEOFFREY HANSEN, ALLIE HANSEN, KENDRA HAWKINS, JOHN HERGERT, ALYSSA HERGERT, C.H. by and through his next friend John

Case No.: 1:26-cv-274

Hergert, COSTIN HERWIG, JENNIFER DEAVER, J.H. by and through his next friend Costin Herwig, J.B.R.D. by and through his next friend Jennifer Deaver, J.M.D. by and through his next friend Jennifer Deaver, BRANDON HITCHINGS, SUZANNE HODGES, BYRON HOGAN, KERRY HOWARD, ANDREW JENKINS, MEGAN JENKINS, A.J. by and through her next friend Andrew Jenkins, S.J. by and through her next friend Andrew Jenkins, P.J. by and through his next friend Andrew Jenkins, ALAN JOHNSON, TERI LARSON-JOHNSON, J.J. by and through his next friend Alan Johnson, CARLY MESSMAN, ABBY SIGURDSON, SAMUEL SIGURDSON, TREMAYNE JOINER, ROBERT JONES, DAUNTE KELLER, ALEXANDER KNOWLES, DAINE KVASAGER, C.K. by and through his next friend Daine Kvasager, R.K. by and through his next friend Daine Kvasager, REBECCA KVASAGER, L.K. by and through her next friend Rebecca Kvasager, KENNETH LEWIS, TAMMY SENECAL-LEWIS, K.L. by and through her next friend Kenneth Lewis, R.L. by and through her next friend Kenneth Lewis, R.A.L. by and through his next friend Kenneth Lewis, TAVERA GREEN, DENNIS LICON, LEIGHTON LIM, DEANNA LUCCHESI, JOSHUA LUCCHESI, ANASTASIA LUCCHESI, H.L. by and through her next friend Deanna Lucchesi, Z.L. by and through her next friend Deanna Lucchesi, JOHN MAGEE, MAZIN MAHDI, DARIUS MARTIN, AMANDA MARTIN, M.M. by and through his next friend Darius Martin, DARLINA MARTIN, CAYLEIGH MARTIN, ARMANDO MARTINEZ IV, ISAAC MARTZ, TORRIN MCDOUGLE, PHILLIP MENDOZA, MELCHI MENDOZA, ALEXANDER MENDOZA, ZACHARY MERRILL, CAROLINA MERRILL, C.M. by and through her next friend Zachary Merrill, JULIAN MITCHELL, JAMES MORGAN, SARAH MORGAN, C.M. by and through her next friend James Morgan, RYAN NOLAN, BRITTANY NORFLEET, ANTHONY SHAPPY, A.S. by and through her next friend Brittany Norfleet, K.S. by and through her next friend Brittany Norfleet, JOSE ORTIZ, ANTHONY PANCHOO, ALEXIS PANCHOO, A.P. by and through her next friend Anthony Panchoo, ZACHARY PARKER, CARLOS PORRES JR., K.L.P. by and through her next friend Carlos Porres Jr., K.R.P. by and through her next friend Carlos Porres Jr.,

MICHAEL PRIDGEON, REBECCA PRIDGEON, A.P. by and through her next friend Michael Pridgeon, MILLS PRIDGEON, T.P. by and through his next friend Michael Pridgeon, PATRICIA PURANDA, RACHEL QUINN, FRANCINE RIOS, individually, and as representative for the estate of ESTATE OF JASON QUITUGUA II, KAEDINN QUITUGUA, MCKENZIE-JAE QUITUGUA, SUMMER QUITUGUA, RODNEY RAGIN, NILSA RIVERA-VILLEGAS, MASON SCARBROUGH, JACOB SCHMIDT, JARON SCHNEIDER, ASHLEY SCHNEIDER, COLLIN SHEPARD, KAITLIN SHEPARD, FREDERICK SHILKE, STEPHANIE SHILKE, W.S. by and through his next friend Frederick Shilke, M.C.R. by and through his next friend Stephanie Shilke, M.D.R. by and through her next friend Stephanie Shilke, MICHAEL SMITH, CORISIA SMITH, A.S. by and through her next friend Michael Smith, A.D. by and through her next friend Corisia Smith, GREGORY SORENSEN, HUGH SPEARS JR., BRANDON SPEARS, JOHNATHAN STARK, KEVIN STEVENS, CASEY STEVENS, DOLORES SYRELL, WILLIAM TABER, DAGMAR TABER, LOUIS PALLA, SAMIRA PALLA, A.T. by and through her next friend William Taber, NICOLAUS TRIVELPIECE, SANDRO VICENTE, LUIS VILLEGAS, HAILEY WEBSTER, JOHN GOETZ, JEREMY WINKLER, TYLA WINKLER, M.A.W. by and through his next friend Jeremy Winkler, M.I.W. by and through his next friend Jeremy Winkler, M.Z.W. by and through her next friend Jeremy Winkler, MASON WRIGHT, and RAM ZAMEL,

*Plaintiffs*,

v.

BRITISH AMERICAN TOBACCO P.L.C., and BRITISH-AMERICAN TOBACCO MARKETING (SINGAPORE) PRIVATE LIMITED,

*Defendants*.

**AMENDED COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT**

# TABLE OF CONTENTS


~~INTRODUCTION ........ 1~~

~~DEFENDANTS ........ 4~~

~~JURISDICTION AND VENUE ........ 5~~

~~SOURCING ........ 5~~

~~FACTUAL ALLEGATIONS ........ 6~~

~~I. NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST ALLIES IN AN "AXIS OF RESISTANCE" SINCE THE 1980s ........ 6~~

~~A. North Korea, The IRGC, And Hizballah Forged An "Axis Of Resistance" Against The United States ........ 6~~

~~B. North Korea – A Designated State Sponsor Of Terrorism – Operates As A Global Criminal Enterprise To Proliferate Weapons ........ 7~~

~~C. The IRGC Operates As A Global Terrorist Organization Dedicated To Targeting The United States ........ 9~~

~~D. Hizballah Functions As The IRGC's Primary Terrorist Proxy ........ 11~~

~~II. DEFENDANTS ILLEGALLY ENGAGED WITH NORTH KOREA, DESPITE ITS DECADES-LONG PARTNERSHIP WITH THE IRGC AND HIZBALLAH, TO DEVELOP AND DEPLOY WEAPONS TARGETING AMERICANS ........ 12~~

~~A. North Korea, The IRGC, And Hizballah Entered A Joint Venture To Produce And Deploy Missiles In Terrorist Attacks Against Americans ........ 13~~

~~B. North Korea Exported Its Missile Technology And Expertise To The IRGC And Hizballah ........ 16~~

~~C. The IRGC And Hizballah Integrated North Korean Weapons Systems Into Their Attacks ........ 22~~

~~D. Cigarette Revenues Provided Vital Financing For Attacks Enabled Through The North Korea-IRGC-Hizballah Joint Weapons Venture ........ 23~~

~~E. The North Korea-IRGC-Hizballah Joint Weapons Venture Produced The *Qiam*- And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs ........ 27~~

III. DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES .......... 29

A. Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties .......... 29

B. Defendants Formed A Joint Venture With A North Korean Front Called Daesong, Operated By Office 39 .......... 33

C. Defendants Lied About Exiting The Joint Venture In 2007 .......... 37

D. Defendants' Venture With Office 39 Became A Key Source Of Funding For North Korea's Weapons Collaboration With The IRGC And Hizballah .......... 44

E. Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty For Their Misconduct .......... 47

IV. DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS .......... 49

A. Defendants Monitored Sanctions And Warnings About North Korea's Role In Financing Terrorists .......... 49

B. Defendants' Compliance And Intelligence Teams Received Repeated Notices That Cigarette Smuggling Was Funding Terrorism .......... 53

V. DEFENDANTS PROVIDED ESSENTIAL AND LASTING SUPPORT TO THE NORTH KOREA-IRGC-HIZBALLAH JOINT WEAPONS VENTURE .......... 56

A. Defendants' Cash And In-Kind Support Enabled Development Of Weapons Used In Terrorist Attacks .......... 56

B. Defendants' Assistance Was Extensive And Continuous .......... 63

VI. THE IRGC AND HIZBALLAH, WITH NORTH KOREAN SUPPORT, USED DEFENDANTS' RESOURCES TO CARRY OUT ATTACKS THAT KILLED AND INJURED AMERICANS .......... 66

A. January 8, 2020 Missile Attack in Iraq .......... 66

B. September 28, 2022 Attack in Iraqi Kurdistan .......... 68

VII. DEFENDANTS' CONDUCT TARGETED THE UNITED STATES AND THE EASTERN DISTRICT OF VIRGINIA, AND HAD A SUBSTANTIAL NEXUS TO THIS DISTRICT .......... 68

A. Defendants' Conduct Targeted The United States, Including The Eastern District of Virginia .......... 68

B. Defendants' Conduct Had A Substantial Nexus To The United States ................ 71

C. Defendants' Misconduct Implicates Important U.S. Interests, Permitting Jurisdiction In U.S. Courts ................ 77

VIII. PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY DEFENDANTS' CONDUCT ................ 77

A. Lommie Blackmon and Cynthia Harmon ................ 78

B. Plaintiffs Associated With the January 8, 2020 Al Asad Attack ................ 78

C. The Mahmoudzadeh Family ................ 83

CLAIM FOR RELIEF ................ 84

COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) ................ 84

JURY DEMAND ................ 86

PRAYER FOR RELIEF ................ 86

INTRODUCTION ................ 1

DEFENDANTS ................ 6

JURISDICTION AND VENUE ................ 8

SOURCING ................ 9

FACTUAL ALLEGATIONS ................ 12

I. NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST ALLIES IN AN "AXIS OF RESISTANCE" TARGETING THE UNITED STATES ................ 12

A. North Korea Operates As A Global Criminal Enterprise To Proliferate Arms ................ 12

B. The IRGC Operates As A Global Terrorist Organization Dedicated To Targeting The United States ................ 19

C. Hizballah Functions As The IRGC's Lead External Terrorist Arm ................ 22

II. DEFENDANTS INTENTIONALLY PARTICIPATED IN NORTH KOREA'S MISSILE PROLIFERATION NETWORK ..... 23

A. North Korea, The IRGC, And Hizballah Entered A Joint Venture To Produce And Deploy Missiles In Terrorist Attacks Against Americans ..... 23

B. North Korea Supplied Its Missile Technology And Expertise To The IRGC ..... 29

1. Procurement and Export of Advanced Missiles ..... 30

2. Institutional Missile Collaboration and Development ..... 32

3. Embedded DPRK Operatives' Direct Support for IRGC and Hizballah Missile Design, Production, Testing, Storage, and Maintenance Inside Iran ..... 33

4. Underground Missile Fortifications ..... 36

C. Through The DPRK-IRGC-Hizballah Joint Arms Venture, The IRGC And Hizballah Integrated North Korean Missile Systems Into Their Attacks ..... 36

D. Office 39/Daesong Cigarette Revenues Provided Vital Financing For Attacks Enabled Through The North Korea-IRGC-Hizballah Joint Arms Venture ..... 38

E. The North Korea-IRGC-Hizballah Joint Arms Venture Produced The *Qiam*- And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs ..... 44

III. DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES ..... 46

A. Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties ..... 47

B. Defendants Formed A Joint Venture With North Korean Terrorist Arm Office 39 Through An Office 39 Front Called Daesong ..... 51

C. Defendants Lied About Exiting The Joint Venture In 2007 ..... 58

1. BAT Engaged in a Sham Divestment of its North Korean Interests ..... 58

2. BAT Laundered Hundreds of Millions of Dollars Through its Ongoing North Korea Joint Venture and Obstructed FinCEN Operations Designed to Prevent Terrorism ..... 61

3. BAT Continued its North Korean Joint Venture Despite Knowledge of North Korea's Weapons Proliferation and Terrorism ..... 64

D. Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty ........ 71

IV. DEFENDANTS PROVIDED ESSENTIAL AND LASTING AID TO IRGC *QIAM* AND *FATEH* MISSILE ATTACKS ENABLED BY THE DPRK-IRGC-HIZBALLAH JOINT ARMS VENTURE ........ 80

A. Defendants' Funding, Financial, And Logistical Support Enabled Development Of The *Qiam* And *Fateh* Missiles Used To Attack Plaintiffs ........ 80

1. BAT Provided Financial Support to IRGC *Qiam* and *Fateh* Attacks ........ 82

2. BAT Provided Cover and Concealment for IRGC *Qiam* and *Fateh* Attacks by Helping DPRK Terrorist Fronts Covertly Leverage the U.S. Financial System on Behalf of the DPRK and IRGC ........ 90

3. BAT Provided Vital Support to North Korean Cigarette Counterfeiting that Financed Missile Procurement ........ 110

B. Defendants' Assistance To *Qiam* And *Fateh* Attacks Was Extensive And Continuous, And Aligned Defendants' Profits With Terrorist Violence ........ 114

V. PLAINTIFFS' EXPERTS HAVE CONFIRMED THE AMENDED COMPLAINT'S ESSENTIAL CULPABILITY AND NEXUS ALLEGATIONS ........ 119

VI. THE IRGC AND HIZBALLAH COMMITTED TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS USING *QIAM* AND *FATEH* MISSILES DEVELOPED AND/OR IMPROVED BY DEFENDANTS' MISCONDUCT ........ 126

A. January 8, 2020 Attack In Iran And Iraq – Operation Martyr Soleimani ........ 126

B. September 28, 2022 Attack in Iran and Iraqi Kurdistan ........ 127

VII. DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS ........ 128

A. Defendants Monitored Sanctions, Reports, And Media Warnings About North Korea's Role In Financing IRGC and Hizballah Missile Attacks ........ 128

B. Defendants' Compliance, Corporate Security, And Intelligence Teams Alerted Defendants That The Illicit Cigarette Trade Was Funding Terrorism ........ 131

VIII. DEFENDANTS' CONDUCT INVOLVED THE UNITED STATES ........ 132

A. Defendants' Conduct Targeted The United States ........ 132

B. Defendants' Conduct Had A Substantial Nexus To The United States .............. 133

1. BAT Deliberately Used the U.S. Financial System to Power its Scheme .......... 133

2. BAT Reached into the United States to Conceal the DPRK Scheme ..... 136

C. Defendants' Conduct Implicates Important U.S. Interests, Permitting Jurisdiction In U.S. Courts .......... 137

IX. PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY DEFENDANTS' CONDUCT .......... 138

A. Plaintiffs Associated With The January 8, 2020 Erbil Air Base Attack ............. 138

B. Plaintiffs Associated With The January 8, 2020 Al Asad Air Base Attack ........ 138

C. The Mahmoudzadeh Family .......... 143

CLAIM FOR RELIEF .......... 144

COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) .......... 144

JURY DEMAND .......... 146

PRAYER FOR RELIEF .......... 146

## INTRODUCTION

1. Plaintiffs are 196 victims of two terrorist missile attacks committed in Iraq. Defendants are British American Tobacco p.l.c. ("BAT") and its subsidiary British-American Tobacco Marketing (Singapore) Private Limited ("~~**BAT Singapore**~~BATMS"). From 2007 through 2017, Defendants ~~operated~~knowingly participated in a North Korean sanctions-evasion and proliferation-financing network tied to the same North Korean entities and financial infrastructure that supported Iran's ballistic missile programs. Defendants did so by operating a secret cigarette-manufacturing joint venture with a North Korean government-owned entity ~~that the U.S. Treasury Department~~ designated ~~in 2010~~by the United States for "facilitating North Korean trafficking in arms." Despite publicly claiming they had exited North Korea~~—because North Korea was a global pariah sponsoring terrorism by proliferating arms—~~, Defendants covertly supplied valuable ~~business~~machinery, equipment, raw materials, and ~~inputs~~technical support to ~~the same cash-starved~~ North Korean-linked entities~~ that were procuring~~. Defendants' scheme substantially assisted the development, production, procurement, financing, and ~~sending weapons to terrorists. For these criminal acts,~~stockpiling of the *Qiam*- and *Fateh*-class missile systems used in the terrorist attacks alleged herein by helping North Korea generate and access substantial hard currency outside the reach of U.S. sanctions enforcement. Defendants were prosecuted by the United States for sanctions violations and bank fraud~~. In~~, and in 2023, ~~those proceedings culminated with a guilty plea, settlement, and deferred prosecution agreement—including BAT's agreement~~BAT agreed to pay ~~over~~more than $629 million to U.S. authorities—~~which was "~~the "largest North Korean sanctions penalty in the history" of the United States.

~~2.~~ At all relevant times, North Korea, also known as the Democratic People's Republic of Korea ("DPRK"), ~~is among~~was the most heavily sanctioned ~~regimes~~regime in the world because it ~~is a~~was the leading proliferator of weapons of mass destruction to terrorists,

including the specific missiles used to attack and injure Plaintiffs. For decades, ~~North Korea~~the DPRK has collaborated with Iran's Islamic Revolutionary Guard Corps ("IRGC") and Hizballah ~~to develop, proliferate, finance, smuggle, secure, and deploy missiles and rockets in the Middle East.~~in a joint missile venture. This collaboration has been documented by the ~~U.S. government, the~~United States, United Nations~~,~~ ("U.N."), and a U.S. District Court~~, which found North Korea enabled violence through~~. Such collaboration was turnkey and solved key chokepoints in the ~~North Korea-Iran-~~IRGC's and Hizballah's missile programs, such as procuring components and materials necessary for IRGC and Hizballah ~~weapons partnership. As a 2008 U.S. report explained, there was a "continuing relationship between North Korea and~~ terrorists to effectively use such arms to attack Americans. Every aspect of the ~~IRG[C], including a kind of joint venture partnership to develop missiles inside Iran."~~

2. ~~U.S. government officials found~~IRGC's missile program production process presented a chokepoint at which the IRGC's missile attacks in Iraq depended upon DPRK support. And that ~~BAT's misconduct financed and enabled~~fact also made U.S. sanctions targeting this conduct so impactful because preventing the IRGC from securing North Korea's ~~missile~~ help at key stages of the process would disrupt, degrade, or prevent the resulting missile attacks. But Defendants flouted these sanctions and ~~rocket programs.~~ knowingly provided substantial assistance to the DPRK-IRGC-Hizballah joint missile venture that helped the IRGC overcome key chokepoints in the development of the *Qiam* and *Fateh*-class missiles that the IRGC used in its attacks against Plaintiffs in Iraq.

3. The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("Treasury") determined that BAT's violations "helped North Korea establish and operate a cigarette manufacturing business—a sector that has reportedly netted over $1 billion

per year for the Government of the DPRK," which is "known to use funds generated through international trade to support" its nuclear and "missile programs." By helping a notorious sponsor of the IRGC missile attack program—North Korea's Office 39, and its commercial arm, Daesong—"establish and operate a cigarette manufacturing business," Daesong-BAT, Defendants did not just help terrorists source weapons through a terrorist front—Defendants built the front itself.

3.4. The Assistant Attorney General of the U.S. Department of Justice's ("DOJ" or the "Justice Department") National Security Division confirmed to Congress in December 2023 that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, generating revenue used to advance North Korea's weapons program." AAnd other senior State Department official described the enforcement action against BAT as "part of our ongoing efforts to impede revenue generation by the DPRK that flows into their illegal unlawful WMD programs." And senior Department of JusticeDOJ officials explained that "[o]ur"our investigation exposed BAT . . . ." as [an] "important component[] in funding North Korea's WMD [Weapons of Mass Destruction] proliferation program," and confirmed that a "substantial portion" of the profits BAT helped generate went ""is believed to flow back directly to the North Korean government, its military, and its WMD program." These findings confirm what was broadly known and frequently publicized before and throughout Defendants'BAT's scheme: North Korea usesDPRK cigarette manufacturing and smuggling to facilitaterevenues financed missile and rocket proliferationthreats in the Middle East.

5. It was also well-known that North Korea's primary customers for missiles and rockets include the IRGC and Hizballah, which used those weapons to attack Americans in the Middle East. Defendants knew—or recklessly disregarded—that by operating an illicit joint

venture with a North Korean state-owned tobacco company, theyThe U.S. government's findings about BAT were reinforced by the U.S. District Court that presided over Defendants' criminal case. At sentencing on April 25, 2023, the Hon. Beryl A. Howell recognized that Korea Kwangson Banking Corporation ("KKBC") and Foreign Trade Bank ("FTB")—DPRK banks implicated in BAT's scheme and used by North Korea to conduct international transactions—"have been designated as WMD proliferators by the Treasury Department," a fact that BATMS "knew." Judge Howell further explained that "North Korea uses KKBC and FTB to mask international financial business of sanctioned proliferators in service of its nuclear ballistic missile and other WMD-related programs that endanger us all." Judge Howell also concluded that Defendants' misconduct "was flagrant and lengthy, over a term of years," involving deliberate efforts to evade U.S. sanctions and deceive U.S. banks while generating "millions and millions of dollars" for DPRK entities.

4.6. During their scheme, Defendants knew that Iran and its IRGC were North Korea's number one overall recipient of DPRK ballistic missile assistance and used those weapons to attack Americans in the Middle East. Defendants also knew that by operating an illicit joint venture with a DPRK state entity, Office 39, through the latter's commercial arm, Daesong, to form the Daesong-BAT cigarette joint venture, Defendants were financing the missile and rocket attacks carried out by the IRGC and Hizballah against Americans. For at least a decade, Defendants persisted in this scheme, funneling hundreds of millions of dollars to North Korean terrorist fronts financing missiles used to attack Americans, including Plaintiffs, and defying repeated warnings and public reporting that their conduct would enable these attacks.

7. Plaintiffs are the victims of the North Korea-IRGC-Hizballah weaponsThe connection between BAT's DPRK-joint venture. Plaintiffs include American servicemembers

partners and civilians—who were killed or wounded in attacks by the IRGC and Hizballah using North Korean-designedIRGC missiles— was repeatedly confirmed through U.S. and other sanctions designations and public government findings issued before and during Defendants' scheme. Throughout the 2007–2017 period of Defendants' misconduct, the United States repeatedly identified the DPRK entities that Defendants knew were involved in their families. scheme as core components of the DPRK's support for the IRGC's ballistic missile programs. Treasury and other public findings called out ongoing DPRK-IRGC cooperation concerning both liquid- and solid-fueled ballistic missile systems, including the *Qiam* and *Fateh* missile families used to attack Plaintiffs. During the same period, Defendants' scheme generated at least hundreds of millions of dollars in covert hard-currency flows for the very same missile proliferation apparatus delivering these lethal arms to the IRGC.

8. Contemporary public reporting similarly warned BAT that its North Korean joint venture partner—Daesong—operated within Office 39, which is the hub of North Korea's procurement network for weapons, including missiles. In 2006, *Asia Times* published an exposé specifically warning that BAT's joint venture partner was linked to entities repeatedly sanctioned by the United States for missile-proliferation activities involving Iran. *Asia Times* further cautioned BAT that continued business with Daesong/Office 39 risked "aiding and abetting illicit North Korean financing" of North Korea's WMD programs.

5. As Plaintiffs allege in great detail, BAT's conduct enabled the North KoreaDPRK-IRGC-Hizballah joint weapons venture to finance, develop, and refine the exact type of missiles and rockets—including *Qiam*- and *Fateh*-class missiles —that were deployed to deadly effect in the attacks against Plaintiffs. BAT knowingly provided directsubstantial assistance to the development of these particular weaponsattacks by illegally helping DPRK

terrorist fronts generatethat collectively served as the IRGC's missile procurement agent and likely generated over $400 million1 billion in seed capital for the DPRK-IRGC-Hizballah joint missile venture during a period that was crucial to the development, production, and manufacturestockpiling of those weapons.

6.9. Accordingly,*Qiam*- and *Fateh*-class missiles. Plaintiffs seek civil damagesrelief under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). JASTA seeks "to provide civil litigants with the broadest possible basis … to seek relief against" anybody that has "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States," including those who act "knowingly or recklessly" and support terrorism "directly or indirectly." JASTA § 2(a)(6), (b). More recently, Congress reaffirmed the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). This case advances these vital national interests.

**DEFENDANTS**

7.10. Defendant British American Tobacco p.l.c. is a British multinational tobacco company that manufactures and sells cigarettes, tobacco, and other nicotine products.. BAT is headquartered in London, United Kingdom, but it is involved in the trade and production ofproduces and trades tobacco products around the world.globally. It is the largest tobacco firm worldwide based on net sales. According to BAT, the "forerunner to British American Tobacco, BATCo, was founded in 1902 as an international joint venture between American Tobacco in the

USA and Imperial Tobacco in the UK." "Today," as BAT explained in 2000, "the new British American Tobacco has active businesses in more than 180 countries, manufacturing facilities in over 100 countries, employs some 120,000 people worldwide and has a total brand portfolio which now comprises over 320 brands. The new British American Tobacco is also the market leader in 68 markets."

8. 11. BAT is a globally integrated firm that has emphasized a centralized leadership structure with direct involvement in local markets. BAT explained in 2000, for example, that "[t]he Global Structure" of "British American Tobacco" was "globally integrated, based on Regions with self-sufficient Management Units, guided and supported by Central Functions and Services." Further, "[c]entralised services, for example, Central Leaf and Procurement, are also based at head office" and "act as suppliers to the End Markets, leveraging the advantages of economies of scale." "Centralised services," BAT has explained, were "also based at head office" and "act[ed] as suppliers to the End Markets, leveraging the advantages of economies of scale." Through this approach, BAT developed and maintained commercial operations and personnel networks in multiple countries, including: (1) North Korea, where BAT maintained commercial operations from at least 2001 through 2017; (2) Iran, where BAT maintained commercial operations from at least 2003 until August 2021; (3) Iraq, where BAT maintained commercial operations from at least 2015 through 2025; and (4) the United States, where BAT maintained commercial operations at all relevant times. In each of these countries, BAT targeted the market for sales, monitored local media and government announcements, closely followed the local security climate and other factors relevant to BAT's business, and employed local agents fluent in the language to develop data and facilitate information sharing throughout BAT.

~~9.~~12. Defendant British-American Tobacco Marketing (Singapore) Private Limited is ~~an indirect~~a subsidiary of BAT ~~located in Singapore.~~. During the relevant period, BAT controlled ~~BAT Singapore~~BATMS and received income generated by ~~BAT Singapore~~BATMS through its ~~direct and indirect~~ sales of products to North Korea.

**JURISDICTION AND VENUE**

13. This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331. Personal jurisdiction exists over each Defendant under ~~Federal Rule of Civil Procedure 4(k)(1) and/or 4(k)(2), and 18 U.S.C. § 2334(a). *See infra* ¶¶ 238-270.~~ Fed. R. Civ. P. 4(k)(1)(C). The ATA expressly authorizes federal jurisdiction over foreign defendants in civil ATA actions, 18 U.S.C. § 2334(a), and the Supreme Court recently held that the exercise of jurisdiction under such federal statutes is governed by a flexible Fifth Amendment framework. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025). Plaintiffs do not rely on Fed. R. Civ. P. 4(k)(1)(A) or any state's long-arm statute as the basis for personal jurisdiction over Defendants. Plaintiffs certify based on reasonably available information that Defendants are foreign corporations that are not subject to jurisdiction in any state's courts of general jurisdiction with respect to the claims arising from the conduct alleged herein. Accordingly, and in the alternative, personal jurisdiction is proper under Fed. R. Civ. P. 4(k)(2).

~~10.~~14. Venue is proper in the Eastern District of Virginia under 18 U.S.C. § 2334(a) because Plaintiffs Shiwa Nahadi and Tara Mahmoudzadeh reside in—and the Estate of Omer Mahmoudzadeh is located in—the Alexandria Division of this District. Venue is also proper in this District because ~~acts furthering BAT's scheme targeted entities~~many anticipated witnesses,

discovery sources, and personsrelevant evidence are located in thisor near the Eastern District. *See infra* ¶¶ 238-246. of Virginia.[1]

**SOURCING**

11.15. Plaintiffs' allegations are based in substantial part on threeten sources: (1) BAT's deferred prosecution agreement, ("DPA"); (2) BATMS's plea agreement; (3) BAT Singapore's Plea Agreement, and (3BATMS's criminal Information, as to which Defendants waived indictment; (4) the transcript of Defendants' Plea Colloquy and BATMS's Sentencing; (5) BAT's regulatory settlement with OFAC. *See* Statement of Offense; (6) United States, U.*S. v.*N., and European Union ("E.U.") sanctions findings of which BAT knew; (7) reports by media outlets that BAT monitored; (8) hearings and reports by Congress; (9) expert analyses; and (10) internal BAT documents. *See United States v. British American Tobacco, et al.*, No. 23-cr-118 (D.D.C. Apr. 25, 2023), Statement of Offense [Dkt. 11 ("Statement of Offense"); Plea Agreement, *U.S. v. British American Tobacco, et al.*, No. 23-cr-118 (D.D.C. Apr. 25, 2023) ("11], Plea Agreement"), [Dkt. No. 12;], Criminal Information [Dkt. No. 1], Transcript of Plea Colloquy and Sentencing [Dkt. No. 21]; Settlement Agreement of British-American TobaccoBAT and OFAC (Apr. 17, 2023) ("BAT OFAC Settlement");[2] U.S. Dep't of Treas., *OFAC Settles with British American Tobacco p.l.c. for $508,612,492 Related to Apparent*

---

[1] Plaintiffs' preliminary investigation confirms that a substantial portion of the anticipated witnesses and discovery is concentrated in or near this District. This includes materials previously collected, reviewed, or produced in connection with Defendants' April 2023 criminal and regulatory resolutions in the United States, as well as evidence maintained by federal agencies located in or near this District. Plaintiffs also believe that many U.S.-based non-party witnesses and experts are located in or near this District. Plaintiffs do not presently anticipate extensive overseas discovery or numerous overseas non-party witnesses. Plaintiffs expect that much of the relevant evidence will be obtained through party discovery, publicly available materials, expert analysis, and limited targeted discovery from U.S.-based persons and entities.

[2] Available here: https://ofac.treasury.gov/media/931661/download?inline.

*Violations of the North Korea and Weapons of Mass Destruction Proliferators Sanctions Regulations* (Apr. 25, 2023) ("OFAC ~~Enforcement~~ Release").[3] Each provides extensive evidence of Defendants' misconduct. ~~And~~ Defendants ~~have~~further stipulated that the facts detailed in ~~these documents are true. *E.g.*,~~ the Information and the Statement of Offense ~~at 1 (Defendants "agree and stipulate to the below factual basis").~~"are true and accurate." Unless otherwise indicated, Plaintiffs have added all emphases in ~~the~~ quotes herein.

16. Many of the sources cited herein use terms such as "weapons of mass destruction," "WMD," or "proliferation" in the context of U.S. and U.N. sanctions targeting North Korea. During the relevant period, these words and phrases in the DPRK sanctions context frequently encompassed missile cooperation with Iran and the IRGC. Throughout the same period, the United States repeatedly identified Iran as a principal recipient of DPRK missile technology, procurement assistance, and proliferation-related financial support, and reports identified North Korea as the number one supplier of missile assistance to Iran while Defendants partnered with Daesong. Accordingly, when the sources herein refer to "weapons of mass destruction," "WMD," or "proliferation" in the context of DPRK sanctions and proliferation networks, such references ordinarily include the ballistic missile technology, procurement activity, and related financial infrastructure underlying the DPRK-IRGC-Hizballah joint missile venture alleged in this Amended Complaint. A wide range of sources confirms the point. The U.S. Code, for example, defines "weapon of mass destruction" to include missiles. *See* 18 U.S.C. § 2332a(c)(2). In 2004, likewise, the U.S. Department of State ("State") reported that "Iran" had "received foreign assistance from entities in North Korea" to "develop and expand its ballistic missile program," which was "WMD assistance." And in 2009, similarly, the U.S. government

[3] Available here: https://ofac.treasury.gov/media/931666/download?inline.

reported that it was working with the U.N. "to convince North Korea to adhere to its pledge not to develop nuclear weapons or other weapons of mass destruction, to include ballistic missiles."

17. With respect to "Iran" as used by the United States, U.N., media, or scholars described in the terrorism context, including regarding missiles, such references ordinarily meant the IRGC (inclusive of proxy Hizballah) because the IRGC exclusively controlled Iran's terror portfolio, including its missiles, and Hizballah was notoriously the IRGC's lead external arm.

18. Plaintiffs retained subject-matter experts concerning DPRK proliferation financing, Office 39 operations, DPRK-Iran missile cooperation, and the *Qiam*- and *Fateh*-class missile systems used in the two terrorist attacks against Americans alleged herein. Dr. Sheena Chestnut Greitens is a leading scholar concerning Office 39 and DPRK illicit trade practices, while Dr. Jeffrey Lewis and Dr. Tom Karako are leading experts concerning DPRK-Iran ballistic missile cooperation and missile proliferation. Following the filing of Defendants' Motion to Dismiss [Dkt. Nos. 30-31], Plaintiffs consulted with these experts regarding issues raised in Defendants' briefing, including missile proliferation, sanctions-evasion financing, operational sustainment, and the relationship between Defendants' sanctions-evasion scheme and the *Qiam*- and *Fateh*-class missile systems. Plaintiffs accordingly incorporated additional factual allegations and expert-supported detail into this Amended Complaint concerning how Defendants' conduct substantially assisted the DPRK-Iran missile-development and proliferation activities that developed, procured, financed, and stockpiled the specific *Qiam*- and *Fateh*-class missile systems used in the terrorist attacks at issue.

# FACTUAL ALLEGATIONS

## I. NORTH KOREA, THE IRGC, AND HIZBALLAH HAVE BEEN TERRORIST ALLIES IN AN "AXIS OF RESISTANCE" ~~SINCE~~TARGETING THE ~~1980s~~UNITED STATES

### ~~A. North Korea, The IRGC, And Hizballah Forged An "Axis Of Resistance" Against The United States~~

~~12.~~19. North Korea, the IRGC, and Hizballah are part of the "Axis of Resistance," a terrorist alliance dedicated to undermining U.S. foreign policy ~~and~~by killing Americans. For decades, they have collaborated to harm U.S. interests through the transfer of advanced arms, use of shared financial networks, training in terrorist tradecraft, and construction of underground ~~attack tunnels. As North Korea scholars Professors Bruce E. Bechtol Jr. and Anthony N. Celso observed in their 2025 book, *Rogue Allies: The Strategic Partnership Between Iran and North Korea*, both Iran and North Korea "as a matter of doctrine, have an obsessive hatred of the United States – and that is what they most have in common." As Drs. Bechtol and Celso explained in the same book, "[t]he North Korea–Iran nexus involves weapons proliferation, political cooperation, money laundering, and robust support to state and nonstate actors in the Middle East," and "the strategic relationship between North Korea and Iran and a host of criminal and terrorist networks" comprised a "nexus between criminal–terrorist networks and rogue states" in which "[t]he Iran–North Korea alliance" had "ominous consequences" for "Middle Eastern security"; "the North Korea–Iran nexus" also "include[d] key … nonstate actors" and involved "the intertwining of their policy moves" against the United States~~missile attack tunnels. During the relevant period, Iran was the world's leading state sponsor of terrorism. North Korea was Iran's primary weapons supplier, including of missiles and rockets.

~~13. Iran is the world's leading state sponsor of terrorism.~~ North Korea ~~is its primary weapons supplier, including with respect to missiles and rockets.~~

### B.A. North Korea—A Designated State Sponsor Of Terrorism—Operates As A Global Criminal Enterprise To Proliferate WeaponsArms

14.20. North Korea is hostile to the United States as a matter of regime policy. As the Department of Defense ("DoD") noted in an analysis published in 2004, the regime "view[s] the United States and views the U.S. as its primary and immediate external security threat" and "has never attempted to conceal theenemy—a fact that it believes the United States is its principal enemy."has been well-known and reported by the U.S. government for decades. To accomplish its anti-American objectives, the DPRK has long supported terrorist groups to undermine U.S. foreign-policy objectives.goals. As the U.S. Department of Defense ("DoD") found in 2006, the DPRK may "threaten the United States" by "transferring weapons or expertise to terrorists." In 2016, likewise, Congress thus has found that North Korea "poses an imminent threat" to "the security of the United States and its allies" and to "the safety of members of the United States Armed Forces." North Korea Sanctions and Policy Enhancement Act of 2016, Pub. L. No. 114-122, § 1(a), 130 Stat. 93, 22 U.S.C. § 9201(a)(9) (Feb. 18, 2016) (findings22 U.S.C. § 9201(a)(9).

15.21. UnlikeAt all relevant times, the DPRK was unlike every other nations, North Korea is organized as a "mafia state."nation. As senior U.S. official Dr. David Asher publicly warned in 2005, itthe DPRK is the "only government in the world … today" that "actively involved in directing" "direct[s] crime as a central part of its national economic strategy and foreign policy," resembling "an organized crime family more than a normal nation." Reports published by the DoD in 2013 and the Library of Congress in 2008 confirmed that the regime operates under a *Songun*, or "Military First," philosophy prioritizing the development of nuclear and missile capabilities "at the expense of" economic recovery, while its leadership rules

through "a mixture of terror and the world'sThis mafia government does not perform most intense personality cult."ordinary governmental functions.

16.22. Kim Jong-Il (Supreme Leader 1994–2011) and Kim Jong-Un (Supreme Leader 2011–Present) have long controlled North Korea'sused their control over the DPRK's government and economy, directing to direct state revenues to fund weaponsmissile development rather than for economic or other policy initiatives. In 2021, for example, the U.N. Panel of Experts reported that the DPRK "continues to prioritize the stability and continuity of the Kim family regime over all other national priorities, including health and medical services and food security" and "has 'almost certainly' … diverted" any "humanitarian assistance" it received from foreign partners (purportedly to feed people) to Kim's inner circle "to meet the needs of the leadership."

17.23. A central pillar of this networkapparatus is Office 39 (a/k/a Daesong). As BAT always knew, Daesong is sometimes spelled "Daesung" or "Taesong," among other ways, and Office 39 was sometimes referred to as "Bureau 39" or "Room 39." As Treasury found on November 18, 2010, Office 39/Daesong is a "secretive branch" of theNorth Korea's government" of North Korea that manages the regime's illicit economic activities, "slush funds," and revenue generation. Treasury has designated Office 39 and its conglomerate, Daesong, as "key component[s]" of the regime's network supporting "arms and related materiel" trafficking.

18. Office 39 operates closely with its front, Green Pine Associated Corporation ("Green Pine"), which Treasury (in 2023) and the U.N. Panel of Experts (in 2015) both found was responsible for about half of DPRK arms and related material exports, including technical assistance and weapons to IRGC-affiliated firms.

24. The To accomplish its illicit ends, Office 39 utilized a network of fronts known as Daesong. For example, an analysis published by the U.S. Army in 2010 found that "Office #39 and all of its subordinate organizations have become known within North Korea as the Daesung Conglomerate." Since 2010, Treasury has designated Office 39 and its conglomerate, Daesong, as "key components" of the regime's network "facilitating North Korean trafficking in arms."

25. Office 39 directed "all crime-for-profit activity" in the DPRK, as the Congressional Research Service noted in 2007—and its coordination of this system was "exercised at the top," as DPRK scholar Dr. Greitens noted in 2005. In 2010, a U.S. Army-published analysis concluded that the "crimes organized by Office #39 are committed beyond the borders of North Korea by the regime itself, not solely for the personal enrichment of the leadership, but to prop up its armed forces and to fund its military programs."

26. Office 39 directly financed, and coordinated other DPRK support to, the DPRK-IRGC-Hizballah joint missile venture. In 2007, for example, the Congressional Research Service reported that Office 39 uses its profits to "procure overseas components for North Korea's weapons of mass destruction programs." Office 39 thus operated as a "vast criminal enterprise" that was "set up and used to finance" DPRK "ballistic-missile programs," as *Vanity Fair* reported in 2009. Office 39 was similarly involved in "the sale of weapons, including missiles" to "countries such as Iran," as the *Vancouver Sun* reported in 2006.

19. 27. Office 39 worked in tandem with the Reconnaissance General Bureau ("RGB") works in tandem with Office 39. Treasury "), the DPRK's primary terrorist operations arm. The RGB was sanctioned the RGB on April 19, 2011, having found that it is North Korea's "in Executive Order 13551 on August 30, 2010, and has been described by Treasury as the DPRK's premier intelligence organization" and primary terrorist arm. As DoD reported in 2021, the RGB

~~oversees "businesses in foreign countries, which are used as fronts for espionage, currency generation, … [and] weapon sales." DoD further reported that RGB operatives are highly trained in "explosives" and "assassinations."~~ and primary arm responsible for DPRK-supported terrorist attacks.

~~20. To move funds and arms, the DPRK (through Office 39/Daesong) uses Korea Mining Development Corporation ("**KOMID**"), Tanchon Commercial Bank ("**Tanchon**"), Korea Kwangson Banking Corporation ("**KKBC**"), and Foreign Trade Bank ("**FTB**").~~

~~21. These entities do not operate in silos; Office 39 and the RGB work together to assist the IRGC and Hizballah, including through KOMID, Tanchon, KKBC, and FTB.~~

~~22. The United States designated North Korea as a State Sponsor of Terrorism from 1988 to 2008, and redesignated it in 2017 after determining, as State reported to Congress in 2018 and 2023, that the regime "repeatedly provided support for acts of international terrorism," including the "shipment of weapons to terrorists and state sponsors of terrorism." North Korea's transfer of missiles and rockets to terrorists poses a paramount risk to America. As DoD found in 2006, North Korea may "threaten the United States … indirectly by transferring weapons or expertise to terrorists."~~

28. Office 39 and the RGB represented two sides of the same DPRK terrorist sponsorship coin: Office 39 functioned as a global financial, logistics, and operational front directly controlled by leadership, while the RGB functioned as the corresponding operations arm responsible for attacks and associated training and logistical aid to allies like the IRGC and Hizballah. The relationship is analogous to the IRGC's domination of Iran's economy through fronts, which allow the IRGC to use commercial activity to source money, technology, and materiel for terrorist attacks. In this way, the DPRK's use of Office 39 as a terrorist finance and

logistics front to source arms, and the RGB as the terrorist operations arm mirrored the longstanding tradecraft of the IRGC and Hizballah that was heavily influenced by DPRK training. The IRGC, for example, operates a global logistics and finance front called the Foundation for the Oppressed that complements the IRGC's official operations arm and is analogous to Office 39's relationship with the RGB.

29. Office 39, including its commercial arm Daesong, always operated as a notorious terrorist front for DPRK, IRGC, and Hizballah terrorists. It was purpose-built to supply funds to the DPRK's top weapons priorities and served as the procurement arm for North Korean RGB terrorists and Office 39's and the RGB's joint arms venture partners, the IRGC and Hizballah.

23.30. The IRGC was chief among North Korea'sOffice 39's terrorist partners. According toAs DoD explained in a 2013 report, North Korea maintained a "core group of recipient countries including …Iran" from 2002 to at least 2020.." As noted in public DoD reports to Congress in 2012, 2016, and 2018, through the Office 39/RGB network, North Korea exported "missile-related equipment, components, materials, and technical assistance" to the IRGC and Hizballah. Due to these missile threats, the United States has consistently employed a "maximum pressure" sanctions campaign targeting the DPRK's weapons proliferation and illicit finance networks since 1994.

24. To facilitate these missile exchanges, Office 39 flouted U.S. counterterrorism rules. In 2010, for example, the U.S. State Department ("State") reported to Congress that the DPRK "has not taken any steps to establish and implement a viable anti-money laundering/counterterrorist financing regime."

31. To move funds and arms, Office 39 uses Korea Mining Development Corporation ("KOMID"), Tanchon Commercial Bank ("Tanchon"), KKBC, and FTB. These entities do not

operate in silos; Office 39 and the RGB work together to assist the IRGC and Hizballah, including through KOMID, Tanchon, KKBC, FTB, and Green Pine Associated Corporation ("Green Pine"), among others. These entities operated as an integrated network of terrorist fronts: Office 39 was the lead partner for the DPRK's primary terrorist arm, the RGB, and served as an exclusive and notorious procurement arm for the IRGC and Hizballah with respect to a litany of weapons and logistics systems, while KOMID, Tanchon, KKBC, FTB, and Green Pine were tightly connected to and directed by Office 39. For example, Dr. Greitens has confirmed in her analysis for Plaintiffs that the Office 39/Daesong-led network functioned as a procurement arm for the IRGC's and Hizballah's missile activities.

32. To accomplish the above ends, Office 39 utilized a network of fronts known as Daesong to conduct its operations. For example, an analysis by Dr. Paul Rexton Kan and others published by the U.S. Army in 2010 found that "Office #39 and all of its subordinate organizations have become known within North Korea as the Daesung Conglomerate."

33. Through Daesong, Office 39 directed North Korea's cigarette manufacturing and smuggling. The 2010 U.S. Army report noted that Office 39 "directs illicit activities" including "the manufacture and distribution of counterfeit cigarettes." A 2009 investigative report by *Vanity Fair* similarly warned that Office 39 was "at the center" of the trade, with its elite headquarters staff supervising "large-scale facilities" like "cigarette factories."

34. BAT's cigarette joint venture in North Korea was part of Office 39's Daesong group: the joint venture was named "**Daesong-BAT**." *See infra* Part III(B). Profits from this joint venture flowed to Office 39 and financed IRGC missile attacks. *Infra* ¶ 123.

35. Throughout the relevant period, BAT, Office 39/Daesong, KOMID, Tanchon, KKBC, FTB, and Green Pine operated within an interconnected DPRK sanctions-evasion,

proliferation-financing, and missile-procurement apparatus that supported IRGC missile attacks. Within that apparatus, BAT's joint venture generated substantial hard-currency flows for Office 39 and its various fronts and agents; Office 39 and Daesong managed and controlled key foreign-currency-generation activities; KOMID and Green Pine operated as principal DPRK arms-procurement entities; and Tanchon, together with KKBC and FTB, facilitated proliferation-related financial transactions and access to the international financial system. These entities operated as coordinated components of a broader DPRK proliferation structure that materially supported DPRK-Iran missile cooperation during the relevant period. The United States similarly identified many of these entities as part of a DPRK proliferation "network," and BAT admitted in its Statement of Offense that its North Korean counterparties operated within such a sanctions-evasion and proliferation-related network. Statement of Offense ¶¶ 7, 9, 32, 44.

36. On August 30, 2010, President Obama issued Executive Order 13551, which specifically designated "Office 39" (in its Annex) upon "finding that the continued actions and policies of the Government of North Korea, manifested most recently by," *inter alia*, "its missile launches in 2009; its actions in violation of UNSCRs 1718 and 1874, including the procurement of luxury goods; and its illicit and deceptive activities in international markets through which it obtains financial and other support, including money laundering, the counterfeiting of goods and currency," foreseeably could "imperil U.S. Armed Forces." 75 Fed. Reg. 53,837. When Treasury designated Office 39/Daesong in 2010, Treasury found—and publicly warned—that it generated illicit revenue used to support the DPRK (including KOMID) "missile" proliferation to "Iran."

### ~~C.~~B. The IRGC Operates As A Global Terrorist Organization Dedicated To Targeting The United States

~~25.~~37. Since April 1979, the IRGC has operated as a global terrorist organization targeting the United States. Unlike the armed forces of a nation, the IRGC is an "ideological

army" mandated by Article 150 of Iran's constitution to "export the Islamic Revolution" through "Jihad, for God's sake." To accomplish this goal while avoiding armed conflict with the United States during the relevant period, the IRGC often sponsors terrorist sponsored proxy attacks against Americans through proxies.

26. From 2007 through 2022, the IRGC sponsored thousands of terrorist attacks and attempted attacks throughout the world—including in, among other places, Iraq, Syria, Türkiye, Israel, Iran, Yemen, Saudi Arabia, Oman, Egypt, Afghanistan, India, the United Kingdom, France, Belgium, the Netherlands, Albania, Bulgaria, Kenya, Somalia, Thailand, and the United States. Iraq, where it sponsored the most. These attacks featured a wide array of arms and attack types, including by improvised explosive device, explosively formed penetrator, bomb, hostage-taking, cyber, small arms, sniper, mine, mortar, uncrewed aerial vehicle ("UAV"), rocket, and missile. While IRGC-sponsored rocket and missile attacks tended to be higher profile than most other attack types (as they usually targeted American diplomatic facilities or military bases in the Middle East), even in core IRGC-sponsored attack geographies in Iraq and Afghanistan, substantially less than ten percentmissiles (among others). With respect to the universe of IRGC-backed attacks involved rockets, and less than one percent involved missiles.

27. The IRGC operates through five primary branches: (1) the IRGC Qods Force ("IRGC-QF" or "Qods Force"), which plans and finances external terrorist operations; (2) the IRGC Intelligence Organization ("IRGC-IO"), the regime's most lethal intelligence arm; (3) the IRGC Aerospace Force ("IRGC-ASF"), responsible for missile and UAV attacks; (4) the Basij, a domestic paramilitary force; and (5) the IRGC Navy, which smuggles weapons and funds.

28.38. The IRGC controls Iran's missile, rocket, and UAV programs.*Qiam* and *Fateh* missile attacks that resulted in the death or serious physical injury of a U.S. national during the

period from 2007 through the present, Plaintiffs are only aware of two IRGC-committed acts of terrorism using *Qiam* and *Fateh* missiles—the January 2020 and September 2022 attacks against Plaintiffs alleged herein. To Plaintiffs' knowledge, Office 39, the RGB, and the IRGC did not commit any other act of terrorism between 2007 and the present that resulted in any American being killed or seriously physically injured by a *Qiam* or *Fateh* missile.

~~29.~~39. The United States has repeatedly documented the IRGC's terrorist attacks on Americans~~. On October 25, 2007, the United States designated the IRGC-QF as a Specially Designated Global Terrorist for providing "lethal support" to Iraqi terrorists targeting Coalition forces. On April 15, 2019, the United States designated the entire IRGC (including its Qods Force) as a Foreign Terrorist Organization, finding that its "support for terrorism is foundational and institutional" and that it was responsible for killing at least 603 American servicemembers in Iraq. Congress similarly found that the IRGC is Iran's "primary arm … for executing its policy of supporting terrorist and insurgent groups." Countering America's Adversaries Through Sanctions Act ("CAATSA") § 105(a), Pub. L. No. 115-44, 131 Stat. 906, 22 U.S.C. § 9404(a)(2) (Aug. 2, 2017). As BAT always knew, when the United States, United Nations, media, or scholars described "Iran" in the context of terrorism, including its missiles and rockets, such references were to the IRGC (inclusive of its proxies) because the IRGC had exclusive control of the Iranian regime's terrorism portfolio, including its sponsorship of missile and rocket attacks.~~ in Iraq. In 2007, the United States formally found that the IRGC Qods Force, the branch of the IRGC that plans and finances external terrorist operations alongside Hizballah, had partnered with Hizballah to supply "lethal support" to Shiite Iraqi terrorists targeting Americans.

40. The IRGC has always controlled Iran's ballistic missile and rocket program.

### D.C. Hizballah Functions As The IRGC's PrimaryLead External Terrorist ProxyArm

30.41. In 1982, the IRGC founded Hizballah in Lebanon, establishing the group as its most important terrorist partner. Hizballah's 1985 "Manifesto" confirmed its subservience to the Iranian regime, declaring that the group "abide[s] by the orders" of the Ayatollah and that its "military apparatus is not separate from our overall social fabric." Consistent with this ideology, Hizballah's primary goal is the destruction of the United States (the "Great Satan") and Israel (the "Little Satan"). Every and lead external attack arm. During the relevant period, every Hizballah operative swore a religious oath of loyalty to Ayatollah Khamenei during the relevant period.

31. Hizballah functions as an IRGC division. Secretary General Hassan Nasrallah led it until he died in 2024,has a formal role within the IRGC's missile and he coordinated attacks with the IRGC.rocket enterprise. As State reported to Congress in 2015, the IRGC has "integrated" Hizballah into these operations to such an extent that the IRGC-ASF Commander of the IRGC Aerospace Force, the IRGC branch responsible for IRGC-led or -sponsored missile and rocket attacks, admitted, "[t]he IRGC and Hizballah are a single apparatus jointed together." Nasrallah publicly admitted in 2015, "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran."

32. Hizballah interfaces between the IRGC and Shia proxies in Iraq, including Kataib Hizballah, with whom Hizballah and the IRGC attacked Plaintiffs. In Iraq, Hizballah created Jaysh al-Mahdi ("JAM") and its Special Groups (including Kataib Hizballah) specifically to inflict mass casualties on Americans. Hizballah deployed instructors to prepare JAM for attacks against Americans, working alongside designated terrorists like Kataib Hizballah leader Abu Mahdi al-Muhandis to populate the terrorist cells that committed every attack against Plaintiffs.

~~33.~~42. ~~Hizballah has a formal role within Iran's missile and rocket enterprise.~~ The IRGC transferred ~~North Korean~~ missiles ~~and rockets (specifically 107mm and 122mm variants)~~ to Hizballah derived from the DPRK-IRGC-Hizballah joint venture. This collaboration allowed Hizballah to serve as a force multiplier, recruiting local members in high-~~terrorism~~terror-risk zones and equipping them with IRGC-supplied, ~~North Korean~~DPRK-designed ~~weaponry~~arms to target Americans in Iraq ~~and Syria~~.

~~**II. DEFENDANTS ILLEGALLY ENGAGED WITH NORTH KOREA, DESPITE ITS DECADES-LONG PARTNERSHIP WITH THE IRGC AND HIZBALLAH, TO DEVELOP AND DEPLOY WEAPONS TARGETING AMERICANS**~~

43. Hizballah interfaces between the IRGC and their Shia terrorist proxies in Iraq, including Kataib Hizballah (or "KH"), with whom Hizballah and the IRGC attacked Plaintiffs.

## II. DEFENDANTS INTENTIONALLY PARTICIPATED IN NORTH KOREA'S MISSILE PROLIFERATION NETWORK

~~34.~~ For decades, North Korea, the IRGC, and Hizballah have collaborated in a joint weapons venture to develop, manufacture, and deploy missiles and rockets in anti-American terrorist attacks. The ~~North Korea~~DPRK-IRGC-Hizballah joint weapons venture ~~produced the specific missiles used to harm Plaintiffs—including **_Qiam_**- and **_Fateh_**-class missiles.~~

~~35.~~44. ~~The North Korea-IRGC-Hizballah joint arms venture~~ was not a formal entity ~~or enterprise.~~. Rather, it was a joint effort by these terrorist actors to develop~~, refine, deploy,~~ and use missiles and rockets ~~against Americans and their allies~~, including the specific *Qiam* and *Fateh* missiles used to harm Plaintiffs. Defendants' misconduct aided those efforts specifically.

### A. North Korea, The IRGC, And Hizballah Entered A Joint Venture To Produce And Deploy Missiles In Terrorist Attacks Against Americans

~~36.~~45. The joint arms venture began during the Iran–Iraq War in the 1980s, when Iran purchased missiles and rockets from North Korea in a barter arrangement in which the two

nations exchanged oil for weapons. During this period, North Korea provided technical aid to help Iran build a domestic missile production facility, which North Korea operated and staffed.

~~37.~~46. From the 1990s through at least 2022, North Korea collaborated with Hizballah in the same way. Throughout, as was widely reported in real-time, North Korea regularly hosted delegations of high-ranking IRGC and Hizballah terrorists to negotiate weapons sales, receive training in terrorist tactics, and coordinate weapons development~~. For instance, Hizballah's former Secretary General Nasrallah, as well as its security and counterespionage chiefs, traveled to North Korea for training. Likewise, high-ranking IRGC commanders traveled to Pyongyang to negotiate missile purchases.~~ —including for missiles.

47. ~~By the late 2000s, this relationship had solidified. As DPRK scholar Larry Niksch testified before Congress in 2015, North Korea~~Between 2001 and 2004, the Central Intelligence Agency ("CIA") provided semiannual public reports to Congress that consistently found that the DPRK was helping the IRGC develop its ballistic missile program. During this period, such CIA warnings included that "entities" in "North Korea" were "continu[ing] to supply crucial ballistic missile–related equipment, technology, and expertise to Iran," and that the CIA "believe[d] that such" DPRK ballistic missile-related "assistance" "include[d] equipment, technology, and expertise."

~~38.~~48. By the late 2000s, the DPRK-IRGC-Hizballah joint arms venture had solidified. In 2008, for example, the Congressional Research Service reported that a wide array of U.S. government, U.N., and media "reports and the State Department's characterization of the IRG[C] as a major player in Iran's missile program point to a likely continuing relationship between North Korea and the IRG[C], including a kind of joint venture partnership to develop missiles inside Iran," that featured supply and coordination with "Hezbollah," including over "rockets and

related electric circuits and solid fuel propellant" used by the IRGC and Hizballah to launch attacks. Dr. Greitens, likewise, observed in 2014 that "North Korea has shifted toward exporting missile components rather than full systems and to working on joint development projects with a small handful of partner countries"—which always included Iran. Similarly, DPRK scholar Larry Niksch testified to Congress in 2015 that the DPRK maintained "working ties with Iranian companies responsible for producing missiles," and regularly dispatched "missile experts" to upgrade the accuracy, lethality, and security of the IRGC's arsenal. IRGC officials, in turn, frequently visited North Korea to observe missile tests throughout the 2000s and 2010s. As the U.N. reported in 2020, North Korea "remains very active in the provision of services in the field of artillery rocket system improvement" and is "known for transferring blueprints" to its partners.

39. Congress found that "cooperation between North Korea and Iran" included the "transfer of goods, services, technology, or intellectual property" relating to their respective missile and conventional weapons programs. CAATSA § 316(a).

40. On July 23, 2014, a federal court likewise found, based on expert testimony, that the DPRK (via Office 39), IRGC, and Hizballah collaborated as part of a joint arms venture:

> With respect to the rocket attacks, the Court finds that Iran assisted Hezbollah in the same respects North Korea did, most generally by providing the funds for the assistance. … [T]his whole thing [*i.e.*, DPRK missiles and rockets supplied to Hizballah,] was financed by Iran. If you would like to know how specifically that worked, the ***financing part of it came from what's called office number 39*** …. Office number 39 works directly with the [Islamic Revolutionary] Guard Corps, and then the funds and weapons are actually funneled out through them.

*Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014).

49. While Defendants partnered with Daesong from 2007 through 2017, the IRGC was the number one overall recipient of ballistic missile assistance from the DPRK. For example,

a study published in 2011 in the *Nonproliferation Review* determined that, at least through 2009—which is during the period of BAT's scheme—the Middle East was the DPRK's most important market, and within that market, Iran was its top customer.

50. Throughout the relevant period, the United States found, and publicly reported, that the DPRK and Iran partnered to sponsor missile attacks. In 2006, for example, Treasury sanctioned firms for enabling IRGC missile threats, including those posed by the *Fateh-110*, and emphasized that IRGC missile programs relied upon direct DPRK aid. In 2010, likewise, the Defense Intelligence Agency found that Iran received DPRK aid in developing its missiles and continued to increase such arms' range, lethality, and accuracy. Similar reports were legion.

~~41.~~ Senior U.S. officials have publicly confirmed that North Korea, the IRGC, and Hizballah operated a joint missile and rocket venture that directly threatened ~~American servicemembers~~Americans in Iraq~~.~~, like Plaintiffs. In 2008, for example, Senator Joe Lieberman publicly warned~~:~~

> ~~The Congressional Research Service … in a report earlier this year said, … '~~ that "North Korea's relationship with the Islamic Revolutionary Guard Corps ~~… appears to be~~ " was "in two areas: Coordination in support for Hezbollah, and cooperation in ballistic missile development~~.' … A detailed report in the *Los Angeles Times* … stated that many North Koreans are working on nuclear missile projects in Iran. … [A] recent study completed and issued by the U.S. Army Combined Arms Center … on the 2006 Lebanon War … found evidence that North Korea had provided various forms of support to the Lebanese Hezbollah, including weapons and technical support. … North Koreans' bad record here [raises substantial concerns whether] they really have stopped supporting some of the* **groups such as the** *~~," and "North Koreans' bad record here" suggested they had continued "supporting" the "IRGC that, according to evidence presented by the U.S. Army, is responsible for training and equipping Iraqi extremists" who~~, in turn, are~~ were "responsible for murdering hundreds of American soldiers~~.~~

~~42.~~51. ." In ~~a~~ 2013 ~~congressional hearing entitled *Breaking the Iran, North Korea, and Syria Nexus*~~, likewise, former CIA Director R. James Woolsey ~~similarly~~ testified to Congress that "North Korea helps develop Iranian ~~. . .~~ … ballistic missiles. North Korea and Iran

effectively have a joint missile program together." And heDirector Woolsey explained that "the United States" was at risk of "potential attacks by the Iran-Syria-North Korea nexus and their terrorist proxies" because "Iran and North Korea have been able to maintain such a close relationship in the development" of "missile programs, even extending it" to "Hezbollah."

43. Scholars have further detailed the mechanics of this partnership. In 2016, Ilan Berman testified to Congress that the "centerpiece of the budding Iran-North Korea relationship" was "***collaboration on strategic capabilities***." This included joint development of Iran's Shahab missile series, which is "closely based on North Korea's nuclear-capable No Dong medium range missile." Berman testified that "Iranian scientists and technicians . . . have had a front-row seat to the DPRK's ballistic missile development, regularly attending its missile launches since at least the early 1990s." And this partnership extended to the IRGC's "***terror proxy of choice: Lebanon's Hezbollah***," with the DPRK collaborating with Hizballah in constructing "elaborate underground tunnels in southern Lebanon."

44. In 2021, Drs. Bechtol and Celso similarly observed that the "Iran–North Korea partnership" created a "vast technological and scientific infrastructure" through which "[m]uch of Iran's formidable arsenal of conventional and missile weaponry (much of it based on North Korean designs) has ***with Pyongyang's assistance been transferred to Tehran's regional proxies in Syria, Iraq, [and] Lebanon***," and this "***armament nexus***" enabled Iran to "develop[] Hezbollah into a formidable fighting force" capable of attacking the United States. In 2025, likewise, Drs. Bechtol and Celso observed that, with respect to "the role of North Korea in the modernization of Tehran's armaments industry" regarding "Iran's growing conventional capability and the role of the IRGC in the development of Lebanese Hezbollah" and "Iraqi Popular Mobilization Forces (PMF)"—always led by Kataib Hizballah—"***[m]any of these***

***groups have been trained and equipped with North Korean arms*** by the IRGC elite Quds Force. In short, the ***North Korea–Iran nexus has enhanced the fighting capability of a host of Middle Eastern terror groups*** that threaten vital American security interests in the Middle East."

52. In 2014, a federal district court, citing expert testimony, found that Office 39 partnered with the IRGC in a joint arms venture that supplied missiles and rockets to the IRGC and Hizballah, for which "the financing part of it came from what's called office number 39," which "works ***directly with the [Islamic Revolutionary] Guard Corps***, and then the funds and weapons are actually funneled out through them." *Kaplan v. Central Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014).

53. In 2017, Congress enacted the Countering America's Adversaries Through Sanctions Act ("CAATSA"), finding "cooperation between North Korea and Iran" included "transfer of goods, services, technology, or intellectual property" "between North Korea and Iran relating to their respective" "ballistic missile development" "programs." CAATSA § 316(a).

45.54. The United States regularly warned (including during the 2013 congressional hearing titled *Breaking the Iran, North Korea, and Syria Nexus*) that this "that this joint missile program" between North Korea, Iran, and Hizballah posed a direct threat to American forces. As early as 1999, the House North Korea Advisory Group found, and publicly reported, that North Korea's missile proliferation activities to the IRGC "created an immediate, serious and growing threat to U.S. forces, interests, and allies . . . ." in "the Middle East." And in 2010, DoD warned that as "North Korea and Iran fielded, as part of their defiance of international norms, are actively testing and fielding new ballistic missile systems, "," and "[a]s the inventories and capabilities of such systems continue to grow, U.S. forces deployed forward will no longer enjoy the relative sanctuary that they have had in conflicts since the end of the Cold War." That same

DoD report presciently warned that "[a]ir bases" and "other assets essential to high-tempo military operations could be at risk."

~~46.~~55. To combat this threat, the United States imposed robust sanctions on the ~~North Korean~~DPRK entities proliferating ~~weapons~~missiles to the IRGC. As senior Treasury ~~counterterrorism~~ official Daniel Glaser ~~publicly~~ testified to Congress in 2006, the U.S. financial attack against proliferators was "related to our effort to combat terrorism," as state sponsors like ~~North Korea~~the DPRK and Iran "intentionally obscure the nature of their financial activities ~~…~~" and "hide behind a veil of legitimacy, disguising their activities, such as weapons sales or procurement, through the use of front companies and intermediaries." Despite these sanctions, the ~~North Korea~~DPRK-IRGC-Hizballah joint arms venture continued throughout the ~~period~~ relevant ~~to this Complaint. In 2008, for example, the Congressional Research Service published an analysis highlighting North Korea's and Iran's "***joint venture partnership to develop missiles inside Iran***." In 2025, likewise, Drs. Bechtol and Celso observed that, with respect to how "the strategic partnership between Pyongyang and Tehran" created "dire security implications" for "Middle Eastern security," the West's "financial sanctions" sought to "weaken the* ***North Korean–Iranian weapons-for-money nexus***."~~period while Defendants participated in it through Daesong-BAT.

### B. North Korea ~~Exported~~Supplied Its Missile Technology And Expertise To The IRGC ~~And Hizballah~~

~~47.~~56. North Korea played at least four key roles in the joint arms venture that supplied the missile, rocket, and unmanned aerial vehicle ("UAV")-related weapons, training, and tunnels used to attack Plaintiffs. In sum, Office 39 led the DPRK missile procurement network that supplied the essential hardware, know-how, and personnel that allowed the IRGC to target

U.S. forces, without which the IRGC's missiles would have been less accurate, effective, and secure.

### 1. Procurement and Export of Advanced WeaponryMissiles

48.57. First, North Korea procured and exported missiles, rockets, UAVs, components, and technology to the IRGC and Hizballah.

58. Decades of reports published by the United States, United Nations, media outlets, and scholars confirmed that there was an inextricableIn 2008, State transmitted a cable (as published online) noting that the DPRK "remains one of the world's leading suppliers of ballistic missiles and technology, and continues to provide assistance to [] Iran's … ballistic missile programs," offering everything from "complete systems" to "production technology," and that "Iran is one of North Korea's key missile customers," for example, by having incorporated DPRK technology into the IRGC's Shahab-3 missile. (The Shahab is a liquid-fueled ballistic missile. From 2010 through at least 2015, the DPRK-IRGC-Hizballah joint arms venture substantially upgraded the Shahab to create the *Qiam*, which was used by the IRGC to injure Plaintiffs in the January 8, 2020 attack.)

49. There was an inextricable procurement nexus between the DPRK (including through Office 39) and Iran (through the IRGC and Hizballah, among others) supporting missile and rocket attacks targeting the United States in the Middle East. In 20012010, for example, the *Washington Times* reported that "North Korea sends missile parts, [and] technology to Iran," and the National Intelligence Council reported that North Korea "has helped countries to acquire technologies to serve as the basis for domestic development efforts – as with Iran's reverse-engineering of the No Dong in the Shahab-3 program." In 2003, similarly, the Congressional Research Service reported that Iran is "reliant on foreign suppliers" for "critical technology" for its "missiles," for which one critical "foreign supplier[]" is "North Korea."

~~50. Similar reports confirming this inextricable nexus were common throughout Defendants' decade-long partnership with the DPRK, including, but not limited to, as follows:~~

~~a. 2008: State transmitted a cable (as published online) noting that Pyongyang "continues to sell ballistic missile-related technology" to Iran, offering everything from "complete systems" to "production technology," and that "Iran is one of North Korea's key missile customers," having incorporated North Korean technology into the Shahab-3, which is based on the North Korean No Dong missile.~~

~~b. 2010: the~~ U.N. Panel of Experts reported that North Korea has "~~provid[ed]~~continued to provide missiles, components, and technology to ~~. . . the Islamic Republic of~~certain countries, including … Iran."

~~c. 2011: in an analysis entitled *The Hizballah-North Korean Nexus*, scholar Carl Wege observed that the "mutually beneficial relationship that developed between Iran and North Korea secondarily benefits Hizballah with Iran financing North Korean efforts that strengthen Iran's Lebanese ally" through which "Hizballah receives assistance from North Korea that could not be readily furnished otherwise by Iran."~~

~~d.~~ In 2013~~: in the *Breaking the Iran, North Korea, and Syria Nexus* congressional hearing~~, Dr. David Albright testified to Congress that "the threats posed by … the Iran-Syria-North Korea proliferation nexus" could "facilitate … missile advances by ~~both countries," *i.e.*,~~" Iran and the DPRK.

~~e. 2013: in the *Breaking the Iran, North Korea, and Syria Nexus* congressional hearing, Representative Steve Chabot warned that the DPRK is "a one-stop shop for missile … technology," which it shared "with the likes of Iran," with which it has a "long and enduring relationship."~~

~~51.~~59. In 2015~~: in the congressional hearing entitled *The Iran-North Korea Strategic Alliance*~~, scholar Ilan Berman testified that "Asia's position as a hub for defense technology, including critical assistance to Iran's ballistic missile … programs" ~~supplied~~was the "context" in which ~~"North Korea~~ the DPRK "has emerged as what is arguably Iran's most important regional ally."

~~f. 2015: Representative Ted Deutsch observed during a congressional hearing that "legislative efforts to strengthen Iran, North Korea, Syria Nonproliferation Act" [INKSNA] sought to "focus on the ***nexus between these three regimes and their quest for weapons***" because "the ***relationship between Iran and North Korea with respect to illicit procurement is vital to the Iranian regime[']s efforts to circumvent international sanctions***"; "INKSNA was enacted and subsequently amended to shut down illicit procurement and transfers."~~

g. 2016: John R. Haines, a scholar at the Foreign Policy Research Institute, noted that the "existence of an ***Iran-North Korean nexus around missile technology is indisputable***."

**2. Institutional Missile Collaboration and Development**

52.60. Second, North Korean specialists collaborated with the IRGC and Hizballah to develop and produce missiles and rockets, sharing technical expertise and exchanging test data.

53.61. Decades of reports published by the United States, United Nations,U.N., media outlets, and scholars confirm that point. In 20032006, for example, the *Los Angeles Times* reported that "North Korean technicians worked for years helping Iran develop the Shahab-3 missile, unveiled last month in Tehran. A foreign intelligence official and a former Iranian intelligence officer said the Koreans are now working on a longer-range Shahab-4." In 2006, the *New York Times* reported that "[f]or years North Korea has supplied Iran with missile technology," and "[t]he North Koreans know the Iranians, and their weapons programs, intimately." And in 2009, similarly, the Congressional Research Service reported that "[m]any experts believe that Iran's Shahab-3" was "a derivative of the North Korean No-Dong 1 ballistic missile." Other reports made similar findings.

54.62. IRGC specialists frequently visited North Korea to collaborate on weapons development and vice versa. In 2010, for example, the Congressional Research Service reported that "Iranian delegations of missile experts and Iranian Revolutionary Guard[IRGC] officials reportedly attended the July 2006 and April 2009 test launches of the Taepong II long range" a ballistic missile.". And in 2017, an Iranian democracy group with extensive contacts inside Iran, the National Council of Resistance of Iran ("NCRI"), reported that "delegations of the IRGC's aerospace[A]erospace [Force] constantly travel to North Korea and exchange knowledge, information and achievements with North Korean [missile and rocket] specialists"," and "since

nuclear negotiations in 2013, this trend has not stopped and North Korea's experts constantly travel to Iran while the IRGC's missile experts visit North Korea."

### ~~3. Embedded Operatives in the Middle East~~

63. Scholars have detailed the mechanics of this partnership in the specific context of the *Qiam* and *Fateh* missiles used to attack Plaintiffs. In 2015, for example, Ilan Berman testified to Congress that the "centerpiece of the budding Iran-North Korea relationship" was "collaboration on strategic capabilities," which included jointly developing the Shahab missile series—linked to the *Qiam*—which was "closely based on North Korea's nuclear-capable No Dong medium range missile." Berman testified that "Iranian scientists and technicians . . . have had a front-row seat to the DPRK's ballistic missile development, regularly attending its missile launches since at least the early 1990s," and that the joint venture extended to "Hezbollah."

### 3. Embedded DPRK Operatives' Direct Support for IRGC and Hizballah Missile Design, Production, Testing, Storage, and Maintenance Inside Iran

~~55.~~64. Third, North Korean operatives embedded directly into IRGC and Hizballah arms procurement, research, ~~and~~ manufacturing, security, and maintenance units.

~~56.~~65. By 2003, as the *Los Angeles Times* reported, there were so many North Koreans working on missile projects in Iran that many Iranian facilities, including a Tehran hotel and a Caspian Sea resort, were reserved for their sole use. These embedded DPRK operatives deployed on behalf of Office 39 and the RGB, often through fronts they controlled (*e.g.*, KOMID), and provided the key specialized labor spine of every node of the IRGC's and Hizballah's missile infrastructure. Between 2007 and 2022, that network of DPRK operatives oversaw and consulted on missile design and testing, worked key positions within missile factories, coordinated the transfer of DPRK missile-related knowledge and advances to the IRGC and Hizballah, and helped maintain the IRGC's and Hizballah's missile stockpiles.

~~57.~~66. As scholar Larry Niksch testified to Congress in 2015, this "institutional collaboration" involved at least "several hundred" North Korean specialists embedded with IRGC and Hizballah units throughout the 2010s. Scholar Dr. Andrea Berger also reported in 2015 that Office 39 front Green Pine and arms dealer KOMID maintained offices in Iran ~~and Syria~~ that were regarded as "permanent arrangements." By 2017, the *Washington Times* reported that Iran played "permanent host" to North Korean scientists, establishing residences in Tehran for DPRK technicians who aided the IRGC's missile design, testing, and development.

~~58.~~67. NCRI confirmed in 2017 that IRGC missile sites were based on "North Korean models and blueprints." According to the same NCRI report, North Korean experts trained IRGC personnel and maintained a "continuous presence" in key industries, including building warheads and guidance systems. The U.N. corroborated this, reporting in 2019 that KOMID and Green Pine "maintain active offices in the Islamic Republic of Iran" and that at least three KOMID representatives remained in Iran under diplomatic cover. Through this cooperation, North Korea and Iran jointly produced missiles for the IRGC and Hizballah.

~~59. From 2007 through 2023, a network of North Korean operatives acting on behalf of Office 39 and the RGB operated in Iran, Lebanon, and Syria, using financial and commercial fronts to support North Korea's missile-proliferation activities.~~

~~60.~~68. One such front was Hong Kong Electronics, an Office 39-controlled entity based on Iran's Kish Island that exploited the island's notorious status as an IRGC logistics hub to facilitate IRGC-sponsored attacks. On June 30, 2009, Treasury designated Hong Kong Electronics under ~~EO~~E.O. 13382, which "freezes the assets of designated proliferators." Treasury ~~determined that "Hong Kong Electronics, located in Kish Island, Iran, has been designated for providing support to North Korea's Tanchon Commercial Bank (Tanchon) and~~

~~Korea Mining Development Trading Corporation (KOMID)," and~~ explained ~~that "North Korea uses front companies like Hong Kong Electronics and a range of other deceptive practices to obscure the true nature of its financial dealings." Treasury further concluded~~ that the designation was "part of our overall effort to prevent North Korea from misusing the international financial system to advance its … missile programs and to sell dangerous technology around the world," and specifically found that "Hong Kong Electronics has also facilitated the movement of money from Iran to North Korea on behalf of KOMID."

~~61.~~ The same DPRK network that facilitated IRGC missile and rocket purchases also relied on Office 39 affiliate Green Pine, which had a substantial on-the-ground presence in Iran. Key resident operatives included Kang Kyong Il and Ri Sung Il (Green Pine representatives in Tehran); Jang Yong Son, Kim Yong Chol, Ha Won Mo, Kim Hak Chol, and Ri Hyong Thae (Iran-based agents for KOMID); and Pak Sin Hyok and Ri Kuk Myong (Tehran-based Office 39 agents operating under fake diplomatic cover). ~~In Syria, Office 39 agents Jo Yong Chol and Kang Ryong facilitated arms sales delivered to Hizballah via the Assad regime.~~

~~62.~~69. Senior North Korean officials also regularly traveled to Iran to coordinate this aid~~.~~ ~~This included~~, including heads of KOMID and Green Pine, such as Ri Jong Chol (Chief of KOMID 1st Office), Kang Myong Chol (Chair of KOMID), and Ri Hak Chol (President of Green Pine~~). Beyond leadership, the U.N. reported in 2021 that at least thirteen~~) and other ~~DPRK~~missile system specialists ~~traveled to Iran to support KOMID~~.

~~63.~~70. North Korean missile specialists thus provided systemic instruction and training to their IRGC and Hizballah allies on how to develop, refine, ~~and~~ deploy, and maintain missiles and rockets to deadly effect, including regarding the *Qiam* and *Fateh* missiles used against Plaintiffs.

71. Pursuant to decades of custom and practice, the IRGC and Hizballah always depended upon hundreds of DPRK missile specialists forward deployed in Iran and Lebanon through Office 39/Daesong, who specifically supervised the operations, maintenance, and quality control practices at IRGC and Hizballah missile facilities in Iran and Lebanon. NCRI, for example, reported in 2017 that DPRK specialists played key leadership roles in IRGC missile production inside Iran. Accordingly, when the *Qiam* and *Fateh* missiles were tested, enhanced, and stockpiled inside Iran from 2007 through 2017, forward deployed DPRK personnel were vital to such missiles' construction, quality, and maintenance.

**4. Underground Missile Fortifications**

~~64.~~72. Fourth, throughout the 2000s and 2010s, North Korea constructed extensive underground ~~fortifications~~missile bases for the IRGC and Hizballah. Modeled after North Korean sites, these tunnels allowed the IRGC and Hizballah to clandestinely store missiles and rockets, protecting their arsenals from U.S. strikes while providing secure launch locations.

* * *

~~65. In sum, North Korea provided the essential hardware, know-how, and personnel that allowed the IRGC to target U.S. forces, without which the IRGC's missiles would have been less accurate, effective, and secure. *See infra* ¶¶ 85-91, 215-225. As Professors Bechtol and Celso concluded in 2018, the "overwhelming majority" of Iranian missiles tested or used to attack others "have had their genesis in North Korea." And as they summarized the decades-long pattern in 2025, "if you see it in North Korea today, you will see it in Iran tomorrow."~~

**C. ~~The IRGC And Hizballah Integrated North Korean Weapons~~Through The DPRK-IRGC-Hizballah Joint Arms Venture, The IRGC And Hizballah Integrated North Korean Missile Systems Into Their Attacks**

~~66.~~73. The joint weapons venture enabled the IRGC's terrorist attacks against Plaintiffs. From the 2000s through at least 2022, a cadre of notorious IRGC and Hizballah terrorists and/or

sponsors partnered with DPRK operatives to facilitate attacks targeting the United States and allies, including:, but not limited to: (1) Qasem Soleimani; (2) Esmail Qaani; (3) Amir Ali Hajizadeh; (4) Mohsen Rezai; (5) Mohsen Rafiqdoost; (6) Mohammed Forouzandeh; (7) Parviz Fattah; (8) Asghar Esma'ilpur; (9) Mohammad Gholami; and (10) Seid Mir Ahmad Nooshin.

a. IRGC Leadership: Qasem Soleimani (Qods Force Commander until 2020), Esmail Qaani (Qods Force Commander post-2020), Amir Ali Hajizadeh (IRGC Aerospace Force Commander), and Mohsen Rezai (former IRGC Commander-in-Chief).

b. Foundation for the Oppressed: Mohsen Rafiqdoost (IRGC Founder and self-identified "father of the Iranian missile program"), Mohammed Forouzandeh (former IRGC Commander-in-Chief), and Parviz Fattah (senior IRGC terrorist).

c. Missile & Research Officials: Asghar Esma'ilpur (Shahid Hemmat Industrial Group (SHIG) Department 7500), Mohammad Gholami (SHIG research official), and Seid Mir Ahmad Nooshin (key negotiator with the DPRK).

67. This collaboration persisted throughout the relevant period. In 2006 in Lebanon, for example, the IRGC and Hizballah made prolific use of missiles and rockets that relied on North KoreanDPRK assistance. A 2010 Congressional Research Service report noted that Israel's Mossad had concluded "'vital missile components' of Hezbollah missiles fired into Israel … came from North Korea." A federal court confirmed these facts in 2014. Based, based on "clear and convincing evidence," the Court found:

> North Korea worked in concert with Iran … to provide rocket and missile components to Hezbollah. ... These rocket and missile components were intended by North Korea and Hezbollah to be used and were in fact used by Hezbollah to carry out rocket and missile attacks against Israeli civilian targets. ... As a result of North Korea's provision of material support and resources, Hezbollah was able to implement and further goals shared by Hezbollah and North Korea.

68.74. *Kaplan*, 55 F. Supp. 3d at 193. The Court found, upon finding that the DPRK gave Hizballah "advanced weapons, expert advice and construction assistance in hiding these weapons in underground bunkers, and training in utilizing these weapons and bunkers to cause terrorist rocket attacks." *Id.* at 200.," *id.* at 200. And in 2010, Secretary of Defense Robert Gates

publicly confirmed that "North Korea continues to smuggle missiles and weapons" to "Iran" and "Hezbollah."

69. This collaboration has persisted. Secretary of Defense Robert Gates publicly confirmed in 2010 that, "North Korea continues to smuggle missiles and weapons" to "Iran" and "Hezbollah." Writing in 2025, Professors Bechtol and Celso observed that Hizballah had become "increasingly dependent on North Korean weapons and expertise" since the late 2000s.

**D. Office 39/Daesong Cigarette Revenues Provided Vital Financing For Attacks Enabled Through The North Korea-IRGC-Hizballah Joint WeaponsArms Venture**

70. Authoritative sources confirmed the tight connection between North Korea'sOffice 39's illicit cigarette trade, which Defendants turbocharged, and the DPRK's ability to support missile and rocket attacks.

71. In 2006, during a congressional hearing entitled *North Korea: Illicit Activity Funding* by the *Regime*, Peter Prahar, a senior official at State's Bureau for International NarcoticsIRGC and Law Enforcement Affairs, testified that "cigarette counterfeiting … may be the single most lucrative item in [North Korea's] portfolio" and is a "major source of income to the regime." Prahar also testified that this illicit revenue "contribute[s] to the financing of DPRK weapons development by a state that is listed as a state supporter of terrorism."

72.75. In 2007, Professor Bechtol explained that "North Korea's illicit economic activities," including "the manufacturing and distribution" of "cigarettes," "finance Kim Chong-il's military (including … missile programs)."its terrorist proxies.

73.76. During the roll-out of enhanced sanctions targeting Office 39/Daesong in August 2010, *supra* ¶ 36, Treasury Under Secretary Stuart Levey warned that North Korea's "belligerent behavior"—including "its missile launches" and proliferation of "missiles" to "Iran"—was

"facilitated by a lifeline of cash generated through a range of illicit activities" generated by "Office 39," including "selling counterfeit cigarettes."

~~74. During a House hearing in 2013, Representative Eliot Engel warned that the "North Korean regime's criminal conduct" included "weapons trafficking, the sale of … missile technology" to "Iran," and "the counterfeiting of … cigarettes"; and that "[p]roceeds from these criminal activities … [a]re also invested in North Korea's military programs."~~

~~75.~~77. This connection between Daesong cigarettes and Office 39 weapons was by design: the same entity—Office 39/Daesong—was responsible for both endeavors. Office 39 served as the central node for operating North Korea's foreign-currency-earning activities. As ~~a~~ 2004 DoD ~~analysis~~analyses explained, Office 39 was "the nerve center of Pyongyang's legal and illegal ventures" and oversaw the "apparatus for securing foreign currency for Kim Chong-il's use."

~~76. Office 39 operated as a "network of networks." As Dr. Sheena Chestnut explained in 2007: "Operating through front companies and illicit affiliates, Bureau 39 is one of several Central Committee offices that procure luxury items for party and military elites, obtain technology and components for arms programs, and pursue illicit activity to fund the first two tasks. In network theory terms, Bureau 39 is the core node of the North Korean–directed wheel network." In 2025, Dr. Bechtol reported that "all of North Korea's . . . illicit activities, including military proliferation," were "ultimately controlled by the infamous Office 39."~~

~~77. Office 39 was controlled directly by the North Korean leadership. As DPRK scholars Daniel Tudor and James Pearson reported in 2015, Office 39 was established by Kim Jong-Il himself to serve as the heart of the DPRK's "Soprano economy." Accordingly, as Dr. Bechtol observed in 2007, Office 39 has always "been under the supervision and guidance of the~~

'Dear Leader.'" Indeed, according to Dr. Bechtol and Celso's analysis in 2025, Office 39's mission is simple: "to generate funds for the regime." Defectors report that Office 39 "monopolised" any profitable sector, accounting for "30 to 40 per cent of the total economy," with profits ending up "in the coffers of the Kim family regime," according to a report published by the Australian Broadcasting Corporation in 2018. As DPRK scholar Paul Rexton Kan observed in 2017, Office 39 is often called "Kim's Cashbox."

78. Office 39 utilized a network of front companies known as the **Daesong** conglomerate (or Daesong group) to conduct its operations. For example, according to an analysis by Kan and others published by the U.S. Army in 2010, "Office #39 and all of its subordinate organizations have become known within North Korea as the Daesung Conglomerate." The *Wall Street Journal* reported in 2010 that "Office 39 also runs legal businesses under a state-owned shell corporation known as the Daesong Group."

79. Because Daesong was a component of Office 39, there was a direct line of control from the Kim regime to Daesong front companies. As DoD noted in an analysis published in 2004, "Bureau 39 personnel" were "part of an elite with information, money, and a pivotal role in the Kim Jong-il regime." In the same DoD-published analysis in 2004, a former Office 39 operative confirmed: "if it goes to Bureau 39, it is the same as sending it to Kim Jong-il."

80. Through Daesong, Office 39 directed North Korea's cigarette manufacturing and smuggling. A 2010 U.S. Army report noted that Office 39 "directs illicit activities" including "the manufacture and distribution of counterfeit cigarettes." A 2009 investigative report by *Vanity Fair* similarly warned that Office 39 was "at the center" of the trade, with its elite headquarters staff supervising "large-scale facilities such as … cigarette factories."

81. BAT's cigarette joint venture in North Korea was part of this Daesong group: the joint venture company was named "**Daesong-BAT**." *See infra* Part III(B). Profits from this joint venture flowed to Office 39.

82. From there, these profits financed North Korea's missile development and the North Korea-IRGC-Hizballah missile joint venture. A 2010 U.S. Army analysis explained that, "[t]hrough its offices in Pyongyang, [Office 39] operates through government and KWP-run front companies such as Daesung. … This Office, in turn, answers directly to Kim Jong-il," who "has maintained direct supervision over Office #39." According to the Army, Kim "task[ed] it with the mission of earning foreign currency to fund regime maintenance," including "providing funds for Kim Jong-il's personal use; and providing for luxury goods that Kim Jong-il uses to reward the regime's military … as well as the needs of the regime security agencies." But, as the Army explained, "[j]ust as importantly, … for … U.S. policy on North Korea, ***at least a portion of the foreign currency funds that Office #39 generates for Kim Jong-il go to investing in North Korea's … missile programs***."

83. The same U.S. Army analysis featured a flow-chart confirming that "Office #39" profits generated funds for Kim as Supreme Leader.




84. In 2006, the Congressional Research Service reported that Office 39 uses its profits to "procure overseas components for North Korea's weapons of mass destruction

programs." Office 39 thus operated as a "vast criminal enterprise" set up to "finance [North Korea's] nuclear-weapons and ballistic-missile programs," as *Vanity Fair* reported in 2009.

85. Office 39 also transmitted the proceeds of North Korea's weapons sales to Iran. As the *Vancouver Sun* reported in 2006, "Room 39 … is also the laundry for the proceeds of drug trafficking and the sale of weapons, including missiles … to countries such as Iran." Professor Bechtol explained in 2023 that "'[t]he money coming from the sale of knowledge or products to Iran is managed by 'Office 39' …. This money goes, among other things, to military projects and nuclear development.'"

86. Office 39 was responsible for "all crime-for-profit activity" in North Korea and its coordination of this system was "exercised at the top," as the Congressional Research Service reported in 2006. An analysis published by the U.S. Army in 2010 concluded that the "crimes organized by Office #39" aimed to "prop up" North Korea's "armed forces and to fund its military programs." In this way, North Korea operated like "criminally financed insurgent groups like the Revolutionary Armed Forces of Colombia (FARC), or the Taliban." As DPRK scholar Paul Rexton Kan explained in 2017, profits generated by Office 39 have given "the regime enough economic vitality to pursue nuclear weapons and ballistic programs." Indeed, according to Kan, Office 39 "financ[es] the weapons' programs of the regime," and "[t]his nexus between illicit finances and sophisticated weapons programs appears to have become tighter under the leadership of Kim Jong Un."

78. From 2007 through 2017, Daesong's cigarette sales comprised Office 39's most important foreign currency-earning activity. By 2006, Office 39's revenue from drugs, counterfeit pharmaceuticals, counterfeit currency, and species trading had all declined substantially. Office 39 needed Daesong cigarette sales to fill this missile financing gap.

Moreover, Daesong cigarettes were far better for Office 39's support of the joint missile venture than these other sources. Among other reasons, cigarettes offer the largest market in terms of population and geographic reach, the least amount of law enforcement interest, and unique value as cash equivalents that Office 39, the RGB, or other entities in the DPRK missile proliferation network used to pay for goods or labor.

79. Throughout BAT's scheme, a mine run of other sources confirmed that DPRK cigarette activities (always led by Office 39) played a key role financing missile threats. In 2006, for example, Peter Prahar, a senior State official, testified to Congress that "cigarette counterfeiting" "may be the single most lucrative item in [North Korea's] portfolio" and is a "major source of income to the regime." Prahar also testified that such cigarette-related revenue "could contribute to the financing of DPRK weapons development by a state that is listed as a state supporter of terrorism." Similar reports were legion throughout the relevant period.

80. While most of the funds Defendants generated flowed to support missile collaboration between the DPRK and IRGC, some funds were also likely used for regime maintenance, luxury goods, and financing DPRK terrorist arms, *e.g.*, the RGB. Such expenditure did not diminish the potency of Defendants' aid to the IRGC's missile attacks herein for at least three reasons. First, missiles were the regime's number one budget priority during the relevant period and, within that category, the missile types that linked to the *Qiam* and *Fateh* were prioritized. Second, Office 39's non-missile expenses were, collectively, a fraction of the expense of the DPRK's missile collaboration with the IRGC, and such missile expenses also dwarfed the expenses spent on the DPRK's Navy. Third, Office 39's non-missile expenditures themselves augmented the shared DPRK-IRGC missile threat because the expenditures described above comprised bounty awards and prizes, as well as luxury housing and cars, that Office 39

supplied to key DPRK missile scientists, technicians, and managers, as well as key RGB leaders and operatives.

### E. The North Korea-IRGC-Hizballah Joint WeaponsArms Venture Produced The *Qiam*- And *Fateh*-Class Missiles Used To Attack And Harm Plaintiffs

87.81. The DPRK regime reinvested Office 39's illicit tobacco profits did not sit idle. The DPRK regime reinvested these illicit proceeds directly into the North KoreaDPRK-IRGC-Hizballah joint weaponsarms venture, funding the development ofand stockpiling of the *Qiam* and *Fateh* missiles and related technology used to harm Plaintiffs.

88.82. In July 2020, the U.S. Army Training and Doctrine Command published an intelligence analysis confirmingfinding that the specific missiles the IRGC fired in its"[t]he attack, code named Operation 'Martyr Soleimani,'" *i.e.*, the IRGC's January 8, 2020 Attack against Plaintiffs, had been upgraded with DPRK aid. According to that analysis, the attack revealed the IRGC's capability to fire missiles with "better precision," achieving an accuracy of within 12 meters compared to previous estimates of 250 meters. These missiles, equipped with satellite navigation and maneuverable reentry vehicles ("MaRV"), showed how the IRGC "benefit[ted] extensively from foreign procurement" and had "leverage[sd] countries like North Korea . . . ." to "extend missile variety and range, and add new generations of ballistic missiles into their force."

89.83. The IRGC achieved this improved accuracy by retrofitting older models with guidance systems to "vastly improve accuracy," as the *Washington Post* reported in 2020. ThisThe improved models included the *Qiam* missile and theadvanced *Fateh-110*, a model provided to Hizballah, series missiles, which were refitted to "zero in on highly specific targets." According to an analysis in 2020 byAs scholar Behnam Taleblu, of the Foundation for Defense of Democracies found in 2020, these missiles, components for which are supplied by Iran

Electronics Industries ("IEI"), reflected "more than a decade of investment" and North KoreanDPRK collaboration.

90. *Fateh* missiles are relatively light-weight, solid-fuel missiles. As *Military Watch* reported in 2018, their solid-fuel design means they can "be stored fully fuelled" and thus have a reduced "required launch time," which makes them "highly practical" and "particularly favoured" by the IRGC and Hizballah.

91.84. North Korea, led by Office 39, played a vital role in developing those*Qiam* and *Fateh* missiles for the IRGC. As *Military Watch* reported in 2018 during BAT's scheme. In 2010, for example, the *Associated Press* reported the Iranian defense minister's announcement that IRGC "forces have test-fired a new liquid-fueled missile with advanced guidance systems for ground targets" called the "*Qiam*-1." In 2016, likewise, the IRGC received North Korean assistance tested an upgraded version of the *Fateh* missile, a test that Mr. Taleblu testified to Congress in 2017 was "importan[t]" because it offered "Proof of Iran's continued upgrading of the *Fateh*-110 class" of missiles to include "a submunitions warhead." The IRGC also received DPRK aid to develop the *Fateh*, including upgrades like a "new composite body" and "a superior fuel composite." The National Council of Resistance of Iran similarly reported in 2017 that the *Fateh-110* was "modeled after North Korean" missiles. This aid , which allowed the IRGC to unveil the *Fateh-313*, which missile that offered improved precision sufficient to target U.S. bases. in Iraq.

92.85. *Qiam* missiles arefired against Plaintiffs were also created, tested, and stockpiled by the product of deep DPRK-IRGC collaboration. Based on the North Korean Scud-C, the *Qiam* was "likely enhanced with North Korean assistance," according to Dr. Bechtol's 2020 analysis-Hizballah joint venture during BAT's scheme. First tested in 2010—at the height of

BAT's scheme—the *Qiam* was designed specifically to strike U.S. military bases in the Middle East., including Iraq. Between 2010 and 2020, North Korea helped the IRGC upgrade the *Qiam*. Among other ways, they added a MaRV, drastically improving its accuracy and lethality.

93. Between 2010 and 2020, North Korea helped the IRGC upgrade the *Qiam* to add a MaRV, drastically improving its accuracy.

86. From 2007 through 2017, North Korea provided lethal aid to the IRGC's *Qiam* and *Fateh* missile threat that was unique from all other potential sources and solved critical procurement and technical chokepoints that differentiated DPRK aid from all other nations. While the Russian and Chinese governments provided some aid to Iran's surface-to-air missile and cruise missile programs during the relevant period, such governments provided only marginal, if any, assistance to the *Qiam* and *Fateh* missiles from 2007 to 2017. Among other reasons, Russian and Chinese assistance was limited during this period because of U.S. diplomatic deals and pressure with both countries. Moreover, only North Korea had a missile joint venture with the IRGC, and only North Korea had hundreds of on-the-ground assets in Iran forward deployed and co-located at IRGC missile facilities.

## III. DEFENDANTS SECRETLY PARTNERED WITH NORTH KOREAN TERRORIST FRONTS FOR NEARLY TWO DECADES

94.87. For decades, while the United States and the international community worked to prevent North Korea's weaponsDPRK arms proliferation—issuing warnings and escalating economic sanctions—BAT undermined those efforts by deliberately operating a cigarette-manufacturing joint venture with DPRK frontsterrorist fronts Office 39/Daesong, KKBC, Tanchon, FTB, Green Pine, and KOMID.

95.88. BAT's guilty plea and settlement agreements in 2023 confirmed what the United States and United Nations had warned for decades: cigarette smuggling directly finances DPRK

missile proliferation to the IRGC and Hizballah. Despite these warnings, BAT operated its scheme with North Korea for nearly two decades. BAT's scheme began and evolved against the backdrop of increasingly urgent warnings from the United States and U.N. about the direct link between cigarette smuggling and DPRK missile proliferation to the IRGC and Hizballah. Despite these warnings, BAT operated its scheme with North Korea for nearly two decades.

### A. Defendants Sought Entry Into North Korea In The 1990s Despite Public Warnings Of The Country's Terrorist Ties

96.89. BAT's illicit cigarette joint venture traces back to the mid-1990s, when the company sought to capture the untapped North Korean market. Internal documents published online confirm that BAT viewed North Korea as a critical opportunity to hook new smokers, despite simultaneously recognizing the regime as a hotbed for illicit cigarette counterfeiting and weapons proliferationarms sales.

97.90. In June 1994, BAT executive Patrick O'Keeffe laid out the strategy in an internal memorandum. He proposed exporting a "trial order" of 4 million State Express cigarettes to "a North Korean Company" not merely for revenue, but to establish "trademark use" that would enable BAT's legal department to "apply pressure against the counterfeiters currently manufacturing and exporting from North Korea." O'Keeffe noted that thetouted that opportunity "would provide us with a reason to visit North Korea," even while acknowledging that doing business therepartnering with a DPRK firm was "obviously sensitive given the current political issues on Nuclear bombs existing between North Korea and the USA."

98.91. O'Keeffe's memo coincided with the U.S. announcement in June 1994 seeking a mandatory arms embargo against North Korea due to its nuclear proliferation. President Clinton publicly warned that North Korea "deal[s] with a lot of rogue states that support terrorism," and U.S. officials identified Iran as "the most likely customer for North Korean nuclear materials."

~~99.~~92. Undeterred, BAT accelerated its plans. ~~An~~In October 1994, the United States and North Korea engaged in a diplomatic crisis over weapons of mass destruction. Simultaneously, an October 1994 BAT memorandum highlighted that it was "actively progressing long term business opportunities" in North Korea, noting that "a new route for direct shipments to Pyongyang has started." By November 1994, BAT's smuggling partner, Singapura United Trading Ltd. ("SUTL"), confirmed in writing to BAT it had "identified a customer for 555 [brand cigarettes] for North Korea" and that BAT employees would visit Pyongyang the following ~~February.~~year. That very same month, President Clinton issued Executive Order 12938 finding that the proliferation of nuclear, biological, and chemical weapons and of the means of delivering such weapons constitutes an unusual and extraordinary threat to the national security of the United States. 59 Fed. Reg. 58,099.

~~100.~~93. BAT persisted. By March 1996, senior BAT executives were negotiating directly with high-ranking ~~North Korean~~DPRK officials~~.~~ known for their close ties to the IRGC. Consistent with the ~~regime's~~DPRK's practice of using regime officials to manage lucrative joint ventures, BAT worked closely with Choe Tae-Bok, a notorious regime insider and Secretary of the Workers' Party of Korea Central Committee. In a March 1996 telex to BAT, Choe informed ~~Defendants~~BAT that he had "spent alot of time to discuss market-occupation for [BAT's] 555 ciga[rette] . . . and, at last, succeeded to get authorization from ~~[the DPRK]~~our government." He emphasized BAT's exclusivity, stating the company "can not deal with other Korean compan[ies]," and referenced an upcoming visit by a BAT delegation to Pyongyang. At the time of this correspondence, Choe was widely known as the spokesman who announced ~~North Korea's~~the DPRK's exit from the Nuclear Nonproliferation Treaty in 1993, and as a vocal public

supporter of Iran'sthe IRGC and its anti-American stance. BAT's interactions with Choe further alerted BAT that its counterparty was an avowed IRGC supporter.

101.94. At the same time, BAT's internal monitoring confirmed that the entities BAT sought to partner with were involved in illicit activities. In June 1996, BAT's in-house technology department's testers identified counterfeit cigarettes manufactured by Daesong—the Office 39-managed conglomerate that would later become BAT's, BAT's future joint venture partner.

102.95. On September 23, 1996, Congress passed the Defense Against Weapons of Mass Destruction Act, Pub. L. 104–-201, 110 Stat. 2715, identifying North Korea and Iran as hostile states possessing WMDs, and warning that they could transfer such weaponsWMDs to terrorist movementsterrorists. Two months later, BAT's subsidiary, Brown & Williamson, presented a plan to BAT's managing board stating that despite high tensions, "we will position ourselves to capitalize on any opportunities."

103. Throughout 1997, according to a contemporaneous BAT document, Defendants continued to "monitor the entities involved in the North Korean counterfeit operation," specifically fearing that counterfeiters were procuring materials to counterfeit BAT's brands.

104. Around the same time, in 1998, the CIA publicly warned that the DPRK was the "world's biggest missile exporter," selling missiles to rogue regimes in the Middle East.

105.96. In November 1999, a House North Korea Advisory Group report alerted BAT about the risk that the DPRK "continues to harbor terrorists" and its partnership with Daesong would result in DPRK-backed, Iranian sponsoredIRGC-backed missile attacks targeting AmericanU.S. servicemembers in the Middle East. Among other things, the House North Korea Advisory Group publicly reported: that could involve Hizballah:

~~d.~~a. "North Korea ranks … as one of the ***greatest missile threats*** in the world due to: the progress made over the past five years in improving its missile capabilities; [and] its record as a leading proliferator of ballistic missiles and missile technology."

~~e.~~ North Korea had "***produced, deployed and exported missiles to Iran***," and in doing so, "North Korea undermined regional stability in the Middle East" and its "proliferation activities pose an increasing threat to American and allied interests globally," including "in the Middle East."

~~f. North Korea "continues to harbor terrorists."~~

~~g.~~b. After receiving DPRK weapons, Iran could, in turn, "export missiles to other countries or even subnational groups"—*i.e.*, ~~its~~ terrorist proxies~~, such as~~ like Hizballah. Thus, ~~North Korea's~~DPRK missile proliferation ~~of missiles~~ to Iran ~~and its terrorist allies~~ "created an immediate, serious and growing threat to U.S. forces, interests, and allies ~~…~~" in "the Middle East," and "***increase[d] the chance that the United States and its allies could face missile attacks***."

~~h.~~c. "Press reports citing North Korean defectors indicate that North Korea created an office specifically to bring in foreign currency. This so-called ***'Bureau No. 39'*** [Office 39/Daesong] functions under the ruling Korean Worker's Party, which is headed by ~~North Korean Leader~~… Kim Jong Il. The office is in charge of … criminal activity including: smuggling [and] counterfeiting … The ***money earned is used to … finance military activity – particularly technology and electronic purchases for intelligence and military purposes***."

The House North Korea Advisory Report was widely republished by the media ~~outlets~~ in ~~real time~~November 1999, including, but not limited to, reports published that month by the *Associated Press*, *United Press International*, *Philadelphia Inquirer*, ~~*Cleveland Plain Dealer, St. Louis Post Dispatch, Kansas City Star,*~~ *Boston Globe*, and *Sinocast*, ~~and~~among others.

~~106.~~97. Unfazed, BAT pushed ahead. The same month the House North Korea Advisory Report warned that Daesong enabled the IRGC's and Hizballah's missile threat against American servicemembers in the Middle East, BAT published an internal order that business "activity in North Korea should be increased."

~~107.~~ By 2000, BAT was actively managing the fallout from accusations that it ~~facilitated~~enabled smuggling~~. A handwritten note from that year documented BAT's "cover-up themes," noting that sales through SUTL didn't "nec. [necessarily] imply knowledge of~~

smuggling" and characterizing allegations of BAT-sponsored smuggling as "well founded but lacking context."

108.98. In in Asia. On July 31, 2000, amidst media reports that BAT'sU.S.-related cigarette smuggling profits were allegedly "used to fund the terrorist group Hizbullah," "—and a backdrop of a deluge of similar media and U.S. government warnings on or before that date, including at least a dozen memorialized in a BAT internal media monitoring email on July 25, 2000, *see infra* ¶ 230—BAT Chairman Martin Broughton blithely dismissed the concernsbroader concern that tobacco firms needed to exercise corporate responsibility, telling *Newsweek*: "***I don't think it's our responsibility to act as a policeman.***" Months later, according to BAT's meeting minutes, its board discussed "potential contract manufacture in North Korea" and," which it ultimately approved the joint venture with the regime.

### B. Defendants Formed A Joint Venture With A North Korean Terrorist Arm Office 39 Through An Office 39 Front Called Daesong, Operated By Office 39

109.99. From 2001 through 2017, the United States, the United Nations,U.N., and the global media issuedpublished high-profile warnings that North Korea was using its revenue to finance missile and rocket proliferation to the IRGC and Hizballah. North Korea's own public acts—including nuclear tests and arms exports to terrorists—corroborated these warningsBAT knew of these facts and the sanctions designed to address them. Rather than cut ties with Office 39, Defendants responded by financing hundreds of millions of dollars in Daesong cigarette manufacturing that secretly leveraged BAT's industry-leading expertise, components, and networks. For at least a decade, BAT operated in secret partnership with Office 39, using deceptive fronts and DPRK banks notoriously connected to missile proliferation to the IRGC that targeted Americans.

110. BAT knew of these facts and the sanctions designed to address them. Rather than cut ties with North Korea, Defendants responded by conducting hundreds of millions of dollars in clandestine cigarette manufacturing. For at least a decade, BAT operated in secret partnership with Office 39 and the RGB, using deceptive front companies and DPRK banks notoriously connected to the weapons proliferation that targeted Americans.

111.100. In 2001, BAT's wholly owned Singapore subsidiary, **BAT Singapore**BATMS, commenced a joint venture cigarette manufacturing business in Pyongyang with Korea Sogyong Chonyonmul Trading Corporation (identified in DOJ documents as North Korean Tobacco Company or "NKTC"). The joint venture was named **Daesong-BAT**.") for a term of 20 years, which was named Daesong-BAT. BATMS held a 60% stake in Daesong-BAT, supplying the machinery, tobacco, and technical management. The remaining 40% was held by NKTC, an Office 39-controlled firm.

112. BAT Singapore held a 60% stake in the joint venture, supplying the machinery, tobacco, and technical management. The remaining 40% was held by NKTC, a state-owned entity controlled by Office 39.

113.101. As BAT brought this ventureDaesong-BAT online, the United States designated North Korea's proliferation network as a threat to America, citing its support for Iran. On January 3017, 2001, the United States sanctioned Changgwang Sinyong Corporation (a/k/a KOMID) for violating the Iran Nonproliferation Act by exporting missile technology to Iran. The BBC reported alerted BAT to the sanction in a piecereport titled "US Imposes Sanctions On North Korean Firm Over Ties With Iran." Moreover, as *Reuters* reported in 2001, the "Bush administration" warned that "it had imposed sanctions against" the "North Korean company, Changgwang Sinyong Corp. [KOMID]" for "helping Iran in violation of international pacts

aimed at curbing the spread of deadly weapons" from North Korea "to Iran" that were "designed to head off the spread of missiles" to "Iran" while "Iran" was "the world's most active state sponsor of terrorism."

~~114.~~102. By January 2002, President Bush declared North Korea and Iran part of an "axis of evil" warning that "North Korea is a regime arming with missiles" while Iran, in turn, "aggressively pursues these [North Korean] weapons and exports terror," a pronouncement that received global media coverage that BAT monitored. According to a February 2002 *Reuters* report, for example, "Bush aides say North Korea is ~~pursuing biological arms and~~… selling ~~ballistic~~[] missile technology to Iran."

~~115.~~103. Despite these warnings, BAT continued operations in North Korea as the United States tightened sanctions on the very network BAT was funding.

~~116.~~104. On December 1, 2004, the United States imposed new sanctions on KOMID for supplying missile goods to the IRGC, which State announced with a press release entitled "U.S. Penalizes Chinese and North Korean Firms for Missile Aid to Iran." BAT knew of these designations through its monitoring of U.S. sanctions announcements and international press reports, including those by the *Associated Press*, *Voice of America*, and *Fox News*.

~~117.~~105. On June 28, 2005, President Bush issued Executive Order 13382, which designated key nodes in the North Korea–Iran arms network, including KOMID (the DPRK's primary arms dealer), Tanchon (its financial arm), and IRGC-affiliated armorers Shahid Hemmat Industrial Group ("SHIG") and Shahid Bakeri Industrial Group ("SBIG"). 70 Fed. Reg. 38,567. As Treasury later ~~observed~~noted in 2007, E.O. 13382 "put[] the international community on notice about the threat" these ~~North Korean~~DPRK and Iranian firms "pose to global security as a result of their activities."

118.106. On September 20, 2005, Treasury designated Banco Delta Asia ("BDA") as a Primary Money Laundering Concern under the USA PATRIOT Act.pursuant to its authorities "to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism" under the USA PATRIOT Act. 70 Fed. Reg. 55,214. Treasury found that BDA was a "willing pawn" for North Korean front companies engaged in "smuggling counterfeit tobacco products." 70 Fed. Reg. 55,214.*Id.* This action directly affected BAT, which had funds frozen at BDA. Recognizing the threat, BAT and NKTC executives met in October 2005 to discuss how U.S. sanctions targeting the DPRK-Iran arms trade would jeopardize their ability to repatriate profits from the cigarette joint venture. The action against BDA also alerted Defendants that helping its DPRK counterparties acquire cigarette-related income foreseeably financed DPRK missile collaboration with Iran. In 2006, for example, the *Vancouver Sun* reported that the U.S. government's "allegation" against "Banco Delta Asia" was that it was "a major portal through which Room 39"—*i.e.*, BAT partner Daesong/Office 39—laundered "the proceeds" of "the sale of weapons, including missiles" to "countries such as Iran"; on information and belief, the U.S. conveyed the same message directly to BAT. In 2006, likewise, senior Treasury official Stuart Levey testified before Congress: "We also know that North Korean entities engaged in WMD proliferation, including Tanchon Bank - the primary financial facilitator of North Korea's ballistic missile program - held accounts at BDA" and the "regulatory action against a bank facilitating a range of North Korean illicit activities has dealt a blow to Pyongyang's ability to engage in illicit conduct and obtain financial services to facilitate that conduct" thereby "frustrat[ing] North Korea's efforts to conduct proliferation-related transactions."

~~119.~~107. BAT's then-secret partnership with Office 39/Daesong soon became a scandal. On October 17, 2005, ~~*The*~~the *Guardian* revealed that BAT had "secretly been operating a factory in North Korea" via a joint venture with Office 39. ~~In response to concerns about~~Regarding "North Korea's human rights record," ~~a~~ BAT "~~company spokeswoman~~ told the *Guardian*: 'It is not for us to interfere with the way governments run countries'" and ~~promised~~vowed that ~~"BAT~~ it "could 'lead by example' and assist the [DPRK]'s development." ~~Another BAT spokesperson responded more candidly: "'Business with North Korea?' … 'Where there are no human rights?'"~~

~~120.~~108. Similar concerns soon arose ~~for~~about BAT's role in Office 39's missile transfers to DPRK allies like the IRGC. On February 8, 2006, *Asia Times* published a detailed exposé titled "Smoke Signals from BAT's North Korea Venture," connecting ~~BAT's~~BAT partner~~,~~ NKTC~~,~~ (*i.e.*, Daesong) to Office 39 and WMD proliferation. *Asia Times* reported that Daesong/NKTC shared contact information with entities associated with North Korean weapons programs and warned BAT that the "the company name Daesong-BAT merits attention" because "Japan and other governments have ***prominently featured Daesong for its ties to missile … proliferation***" and the "Daesong" name in the joint venture linked it to a known Office 39 front that had a "pervasive proliferation record" and "links" to a KOMID firm that had "been repeatedly sanctioned by the United States for its ***missile-proliferation activities and sales to Iran***." Accordingly, the same *Asia Times* exposé explicitly cautioned BAT that "the black-market trade of cigarettes could have a tangible impact on North Korea's ~~***[arms]***~~ financing~~." *Asia Times*~~" of missile cooperation between Office 39 and the IRGC and, accordingly, cautioned BAT that such continued economic partnership with Daesong risked "***aiding and abetting illicit North Korean financing that is alleged to fuel Kim Jong-il's slush fund and WMD programs.***"

The same *Asia Times* report further ~~identified that~~alerted BAT about the ~~"Daesong" name~~risks inherent in ~~the~~its joint venture ~~linked it~~with DPRK entities connected to ~~the Daesong General Trading Corp., a known Office 39 front tied to missile~~firms and ~~rocket proliferation.~~banks associated with WMD procurement and illicit financial networks, including via shared contacts.

~~121.~~109. ~~On~~Four months later, on June 13, 2006, Treasury, acting under E.O. 13382, publicly designated multiple companies for supplying missile-related and dual-use components to IRGC missile and rocket programs, expressly identified Iranian missile systems including *Fateh*-class missiles, and tied those programs to North Korean-designed arms produced under license. Treasury further warned that such conduct—often carried out through third-country intermediaries—constituted sanctionable support for missile and rocket proliferation networks.

~~122.~~110. In July 2006, the DPRK launched multiple missiles. Congress responded with the North Korea Nonproliferation Act of 2006, Pub. L. 109-353, 120 Stat. 2015 (Oct. 13, 2006), aimed at penalizing North Korea, Iran, and Syria for their arms cooperation.

~~123.~~111. On October 9, 2006, North Korea tested a nuclear weapon. The U.N. Security Council responded with Resolution 1718, which, among other measures, banned the export of "luxury goods" to North Korea. This ban was designed to squeeze Kim Jong-Il, Office 39, and military leaders—all of whom used imported cigarettes to fund ~~the DPRK's~~DPRK terrorist activities.

112. On January 9, 2007, Treasury designated Bank Sepah, describing it as "the financial linchpin" of "Iran's missile procurement network" and finding that it had "actively assisted Iran's pursuit of missiles capable of carrying weapons of mass destruction." Treasury explained that Bank Sepah provided financial support and services to Iran's Aerospace Industries

Organization ("AIO"), Shahid Hemmat Industries Group ("SHIG"), and Shahid Bakeri Industries Group. Treasury further found that AIO had directed Bank Sepah to "transfer well over half of a million dollars to a North Korean firm associated with Komid, a North Korean entity designated for providing Iran with missile technology." Treasury also found that "SHIG is responsible for Iran's ballistic missile program, most notably the Shahab series of medium range ballistic missiles based on the North Korean-designed No Dong missile," and that "SHIG has received help from China and North Korea in the development of this missile." Notably, the *Qiam* developed during the 2010s is part of the Shahab series—but with dramatically upgraded components that revolutionized the *Qiam*'s accuracy and lethality. Accordingly, Treasury's warning related to *Qiam* missiles that the IRGC used against Plaintiffs.

124.113. By early 2007, the U.S. Department of Commerce implemented strict export controls barring the export of luxury goods to North Korea, including tobacco. 72 Fed. Reg. 3722. The United States intended those controls to deprive North KoreanDPRK officials of the capacity to continue their missile belligerencethreats. BAT was not deterred by these sanctions. It recognized that they would create scarcity that fueled the black market. Consistent with its internal findings that "consumer demand for international brands stimulates smuggling and counterfeiting" whenever legal supply is constrained, BAT embraced illicit networks to keep its products flowing to the regime.

125.114. As every other Western multinationals multinational exited the North Korean market in response to these sanctions and the nuclear test in 2006, BAT remained. As the BBC reported in 2006, "no major Western multinationals beyond British American Tobacco - which has a tobacco plant in the country - operate in North Korea." From 20072006 through 2017, BAT was the ***only Western multinational firm*** that consciously chose to defy U.S.

antiterrorism sanctions by operating a joint venture in North Korea with DPRK terrorist fronts.front Daesong. Plaintiffs are not aware of any other Western firm that partnered with Office 39, or any other DPRK entity, through Daesong from 2007 through 2017 whileaside from BAT did so. Simply put, BAT was an extreme outlier amongst multinational firms.

### C. Defendants Lied About Exiting The Joint Venture In 2007

#### 1. BAT Engaged in a Sham Divestment of its North Korean Interests

126.115. Confronted with the rising tide of sanctions and international pressure on North Korea, BAT began looking for ways to publicly dissociate itself from Daesong-BAT, while surreptitiously continuing its illegal joint venture. BAT determined that the best way to facilitate the appearance of an exit would be to sell its stake in Daesong-BAT to a "friendly" third party that would serve as a front for BAT to continue partnering with the DPRK.

127.116. BAT chose SUTL, a Singapore-based cigarette distributor, as this sham third party. BAT had a longstanding business relationship with SUTL, in large part related to BAT's extensive cigarette smuggling operations in Asia. (Defendants' settlements with the DOJ label SUTL as "Company 1.")

128.117. In April 2007, BAT's Standing Committee—including BAT's Chief Executive Officer, Chief Operating Officer, and Financial Director—approved a series of corporate transactions designed to create the appearance of a complete BAT divestment from North Korea while secretly retaining *de facto* control over Daesong-BAT. BAT OFAC Settlement at 2; OFAC Enforcement Release at 1. The plan was reviewed and approved by BAT's Central Finance Office and multiple BAT regional headquarters. BAT OFAC Settlement at 3.

129.118. On June 8, 2007, BAT executed the public face of this deception. The company issued a press statement announcing that it was exiting its North Korea business by

selling its stake in Daesong-BAT to SUTL. This announcement was materially false, made with the purpose and effect of deceiving the outside world, including the United States and U.S. financial institutions, into believing that BAT was done doing business with North Korea. BAT Information ¶¶ 35-37Statement of Offense ¶¶ 32-34; *see also* BAT, *British American Tobacco to Sell Its Share in Democratic People's Republic of Korea Business* (June 8, 2007) ("British American Tobacco has agreed in principle to sell its share in Taesong BAT, a joint venture cigarette business in Pyongyang with the Korea Sogyong Chonyonmul Trading Corporation, a state-owned company. The prospective purchaser is a company within the SUTL group of companies, a Singapore-based trading group that invests in various business ventures in South East Asia."). [*i.e.*, Daesong-BAT]").

130. Within days of Defendants' sham press release, BAT reached into the United States to conceal its scheme in response to media scrutiny. On June 18, 2007, *Forbes* reported on BAT's ongoing North Korea business, highlightingwarning that:

131.119. British American Tobacco will peddle cigarettes nearly anywhere on the planet, North Korea included. For the last six years it's churned out millions of them from . . . Pyongyang . . . . Much even though "[m]uch of the revenue from [BAT's] joint venture with a [DPRK] outfit lands in the coffers of one of the world's most . . . vile regimes. But Paul Adams, [BAT]'s chief executive, doesn't mind. "Why shouldn't we sell there?" he shrugs . . . . "We will sell where it's legal, where we can operate to our own international standards, and where we can make money."," BAT's then-CEO, Paul Adams, "doesn't mind." BAT then sent a false statement to persons at *Forbes* known to be in the United States that its decision to quit Daesong was "for business reasons and to manage future business risk." This caused *Forbes* to publish a

retraction on July 23, 2007, thereby disseminating BAT's lies to U.S. audiences, including shareholders and regulators, helping conceal the scheme.

132. But on July 23, 2007, *Forbes* published a follow-up retracting the story based on a false statement sent by BAT, through a spokesman, to *Forbes*, which BAT sent to persons whom it knew to be in the United States. BAT lied to *Forbes*, claiming its decision to "quit[] North Korea" was "not made as a result of political pressure, but 'for business reasons and to manage future business risk.'" By tricking *Forbes* into publishing this retraction, BAT caused its lies to be widely disseminated to U.S. audiences, including shareholders and regulators.

133.120. The ostensible transfer was consummated in August 2007. SUTL purchased BAT DPRK—a Singapore-incorporated holding company, which BAT indirectly held through a Dutch subsidiary—for one (1) Euro—, far less than the market value of the business. BAT DPRK had acquired BATMS's stake in the Daesong-BAT joint venture in 2004 and continued to operate it under those same terms. OFAC Settlement at 3. At the same time, a BAT subsidiary acquired a call option to repurchase BAT DPRK for one Euro, which BAT planned to exercise if the political climate improved. BAT SingaporeBATMS agreed to continue supplying Daesong-BAT with cigarette ingredients exactly as it had prior to the "divestment." *See* Statement of Offense ¶¶ 37, 39, 41. Under BAT's revised JVjoint venture with Office 39, shares in Daesong-BAT were reallocated: BAT DPRK (now nominally owned by SUTL) would own 50% (down from 60%), and NKTC would hold 50% (up from 40%). *See* Statement of Offense*id.* ¶ 37.

134.121. As the atypical terms suggest, this was not a routine business deal but a BAT sham designed to evade U.S. sanctions. Information ¶ 46.Statement of Offense ¶¶ 38-39, 45-47. In reality, Defendants retained effective control over Daesong-BAT. As BAT admitted,

even after the transaction, "[BAT Singapore]"BATMS and BAT (by virtue of being [BAT Singapore's]BATMS's ultimate parent company) maintained control of all relevant aspects of the North Korea business." Statement of Offense*Id.* ¶ 35. An internal email described the deal as "a vehicle for BAT to bring out the JV money and distribute it to BAT. [SUTL] will have no beneficial interest in" BAT DPRK. Information ¶ 42.*Id.* ¶ 38. Internal documents confirm this control. *Id.* ¶¶ 39-40.

135. Internal documents confirm this control. One BAT Singapore employee who moved to SUTL explained, "I am still working for BAT business though BAT is not directly dealing in DPRK . . . . Though the contract is under [SUTL], the business is run under BAT interests." Information ¶ 43. Another document described BAT holding "de facto control," ensuring it continued to exercise significant influence over Daesong-BAT and directly benefitted from DPRK sales. Information ¶ 44.

### 2. BAT Laundered Hundreds of Millions of Dollars Through its Ongoing North Korea Joint Venture and Obstructed FinCEN Operations Designed to Prevent Terrorism

136.122. As agreed, SUTL acted principally as an intermediary to launder the flow of funds from North Korea to BAT. BAT SingaporeBATMS shipped goods (primarily cigarette components) to Daesong-BAT in the care of SUTL, invoicing SUTL. SUTL forwarded the invoices to NKTC. NKTC then paid SUTL—in U.S. dollars, typically using Chinese front companies—and SUTL remitted almost the entire amount to BAT, minus a small commission. These practices persisted at least through August 2016. Information ¶ Statement of Offense ¶¶ 42-45.

137.123. Over the years, BAT's schemeDaesong-BAT generated billions in revenue, and at least hundreds of millions of dollars in profit, split 50/50 between Daesong and BAT. According to BAT's enforcement resolution with U.S. authorities and based on the

amounts paid to BAT SingaporeBATMS, BAT's scheme enabled NKTCOffice 39/Daesong to generateachieve **over $400415 million**. *See* in liquidity, *see* Statement of Offense ¶ 54., because BAT enabled Office 39 to deploy financial resources that were effectively trapped under sanctions and otherwise useless to Office 39. Daesong-BAT, in turn, used those components to create at least hundreds of millions in revenue on a per-year basis, and likely substantially more than $1 billion overall. Indeed, Dr. Lewis—citing DOJ's own findings about BAT's scheme—has opined that Daesong-BAT potentially generated more than $8 billion in revenue at the DPRK's prevailing revenue spread of $20 in revenue for every $1 spent on components. *See infra* ¶¶ 156, 219. Moreover, revenue creation, as well as profit, allowed Office 39 what it needed to fulfill its role in the DPRK-IRGC-Hizballah missile procurement network because foreign currency located outside North Korea—which BAT helped Office 39 generate at an industrial scale for more than a decade—was the top priority. *See infra* ¶ 186.

138.124. To move these funds, the conspirators knowingly used North Korean banks Tanchon, KKBC, and FTB., and continued doing so after learning that KKBC and FTB effectively served as arms of Tanchon and KOMID. Statement of Offense ¶ 32(b).

139.125. At a 2007 meeting, NKTC proposed using "export earnings" to pay SUTL. InformationStatement of Offense ¶ 44(a). This euphemism referred to money NKTC generated abroad that could not be repatriated due to banking restrictions. Instead, NKTC and BAT agreed to launder payments through Chinese intermediaries. For example, Dandong Hongxiang Industrial Development Company ("DHID"), a front company for the North Korean government, sent approximately $125 million to SUTL between 2007 and 2014—money intended for BAT Singapore. InformationBATMS. *Id.* ¶ 44(cb)-(d). (On September 16, 2016, Treasury sanctioned DHID for acting for or on behalf of KKBC. *See* Information*id.* ¶ 44(e).) In

total, 50 other front companies moved at least $216 million in U.S. dollars to SUTL; all were remittances for BAT. ~~Information~~*Id.* ¶ 44(f).

~~140.~~126. These funds cleared through correspondent accounts at U.S. banks. Because U.S. banks refused to process DPRK transactions ~~for North Korea~~, BAT and its co-conspirators structured the payments to mask the source, making them appear to come from legitimate Chinese ~~businesses~~firms. This was done "with the intent to deceive U.S. financial institutions." ~~Information ¶¶ 46~~Statement of Offense ¶¶ 45-47. BAT stipulated that at least four U.S. banks unknowingly processed these transactions. ~~Information ¶ 30~~*Id.* ¶ 29.

127. The U.S. banks that BAT manipulated were required under the Bank Secrecy Act to monitor transactions and submit Suspicious Activity Reports to the Financial Crimes Enforcement Network ("FinCEN"), *see* Statement of Offense ¶¶ 14-17, a Treasury bureau headquartered in this District. Defendants carried out a scheme specifically to defeat these reporting mechanisms by routing payments through front companies, stripping DPRK identifiers from wire transfer instructions, advising co-conspirators how to respond to bank compliance inquiries in ways that concealed the transactions' true origin, and suppressing internal records accurately describing their conduct. *See id.* ¶¶ 20, 33, 35, 47, 49(c), 51, 55, 70-72. Defendants admittedly understood that U.S. banks were required to monitor and report such transactions to FinCEN, and nevertheless caused those banks to process hundreds of millions of dollars in prohibited DPRK transactions without reporting their true nature. *See id.* ¶¶ 14-17, 54. Defendants directly and intentionally deprived FinCEN's centralized reporting and analytical functions in this District of accurate financial intelligence concerning DPRK sanctions evasion. Defendants thus engaged in intentional misconduct calculated to produce effects within this District, which did, in fact, produce such effects.

### 3. BAT Continued Itsits North Korean Joint Venture Despite Knowledge of North Korea's Weapons Proliferation and Terrorism

141.128. While BAT unlawfully funneled money to Office 39 and the North Korean governmentprocurement network it operated for the IRGC's missile program, the United States and United NationsU.N. consistently highlighted North Korea's vitalthe DPRK's key role in missile and rocket proliferation to the IRGC and Hizballah.

142.129. Although the United States de-listed North Korea as a state sponsor of terrorism in 2008 during nuclear negotiations,[4] (redesignating it in 2017, which has continued ever since, *see* 82 Fed. Reg. 56,100), it continued to enforce strict counterproliferation sanctions, recognizing that preventing DPRK terrorism remained a key element of its anti-terror strategy. Indeed, North Korea was so heavily sanctioned – "one of the heaviest sanctioned countries around," according to a 2015 colloquy between Representative Bill Keating and senior State official Hillary Batjer Johnson – that the State Sponsor of Terror designation "would not enhance or necessarily alter any of the current sanctions that are applicable to the DPRK at this time."U.S. anti-terror strategy.

130. In October 2008, State designated the Korea Taesong Trading Company (*i.e.*, BAT partner Daesong/Office 39) under the Iran, North Korea, and Syria Nonproliferation Act, which provides for penalties on entities and individuals for the transfer to or acquire from Iran, North Korea, and Syria equipment and technology that are controlled under multilateral control lists or that otherwise have the potential to make a material contribution to the development of WMD or cruise or ballistic missile systems. 73 Fed. Reg. 63,226.

[4] As State reported to Congress in 2023, on November 20, 2017, "the Secretary of State designated [North Korea] as a State Sponsor of Terrorism" after the Secretary "determined [that] the DPRK had repeatedly provided support for acts of international terrorism in the nine years since its designation had been rescinded," and the DPRK has remained so designated ever since.

~~143.~~131. In April 2009, ~~thirty~~ American citizens ~~residing in Israel~~ sued ~~North Korea and Hizballah~~the DPRK, alleging ~~North Korea~~it provided to Hizballah the missiles and rockets used in ~~2006~~ attacks ~~carried out by Hizballah.~~in the Middle East in 2006. *See Kaplan*, ~~*et al. v. Hezbollah and Democratic People's Republic of Korea*~~*supra*, No. 09-cv-646~~, ECF~~ [Dkt. No. 1] (D.D.C. filed Apr. 8, 2009). The lawsuit was widely reported.

~~144. In May 2009, North Korea conducted another nuclear test, and the U.N. Security Council adopted Resolution 1874, condemning the test and demanding member states prevent North Korea from accessing financial resources for its missile program. A few months later, in August 2009, Ambassador Philip Goldberg, coordinating U.S. sanctions implementation, warned banks worldwide to look for transactions involving North Korean entities.~~

~~145.~~132. ~~Around the same time,~~ On June 30, 2009, the U.S. and U.N. sanctioned the entities involved in North Korea's proliferation to the IRGC. ~~On June 30, 2009, they sanctioned~~They did so by sanctioning Hong Kong Electronics, a front company in Iran facilitating money movement for KOMID.

~~146.~~133. In July 2009, as the U.N. reported in real-time, UAE authorities intercepted a shipment of DPRK weapons bound for Iran containing 2,030 detonators for Grad rockets—the exact type the IRGC supplied to Hizballah.

~~147.~~134. On August 11, 2009, Treasury designated KKBC—~~the very~~a bank ~~participating in~~funding BAT's scheme—for ~~providing financial services to~~ being a financier of the DPRK missile program. BAT knew of this ~~designation~~ and knew KKBC's role in its own scheme, yet continued to use ~~the bank~~KKBC. *See* Statement of Offense ¶¶ 59-62.

~~148.~~135. In December 2009, another arms shipment to terrorists was intercepted: 35 tons of North Korean rockets and surface-to-air missiles aboard a transport aircraft bound for

Iran and likely Hizballah. Had this shipment not been stopped, 35 tons of materiel would have likely been used in attacks targeting Americans in the Middle East, including Iraq.

136. ~~On~~As noted above, on August 30, 2010, President Obama signed Executive Order 13551, ~~blocking property~~finding that "the continued actions and policies" of ~~persons involved in~~ "North ~~Korea's~~Korea," including its missile proliferation~~. 75 Fed. Reg. 53837. And the~~ activity, "imperil U.S. Armed Forces" and "constitute an unusual and extraordinary threat to the national security" of "the United States." The Executive Order also found that North Korea "obtains financial and other support" for these actions and policies through, among other activities, "the counterfeiting of goods and currency," and explicitly named Office 39 as an entity that should be designated because of its role in supporting this enterprise. That same day, Treasury ~~and State~~ designated ~~both Office 39 and~~ Korea Taesong Trading Company (*i.e.*, ~~BAT's~~BAT partner Daesong) for ~~their role in the "counterfeiting of goods," "illicit activities," and "facilitating North Korean trafficking in arms."~~"supporting North Korea's Weapons of Mass Destruction (WMD) program." Treasury ~~explained~~specifically noted that Daesong is used by KOMID for trading purposes and that KOMID "has been sanctioned by the United States repeatedly over the last 10 years for trading in missile technology." Treasury subsequently found, in November 2010, that Office 39 provides "critical support to North Korean leadership~~"~~ in part through engaging in illicit economic activities~~.~~" and that "Korea Daesong General Trading Corporation is used to facilitate foreign transactions on behalf of Office 39."

~~149.~~137. As Under Secretary Levey put it in announcing the sanctions: "The destructive course that the North Korean government is charting," including its missile proliferation program, "is facilitated by a lifeline of cash generated through a range of illicit activities." Under Secretary Levey explicitly identified "selling counterfeit cigarettes" as a key

~~piece~~source of ~~this~~ illicit funding for the missile proliferation network upon which the DPRK and IRGC mutually relied.

~~150.~~138. Executive Order 13551 also authorized blocking the property of anyone who imported "luxury goods~~,"~~" into the DPRK, including tobacco~~, into North Korea.~~[5]. BAT knew of these prohibitions but deliberately undermined them.

~~151.~~139. On November 18, 2010, the U.S. designated Daesong Bank and Korea Daesong General Trading Corporation—entities linked to BAT's "Daesong" joint venture—as "key components of Office 39's financial network" supporting "proliferation~~.~~."

~~152.~~140. In 2011, Treasury warned multinationals that North Korea was one of only two jurisdictions in the world subject to Financial Action Task Force countermeasures due to substantial terrorist financing risks.

~~153.~~141. In December 2012, North Korea conducted ~~an illegal long-range rocket~~ a missile test, followed by a nuclear test in February 2013. The U.N. Security Council reacted ~~with~~: Resolution 2087 ~~demanding~~demanded that ~~North Korea~~the DPRK "suspend[] all activities related to its ballistic missile program" and stop "evad[ing] sanctions~~"~~," and ~~highlighting North Korea's role as~~found it was an "exporter of goods and equipment related to ballistic missiles."

~~154.~~142. On March 11, 2013, Treasury designated ~~the **Foreign Trade Bank** ("**FTB**"),~~FTB, North Korea's primary foreign exchange bank, as a "key financial node" in the weapons proliferation apparatus. BAT knew FTB played a central role in its cigarette scheme. Statement of Offense ¶¶ 63-69. BAT also learned that FTB facilitated missile sales to the IRGC. Yet, BAT continued to rely on FTB to move its illicit profits.

~~[5] The Executive Order adopted the definition of "Luxury Goods" from 15 C.F.R. 746.4(b)(l) and Supplement No. 1 to part 746 and similar items, which included tobacco as a luxury good. *See* Exec. Order 13551 §4(f).~~

~~155.~~143. In January 2016, North Korea kidnapped 22-year-old U.S. citizen, and University of Virginia student, Otto Warmbier~~. The regime~~ while he was visiting the DPRK. It took ~~Otto~~him hostage to coerce the United States into concessions—a blatant act of state-sponsored ~~terrorism~~terror. His ~~kidnapping~~ordeal was covered intensely by global media, including the U.K. outlets BAT monitored, including at least four separate *Guardian* reports that year. The regime paraded Warmbier for forced confessions, using him as a pawn while BAT continued its partnership with the government torturing him. Warmbier was returned to the U.S. in a comatose state in 2017 and died shortly thereafter.

~~156.~~144. On February 18, 2016, Congress enacted the North Korea Sanctions and Policy Enhancement Act, highlighting that North Korea "has sponsored acts of international terrorism," and "urg[ing] the President, in the strongest terms" to "immediately designate North Korea as a jurisdiction of primary money laundering concern." Pub. L. 114-122, 130 Stat. 93.

~~157.~~145. On June 2, 2016, Treasury issued a ~~formal~~ Notice further highlighting the role of KKBC and FTB—two ~~of BAT's banking~~ partners involved in BAT's scheme—in supporting missile proliferation. 81 Fed. Reg. ~~35441~~35,441. Later ~~that year~~in 2016, as part of the imposition of a special measure against North Korea as a jurisdiction of primary money laundering concern, Treasury ~~formally prohibited~~barred U.S. ~~financial institutions~~banks from opening or maintaining correspondent accounts for, or on behalf of, ~~North Korean banking institutions.~~DPRK banks. 81 Fed. Reg. ~~78715~~78,715.

~~158.~~ Despite the ~~kidnapping~~hostage-taking of an American student, the designation of its banking partners as missile proliferators, and the finding that its host country was a primary money laundering concern, BAT continued to partner with Office 39/Daesong through at least

late 2017. BAT's misconduct enabled Office 39 to finance the specific missiles that killed and maimed Plaintiffs.

**D. Defendants' Venture With Office 39 Became A Key Source Of Funding For North Korea's Weapons Collaboration With The IRGC And Hizballah**

159. In the 2000s and 2010s, as DoD reported in 2018, North Korea remained a pariah state, "unable to significantly expand ties because of international sanctions and the stigma of gross human rights violations." But, according to the same DoD report, the regime's skill in navigating black markets and its "no-questions-asked" philosophy made it an attractive partner for actors willing to prioritize profit over legality.

160. Enter BAT. In announcing BAT's record-setting resolution, the United States confirmed that BAT's misconduct enabled North Korean missile assistance to its most critical partner, the IRGC. As OFAC explained, "BAT's apparent violations helped North Korea establish and operate a cigarette manufacturing business – a sector that has reportedly netted over $1 billion per year for the Government of the DPRK." The DPRK Government "is known to use funds generated through international trade to support its nuclear and missile programs and weapons proliferation." And BAT's "conspiracy" with the DPRK "involved entities designated by OFAC for their proliferation activities and provided them with opportunities to evade U.S. sanctions." OFAC Enforcement Release at 4.

161. In 2023, the U.S. Attorney's Office for the District of Columbia emphasized the sheer scale of this funding, noting that for every dollar invested in cigarette production, North Korea realized $20 of revenue for its "government, its military, and its WMD program." The Principal Associate Deputy Attorney General confirmed that the investigation "exposed BAT . . . as [an] important component[] in funding North Korea's WMD proliferation program."

162. Given the Kim regime's criminal structure, licit transactions with DPRK commercial firms sponsor terrorism just as illicit ones do. As Under Secretary Levey warned in 2006, "the line between North Korea's licit and illicit money is nearly invisible." In the same warning, Levey detailed the "multifaceted problems and threats posed by state sponsors of terror Iran, Syria, and North Korea": "North Korea, the world's foremost proliferator of ballistic missile technology . . . continues to develop ballistic missiles of increasing sophistication and range. Iran lies at the dangerous intersection of terrorism and weapons of mass destruction . . . providing financial and material support to terrorist groups, like Hizballah."

163. Congress codified these findings in the North Korea Sanctions and Policy Enhancement Act of 2016, explicitly codifying Levey's warning that "the line between illicit and licit North Korean money is nearly invisible." 22 U.S.C. § 9221(a)(1)(A)(i) (Feb. 18, 2016).

164. The United States has long recognized that financial support to state sponsors of terrorism supports catastrophic attacks. As Under Secretary Levey noted in 2006, Treasury's mission to "sever the lines of financial support to international terrorists" and to weapons proliferators is predicated on the understanding that "financial networks . . . underlie all of these threats."

165. North Korea uses the international financial system to disguise weapons sales behind a "veil of legitimacy," utilizing fronts and intermediaries to evade detection. As Under Secretary Levey explained in 2006, the designation of Banco Delta Asia as a primary money laundering concern was a direct response to this threat, aimed at cutting off the "willing partner" handling North Korea's "dirty business."

166. Commercial transactions enabling terrorists to profit from counterfeiting directly aid terrorist attacks. Congress has found that "ties have been established between counterfeiting

and terrorist organizations that use the sale of counterfeit goods to raise and launder money." Stop Counterfeiting in Manufactured Goods Act, Pub. L. 109-181, § 1(a)(2)(E), 120 Stat 285 (Mar. 16, 2006) (18 U.S.C. § 2320 Note).

167. Specifically regarding the tobacco trade, Congress found that "Hezbollah, Hamas, al Qaeda, and other terrorist organizations have profited from trafficking in illegal cigarettes" and that such involvement will continue to grow "because of the large profits such organizations can earn." Prevent All Cigarette Trafficking Act of 2009, Pub. L. 111-154, § 1(b)(2)-(3), 124 Stat. 1087 (Mar. 31, 2010) (15 U.S.C. § 375 Note).

168. By partnering with the world's most prolific state-sponsor of cigarette counterfeiting, BAT knowingly fed a revenue stream that Congress had identified as a primary enabler of terrorist attacks.

169.146. At all times, Defendants knew that a foreseeable consequence of improving the IRGC's missile and rocket capability was that those weapons would be used in anti-American terrorist attacks by Hizballah and Kataib Hizballah. As repeatedly confirmed in U.S. government reports and announcements that Defendants actively monitored, Defendants knew that: Hizballah and Kataib Hizballah were both striking arms of the IRGC; members of Hizballah and Kataib Hizballah swore fealty to Ayatollah Khamenei; and many Hizballah and Kataib Hizballah terrorists were members of the IRGC, too, including notorious terrorists Imad Mugniyeh and Abu Mahdi al-Muhandis.

**E.D. Defendants Admitted Their Role In Supplying North Korea With Money It Used To Fund Terrorism And Paid A Record-Breaking $629 Million Penalty For Their Misconduct**

170.147. In 2023, BAT's years of culpable misconduct produced what the U.S. Department of JusticeUnited States called "the largest North Korean sanctions penalty in the history of the Justice Department." On April 25, 2023, DOJ announced a $629 million settlement

with BAT for its illegal DPRK tobacco sales to North Korea.joint venture. BAT and BAT SingaporeBATMS engaged "in an elaborate scheme to circumvent U.S. sanctions and sell tobacco products to North Korea," thus causing "funds to illegally flow into the coffers of the Democratic People's Republic of Korea (DPRK)." For years, according to DOJ, BAT partnered withand the regime to operateDPRK jointly operated a cigarette business that relied on "financial facilitators linked to North Korea's weapons of mass destruction proliferation network." The Assistant Attorney General of the Justice Department's National Security Division confirmed to Congress in December 2023 that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, generating revenue used to advance North Korea's weapons program."

171.148. On the day DOJ announced the record-breaking settlement, OFAC also settled its civil enforcement action against BAT. Underscoring the severity of the misconduct, OFAC imposed the "statutory maximum civil monetary penalty," determining that BAT's violations were "egregious" and "not voluntarily self-disclosed." OFAC Enforcement Release at 1.

172.149. As part of this resolution, BAT SingaporeBATMS pleaded guilty to a Criminal Information charging conspiracy to commit bank fraud and conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"). BAT entered into a deferred prosecution agreement ("DPA")DPA based on the same charges, which included "conspiracy to commit bank fraud" and "conspiracy to violate [IEEPA]" through "sales of tobacco products to the Democratic People's Republic of Korea . . . between [DPRK]" from "in or around February 2009 until in or around June 2017." Information ¶ 1.

~~173.~~150. In the DPA and Statement of Offense, Defendants admitted facts establishing their culpable intent beyond any doubt. They admitted that "BAT and ~~[BAT Singapore]~~BATMS had knowledge of U.S. sanctions~~. . . .~~," including "the sanctions on designated North Korean entities, and willfully disregarded those sanctions." Statement of Offense ¶ 55. And Defendants confessed to structuring transactions to obfuscate sales to North Korea, causing U.S. ~~financial institutions~~banks to process illegal transactions, as ~~BAT Singapore~~BATMS "inten[ded] to deceive U.S. financial institutions." ~~Statement of Offense~~*Id.* ¶¶ 45-46.

~~174.~~151. ~~Defendants' admissions confirmed that this~~This conspiracy reached the highest ~~levels~~level of BAT. For example, OFAC found that "BAT management had actual knowledge regarding the apparent conspiracy from its inception through its termination," noting that this "knowledge extended to BAT's Standing Committee, which signed off on the ostensible divestment from the Joint Venture." OFAC ~~Enforcement~~ Release at 3.

~~175.~~152. To maintain their illegal terrorist financing, BAT and ~~BAT Singapore~~BATMS engaged in active deception. When banks raised questions about wire transfers, ~~BAT Singapore~~BATMS simply canceled the transactions and re-routed them through more sympathetic institutions, knowing their partner SUTL was deceiving those banks about the funds' origin. ~~Information ¶¶ 71~~Statement of Offense ¶¶ 70-72. As OFAC detailed, BAT "concealed their North Korea-related business by purporting to exit the Joint Venture and receiving payments through a complex remittance structure that relied on an opaque series of front companies and intermediaries." OFAC ~~Enforcement~~ Release at 3. BAT further "ignored requests for information from banks, and asked its counterparty to remove any mention of North Korea from transactional documents." *Id.*

## IV. DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS

### A. Defendants Monitored Sanctions And Warnings About North Korea's Role In Financing Terrorists

176. As a sophisticated, integrated, multinational corporation operating in a highly regulated industry with a substantial presence in the United States, the Middle East, and East Asia, Defendants maintained a rigorous surveillance regime to monitor "geopolitical and economic policy developments worldwide." As part of BAT's formal "risk modelling" and "external risk assessments," Defendants specifically tracked "[g]eopolitical tensions . . . international sanctions . . . [and] terrorism" capable of "disrupt[ing] [BAT]'s business in multiple markets." Thus, BAT actively monitored:

i. every official United States and United Nations sanctions designation, including associated press releases, reports, and findings targeting North Korea, Iran, the IRGC, and Hizballah; and

j. other public sources—including articles published by mainstream media outlets, non-governmental organizations, investigative journalists, scholars, and others—that published data relevant to tobacco products and geographies where BAT operated.

177. Defendants executed this monitoring through an internal network comprising compliance, anti-illicit trade, media monitoring, strategic communications, and intelligence personnel, as well as thousands of BAT's and BAT Singapore's employees and agents stationed in the United States, North Korea, East Asia, Iran, and the Middle East. The knowledge possessed by these employees and agents is imputed to Defendants.

178. Internal documents confirm that this system functioned as designed, delivering real-time intelligence regarding terrorist financing risks. For example, a July 25, 2000 internal BAT "blast" email summarized twelve separate media reports alerting BAT executives that "Cigarette Smuggling May Link to Terrorists" and warning that illicit sales in the U.S. were being "funneled to" the "Mideast" to "fund Hezbollah."

179. BAT supplemented its internal capabilities by retaining lobbyists and law firms in the United States and United Kingdom to monitor U.S. government and U.N. policy changes and legislation in real time. This institutional commitment to sanctions monitoring was not new; internal documents reveal that BAT was actively analyzing sanctions announcements—such as those targeting Southern Rhodesia—as early as the 1960s. Accordingly, BAT possessed actual, real-time knowledge of every relevant U.S. and U.N. sanctions designation, press release, and finding published before or during the conduct alleged herein. *See, e.g.*, Statement of Offense ¶¶ 31, 34, 55, 57 (discussing Defendants' knowledge of U.S. sanctions on North Korea); Information ¶ 55.

180. BAT and BAT Singapore also possessed unique private knowledge of the relevant facts. As one of the world's largest tobacco firms with billions of dollars in annual sales, BAT had access to proprietary data regarding its partners, supply chains, and markets that exceeded what was available to regulators or the public. Consequently, BAT was aware of pertinent facts regarding the North Korean joint venture and its partners well before they became public, and possessed critical information that never became public.

181. Specifically, Defendants knew that Iran was Office 39's largest arms customer and was aware of an overwhelming consensus of reports from the U.S., U.N., U.K., and international media that confirmed that North Korea and Iran were collaborating to strengthen each other's missile programs—with the United States as their shared primary target.

k. 2002: President Bush declared that North Korea and Iran comprised an "axis of evil," warning they could work together to provide WMDs to terrorists.

l. 2006: Treasury sanctioned numerous firms for enabling IRGC missile and rocket development, including the *Fateh-110* missile, and emphasized that such Iranian programs relied upon direct North Korean support.

m. 2006: DoD warned that North Korea had sold long-range missiles to other states of concern, while Iran's support for terrorism raised concerns about its intentions.

n. 2008: The Congressional Research Service reported that North Korea's relationship with the IRGC involved coordination in support for Hizballah and cooperation on missiles.

o. 2010: The Defense Intelligence Agency confirmed that Iran received assistance from North Korea in developing its missile program and continued to increase the range, lethality, and accuracy of these systems.

p. 2010: The U.N. Panel of Experts reported multiple interdictions of North Korean arms shipments bound for Iran, including rockets and surface-to-air missiles.

q. 2011: *Small Wars Journal* detailed how North Korea provided advanced commando training to Hizballah field commanders following the 2006 war.

r. 2013: DoD reported that North Korea had exported missile technology to countries including Iran.

s. 2016: The *Jerusalem Post* reported that North Korea helped Iran build the Safir and Sejil missiles and funneled weapons to Hizballah via the IRGC trafficking network.

t. 2017: Congress codified recognition of North Korea-Iran cooperation on nuclear and ballistic missile development in the Countering America's Adversaries Through Sanctions Act. CAATSA, § 316(a).

182. Beyond the general alliance, Defendants knew—or recklessly disregarded—that their partnership and transactions with their specific North Korean counterparties, including Daesong, Tanchon, FTB, and KOMID, directly financed DPRK-IRGC missile collaboration.

a. 1999: The House North Korea Advisory Group warned that North Korea, through Office 39 (*i.e.*, BAT's partner, Daesong), was one of the greatest missile threats in the world and had "exported missiles to Iran" that foreseeably threatened U.S. servicemembers in the Middle East.

b. 2001: Treasury sanctioned KOMID for violating the Iran Nonproliferation Act by exporting missile technology to Iran.

c. 2004: Commerce designated the DPRK as a terrorist-supporting regime, warning that dual-use items offered significant aid to its ability to support terrorism.

d. 2004: the United States imposed more sanctions on KOMID for its "Missile Aid to Iran."

e. 2009: Treasury sanctioned Tanchon Commercial Bank (a BAT partner) for its vital role in DPRK supply of assistance to IRGC missile efforts.

f. 2010: Treasury designated Office 39 (*i.e.*, BAT's partner, Daesong), for the vital aid that Office 39 supplied to DPRK missile proliferation efforts.

g. 2010: The U.N. reported that Tanchon managed financial transactions related to missile deals between KOMID and Iranian entities.

h. 2012: The U.S. Mission to the U.N. confirmed that Tanchon plays a role in financing North Korea's ballistic missile sales to Iran.

i. 2014: State confirmed that Tanchon acts as the financial arm of KOMID, facilitating missile sales to Iran's SHIG.

j. 2016: Treasury confirmed that KOMID representatives in Iran continued to sell weapons, with payments often funneled through fronts operating at the direction of DPRK banks.

183. The IRGC's deployment of *Qiam*- and *Fateh*-class missiles against U.S. forces and civilians was not an independent or unforeseeable intervening act. It was the precise and intended use of the missile capabilities Defendants helped create. Defendants knew—or recklessly disregarded—that Office 39's revenues were directed to North Korea's missile enterprise and that those weapons would be supplied to the IRGC and its proxies for use in attacks against Americans. The resulting missile strikes were therefore a foreseeable—if not inevitable—consequence of Defendants' illegal conduct.

**B. Defendants' Compliance And Intelligence Teams Received Repeated Notices That Cigarette Smuggling Was Funding Terrorism**

184. BAT's support for IRGC and Hizballah attacks occurred against a backdrop of decades of intense global scrutiny regarding the extreme risk that tobacco-related crimes—including illicit cigarette sales, smuggling, counterfeiting, and intellectual property theft—financed terrorist attacks.

185. As early as 2003, the U.S. Government Accountability Office reported that "[t]errorists have earned assets through the highly profitable illicit trade in cigarettes" and that "Hizballah" had "earned assets through trafficking in contraband cigarettes or counterfeit cigarette tax stamps." In 2004, the FBI Director warned during remarks to the Hong Kong

American Chamber of Commerce that "We are seeing … terrorists engaged in cigarette smuggling … to raise money for their operations."

186. Since 2004, DOJ has published a report by a senior American intelligence analyst alerting the industry that "[t]raffickers of cigarettes in the United States and the United Kingdom are providing material support to the Hezbollah …, among other terrorist groups." The report warned that "[b]ecause of the huge profits in the illicit cigarette trade, as well as the potentially low penalties for getting caught, illicit cigarette trafficking now rivals drug trafficking as the method of choice to fill the bank accounts of terrorists." It concluded that these schemes "provide the terrorist groups with millions of dollars annually, which fund the purchasing of firearms and explosives to use against the United States, its allies, and other targets."

187. These warnings issued steadily throughout BAT's illicit venture. In 2008, the U.S. House Committee on Homeland Security published *Tobacco and Terror: How Cigarette Smuggling Is Funding Our Enemies Abroad*, a report which concluded that the illicit tobacco trade was "one of the most lucrative smuggling operations in the United States and around the globe," with a "large percentage of the money … financ[ing] groups such as Hezbollah." The report estimated that "[i]n just two months of illicit cigarette trade operations, a motivated terrorist cell could generate sufficient funds to carry out another September 11th style attack."

188. In 2015, the U.S. Departments of State, Justice, Treasury, Homeland Security, and Health and Human Services jointly published *The Global Illicit Trade in Tobacco: A Threat to National Security*. This interagency report alerted BAT that "trafficking in illicit tobacco products" continued to grow as a threat to national security because "cigarette smuggling" was a "lucrative crime for some terrorist groups and a potential revenue source to finance acts of terror," citing "specific links between cigarette smuggling and terrorist organizations, such as …

Hizballah." Mainstream media outlets, including the *Wall Street Journal*, *NBC News*, and the International Consortium of Investigative Journalists, reinforced these warnings, alerting BAT that Hizballah used cigarette crimes to fund attacks.

189. BAT possessed actual knowledge of these risks. Its in-house personnel closely monitored U.S. government and media reports, and its own corporate filings confirm it was acutely aware of the terrorist finance risks presented by the illicit cigarette trade.

190. In 2013, BAT admitted in an annual sustainability report that it knew "Interpol … states that criminal gangs that traffick drugs, arms and people are also behind the illegal tobacco and alcohol trades," and that the U.S. Department of Justice believed these organizations had "ties to terrorist organisations." In 2016, BAT similarly admitted in its annual sustainability report that "up to 12% of global tobacco sales" were illegal, and that "[i]ncreasingly, this black market" was "being linked to the financing" of "terrorism," allowing extremist groups to "diversify their revenue streams in order to carry out their horrific attacks." In March 2017, BAT again admitted that the "black market in tobacco," involving "counterfeit cigarettes" and "cross border smuggling," "fund[ed] terrorism."

191. BAT's social media statements confirm this knowledge. Within the same period when BAT was engaged in the conduct described in the DOJ and OFAC enforcement resolutions, BAT publicly acknowledged the terrorism-cigarette smuggling nexus. On April 12, 2013, BAT acknowledged on its official Twitter account (@BATplc) that "Interpol says terrorist groups including … Al-Qaeda profit from illegal cigarettes #dontsupportterrorism #tobaccotrafficking." On September 2, 2013, BAT tweeted that the "UK & Ireland are hotbeds of illicit tobacco, raising fears trade is funding terrorism."

192. BAT's specific intelligence about North Korea reinforced that knowledge. At all relevant times, BAT deployed a sophisticated in-house corporate intelligence arm capable of placing investigators on the ground inside North Korea—an access level that even the U.S. intelligence community struggled to achieve. Armed with this intelligence, BAT knew that North Korea (through Office 39 and the RGB) supplied Hizballah and the IRGC with core terrorist tactics, techniques, and procedures ("TTP"). Because the RGB directly trained Hizballah and indirectly trained them through the IRGC, BAT knew that its counterparty's TTP included financing attacks through criminal schemes. Accordingly, BAT's knowledge of the general link between Hizballah and illicit cigarettes, combined with its specific knowledge of the RGB's operations, alerted BAT that its own crimes with North Korean fronts risked financing the very attacks that injured Plaintiffs.

153. V. DEFENDANTS At sentencing, the Honorable Beryl A. Howell emphasized that "[v]iolating U.S. sanctions is, needless to say, a very serious threat to national security, particularly when that violation involves North Korea; a country that has long been subject to U.S. sanctions as a result of its status as a proliferator of weapons of mass destruction." *United States v. British American Tobacco, et al.*, No. 23-cr-118 [Dkt. No. 21 at 31] (D.D.C. Apr. 25, 2023).

## IV. DEFENDANTS PROVIDED ESSENTIAL AND LASTING SUPPORTAID TO IRGC *QIAM* AND *FATEH* MISSILE ATTACKS ENABLED BY THE NORTH KOREADPRK-IRGC-HIZBALLAH JOINT WEAPONSARMS VENTURE

### A. Defendants' CashFunding, Financial, And In-KindLogistical Support Enabled Development Of WeaponsThe *Qiam* And *Fateh* Missiles Used In Terrorist AttacksTo Attack Plaintiffs

154. As DoD reported in 2018, North Korea in the 2000s and 2010s was a pariah state, "unable to significantly expand ties because of international sanctions." But, according to the

same DoD report, the regime's skill in using black markets and its "no-questions-asked" philosophy made it an attractive partner for unscrupulous actors.

193.155. Enter, BAT. From 2007 through 2017, BAT and BAT Singapore engaged inDefendants committed a series of illegal transactions with North Korean counterparties engaged in the regime's proliferation activities.missile support to the IRGC. This culpable misconduct funneled at least hundreds of millions of dollars, and likely substantially more than $1 billion, directly to the DPRK's arms-proliferation program, enabling missile transfers to the DPRK-IRGC- and -Hizballah andjoint weapons venture, thus substantially assisting the development and deployment of the specific *Qiam* and *Fateh* missiles used by the IRGC to harmattack Plaintiffs.

156. In 2023, the Executive Branch found that Defendants' illicit partnership with Daesong/Office 39 made a key contribution to the IRGC missile threat against America.

a. OFAC found that: "BAT's apparent violations ***helped North Korea establish and operate a cigarette manufacturing business***—a sector that has reportedly netted ***over $1 billion per year*** for the Government of the DPRK"; the DPRK "***use[d] funds generated through international trade to support its … missile programs and weapons proliferation***"; and BAT's "conspiracy" with the DPRK "involved entities designated by OFAC for their proliferation activities and provided them with opportunities to evade U.S. sanctions."

b. The U.S. Attorney's Office for the District of Columbia emphasized the sheer scale of Defendants' aid—and its direct nexus to DPRK-linked missile threats—by noting that for every "dollar" invested in cigarette production materials, North Korea realized "$20" of revenue, and a "substantial portion of this profit is believed to flow back directly to the North Korean government, its military, ***and its WMD program***."

c. The Assistant Attorney General of the National Security Division confirmed to Congress that BAT's business in North Korea resulted "in approximately $418 million of banking transactions, ***generating revenue used to advance North Korea's weapons program***."

d. The Principal Associate Deputy Attorney General confirmed that "***BAT***" operated as an "***important component[] in funding North Korea's WMD proliferation program***."

When the U.S. government made the statements above, such findings necessarily included DPRK-backed missile attacks by the IRGC. *See supra* ¶ 16 (WMD nomenclature).

157. BAT's secret joint venture with Office 39 was likely Office 39's number one overall missile funding source. Without BAT's assistance, the IRGC and Hizballah, through their joint venture with the DPRK (of which Office 39/Daesong was the hub), could not have developed, tested, refined, and stockpiled from 2007 through 2017 the specific *Fateh* and *Qiam* missiles that the IRGC and Hizballah used to attack Plaintiffs.

### 1. BAT Provided Direct Financial Support to the DPRK's Arms EffortsIRGC *Qiam* and *Fateh* Attacks

194.158. Daesong-BAT generated massive revenues that enabled North Korea's proliferation activities. According to DOJ, BAT's scheme "allow[ed] funds to illegally flow into the coffers" of the DPRK and enabled "financial facilitators linked to North Korea's weapons of mass destruction proliferation network." ByDefendants' scheme enabled DPRK terrorist cash flow through two channels: (1) Daesong-BAT profits; and (2) Daesong cigarette counterfeiting. With respect to the former, by conservative estimates, BAT's misconduct supplied Office 39 with at least $50 million in illicit Daesong-BAT joint venture profits annually from 2007 through at least 2017., and likely much more than that. With respect to the latter, given the scale of DPRK cigarette counterfeiting, Daesong/Office 39 likely realized a comparable amount.

195.159. These funds BAT's illicit returns did not vanish into the general economy; they funded the in North Korea IRGC-Hizballah joint weapons venture.. Instead, BAT's payments financed the allowed Office 39 and its financial and logistics arms (Tanchon, KKBC, FTB, and KOMID) to finance the supply, testing, deployment, and operation of the IRGC's and Hizballah's advanced weaponsmissile production, testing, deployment, and maintenance systems—and the terrorist TTPtactics, techniques and procedures required to use them—in Iran, Syria, and Lebanon.

~~196.~~160. North ~~Korea's~~Korean custom and practice ensured that Office 39's cigarette ~~trade with BAT~~ profits generated ~~blockbuster profits that directly funded~~ by BAT's scheme financed the ~~DPRK's military-first agenda. As senior U.S. State Department official David Asher warned in 2005, analysts agreed that illicit trading activities provide critical support to~~missile attacks against Plaintiffs by funding North Korea's ~~"military-first" economy. Counterfeit cigarettes, he noted, "may well be North Korea's largest containerized export sector." And as BAT knew,~~missile development and the ~~U.N. confirmed, tobacco sales have long comprised one~~DPRK-IRGC-Hizballah missile joint venture, which necessarily included *Qiam* and *Fateh* missiles, both of ~~the DPRK's~~which (and their DPRK equivalents) were top ~~five sources of import-related cash flow.~~priorities for the DPRK and IRGC throughout the relevant period.

~~197.~~ A fixed percentage of ~~every dollar~~all funds BAT ~~generated~~created for Daesong funded ~~the regime's~~DPRK arms programs~~. As~~, including missiles. For example, the U.S. Institute of Peace reported in 2009, the most ~~critical~~vital role of DPRK state trading firms was to route "a designated percentage of all revenues~~. . .~~" "directly into Kim Jong Il's personal accounts~~,"~~"—a ~~primary~~core use of which was to ~~implement missile programs.~~

~~198.~~161. fund missiles. This programmatic funding mechanism meant that hard ~~currency~~ foreign currencies from BAT's ~~illicit profits was~~partnership with Daesong, including hundreds of millions of U.S. dollars, were effectively siloed within Office 39 for ~~weapons~~arms procurement~~. As~~, necessarily including *Qiam* and *Fateh* missiles given their top priority status for the ~~U.S. Institute of Peace warned~~DPRK and IRGC alike. For example, as Dr. Greitens observed in 2007, these DPRK structures meant that revenues and profits programmatically "***finance[d] DPRK weapons programs***" through Office 39 in ~~2009, the system was driven by~~

"foreign currency revenue generation bases"a way that funneled goods and profits updid not depend merely upon the fact "that money was fungible once in North Korea's hands" because "illicit activity [] provide[d] the chainDPRK military and security services with an internally generated, directly accessible source of command to the highest levels of the Worker's Party and the National Defense Commissionhard currency for procurement" siloed within Office 39.

199.162. This meant that the cash BAT generated stayed in-house with Kim and Office 39—the two actors most directly responsible for financing DPRK aid to IRGC and Hizballah missile attacks—and a substantial share of these funds supported the North KoreaDPRK-IRGC-Hizballah joint missile venture. ForIn 2017, for example, ProfessorsDPRK scholar Dr. Kan found that Office 39 profits "financ[e] the weapons' programs of the regime," and "[t]his nexus between illicit finances and sophisticated weapons programs appears to have become tighter under the leadership of Kim Jong Un." In 2025, likewise, Drs. Bechtol and Celso observed in 2025 that the DPRK used a "large portion of these funds" for missiles during the 2010s.

163. Indeed, a U.S. Army-published analysis in 2010 has effectively confirmed the inextricable nexus between the foreign currency generation, revenues, and profits that BAT generated for Office 39/Daesong and DPRK-backed missile threats targeting the United States. The analysis found: "Through its offices in Pyongyang, [Office 39] operates through government and KWP-run front companies such as Daesung." "This Office, in turn, answers directly to Kim Jong-il," who "has maintained direct supervision over Office #39." "Just as importantly" for "U.S. policy on North Korea," "at least a portion of the foreign currency funds that Office #39 generates for Kim Jong-il go to investing in North Korea's … missile programs."

164. North Korean policy, and Office 39 custom and practice, ensured Defendants' Daesong transactions, and resulting Office 39 revenues and profits, financed the IRGC missile attacks against Plaintiffs. North Korea practiced a *Songun*, or "Military First," governing doctrine that ensured BAT's money reached the specific missile programs that injured Plaintiffs. As senior State official David Asher warned in 2005, illicit trading activities provide critical support to North Korea's "military-first" approach for which "cigarettes" were potentially "North Korea's largest containerized export sector." Accordingly, as DoD explained in 2013, the Kim regime believed that its "security" was "disproportionately dependent on military might," and it prioritized its "primary goal of pursuing its nuclear and missile capabilities" at "the expense of" pursuing "economic recovery and prosperity." Consequently, most of Daesong-BAT's blockbuster revenues directly financed Office 39's support of the DPRK's Military-First agenda—for which missiles were the top priority from 2007 through 2022. *See supra* ¶ 80; *infra* ¶ 186.

165. From 2007 through 2022, most Office 39 profits flowed to the DPRK military and, within that budget, most such monies flowed to the DPRK missile program, for which the *Qiam* and *Fateh* (and their DPRK equivalents) were always the number one overall budget priority. Among other reasons, the *Qiam* and *Fateh* missiles (and their DPRK analogues) comprised the IRGC's and DPRK's principal means of potentially causing mass casualty attacks against the United States in areas far from the relevant DPRK or IRGC launch site.

166. True, the DPRK regime also financed a nuclear program, but most such expenditures predated Defendants' scheme. Simply put, the DPRK raced to develop and stockpile nuclear weapons from the early 1990s through 2006—when it conducted its first nuclear test. From 2007 through the present, however, the DPRK's top priority shifted from

nuclear weapons—which it had already developed—to bolstering the missile capabilities needed to deliver them. And those same capabilities—and North Korean missile systems—were the foundation for the IRGC's *Qiam* development and *Fateh* enhancements used to attack Plaintiffs.

200.167. BAT's support supplied vital financial lubrication to attacks enabled by the DPRK-IRGC-Hizballah joint weapons venture. North Korea needed hard currency fromcreated by Office 39's joint venture with BAT to: (i) train and pay its missile specialists in Iran; (ii) fund trips to Syria for collaboration with Hizballah; (iii) procure missile components like gyroscopes; (iv) maintain assembly facilities; and (v) transport weapons to Iran. BAT's support supplied vital financial lubrication to attacks enabled by the DPRK-IRGC-Hizballah joint weapons venture. Under the custom and practice of the joint arms venture, even though the IRGC "paid" Office 39 for DPRK weapons and services, most such IRGC-to-DPRK "payments" were denominated in barter trade, (*e.g.*, oil), rather than U.S. dollars, *e.g.*, oil. For that reason, Office 39's (the DPRK needed hard currency, and BAT's other DPRK partners') ability to access especially U.S. dollars andfrom the U.S. financial system was vital to the success of BAT's participation in the joint weapons venture. The DPRK needed lots of cash, from Office 39 on the front end to supplyfinance the turnkey support it provided to IRGC and Hizballah rocket attacks in the Middle East. The DPRK was not getting cash on the back end from the IRGC and thus could not rely on Iranian payments for their money, especially as sanctions on both ramped up dramatically beginning in the mid-2000s.

201.168. When BAT funded the DPRK fronts herein, it financed the very individuals serving as logistics officers for the IRGC and Hizballah. From the early 2000s through 2025, North Korea maintained hundreds of RGB, Office 39, and KOMID agents on the ground in Iran, where they were dual-hatted as experts seconded to the IRGC for its missile

programs. *See supra* ¶¶ 54-61.*See supra* ¶¶ 64-71. These North Korean experts maintained a "continuous presence" in key Iranian industries, building warheads and guidance systems for the very missiles that harmed Plaintiffs.

202.169. North Korea'sOffice 39's (and thus BAT's) role in this venture was critical. For example, during a 2013 Congressional hearing entitled *Breaking the Iran, North Korea, and Syria Nexus*, former CIA Director R. James Woolsey testified to Congress in 2013 that Iran's power in the regionIRGC threat is "underpinned by North Korean arms and technology," which are "underwritten by Iran, [and] supplied by North Korea." During the same hearing, proliferation scholar Dr. David Albright explained that "stopping the money flows that pay" for . . . "missile related goods" is vital to preventing attacks that deployed missiles developed by the North KoreaDPRK-IRGC-Hizballah joint missile venture.

203.170. BAT's role was pivotal. Senior U.S. government officials have confirmed that hard currency is the "Achilles' heel" of the terror network.IRGC and DPRK terrorists' shared missile procurement, logistics, and financing networks. In 2017, for example, Representative Ed Royce noted that North Korea's advanced weapons programs rely on foreign technology that requires "an inordinate amount of money," and senior Treasury official Marshall Billingslea testified to Congress that year that Kim Jong-Un has two key financial vulnerabilities: the need for revenue to maintain missile programs and access to the global financial system to acquire hard currency.

204. When North Koreathe DPRK is squeezed financially, its ability to proliferate armsmissiles is constrained., and the subsequent risk of terrorist missile attacks is reduced. Defectors confirmed that when hard currency was scarce, missile production lines shut down for months because they could not buy necessary components like gyroscopes on the black market.

For example, during a 2013 hearing entitled *North Korea's Criminal Activities: Financing the Regime*, witnesses testified to this effect.

205.171. By enabling Office 39 to generate at least hundreds of millions of dollars, and likely more than $1 billion, BAT remedied this vulnerability, keeping the missile lines upon which the IRGC relied running. In 2017, David Luna, former chair of the OECD Task Force on Countering Illicit Trade, observed that the illegal tobacco trade helped prop up Kim Jong-Un's nuclear program. throughout the scheme. Those profits did not merely line the pockets of corrupt DPRK officials; they purchased the enginesallowed Office 39 and the other DPRK entities alleged herein to act as the IRGC's procurement agent and purchase the propulsion systems and components, guidance systems, and materials to make fuel that needed by the IRGC, which powered the specific *Qiam* and *Fateh* missiles launched atthat harmed Plaintiffs.

172. With respect to the BAT-generated Daesong profits involving, or flowing through, Office 39/Daesong, KKBC, FTB, Tanchon, and KOMID, the distinction between "licit" and "illicit" transactions was immaterial. Given the DPRK's unique status as the world's only mafia state, *supra* ¶ 21, there were very few external trading firms and banks, all of which supported missile transactions, *supra* ¶¶ 5, 24-25, 31. BAT accordingly knew that even BAT's purportedly licit transactions with Office 39, Tanchon, KKBC, FTB, or KOMID sponsored IRGC attacks involving DPRK-enabled missiles just as illicit transactions did. For example, as Treasury Under Secretary Levey warned in 2006 and Congress found in 2016, "the line" between North Korea's licit and illicit money "is nearly invisible." 22 U.S.C. § 9221(a)(1)(A)(i). Treasury's same 2006 warning detailed the "multifaceted problems and threats posed by state sponsors of terror Iran, Syria, and North Korea": "North Korea, the world's foremost proliferator of ballistic missile technology … continues to develop ballistic missiles of increasing

sophistication and range. Iran lies at the dangerous intersection of terrorism and weapons of mass destruction … providing financial and material support to terrorist groups, like Hizballah."

173. BAT's role was uniquely potent. Throughout the relevant period, Defendants were always Office 39's number one overall external financier and logistical supporter of missile and rocket attacks sponsored by Office 39's participation in the DPRK-IRGC-Hizballah joint arms venture.

174. Sanctions designation findings published by the United States, U.N., and E.U. after a rigorous fact-finding process have effectively confirmed the concrete nexus between BAT's partnership with Daesong and the attacks against Plaintiffs. Indeed, official U.S. sanctions findings and releases are made conservatively, and only after all the relevant facts can be proven conclusively to the government's satisfaction. Accordingly, each such U.S. finding should be regarded as strong evidence of the finding's truth. When each such finding was issued, it was specifically based on a determination that commercial transactions with **BAT's specific scheme counterparties** were likely to aid IRGC missile threats enabled by the DPRK.

a. 2001: State sanctioned "Changgwang Sinyong Corporation [KOMID]" under the "***Iran Nonproliferation Act***," finding that it had engaged in "missile" transfers to "Iran."

b. 2004: The United States further sanctioned KOMID for its "***Missile Aid to Iran***."

c. 2007: Treasury sanctioned agents of "***Iran's missile procurement network***" that enabled "Iran's pursuit of missiles capable of carrying weapons of mass destruction," finding that "a North Korean firm associated with [KOMID], a North Korean entity designated for providing Iran with missile technology" and "SHIG is responsible for Iran's ballistic missile program, ***most notably the Shahab series of medium range ballistic missiles*** based on the North Korean-designed No Dong missile"—linked to the *Qiam*—for which "SHIG has received help" from "North Korea in the development of this missile."

d. 2009: Treasury announced sanctions "target[ing] North Korea's missile proliferation network" shared with "Iran," which included sanctions against Tanchon (a BAT partner) for its vital role in DPRK supply of assistance to Iran's missile efforts, finding that "Tanchon plays a key role in financing the sales of ballistic missiles for KOMID" and "Tanchon" was "involved ***in ballistic missile transactions from KOMID to Iran's*** Shahid Hemmat Industrial Group (SHIG), which is ***the Iranian organization***

***responsible for developing liquid-fueled missiles***"—the specific class of IRGC ballistic missiles that included the *Qiam* missiles used against Plaintiffs.

e. 2010: Treasury designated Office 39/Daesong, finding that it generated illicit revenue used to support the DPRK (including KOMID) "missile" proliferation efforts to "Iran."

f. 2010: The United States publicly warned that it issued a "set of designations ***targeting Iran's … missile programs***" upon finding that Iran used "the Islamic Revolutionary Guards Corps to carry out and mask proliferation activities" and that IRGC entities "have ties to Iran's ballistic missile programs" designed to threaten the United States in the Middle East, for which "KOMID" and "Tanchon" played a key role.

g. 2010: The U.N. Panel of Experts found that "Tanchon" managed financial transactions related to "missile" deals between KOMID and entities in "Iran."

h. 2011: The E.U. imposed sanctions upon finding that "Tanchon plays a role in financing KOMID's … sales of ballistic missiles and has also been involved in ballistic missile transactions from KOMID to Iran's Shahid Hemmat Industrial Group (SHIG)."

i. 2013: Treasury further sanctioned Tanchon for its key role in DPRK missile aid to the IRGC, finding that "Tanchon" and "KOMID" continued to serve as "***part of the web of banks, front companies and government agencies*** that support North Korea's continued proliferation activities" concerning "missiles," and further found that Tanchon continued to "play[] a role in financing KOMID's sales of ballistic missiles and has also been involved in ballistic missile transactions from KOMID to Iran's Shahid Hemmat Industrial Group (SHIG), the U.S. and UN-designated ***Iranian organization responsible*** for ***developing liquid-fueled ballistic missiles***"—the specific class of IRGC ballistic missiles that included the *Qiam* missiles used against Plaintiffs.

j. 2016: Treasury found that KOMID continued to have a direct nexus to IRGC missile threats when the United States designated "entities and individuals involved in procurement on behalf of Iran's ballistic missile program" including "Sayyed Javad Musavi" upon finding that "Musavi is the SHIG commercial director and has worked directly with North Korean officials in Iran from UN- and U.S.-designated Korea Mining Development Trading Corporation (KOMID). SHIG also coordinates KOMID shipments to Iran. ***The shipments have included valves, electronics, and measuring equipment*** suitable for use in ground testing of ***liquid propellant ballistic missiles***"—the specific class of IRGC ballistic missiles that included the *Qiam* missiles against Plaintiffs.

### 2. BAT Provided ~~Critical~~ Cover and Concealment for ~~the Terror Network~~IRGC *Qiam* and *Fateh* Attacks by Helping DPRK Terrorist Fronts Covertly Leverage the U.S. Financial System on Behalf of the DPRK and IRGC

175. BAT's illicit joint venture with Office 39/Daesong also augmented the support for IRGC and Hizballah *Qiam* and *Fateh* missile attacks by supplying vital access to the U.S.

financial system, and corresponding cover and concealment for such transactions, which are cornerstones of every successful terrorist operation. In this way, Defendants' conduct was even worse than simply depositing cash directly to Office 39 inside North Korea because BAT helped Office 39 (and, by extension, the IRGC through their joint missile venture) leverage the power of the U.S. financial system through financial sources and accounts outside of North Korea.

206.176. BAT's sanctions-evasion, money laundering, and bank fraud-related assistance to Office 39's (and, through it, the IRGC's) missile procurement scheme was extensive, multifaceted, and enduring. *See supra* Part III. Moreover, as BAT knew, its assistance concerned one of the largest potential areas through which North Korean terrorists and their IRGC allies could extract the financial system support, cover, and leverage of U.S. banks in support of their ability to threaten Americans with missiles. The U.N. has confirmed, for example, that tobacco sales have long comprised one of the DPRK's top five sources of import-related cash flow. This also meant that BAT's concealment deprived U.S. counterterrorism authorities, intelligence professionals, and investigators of vast amounts of likely actionable data exposing the missile procurement networks upon which the shared IRGC-DPRK missile threat relied.

207.177. From 2007 through at least 20222017, BAT provided this concealment to Office 39—and, through it, the IRGC and Hizballah, given Office 39's status as a key missile procurement agent for both FTOs, *e.g.*, *supra* ¶ 26—by engaging in the exact behaviors the United NationsU.N. identified as key vulnerabilities in the sanctions regime. As the U.N. found in 2017, North Korea's ability to trade in "lucrative military technologies" relied on the use of "non-nationals of the [DPRK] as facilitators" and companies registered by foreign agents. In 2018, the U.N. reported that "corporate service providers present a key vulnerability," allowing

the DPRK to create front companiesfronts that "leverage the assistance of non-nationals" to move money worldwide. In 2018, the U.N. also reported: "Joint ventures with foreign companies have further generated hard currency through overseas companies with no overt links to designated entities or interests of the [DPRK]." This same report found that the RGB "benefits heavily" from the cooperation of foreign businesses. By 2019, the U.N. concluded that the "deceptive practices of the [DPRK]" enabled it to access the financial system by making use of "complicit foreign nationals to obfuscate their activities" specifically to "raise money for the country's weapons of mass destruction programmes."

178. When BAT BAT's conduct helped Office 39, Tanchon, KKBC, FTB, and KOMID access the RGBinternational financial system to disguise missile-related sales behind a "veil of legitimacy," utilizing fronts and intermediaries to evade detection. As Under Secretary Levey explained in 2006, the designation of Banco Delta Asia as a primary money laundering concern was a direct response to this threat, aimed at cutting off the "willing partner" handling North Korea's "dirty business." By secretly continuing its joint venture with Daesong/Office 39 from 2007 through 2017, BAT continued to supply a "veil of legitimacy" to DPRK missile proliferators who needed such cover to enable their continued supply of missile aid to the IRGC.

208.179. When Defendants helped Office 39 conceal their scheme, and helped Office 39 and, through it, the IRGC, allow Tanchon, KKBC, FTB, and KOMID to leverage the power of the U.S. financial system, Defendants directly increased the flow of aid to IRGC and Hizballah missile attacks. As Congress has found, the United States relies on financial intelligence to disrupt terror networks. 9/11 Commission Implementation Act of 2004, 22 U.S.C. § 2656 Note, Pub. L. 108-458, Title VII, § 7118, 118 Stat. 377 (Dec. 17, 2004). For at least

~~fifteen~~10 years, BAT's conduct willfully obstructed these key efforts, ensuring the financial channels for ~~terror~~the terrorists' missile attacks remained open.

~~**3. BAT Bolstered North Korea's Arms Smuggling Network**~~

~~209. BAT's illicit venture also strengthened the criminal infrastructure North Korea used to move weapons. The BAT-Daesong secret joint venture helped North Korea deepen its ties with global smuggling networks, which it initially leveraged to move cigarettes but subsequently used for proliferation. As the Director of the U.S. Army's Strategic Studies Institute noted in 2010, Office 39 exercised "what is essentially criminal sovereignty," using state tools to perpetrate schemes like cigarette smuggling abroad.~~

~~210. In 2006, the *Wall Street Journal* reported that supplying counterfeit cigarettes had "cemented North Korea's ties to crime organizations," giving the country access to a vast smuggling network capable of moving "almost anything – from forged U.S. banknotes to weapons." According to the *Journal*, a senior Bush administration official warned that "The North Koreans could import technology and export strategic goods and weapons. It's a big deal."~~

~~211. Office 39 and the RGB applied the expertise gained from BAT-enhanced cigarette smuggling directly to their arms sales. As Dr. Chestnut observed in 2007, North Korea applied tools developed in criminal activities – such as the use of middlemen, fronts, and complicated financial arrangements – to proliferation. The regime "transferred its ability to compartmentalize, camouflage operations, and adapt rapidly to enforcement from illicit activity to proliferation." This transfer of expertise was facilitated by personnel overlap: the same Office 39 agents involved in cigarette smuggling were often involved in missile and rocket proliferation.~~

~~212. BAT's products provided physical cover for contraband, including weapons. In 2017, the U.N. reported instances where North Korea used "cigarette packaging" to disguise shipments of military radio communications products and weapons components. Similarly, as~~

Dr. Chestnut warned in 2007, the regime used cigarette cartons to smuggle counterfeit dollars that funded its weapons sales. By bolstering this smuggling infrastructure that Office 39 used interchangeably for cigarettes and weapons, BAT enabled North Korea to transport the missiles and weapons components used in the attacks against Plaintiffs.

213. At all relevant times, BAT knew that a substantial portion of the materials it exported to North Korea were diverted to cigarette counterfeiting or smuggling operations. North Korea—and particularly Office 39—is infamous for smuggling branded and counterfeit cigarettes to exploit the margin between production costs and taxes.

214. BAT actively monitored North Korea's illicit cigarette smuggling. Indeed, after examining a confidential report prepared by BAT and other tobacco companies, the *Wall Street Journal* and *Time* reported in 2006 that BAT knew that the DPRK's cigarette scheme was "all sanctioned by the state" and could generate up to **$720 million annually**.

215. Internal BAT documents confirm it closely monitored this illicit trade. A 2009 BAT presentation explicitly highlighted North Korea as a hotbed of illicit cigarettes (first), and that BAT knew the DPRK was smuggling cigarettes globally, including into America (second):

216. Some of that contraband production and smuggling was BAT's own. As reported by *Daily NK* in 2006, a defector stated, "I am sure that they are producing counterfeit cigarettes more easily since they started the cooperation with a foreign company [BAT], and they must be exporting the products through secret routes." Another defector confirmed awareness that the "Daesung Cigarette Factory" was counterfeiting brands like Marlboro. Investigative journalist Julian Rademeyer reported in 2017 that despite BAT's purported withdrawal, the plant remained in operation. A former DPRK import-export manager stated: "They still have the BAT factory in

~~Pyongyang . . . They are making various kinds of cigarettes including Dunhill and Benson and sometimes they are smuggling it" outside the DPRK.~~

~~217. Based on Office 39's custom and practice, BAT's prior history with Daesong (including awareness of smuggling), and the DPRK's reliance on cigarette counterfeiting and smuggling, a substantial number of cigarettes produced by Daesong-BAT, or with BAT's assistance, were likely counterfeited and smuggled, generating additional revenues that enabled North Korea's missile proliferation activities and the specific missile attacks on Plaintiffs.~~

**~~B. Defendants' Assistance Was Extensive And Continuous~~**

~~218. Defendants' sustained assistance to the North Korea-IRGC-Hizballah joint weapons venture functioned as a financial lifeline for the world's most dangerous proliferation network. BAT's substantial assistance enabled its joint venture partner, Office 39, to power IRGC, Hizballah, and proxy attacks targeting the United States in Iraq and Syria from 2007 through at least 2022.~~

~~219. Defendants' joint venture with Office 39 remained active and highly lucrative throughout the 2010s, generating over $400 million—the decade when Iran's *Qiam* and *Fateh* programs matured from experimental prototypes into lethal, precision-guided systems used to attack Plaintiffs.~~

~~220. The *Qiam* missile's development tracks the height of BAT's scheme. The *Qiam-1* was first successfully test-fired in August 2010—the same year BAT was actively expanding its illicit sales and navigating the new U.S. sanctions regime targeting Office 39.~~

~~221. As BAT continued to move funds through SUTL and sanctioned banks between 2010 and 2015, the *Qiam* underwent significant modifications, including the removal of stabilizing fins (a DPRK design signature) and the integration of a MaRV. During this period,~~

IRGC media outlets boasted that the *Qiam* missile was "specifically built to target U.S. bases in the region," as IRGC media arm *Fars* reported in 2014.

222. By 2017, the *Qiam* had been perfected, stockpiled, and transferred to the IRGC's arsenal, ready for IRGC terrorist attacks.

223. Similarly, the *Fateh* program achieved its most lethal milestones while BAT served as a primary revenue source for North Korea. North Korea and the IRGC upgraded the *Fateh-110* throughout the early 2010s. And in 2015—when BAT Singapore admittedly was facilitating fraudulent wire transfers for the joint venture—Iran unveiled the *Fateh-313*, the variant offering improved precision sufficient to target specific military hangars.

224. Missile programs are capital-intensive. They require a steady stream of hard currency to pay for foreign components, specialized labor, and testing. When funding dries up, production lines stall. By providing a consistent revenue stream, BAT ensured that the North Korea-IRGC-Hizballah joint weapons venture faced no such interruptions, providing the financial runway necessary for these weapons to reach maturity.

225. The hundreds of millions of dollars BAT funneled to Office 39 functioned as **seed capital** for a military-industrial infrastructure that operates on multi-year production cycles. The capital BAT injected into the regime during the height of the scheme was converted into durable assets—missile factories, underground bunkers, and procurement networks—that continued to churn out weapons long after BAT formally sold its North Korean business interests.

226. Specifically, the missiles that struck Plaintiffs in 2020 and 2022 were developed, secured, and stockpiled during the time when BAT was providing hundreds of millions of dollars to Office 39. Missile development requires multi-year production cycles; the R&D, component procurement, and assembly of the arsenals deployed by the IRGC and Hizballah occurred during

the 2007-2017 period when BAT partnered with Office 39/Daesong. The arms built during this period remained operational and were used against Americans, including Plaintiffs, years later.

227. Furthermore, the illicit trade infrastructure BAT fortified proved resilient. The smuggling routes and cash equivalent cigarette economy BAT established continued to generate liquidity for the regime, allowing DPRK operatives embedded in Iran and Syria to maintain their operations through 2023. By hardening these logistical arteries, BAT allowed the North Korea-IRGC-Hizballah joint weapons venture to survive the tightening of international sanctions.

228. The missiles launched at Al Asad Air Base in January 2020 and in Iraqi Kurdistan in September 2022 were not developed overnight. They were the product of years of prior design, testing, production, and stockpiling – processes that occurred while Defendants were generating revenue for Office 39 and its arms-proliferation partners for at least a decade. Defendants' provision of manufacturing infrastructure and sustained revenue during this critical development window ensured that the *Qiam*- and *Fateh*-class systems used to attack Plaintiffs reached operational readiness.

229. Defendants' provision of support to the North Korea-IRGC-Hizballah weapons venture was not episodic (like a series of isolated payments) or incidental, but sustained and critical. Defendants constructed a durable commercial enterprise with a predictable and recurring revenue stream for at least a decade – precisely the type of financial continuity required to support the costly work of long-term missile development, production, and deployment. Indeed, DOJ publicly confirmed in 2025, as a core tenet of counterterrorism policy, that terrorists "often cannot carry out their operations [*i.e.*, attacks] without assistance from foreign companies and financial networks."

230. Plaintiffs do not allege that BAT's misconduct necessarily enabled all IRGC-sponsored terrorism anywhere in the world at any time. Plaintiffs instead allege that BAT was responsible for a discrete subset of IRGC-sponsored terrorism: missile and rocket attacks in the Middle East from 2007 through 2022, which were a natural and virtually inevitable consequence of BAT's extraordinary misconduct. Plaintiffs expressly disclaim any allegation that BAT's conduct assisted any IRGC attack type in any geography other than IRGC-sponsored attacks in the Middle East from 2007 to 2022 that had a nexus to the deployment of missiles or rockets.

## VI. THE IRGC AND HIZBALLAH, WITH NORTH KOREAN SUPPORT, USED DEFENDANTS' RESOURCES TO CARRY OUT ATTACKS THAT KILLED AND INJURED AMERICANS

### A. January 8, 2020 Missile Attack in Iraq

231. On January 8, 2020, a combined terrorist group comprised of IRGC terrorists in Iran (drawn from the Qods Force, Intelligence Organization, and Missile Command) and a joint Hizballah/Kataib Hizballah cell in Iraq committed a complex attack targeting the United States at Al Asad Air Base in Anbar, Iraq, and at Erbil Air Base in Erbil, Iraq.

232. Hizballah played a vital role in the attack. Its leadership—including Secretary General Hassan Nasrallah, and senior Iraq-operations leaders Mohammad Kawtharani and Yusuf Hashim—commanded the operation in Iraq. Hizballah pulled together the disparate elements of the attack, coordinating the on-the-ground intelligence collection, surveillance drone operators, and spotters, with the missile batteries in Iran that IRGC agents controlled. Hizballah assumed this prominent role for two primary reasons. First, under long-standing custom and practice, Hizballah was responsible for leading high-profile proxy attacks against the United States in Iraq. Second, the U.S. counterterrorism strike on January 3, 2020, which killed Qasem Soleimani and Abu Mahdi al-Muhandis, created an immediate operational void. Hizballah was the only

credible option capable of coordinating the various terrorist components needed to execute such a complex attack in the chaotic five-day window between Soleimani's death and the retaliation.[6]

233. The attack began around 1:30 A.M. local time and lasted more than three hours. It was a well-planned strike reflecting extensive preparation, including the use of Kataib Hizballah terrorists performing pre-attack intelligence gathering.

234. The attack relied heavily on the North Korean-IRGC-Hizballah joint weapons venture. The complex attack included a mix of weapons and technologies, including but not limited to *Qiam*- and *Fateh*-class missiles; UAVs for surveillance and targeting; electronic warfare devices and GPS jammers; and encrypted communications, including mobile phones, laptops, and Motorola radios reconfigured by Iran Electronics Industries ("IEI"). This was one of the first times the IRGC fired large numbers of *Qiam*-class missiles.

235. At the same time as the strikes, the IRGC launched a coordinated disinformation campaign targeting American military families. IRGC-controlled media falsely claimed that "more than 80 U.S. forces" had been killed. This tactic was designed to leverage the "fog of war" to terrorize families in the United States before accurate casualty assessments could be released—a signature tactic Hizballah perfected against Israel in 2006.

236. The attack violated the laws of war. The terrorists wore no uniforms, failed to distinguish themselves as combatants, and indiscriminately placed civilians at risk.

**B. September 28, 2022 Attack in Iraqi Kurdistan**

237. On September 28, 2022, a joint cell comprised of Hizballah and Kataib Hizballah in Iraq and the IRGC in Iran committed a massive missile and UAV attack in Iraqi Kurdistan.

[6] The January 8, 2020 missile attack was part of "Operation Martyr Soleimani," which spanned multiple geographies and modalities of terrorist violence, and killed or injured scores of American service members between January 8-11, 2020.

238. The joint cell launched at least 70 *Fateh*-class missiles and dozens of Shahid-class UAVs at Kurdish refugee camps in Koya, Iraq.

239. The attack was planned and authorized by the IRGC. It relied on IRGC-supplied weapons, including at least 70 *Fateh*-class missiles—the same arms jointly developed by the IRGC and Office 39. The terrorists used IRGC-supplied intelligence, including satellite imagery and real-time UAV feeds, to target the victims. Consistent with long-standing IRGC, Hizballah, and Kataib Hizballah TTP and custom and practice, Hizballah and Kataib Hizballah were very likely involved in supplying localized, pre-attack intelligence, including pattern of life intelligence that helped maximize attack lethality.

240. The attack was an indiscriminate act of terror. As confirmed by witness statements and U.S. government condemnations, the attack targeted a civilian area, killing 13 people and injuring several schoolchildren.

## VII. DEFENDANTS' CONDUCT TARGETED THE UNITED STATES AND THE EASTERN DISTRICT OF VIRGINIA, AND HAD A SUBSTANTIAL NEXUS TO THIS DISTRICT

### C. Defendants' Conduct Targeted The United States, Including The Eastern District of Virginia

241. Defendants' conduct targeted the United States generally, and the Eastern District of Virginia specifically, through a multi-faceted campaign of terror finance and illicit trade. Defendants targeted U.S. government entities and decision-makers in this District—specifically the Department of Defense at the Pentagon in Arlington, Virginia—through participation in a "Counterpressure" scheme designed to coerce U.S. policy. And they targeted victims in this District, including Philip Morris USA (headquartered in Richmond, Virginia), by flooding the U.S. market with counterfeit cigarettes that funded the very arms used to attack Americans.

### 1. Defendants Targeted the United States by Participating in DPRK-Sponsored Missile Attacks

242. First, each Defendant targeted the United States by agreeing to become an active participant in the North Korea-IRGC-Hizballah joint weapons venture.

243. BAT and BAT Singapore targeted the United States by partnering with the architects of this venture—Office 39, KOMID, the RGB, and the Kim regime. Defendants operated a complex, integrated scheme to power Hizballah and IRGC missile attacks that they knew targeted the United States. This partnership was not merely commercial; it was a strategic alliance with actors whose primary purpose was to threaten American national security. Indeed, Defendants did so while knowing that a core objective of North Korea's support for Middle Eastern terrorism was to distract U.S. policymakers from its own proliferation. As Dr. Bechtol explained in 2010, supporting terrorists targeting U.S. allies was "an important element in keeping Washington's efforts focused on these terrorist acts—and not on North Korea."

244. Defendants' targeting was knowing. For decades, Congress has warned the world that America exercises broad jurisdiction over conduct sponsoring terrorist attacks against Americans. The Antiterrorism and Effective Death Penalty Act of 1996 enshrined the finding that "international terrorism is a serious and deadly problem that threatens the vital interests of the United States" and that Congress exercises "universal prosecutive jurisdiction" over persons involved in such acts. 18 U.S.C. § 2339B, Stat. Notes, Int'l Terrorist Fundraising Prohibition; Findings and Purpose, Pub. L. 104-132, Title III, § 301(a), 110 Stat. 1247 (Apr. 24, 1996).

### 2. Defendants Targeted the United States and This District by Strengthening Illicit DPRK Cigarette Networks and Profits

245. Second, each Defendant targeted the United States by facilitating and profiting from illicit DPRK cigarette sales to customers inside the United States—sales that generated the U.S. dollars vital to the North Korean terrorist sponsors.

246. BAT and BAT Singapore agreed to operate a secret joint venture that relied on illicit sales to the U.S. market. According to a report by *GlobalData* in 2019, North Korean smokers – and smugglers – preferred "American" brands comprising "Virginia" tobacco. As Defendants knew (and the Justice Department later reported in 2015), from 2002 to 2005 alone, counterfeit Marlboro® cigarettes originating from North Korea were detected in 1,300 incidents within U.S. jurisdiction, including incidents of DPRK counterfeits discovered in Virginia.

247. A substantial volume of BAT-supplied, DPRK-produced counterfeits were smuggled into America. In 2005, U.S. authorities seized over a billion fake cigarettes, many from North Korea. By 2015, as DPRK scholar Dr. David Asher testified to Congress, counterfeit cigarettes were North Korea's "largest export," with trafficking "all over the United States."

248. This illicit trade created a specific nexus to the Eastern District of Virginia. As Defendants knew, their DPRK partner sold counterfeit Marlboro® cigarettes, committing intellectual property ("IP") crimes in this District. This conduct harmed Philip Morris USA in Richmond, Virginia by misappropriating its IP to enhance the value of illicit DPRK cigarettes.

249. These IP crimes also funded terrorism. As the Secretary General of Interpol testified to Congress in 2003, there is a "direct connection between financing of terrorism and intellectual property crime," with terrorist organizations using pirated cigarettes to raise millions of dollars. By powering this illicit trade, Defendants directly connected their assistance to the missile attacks against Plaintiffs to the IP crimes committed in this District.

### 3. Defendants Knowingly and Deliberately Targeted the United States

250. Defendants' targeting of the United States was knowing and deliberate. Defendants knew that U.S. economic sanctions were designed specifically to reduce the threat of violence against America. In 2019, Treasury confirmed that its sanctions were "specifically aimed at countering and neutralizing the DPRK's efforts to undermine U.S. national security."

251. Furthermore, Defendants knew that North Korean support for terrorist attacks via missiles always targeted the United States as the primary enemy. As DPRK scholar Dr. Victor Cha observed in 2024, North Korea has justified its missile tests and terrorist support for decades by citing the "threat posed by" the "United States." By funding the regime's weapons program, Defendants knowingly participated in a campaign directed at the United States.

**D. Defendants' Conduct Had A Substantial Nexus To The United States**

252. Defendants' engagement with the United States resulted from calculated choices designed to maximize the profitability and sustainability of their illicit joint venture with the DPRK. Defendants deliberately chose to launder at least $251,631,903 through correspondent accounts at U.S. banks in at least 228 unlawful, U.S. dollar-denominated transactions, thus expressly directing their conduct at and through America. *See* OFAC Enforcement Release at 2.

253. In conceiving and executing their North Korea scheme, BAT and BAT Singapore purposefully engaged in conduct directed at the United States in at least three distinct ways, supplying unique, "only-from-America" value that augmented the killing power Office 39 supplied to IRGC and Hizballah missile and rocket attacks. First, BAT utilized the U.S. financial system to process hundreds of millions of dollars. Second, BAT leveraged its U.S.-based brand, marketing, intellectual property, and R&D to amplify the value of the illicit cigarettes Office 39 sold. Third, BAT and its partners targeted the U.S. market for illicit cigarette sales, generating the revenue that funded the weapons used to attack Americans.

**1. BAT Deliberately Used the U.S. Financial System to Power its Scheme**

254. BAT and BAT Singapore purposefully engaged in conduct directed at the United States by structuring transactions and issuing public announcements intended specifically to deceive U.S. financial institutions. Their goal was to trick these institutions into processing U.S.

dollar transactions for BAT's and Office 39's benefit, in willful violation of U.S. sanctions targeting the DPRK's supply of arms to the IRGC and its proxies.

255. This deception was successful. BAT's conduct directly caused U.S. dollar transactions worth hundreds of millions of dollars to flow through U.S. banks and the U.S. financial system, ultimately reaching the slush funds that powered the North Korea-IRGC-Hizballah joint weapons venture. "Had the U.S. correspondent banks known that these payments originated in North Korea, they would not have processed the transactions." Information ¶ 54.

256. BAT and BAT Singapore intentionally concealed their continuing interest in, and control over, the North Korea joint venture for the express purpose of deceiving U.S. banks about the origin of the revenues it generated. The purpose and effect of this conduct was the illicit use of the U.S. financial system to process hundreds of millions of dollars routed through North Korean institutions and fronts, in violation of U.S. law. This conduct was squarely aimed at the United States and was part of an illegal scheme that funded North Korean entities known to support the terrorists who injured Plaintiffs. Specifically, the money and cigarettes flowing from the BAT sanctions evasion scheme went to DPRK entities known for proliferating missiles and associated technology to the IRGC terrorists who used those very missiles to injure Plaintiffs.

257. In 2023, BAT and BAT Singapore admitted under oath to engaging in "a conspiracy to commit bank fraud and sanctions violations in connection with the provision by North Korean entities and others of false information to U.S. banks processing U.S. dollar transactions on behalf of North Korean entities, and thus causing the export of financial services from the United States to North Korea" without OFAC licenses. Statement of Offense ¶ 30. BAT Singapore pleaded guilty to bank fraud under 18 U.S.C. § 1344, a statute that requires a *mens rea*

of "knowing" and applies only to U.S. financial institutions and U.S. branches of foreign financial institutions. *See* 18 U.S.C. § 20 (defining "financial institution").

258. Through their deception, Defendants purposefully "cause[d] U.S. persons and entities, to wit, financial institutions located in the United States, to export goods and services, to wit, financial services, with and for the benefit of KKBC, FTB, North Korea, and North Korean entities," which constituted bank fraud and violated U.S. sanctions. Information ¶ 79.

259. While BAT "[d]irect[ed] business from North Korea" through its secret joint venture with DPRK "state-owned entities and banks," it knew that doing so "allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts." 81 Fed. Reg. 35441. BAT knew these funds ultimately reached "[e]ntities in North Korea involved in the proliferation of … ballistic missiles" that "conduct[ed] business in, from, or through North Korea, or at the direction of the North Korean government." 81 Fed. Reg. 35441. Indeed, "[i]n spite of" the designation of North Korean terrorist-sponsoring banks like "KKBC" in 2009, BAT "continued to evade sanctions and [help] process financial transactions that support[ed] the proliferation of . . . ballistic missiles by using front companies to clear U.S. dollar transactions through U.S. correspondent accounts." 81 Fed. Reg. 35441.

180. BAT's use of the U.S. financial system was always knowing. Among other reasons, BAT's experience in the U.S. financial system, its in-house financial personnel, and agents knowledgeable about the United States (whose knowledge is imputed to BAT) confirm this awareness. Moreover, Treasury publicly warned multinationals like BAT. The United States has long recognized that enabling terrorist sponsors to access the global financial system—as BAT did here—supplies direct, key support to terrorist attacks. As Under Secretary Levey noted in 2006, for example, Treasury's mission to "sever the lines of financial support to international

terrorists" and to arms proliferators is predicated on the understanding that "[t]here are financial networks that underlie all of these threats."

181. Indeed, the Executive Branch and Congress have both confirmed that North Korean activities during the relevant period had a causal relationship with terrorist attacks committed by other terrorist groups allied with the DPRK. In 2016, Congress found that the DPRK had "sponsored acts of international terrorism," including the "shipment of weapons to terrorists and state sponsors of terrorism" between 2008 and 2016. 22 U.S.C. § 9201(a)(10)(B) (Feb. 28, 2016). In 2018, likewise, State's annual report on terrorism for the year 2017 found that North Korea had "repeatedly provided support for acts of international terrorism" in the time up to, and including, the reporting period, *i.e.*, in 2017 and the years prior to 2017. In both instances, the relevant U.S. findings encompassed the key period near the end of BAT's scheme—after a decade of BAT aid to the DPRK-IRGC-Hizballah joint missile venture had done its damage.

182. Moreover, during BAT's sentencing, Judge Howell found that KKBC and FTB—DPRK banks involved in BAT's scheme and used by Office 39 to conduct international financial activity—"have been designated as WMD proliferators by the Treasury," a fact that BATMS "knew." *U.S. v. BAT*, *supra* ¶ 5, at 31. Judge Howell also found that "North Korea uses KKBC and FTB to mask international financial business of sanctioned proliferators in service of its nuclear ballistic missile and other WMD-related programs that endanger us all." *Id.* at 31-32.

183. BAT has also publicly admitted that it is plausible that illicit cigarettes could have a concrete nexus to financing terrorist attacks. In 2016, for example, BAT admitted in its annual sustainability report that "up to 12% of global tobacco sales" were illegal, and that "[i]ncreasingly, this black market" was "being linked to the financing" of "terrorism," allowing extremist groups to "diversify their revenue streams in order to carry out their horrific attacks."

While BAT's quote was about terrorism generally, BAT's rationale applies fully to the revenues generated by BAT's scheme with Office 39/Daesong given the latter's role as a key missile procurement agent for the IRGC and Hizballah.

~~260.~~ BAT's misconduct directly undermined U.S. efforts to work with American financial institutions to prevent North Korean-sponsored terrorism. On June 14, 2007, for example, the Secretary of the Treasury cautioned that "our financial actions have produced demonstrable impacts on threats" from "terrorist groups" and "dangerous regimes in North Korea and Iran" by leveraging "targeted financial measures" that Treasury could effectively use "because the U.S. is the key hub of the global financial system; we are the banker to the world."

~~261.~~184. ~~BAT's misconduct directly undermined U.S. efforts to work with American financial institutions to prevent North Korean-sponsored terrorism.~~ As Treasury and State observed in 2020, likewise, "the U.S. government's commitment to work with the private sector to prevent" the "facilitation of terrorist activities" with "a focus on Iran" and "North Korea" was a fundamental premise of U.S. foreign policy. For well over a decade, BAT frustrated such efforts aimed at halting DPRK-enabled missile threats against Americans.

~~262.~~185. BAT's misconduct enabled North Korean terrorist procurement agents acting on behalf of the IRGC and Hizballah, such as Office 39, to leverage the credibility, reliability, speed, and strength of the U.S. financial system and the U.S. dollar. This turbocharged the attacks that relied upon arms sourced through the ~~North Korea~~DPRK-IRGC-Hizballah joint weapons venture. As BAT always knew, and *Radio Free Asia* reported in 2011, "U.S. dollars were highly sought after by the corrupt [DPRK] officials because the greenback is easy to keep, and can be used for any purpose." Moreover, as BAT knew, the U.N. reported in 2015 that the RGB played important roles in the DPRK's financial system, transporting bulk

cash and arranging clandestine activities where "[i]n most cases . . . … transactions were made in United States dollars . . . … and transferred through corresponding bank accounts in the United States."

263. 186. BAT also knew that its North Korean counterparts, including Office 39, depended upon access to U.S. dollars for the joint weapons venture to succeed. Because the inputs for the venture (*e.g.*, electronics in Asia) were priced and sold in U.S. dollars, North Korea's ability to reliably access the enormous U.S. dollar stockpile that BAT helped build played a primary role in powering the attacks perpetrated by Hizballah and the IRGC. As North Korea scholar Dr. Andrea Berger observed in 2015, BAT's counterparts at Office 39 prioritized obtaining U.S. dollars even above maximizing profits, possibly having been "told by their superiors that generating revenue denominated in foreign currencies, rather than profit, is the top priority." Office 39's motivation was simple: profits denominated in North Korean *won* did not finance the joint weapons venture because the missiles and rockets required U.S. dollars for procurement.

264. 187. As BAT knew, the U.S. dollar was always the DPRK's most important foreign currency to the regime. A. As a 2008 Library of Congress study observed thatnoted, "more than 60 percent" of foreignsuch currency in North Korea "was in U.S. dollars." North Korea's ability to access the U.S. financial system was vital to the DPRK'sits ability to pursue the illicit ends for which it was sanctioned. *Compare* 22 U.S.C. § 9222(a)(4)-(5) (Findings), Pub. L. 114-122, Title II, § 202 ("Ensuring the consistent enforcement of United Nations Security Council resolutions and financial restrictions on North Korea"),, 130 Stat. 104 (Feb. 18, 2016) ("Congress makes the following findings: . . . … (4) All member states share a common interest in protecting the international financial system from the risks of money laundering and illicit

transactions emanating from North Korea. (5) The United States dollar and the euro are the world's principal reserve currencies, and the United States and the European Union are primarily responsible for the protection of the international financial system from the risks described in paragraph (4)."), *with* U.S. Dep't of Treas., *Imposition of Special Measure Against North Korea as a Jurisdiction of Primary Money Laundering Concern,* 81 Fed. Reg. 7871578,715 (Nov. 9, 2016) ("(findings by Treasury that "North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives. . . . . . . . [T]hese deceptive practices have allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts.").

265.188. Moreover, the joint weapons venture depended upon Office 39's ability to access the U.S. financial system through illicit partnerships. In 2014, the U.N. found that the DPRK used "confidential business dealings" to "pool funds in accounts that, in turn, could help to advance prohibited programmes or disguise earnings from arms or proliferation-related transfers . . . through joint ventures where a foreign partner could hold funds on behalf of or for the benefit of designated entities." This is exactly what happened here, with BAT and SUTL serving as the foreign partners holding U.S. dollars for Office 39/RGB.

189. Office 39 and the RGB also applied the expertise gained from BAT-enhanced illicit cigarette financing activity directly to their missile sales. As Dr. Greitens observed in 2007, North Korea applied tools developed in illicit activities—such as the use of middlemen, fronts, and complicated financial arrangements—to proliferation. The regime "transferred its ability to compartmentalize, camouflage operations, and adapt rapidly to enforcement from illicit activity to proliferation." This expertise transfer was enabled by personnel overlap: the same dual-hatted Office 39 agents involved in cigarette activities were often involved in missile proliferation.

190. When Defendants helped Office 39—and by extension, the IRGC and Hizballah—evade these efforts, they strengthened the IRGC's ability to attack Americans in the Middle East. *See supra* ¶¶ 55, 178. Indeed, Dr. Greitens observed in 2007 that the DPRK's proliferation network was squarely linked to terrorist threats because "North Korean criminal smuggling" directly "create channels for proliferation that, by their very nature, evade detection" and thereby "provide terrorist organizations" with weapons, "thus enabling them to stage an attack on the United States."

191. Defendants' financing and concealment aid supplied potent assistance to the IRGC's *Qiam* and *Fateh* attacks against Plaintiffs because the IRGC's ability to propagate such threat, in the first instance, depended upon a vast DPRK-IRGC missile network that required secrecy, sanctions-free funding, and reliable capital—all of which BAT covertly supplied for more than a decade. *See supra* Part III. For example, DPRK scholars Bechtol and Celso observed in 2025 that the "Iran–North Korea partnership" created a "vast technological and scientific infrastructure" through which "[m]uch of Iran's formidable arsenal" of "missile weaponry (much of it based on North Korean designs) has with Pyongyang's assistance been transferred to Tehran's regional proxies" in "Iraq" and "Lebanon" (among other places), and this "*armament nexus*" enabled Iran to "develop[] Hezbollah into a formidable fighting force capable of offensive operations" against the United States in the region.

### 3. BAT Provided Vital Support to North Korean Cigarette Counterfeiting that Financed Missile Procurement

192. BAT's illicit venture also strengthened the criminal infrastructure that Office 39 used to move missiles. Daesong-BAT helped the DPRK dramatically expand cigarette counterfeiting while deepening its ties with global smuggling networks, which Office 39 initially leveraged to move cigarettes but subsequently used for missiles. As the Director of the U.S.

Army's Strategic Studies Institute noted in 2010, Office 39 exercised "what is essentially criminal sovereignty," using state tools to execute schemes like cigarette smuggling.

193. In the late 1990s, North Korean counterfeiting of BAT products was extensive, and the DPRK counterfeits were of poor quality. This cost BAT money two ways. First, BAT lost sales. Second, BAT lost customer loyalty when people purchased subpar fake BAT cigarettes made by Daesong. Equally important, North Korean counterfeit cigarettes flowed to three of BAT's most important markets—the U.S., China, and Japan.

194. BAT's competitors chose to confront Daesong's counterfeiting by working with law enforcement. BAT chose differently: it entered a secret 20-year joint venture partnership with Daesong in 2001. Notably, BAT concealed its Daesong joint venture from 2001 through 2005, only acknowledging it after press reports exposed the scheme.

195. When BAT partnered with Daesong, it did so, in part, with counterfeiting in mind. In June 1994, for example, BAT executive Patrick O'Keeffe laid out what would ultimately become BAT's successful strategy to partner with Office 39/Daesong in an internal memorandum, which proposed exporting a "trial order" of 4 million BAT cigarettes to "a North Korean Company" not just for revenue, but to establish "trademark use" to enable BAT's lawyers to "apply pressure against the counterfeiters currently manufacturing and exporting from North Korea," which BAT knew by then included Daesong.

196. Simply put, BAT recognized that its partnership with Daesong was an alternative means to fighting the counterfeiting of BAT's products. BAT knew, or was willfully blind, that its Daesong partners would never abandon cigarette counterfeiting, but would simply leverage the skills, components, expertise, networks, and funds sourced from Daesong-BAT to revolutionize Daesong's cigarette counterfeiting business as well, while Daesong, in turn,

minimized the counterfeiting of BAT cigarettes while simultaneously increasing overall counterfeiting activity dramatically, on net, by redirecting (and growing) their counterfeiting of BAT's largest rival, Philip Morris, which was the Coke to BAT's Pepsi. In this way, Defendants' motivation to partner with terrorist sponsors (Office 39 and the RGB) through Daesong-BAT to extract economic benefits—a robust solution to then-existing counterfeiting of BAT's cigarettes—mirrored the logic of protection payments to terrorists: in both contexts, the corporate actor partners with a violent or criminal actor with the understanding, and intention, of redirecting such crimes away from the corporation and towards others.

197. BAT's counterfeiting strategy worked as intended: as BAT's value to Office 39/Daesong went up, Daesong's counterfeiting of BAT goods went down. Indeed, from 2007 through 2017, Daesong does not appear to have counterfeited BAT products at scale, even though Daesong intensified its counterfeiting of Philip Morris's cigarettes during the same period. Plaintiffs are unaware of any report documenting any instance of BAT's goods having been counterfeited by North Korean state firms during the period from 2007 through 2017. This stands in contrast to significant counterfeiting of Philip Morris's Marlboro® cigarettes by Office 39 through Daesong during the same period.

198. BAT provided vital assistance to Daesong counterfeiting. Before its partnership with BAT, Daesong was a backwards tobacco firm without the benefit of BAT's industry-leading expertise, technologies, networks, and more. In short, BAT revolutionized Daesong's utility to Office 39 as a tobacco company. That, in turn, meant that Daesong's cigarette counterfeiting became far more potent. Armed with BAT's technical support and expertise, Daesong dramatically expanded its cigarette counterfeiting activities during the precise period when BAT partnered with it. In so doing, Daesong-BAT was an Office 39 front for DPRK

sponsorship of missile threats by the IRGC, and an important component of the Iranian ballistic missile procurement network. According to Dr. Greitens, BAT's participation in Daesong-BAT substantially strengthened Office 39's cigarette counterfeiting operations. *See infra* ¶ 218.

199. The timeline confirms Plaintiffs' allegation. In 2001, BAT executed a 20-year joint venture partnership with Daesong in which BAT supplied technical assistance, know-how, components, and the expertise of the world's largest tobacco firm. In 2002, North Korean cigarette counterfeiting dramatically accelerated. Writing in her 2014 book, Dr. Greitens observed: "Counterfeit cigarettes have been another lucrative trade item for North Korea, linked to the country by both import and export data. This trade is thought to have begun on a small scale in the 1990s, but increased substantially around 2002"—one year after BAT partnered with Office 39. In 2014, she also observed the DPRK's counterfeiting custom and practice to import parts and expertise, reverse-engineer them, and then build a counterfeit export base: the "previous pattern witnessed in the drug trade, where North Korea attempted to import large volumes of a precursor material (ephedrine for the drug trade, packaging for the cigarettes) and was then linked to a series of incidents involving the export smuggling of the finished product (methamphetamine for the drug trade, and counterfeit cigarettes)."

200. Defectors have confirmed it is likely BAT's partnership with Daesong bolstered the latter's cigarette counterfeiting operations. As reported by *Daily NK* in 2006, a defector stated, "I am sure that they are producing counterfeit cigarettes more easily since they started the cooperation with a foreign company [BAT], and they must be exporting the products through secret routes." Another defector confirmed awareness that the "Daesung Cigarette Factory" was counterfeiting brands like Marlboro.

201. At all relevant times, BAT knew that a substantial portion of the materials, technical expertise, and practices it exported to North Korea were diverted to cigarette counterfeiting or smuggling operations. Daesong/Office 39 is infamous for smuggling branded and counterfeit cigarettes to exploit the margin between production costs and taxes.

202. Based on Office 39's custom and practice, BAT's prior history with Daesong (including awareness of smuggling), and the DPRK's reliance on cigarette counterfeiting and smuggling, a substantial number of cigarettes produced by Daesong-BAT, or with BAT's assistance, were likely counterfeited and smuggled, generating additional revenues that enabled North Korea's missile proliferation activities and the specific missile attacks on Plaintiffs. These revenues ultimately flowed through the same Office 39/Daesong channels as did Daesong-BAT currency generation, and were used for the same purpose and to the same effect. Given the scale of DPRK cigarette counterfeiting, its dramatic increase while BAT partnered with Daesong, and the profitability of such conduct, among other reasons, Defendants' counterfeiting-related assistance likely generated currency for the DPRK-IRGC-Hizballah joint missile venture's needs in a comparable, if not greater, amount than what BAT caused through Daesong-BAT.

### B. Defendants' Assistance To *Qiam* And *Fateh* Attacks Was Extensive And Continuous, And Aligned Defendants' Profits With Terrorist Violence

203. Defendants' sustained assistance to the DPRK-IRGC-Hizballah joint arms venture functioned as a financial lifeline for the world's most dangerous proliferation network. BAT's substantial assistance enabled its joint venture partner, Office 39, to power IRGC, Hizballah, and proxy attacks targeting the United States in Iraq from 2007 through at least 2022.

204. Defendants' joint venture with Office 39 was lucrative and easily generated over $400 million, and likely over $1 billion, throughout the 2010s—the period of BAT's scheme

when Iran's *Qiam* and *Fateh* programs matured from experimental prototypes into lethal, precision-guided systems used to attack Plaintiffs.

205. And even after Defendants purportedly exited North Korea in late 2017, Defendants' assistance continued to—quite literally—pay financial dividends to Daesong/Office 39 for at least several years thereafter, *i.e.*, into the early 2020s. Among other reasons, Defendants supplied technical expertise, cigarette manufacturing components, and other invaluable sourcing, financing, and counterfeiting infrastructure during BAT's decades-long partnership with Daesong, Office 39 was able to continue profitably manufacturing cigarettes thereafter as a result. As is commonly the case when a decades-long enterprise involving technical collaboration, network augmentation, and skill transfer—which describes Daesong-BAT—the economic value of the venture typically has a multi-year tail even after one partner exits the venture since the relationships, technologies, networks, and the like created during the venture continue to benefit the firm that remained—like here, where Daesong continued selling cigarettes after BAT exited its joint venture, and continued generating cash flow that was directly attributable to the turnkey assistance BAT supplied to Daesong for at least several years after the venture ended attributable to BAT's acts that revolutionized Daesong's financial capabilities.

206. The *Qiam* missile's development tracks the height of BAT's scheme. The *Qiam-1* was first successfully test-fired in August 2010—the same year BAT was actively expanding its illicit sales and navigating the new U.S. sanctions regime targeting Office 39. As BAT continued to move funds through SUTL and sanctioned banks between 2010 and 2015, the *Qiam* underwent significant modifications, including the removal of stabilizing fins (a DPRK design signature) and the integration of a MaRV. During this period, IRGC media outlets boasted that the *Qiam* missile was "specifically built to target U.S. bases in the region," as IRGC media arm

*Fars* reported in 2014. By the end of 2017, the *Qiam* had been developed, stockpiled, and transferred to the IRGC's arsenal, ready for IRGC terrorist attacks.

207. Likewise, the *Fateh* program achieved its most lethal milestones while BAT served as a primary DPRK revenue source. In 2010, North Korea and the IRGC unveiled the third-generation *Fateh-110*, the variant offering improved precision sufficient to target specific military hangars. And in 2015—when BATMS admittedly was facilitating fraudulent wire transfers for the joint venture—Iran unveiled the *Fateh-313*, which offered longer range.

208. From 2007 through 2017, the *Qiam* and *Fateh* programs were capital intensive. They required a steady stream of hard currency to pay for foreign components, specialized labor, and testing. When funding dries up, missile production lines stall. By providing a consistent revenue stream, BAT ensured that the DPRK-IRGC-Hizballah joint missile venture faced no such interruptions, providing the financial runway necessary for these weapons to reach maturity.

209. The hundreds of millions of dollars BAT funneled to Office 39 functioned as seed capital for the IRGC's and DPRK's shared military-industrial missile infrastructure that operates on multi-year production cycles to create and upgrade missiles, including the *Qiam* and advanced *Fateh* series. The capital BAT injected into Office 39 during the scheme was converted into durable assets—procurement networks, component stockpiles, weapons stockpiles, missile factories, and missile bunkers—that continued augmenting IRGC *Qiam* and *Fateh* missile threats to the United States in Iraq long after BAT formally sold its DPRK business.

210. Specifically, the *Qiam* and *Fateh* missiles that struck Plaintiffs in 2020 and 2022 were developed, secured, and stockpiled during the time when BAT was providing at least hundreds of millions of dollars to Office 39. Missile development requires multi-year production cycles; the R&D, component procurement, and assembly of the arsenals deployed by the IRGC

and Hizballah occurred during the 2007-2017 period when BAT partnered with Office 39/Daesong. The *Qiam* and *Fateh* missiles built and stockpiled during this period remained operational and were used against Americans, including Plaintiffs, years later under long-standing "first in, first out" weapons practice, in which one uses their oldest stock first.

211. The *Qiam* and *Fateh* missiles launched by the IRGC against Plaintiffs were the product of years of design, testing, production, and stockpiling, all funded by revenues generated for Office 39 and its arms-proliferation partners for at least a decade. Defendants' provision of manufacturing infrastructure and sustained revenue during this critical development window ensured that the *Qiam* and *Fateh* missiles used to attack Plaintiffs reached operational readiness.

212. Defendants' provision of support to *Qiam* and *Fateh* attacks enabled by the DPRK-IRGC-Hizballah weapons venture was not episodic (like a series of isolated payments) or incidental, but sustained and critical. Defendants constructed a durable commercial enterprise with a predictable and recurring revenue stream for at least a decade—precisely the type of financial continuity required to support the costly work of long-term missile development, production, and deployment needed for the IRGC's *Qiam* and *Fateh* attacks here.

213. With respect to *Qiam* and *Fateh* missile attacks by the IRGC that involved North Korean assistance, BAT's conduct was pervasive, systemic, and culpable. While Plaintiffs do not allege that BAT's misconduct necessarily enabled all IRGC-sponsored terrorism anywhere in the world at any time, Defendants are responsible for a discrete subset of IRGC-led attacks that utilized the specific models and types of *Qiam* and *Fateh* missiles that Daesong/Office 39 helped develop and supply to the DPRK's principal missile customer, the IRGC, using proceeds generated through BAT's criminal misconduct. There are only two known terrorist missile attacks that harmed Americans involving those missile systems, and both are alleged herein.

214. Defendants operated in a joint missile enterprise with the IRGC, Hizballah, and DPRK in which terrorist missile attacks sponsored by Office 39 ordinarily profited BAT. As Defendants always knew, BAT's joint venture counterparty, Daesong/Office 39, was the essential hub of the DPRK-IRGC-Hizballah joint venture responsible for facilitating joint development and deployment of missiles by terrorists armed by such venture. And as BAT also knew, the DPRK's desire to enter into a business partnership with BAT was motivated in substantial part by Office 39's longstanding function of generating hard currency for the DPRK regime's sponsorship of anti-American terrorism, which was the very reason Kim Jong-Il created Office 39 in the first instance.

215. Judge Howell concluded at sentencing that BAT and BATMS's misconduct "was flagrant and lengthy, over a term of years," involving deliberate efforts to evade U.S. sanctions and deceive U.S. banks while generating "millions and millions of dollars" for DPRK arms proliferators. *U.S. v. BAT*, *supra* ¶ 5, at 32. While the court observed that the underlying criminal acts involved tobacco, it emphasized that Defendants' misconduct was carried out through sanctioned DPRK bank arms proliferators and involved efforts to conceal the DPRK role in the transactions. For example, when a bank raised concerns about the origin of funds, BATMS and its counterparties discussed submitting "documents that will not show DPRK" and ultimately advised canceling the transfer in response to bank scrutiny—conduct Judge Howell described as "pretty flagrant and well-known." *Id.*

216. Defendants' admitted misconduct was not ordinary commercial activity, but a pervasive, systemic, and culpable scheme to channel funds through the shared DPRK-IRGC sanctions-evading financial network that supports missile attacks sponsored and committed by both. *Supra* ¶¶ 31, 35 (Office 39, Tanchon, KKBC, and FTB acted as logistics agent for IRGC

missile deals); ¶ 105 (above DPRK terrorist fronts shared missile-related procurement, financial, and logistical networks with IRGC); ¶ 1 (elements of above DPRK sanctions evasion network with which BAT partnered provided on-the-ground support to IRGC missile efforts inside Iran).

## V. PLAINTIFFS' EXPERTS HAVE CONFIRMED THE AMENDED COMPLAINT'S ESSENTIAL CULPABILITY AND NEXUS ALLEGATIONS

217. As noted above, Plaintiffs have retained and consulted renowned subject matter experts. *Supra* ¶ 18. Those experts have confirmed that BAT's partnership with Daesong enabled the DPRK-IRGC-Hizballah joint venture to develop and deploy the specific *Qiam* and *Fateh*-class missiles used to attack Plaintiffs. In other words, they have confirmed the veracity and plausibility of Plaintiffs' essential allegations regarding Defendants' culpability and the nexus between Defendants' misconduct and the attacks that injured Plaintiffs.[7] In further support of Plaintiffs' claims, Plaintiffs allege the facts quoted below.

218. **Dr. Sheena Chestnut Greitens**. Plaintiffs retained and consulted with Dr. Greitens concerning BAT's admissions in its criminal case and guilty plea, DPRK illicit networks, hard-currency-generation activities, sanctions evasion, proliferation-related networks, and Office 39 operations. Dr. Greitens is an Associate Professor at the University of Texas at Austin Lyndon B. Johnson School of Public Affairs and Director of the Asia Policy Program. Dr. Greitens has closely studied North Korea for over two decades. Her scholarship includes "Illicit Activity & Proliferation: North Korean Smuggling Networks," published in *International*

[7] The factual allegations herein are independently supported by, among other things, Defendants' own admissions and internal documents, public records, sanctions findings, government reports, congressional materials, public reporting, and other sources cited throughout this Amended Complaint. Plaintiffs' expert analyses are included to provide additional factual context and corroboration—grounded in each expert's specialized knowledge, specific evidence, and the detailed factual allegations set forth herein—concerning BAT's April 2023 criminal resolution, missile proliferation, sanctions-evasion financing, and DPRK-IRGC missile cooperation, including issues specifically challenged in Defendants' Motion to Dismiss [Dkt. Nos. 30-31].

*Security*, and "Illicit: North Korea's Evolving Operations to Earn Hard Currency," published by the Committee for Human Rights in North Korea. She has also held affiliations with the U.S. Army War College, Carnegie Endowment for International Peace, Harvard University's Fairbank Center, Brookings Institution, and Center for Strategic and International Studies. Dr. Greitens has traveled to North Korea for her research, interviewed former DPRK officials concerning its illicit networks, and researched BAT's activities in the region, including an interview with a former BAT executive in South Korea. Dr. Greitens has reviewed portions of this Amended Complaint relevant to her areas of expertise and confirmed that the allegations concerning Office 39 operations, DPRK illicit trade practices, sanctions-evasion financing, and the role of foreign-currency-generation networks in supporting DPRK proliferation activities are consistent with her expert analysis and opinions. In her analysis, Dr. Greitens shared specific facts and her opinions, including as follows:

a. "North Korea's joint venture with British-American Tobacco (BAT) was not simply a business deal to sell a handful of tobacco and cigarette components to a North Korean Tobacco Company. It provided an otherwise extraordinarily isolated regime with the ability, at scale, to continue funding and developing its missile program during a critical period."

b. "North Korea's joint venture with BAT provided a key means for North Korea to earn hard currency, at a time (mid-2000s) when other illicit sources of revenue were drying up due to enforcement pressure. Few if any other sources were capable of filling this gap. BAT's joint venture could, simply through its profits, and then also provided significant additional financial benefits through its contribution to North Korea's counterfeit cigarette industry."

c. "Multiple credible sources assessed that DPRK state-sponsored drug production and trafficking, previously one of its most lucrative hard currency earning operations, decreased significantly in the mid-2000s and onward."

d. "The BDA finding in September 2005 [*supra* ¶ 106] quoted estimates by the Congressional Research Service that drug production and trafficking alone had generated anywhere from $85 million to $500 million for the regime annually from 1997 to 2005, noting that $200 million a year from the drug trade was an estimate 'widely encountered in the U.S. policy community.' Loss of drug trade income alone, therefore, created a

revenue gap of ~$100-$200 million annually in the mid-2000s that North Korea had few options to fill."

e. "The income provided by North Korea's joint venture with BAT allowed Pyongyang to offset the drop in hard currency income from revenue streams that had been placed under enforcement pressure (such as drug production/trafficking and currency counterfeiting). The BAT joint venture appears to have been the largest revenue source that North Korea used to offset or make up the unexpected shortfall."

f. "However, BAT's arrangement also provided additional financial benefits to North Korea by sending it the materials, equipment, and know-how to gain a foothold in high-quality cigarette counterfeiting, which by the late 2000s had become North Korea's most lucrative new source of revenue and foreign income/hard currency."

g. "BAT played a unique role in funding North Korea's 'court economy' at a time when other entities, even Chinese banks that had previously been more risk-acceptant on business with North Korea, were reducing their exposure."

h. "North Korea has a demonstrated pattern of using joint ventures and front companies to obtain knowledge, precursors, and materials that enable the regime to subsequently engage in sophisticated counterfeiting. This is the model that the BAT joint venture provided for North Korean cigarette counterfeiting."

i. "Thus the most conservative estimates of the North Korean regime's profits from cigarette counterfeiting in the period relevant to this [amended] complaint approximate or exceed the entire amount previously obtained by drug production/trafficking, possibly by a significant margin."

j. "The North Korean entities, including Daesong, that BAT partnered with in its joint venture are key organizations in North Korea involved in both illicit activities and arms exports. By the time that BAT/BATMS agreed to covertly continue their joint venture operations, the overlap between North Korean financial institutions and the networks used to support its weapons development and terrorism-related activities were clear. Additional information accumulated on these connections in the first several years of BAT's covert arrangement. These actors form part of a network in which Office 39 acts as the coordinating node: Daesong and KOMID carry out activities directed by Office 39, while Tanchon, KKBC, and FTB provide financial and banking support."

219. **Dr. Jeffrey Lewis**. Plaintiffs retained and consulted with Dr. Lewis concerning BAT's admissions in its criminal case and guilty plea, missile proliferation, DPRK weapons programs, ballistic missile development, and DPRK-Iran missile cooperation. Dr. Lewis has nearly three decades of experience in proliferation-related issues. He is a Distinguished Scholar of Global Security at Middlebury College and a Distinguished Fellow at the Foreign Policy

Research Institute. Dr. Lewis also serves as Director of the East Asia Nonproliferation Program at the James Martin Center for Nonproliferation Studies, is a member of the National Academies of Science, Engineering and Medicine's Committee on International Security and Arms Control, and previously served as a member of the U.S. Department of State's International Security Advisory Board. His publications include numerous works concerning missile proliferation, nonproliferation, Iran, and North Korea. Dr. Lewis has reviewed portions of this Amended Complaint and confirmed that the allegations concerning DPRK-Iran missile cooperation, proliferation financing, and the development, procurement, and sustainment of the *Qiam*- and *Fateh*-class missile systems are consistent with his expert analysis and opinions. In his analysis, Dr. Lewis shared specific facts and his opinions, including as follows:

a. "Between 2007-2017, British American Tobacco functioned as an arm of the DPRK-Iran cooperative missile venture, a proliferation network sanctioned by the United States and United Nations in which Iran and North Korea worked in concert to develop a new generation of ballistic missiles. BAT's piece of the action, so to speak, was at least $400 million. North Korea was able to launder more than $400 million, which had been frozen by US sanctions at Tanchon Commercial Bank, and use it to establish front companies that generated hard currency from cigarette sales for the missile program. These front companies generated hundreds of millions of dollars at precisely the same time North Korea needed hundreds of millions of dollars to fund its participation in the venture. This money was beyond the reach of the U.S. Treasury, making it especially valuable to finance North Korea's role as a procurement agent for its partners, including Iran. Iran received assistance it could not otherwise acquire in the development, testing, and production of a new generation of ballistic missiles developed and stockpiled during this period, notably the *Qiam* and advanced *Fateh*-series short-range ballistic missiles that were used by the IRGC precisely as they were intended—against American servicemembers."

b. "Each of the parties had an essential role to play in freeing more than $400 million in frozen funds to help finance the development of weapons such as the more than a dozen *Qiam* and advanced *Fateh*-series missiles that injured U.S. persons in 2020 and 2022. Without BAT's and North Korea's contributions, the missile venture would likely have not succeeded."

c. "Had BAT not committed sanctions evasion and bank fraud, North Korea could not have used the funds frozen at Tanchon Commercial Bank and the banks Tanchon controlled. Without the ability to use funds at Tanchon Bank and the banks it controlled, North Korea could not have acted as a procurement agent. North Korea was the only party

willing and able to aid Iran in developing these missiles, particularly to act as a procurement broker on its behalf."

d. "The Iranians claim, and photographs and videos of the missiles that I have personally examined support, that the *Qiam* and advanced *Fateh*-series missiles were developed and began production during the period that BAT was committing sanctions evasion and bank fraud. The *Qiam* and advanced *Fateh*-series missiles that Iran developed during the period in which BAT was acting as an arm of the proliferation network were a dramatic improvement over older, less accurate *Scud*-C and early generation *Fateh*-110 missiles. The advances Iran made in missile accuracy shown by the *Qiam* and advanced *Fateh*-series missiles—missiles that the IRGC used to grievous effect on January 8, 2020 and September 28, 2022—occurred during BAT's 2007-2017 scheme with North Korea. Without North Korea's cooperation, again substantially financed by the sanctions evasion and bank fraud scheme with BAT, Iran almost certainly could not have developed the *Qiam* and advanced *Fateh*-series missiles or used them to harm anyone."

e. "During this period, Iran also acquired materials and components that Iran used to produce hundreds of *Qiam* and advanced *Fateh*-series missiles. In general, militaries around the world, including Iran, use the oldest munitions in a stockpile first (a practice called "first-in, first-out"). Prior to 2020, Iran used only a handful of the missiles it produced with North Korean assistance, making it highly likely that, in 2020 and after, Iran continued to draw from stockpiles of missiles produced during the period of BAT's sanctions evasion and bank fraud scheme or using materials and components acquired during the period of BAT's scheme."

f. "Without access to the financial markets, the North Korean-Iranian missile venture would not have been able to purchase crucial items necessary to design, test, or produce missiles."

g. "The U.S. intelligence community consistently assessed that Iran was dependent on foreign assistance during this period. North Korea acted as a procurement agent for Iran. During the period of BAT's sanctions evasion and bank fraud scheme, Iran needed to import many of the components of *Qiam* and advanced *Fateh*-series missiles sought by the IRGC, including high-strength materials such as aerospace-grade aluminum for airframes and graphite for jet vanes, precursors for propellant including aluminum powder, and electronic components for guidance systems. Many of Iran's efforts to procure these items were blocked or interdicted. The United States made substantial efforts to interdict shipments of these components in this period. The United States could not, however, interdict every shipment; that is why restricting access to financial markets is a crucial element of any strategy to combat this network. With sufficient funds, North Korea and Iran could make multiple attempts to procure needed materials and goods. Even if some shipments are detected, others will not be. This is also why BAT's assistance is so meaningful."

h. "Iran was, nonetheless, able to procure those items used as components of *Qiam* and advanced *Fateh*-series missiles. North Korea is known to have acquired the same items at the same time and to have acted as a procurement agent on the part of this network. North

Korea almost certainly played a crucial role as a procurement agent for IRGC in this period. Without these items, as well as broader technical assistance from North Korea, Iran could not have developed or stockpiled the *Qiam* and advanced *Fateh*-series missiles used in 2020 and 2022. For North Korea to play this role, it required money and, just as crucially, money that was outside the reach of the long arm of the U.S. Treasury."

i. "BAT's unique and indispensable role in the network allowed North Korea to turn more than $400 million frozen at a sanctioned bank into many more hundreds of millions of dollars that could be used to pay for missile factories, the tools that go in them, the personnel inside, and the materials and components to make the missiles themselves, to fuel them, and to guide them to their targets. BAT's role in the network was as important to the success of the cooperative missile venture as the functions performed by the other eight entities initially sanctioned in EO [13382]. Indeed, many entities and individuals later designated under EO [13382] appear to have had much smaller financial roles in the network than BAT did between 2007-2017."

j. "During the period of BAT's involvement with the cooperative missile venture, there were materials and components necessary for the *Qiam* and advanced *Fateh*-series that only North Korea could likely provide. These represented 'chokepoints' without which the Iranian missiles would not work and, therefore, without which no one would have been injured. Each party understood what it gained from the network."

k. "This cooperative missile venture was operating during the development of the *Qiam* and advanced *Fateh*-series missiles. Iran developed the *Qiam* and its current generation of advanced *Fateh*-series missiles between 2010-2017. To support development of their ballistic missiles, North Korea and Iran constructed large infrastructure to design, test and produce ballistic missiles, much of which is placed underground. Iran reportedly aided in construction of the underground portions of these facilities. Iranian and North Korean technicians were reportedly co-located in both countries. UN reports document extensive travel between experts from the two countries."

l. "These expenses include both the costs of creating the production infrastructure as well as sourcing components and materials. For any missile program such as the *Qiam* or advanced *Fateh*-series, funds are necessary to procure materials, components, tools, computers, and software from abroad, as well as to pay for personnel expenses. North Korean missile experts often receive training abroad, are given special rewards such as luxury watches and foreign cars for their work, and incur expenses traveling to and living in Iran. Creating the production infrastructure likely cost several hundreds of millions of dollars. When North Korea exported production lines to Iran and Pakistan for early generation *Scud*-derived missiles (the precursor to the *Qiam*) in the 1990s, the reported prices were $120 million and $150 million, respectively, or around $200-250 million in 2016 dollars."

m. "The costs associated with the annual production of *Qiam* and advanced *Fateh*-series missiles would have been on the order of several hundred million dollars each year those missiles were produced. During the period of BAT's sanctions evasion and bank fraud scheme, Iran and North Korea *each* produced at least 100 missiles per year, mostly of

these classes of missiles. In 2017, North Korea offered different types of *Scud*-derived missiles for sale for $3 million and $5 million each, suggesting the approximate cost to produce them was somewhat less. Therefore, *Qiam* and advanced *Fateh*-series missiles likely cost a few million dollars each to produce. Overall, North Korea would have required several hundred million dollars a year to fund its role in the cooperative missile venture."

n. "Absent access to these materials and components, Iran could not have developed and produced these missiles. North Korea had similar requirements and, during this period, sought to procure these items for itself and others. The hundreds of millions of dollars made available to North Korea by BAT's sanctions evasion and bank fraud scheme would have been extraordinarily valuable for this purpose. Essential to North Korea's ability to act as a development partner and procurement agent for the IRGC within the context of the cooperative missile venture was the ability to access funds outside of US sanctions, especially dollars, to pay for the materials that would be sold to Iran and others. For North Korea to purchase items such as aluminum powder, graphite, high-strength aluminum, or electronics associated with missile guidance, either for itself or on behalf of another party such as the IRGC, it needed access to substantial funds outside of sanctions."

o. "BAT substantially aided North Korea's ability to procure controlled goods for Iran's missile program. The crimes to which BAT pleaded guilty resulted in the laundering of more than $400 million in funds held by the Tanchon Commercial Bank, the commercial arm of North Korea's missile program, and the banks it controlled, like KKBC. These funds were not available to North Korea's missile program until BAT tricked US financial institutions into processing them."

p. "In exchange, North Korea was able to establish a cigarette manufacturing business, a sector that the U.S. Department of Treasury believes earns North Korea more than $1 billion a year. By Treasury's estimate, North Korea earned 20 dollars for each dollar Tanchon Commercial Bank transferred to BAT, representing more than $8.3 billion. As these funds were held by front companies that were based outside of North Korea, they were uniquely valuable to North Korea, which routinely directs such front companies to make payments on behalf of the missile program. Given the unique role of North Korean front companies, the high priority the regime places on the program, and the role of Tanchon and KKBC in funding the network from the start, a substantial amount of these funds was almost certainly used by North Korea's missile program."

220. **Dr. Tom Karako**. Plaintiffs retained and consulted with Dr. Karako concerning BAT's admissions in its criminal case and guilty plea, ballistic missile systems, missile proliferation, DPRK missile threats, Iranian missile capabilities, and the operational characteristics of the *Qiam*- and *Fateh*-class missile systems. Dr. Karako has 25 years of experience in missile and missile defense-related issues. Dr. Karako is the Director of the Missile

Defense Project with the Defense and Security Department at the Center for Strategic and International Studies ("CSIS"), where his research focuses on missile defense, strategic forces, missile proliferation, nuclear deterrence, and related issues. He previously served with the House Armed Services Committee, where he worked on strategic forces, missile defense, nonproliferation, and NATO policy matters. Dr. Karako has authored or co-authored numerous publications concerning missile defense, North Korean missile threats, missile proliferation, hypersonic weapons, and Iranian missile capabilities and multiple CSIS analyses concerning DPRK missile developments and regional missile-defense architecture. Dr. Karako has reviewed portions of this Amended Complaint relevant to his areas of expertise and confirmed that the allegations concerning DPRK-Iran missile cooperation, ballistic missile proliferation, missile procurement and sustainment networks, and the *Qiam*- and *Fateh*-class missile systems are consistent with his expert analysis and opinions; he did not prepare a written analysis.

## VI. THE IRGC AND HIZBALLAH COMMITTED TERRORIST ATTACKS THAT KILLED AND INJURED AMERICANS USING *QIAM* AND *FATEH* MISSILES DEVELOPED AND/OR IMPROVED BY DEFENDANTS' MISCONDUCT

### C. January 8, 2020 Attack In Iran And Iraq – Operation Martyr Soleimani

221. On January 8, 2020, a combined terrorist group comprising IRGC terrorists in Iran and a joint Hizballah/Kataib Hizballah cell in Iraq committed a complex missile attack targeting the United States at Al Asad Air Base in Anbar, Iraq, and at Erbil Air Base in Erbil, Iraq (the "2020 Attack"). The 2020 Attack began around 1:30 A.M. local time and lasted approximately three hours. It was a well-planned strike reflecting extensive preparation, including the use of Kataib Hizballah terrorists performing pre-attack intelligence gathering.

222. The 2020 Attack relied heavily on the North Korean-IRGC-Hizballah joint weapons venture. The attack included a mix of weapons and technologies, including but not limited to over a dozen *Qiam*- and *Fateh*-class missiles that were launched from locations in

Iran. At least 11 of those missiles landed at Al Asad Air Base and at least one struck Erbil Air Base. The *Qiam* and *Fateh* missiles detonated during the 2020 Attack, while UAVs supplied targeting assistance. This was one of the IRGC's largest and most direct strikes ever targeting U.S. personnel and facilities since 1979, and was the first time the IRGC fired large numbers of *Qiam* missiles from its stockpile, having only fired one or two *Qiam* missiles previously.

223. At the same time as the strikes, the IRGC launched a coordinated disinformation campaign targeting American military families. IRGC-controlled media falsely claimed that "more than 80 U.S. forces" had been killed. This tactic was designed to leverage the absence of reliable information to terrorize families in the United States before accurate casualty assessments could be released—a signature tactic Hizballah used against Israel in 2006.

224. The 2020 Attack violated the laws of war. Among other reasons, the Hizballah and Kataib Hizballah terrorists wore no uniforms, failed to distinguish themselves as combatants, and indiscriminately placed civilians at risk, including airline passengers.

**D. September 28, 2022 Attack in Iran and Iraqi Kurdistan**

225. On September 28, 2022, a joint cell comprised of Hizballah and Kataib Hizballah in Iraq and the IRGC in Iran launched at least 70 *Fateh*-class missiles from IRGC sites in Iran and dozens of Shahid-class UAVs, at Kurdish refugee camps in Koya, Iraq (the "2022 Attack"). The 2022 Attack targeted the United States because, among other reasons, the IRGC believed the Kurdish civilian victims to be U.S. allies, and intended to kill and maim them to intimidate the United States while the IRGC was under intense pressure by U.S. sanctions.

226. The 2022 Attack was planned and authorized by the IRGC. It relied on IRGC-supplied weapons, including at least 70 *Fateh*-class missiles—the same arms jointly developed by the IRGC and Office 39. The terrorists used IRGC-supplied intelligence, including satellite imagery and real-time UAV feeds, to target the victims. Consistent with long-standing IRGC,

Hizballah, and Kataib Hizballah tactics, techniques, and procedures and custom and practice, Hizballah and Kataib Hizballah were very likely involved in supplying localized, pre-attack intelligence, including pattern of life intelligence that helped maximize attack lethality.

227. The 2022 Attack was an indiscriminate act of terror. Among other reasons, the attack targeted a civilian area, killing 13 people and injuring several schoolchildren.

## VII. DEFENDANTS KNEW THAT THEIR PAYMENTS TO NORTH KOREA ENABLED THE IRGC'S AND HIZBALLAH'S ATTACKS ON AMERICANS

### E. Defendants Monitored Sanctions, Reports, And Media Warnings About North Korea's Role In Financing IRGC and Hizballah Missile Attacks

228. As a sophisticated, integrated, multinational corporation operating in a highly regulated industry with a substantial presence in the United States, the Middle East, and East Asia, Defendants (per BAT) maintained a rigorous surveillance regime to monitor "geopolitical and economic policy developments worldwide." According to BAT, as part of BAT's formal "risk modelling" and "external risk assessments," Defendants specifically tracked "[g]eopolitical tensions including international sanctions, social unrest, terrorism and organised crime" capable of "disrupt[ing] [BAT]'s business in multiple markets." Thus, BAT actively monitored:

a. every official U.S. and U.N. sanctions designation, including associated releases, reports, and findings targeting, *inter alia*, the DPRK, Daesong, Iran, IRGC, and Hizballah; and

b. other public sources—including articles published by mainstream media outlets, non-governmental organizations, investigative journalists, scholars, and others—that published data relevant to tobacco products and geographies where BAT operated.

229. Defendants executed this monitoring through an internal network comprising compliance, corporate security, anti-illicit trade, media monitoring, strategic communications, and intelligence personnel, as well as thousands of BAT's and BATMS's employees and agents stationed in the United States, North Korea, East Asia, Iran, and the Middle East. The knowledge possessed by such employees and agents is imputed to Defendants.

230. Internal BAT documents confirm that this system functioned as designed, delivering real-time intelligence regarding terrorist financing risks. For example, a July 25, 2000 internal BAT "blast" email summarized twelve separate media reports alerting BAT executives that "Cigarette Smuggling May Link to Terrorists" and warning that illicit sales in the U.S. were being "funneled to" the "Mideast" to "fund Hezbollah." Internal BAT documents also specifically confirm that BAT monitored every specific media outlet named in this Complaint through BAT's media monitoring, corporate security, lobbyist, and advertising functions.

231. BAT supplemented its internal capabilities by retaining lobbyists and law firms in the United States and United Kingdom to monitor U.S. government and U.N. policy changes and legislation in real time. BAT possessed actual, real-time knowledge of every relevant U.S. and U.N. sanctions designation, release, and finding published before or during the conduct alleged herein. *See, e.g.*, Statement of Offense ¶¶ 31, 34, 55, 57 (discussing Defendants' knowledge of U.S. sanctions on North Korea); Information ¶ 55.

232. Defendants knew that Iran was Office 39's largest arms customer and were aware of an overwhelming consensus of reports from the U.S., U.N., U.K., and international media that confirmed that North Korea and Iran were collaborating to strengthen each other's missile programs—with the United States as their shared primary target.

233. Beyond the general alliance, Defendants knew that their partnership and transactions with **BAT's specific scheme counterparties,** including Daesong/Office 39, Tanchon, FTB, and KOMID, directly enabled IRGC missile threats against America. Each of the numerous U.S., U.N., and E.U. findings from 1999 through 2016 concerning BAT's counterparties specifically found that a western firm's transactions with such counterparty could enable the IRGC's missile threat against Americans. *See, e.g.*, *supra* ¶¶ 36, 54, 1, 96, 101, 104-

105, 112, 130, 142, 174. Defendants knew of each in real time, alerting them that their scheme aided IRGC missile attacks.

234. Notably, Defendants also persisted in their aid to IRGC-backed missile and rocket attacks in Iran and Iraq enabled by DPRK weapons aid to the IRGC even after IRGC proxies committed dozens of high-profile missile and rocket attacks in Iraq, Israel, and Lebanon from 2006 through 2017, while BAT continued scheming with such terrorists' key armorer. Defendants did so even though a legion of public sources alerted BAT in real-time that such DPRK aid continued to sponsor such terrorist attacks in the Middle East. *See, e.g.*, *supra* ¶¶ 8, 30, 47, 50-1, 54, 1, 96.

235. The IRGC's deployment of *Qiam*- and *Fateh*-class missiles against U.S. forces and civilians was not an independent or unforeseeable intervening act. It was the precise and intended use of the missiles Defendants helped create and enhance. Defendants knew that Office 39's revenues supplied by BAT's secret partnership with Daesong were directed to North Korean missiles and that those weapons would be supplied to the IRGC and its proxies for use in attacks against Americans. The resulting missile strikes were therefore a foreseeable—if not inevitable—consequence of Defendants' illegal conduct.

236. At all times, Defendants knew that a foreseeable consequence of improving the IRGC's missile and rocket capability was that those weapons would be used in anti-American terrorist attacks by Hizballah and Kataib Hizballah (or "KH"). As confirmed in U.S. government reports and announcements that Defendants actively monitored, Defendants knew that: Hizballah and KH were both striking arms of the IRGC; members of Hizballah and KH swore fealty to Ayatollah Khamenei; and many Hizballah and KH terrorists were members of the IRGC, too.

### F. Defendants' Compliance, Corporate Security, And Intelligence Teams Alerted Defendants That The Illicit Cigarette Trade Was Funding Terrorism

237. BAT's support for IRGC and Hizballah attacks occurred against a backdrop of decades of intense global scrutiny regarding the extreme risk that tobacco-related crimes—including illicit cigarette sales, smuggling, counterfeiting, and intellectual property theft—financed terrorist attacks. In 2003, for example, the U.S. Government Accountability Office reported that "[t]errorists have earned assets through the highly profitable illicit trade in cigarettes" and that "Hizballah" had "earned assets through trafficking in contraband cigarettes or counterfeit cigarette tax stamps." In 2004, likewise, DOJ published a report by a senior American intelligence analyst alerting the industry that "[t]raffickers [of cigarettes] in the United States and the United Kingdom are providing material support to the Hezbollah," among others, and warning that "[b]ecause of the immense profits in the illicit cigarette trade, as well as the potentially low penalties for getting caught, illicit cigarette trafficking now rivals drug trafficking as the method of choice to fill the bank accounts of terrorists."

238. These warnings issued throughout BAT's illicit venture. In 2008, for example, the U.S. House Committee on Homeland Security published *Tobacco and Terror: How Cigarette Smuggling Is Funding Our Enemies Abroad*, a report which concluded that "[i]n just two months of illicit cigarette trade operations, a motivated terrorist cell could generate sufficient funds to carry out another September 11th style attack." In 2015, likewise, the U.S. Departments of State, Justice, Treasury, Homeland Security, and Health and Human Services published *The Global Illicit Trade in Tobacco: A Threat to National Security*, which alerted BAT that "illicit tobacco" continued to grow as a national security threat because "cigarette smuggling" was a "lucrative crime for some terrorist groups and a potential revenue source to finance acts of terror." (Both reports named Hizballah as an example of the cigarette-terrorist attack nexus.)

239. BAT knew of these risks. Its in-house personnel closely monitored United States and media reports, and its own corporate filings and social media confirm it was acutely aware of the terrorist finance risks presented by the cigarette trade. Moreover, BAT always deployed a sophisticated in-house corporate intelligence arm. Armed with this intelligence, BAT knew that North Korea (through Office 39 and the terrorist operations arm RGB) supplied Hizballah and the IRGC with core terrorist tactics, techniques, and procedures. Because the RGB directly trained Hizballah and indirectly trained them through the IRGC, BAT knew that its counterparty's tactics, techniques, and procedures included financing attacks through criminal schemes. Accordingly, BAT's knowledge of the link between Hizballah and cigarettes, combined with its knowledge of the RGB's operations, alerted BAT that its own crimes with terrorist fronts risked financing attacks.

## VIII. DEFENDANTS' CONDUCT INVOLVED THE UNITED STATES

### A. Defendants' Conduct Targeted The United States

240. First, each Defendant targeted the United States by agreeing to become an active participant in the DPRK-IRGC-Hizballah joint weapons venture, a complex, integrated scheme to power Hizballah and IRGC missile attacks that Defendants knew targeted the United States. This partnership was not merely commercial; it was a strategic alliance with actors whose primary purpose was to threaten American national security. Indeed, Defendants did so while knowing that a core objective of North Korea's support for Middle Eastern terrorism was to distract U.S. policymakers from its own proliferation.

241. Defendants' targeting was knowing. For decades, Congress has warned the world that America exercises broad jurisdiction over conduct sponsoring terrorist attacks against Americans. The Antiterrorism and Effective Death Penalty Act of 1996 enshrined the finding that "international terrorism is a serious and deadly problem that threatens the vital interests of

the United States" and that Congress exercises "universal prosecutive jurisdiction" over persons involved in such acts. 18 U.S.C. § 2339B, Stat. Notes (Apr. 24, 1996).

242. Defendants knew that U.S. sanctions were designed specifically to reduce the threat of attacks against America. *See*, *e.g.*, *supra* ¶¶ 30, 180 (United States sanctions were specifically aimed at countering DPRK threats to undermine U.S. national security).

243. Furthermore, Defendants knew that DPRK support for terrorist attacks via missiles always targeted the United States as the primary enemy. As DPRK scholar Dr. Victor Cha observed in 2024, North Korea has for decades justified its missile tests and terrorist support by citing the "threat posed by" the "United States." By funding the DPRK's sponsorship of IRGC missiles, Defendants knowingly participated in a campaign directed at the United States.

## B. Defendants' Conduct Had A Substantial Nexus To The United States

244. Defendants purposefully engaged in conduct directed at the United States in at least two ways, supplying unique, "only-from-America" value that augmented the killing power Office 39 supplied to IRGC and Hizballah missile attacks. First, Defendants utilized the U.S. financial system to process hundreds of millions of dollars. Second, Defendants reached into America to conceal their scheme and supply cover and concealment to the DPRK-IRGC-Hizballah joint arms venture's use of the U.S. financial system to raise and move funds, and the Office 39 procurement network's partnership with the world's leading tobacco firm, BAT.

### 1. BAT Deliberately Used the U.S. Financial System to Power its Scheme

245. BAT and BATMS purposefully engaged in conduct directed at the United States by structuring transactions and issuing public announcements intended specifically to deceive U.S. financial institutions. Their goal was to trick these institutions into processing U.S. dollar transactions for BAT's and Office 39's benefit, in willful violation of U.S. sanctions targeting the DPRK's supply of arms to the IRGC and its proxies. Thus, Defendants deliberately chose to

launder at least $251,631,903 through correspondent accounts at U.S. banks in at least 228 unlawful, U.S. dollar-denominated transactions. *See* OFAC Release at 2. "Had the U.S. correspondent banks known that these payments originated in North Korea, they would not have processed the transactions." Information ¶ 54.

246. In 2023, BAT and BATMS admitted under oath to engaging in "a conspiracy to commit bank fraud and sanctions violations in connection with the provision by North Korean entities and others of false information to U.S. banks processing U.S. dollar transactions on behalf of North Korean entities, and thus causing the export of financial services from the United States to North Korea" without OFAC licenses. Statement of Offense ¶ 30; Information ¶ 79 (BAT caused the export of financial services "with and for the benefit of KKBC, FTB, North Korea, and North Korean entities" in violation of the bank fraud statute and U.S. sanctions). BATMS pleaded guilty to bank fraud under 18 U.S.C. § 1344, a statute that requires a *mens rea* of "knowing" and applies only to U.S. financial institutions and U.S. branches of foreign financial institutions. *See* 18 U.S.C. § 20 (defining "financial institution").

247. Treasury warned in 2016 that the DPRK constituted a Jurisdiction of Primary Money Laundering Concern under Section 311 of the USA PATRIOT Act. *See supra* ¶ 145. Like Treasury's general finding, Defendants "[d]irect[ed] business from North Korea" through their secret Daesong-BAT joint venture with DPRK "state-owned entities and banks," while knowing that doing so "allowed millions of U.S. dollars of DPRK illicit activity to flow through U.S. correspondent accounts." 81 Fed. Reg. 35,441. And like Treasury's fact pattern, Defendants knew these funds ultimately reached "[e]ntities in North Korea involved in the proliferation of … ballistic missiles" that "conduct[ed] business in, from, or through North Korea, or at the direction of the North Korean government," tracking Treasury's DPRK finding. *Id*. Indeed, Defendants'

acts also track that finding: "[i]n spite of" the designation of DPRK terrorist-sponsoring banks like "KKBC" in 2009, BAT "continued to evade sanctions and [help] process financial transactions that support[ed] the proliferation" of "ballistic missiles by using front companies to clear U.S. dollar transactions through U.S. correspondent accounts." *Id.*

248. By accessing the U.S. financial system to transact in U.S.-dollar-denominated transactions, Defendants avoided more costly alternative U.S. dollar-related financial channels in regional financial centers such as Tokyo, Hong Kong, Singapore, and Manila that were available to sanctioned DPRK entities. Even relatively modest increases in transaction costs across hundreds of millions of dollars in transactions would have translated into millions of dollars in additional costs for Defendants and the other missile venture participants. Accordingly, Defendants' contacts with the United States had a direct and substantial impact on the scheme's profitability, liquidity, and operational success.

249. Defendants supplied cover and concealment to financial activity involving Office 39, Tanchon, KKBC, FTB, and KOMID by using contacts with the United States to avoid scrutiny and detection by U.S. counterterrorism and financial-intelligence professionals at Treasury, including FinCEN, DOJ, and other U.S. government components. Defendants also schemed to cause false information to be supplied to U.S. banks and, necessarily, to FinCEN. Through that conduct, Defendants obstructed U.S. counterterrorism operations targeting the missile threat flowing from the DPRK-IRGC-Hizballah joint missile venture by helping DPRK enablers of IRGC missiles preserve the secrecy of their financial networks while the United States was engaged in a whole-of-government effort to identify and dismantle them.

250. BAT's use of the U.S. financial system was always knowing. Among other reasons, BAT's experience in the U.S. financial system, its in-house financial personnel, and

agents knowledgeable about the United States (whose knowledge is imputed to BAT) confirm this awareness. Moreover, Treasury publicly warned multinationals like BAT.

### 2. BAT Reached into the United States to Conceal the DPRK Scheme

266.251. BAT also reached intoconcealed the DPRK scheme through affirmative acts of deception involving the United States to conceal the scheme by, among other things, transmitting fraudulent, including false statements to banksU.S. financial institutions and media organizations in America, including, but not limited to,outlets, such as BAT's transmission of false statements to *Forbes* in the United States in 2007. *Supra* ¶ 130. These affirmative acts of concealment targeted U.S. audiences*See supra* ¶ 1. These acts were designed to preserve and continue the DPRK scheme by shielding it from U.S. sanctions scrutiny, regulators, and shareholders, further deepening the nexus to this forumenforcement authorities.

### 3. BAT Leveraged Marketing Value Derived from BAT's U.S. Contacts

267. BAT leveraged its U.S. contacts to power the branding, marketing, and R&D that enhanced Office 39's ability to sell BAT's tobacco. BAT supplied Daesong with brand and IP advantages. As BAT touted in 2000, it controlled "valuable equity in international brands . . . symbolised to the public through the trademarks," which carried a "reputation for manufacturing high quality cigarettes."

268. BAT depended upon its U.S. contacts to protect its brand through the extensive use of the U.S. IP system.

269. According to BAT, Defendants powered the resale value of Daesong's cigarette sales through BAT's status as an "American" company selling "American" tobacco vetted by the U.S. Food and Drug Administration ("FDA"). Such U.S. regulatory approvals directly increased the resale value of the cigarettes BAT jointly produced with Daesong. Among other reasons, the FDA was universally recognized around the world as the "gold standard" for product safety.

270. According to BAT, Defendants also leveraged BAT research centers in the United States to continually test, refine, and enhance the tobacco every BAT subsidiary and affiliate sold worldwide – necessarily including Office 39/Daesong.

252. Defendants also knowingly deprived the United States, specifically FinCEN, of key financial intelligence that the United States depended upon to identify and counter terrorist finance networks targeting U.S. interests. *See, e.g.*, *supra* ¶ 127.

### E.C. Defendants' MisconductConduct Implicates Important U.S. Interests, Permitting Jurisdiction In U.S. Courts

271.253. Defendants' misconduct violated multiple U.S. laws, including sanctions on North Korea designed to prevent violence against Americans in the United States and abroad. Defendants' misconduct also implicates JASTA's finding that "entities … that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy … of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA § 2(a)(6). For yearsat least a decade, Defendants willfully provided exactly such direct and indirect support to North Korea, the IRGC, and Hizballah. Congress has determined that Plaintiffs, who are U.S. nationals and/or the family members of U.S. nationals, have a strong interest in pursuing justice in a U.S. forum.

272. Plaintiffs, who are U.S. nationals and the family members of U.S. nationals, have a strong interest in pursuing justice in a U.S. forum.

## VIIIIX. PLAINTIFFS WERE INJURED IN TERRORIST ATTACKS ENABLED BY DEFENDANTS' CONDUCT

273.254. Except where otherwise specified, each Plaintiff was a U.S. national at the time of the attack that injured them and remains one today (or, was a U.S. national at death).

### A. Plaintiffs Associated With The January 8, 2020 Erbil Air Base Attack

#### A. Plaintiffs Lommie Blackmon and Cynthia Harmon

274.255. Plaintiffs Lommie Blackmon and Cynthia Harmon were in Iraq working worked as civilian contractors for KBR at Erbil Air Base during the time of the January 8, 2020 Erbil Air Base Attack. Both were, which severely wounded in the attack, which causedboth by causing severe physical and/or psychological injuries. As a result of the attack and their respective injuries, each of these Plaintiffs has experienced severe physical and emotional pain and suffering.

### B. Plaintiffs Associated With theThe January 8, 2020 Al Asad Air Base Attack

275.256. Each of the Direct Victim PlaintiffsPlaintiff in the table below was severely wounded at Al Asad Air Base by the January 8, 2020 Al Asad Attack, resulting in severe physical and/or psychological injuries, including, but not limited to, one or more of the following: Traumatic Brain Injury ("TBI"); post-concussion syndrome; injuries to head, shoulders, knees, elbows, and back; Post-Traumatic Stress Disorder ("PTSD;"); anxiety; acute stress disorder; depression, including major depressiondepressive disorder; panic disorder; sleep disorders, including insomnia and sleep apnea; tinnitus; hearing loss; migraines/headaches; panic disorders; eye convergence insufficiency; psoriasis and psoriatic arthritis; cognitive communication disorder; autonomic dysfunction; benign proximal placementparoxysmal positional vertigo; audioauditory processing disorder; resulting problems with balance, speech, memory, and concentration; severe alcohol abuse disorder; bilateral vestibular system damage

and dysfunction; cervicalgia; cervical lymphadenopathy; thyroid nodules; fibromyalgia~~,~~; lumbar degenerative disc disease; and exacerbation of existing conditions (including multiple sclerosis, thyroid toxicosis paralysis, hyperthyroidism, and Graves' disease). Each Direct Victim Plaintiff below has experienced severe mental anguish~~, as well as~~ and severe physical and emotional pain and suffering~~,~~ as a result of the ~~January 8,~~ 2020 ~~Al Asad~~ Attack and their respective injuries.

| Direct Victim ~~Plaintiff~~Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| ~~Staff Sergeant (~~SSG~~)~~ Toni Alexander | ~~Sergeant First Class (~~SFC~~)~~ Brock Johnson (Husband) |
| Ahmed Alsagar | |
| ~~Sergeant (~~SGT~~)~~ Shanerria Barber | |
| ~~Specialist (~~SPC~~)~~ Patrick Ben | |
| SPC Badekemi Biladjetan | |
| SPC Einreb Bismanos | |
| SGT Julius Brisco | Melissa Brisco (Wife) |
| | T.B., ~~by and~~ through ~~his~~ next friend SGT Brisco (Son) |
| | J.M., ~~by and~~ through ~~his~~ next friend Melissa Brisco (Stepson)[8] |
| SPC Ali Brown | |
| SGT Timothy Brown | |
| SPC James Carson | SPC Mackenzie Kammerer (Ex-Wife)[9] |
| SPC Jaron Carter | Olivia Carter (Wife) |
| | J.C., ~~by and~~ through ~~her~~ next friend SPC Carter (Daughter) |
| ~~Chief Warrant Officer 2 (~~CW2~~)~~ Thomas Caudill | Adrienne Caudill (Wife) |
| | L.H.C.; L.T.C., and O.C., ~~each by and~~ through ~~their~~ next friend CW2 Caudill (Sons) |
| | R.C., ~~by and~~ through ~~her~~ next friend CW2 Caudill (Daughter) |
| CW2 Dolphise Colomb | M.W., ~~by and~~ through ~~his~~ next friend CW2 Colomb (Son) |
| SPC Necollier Daniels | Sarah Daniels (Wife) |
| | C.N.D. and C.T.D., ~~each by and~~ through ~~his~~ next friend SPC Daniels (Sons) |
| SGT Jacob Deer | Samantha Deer (Wife) |
| | J.A.D. and J.C.D., ~~each by and~~ through ~~his~~ next friend SGT Deer (Sons) |

[8] J.M. and every other Associated Family Member Plaintiff that is a stepchild of a Direct Victim Plaintiff lived in the same household as such Direct Victim Plaintiff and considered him the functional equivalent of a biological father.

[9] SPC Kammerer and every other Associated Family Member Plaintiff ~~that~~who is an ex-spouse of a Direct Victim Plaintiff was ~~such~~ married to that Direct Victim ~~Plaintiff's spouse~~Plaintiff at the time of the ~~January 8, 2020 Al Asad~~ Attack.

| Direct Victim ~~Plaintiff~~Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| SPC Corey Faucett | |
| Thomas Feldschneider | Courtney Feldschneider (Wife) |
| | J.F., ~~by and~~ through ~~his~~ next friend Thomas Feldschneider (Son) |
| SGT Julie Ferguson | |
| SGT Mitchell Ferguson | |
| SPC Miguel Figueroa | |
| SSG Aaron Futrell | |
| SGT Steven Garrett | Heather Garrett (Wife) |
| | S.G., ~~by and~~ through ~~his~~ next friend SGT Garrett (Son) |
| ~~Private Second Class (~~PV2~~)~~ Brandon Godwin | |
| SGT Dustin Graham | Malissa Graham (Wife) |
| | H.G., ~~by and~~ through ~~her~~ next friend SGT Graham (Daughter) |
| SGT Stephon Green | Mentoria Green (Wife) |
| | A.G. and S.G., ~~each~~ through ~~their~~ next friend SGT Green (Children) |
| SPC Nathan Grosse | |
| SPC Brett Gustafson | Amanda Gustafson (Wife) |
| | L.G., ~~by and~~ through ~~his~~ next friend SPC Gustafson (Son) |
| ~~Captain (~~CPT~~)~~ Geoffrey Hansen | Allie Hansen (Wife) |
| Kendra Hawkins | |
| CW2 John Hergert | Alyssa Hergert (Wife) |
| | C.H., ~~by and~~ through ~~his~~ next friend CW2 Hergert (Son) |
| SSG Costin Herwig | Jennifer Deaver (Ex-Wife) |
| | J.H., ~~by and~~ through ~~his~~ next friend SSG Herwig (Son) |
| | J.B.R.D. and J.M.D., ~~each by and~~ through ~~his~~ next friend Jennifer Deaver (Stepsons) |
| ~~Private First Class (~~PFC~~)~~ Brandon Hitchings | |
| SGT Suzanne Hodges | |
| PFC Byron Hogan | |
| SPC Kerry Howard | |
| SSG Andrew Jenkins | Megan Jenkins (Wife) |
| | A.J. and S.J., ~~each by and~~ through ~~her~~ next friend SSG Jenkins (Daughters) |
| | P.J., ~~by and~~ through ~~his~~ next friend SSG Jenkins (Son) |
| ~~Major (~~MAJ~~)~~ Alan Johnson | Teri Larson-Johnson (Wife) |
| | J.J., ~~by and~~ through ~~his~~ next friend MAJ Johnson (Son) |
| | Carly Messman (Stepdaughter) |
| | Abby Sigurdson (Stepdaughter) |
| | Samuel Sigurdson (Stepson) |
| SFC Brock Johnson | SSG Toni Alexander (Wife) |
| PFC Tremayne Joiner | |
| SPC Robert Jones | |

| Direct Victim ~~Plaintiff~~Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| SPC Mackenzie Kammerer | SPC James Carson (Ex-Husband) |
| SPC Daunte Keller | |
| SPC Alexander Knowles | |
| SFC Daine Kvasager | C.K. and R.K., ~~each by and~~ through ~~his~~ next friend SFC Kvasager (Sons) |
| SSG Rebecca Kvasager | L.K., ~~by and~~ through ~~her~~ next friend SSG Kvasager (Daughter) |
| SGT Kenneth Lewis | Tammy Senecal-Lewis (Wife) |
| | K.L. and R.L., ~~each by and~~ through ~~her~~ next friend SGT Lewis (Daughters) |
| | R.A.L., ~~by and~~ through ~~his~~ next friend SGT Lewis (Son) |
| | TaVera Green (Stepdaughter) |
| Dennis Licon | |
| SGT Leighton Lim | |
| SSG Deanna Lucchesi | Joshua Lucchesi (Husband) |
| | Anastasia Lucchesi (Daughter) |
| | H.L. and Z.L., ~~each by and~~ through ~~her~~ next friend SSG Lucchesi (Daughters) |
| SGT John Magee | |
| Mazin Mahdi ~~(contractor)~~ | |
| SGT Darius Martin | Amanda Martin (Wife) |
| | M.M., ~~by and~~ through ~~his~~ next friend SGT Martin (Son) |
| | Darlina Martin (Mother) |
| | Cayleigh Martin (Sister) |
| SSG Armando Martinez IV | |
| SPC Isaac Martz | |
| SSG Torrin McDougle | |
| SGT Phillip Mendoza | Melchi Mendoza (Wife) |
| | Alexander Mendoza (Son) |
| SGT Zachary Merrill | Carolina Merrill (Wife) |
| | C.M., ~~by and~~ through ~~her~~ next friend SGT Merrill (Daughter) |
| ~~Corporal (~~CPL~~)~~ Julian Mitchell | |
| SGT James Morgan | Sarah Morgan (Wife) |
| | C.M., ~~by and~~ through ~~her~~ next friend SGT Morgan (Daughter) |
| SPC Ryan Nolan | |
| SGT Brittany Norfleet | Anthony Shappy (Husband) |
| | A.S. and K.S., ~~each by and~~ through ~~her~~ next friend SGT Norfleet (Daughters) |
| SPC Jose Ortiz | |
| SGT Anthony Panchoo | Alexis Panchoo (Ex-Wife) |
| | A.P., ~~by and~~ through ~~her~~ next friend SGT Panchoo (Daughter) |
| Zachary Parker ~~(contractor)~~ | |
| SFC Carlos Porres Jr. | K.L.P. and K.R.P., ~~each by and~~ through ~~her~~ next friend SFC Porres (Daughters) |

| Direct Victim ~~Plaintiff~~Pls. | Associated Family Member Plaintiff(s) |
|---|---|
| CW2 Michael Pridgeon | Rebecca Pridgeon (Wife) |
| | A.P., ~~by and~~ through ~~her~~ next friend CW2 Pridgeon (Daughter) |
| | Mills Pridgeon (Son) |
| | T.P., ~~by and~~ through ~~his~~ next friend CW2 Pridgeon (Son) |
| Patricia Puranda ~~(contractor)~~ | |
| ~~Technical Sergeant (~~TSgt~~)~~ Rachel Quinn | |
| SGT Jason Quitugua II[10] | Francine Rios (Mother), bringing claims both in her personal capacity and ~~in her capacity~~ as representative of SGT Quitugua's estate. |
| | Kaedinn Quitugua (Sister) |
| | Mckenzie-Jae Quitugua (Sister) |
| | Summer Quitugua (Sister) |
| SGT Rodney Ragin | |
| SPC Nilsa Rivera-Villegas | |
| SPC Mason Scarbrough | |
| SSG Jacob Schmidt | |
| PFC Jaron Schneider | Ashley Schneider (Wife) |
| PFC Collin Shepard | Kaitlin Shepard (Wife) |
| SGT Frederick Shilke | Stephanie Shilke (Wife) |
| | W.S., ~~by and~~ through ~~his~~ next friend SGT Shilke (Son) |
| | M.C.R., ~~by and~~ through ~~his~~ next friend Stephanie Shilke (Stepson) |
| | M.D.R., ~~by and~~ through ~~her~~ next friend Stephanie Shilke (Stepdaughter) |
| PFC Michael Smith | Corisia Smith (Ex-Wife) |
| | A.S., ~~by and~~ through ~~her~~ next friend PFC Smith (Daughter) |
| | A.D., ~~by and~~ through ~~her~~ next friend Corisia Smith (Stepdaughter) |
| SPC Gregory Sorensen | |
| Hugh Spears Jr. ~~(contractor)~~ | Brandon Spears (Son) |
| SPC Johnathan Stark | |
| SGT Kevin Stevens | Casey Stevens (Wife) |
| Dolores Syrell ~~(contractor)~~ | |
| William Taber ~~(contractor)~~ | Dagmar Taber (Wife)[11] |
| | Louis Palla (Son) |
| | Samira Palla (Daughter) |

[10] SGT Quitugua, who suffered from a TBI and PTSD that were caused by the ~~January 8,~~ 2020 ~~Al Asad~~ Attack, ~~committed~~died by suicide on October 7, 2021, as a result of those injuries. The Plaintiff members of the Quitugua Family are the survivors and/or heirs of SGT Quitugua and are entitled to recover for the damages he sustained to his person and/or property.

[11] Dagmar Taber, Louis Palla, and Samira Palla are German citizens. However, as the heirs and/or survivors of Mr. Taber—who *is* a U.S. national—they are entitled to recover for the damages he sustained as a result of the ~~January 8,~~ 2020 ~~Al Asad~~ Attack.

| **Direct Victim ~~Plaintiff~~Pls.** | **Associated Family Member Plaintiff(s)** |
|---|---|
| | A.T., ~~by and~~ through ~~her~~ next friend Mr. Taber (Daughter) |
| SPC Nicolaus Trivelpiece | |
| SSG Sandro Vicente | |
| SPC Luis Villegas | |
| ~~First Lieutenant (~~1LT~~)~~ Hailey Webster | John Goetz (Husband) |
| SGT Jeremy Winkler | Tyla Winkler (Wife) |
| | M.A.W. and M.I.W., ~~each by and~~ through ~~his~~ next friend SGT Winkler (Sons) |
| | M.Z.W., ~~by and~~ through ~~her~~ next friend SGT Winkler (Daughter) |
| SPC Mason Wright | |
| Ram Zamel | |

~~276.~~257. Each Associated Family Member Plaintiff in the table above has experienced severe mental anguish and emotional pain and suffering as a result of the ~~January 8,~~ 2020 ~~Al Asad~~ Attack and the injuries suffered by the Direct Victim Plaintiffs to whom they are related.

### C. The Mahmoudzadeh Family

~~277.~~258. Omer Mahmoudzadeh was in Iraq helping refugees in camps near the Democratic Party of Iranian Kurdistan headquarters. He was killed in the ~~September 28,~~ 2022 Attack. Plaintiff Shiwa Nahadi, Mr. Mahmoudzadeh's widow, brings claims in both her personal capacity and as ~~the~~his estate representative ~~of his estate.~~. Plaintiff Tara Mahmoudzadeh, ~~Mr. Mahmoudzadeh's~~Omer's daughter, joins in these claims. As a result of ~~this terrorist~~the 2022 attack, the Mahmoudzadeh family has experienced severe mental anguish, emotional pain, and the permanent loss of Omer's society, companionship, and counsel. Moreover, as ~~Mr. Mahmoudzadeh's~~Omer's heirs and/or survivors, the Plaintiff members of ~~Mr. Mahmoudzadeh's~~his family are entitled to recover for the damages he sustained to his person and/or property as a result of the ~~September 28,~~ 2022 Attack.

## CLAIM FOR RELIEF

### COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)(2) (All Plaintiffs: Secondary Liability; Aiding and Abetting)

~~278.~~259. Plaintiffs incorporate their factual allegations above.

~~279.~~260. To establish a claim for aiding and abetting under the ~~Justice Against Sponsors of Terrorism Act~~JASTA, 18 U.S.C. § 2333(d)(2), Plaintiffs must show~~: (1)~~ that: (1) they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) ~~that~~ they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) ~~that the~~such act of international terrorism was committed, planned, or ~~authorized~~authorized by an organization that had been designated as a Foreign Terrorist Organization ("FTO") at the time of the act of international terrorism; (4) ~~that~~ Defendants were generally aware that they were playing a role in an overall illegal or tortious activity from which ~~the~~an act of international terrorism was a ~~foreseeable~~foreseeable consequence; and (5) ~~that~~ Defendants aided or abetted an act of international terrorism by knowingly ~~provided~~providing substantial assistance.

~~280.~~261. Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

~~281.~~262. The terrorist attacks that injured Plaintiffs were acts of "international terrorism~~" because:~~":

a. the attacks involved violent and dangerous acts that violated the criminal laws of the United States and many States (or would if committed in the ~~United States).~~U.S.). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, ~~kidnapping,~~ and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, ~~hostage taking,~~ damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f;

b. the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, and the United States, and other nations, (ii) to influence the policy of the U.S., Iraqi, and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Iraqi, and other governments by mass destruction, and assassination, and kidnapping; and

c. the attacks occurred primarily outside the territorial jurisdiction of the United States.

282.263. The United States has designated Hizballah, Kataib Hizballah, ("KH"), and the IRGC as Foreign Terrorist Organizations, doing so in 1997, 2009, and 2019, respectively. Each attack was committed by the IRGC and KH, planned, or by the IRGC, KH, and Hizballah, and authorized by the Hizballah, Kataib IRGC and Hizballah, and/or the IRGC. Allwhile all three groups were designated Foreign Terrorist Organizations when the terrorist attacks that killed or injured Plaintiffs occurredFTOs.

283.264. Defendants were generally aware that they were playing a role in an overall illegal and tortious activity that supported and facilitated terrorist organizations and terrorist violence, as evidenced by their guilty pleas admitting to years of criminal misconduct including bank fraud andfrom which the terrorist attacks alleged herein were a foreseeable consequence. As detailed above, Defendants knowingly participated in a decade-long sanctions-evasion. scheme involving DPRK proliferation-linked entities, missile-procurement networks, and designated DPRK financial institutions that were indispensable components within the IRGC's ballistic missile procurement network. Defendants' criminal resolutions further confirm that Defendants understood the unlawful nature of the underlying conduct.

284.265. The terrorist attacks that injured Plaintiffs were a natural, probable, and foreseeable consequence of Defendants' unlawful activity. Years of authoritative public sources established that facilitating illicit tobacco production in North Korea financed missile proliferation to the IRGC and Hizballah, which would use those missiles to attack Americans.

~~285.~~266. Defendants ~~provided assistance~~acted knowingly and culpably, and not innocently or inadvertently. Defendants did so with knowledge of~~, or deliberate indifference to,~~ the fact that they were providing direct and indirect assistance to terrorist ~~organizations~~groups engaged in violent attacks against Americans.

~~286.~~267. Defendants' assistance was substantial in both a quantitative and qualitative sense. By ~~providing~~generating at least hundreds of millions of dollars that financed ~~missile technology and weapons capabilities~~the specific missiles that made the attacks possible, Defendants contributed significantly to the attacks' success.

~~287.~~268. Defendants' assistance was systemic, pervasive, and ~~systemic~~culpable. The assistance involved years of willful misconduct and tremendous sums of money that provided critically important assistance to the ~~Foreign Terrorist Organizations~~FTOs that killed or injured Plaintiffs and their family members.

~~288.~~269. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

~~289.~~270. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

~~290.~~271. Wherefore, Plaintiffs pray this Court:

a. Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b. Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c. Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d. Award Plaintiffs prejudgment interest; and

e. Award Plaintiffs any such further relief the Court deems just and proper.

Dated: ~~January 29~~May 27, 2026

Respectfully submitted,

*/s/ Raj Parekh*

Raj Parekh (Va. Bar No. 101209)
Anthony Asuncion (*pro hac vice* ~~forthcoming~~)
Matthew J. Fisher (*pro hac vice* ~~forthcoming~~)
Adam J. Goldstein (*pro hac vice* ~~forthcoming~~)
Kathryn L. Rakoczy (*pro hac vice* ~~forthcoming~~)
Devin Charles Ringger (*pro hac vice* ~~forthcoming~~)
Tejinder Singh (*pro hac vice* ~~forthcoming~~)
Ryan R. Sparacino (*pro hac vice* ~~forthcoming~~)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
raj.parekh@sparacinopllc.com
anthony.asuncion@sparacinopllc.com
matt.fisher@sparacinopllc.com
adam.goldstein@sparacinopllc.com
kate.rakoczy@sparacinopllc.com
devin.ringger@sparacinopllc.com
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com

*Counsel for Plaintiffs*