**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SHIWA NAHADI, et al., | |
| Plaintiffs, | |
| v. | Case No.: 1:26-cv-274-LMB-WEF |
| BRITISH AMERICAN TOBACCO P.L.C., and BRITISH-AMERICAN TOBACCO MARKETING (SINGAPORE) PRIVATE LIMITED, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    The BAT Defendants ............................................................................... 3

    B.    The Complaint's Attempts To Tie Sales Of Cigarette Components In North Korea To Terrorist Attacks In Iraq Years Later ........................................... 3

        1.    The Attacks Injuring Plaintiffs ................................................... 4

        2.    The Complaint's Attempts To Tie Defendants To The Attacks ............... 4

    C.    Defendants' Acceptance Of Responsibility For Violations Of North Korea Sanctions Between 2007 And 2017 ........................................................ 6

    D.    The Complaint's Attempts To Connect Its Allegations To The United States ............................................................................................... 7

ARGUMENT ................................................................................................................... 8

I.    Defendants Are Not Subject To Personal Jurisdiction In This Court ............................... 8

    A.    The Complaint Does Not Satisfy Rules 4(k)(1)(C) Or 4(k)(2) ........................... 9

    B.    The Exercise Of Personal Jurisdiction Would Violate The Fifth Amendment ....................................................................................... 10

        1.    The Complaint Does Not Allege Sufficient Activities By Defendants Directed At The United States ........................................ 11

        2.    The Complaint Does Not Establish That The Exercise Of Jurisdiction Over Defendants Would Be Constitutionally Reasonable ...................................................................... 13

        3.    *Fuld* Does Not Support the Exercise Of Personal Jurisdiction Here ....... 15

II.    The Complaint Fails To Plausibly Allege Defendants Aided And Abetted The IRGC, Hizballah, And Kataib Hizballah In Carrying Out The 2020 And 2022 Attacks ...................................................................................... 18

    A.    The Complaint Fails To Allege A Concrete Nexus Between BATMS's Tobacco Sales In North Korea From 2007 To 2017 And Terrorist Attacks Committed By Iran-Aligned FTOs In Iraq In 2020 And 2022 ....................... 20

        1.    The Allegations Of Indirect Assistance Are Extremely Attenuated ........ 20

        2.    The Years Of Separation Between Defendants' 2007-2017 Sanctions Violations And The 2020 And 2022 Attacks Further Attenuate Any Nexus To Terrorism ..................................... 27

    B.    The Complaint Fails To Allege That Defendants Intended To Facilitate The 2020 And 2022 Attacks ....................................................... 28

CONCLUSION ................................................................................................................. 30

i

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alsanabani v. Spear Operations Grp.*,
No. 25-cv-1684, 2026 WL 983064 (D.D.C. Apr. 13, 2026)..................................................21

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
480 U.S. 102 (1987)............................................................................................14, 16, 17

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ...............................................................................21, 23, 24

*Averbach v. Cairo Amman Bank*,
No. 19-cv-4, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ........................................................27

*Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"*
283 F.3d 208 (4th Cir. 2002) .......................................................................................10, 13, 18

*Calder v. Jones*,
465 U.S. 783 (1984)............................................................................................................13

*Cartwright v. T-Mobile US, Inc.*,
No. 23-cv-625, 2023 WL 5959424 (E.D. Va. Sept. 13, 2023) ...................................................6

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) .......................................................................................3, 20

*Force v. Qatar Charity*,
No. 20-cv-2578, 2025 WL 43163 (E.D.N.Y. Jan. 7, 2025)....................................................13

*Fraenkel v. Standard Chartered Bank*,
Nos. 24-cv-4484, 24-cv-5788, 2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025) ......................22

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025)................................................................................................8, 11, 15, 16, 17

*Grayson v. Anderson*,
816 F.3d 262 (4th Cir. 2016) ............................................................................................8

*Grizzard v. LG Chem Ltd.*,
641 F. Supp. 3d 282 (E.D. Va. 2022) ...............................................................................15

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)....................................................................................19, 20

*Harriman v. Compton*,
No. 21-cv-1102, 2021 WL 2667062 (D.S.C. June 29, 2021) ...........................................13, 15

*Hassan v. Barzani*,
674 F. Supp. 3d 282 (E.D. Va. 2023) ................................................................................14

*In re Diisocyanates Antitrust Litig.*,
2026 WL 522845 (W.D. Pa. Feb. 25, 2026)..............................................................15, 16, 17

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
 432 F. Supp. 2d 571 (E.D. Va. 2006) ...................................................................30

*Khashoggi v. NSO Grp. Techs. Ltd.*,
 700 F. Supp. 3d 384 (E.D. Va. 2023) ...............................................2, 10, 13, 14, 15

*Khashoggi v. NSO Grp. Techs. Ltd.*,
 138 F.4th 152 (4th Cir. 2025) ......................................................................2, 12

*Lokhova v. Halper*,
 995 F.3d 134 (4th Cir. 2021) ...............................................................................3

*Newman v. Associated Press*,
 758 F. Supp. 3d 1357 (S.D. Fla. 2024) ...............................................................21

*Ofisi v. BNP Paribas, S.A.*,
 77 F.4th 667 (D.C. Cir. 2023).........................................................................22, 24

*Parizer v. AJP Educ. Found., Inc.*,
 No. 24-cv-724, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025) .........................3, 9, 28

*Perdue Foods LLC v. BRF S.A.*,
 814 F.3d 185 (4th Cir. 2016) .................................................................................8

*Przewozman v. Qatar Charity*,
 No. 20-cv-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023)..............................12

*Saudi v. Northrop Grumman Corp.*,
 427 F.3d 271 (4th Cir. 2005) ....................................................................10, 11, 17

*Schrier v. Qatar Islamic Bank*,
 632 F. Supp. 3d 1335 (S.D. Fla. 2022) .............................................................9, 12

*Short v. Hartman*,
 87 F.4th 593 (4th Cir. 2023) ...............................................................................18

*Siegel v. HSBC N. Am. Holdings, Inc.*,
 933 F.3d 217 (2d Cir. 2019).................................................................................27

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
 605 U.S. 280 (2025)......................................................................................29, 30

*Troell v. Binance Holdings Ltd.*,
 No. 24-cv-7136, 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026)..................................22

*Twitter, Inc. v. Taamneh*,
 598 U.S. 471 (2023)...........................2, 3, 8, 18, 19, 20, 23, 24, 25, 27, 28, 29, 30

*Walden v. Fiore*,
 571 U.S. 277 (2014)................................................................................11, 12, 15

**STATUTES**

18 U.S.C. § 2333................................................................................3, 18, 20, 21

18 U.S.C. § 2334.................................................................................................9

**RULE**

Fed. R. Civ. P. 4 ........................................................................................................................9

**LEGISLATIVE MATERIAL**

*North Korea: Illicit Activity Funding the Regime: Hearing Before the Subcomm. on Fed. Fin. Mgmt., Gov't Info. & Int'l Sec. of the S. Comm. on Homeland Sec. & Governmental Affs.*, S. Hrg. 109-887 (2006) ...........................................................26

**INTRODUCTION**

This case seeks to hold two foreign companies liable for attacks committed in Iraq by Iran-aligned terrorists in 2020 and 2022, based on a commercial relationship the companies had with a North Korean cigarette manufacturer that ended in 2017.  The Complaint stretches its attenuated chain of causation, and the Court's jurisdiction, well beyond what the law allows.

Defendants British American Tobacco p.l.c. ("BAT") and British-American Tobacco Marketing (Singapore) Private Limited ("BATMS") are based, respectively, in the United Kingdom and Singapore.  Until 2017, BATMS participated in a cigarette manufacturing business with North Korean Tobacco Company ("NKTC"), to which BATMS supplied machinery, tobacco, and technical management.  In return, BATMS received monetary payments.  And that is where Defendants' alleged conduct ends.  The Complaint nevertheless seeks to hold Defendants liable under the Anti-Terrorism Act ("ATA") for aiding and abetting a pair of 2020 and 2022 missile attacks in Iraq based on an alleged multi-step chain:

- Some revenue that NKTC earned from the cigarette joint venture made its way to Office 39, an entity affiliated with the North Korean government;

- Office 39, working through its "commercial arm" (known as "Daesong"), used materials and know-how from the joint venture to generate additional revenues for the North Korean government through cigarette counterfeiting;

- The North Korean government acquired missile components and developed missile technology through entities "connected to" Office 39;

- Those entities sold some missile components and technology to Iran and the Islamic Revolutionary Guard Corps ("IRGC");

- With assistance from North Korean personnel, the Iranian government and IRGC used those missile components and technology to improve Iran's ballistic missile program;

- In 2020 and 2022, years after the cigarette joint venture in North Korea had ended, the IRGC and two affiliated terrorist organizations (Hizballah and Kataib Hizballah) used Iranian missiles to commit attacks on Americans in Iraq.

1

At each step in that chain, the ostensible connection between Defendants and the attacks at issue becomes more remote, attenuated, and conjectural.  Defendants are not alleged to have had any dealings with Iran or with the terrorist groups that committed the attacks, are not alleged to have sought to further terrorist activity, and are not alleged to have paid money to North Korea or any terrorist group.  Given the complete absence of such allegations, the Complaint fails on two separate and independently dispositive grounds.

*First*, the Complaint does not make out even a prima facie case for personal jurisdiction over Defendants.  Defendants are foreign companies, and none of their alleged conduct—much less conduct from which the asserted claims arise—occurred in the United States.  This Court has dismissed similar claims for lack of personal jurisdiction.  *See Khashoggi v. NSO Grp. Techs. Ltd.*, 700 F. Supp. 3d 384, 402 (E.D. Va. 2023), *aff'd*, 138 F.4th 152 (4th Cir. 2025).  It should do so again here.  In fact, this presents a clearer case:  The Complaint disclaims sufficient contacts with Virginia and relies only on Rules 4(k)(1)(C) and 4(k)(2), neither of which is satisfied, including because jurisdiction here would be inconsistent with Fifth Amendment due process.

*Second*, on the merits, the Complaint fails to state a claim under the ATA for aiding and abetting the 2020 and 2022 attacks.  The Supreme Court has set a high bar for such claims:  A defendant must have provided "substantial assistance . . . in the commission of the actionable wrong," "consciously and culpably participat[ing] in [the] wrongful act so as to help make it succeed."  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493, 495 (2023) (internal quotation marks omitted).  The Complaint makes no such allegations.  Instead, as in *Taamneh*, "the nexus between defendants and [each] attack is far removed," and "plaintiffs have failed to allege that defendants intentionally provided any substantial aid to the" attacks.  *Id.* at 506.  Defendants' alleged conduct was commercial:  BATMS sold material that a North Korean company used to manufacture

2

cigarettes, and even that conduct ceased more than two-and-a-half years before the first attack. Defendants had no contact whatsoever with "the person[s] who committed [the relevant] act[s] of international terrorism"—the IRGC, Hizballah, and Kataib Hizballah. 18 U.S.C. § 2333(d)(2). And Defendants are not alleged to have been motivated by any desire "to bring about" terrorist attacks or "to make [such attacks] succeed." *Taamneh*, 598 U.S. at 490 (citation omitted). Lacking any such allegations, the Complaint rests instead on a "butterfly effect" theory of liability that courts have repeatedly rejected. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019) (citation omitted); *see also Parizer v. AJP Educ. Found., Inc.*, No. 24-cv-724, 2025 WL 2382933, at *19, *22-23 (E.D. Va. Aug. 15, 2025) (dismissing ATA aiding-and-abetting claim where "[p]laintiffs do not seek to have the Court draw a single inference but rather a chain of inferences that become more and more attenuated [as] one moves down the chain"). If this Court does not dismiss on personal jurisdiction grounds, therefore, it should dismiss the Complaint for failure to state a claim.

## BACKGROUND[1]

### A. The BAT Defendants

Defendants are foreign companies operating in foreign countries. "Defendant British American Tobacco p.l.c. is a multinational tobacco company . . . headquartered in London." Amended Complaint ("AC" or "Complaint"), ECF No. 39 ¶ 10. The other Defendant is British-American Tobacco Marketing (Singapore) Private Limited, "a subsidiary of BAT." *Id.* ¶ 12.

### B. The Complaint's Attempts To Tie Sales Of Cigarette Components In North Korea To Terrorist Attacks In Iraq Years Later

Plaintiffs filed this suit on January 29, 2026. ECF No. 1. After Defendants moved to dismiss, Plaintiffs filed the operative Complaint on May 27, 2026. The suit seeks to hold

---

[1] Defendants take the Complaint's allegations as true only for purposes of this motion to dismiss. *See Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021).

3

Defendants liable for attacks carried out in Iraq in 2020 and 2022 by three Iran-backed Foreign Terrorist Organizations ("FTOs"):  the IRGC, Hizballah, and Kataib Hizballah.

### 1.    The Attacks Injuring Plaintiffs

"Plaintiffs are 196 victims of two terrorist missile attacks committed in Iraq."  AC ¶ 1. First, "[o]n January 8, 2020," IRGC terrorists in Iran "and a joint Hizballah/Kataib Hizballah cell in Iraq" committed an attack targeting two air bases, "Al Asad Air Base in Anbar, Iraq," and "Erbil Air Base in Erbil, Iraq."  *Id.* ¶ 221.  The attack involved "a mix of weapons and technologies," including "*Qiam-* and *Fateh-* class missiles."  *Id.* ¶ 222.  Second, on September 28, 2022, the same FTOs used "*Fateh*-class missiles" to attack "Kurdish refugee camps in Koya, Iraq."  *Id.* ¶ 225.

### 2.    The Complaint's Attempts To Tie Defendants To The Attacks

The Complaint does not allege Defendants had any direct relationship with the IRGC or any other terrorist organization.  Instead, it alleges that Defendants had a business relationship with a different actor—a North Korean joint venture that manufactured cigarettes at a factory in Pyongyang.  AC ¶ 100.  BATMS and the North Korean Tobacco Company ("NKTC") began operating the joint venture, which the Complaint refers to as "Daesong-BAT," in 2001.  *Id.* BATMS's role in the joint venture involved "supplying the machinery, tobacco, and technical management."  *Id*.  In 2007, BATMS formally divested its interest to "Company 1," a distributor that had previously delivered products to the joint venture.  *Id.* ¶¶ 115-17.  In practice, however, BATMS continued to exercise control over the joint venture entity.  *Id.* ¶ 117.

Starting from BATMS's provision of "machinery, tobacco, and technical management" to the Daesong-BAT joint venture in Pyongyang, *id.* ¶ 100, the Complaint then sketches an extraordinarily lengthy causal chain in an attempt to establish that Defendants "knowingly provided substantial assistance" to the 2020 and 2022 attacks by Iran-backed FTOs in Iraq, *id.* ¶ 9. Defendants themselves play no further role in that causal chain:  The Complaint does not allege

4

that Defendants engaged in any relevant activities in Iraq and Iran; does not allege that Defendants intended to harm any of the people targeted in the attacks; and does not allege any conduct by Defendants at all (unlawful or otherwise) during 2020-2022 when the attacks occurred. Instead, the alleged causal chain consists exclusively of actions by intervening parties, including sovereign nations, which Defendants are not alleged to have controlled. The intervening parties include:

*NKTC*: As described above, the "partner" and other party to the joint venture was North Korea Tobacco Company. *Id.* ¶¶ 100, 108.

*Office 39*: The next entity in the causal chain is "Office 39," an arm of the North Korean government, which "controlled" NKTC. *Id.* ¶ 100. The Complaint alleges that profits from the joint venture flowed to Office 39 and that the joint venture "enabled Office 39 . . . to achieve over $415 million in liquidity," referring to amounts paid *to BATMS* from accounts that Office 39 would otherwise have had difficulty using because of banking sanctions. *Id.* ¶ 123. The Complaint also alleges that Office 39, operating through a conglomerate known as "Daesong," used "technical support and expertise" it gained from the joint venture to expand its existing program of cigarette counterfeiting. *Id.* ¶ 198. The Complaint alleges that cigarette counterfeiting "likely generated currency" in "comparable, if not greater, amount[s] than" the joint venture. *Id.* ¶ 202.

*Additional North Korean Intermediaries*: The Complaint alleges that Office 39 then worked through a "network" of entities, including banks, suppliers, and criminal organizations, to carry out additional transactions necessary for North Korea's weapons programs. *Id.* ¶ 35. Those entities include "Tanchon Commercial Bank," the "Korea Mining Development Corporation," and "Green Pine Associated Corporation," an "arms-procurement entit[y]." *Id.* ¶¶ 31, 35.

*The North Korean Military*: The Complaint alleges that "most Office 39 profits flowed to the [Democratic People's Republic of Korea ("DPRK")] military, and, within that budget, most

5

such monies flowed to the DPRK missile program." *Id.* ¶ 165; *see id.* ¶ 161 (alleging that "a designated percentage of all revenues" was routed "into Kim Jong Il's personal accounts—a core use of which was to fund missiles"). The Complaint admits that "some funds were also likely used for regime maintenance," "luxury goods," and "the DPRK's Navy." *Id.* ¶ 80.

*Iran and the IRGC*: Next in the chain, the Complaint alleges that the sovereign country of Iran and its IRGC acquired "DPRK weapons and services," mostly "in barter trade (*e.g.*, oil), rather than [with] U.S. dollars." *Id.* ¶ 167. Iran and the IRGC then allegedly used technology and components from North Korea in developing *Qiam-* and *Fateh*-class missiles. *Id.* ¶¶ 165-66, 171.

*Hizballah and Kataib Hizballah*: Finally, the Complaint alleges that Hizballah and Kataib Hizballah, in cooperation with the IRGC, used Iran's *Qiam-* and/or *Fateh*-class missiles to carry out the attacks in Iraq in 2020 and 2022. *Id*. ¶¶ 222, 225.

### C.    Defendants' Acceptance Of Responsibility For Violations Of North Korea Sanctions Between 2007 And 2017

Interspersed with its discussion of the 2020 and 2022 terrorist attacks in Iraq, the Complaint also discusses Defendants' acceptance of responsibility for violating North-Korea-related U.S. sanctions between 2007 and 2017. *See* AC ¶ 15. The sanctions violations are not alleged to have involved sending money to North Korea or North Korean entities, and BATMS's provision of cigarette components to NKTC is not alleged to have violated any sanctions. The sanctions violations instead occurred when BATMS sought to "bring cash *out* of DPRK." Snyder Decl., Ex. A, Attach. A (Statement of Offense) ¶ 35 (emphasis added).[2] Specifically, Defendants acknowledged that the way BATMS received payments from the Daesong-BAT joint venture

---

[2] The Court may take judicial notice of the Statement of Offense in BAT's deferred prosecution agreement, "BAT Singapore's Plea Agreement" and "BAT's regulatory settlement with OFAC," upon which the FAC's allegations are based "in substantial part." AC ¶ 15; *see, e.g.*, *Cartwright v. T-Mobile US, Inc.*, No. 23-cv-625, 2023 WL 5959424, at *2 n.3 (E.D. Va. Sept. 13, 2023).

violated restrictions against "transacting with sanctioned banks and entities in North Korea through the use of U.S. dollar wire transfers and U.S. financial institutions." *Id.* ¶ 34.

The transactions occurred as follows:  First, "BATMS shipped goods (primarily cigarette components) to the [joint venture], in care of Company 1." *Id.* ¶ 42.  "BATMS invoiced Company 1 for the amount of the goods." *Id.*  "Company 1," in turn, "sent the invoice to an employee of NKTC." *Id.*  "NKTC made payments in U.S. dollars to Company 1 for the amount due on the invoice, often using a Chinese front company to process the payment." *Id.*  Finally, "Company 1 separately made payments to BATMS in the same amount, minus a small percentage commission." *Id.*  These "remittances for BAT," and BATMS's "receiving payments" in this way, caused U.S. dollar-denominated transactions at U.S. financial institutions.  AC ¶¶ 125, 152.  In 2023, BATMS agreed to pay $629 million in fines and forfeitures, and BAT agreed to pay an additional $5 million, to resolve charges arising from those sanctions violations.  *See* Snyder Decl., Ex. B, Attach. A; Snyder Decl., Ex. C at 5.

**D.     The Complaint's Attempts To Connect Its Allegations To The United States**

Defendants are both foreign corporations, and all of their alleged conduct discussed above took place overseas.  Nevertheless, in an attempt to establish personal jurisdiction in this Court, the original complaint argued that Defendants had "targeted . . . the Eastern District of Virginia, and had a substantial nexus to this District."  ECF No. 1 at 68 (capitalization altered).  After Defendants explained that those allegations fell well below the bar for establishing personal jurisdiction, *see* ECF No. 31, at 9-19, Plaintiffs abandoned their Virginia-specific allegations and now assert that Defendants would not be "subject to jurisdiction in any state's courts of general jurisdiction with respect to" the claims at issue, AC ¶ 13.  The Complaint continues to assert that Defendants are subject to personal jurisdiction in *federal* court, however, based on allegations that: (1) other actors whom Defendants allegedly aided and abetted—*i.e.*, the "DPRK-IRGC-Hizballah

7

joint weapons venture"—sought to affect U.S. policymakers, *id.* ¶ 240; (2) funds passed through a U.S. bank on their way from the joint venture in North Korea to BATMS in Singapore, *id.* ¶¶ 244-50; and (3) Defendants made a statement to Forbes in 2007, *id.* ¶ 251.

## ARGUMENT

The Court should dismiss the Complaint pursuant to Rule 12(b)(2) because it does not contain factual allegations establishing personal jurisdiction over Defendants. If the Court reaches the merits, it should dismiss the Complaint under Rule 12(b)(6) because it does not plausibly allege that Defendants "consciously and culpably 'participated' in [attacks in Iraq] so as to help 'make [those attacks] succeed.'" *Taamneh*, 598 U.S. at 493 (citation omitted).

## I.    Defendants Are Not Subject To Personal Jurisdiction In This Court

Under Rule 12(b)(2), "the plaintiff bears the burden of demonstrating personal jurisdiction." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Dismissal is appropriate where plaintiffs "fail[] to allege facts sufficient to establish" personal jurisdiction. *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016).

"[F]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 11 (2025). The original complaint therefore alleged that Defendants are subject to personal jurisdiction in Virginia courts. ECF No. 1 ¶¶ 238, 242-46. In moving to dismiss, however, Defendants explained that the exercise of jurisdiction would violate the Fourteenth Amendment's Due Process Clause because neither Defendants nor the asserted claims have a sufficient connection to Virginia. ECF No. 31, at 9-14.

Rather than defend their initial jurisdictional allegations, Plaintiffs abandoned them. The Complaint now alleges that Defendants "are not subject to jurisdiction in any state's courts of general jurisdiction with respect to the claims" asserted therein. AC ¶ 13. The Complaint instead contends that this Court can exercise personal jurisdiction over Defendants under Federal Rules of

Civil Procedure 4(k)(1)(c) and 4(k)(2). That contention fails because the Complaint does not adequately plead the prerequisites of either Rule, and because exercising personal jurisdiction in this case would violate Fifth Amendment due process principles. Contrary to the Complaint's assertions, the Supreme Court's recent decision in *Fuld* does not suggest otherwise.

### A.    The Complaint Does Not Satisfy Rules 4(k)(1)(C) Or 4(k)(2)

Rule 4(k)(1)(C) does not authorize jurisdiction in the circumstances here. Under Rule 4(k)(1)(C), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." The statute cited in the Complaint is Section 2334(a) of the ATA, which provides that "[p]rocess in [an ATA] action may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). Based on those provisions, some courts allow personal jurisdiction over "defendants who are properly served anywhere in the United States." *Parizer*, 2025 WL 2382933, at *11. But Rule 4(k)(1)(C) does not supply jurisdiction over a defendant served "*outside* the United States." *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1350 (S.D. Fla. 2022) ("[I]t would be inappropriate . . . to effectively extend the territorial reach of a federal statute where the statute provides for nationwide service of process and does not authorize service outside the United States." (internal quotation marks and citation omitted)). Here, Defendants were not served in the United States. Instead, each foreign Defendant executed a waiver of service, which "does not waive any objection to personal jurisdiction." Fed. R. Civ. P. 4(d)(5); *see* ECF Nos. 12 & 13 (Feb. 6, 2026) (reflecting Defendants' waivers of service and preserving all defenses and objections to the Court's jurisdiction). As a result, Rule 4(k)(1)(C) and Section 2334(a) do not support jurisdiction here.

The Complaint also invokes Rule 4(k)(2), but does not satisfy that provision either. Under Rule 4(k)(2), a plaintiff "must demonstrate"—not merely assert—that a defendant "is not subject

to personal jurisdiction in any state." *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory*," 283 F.3d 208, 215 (4th Cir. 2002). The Complaint's conclusory statement that Defendants are "not subject to jurisdiction in any state's courts of general jurisdiction" does not make that showing, especially when the original complaint asserted that Defendants *are* subject to jurisdiction in Virginia. AC ¶ 13; *see* ECF No. 1 ¶ 238. Thus, Rule 4(k)(2) does not apply.

Because prerequisites for both Rules are lacking, the jurisdictional inquiry can end there.

**B.**   **The Exercise Of Personal Jurisdiction Would Violate The Fifth Amendment**

Even where other requirements of Rules 4(k)(1)(c) and 4(k)(2) are satisfied, personal jurisdiction cannot be exercised unless doing so is consistent with the Due Process Clause of the Fifth Amendment. Here, it is not, for many of the same reasons that jurisdiction could not be exercised in a Virginia court consistent with the Due Process Clause of the Fourteenth Amendment. *See Khashoggi*, 700 F. Supp. 3d at 402 ("[T]he same constitutional due process analysis conducted with respect to specific personal jurisdiction [under the Virginia long-arm statute] counsels against plaintiff's argument under Rule 4(k)(2).").

Specifically, to satisfy Fifth Amendment due process, Fourth Circuit precedent requires a plaintiff to demonstrate at least two things: (1) that "the plaintiff's claims arise out of [the defendant's] activities directed at the United States," *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) (cleaned up); and (2) that the constitutional "reasonableness" factors are satisfied, including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief," *Base Metal*, 283 F.3d at 213-14. The Complaint's allegations satisfy neither requirement, and nothing in the Supreme Court's recent *Fuld* decision changes the result.

10

## 1.    The Complaint Does Not Allege Sufficient Activities By Defendants Directed At The United States

Under the first prong of the Fourth Circuit analysis, courts assess whether the defendants' "alleged misconduct" that formed "the basis for the suit" occurred in the United States.  *Saudi*, 427 F.3d at 276 (dismissing for lack of personal jurisdiction based on Fifth Amendment due process where the "cause of action arises from [defendant's] alleged misconduct either in Singapore or on the high seas," and the plaintiff "identifies no tortious conduct *by* [*defendant*]" in the U.S.).  The Complaint identifies three ways in which Defendants' activities allegedly "targeted" the United States, but none is "meaningful" for purposes of personal jurisdiction.  *Fuld*, 606 U.S. at 23.

*"Joint Weapons Venture."*  The Complaint alleges that Defendants "targeted the United States by agreeing to become an active participant in the DPRK-IRGC-Hizballah joint weapons venture."  AC ¶¶ 240-43, 249.  That allegation seeks to ground jurisdiction on the acts of third parties like North Korea, Iran, or the FTOs, rather than on actions taken by Defendants themselves.  As the Supreme Court has explained, however, the basis for personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State. . . . We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citations omitted). Here, the only acts by Defendants alleged to constitute "participa[tion]" in the "joint weapons venture" involved BATMS's sale of cigarette components to a company in North Korea.  *See* AC ¶ 240.  Those sales by BATMS cannot plausibly be said to have targeted the United States—and thus provide no basis for exercising jurisdiction.  *See*

11

*Khashoggi*, 138 F.4th at 161-62 (affirming dismissal where defendant was not the "direct actor" who injured plaintiff through surveillance in Virginia that led to a killing abroad).[3]

*Correspondent Accounts.*    The Complaint also relies heavily on the allegation that Defendants "chose to launder at least $251,631,903 through correspondent accounts at U.S. banks."  AC ¶ 245.  The Complaint concedes, however, that those correspondent accounts paid money *to* Defendants, and that no funds passed *from* Defendants *to* North Korea or any FTO.  *See id.* ¶ 125.  Indeed, no FTO was on either side of any transaction.  Transactions that did not provide support to or even involve any FTO cannot provide a basis for the exercise of personal jurisdiction over claims arising from attacks by those third-party entities.

Even in cases where money eventually flowed to an FTO, courts have repeatedly rejected arguments that the use of correspondent accounts supported personal jurisdiction under the Fifth Amendment.  In *Przewozman v. Qatar Charity*, No. 20-cv-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023), for example, the court granted dismissal where there was "no basis from which the court can conclude that 'the correspondent account at issue' was 'used as an instrument to achieve the very wrong alleged,'" and where the plaintiffs "failed to allege a causal link between the use of the correspondent account, which ended in 2015, and the rocket attacks that caused their injury in 2019."  *Id.* at *15.  And in *Schrier*, correspondent account transactions that "ultimately reached" terrorists were "far too attenuated" to support personal jurisdiction, because the plaintiff alleged only that "some funds—not *these specific funds*—flowed through . . . correspondent accounts" to support terrorism.  632 F. Supp. 3d at 1360 (internal quotation marks omitted); *see*

---

[3] Relatedly, the Complaint's allegations about the effect of Defendants' conduct on Plaintiffs in the United States or third parties like FinCEN cannot establish personal jurisdiction in the United States.  *See* AC ¶¶ 127, 223, 249, 252; *Walden*, 571 U.S. at 290 ("Mere injury to a forum resident is not a sufficient connection to the forum.").

*also Force v. Qatar Charity*, No. 20-cv-2578, 2025 WL 43163, at *3 (E.D.N.Y. Jan. 7, 2025) ("[T]o support the constitutional exercise of personal jurisdiction . . . [the] plaintiff's claim 'must arise out of or relate to' the defendant's use of the correspondent account."). So too here. Defendants' *receipt* of funds through correspondent accounts—with no alleged *payments* of funds—is even less related to the attacks at issue than the payments in *Przewozman* and *Schrier*.

*Forbes Statement.* Finally, the Complaint alleges that Defendants directed false statements to U.S. media outlets, but the only statement it identifies was made to Forbes in 2007. AC ¶¶ 119, 251. The unremarkable statement about divesting the equity interest in the joint venture—made 13 years before the first attack—has nothing to do with the claims asserted here. It certainly was not an intentional act made with the knowledge that it was likely to cause Plaintiffs harm in the United States, as required for a published statement to create jurisdiction. *See Calder v. Jones*, 465 U.S. 783, 790 (1984).

### 2. The Complaint Does Not Establish That The Exercise Of Jurisdiction Over Defendants Would Be Constitutionally Reasonable

Even where a defendant engaged in sufficient activities directed at the United States, Fourth Circuit precedent also requires consideration of constitutional "reasonableness" factors, including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Base Metal*, 283 F.3d at 213-14. Courts view these reasonableness factors "through the lens of the nature and quality of the defendant's forum-state contacts." *Harriman v. Compton*, No. 21-cv-1102, 2021 WL 2667062, at *6 (D.S.C. June 29, 2021); *see also Khashoggi*, 700 F. Supp. 3d at 400 ("The more attenuated the contacts with the forum state, the less a defendant must show in terms of unreasonableness to defeat the court's exercise of jurisdiction."). Given the dearth of contacts between Defendants and the United States related to Plaintiffs' claims, those factors preclude exercising personal jurisdiction here.

13

*Burden on Defendants*.  Defendants are foreign entities that face "unique burdens" from having to "defend oneself in a foreign legal system." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987); *see Hassan v. Barzani*, 674 F. Supp. 3d 282, 295 (E.D. Va. 2023). *Khashoggi* is instructive.  There, an action was brought by the wife of a deceased journalist and U.S. resident, based on his killing in Turkey.  700 F. Supp. 3d at 389.  Even though the plaintiff was allegedly surveilled in Virginia, the Court found the "factors counseling against personal jurisdiction being constitutionally reasonable" were "substantial" because the defendant was foreign, owned no property in the forum, and had not authorized anyone to act for it in the forum. *Id.* at 400-02.  Moreover, the involvement of foreign sovereigns not subject to U.S. discovery processes "would likely impose substantial restrictions on parties' discovery and impair their abilities to access relevant documents to present or defend a position," making it particularly unreasonable to require the foreign defendants to proceed here.  *Id.* at 401-02.

Defendants in this case would face similarly substantial burdens.  Both are foreign entities, and the Complaint does not allege that they own property in the forum or have authorized anyone to act for them here.  Moreover, the Complaint's allegations concern a North Korean commercial venture, that company's links to the North Korean government, the North Korean government's dealings with Iran, Iran's support for FTOs, and attacks that those FTOs committed in Iraq.  AC ¶ 122.  Most of the evidence about those intervening links in the causal chain is in Asia and the Middle East.  And while the Complaint observes that "Plaintiffs do not presently anticipate extensive overseas discovery or numerous overseas non-party witnesses," *id.* ¶ 14 n.1, that simply reflects a recognition that much of the most probative evidence—including evidence for the defense—would be effectively impossible to obtain in a U.S. legal proceeding.  That reality counsels strongly against the reasonableness of haling foreign Defendants into this Court.

14

*Interest of the Forum.* The Complaint's asserted bases for tying this suit and Defendants' predicate conduct to the United States are also highly attenuated. In *Khashoggi*, this Court held that "the more attenuated the contacts with the forum state, the less a defendant must show in terms of unreasonableness to defeat the court's exercise of jurisdiction." 700 F. Supp. 3d at 400; *see also In re Diisocyanates Antitrust Litig.*, 2026 WL 522845, at *11 (W.D. Pa. Feb. 25, 2026) (finding forum lacked interest where no meaningful relationship "between the foreign Defendants and the United States" existed). As addressed above, all of the predicate conduct here occurred overseas. Thus, this factor carries less weight and the interest of the forum is diminished.

*Convenience to Plaintiffs.* "Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant[s]—not the convenience of the plaintiffs." *Grizzard v. LG Chem Ltd.*, 641 F. Supp. 3d 282, 292 (E.D. Va. 2022) (quoting *Walden*, 571 U.S. at 284); *see also Harriman*, 2021 WL 2667062, at *6 (finding exercise of personal jurisdiction unreasonable where forum was "convenient . . . for [plaintiff] (and [plaintiff] alone)"). In *Khashoggi*, the Court found the exercise of personal jurisdiction would not be reasonable, even though the plaintiff argued that she had a "substantial interest in vindicating her rights in this Court and would be burdened if forced to litigate her claims" abroad. 700 F. Supp. 3d at 400. And here, where just two of the 196 Plaintiffs reside in this District, AC ¶ 14, this factor is further diminished.

Weighing these factors, and considering the lack of relevant conduct targeting the United States, the exercise of jurisdiction over Defendants would not be constitutionally reasonable.

### 3.    *Fuld* Does Not Support the Exercise Of Personal Jurisdiction Here

In urging the exercise of personal jurisdiction, the Complaint invokes the Supreme Court's statement in *Fuld* that the Fifth Amendment "permits a more flexible jurisdictional inquiry" than does the Fourteenth Amendment. 606 U.S. at 16. *Fuld* does not support personal jurisdiction here.

While *Fuld* held that the Fifth and Fourteenth Amendment due process analyses are not coextensive, it addressed a very different statute and set of facts, and went out of its way to clarify that it was not addressing "more attenuated assertions of jurisdiction." *Id.* at 18; *see id.* at 18-19 (citing *Asahi*, 480 U.S. at 115) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.")). *Fuld* involved a suit against the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") for directly supporting terror attacks in Israel and the West Bank. *Id.* at 5-7, 9. The statute that created personal jurisdiction there, the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), expressly "refers to the PA and PLO by name." *Id.* at 8. In analyzing that statute under the Fifth Amendment, the Supreme Court found that narrow focus significant: "Far from haling just any run-of-the-mill private defendant into American courts, the PSJVTA represents but one targeted aspect of a multifaceted foreign policy toward these two *sui generis* foreign entities, both of which exercise governmental functions . . . and have decades of meaningful contacts, ties, [and] relations with the United States." *Id.* at 22 (internal quotation marks omitted).

The Court found the exercise of jurisdiction under the PSJVTA consistent with the Fifth Amendment, reasoning that "the statute ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States." *Id.* at 22-23. Congress "tie[d] jurisdiction to specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in [the PA and PLO's] relationships with the United States." *Id.* at 21. Specifically, the statute grounded jurisdiction on (1) payments to individuals who committed a terrorist act that injured or killed a U.S. national; or (2) specified "activities on U.S. soil." *Id.* at 8-9. As another court recently explained, "*Fuld* still suggests the necessity of a judicial evaluation of a foreign party's contacts with the United States." *In re Diisocyanates Antitrust Litig.*, 2026 WL 522845,

16

at \*6; *see id.* at \*5 ("Plaintiffs failed to establish that the foreign Defendants had sufficient minimum contacts with the United States or that they availed themselves of American law or otherwise reasonably could anticipate being involved in litigation in the United States, even if the measure for doing so is a more flexible inquiry than how the Due Process Clause of the Fifth Amendment had been understood pre-*Fuld*.") (internal quotation marks omitted).

*Fuld* also explicitly acknowledged that "the prospect remains that the Fifth Amendment might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case,'" as does the Fourteenth Amendment.  606 U.S. at 23 (quoting *Asahi*, 480 U.S. at 115).  But the Court found it unnecessary to resolve that question because, assessing "reasonableness" based "on an evaluation of several factors, including 'the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief,'" "[t]he PSJVTA ticks all three boxes." *Id.* at 23-24.  It was thus "sufficient unto the day that, whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts, the PSJVTA does not transgress them." *Id.* at 19.

This case implicates questions not at issue in *Fuld*, whose answers are controlled by Fourth Circuit precedent.  Unlike the PSJVTA, Section 2334(a) of the ATA does not name specific entities that Congress has determined should be subject to personal jurisdiction based on a documented history of contacts with the United States.  Instead, it authorizes suits against "any run-of-the-mill private defendant." *Fuld*, 606 U.S. at 22. *Fuld* expressly declined to address the limits of Fifth Amendment due process for a case like this one.  It therefore did not overrule Fourth Circuit precedent requiring that "the plaintiff's claims arise out of [the defendant's] activities directed at the United States," *Saudi*, 427 F.3d at 276, and that the constitutional "reasonableness"

17

factors be satisfied, *Base Metal*, 283 F.3d at 213-14.[4]  Because the Complaint here does not satisfy either of those longstanding requirements, it should be dismissed for lack of personal jurisdiction.

**II.      The Complaint Fails To Plausibly Allege Defendants Aided And Abetted The IRGC, Hizballah, And Kataib Hizballah In Carrying Out The 2020 And 2022 Attacks**

Even if Defendants were subject to personal jurisdiction, dismissal would be appropriate on the independent ground that the Complaint fails to state a claim.  BATMS's sale of cigarette components to a North Korean entity does not provide a sufficient basis for holding that Defendants aided and abetted terrorist attacks by Iran-aligned FTOs in Iraq years later.

The ATA provides a cause of action for U.S. nationals "to bring civil lawsuits when 'injured in [their] person, property, or business by reason of an act of international terrorism.'" *Taamneh*, 598 U.S. at 482-83 (quoting 18 U.S.C. § 2333(a)).  As relevant here, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, . . . the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).

The Supreme Court addressed the standards for ATA aiding-and-abetting claims in *Taamneh*.  The Court emphasized that "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it."  598 U.S. at 495.  Instead, the plaintiff must show that the defendant aided "the commission of the actionable wrong"—*i.e.*, the specific "act of international terrorism" that injured the plaintiff.  *Id.*

The Court also clarified how to assess whether a complaint plausibly alleges that a defendant aided and abetted a specific attack.  In doing so, the Court relied on the decision in

---

[4] *See Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) ("A Supreme Court decision overrules or abrogates our prior precedent only if our precedent is impossible to reconcile with a subsequent Supreme Court decision." (internal quotation marks omitted)).

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress identified as "'provid[ing] the proper legal framework' for 'civil aiding and abetting and conspiracy liability.'" *Taamneh*, 598 U.S. at 485 (alteration in original) (citations omitted).  The Court summarized *Halberstam* as establishing three basic requirements:  "First, 'the party whom the defendant aids must perform a wrongful act that causes an injury.'  Second, 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance.'  And, third, 'the defendant must knowingly and substantially assist the principal violation.'"  *Id.* at 486 (citations omitted).[5]

The third requirement is, for good reason, the most difficult to allege.  The Court explained that it reflects the "fundamental question of aiding-and-abetting liability":  whether "defendants consciously, voluntarily, and culpably participate[d] in or support[ed] the relevant wrongdoing." *Id.* at 505; *see id.* at 498 (asking if plaintiffs plausibly alleged that "defendants culpably 'associate[d themselves] with' the [specific] attack, 'participate[d] in it as something that [they] wishe[d] to bring about,' or sought 'by [their] action to make it succeed'" (citation omitted)). Answering whether the defendant's participation was sufficiently culpable and conscious depends on (1) the directness of any connection (or "nexus") between the conduct and the specific attack, and (2) the defendant's state of mind.  *See id.* at 506 (weighing whether complaint alleged "direct nexus" or "culpable participation through intentional aid").  Those requirements work "in tandem."

---

[5] The Court added that other "factors" articulated in *Halberstam*, while not "inflexible codes," can also shed light on the inquiry: "(1) 'the nature of the act assisted,' (2) the 'amount of assistance' provided, (3) whether the defendant was 'present at the time' of the principal tort, (4) the defendant's 'relation to the tortious actor,' (5) the 'defendant's state of mind,' and (6) the 'duration of the assistance' given." *Taamneh*, 598 U.S. at 486-87, 497 (quoting *Halberstam*, 705 F.2d at 488).

*Id.* at 491. Thus, "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 506.

In short, under *Taamneh*, the Complaint must plausibly allege a sufficient nexus between Defendants' actions and the specific attacks in 2020 and 2022, as well as Defendants' conscious intent to assist those attacks. It does neither.

> **A.     The Complaint Fails To Allege A Concrete Nexus Between BATMS's Tobacco Sales In North Korea From 2007 To 2017 And Terrorist Attacks Committed By Iran-Aligned FTOs In Iraq In 2020 And 2022**

The Complaint falls well short of establishing a "concrete nexus" between Defendants and the attacks in Iraq. *Id.* at 501. Among other problems, it (1) admits that Defendants were separated from the attacks by numerous layers of intervening actors and events; and (2) acknowledges that Defendants ceased any relevant conduct years before the attacks occurred.

> **1.     The Allegations Of Indirect Assistance Are Extremely Attenuated**

As the Supreme Court explained in *Taamneh*, "the text of § 2333(d)(2) demands . . . that the defendant have given knowing and substantial assistance to the primary tortfeasor." *Id.* at 491; *see id.* at 486 (considering the "defendants' 'relation to the tortious actor'" (citation omitted)); *see also Crosby*, 921 F.3d at 627 n.6 ("Courts now routinely dismiss ATA claims when the plaintiffs fail to allege a direct link between the defendants and the individual perpetrator."). Here, the "primary tortfeasor[s]"—*i.e.*, the FTOs that carried out the 2020 and 2022 attacks—were the IRGC, Hizballah, and Kataib Hizballah. *See*, *e.g.*, AC ¶¶ 221, 225. But the Complaint does not allege that Defendants interacted with those "primary tortfeasor[s]" in any way, let alone provided them with substantial assistance in carrying out the attacks in question. Instead, it alleges that BATMS provided cigarette components to a commercial joint venture in North Korea, and that— through a chain of independent decisions by intervening parties—some portion of the revenue

from that venture contributed to funding the development of missile technology that was then supplied to the FTOs and eventually deployed in the relevant attacks.

Defendants are not aware of any case in which a court has found liability under the ATA (or even allowed a case to proceed past the pleading stage) based on such an attenuated connection between the defendants and the "person who committed [the] act of international terrorism." 18 U.S.C. § 2333(d)(2). Even where courts have suggested that parties could aid and abet principal actors if "relevant substantial assistance was given to an intermediary," they have required the plaintiff to show that the specific assets at issue were used to facilitate the relevant attacks. *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 437, 444-45 (2d Cir. 2025); *Newman v. Associated Press*, 758 F. Supp. 3d 1357, 1372 (S.D. Fla. 2024) (dismissing complaint because allegations were "inadequate to establish that any amount of money or assistance from the AP went to Hamas"). In doing so, they have specifically "rejected the notion that *Halberstam* allows aiding-and-abetting liability to attach based on . . . a 'fungibility theory.'" *Ashley*, 144 F.4th at 444.

In *Ashley*, for example, the Second Circuit explained that "money laundering for individuals and entities with an apparent or possible connection to terrorists" is not the same as "substantial support to the [terrorists]" themselves. *Id.* It thus affirmed dismissal where plaintiffs failed to plead transactions "with specificity," and where even if it were "possible that some of the Banks' transactions in the money laundering schemes produced money that was transferred to the Syndicate and used to facilitate bombings," the "disconnect between the Banks' involvement and support for the terrorist attacks" gave rise to "a high degree of speculation." *Id.* at 444-45; *see Alsanabani v. Spear Operations Grp.*, No. 25-cv-1684, 2026 WL 983064, at *5 (D.D.C. Apr. 13, 2026) (dismissing where "[plaintiff] allege[d] that [defendant] engaged in standard banking transactions . . . and that some of that money, through a string of intermediaries, eventually

21

reached" a terrorist organization); *see Troell v. Binance Holdings Ltd.,* No. 24-cv-7136, 2026 WL 636849, at *19 (S.D.N.Y. Mar. 6, 2026) (dismissing where plaintiffs failed to "allege that any of these [laundered] funds were transferred to or from Hezbollah").

Courts often hold that allegations of indirect assistance are too attenuated to support liability even where the allegations involve sanctions violations. In *Fraenkel v. Standard Chartered Bank*, Nos. 24-cv-4484, 24-cv-5788, 2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025), for example, the complaint alleged that a bank evaded sanctions on Iran and indirectly supported some of the same FTOs at issue here by processing "U.S. dollar-denominated transactions" for "fronts and agents for Iran's Terrorist Sponsors," thereby "transferring billions of dollars on their behalf." *Id.* at *2. The court found that insufficient, holding that allegations that the bank "clear[ed] and launder[ed] . . . money for customers connected to Iran or Iran's Terrorist Sponsors" were "far too attenuated to establish a direct nexus between [the bank's] conduct and the Attacks." *Id.* at *9. Similarly, in *Troell*, 2026 WL 636849, the court found that even "intentionally and knowingly facilitat[ing] transactions by sanctioned entities" is "insufficient to establish the nexus required to render a defendant secondarily liable for specific terrorist attacks." *Id.* at *18. And in *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023), the D.C. Circuit affirmed dismissal of a common-law claim for aiding and abetting terrorism based on the *Halberstam* "knowing and substantial assistance" framework: Even where a bank "evad[ed] U.S. sanctions on Sudan," "a state sponsor of terrorism," the complaint still failed because it did not allege that specific assistance from the bank "flowed to al-Qaeda to fund its murderous plots." *Id.* at 672, 675, 677.

Those holdings apply forcefully to the even-more-indirect causal chain asserted here. The Complaint's primary theory appears to be that BATMS's participation in the Dasesong-BAT joint venture allowed NKTC—and, through NKTC, Office 39—to generate revenue that eventually

22

funded North Korean missile development.  AC ¶ 123.  The Complaint does not allege that Defendants had dealings with the Iran-backed FTOs that carried out the attacks.  It does not allege that Defendants supplied any weapons or other materiel used by those FTOs.  It does not even allege that Defendants supplied the sort of fungible financial assets that the Second Circuit found insufficient in *Ashley*.  144 F.4th at 444.  Instead, BATMS is alleged to have provided "cigarette components" used to produce cigarettes at a factory in Pyongyang.  *See* AC ¶¶ 100, 122.  Whatever the permissible bounds of aiding-and-abetting liability, there is no "concrete nexus" between the provision of raw materials for cigarette production in North Korea and missile attacks by Iran-aligned terrorists in Iraq years later.  *Taamneh*, 598 U.S. at 501.

The Complaint adds to that attenuation by affirmatively alleging myriad layers of separation between BATMS's cigarette components and the FTOs, in a chain that seeks to connect numerous intervening actors spread over thousands of miles and multiple years.  Those layers of separation include: (1) the North Korean cigarette joint venture; (2) the partner in the joint venture, NKTC; (3) "Office 39," through which NKTC's profits from the joint venture allegedly "flowed," AC ¶ 34; (4) additional North Korean intermediaries, including the North Korean military, which allegedly transacted with even more third parties to develop missile technology and buy necessary components, *id.* ¶¶ 161, 165, 167; (5) Iran and the IRGC, which acquired the North Korean missile technology and components and then used those inputs to design and manufacture new classes of Iranian missiles, *id.* ¶¶ 167, 169; and, finally, (6) Hizballah and Kataib Hizballah, which coordinated with the IRGC to carry out the 2020 and 2022 attacks in Iraq, *id.* ¶¶ 221, 225.

Beyond the sheer number of intervening parties, the causal chain is even more speculative because two of those parties are sovereign governments.  "[W]hen an intermediary is a sovereign state with many legitimate agencies, operations, and programs to fund, the need for additional

23

allegations supporting substantiality is all the more acute." *Ofisi*, 77 F.4th at 677-78 (internal

quotation marks and citation omitted) (affirming dismissal of claim involving "state sponsor of

terrorism"). For that reason, allegations that a defendant indirectly aided and abetted an FTO by

making payments to an intervening government entity are generally inadequate, because they rely

on speculative inferences that those funds were then passed to terrorists or "were necessary" for

the government "to fund the attacks." *Id.* The Complaint here is no different. Indeed, it

affirmatively acknowledges that North Korea directed funds generated by Office 39 to numerous

uses, including "regime maintenance," "luxury goods," and the "DPRK [] Navy." AC ¶ 80. And

while the Complaint includes a conclusory allegation that "most of the funds Defendants generated

flowed to support missile collaboration between the DPRK and IRGC," *id.*, it does not trace any

specific funds from Defendants (or even the cigarette joint venture) to the 2020 and 2022 attacks.

Instead, the Complaint simply asserts that because North Korea allegedly "prioritized" the "missile

types linked to the *Qiam* and *Fateh*" missiles later developed by Iran, *id.*, some portion of the funds

generated by the joint venture must have ended up going to development of technology deployed

in missiles used in the attacks. That speculative assumption embraces just the sort of "fungibility

rationale" that courts have consistently rejected in this context. *Ashley*, 144 F.4th at 444; *see*

*Taamneh*, 598 U.S. at 495 ("[I]t is not enough . . . that a defendant have given substantial assistance

to a transcendent 'enterprise' separate from and floating above all the actionable wrongs . . . .").[6]

Allegations that the joint venture generated not just profits but "hard currency"—*i.e.*, funds

denominated in U.S. dollars or other currencies that could be more easily used to acquire missile

---

[6] Where a complaint plausibly alleges that a defendant specifically intended to facilitate a
particular "act of international terrorism," *Taamneh*, 598 U.S. at 495, facts establishing such
tracing may not be required. As discussed below, however, the Complaint contains no plausible
allegations that Defendants intended to facilitate the attacks at issue, or even that they intended to
facilitate terrorist attacks more generally. *See* pp. 28-30, *infra*.

components, *see*, *e.g.*, AC ¶ 167—cannot establish the necessary connection, either.  First, as with its allegations about profits more generally, the Complaint identifies no basis for tracing any "hard currency" from the cigarette joint venture to the specific missiles used in the attacks.  Thus, even if the "hard currency" allegations could establish that the joint venture facilitated the "transcendent 'enterprise'" of North Korea's missile program, *Taamneh*, 598 U.S. at 495, they would be insufficient to establish a nexus to the specific "act[s] of international terrorism" at issue here, *id.*

Second, the Complaint does not coherently plead that the joint venture *did* generate meaningful amounts of foreign currency.  The joint venture was intended to attract "new smokers" in North Korea and "capture the untapped North Korean market."  AC ¶ 89.  Those sales in North Korea obviously would not generate foreign currency, and the Complaint does not suggest otherwise.  Instead, it alleges more obliquely that the joint venture "enabled Office 39 . . . to achieve over $415 million in liquidity," because Office 39 could pay for the cigarette components using U.S. dollar-denominated accounts that were "trapped under sanctions and otherwise useless to Office 39."  *Id.* ¶ 123 (emphasis omitted) (citing Statement of Offense ¶ 54).  But as the cited source makes clear, the $415 million figure reflected dollar-denominated payments transferred *to BATMS* from Office 39, *see* Statement of Offense ¶ 54 (stating that "Company 1"—identified as a conduit of payments to BATMS—received the $415 million).  In other words, the Complaint affirmatively alleges that, through the cigarette joint venture, North Korean entities gave up hard currency to obtain tobacco products for the "North Korean market."  AC ¶ 89.  The details of those transactions thus undermine, rather than support, the Complaint's conclusory allegations that the joint venture was a major source of U.S.-dollar inflows for the North Korean regime.

After Defendants noted in their first motion to dismiss that the $415 million flowed in the wrong direction, *see* ECF No. 31 at 12-13, Plaintiffs now assert that "a substantial number of

cigarettes produced by Daesong-BAT, or with BAT's assistance, were likely counterfeited and smuggled," and that those cigarettes in turn "likely generated currency . . . in a comparable, if not greater, amount than what BAT caused through Daesong-BAT."  AC ¶ 202.  As the repeated "likely" qualifiers indicate, that allegation is just more speculation:  The Complaint alleges no facts about any specific counterfeit cigarettes produced using diverted BATMS materials, the quantity of such cigarettes produced, the destinations to which they were smuggled, or the value they generated for NKTC or Office 39.  Instead, having offered generalized assertions that some unknown number of cigarettes produced by the joint venture were "likely" counterfeited and smuggled, *id.*, the Complaint elsewhere asserts that "'cigarette counterfeiting'" writ large "is a 'major source of income to the regime,'" *id.*  ¶ 79 (quoting 2006 Congressional testimony).[7]  But as the Complaint admits, North Korea operated numerous "large-scale" counterfeiting "factories," entirely apart from the Daesong-BAT factory in Pyongyang.  *Id.* ¶ 33.  The Complaint offers no basis for concluding that products diverted from the joint venture, which involved a single factory and sought to target "new smokers" in the "untapped North Korean market," *id.* ¶ 89, represented anything more than a small fraction of that broader counterfeiting operation.   Therefore, the Complaint cannot establish that the missiles used in the attacks are traceable to any incremental contributions that BATMS's components allegedly made to the counterfeiting effort.

---

[7] Even the allegations about the role of cigarette counterfeiting more broadly rely on speculation. For example, in the same Congressional testimony, the witness acknowledged that "it is . . . a highly speculative process trying to assess the value of these illicit activities," and that "[a]ny assessment of the value of a criminal activity to the DPRK is just necessarily highly speculative." *North Korea: Illicit Activity Funding the Regime: Hearing Before the Subcomm. on Fed. Fin. Mgmt., Gov't Info. & Int'l Sec. of the S. Comm. on Homeland Sec. & Governmental Affs.*, S. Hrg. 109-887, at 11-12 (2006) (testimony of State Dept. Official Peter Prahar).

2.     **The Years Of Separation Between Defendants' 2007-2017 Sanctions Violations And The 2020 And 2022 Attacks Further Attenuate Any Nexus To Terrorism**

The timing of Defendants' alleged conduct also undermines the Complaint's aiding-and-abetting claim.  Although the Complaint seeks to hold Defendants liable for attacks in 2020 and 2022, it alleges no misconduct by either Defendant after 2017.  *See* pp. 3-8, *supra*.

The "conceptual core" of aiding-and-abetting liability is "that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'"  *Taamneh*, 598 U.S. at 492-93 (alteration in original) (citation omitted).  Defendants cannot have "participated" in attacks that injured Plaintiffs when they ceased their alleged conduct years before those attacks occurred.  *See*, *e.g.*, *Averbach v. Cairo Amman Bank*, No. 19-cv-4, 2020 WL 486860, at *14 (S.D.N.Y. Jan. 21, 2020) ("The long period of time [more than ten months] that passed after [defendant] provided the services until the Park Hotel Bombing precludes an inference that [defendant] was generally aware that it was playing a role in that attack."), *report and recommendation adopted*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).  As the Second Circuit held when affirming dismissal of another ATA aiding-and-abetting claim, an allegation that a defendant's activities ended even "ten months before the [specific] Attacks" is a "crucial[]" concession supporting dismissal.  *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) ("HSBC's decision not to provide banking services to ARB for the ten months preceding the November 9 Attacks makes it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks.").

Attempting to overcome the multi-year gap between the conclusion of Defendants' alleged indirect assistance in 2017 and the FTOs' commission of the attacks in 2020 and 2022, the Complaint alleges that North Korea (and, by extension, the FTOs) "continue[d] to benefit" from Defendants' actions "even after [BATMS] exit[ed] the venture."  AC ¶ 205.  But the question in

27

an ATA aiding-and-abetting case is not whether a tortfeasor "benefit[ed]" from acts of a defendant. *Id.* Rather, it is whether the defendant "'participate[d]' in [the] wrongful act so as to help 'make it succeed.'" *Taamneh*, 598 U.S. at 493 (alteration in original) (citation omitted). Because the Complaint acknowledges that Defendants "exited [the] joint venture" in 2017, AC ¶ 205, it cannot plausibly assert that Defendants "participate[d]" in the attacks years later.

> **B.     The Complaint Fails To Allege That Defendants Intended To Facilitate The 2020 And 2022 Attacks**

The failure to allege a concrete nexus between BATMS's sale of cigarette components in North Korea and the attacks in Iraq is sufficient reason, by itself, to dismiss the Complaint. But at the very least, finding liability based on the Complaint's attenuated causal chain would require allegations showing that Defendants affirmatively intended to facilitate the specific attacks at issue. *See Taamneh*, 598 U.S. at 506 ("[T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort."); *Parizer*, 2025 WL 2382933, at *22 ("[A] failure to allege any 'definable nexus' between the assistance provided and the wrongful act—'at minimum—drastically increases [plaintiffs'] burden to show that defendants somehow consciously and culpably assisted the attack.'" (quoting *Taamneh*, 598 U.S. at 503)).

The Complaint cannot satisfy that demanding standard. Nothing in the Complaint plausibly alleges that Defendants "culpably 'associated themselves with' the [2020 and 2022] attack[s], 'participated in [them] as something that they wished to bring about,' or sought 'by their action to make [them] succeed." *Taamneh*, 598 U.S. at 498 (original alterations and citation omitted). Indeed, the Complaint lacks any allegations of fact plausibly indicating that Defendants intended to support any type of terrorism, or that they aimed to assist IRGC, Hizballah, or Kataib Hizballah in any capacity whatsoever. The Complaint simply alleges BATMS sold supplies to

Daesong-BAT that were used to manufacture cigarettes at a facility in North Korea. *See*, *e.g.*, AC ¶ 122. Even if Defendants were generally aware that some portion of Daesong-BAT's profits from cigarette sales might eventually be used by the North Korean government to develop weapons technology, and that the technology could be shared with Iran, that does not suffice to establish that Defendants intended to facilitate the attacks on Plaintiffs (or anyone else).

*Taamneh* itself provides an apt comparison. The plaintiffs there alleged that the defendant social media companies "ha[d] known that ISIS ha[d] used their platforms for years." 598 U.S. at 481. They also alleged that the defendants had allowed ISIS to "benefit from their 'recommendation' algorithms, enabling ISIS to connect with the broader public, fundraise, and radicalize new recruits." *Id.* at 481-82. And the plaintiffs further alleged that the defendants themselves had "profited from the advertisements placed on ISIS' tweets, posts, and videos." *Id.* at 482. But the Court nevertheless held that the plaintiffs failed to state a claim under the ATA because "[n]one of those allegations suggest that defendants 'culpably associated themselves with' the [specific] attack, 'participated in it as something that they wished to bring about,' or sought 'by their action to make it succeed.'" *Id.* at 498 (original alterations and citation omitted).

The Supreme Court's decision in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), a recent non-ATA case involving aiding-and-abetting principles, is likewise instructive. There, the Court rejected Mexico's attempt to hold American gun manufacturers liable as abettors of unlawful firearm sales made by downstream gun dealers to Mexican gun traffickers. *See id.* at 299. Although the Court had "little doubt" that illegal sales to gun traffickers take place, "and that the manufacturers know they do," the Court found aiding-and-abetting liability unwarranted because Mexico had not alleged that the manufacturers intended for the sales to happen. *Id.* at 294. Specifically, "Mexico ha[d] not adequately pleaded what it

need[ed] to: that the manufacturers participate in those sales as in something that they wish to bring about, and seek by their action to make succeed." *Id.* (internal quotation marks and original alterations omitted).

So too here: Nothing in the Complaint plausibly suggests that BATMS sold cigarette components in North Korea because it wanted to facilitate attacks in the Middle East. Instead, as in *Smith & Wesson*, the Complaint suggests at most that Defendants had a profit motive, coupled with an "indifference" to the ways in which their business operations might indirectly benefit distant bad actors. *Id.* at 297 (original alteration omitted) (quoting *Taamneh*, 598 U.S. at 500). In fact, the allegations here show even less intent than in *Smith & Wesson*, where the defendants manufactured and sold guns used in the ultimate torts. *See id.* at 288-89. Here, by contrast, the Complaint alleges that BATMS profited by selling cigarette components, which were not themselves used to injure Plaintiffs but were instead used by the North Korean government to earn revenue, some unknown portion of which may have been devoted to developing other products that were provided to yet another government, which directed the attacks years after Defendants' relevant conduct had ended. As *Taamneh* and *Smith & Wesson* (among others) illustrate, that is not sufficient intent to make out a claim for aiding-and-abetting liability.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction or, in the alternative, under Rule 12(b)(6) for failure to state a claim. Because Plaintiffs already took the opportunity to amend, any dismissal on the merits should be with prejudice. *See Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 595 (E.D. Va. 2006) ("In the Eastern District of Virginia, an amendment may be considered futile where Plaintiffs have previously had two full opportunities to plead their claim.").

30

Dated:  June 15, 2026.

<div style="display: flex;">
<div>

Gary A. Bornstein (*pro hac vice*)
David H. Korn (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY  10001
(212) 474-1000
gbornstein@cravath.com
dkorn@cravath.com

</div>
<div>

Respectfully submitted,

*/s/ Craig C. Reilly*

Craig C. Reilly (VSB # 20942)
LAW OFFICE OF CRAIG C. REILLY
429 North Saint Asaph Street
Alexandria, VA  22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com

John Buretta (*pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000
johnburetta@paulhastings.com

Benjamin W. Snyder (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
bensnyder@paulhastings.com

*Counsel for Defendants*

</div>
</div>

31