# Exhibit A

FILED
APR 25 2023
Clerk, U.S. District and Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM NO: 23-cr-118 (BAH) |
| | : | |
| v. | : | |
| | : | |
| BRITISH AMERICAN TOBACCO P.L.C., | : | |
| | : | |
| Defendant. | : | |

## DEFERRED PROSECUTION AGREEMENT

Defendant British American Tobacco p.l.c. ("BAT" or the "Company"), by its undersigned representatives, pursuant to authority granted by the Company's Board of Directors, and the United States, through the Department of Justice, United States Attorney's Office for the District of Columbia and National Security Division, Counterintelligence and Export Control Section (the "Offices"), enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1. The Company acknowledges and agrees that the Offices will file the attached two count criminal Information in the United States District Court for the District of Columbia charging the Company with conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349, and conspiracy to violate the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705(a). In so doing, the Company: (a) knowingly waives its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives for purposes of this Agreement and for the purpose of any charges

by the United States arising out of the conduct described in the attached Statement of Offense any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia.

2. The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Offense attached hereto as ATTACHMENT A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in ATTACHMENT A are true and accurate. Should the Offices pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Offense in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Offense at any such proceeding.

**Term of the Agreement**

3. This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company agrees, however, that, in the event the Offices determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Paragraph 14, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to

eliminate the need for the reporting requirement in Paragraph 14, and that the other provisions of this Agreement have been satisfied, the Term of the Agreement may be terminated early.

**Relevant Considerations**

4. The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Company. Among the factors considered were the following:

a. The Company's willingness to acknowledge and accept responsibility for the actions of its officers, directors, employees, and agents as charged in the Information and as set forth in the Statement of Offense;

b. The Company's lack of a criminal history;

c. The Company's due diligence and remediation efforts to date, and the continued enhancement of its U.S. sanctions compliance program pursuant to this Agreement;

d. The Company's agreement to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Company and its current or former officers, directors as provided in Paragraph 5 below; and

e. The Company's provision of valuable information that has expanded and advanced the criminal investigation.

**Future Cooperation and Disclosure Requirements**

5. The Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and ATTACHMENT A, and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term of this Agreement, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in Paragraph 3. At the request of the Offices, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and ATTACHMENT A, and other conduct under investigation by the Offices or any other component of the Department of Justice. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a. The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Offices may inquire concerning all matters relating to the conduct described in this Agreement and ATTACHMENT A, and other conduct under investigation by the Offices, about which the Company has any knowledge or about which the Offices may inquire. This obligation of truthful

disclosure includes, but is not limited to, the obligation of the Company to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Company.

b. Upon request of the Offices, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Subparagraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c. The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d. With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities of such materials as the Offices, in their sole discretion, shall deem appropriate.

6. In addition to the obligations in Paragraph 5, during the Term of this Agreement, should the Company learn of credible evidence or allegations of sanctions violations, *i.e.*, the provision of BAT products to countries sanctioned by the United States and paid for in U.S. dollars, the Company shall promptly report such evidence or allegations to the Offices.

**Payment of Monetary Penalty and Fine**

7. The Offices and the Company agree that, based on the factors set forth in 18 U.S.C. §§ 3572(a), (d), the penalty and fines in the amount of $440,350,738 ("the penalty and fine amount") and forfeiture amount are appropriate in this case, as follows:

- Bank Fraud Penalty & Fine, 18 U.S.C. §§ 1344, 3571(d) - $122,537,016
- IEEPA Penalty & Fine, 18 U.S.C. § 3571(d), 50 U.S.C. § 1705 - $317,813,722
- Criminal Forfeiture (IEEPA), 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461- $189,541,115

The Company shall be jointly and severally liable for the full penalty, fine, and forfeiture amount, $629,891,853, with its subsidiary, British-American Tobacco Marketing (Singapore) Private Limited ("BATMS"), which is entering into a plea agreement with the Offices simultaneously with this Agreement. The total monetary penalty, fine, and forfeiture amount in both this Agreement and BATMS's plea agreement is solely for purposes of reflecting BATMS's and the Company's joint and several liability for a single amount of $629,891,853. The Company and the Offices agree that the penalty, fine and forfeiture amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of the Company's conduct. The parties further agree that the Company's payment of the full penalty, fine, and forfeiture amount to the United States Treasury will satisfy the penalty, fine, and forfeiture amount to be imposed on BATMS pursuant to its plea agreement.

8. Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the penalty and fine amount is the maximum penalty and fine that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those

circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine paid pursuant to this Agreement.

9. The Company agrees to pay the full penalty and fine amount to the United States Treasury by the end of the Term, and further in accordance with the schedule described in ATTACHMENT D. Because the penalty and fine amount will not be paid before the fifteenth day after the date of the judgment, the Company will pay interest along with each payment as calculated pursuant to 18 U.S.C. § 3612(f)(2). Payments shall be made pursuant to payment instructions provided by the Offices in their sole discretion. The Company releases any and all claims it may have to such funds, and further certifies that it passes clean title to these funds, which are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to the funds in any way will be considered a breach of this agreement. The Company shall indemnify the Offices for any costs it incurs associated with the passing of clean title to the funds. The penalty and fine amount is final and shall not be refunded.

**Forfeiture**

10. As a result of the conduct described in the Information and the Statement of Offense, the Company agrees to be jointly and severally liable for forfeiture ordered of BATMS up to the amount of $189,541,115 ("the Forfeiture Amount").

a. The Company agrees that the facts contained in the Information and in the Statement of Offense establish that the Forfeiture Amount is subject to criminal forfeiture to the

United States, as alleged in Paragraphs 80-82 of the Information. The Company further agrees that the facts set forth in the forfeiture allegation with respect to Count Two of the Information and the facts in the Statement of Offense justify a finding that the proceeds of Count Two obtained by BAT and BATMS are at least greater than the Forfeiture Amount, which constitutes or is derived from proceeds traceable to Count Two. In connection with this resolution, BAT agrees that at least the Forfeiture Amount is a result of the offense charged in Count Two and agrees to forfeit this amount to the Government. The Company agrees to sign any documents necessary to effectuate forfeiture of the Forfeiture Amount, including a stipulation as to the involvement of the Forfeiture Amount in the unlawful conduct.

b. By this Agreement, the Company expressly waives all constitutional and statutory challenges in any manner to the Criminal Forfeiture Complaint carried out in accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Company also waives service of the Criminal Forfeiture Complaint and *in rem* jurisdiction as to the Forfeiture Amount.

c. The Company shall release any and all claims it may have to the Forfeiture Amount and execute such documents as necessary to accomplish the forfeiture of the funds. The Company agrees that it will not file a claim with the Court or otherwise contest the criminal forfeiture of the Forfeiture Amount and will not assist a third party in asserting any claim to the Forfeiture Amount. The Company certifies that the funds used to pay the Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this agreement.

d. The Company agrees that the Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including tax purposes. The Company agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any fine or forfeiture paid pursuant to this Agreement.

e. The Company shall transfer the Forfeiture Amount to the United States Treasury by the end of the Term, and further in accordance with the schedule described in ATTACHMENT D and shall pay any associated transfer fees. Such payment shall be made pursuant to wire instructions provided by the Offices or by check deposited with the United States Marshals Service. Because the forfeiture amount will not be paid before the fifteenth day after the date of the judgment, the Company will pay interest along with each payment as calculated pursuant to 18 U.S.C. § 3612(f)(2). If the Company fails to timely make the payments required under this Paragraph and in accordance with the schedule described in ATTACHMENT D, interest (at the rate specified by 18 U.S.C. § 3612(f)(2)) shall continue to accrue on the unpaid balance through the date of payment, unless the Offices, in their sole discretion, choose to reinstate prosecution pursuant to Paragraphs 20-22, below.

f. The Forfeiture Amount paid is final and shall not be refunded should the Offices later determine that the Company has breached this Agreement and commences a prosecution against the Company. In the event of a breach of this Agreement and subsequent prosecution, the Offices may pursue additional civil and criminal forfeiture in excess of the Forfeiture Amount. The Offices agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset

against whatever forfeiture the Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

**Conditional Release from Liability**

11. Subject to Paragraphs 18-19, the Offices agree, except as provided herein, that they will not bring any criminal or civil case against the Company relating to any of the conduct described in the Statement of Offense, attached hereto as ATTACHMENT A, or the criminal Information filed pursuant to this Agreement. The Offices, however, may use any information related to the conduct described in the attached Statement of Offense against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a. This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b. In addition, this Agreement does not provide any protection against prosecution of any present or former officer, director, employee, shareholder, agent, consultant, contractor, or subcontractor of the Company for any violations committed by them.

**Corporate Compliance Program**

12. The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., and U.S. sanctions laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include sales of BAT products and processing of bank transactions.

13. In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement,

a. Continue to apply the OFAC sanctions list to United States Dollar ("USD") transactions, the acceptance of customers, and all USD cross-border Society for Worldwide Interbank Financial Telecommunications ("SWIFT") incoming and outgoing messages involving payment instructions or electronic transfer of funds;

b. Except as otherwise permitted by United States law, not knowingly undertake any USD cross-border electronic funds transfer or any other USD transaction for, on behalf of, or in relation to any person or entity resident or operating in, or the governments of North Korea, Iran, Syria, or Cuba;

c. Continue to complete financial economic crime sanctions training, covering U.S., U.N., and E.U. sanctions and trade control laws for all employees (1) involved in the processing or investigation of USD payments and all employees and officers who directly or indirectly are supervising these employees, (2) involved in execution of USD denominated securities trading orders and all employees and officers who directly or indirectly are supervising these employees; and (3) involved in transactions or business activities involving any nation or entity subject to U.S., E.U., or U.N. sanctions, including the execution of cross-border payments;

d. Continue to apply its written policy requiring that financial institutions initiating bank transfers on behalf of BAT use SWIFT Message Type ("MT") MT 202COV bank-to-bank payment message where appropriate under SWIFT Guidelines, and by the date of the first report required by Paragraph 14, certify continuing application of that policy;

e. Continue to apply and implement compliance procedures and training designed to ensure that the Company's compliance officer in charge of sanctions is made aware in a timely manner of any known requests or attempts by any entity (including, but not limited to, the Company's customers, financial institutions, companies, organizations, groups, or persons) to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws. The Company's Head of Compliance, or his or her designee, shall report to the Offices in a timely manner, the name and contact information, if available to the Company, of any entity that makes such a request, subject to any applicable laws, including any data privacy or bank secrecy laws;

f. Maintain the electronic database of SWIFT MT payment messages and all documents and materials produced by the Company to the Offices as part of this investigation relating to USD payments processed during the period from August 2007 through June 2017 in electronic format during the Term of this Agreement, including any extensions.

<u>**Corporate Compliance Reporting**</u>

14. The Company agrees that it will report to the Offices annually during the Term of the Agreement regarding remediation and implementation of the compliance measures described in Paragraphs 12 and 13. Such reports must include specific and detailed accounts of the Company's bank fraud and U.S. sanctions laws compliance improvements.

15. The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are

intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

16. The Company may extend the time period for submission of any compliance reports with prior written approval of the Offices.

17. Thirty days after the expiration of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Offices that the Company has met its disclosure obligations pursuant to Paragraph 13 of this Agreement. Such certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Deferred Prosecution**

18. In consideration of: (a) the past and future cooperation of the Company described in Paragraphs 4-5 above; (b) the Company's payment of the penalty and fine amount and forfeiture, totaling $629,891,853, and (c) the Company's implementation and maintenance of remedial measures as described in Paragraphs 12 and 13 above, the Offices agree that any prosecution of the Company for the conduct set forth in the attached Statement of Offense, and for the conduct that the Company disclosed to the Offices prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

19. The Offices further agree that if the Company fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against the Company and, at the conclusion of the Term, this Agreement shall expire. Within two months of the Agreement's expiration, the Offices shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and ATTACHMENT A.

**Breach of the Agreement**

20. If, during the Term of this Agreement, the Company (a) commits any felony under United States federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 5 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 12-13 of this Agreement; or (e) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Offices in the United States District Court for the District of Columbia or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by the Company. Any such prosecution relating to the conduct described in the attached Statement of Offense or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of

limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of 18 U.S.C. §§ 1344, 1349, and 50 U.S.C. § 1705, which occurs during the Term will be tolled from the date upon which the violation occurs until the date upon which the Offices are made aware of the violation.

21. In the event the Offices determine that the Company has breached this Agreement, the Offices agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Company.

22. In the event that the Offices determine that the Company has breached this Agreement: (a) all statements made by, or on behalf of, the Company to the Offices or to the Court, including the attached Statement of Offense, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the

Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Offices.

23. The Company acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

**Sale, Merger, or Other Change in Corporate Form of Company**

24. Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, the Company agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The Company shall obtain approval from the Offices at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form, including dissolution, in order to give the Offices an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.

## Public Statements by Company

25. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Offense. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 20-22 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Offense will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Offense, the Offices shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Offense provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Offense. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

26. The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement,

the Company shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company; and (b) whether the Offices have any objection to the release. Statements at any press conference concerning this matter shall not be inconsistent with such a press release.

**Limitations on Binding Effect of Agreement**

27. This Agreement is binding on the Company and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities.

28. The Company understands that it may be subject to suspension or debarment action by state or federal agencies other than the Offices based upon entering into this Agreement, and that this Agreement in no way controls what action, if any, other agencies may take. The Company affirms that it wants to enter into this Agreement regardless of any suspension or debarment consequences. The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities, to include the Department of the Treasury, the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide information to be evaluated independently by such authorities.

**Notice**

29. Any notice to the Offices under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to

Gregg Maisel, Chief National Security Section, Assistant United States Attorney, United States Attorney's Office for the District of Columbia, 601 D Street, N.W., Washington, D.C. 20530. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Globe House, 4 Temple Place, London, United Kingdom, WC2R 2PG. Notice shall be effective upon actual receipt by the Offices or the Company.

**Complete Agreement**

30. This Agreement sets forth all the terms of the agreement between the Company and the Offices. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR BRITISH AMERICAN TOBACCO P.L.C.**

Date: April 14, 2023 By: ______________________
Gareth Cooper
BRITISH AMERICAN TOBACCO P.L.C.

Date: April 14, 2023 By: ______________________
John D. Buretta
Evan Norris
Megan Y. Lew
Cravath, Swaine & Moore LLP

Date: April 14, 2023 By: ______________________
Wick Sollers
King & Spalding LLP

**FOR THE UNITED STATES ATTORNEY'S OFFICE:**

MATTHEW M. GRAVES
United States Attorney

Date: April 15, 2023 BY: ______________________
Karen P. W. Seifert
Assistant United States Attorney

**FOR THE NATIONAL SECURITY DIVISION:**

MATTHEW G. OLSEN
Assistant Attorney General
National Security Division

Date: April 16, 2023

BY: ______________________
Beau Barnes
Trial Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for British American Tobacco p.l.c. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: April 14, 2023

BRITISH AMERICAN TOBACCO P.L.C.

By: ______________________________

Gareth Cooper
Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property

# CERTIFICATE OF COUNSEL

We are counsel for British American Tobacco p.l.c. (the "Company") in the matter covered by this Agreement. In connection with such representation, we have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, we are of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, we have carefully reviewed the terms of this Agreement with the Board of Directors and the Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property of the Company. We have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: April 14, 2023

By: ______________________________
John D. Buretta
Evan Norris
Megan Y. Lew
Cravath, Swaine & Moore LLP
Counsel for British American Tobacco p.l.c.

By: ______________________________
Wick Sollers
King & Spalding LLP
Counsel for British American Tobacco p.l.c.

# ATTACHMENT A

## STATEMENT OF OFFENSE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>BRITISH AMERICAN TOBACCO P.L.C.,<br><br>and<br><br>BRITISH-AMERICAN TOBACCO MARKETING (SINGAPORE) PRIVATE LIMITED,<br><br>Defendants. | : | CASE NO. 23-cr-118 |

## STATEMENT OF OFFENSE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia and the National Security Division, and the defendants, British American Tobacco p.l.c. and British-American Tobacco Marketing (Singapore) Private Limited, with the concurrence of their attorneys, agree and stipulate to the below factual basis. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate facts regarding a conspiracy to commit bank fraud, 18 U.S.C. §§ 1344, 1349, and a conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*

### I. Relevant Legal Background

#### *A. Sanctions Against North Korea*

1. The Trading with the Enemy Act ("TWEA") of 1917, codified at 12 U.S.C. § 95 & 50 U.S.C. § 4301 *et seq.*, authorized the President to restrict trade between the United States and

countries with which it is adverse. On December 16, 1950, the President designated the Democratic People's Republic of Korea ("DPRK" or "North Korea"), under TWEA. North Korea remained designated as such until June 26, 2008.

2. Under TWEA, U.S. financial institutions were barred from conducting transactions for the benefit of North Korea, to include "[a]ll transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States." 31 C.F.R. § 500.201 (2006 ed.).

***B. United Nations Sanctions***

3. In December 1985, North Korea ratified the Nuclear Non-Proliferation Treaty ("NPT"). On January 10, 2003, North Korea withdrew from the NPT. On October 14, 2006, the United Nations ("UN") Security Council passed Resolution 1718 condemning North Korea's first nuclear test and imposed sanctions on North Korea, including the supply of heavy weapons and select luxury goods. After successive nuclear tests by North Korea, the UN Security Council strengthened or imposed additional sanctions in 2009, 2013, 2016 and 2017.

***C. IEEPA***

4. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, enacted in 1977, authorized the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

5. The U.S. Departments of the Treasury, Commerce, and State enforce and administer economic sanctions under their respective authorities, to accomplish U.S. foreign

policy and national security goals. In particular, the Department of the Treasury publishes a publicly available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions. SDNs' property and interests in property, subject to U.S. jurisdiction or in the possession and control of U.S. persons, are blocked when they are placed on the SDN list. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

6. Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On November 14, 1994, the President issued Executive Order ("EO") 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

7. On June 28, 2005, the President, in order to take additional steps with respect to the national emergency described and declared in EO 12938, issued EO 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") targeting proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13382 authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq.* EO 13382 and the Weapons of Mass

Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities placed on the SDN list under those authorities, unless exempt or authorized by the Office of Foreign Assets Control ("OFAC"), which was located in Washington, D.C.

8. On August 11, 2009, the Department of the Treasury designated the North Korean bank Korea Kwangson Banking Corp. ("KKBC") under EO 13382 for providing financial services in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN pursuant to UN Security Council Resolution 1718 for their roles in North Korea's WMD and missile programs. At the time of the designation, the Department of the Treasury's Under Secretary for Terrorism and Financial Intelligence stated, "North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit."

9. On March 11, 2013, the Department of the Treasury designated the Foreign Trade Bank ("FTB"), North Korea's primary foreign exchange bank, pursuant to EO 13382, for providing financial services that assisted in the proliferating of WMD. In the designation, Treasury stated, "North Korea uses FTB to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . . By designating FTB, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system. FTB is a state-owned bank established in 1959. FTB acts as North Korea's primary foreign exchange bank and has provided key financial support to [KKBC]."

10. On March 15, 2016, the President, in order to take additional steps with respect to the previously described national emergency, issued EO 13722 addressing the Government of North Korea's continuing pursuit of its nuclear and missile programs. EO 13722 imposed a comprehensive blocking of the Government of North Korea and the Workers' Party of Korea. Pursuant to that authority, on March 5, 2018, the Secretary of the Treasury amended the "North Korea Sanctions Regulations." 83 Fed. Reg. 9182 (Mar. 5, 2018); *see* 31 C.F.R. § 510.101 *et seq.* EO 13722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC. Under these orders, U.S. financial institutions were barred from providing correspondent banking services to North Korea entities.

11. EOs 13466 and 13722, and the North Korea Sanctions Regulations also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these Executive Orders or regulations.

***D. Bank Secrecy Act***

12. Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency

conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

13. According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all substantial U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

14. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to avoid sanctions programs administered by OFAC.

15. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. *See* USA PATRIOT Act § 311, codified at 31 U.S.C. § 5318A. One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial institutions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

16. In June 2016, FinCEN determined that the entire North Korean financial sector was a "primary money laundering concern." 81 Fed. Reg. 35665 (June 3, 2016). On November 9, 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its

behalf. A second special measure required U.S. financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States. Failure to comply with the special measure resulted in civil and criminal penalties for U.S. financial institutions.

17. As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, in at least March 2016, correspondent banks refused to knowingly process any U.S. dollar wire transactions involving entities in North Korea.

**II. <u>North Korea Banking and Use of Front Companies</u>**

18. The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions." 81 Fed. Reg. 78715 (Nov. 9, 2016). These companies are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism controls." *Id.*

19. The United Nations Panel of Experts found that once North Korea registered a front company without overt links to the country through the assistance of foreign nationals, it became significantly easier for its firms to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts with banks outside of North Korea.

20. North Korean entities used front companies to pay their counterparties in U.S. dollars. The use of front companies and stripping material information, such as the true

counterparties to the transaction, from wire transfer instructions influence the decision making of the correspondent banks into processing transactions that they otherwise normally would not.

## III. Entities

21. British American Tobacco p.l.c. ("BAT"): BAT, established in 1902, is a multinational entity headquartered in London, United Kingdom, involved in the trade and production of tobacco products around the world.

22. British-American Tobacco Marketing (Singapore) Private Limited ("BATMS"): BATMS is an indirect subsidiary of BAT located in Singapore. During the time period relevant to these offenses, BAT exercised control over BATMS and received income from revenue generated by BATMS through BATMS's sales of products to North Korea via Company 1.

23. North Korean Tobacco Company ("NKTC"): NKTC is a North Korean trade company that specializes in the production of cigarettes sold in North Korea and other markets. NKTC is owned by the government of North Korea.

24. Joint Venture Tobacco Factory ("JVTF"): JVTF was a joint venture company established in North Korea by BATMS and NKTC. The original joint venture agreement was signed in 2001 with a 20-year operating period.

25. Company 1: Company 1 is a Singaporean conglomerate that supplies a variety of goods to various Asian markets. In 2005, BATMS appointed Company 1 as a distributor of BAT cigarette kitsets in North Korea and other markets in Asia. At the height of the relationship between BATMS and Company 1, the distribution of BAT products previously accounted for roughly 50% to 60% of Company 1's business.

26. BAT DPRK Subsidiary ("BAT DPRK"): BAT DPRK was owned by a BAT subsidiary and acquired BATMS's shares in the JVTF in 2004. In August 2007, BAT DPRK was

sold to Company 1 and thereafter became Company 1 DPRK, a subsidiary of Company 1. BAT DPRK was previously named BAT Holdings DPRK. From August 2007 to May 2017, a BAT subsidiary held a call option to repurchase Company 1 DPRK.

27. The Foreign Trade Bank ("FTB"): As noted above, FTB was a North Korean state-owned bank and was North Korea's primary foreign exchange bank.

28. Korean Kwangson Banking Corporation ("KKBC"): As noted above, KKBC was a North Korean state-owned bank and a subsidiary of FTB.

29. U.S. Bank 1, U.S. Bank 2, U.S. Bank 3, and U.S. Bank 4 (collectively, "the U.S. banks") were U.S. financial institutions then insured by the Federal Deposit Insurance Corporation. During the relevant time period, the U.S. banks unknowingly processed correspondent banking transactions for U.S. dollar transactions originating in North Korea for the benefit of BATMS, and ultimately BAT, which they would not have processed had they known the true nature of the transactions.

## IV. <u>The Scheme</u>

### *A. Background*

30. Starting in at least August 2007 and continuing through at least June 2017 (the "relevant time period"), BAT, BATMS, and others engaged in a conspiracy to commit bank fraud and sanctions violations in connection with the provision by North Korean entities and others of false information to U.S. banks processing U.S. dollar transactions on behalf of North Korean entities, and thus causing the export of financial services from the United States to North Korea, and without seeking or obtaining the requisite licenses from OFAC when necessary.

31. Specifically, during the relevant time period, BAT and BATMS were aware that: (i) U.S. financial institutions, including the U.S. banks, would not process U.S. dollar

correspondent banking transactions on behalf of customers located in North Korea to the extent that such transactions violated sanctions placed on North Korea by the United Nations and the United States and (ii) U.S. sanctions prohibited transactions with sanctioned banks and entities that used U.S. dollar wire transfers and U.S. financial institutions.

32. As discussed, JVTF was a joint venture company established in North Korea by BATMS and NKTC. The original joint venture agreement was signed in 2001. To ensure that banks would process JVTF's U.S. dollar transactions, BAT, BATMS and NKTC did two things.

a. First, on June 8, 2007, BAT issued a press release stating that BAT "has agreed in principle to sell its share in [JVTF], a joint venture cigarette business in Pyongyang with [NKTC], a state-owned company." In reality, as described further herein, BATMS maintained significant influence over the JVTF and used Company 1 as a shell company at various points during the relevant time period, and BAT continued to benefit from BATMS's significant influence over the JVTF.

b. Second, on behalf of NKTC, KKBC enacted an elaborate scheme of utilizing a network of front companies located throughout the world to conceal the North Korean nexus of payments it made to Company 1, which subsequently flowed to BATMS and ultimately BAT. Before and after the United States issued sanctions against KKBC and FTB, each North Korean bank employed several Chinese entities to make these types of payments to Company 1 on behalf of NKTC.

33. BATMS's and its co-conspirators' deceptive practices caused U.S. financial institutions, including the U.S. banks, to process transactions that they would not have otherwise processed.

34. Throughout the relevant time period, BAT and BATMS were aware of prohibitions against transacting with sanctioned banks and entities in North Korea through the use of U.S. dollar wire transfers and U.S. financial institutions.

***B. Details of the Scheme***

***BAT's and BATMS's Artifice to Conceal Its North Korean Business***

35. On April 12, 2005, BATMS entered into a "Sale and Purchase Agreement" with Company 1 wherein Company 1 would buy goods from BATMS and would resell those goods strictly to the entities that BATMS designated in the agreement. The contract stated that Company 1 would pay for the goods once they were received by Company 1, however, another part of the contract stated "BATMS shall deliver the Goods to the location designated by BATMS in DPRK." This agreement was the first of many between BATMS and Company 1. BATMS and BAT (by virtue of being BATMS's ultimate parent company) maintained control of all relevant aspects of the North Korean business.

a. According to official meeting minutes, "BAT" and NKTC attended an October 2005 JVTF meeting.[1] At this meeting, the parties discussed remittances related to North Korea: "If the remittance of funds continues to be a problem, the viability of the joint venture will be in question as BAT cannot keep paying suppliers and not get paid from DPRK. [NKTC] will look into getting approvals for BAT to bring cash out of DPRK by end of Oct. 2005."

---

[1] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

36. As previously stated, BAT issued a press release on June 8, 2007, announcing its agreement in principle to sell its shares in the JVTF to Company 1.

37. This press release was followed up by a formal agreement between BATMS, other BAT subsidiaries, and Company 1, executed on August 10, 2007, and referred to as the "Umbrella Agreement." The agreement included the following relevant terms:

a. In the initial JVTF agreement, BAT, through its subsidiary, BATMS, had owned 60% of the JVTF. In January 2004, BATMS had sold its 60% ownership rights to a BAT subsidiary, referred to as "BAT Holdings DPRK." At the time of the 2007 Umbrella Agreement, the outstanding funds owed on this intra-company purchase was $12,521,295.39.

b. In the Umbrella Agreement, (i) BAT Holdings DPRK agreed to shift 10% of its ownership interest in the JVTF to NKTC, resulting in a 50/50 split of the JVTF and (ii) BAT Holdings DPRK (including its 50% interest in the JVTF) was sold to Company 1 for the price of €1.00 (approximately $1.37 at the time), far less than the value of the business stated on BAT's internal records.

c. The Umbrella Agreement included, among other terms, a call option that allowed a BAT subsidiary to repurchase BAT Holdings DPRK (the "Call Option Agreement"). Because BAT Holdings DPRK held a 50% ownership interest in the JVTF, the call option essentially gave a BAT subsidiary the right to repurchase 50% of the JVTF after a two-year period, if it so desired. Under the terms of the Call Option Agreement, BAT Holdings DPRK could not make any material changes to its business without the prior written approval from the BAT subsidiary that owned the call option.

d. BATMS agreed to supply BAT Holdings DPRK with "technical and other related support services to be agreed between the relevant parties for the development of the business of [JVTF]."

38. However, the 2007 Umbrella Agreement was a tool for remitting North Korean funds to BATMS, and ultimately BAT. In an April 23, 2007, email discussing the Umbrella Agreement, a Company 1 executive noted that Company 1 DPRK would be "a vehicle for BAT to bring out the JV money and distribute it to BAT. [Company 1] will have no beneficial interest in [Company 1 DPRK]."

39. A later March 2015 document drafted by BATMS and BAT discussing the arrangement created by the 2007 Umbrella Agreement stated that "to ensure that BAT", through a subsidiary, held "de facto control of [Company 1 DPRK (previously known as BAT Holdings DPRK)] and through [Company 1 DPRK], significant influence over the equity accounted [JVTF]," various restrictions were put in place on Company 1 DPRK as described in the Call Option Agreement. The document went on to state, "The restrictions were also intended to ensure that when BAT reacquired the Holding company it would be fit for purpose. Removal of these restrictions might be perceived as a loss of control over the Holding Company."

40. Despite the fact that Company 1 and NKTC owned the JVTF, BATMS and BAT (by virtue of being BATMS's ultimate parent company) continued to exercise significant influence over the JVTF and to directly benefit from sales of products to North Korea. Similarly, BATMS and BAT (by virtue of being BATMS's ultimate parent company) continued to exercise significant influence over the North Korea sales, as discussed in an August 23, 2012 email from a former BATMS employee who had moved to Company 1 and stated, "I am still working for BAT business though BAT is not directly dealing in DPRK. . . . Though the contract is under [Company 1], the

business is run under BAT interests. I was long requested by previous BAT senior management to help watch out the JV [sic] as it's BAT interest in the end."

41. Thus, despite the apparent change in ownership of the JVTF, BATMS and BAT (by virtue of being BATMS's ultimate parent company) had significant influence over significant business decisions and the remittance process, and continued to receive profits from North Korea sales. Company 1 bore no financial risk from the arrangement. Employees of Company 1, who witnessed the business interactions between Company 1, "BAT", BATMS, and NKTC, affirmed the same:

a. Witness 1 stated that "BAT"[2] sold the business to Company 1 but continued to run the business, supplied all the raw materials for the JVTF, and continued to attend annual meetings for the JVTF.

b. Witness 2 stated that "BAT" used Company 1 as an intermediary to create a type of "insurance policy" that provided protection for "BAT," meaning it appeared to the outside world that BAT was no longer operating in North Korea. According to the witness, in truth, "BAT" assumed all liability for North Korean-related business and guaranteed to Company 1 the North Korean payments to Company 1 through 2017. Witness 2 also stated that "BAT" made all the decisions regarding the products supplied to North Korea.

c. Witness 3 stated that "BAT" used Company 1 to appear to be the legal owner of "BAT's" joint venture with North Korea. "BAT" wanted to create distance from the joint venture

---

[2] Witnesses 1, 2, and 3 referred to "BAT" without stating whether they meant British American Tobacco p.l.c., BATMS, or another BAT subsidiary. The context indicates that their references to "BAT" may have been to BATMS—not British American Tobacco p.l.c.

but did not want to stop its North Korean business. Company 1 was not allowed to make any changes to the joint venture without "BAT's" consent.

***Movements of Goods and Funds Associated with the North Korean Business***

42. Following the 2005 Sale and Purchase Agreement and 2007 Umbrella Agreement, a system was put in place to move the goods and funds associated with the JVTF, and ultimately to process payments for BATMS, without connection to North Korea.

a. BATMS shipped goods (primarily cigarette components) to the JVTF, in care of Company 1.

b. BATMS invoiced Company 1 for the amount of the goods.

c. Company 1 sent the invoice to an employee of NKTC.

d. NKTC made payments in U.S. dollars to Company 1 for the amount due on the invoice, often using a Chinese front company to process the payment.

e. Company 1 separately made payments to BATMS in the same amount, minus a small percentage commission.

While the system had some variations over time, in general the use of Company 1 as an intermediary for sales and payment arrangements continued until BATMS ceased its sales to North Korea via Company 1 in July 2016, with payments for such sales concluding in August 2016.

43. BATMS was paid for the goods it sent to the JVTF and North Korea in U.S. dollars until approximately May 2014, when BATMS elected to change all payments it received from Company 1 related to the North Korean business to Singaporean Dollars ("SGD").

44. Beginning in at least 2007, NKTC, through its banks KKBC and FTB, regularly used Chinese front companies to process payments between NKTC and Company 1 in order to disassociate the payments from their North Korean origin.

a. For instance in 2007, after NKTC sent multiple cash payments to Company 1 for BATMS, a new arrangement was set up to use front companies to wire the funds from NKTC to Company 1. This new arrangement was first discussed at the August 2007 JVTF meeting between NKTC and "BAT".[3] It was noted in the meeting minutes that, "[g]oing forward, [NKTC] proposed the use of their export earnings to pay Company 1." The term "export earnings" referred to revenue that North Korea generated by exporting goods from North Korea to countries like China. The payments for these exports, which would typically be remitted to North Korea, were trapped in China due to banking restrictions. Therefore, North Korea used these funds in China to pay parties to which North Korea owed money.

b. On or about October 1, 2007, a Chinese company, Dandong Hongxiang Industrial Development Company ("DHID"), wired roughly $1 million in U.S. dollars to Company 1.

c. Another JVTF meeting was held in January 2008 with NKTC and "BAT".[4] At this meeting, the parties discussed using DHID to pay Company 1 and then Company 1 remitting the funds to BATMS, as payment for NKTC purchases. The parties decided this arrangement was suitable for future remittances. The parties were aware that DHID had not purchased the goods related to the DHID payments.

d. From 2007 to 2014, DHID sent approximately $125 million to Company 1, which was money intended for BATMS as payment for NKTC purchases.

---

[3] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

[4] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

e. On September 26, 2016, the Department of the Treasury sanctioned DHID and four of its executives for acting for or on behalf of KKBC, which had been sanctioned since August 2009. Treasury also stated that "DHID used an illicit network of front companies, financial facilitators and trade representatives to facilitate transactions on behalf of KKBC."

f. Additionally, approximately 50 other front companies, also not involved with NKTC or JVTC, moved at least approximately $216 million in U.S. dollars to Company 1 over the relevant time period, all of which were remittances intended for BATMS.

*C. Knowledge*

***Bank Fraud***

45. BATMS and BAT structured BATMS's transactions with the JVTF in order to obfuscate BATMS's sales to North Korea, and therefore caused U.S. financial institutions, including the U.S. banks, to process correspondent U.S. dollar transactions for BATMS's benefit. Had those financial institutions known the transactions originated in North Korea, they would not have processed those transfers.

46. BATMS knowingly executed the aforementioned scheme, with the intent to deceive U.S. financial institutions, including the U.S. banks, in order to obtain the money, through the use of correspondent banking transactions, from the U.S. financial institutions.

47. BAT and BATMS designed the scheme to make it appear that they had divorced themselves from North Korean sales. Specifically, on June 8, 2007, as previously stated, BAT issued a press release stating that BAT "has agreed in principle to sell its share in [JVTF], a joint venture cigarette business in Pyongyang with [NKTC], a state-owned company."

48. NKTC was using front companies to process payments as early as 2007. Furthermore, in response to questions from in-house counsel, who was employed by a BAT

subsidiary in Asia, in July 2014, Company 1 noted that the North Korean government traded goods with Chinese companies, mainly exporting coal. Instead of the Chinese companies making payments for the coal to the appropriate North Korean entity, the Chinese companies made payments for goods that companies, like NKTC, procured from other countries.

49. Contrary to assertions that it was no longer operating in North Korea, BATMS and BAT (by virtue of being BATMS's ultimate parent company) retained significant influence over the JVTF and instructed Company 1 on how to operate the business.

a. For instance, when discussing the issuance of invoices from Company 1 to JVTF, a BATMS employee sent an email on August 27, 2008 to a group of BATMS and Company 1 employees. The email reads, "I received a request from [NKTC] for an invoice to do the remittance on a monthly basis. What [NKTC] needs is an invoice on [Company 1] letterhead and bank details as we are remitting the money to [Company 1] and the details of the remittance. I will need to give you the value once they inform me the total amount of remittance. Can you assist to generate this invoice and forward me a scan copy. I attach a sample for your reference."

b. Additionally, on August 19, 2009, a BATMS employee sent an email to a Company 1 employee, instructing the Company 1 employee to pay certain bills on behalf of the JVTF, stating "The amount is correct. Please pay . . ."

c. A draft memo from August 2010 stated that "any expenditure incurred by [JVTF] has to be approved by both BAT and [NKTC]." This same memo, which showed edits from BATMS employees in track changes, stated in a deleted sentence: "Recently, BAT has sold its investment in [BAT Holdings DPRK] to [Company 1]. Although we have sold the investment, we continue to retain significant control and we are still involved in the day-

to-day business operation of the DPRK business." One of the retained sections states, "any expenditure incurred by DPRK JV has to be approved by both BAT and [NKTC]."

50. Employees of the JVTF understood that BATMS continued to run business operations. In September 2012, the JVTF country manager noted that "ex BAT staff [had been] transferred to Company 1," that employees were still being paid under the "BAT standard" rather than the "Company 1 standard," and that the employee believed they were "still working for BAT business though BAT is not directly dealing in DPRK."

51. BATMS continued to attend meetings related to the JVTF despite its alleged separation from the North Korean business. For instance, a group of employees from BATMS and a BAT subsidiary in Asia attended the February 2010 JVTF meeting and dined with Company 1 employees and representatives from NKTC. An employee of Company 1,[5] who witnessed these meetings, stated, "[NKTC], knowing that BAT personnel were sometimes present at the meeting location, would arrange side meetings directly with BAT officials." The employee said that "no meeting minutes were ever taken at the side meetings, and that BAT had directed that no meeting minutes should ever be taken at the side meetings. The employee recalled that, NKTC used BAT's attendance at the meetings as proof that BAT was "still in the game." Another Company 1 employee described Company 1's presence at the meetings as "effectively a middleman."

52. Moreover, BATMS was not selling products generally to Company 1 for sale wherever Company 1 determined. A 2015 document reflects that the specification for tobacco

---

[5] The witnesses referred to "BAT" without stating whether they meant British American Tobacco p.l.c. or BATMS. The context indicates that their references to "BAT" likely were to BATMS or the BAT subsidiary in Asia—not British American Tobacco p.l.c.

being sold to Company 1 was "DPRK," *i.e.*, the mix that BAT had been producing for North Korean sales since the early 2000s, and thus BAT and BATMS sold to Company 1 products it knew were destined for North Korea.

53. In early 2015, BATMS employees considered whether to enact a more arm's-length relationship with Company 1 and its subsidiary, Company 1 DPRK, by changing the terms of the Call Option Agreement that gave BAT, through a subsidiary, de facto control over Company 1 DPRK. While BATMS assessed the terms of the Call Option Agreement, no immediate changes were made and BAT, through a subsidiary, continued to retain the call option and de facto control over Company 1 DPRK. As part of this assessment, a discussion was held among BATMS and a BAT in-house accountant because, under accounting rules applicable to BAT, BAT had accounted for Company 1 DPRK as a subsidiary and JVTF as a joint venture. The BAT accountant noted in an email to a BATMS employee that Company 1 DPRK "was still under BAT control" per accounting rules, and went on to state, "with the conclusion above (that we controlled [Company 1 DPRK]) led to the conclusion that BAT had significant influence over activity of [JVTF]." The same BAT accountant provided a list of considerations to keep in mind if the current structure of the relationship with Company 1 and Company 1 DPRK were to change, noting "[i]f we were to lose control over [Company 1 DPRK], we must lose 'significant influence' over [JVTF]." The BAT accountant continued, "As a rule of thumb, the more we change the original agreements to 'free up' [Company 1], the more likely it is that we cannot account for [Company 1 DPRK] as a subsidiary and [JVTF] as a joint venture." The BAT accountant then discussed the potential financial impact of such proposed changes. In May 2017, the call option was sold to Company 1, and payments from Company 1 to BATMS for the purchase of the call option were completed in June 2017.

54. During the relevant time period, Company 1 received at least $415,717,848 in U.S. dollar correspondent banking transactions from NKTC to Company 1 in cash and wire transactions that flowed through U.S. correspondent banks, including the U.S. banks. These transactions all originated from NKTC and were paid through NKTC's banks and their front companies to Company 1. Had the U.S. correspondent banks known that these payments originated in North Korea, they would not have processed the transactions.

***IEEPA***

55. BAT and BATMS had knowledge of U.S. sanctions under IEEPA, including the sanctions on designated North Korean entities, and willfully disregarded those sanctions.

56. The September 15, 2005, designation of Banco Delta Asia ("BDA"), a bank based in Macau, by the Department of the Treasury resulted in the freezing of $20 million held by BDA's clients in accounts at BDA. BATMS was using BDA for money transfers related to its North Korean business, and BATMS's funds were frozen as a result.

57. As stated, an October 2005 JVTF meeting was held with NKTC and "BAT".[6] The attendees discussed the Department of the Treasury sanctions, and the "BAT" attendees expressed concern about the ability to be paid by NKTC as a result.

58. BAT decided to sell off its stake in the JVTF in 2007 by selling BAT DPRK to Company 1, at a time when North Korea remained sanctioned under TWEA.

---

[6] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

*Company 1's Use of Sanctioned Entity KKBC*

59. At various points in time during the relevant time period, BAT and BATMS had knowledge that Company 1 used KKBC to transact business, even after KKBC was designated by the Treasury Department.

60. On January 6, 2006, prior to the imposition of sanctions against KKBC, KKBC made a payment to Company 1 for $361,861.67. It was common for Company 1 to send messages to BATMS stating amounts received from NKTC/JVTF and the front companies making those payments.

61. On April 29, 2014, in-house counsel, who was employed by a BAT subsidiary in Asia, sent a list of questions related to sanctions by email to Company 1 employees and an attorney representing Company 1. One of the attachments to the email was a list of all sanctioned North Korean banks, including KKBC and FTB. On July 3, 2014, the attorney representing Company 1 answered the several questions put forward by the in-house counsel. Included in the email was a statement that added "[NKTC] uses the bank known as Korea Kwangson Bank [KKBC]," which at that point had been sanctioned by the Treasury Department for nearly five years.

62. U.S.-dollar wire transfers from NKTC to Company 1 from the time that KKBC was designated on August 11, 2009 until May 2017, when BAT terminated its interest in the North Korean business, totaled approximately $286,810,910. A portion of these funds were transferred to BATMS until August 2016, by which time BATMS had stopped selling products to the DPRK via Company 1.

*Company 1's Use of Sanctioned Entity FTB*

63. At various points in time during the relevant time period, BAT and BATMS had knowledge that Company 1 used FTB to transact business.

64. Between 2005 and approximately November 2017, NKTC moved approximately $74,420,000 in bulk U.S. dollar cash to Company 1 using FTB, which was subsequently deposited into Company 1's bank account. A portion of such funds was transferred to BATMS by Company 1 in U.S. dollars and, beginning in June 2014, in Singaporean dollars. These transfers to BATMS stopped in August 2016, however, a month after BATMS had stopped selling products to the DPRK via Company 1.

65. On January 31, 2008, months after Company 1 purchased BAT DPRK, a two-day meeting was held in Vietnam. According to the meeting notes, NKTC and "BAT" attendees were at the meeting.[7] No Company 1 representatives were listed as attending the meeting. Fund remittance was one of the topics covered in the meeting. The meeting minutes stated, "Both parties reviewed the fund remittance going forward. The current system of remitting via FTB, [Entity Name] and [Chinese Bank] will continue to be used. Money will only be transferred to FTB when Company 1 received the funds." The meeting minutes also reflected discussion of "another process," noting that the JVTF "could open a Euro account with FTB" and that "there would be an exchange rate risk that BAT has to manage." The minutes stated that "BAT will review [the process] and revert." This process was not pursued.

66. A 2009 presentation on BAT letterhead showed the flow of funds between BATMS, the JVTF, Company 1, and North Korea, and included notations to FTB.

67. After FTB was sanctioned on March 11, 2013, NKTC continued to use FTB to send remittances to Company 1 until approximately 2017. A portion of such remittances was transferred

---

[7] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

from Company 1 to BATMS until August 2016, by which time BATMS had ceased selling products to the DPRK via Company 1. In or about May 2014, employees from BATMS, a BAT subsidiary in Asia, and Company 1 discussed complying with sanctions, and decided that Company 1 would now pay BATMS in SGD, as opposed to U.S. dollars. On or about May 5, 2014, BATMS opened an "SGD account" with its bank and asked Company 1 to change the payments to SGD. Prior to BATMS taking steps to open an "SGD account" (*i.e.*, between March 11, 2013, and May 5, 2014), BATMS caused U.S. financial institutions to process approximately $56,788,034 of transactions from North Korea via NKTC's bank, FTB, all of which were ultimately for the benefit of North Korea.

68. However, despite BATMS attempting to change its dealings with Company 1 to SGD, BAT and BATMS were aware that the arrangement continued to cause U.S. dollar transactions to occur in connection with NKTC's remittances to Company 1. For example, on June 4, 2014, BATMS was informed by Company 1 in an email that Company 1 had received U.S. dollar transfers from NKTC. BATMS then instructed Company 1 to convert the USD to SGD and send the converted sum into BATMS's bank account. Thus, regardless of any measures taken, the arrangement was causing U.S.-dollar transactions between NKTC and Company 1, for the benefit of North Korea, including FTB.

69. Despite the sanctions designations against KKBC and FTB, BATMS and Company 1 failed to change the currency of payments from NKTC to Company 1, and those payments—involving front companies and FTB and/or KKBC at various points in time—remained in U.S. dollars until the end of the relevant time period. Approximately $78,873,081 was paid via wire transfer in U.S. dollars by NKTC to Company 1, where a portion was for the benefit of

BATMS, and ultimately BAT, for sales of products, from May 5, 2014 until August 2016, by which time BATMS had ceased selling products to the DPRK via Company 1.

### *D. Efforts to Conceal Sales to North Korea & Avoid Sanctions*

70. At various points during the relevant time period, BATMS was aware of efforts to conceal its conduct involving North Korea with financial institutions.

71. For example, on or about December 29, 2014, BATMS's bank raised questions to Company 1's bank about a pending wire transfer from Company 1 to BATMS. Company 1's bank subsequently forwarded these questions to Company 1. BATMS conferred by email with Company 1 about how Company 1 should answer questions about the origin of Company 1's funds to be remitted to BATMS and requests for documentation related to the same. A Company 1 employee advised that the sale invoice should be submitted to Company 1's bank, rather than the shipping document, as the former "will not show DPRK." The same Company 1 employee noted that "[n]evertheless, we will be caught under question 4," referring to another question about the origin of the funds, and further suggested that BATMS and Company 1 allow the wire transfer to expire and try it again with a different bank. In response, a BATMS employee advised the Company 1 employee to cancel the wire transfer.

72. In a later response about the same issue, the Company 1 employee, in an email to in-house counsel, who was employed by a BAT subsidiary in Asia, noted that Company 1 used to have an account at BATMS's bank and that bank "knew that Company 1 is involved in the DPRK trade since the start." Further, the bank knew that the money was "paid from a China bank account owned by Chinese / Hong Kong Company" and the bank "used to have the view that as long as the remitter is a Chinese or Hong Kong company they are fine." The Company 1 employee noted that the bank was aware that another bank had been fined by the U.S. government, and thereafter

told Company 1 "to close all bank account relating to DPRK." The in-house counsel asked whether Company 1 thought Company 1's current bank "knows that the funds you are wanting to transfer to BAT are the funds relating to DPRK?" The Company 1 employee replied that it had previously informed its current bank that the money was coming from China. Thus, BATMS and the in-house counsel were on notice that Company 1 was not informing financial institutions regarding the true origin of U.S.-dollar funds it was receiving, and thus causing financial institutions, including U.S. financial institutions, to process U.S. dollar payments.

73. The aforementioned scheme resulted in a gross gain to BAT and BATMS of at least approximately $189,541,115.

### *E. Wind Down of the North Korean Business*

74. In April 2016, BATMS began winding down its sales of products to Company 1, one month after EO 13722 was issued, and completely ceased such sales in July 2016. The last remittance in connection with such sales from Company 1 to BATMS occurred in August 2016.

75. In May 2017, BAT, through a subsidiary, novated its rights under the Call Option Agreement to Company 1. In exchange, Company 1 made payments to BATMS in May and June 2017.

## V. <u>Sample Wire Transactions</u>

76. During the relevant time period, NKTC made approximately 280 wire transfers totaling $341,297,848 in U.S. dollars to Company 1, a portion of which was ultimately intended for BATMS. All of the payments were made in the name of companies other than NKTC and in a form that otherwise obscured the payments' connection to North Korea. BAT, BATMS and Company 1 knew that those companies were not true purchasers of BAT and BATMS's products.

77. Below is a sample of U.S. dollar payments made by NKTC to Company 1 related to NKTC's purchases of BAT and BATMS products, a portion of which was thereafter funneled to BATMS (and ultimately BAT) as U.S. dollar wire transfers. NKTC routed these transactions through its banks, FTB and KKBC, both of which were sanctioned by OFAC at the time of the transactions, and thus these payments would have required a license from OFAC. These payments were processed by financial institutions in the United States. The financial institutions, had they known of the true origin of the payments and the lack of a license, would have frozen, blocked, investigated, and/or denied the transactions.

| Date | Originator of Payment | Amount |
|---|---|---|
| 4/29/2013 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | $2,409,300.19 |
| 7/8/2013 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | $2,019,464.79 |
| 7/30/2013 | GOLDEN DRAGON (HONG KONG) INTERNATIONAL TRADING LIMITED | $2,031,457.13 |
| 9/25/2013 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | $2,299,976.99 |
| 11/7/2013 | SHEEN FAIR TRADING LTD | $1,000,383.58 |

Respectfully submitted,

Matthew M. Graves
United States Attorney

By: Karen P. W. Seifert

Karen P. W. Seifert
Assistant United States Attorney

Matthew G. Olsen
Assistant Attorney General
National Security Division

By:

Beau Barnes
Trial Attorney

DEFENDANT'S ACCEPTANCE

The Authorized Representative of British American Tobacco p.l.c. (BAT) is authorized and empowered on behalf of BAT to execute this Statement of Offense. I have read every page of this Statement of Offense and have discussed it with the management of BAT and outside counsel. We fully understand this Statement of Offense, and I have been authorized to agree to it on behalf of Statement of Offense without reservation.

Date: April 14, 2023

Gareth Cooper
Authorized Representative
British American Tobacco p.l.c.

DEFENDANT'S ACCEPTANCE

The Authorized Representative of British-American Tobacco Marketing (Singapore) Private Limited (BATMS) is authorized and empowered on behalf of BATMS to execute this Statement of Offense. I have read every page of this Statement of Offense and have discussed it with the management of BATMS and outside counsel. We fully understand this Statement of Offense, and I have been authorized to agree to it on behalf of Statement of Offense without reservation.

Date: April 14, 2023

Gareth Cooper
Authorized Representative, British-American Tobacco Marketing (Singapore) Private Limited

ATTORNEY'S ACKNOWLEDGMENT

I have read every page of this Statement of Offense, reviewed it with my clients, British American Tobacco p.l.c. and British-American Tobacco Marketing (Singapore) Private Limited, and fully discussed it with my client.

Date: April 14, 2023

John D. Buretta
Attorney for British American Tobacco p.l.c. and British-American Tobacco Marketing (Singapore) Private Limited

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

It was noted that British American Tobacco p.l.c. (the "Company") had been engaged in discussions with the United States, through the Department of Justice, United States Attorney's Office for the District of Columbia and National Security Division, Counterintelligence and Export Control Section (the "Offices"), regarding issues arising in relation to bank fraud and sanctions violations related to sales to North Korea. It was further noted that, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices.

With reference to the briefing provided by outside counsel to the Company that had been previously circulated to the Board, Mr Gareth Cooper and Mr John Buretta advised the Board of its rights, possible defences, the U.S. Sentencing Guidelines' provisions and the consequences of entering into such agreement with the Offices.

After due and careful consideration, the Board resolved that:

1. The Company (a) acknowledges the filing of the two-count Information charging the Company with conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349, and conspiracy to violate the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1705(a); (b) waives indictment on such charges and enter into a Deferred Prosecution Agreement (the "Agreement") with the Offices; and (c) agrees to accept a monetary penalty and fine, and judgment of criminal forfeiture against the Company and its subsidiary, British-American Tobacco Marketing (Singapore) Private Limited (BATMS), totaling $629,891,853, for which the Company and BATMS would be jointly and severally liable, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information, where such payment would fully satisfy the penalty, fine and forfeiture amount to be imposed on BATMS in connection with BATMS's plea agreement.

2. The Company accepts the terms and conditions of the Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Offense of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defences based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Offense attached to the Agreement, relating to conduct known to the Offices prior to the date on which the Agreement would be signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement.

3. The Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property, be hereby authorised, empowered and directed to approve, agree, do, perform, execute and deliver on behalf of the Company the Agreement substantially in such form as previously circulated to the Board with such changes as the Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property, may approve;

4. The Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property, be hereby authorised, empowered and directed to continue to do such other acts and things as he may consider necessary, desirable or appropriate and to approve the forms, terms or provisions of any agreement or other documents as he may consider necessary, desirable or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions.

5. All of the actions of the Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property, which actions would have been authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, be hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company.

---

I CERTIFY the above to be a true extract from the Minutes of a Meeting of the Board of Directors of BRITISH AMERICAN TOBACCO P.L.C. held via videoconference on March 27th, 2023.

Date: 27.3.2023

By: ____________________
Company Secretary
British American Tobacco p.l.c.

# ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Bank Secrecy Act and U.S. sanctions laws, British American Tobacco p.l.c. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new or to modify existing internal controls, compliance code, policies, and procedures in order to ensure that it maintains: (a) a system of internal accounting controls designed to ensure that the Company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous compliance program that includes policies and procedures designed to detect and deter violations of the Bank Secrecy Act and U.S. sanctions laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*High-Level Commitment*

1. The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Bank Secrecy Act and U.S. sanctions laws and its compliance code.

*Policies and Procedures*

2. The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the Bank Secrecy Act and U.S. sanctions laws, which policy shall be memorialized in a written compliance code.

3. The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Bank Secrecy Act and U.S. sanctions laws, and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Bank Secrecy Act and U.S. sanctions laws by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.

4. The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that:

a. transactions are executed in accordance with management's general or specific authorization;

b. transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

c. access to assets is permitted only in accordance with management's general or specific authorization; and

d. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5. The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, including, but not limited to, its geographical organization, industrial sectors of operation, involvement in joint venture arrangements, and degree of governmental oversight and inspection.

6. The Company shall review its compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

*Proper Oversight and Independence*

7. The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8. The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9. The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10. The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Bank Secrecy Act and U.S. sanctions laws or the Company's compliance code, policies, and procedures related to such laws.

11. The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of

violations of the Bank Secrecy Act and U.S. sanctions laws or the Company's compliance code, policies, and procedures related to such laws.

*Enforcement and Discipline*

12. The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13. The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Bank Secrecy Act and U.S. sanctions laws and the Company's compliance code, policies, and procedures related to such laws by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program related to the Bank Secrecy Act and U.S. sanctions laws is effective.

*Mergers and Acquisitions*

14. The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities by legal, accounting, and compliance personnel.

15. The Company will ensure that the Company's compliance code, policies, and procedures regarding the Bank Secrecy Act and U.S. sanctions laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a. train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the Bank Secrecy Act and U.S. sanctions laws and the Company's compliance code, policies, and procedures regarding such laws; and

b. where warranted, conduct an audit specific to the Bank Secrecy Act and U.S. sanctions laws of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

16. The Company will conduct periodic reviews and testing of its compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of the Bank Secrecy Act and U.S. sanctions laws and the Company's code, policies, and procedures related to such laws, taking into account relevant developments in the field and evolving industry standards.

**ATTACHMENT D**

**PAYMENT SCHEDULE**

**Payable on or before September 30, 2023**

| | |
|---|---|
| Fine | $ 220,175,369.00 |
| Forfeiture | $ 94,770,557.50 |

**Payable on or before June 30, 2024**

| | |
|---|---|
| Fine | $ 220,175,369.00 |
| Forfeiture | $ 94,770,557.50 |

| | |
|---|---|
| **Total** | **$ 629,891,853.00*** |

*Exclusive of interest calculated pursuant to 18 U.S.C. § 3612(f)(2)