# Exhibit C

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

# SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") with respect to **ENF 54851** is made by and between the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) and British American Tobacco p.l.c. ("BAT") and its subsidiaries and affiliates worldwide (collectively, "Respondent").

## I. PARTIES

OFAC administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and proliferators of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

Respondent is an international tobacco company headquartered in London, England, with global operations in the United States, the Americas and Sub-Saharan Africa, Europe and North Africa, and the Asia-Pacific and Middle East. British-American Tobacco Marketing (Singapore) PTE Ltd. ("BATM"), located in Singapore, is a wholly owned subsidiary of BAT.

## II. APPARENT VIOLATIONS

Between August 11, 2009 and October 11, 2016, Respondent appears to have violated § 544.205(b) of the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. part 544 (WMDPSR) when it formed and participated in a conspiracy to remit payments from the Democratic People's Republic of Korea (DPRK or "North Korea") through a number of intermediaries, to BATM. Respondent's actions caused U.S. financial institutions to process 228 U.S. dollar (USD) denominated wire transfers totaling approximately $251,631,903 that contained the blocked property interests of Korea Kwangson Banking Corp. (KKBC) and the Foreign Trade Bank (FTB), which were designated Specially Designated Nationals or Blocked Persons ("SDNs") under Executive Order (E.O.) 13382 on August 11, 2009 and March 11, 2013, respectively.

Additionally, between March 18, 2016 and September 14, 2017, Respondent appears to have violated § 510.212 of the North Korea Sanctions Regulations, 31 C.F.R. part 510 (NKSR) on 15 occasions when it caused the foreign branch of a U.S. financial institution and a U.S. correspondent bank to process USD payments totaling $29,685.72 that arose from BATM's sale of cigarettes to the DPRK's Embassy in Singapore, which would have been prohibited by §§ 510.206 and 510.211 of the NKSR if engaged in by a U.S. person. The apparent conspiracy to violate the WMDPSR and other apparent violations of the NKSR described above caused U.S. banks to deal in blocked property or otherwise engage in transactions prohibited by U.S. sanctions regulations (collectively, "Apparent Violations").

## III. FACTUAL STATEMENT

Establishment of the Joint Venture in North Korea

On February 1, 2001 BATM and an entity incorporated in the DPRK (the "DPRK Company"), formed a joint venture company (the "Joint Venture") to manufacture BAT cigarettes in the DPRK for domestic sale and consumption. DPRK Company operated in the DPRK's tobacco industry and was ostensibly owned by the government of North Korea. In order to support the manufacture of cigarettes in North Korea, BATM agreed to: supply the DPRK Company with machines and equipment; supply cut tobacco, filters, cigarette paper, and other materials for the manufacturing of cigarettes ("Kit Sets"); and provide professional services, including through managers and technical advisers to assist the DPRK Company in the DPRK, among other undertakings. Under the terms of their agreement, BATM was entitled to 60 percent of the Joint Venture's profits while the DPRK Company was entitled to the remaining 40 percent. Another Singapore-incorporated holding company ("BAT DPRK"), which BAT indirectly held through a Netherlands subsidiary ("BAT Netherlands"), purchased BATM's stake in the Joint Venture in 2004, and continued to operate the Joint Venture according to these terms.

Divestment to a "Friendly 3rd Party"

In early 2005, BAT began considering options to remove itself from the Joint Venture due to concerns over its public association with the DPRK and the difficulty in remitting profits out of the DPRK. According to a memo drafted by BAT's country manager for the DPRK, BAT determined that a "voluntary and managed 'exit'" was the most viable option for divesting from the Joint Venture. This would entail divesting BAT's stake in the Joint Venture "to a friendly 3rd party acceptable to both BAT and the [DPRK] Government."

The divestment, however, purposefully obscured BAT's continued effective ownership and control over the Joint Venture. A BAT regional manager for the Asia-Pacific Region was informed, for example, that the divestment "would not have a material impact on profitability but allow BAT to divest the [Corporate and Regulatory Affairs] risks." BAT also intended to seek "written assurance that when the political climate improves . . . BAT will buy back the 60 percent stake from the 3rd party based on a pre-determined formula" through a call option.

A Singapore-based trading group (the "Singapore Company"), which was the distributor for BAT brands of cigarettes in the DPRK, was eventually chosen to be the "friendly 3rd party" to stand in for BAT in the Joint Venture by acquiring BAT DPRK. The Singapore Company represented to BAT that it understood BAT DPRK would act "as a vehicle for BAT to bring out [the Joint Venture's] money and distribute [dividends] back to BAT. [The Singapore Company] will have no beneficial interest in [BAT DPRK]."

After the relevant BAT subsidiaries agreed upon terms with the DPRK Company and the Singapore Company for the divestment and other related matters, BAT's Standing Committee at its headquarters in London—which consisted of BAT's Chief Executive Officer, Chief Operating Officer, Finance Director, and others—reviewed and approved the divestment to the Singapore Company during a meeting on April 19, 2007. The Central Finance Office at BAT headquarters,

as well as BAT's Amsterdam Corporate, Asia-Pacific Regional, and East Asia Area offices, among others, all reviewed and approved the divestment proposal.

On August 10, 2007, BATM, BAT Netherlands, and BAT DPRK entered into a series of agreements with the Singapore Company covering the divestment, the call option, and the continued operations of the Joint Venture. According to these arrangements, the Singapore Company purchased BAT DPRK, and thereby BAT's stake in the Joint Venture, from BAT Netherlands for one Euro. BAT Netherlands and the Singapore Company entered into an additional agreement that granted BAT Netherlands a call option—which it could exercise at its discretion—whereby BAT Netherlands could repurchase the Joint Venture from the Singapore Company for one Euro. BATM agreed to continue supplying the Joint Venture with Kit Sets to manufacture cigarettes and technical services as it had prior to the divestment, among other provisions.

Remittance of Payments from North Korea Through SDN Banks to the Singapore Company and BATM

Between 2009 and 2016, the DPRK Company remitted payments to the Singapore Company related to the Joint Venture business through a multi-step payment process. These included payments the Joint Venture and BAT DPRK owed to BATM for Kit Sets, technical services, royalties, and other debts. In order to make these payments, the DPRK Company moved USD funds from its account with FTB in the DPRK to China, through multiple bank accounts that contained the interests of FTB and KKBC, and then to the Singapore Company. Once the DPRK Company remitted payment to the Singapore Company, the Singapore Company would then transfer funds owed to BATM in USD or Singapore dollars to one of BATM's accounts in Singapore. BATM would periodically sweep the funds to its bank account at the Singapore branch of a U.S. bank. According to BAT, this process was meant to reduce the risk of the money being frozen "in any leg of the transaction" process. The payments from the Singapore Company to BATM for Kit Sets, technical services, royalties, and other debts ceased in August 2016. Altogether, twelve U.S. banks processed 228 USD payments totaling approximately $251,631,903 that the DPRK Company remitted to the Singapore Company between KKBC's designation on August 11, 2009 and October 11, 2016 as a result of this scheme.

BAT Understood Its Conduct was Likely Prohibited by U.S. Sanctions Regulations

According to internal emails discussing BAT's DPRK-related business, BAT managers in Asia-Pacific offices understood as early as April 2005 that USD-denominated payments passed through the U.S. financial system and that financial institutions implementing U.S. sanctions or anti-money laundering controls could impede this remittance payment process. Another BATM memorandum from approximately 2008 showed that it knew that there was a "persistent risk of sanctions from the US on DPRK [sic]. Such sanctions would prevent any USD transactions with DPRK relations or origins from clearing in the system worldwide."

As of January 6, 2006, and at multiple times throughout the conspiracy, BATM was made aware that KKBC and FTB were used or otherwise involved, both before and after their designations, in the process to remit payments from the DPRK Company to the Singapore

Company, which then sent the payments to BATM. On April 18, 2013, a few weeks after FTB was designated, a BATM employee acknowledged the continued use of FTB to remit payments to the Singapore Company—which in turn remitted the payments to BATM—when responding to the Singapore Company's email regarding an issue with FTB and associated bank charges. The following month BATM was again alerted to FTB's involvement when the Singapore Company emailed BATM stating that FTB itself had confirmed a "payee" (i.e. a front company) had, and would continue to, remit funds to the Singapore Company.

In April 2014, BAT's M&A and Projects Counsel for Asia-Pacific sent the Singapore Company a request to confirm whether the Joint Venture was conducting business with any SDN in the DPRK as part of a due diligence review. Among the list of SDNs BAT's counsel sent were KKBC and FTB. Also included in the email to the Singapore Company were due diligence questions to determine whether any SDNs were involved in the Joint Venture and how payments from the Joint Venture were remitted to the Singapore Company from the DPRK Company's FTB accounts. The Singapore Company confirmed in July 2014 that "the DPRK Company uses the bank known as [KKBC]."

<u>BAT Concealed its Apparent Violations from Financial Institutions to Further the Apparent Conspiracy</u>

BAT concealed the North Korean nexus to its business operations with the Joint Venture and its apparently violative conduct from financial institutions on multiple occasions to further the apparent conspiracy, including by refusing to answer sanctions-related questions from banks about BATM's transactions involving the Joint Venture. For example, after the Singapore Company's bank requested more information regarding a wire transfer to BATM in December 2014, the Singapore Company proposed to BATM that it not supply the shipping documents as it would indicate a connection to the DPRK. The Singapore Company noted that "[n]evertheless, we will be caught under question 4," referring to another question about the origin of the funds. The Singapore Company further suggested that BATM and the Singapore Company allow the wire transfer to expire and try it again with a different bank or instead seek another method to remit the funds to BATM that would "hopefully result in less questioning." BATM agreed to let the wire transfer expire.

Separately, in response to an inquiry from a bank in 2014, BAT acknowledged BATM indirectly exported Kit Sets to the DPRK, but stated that BAT checked on all banks used by its group companies and third-party suppliers when dealing with sanctioned countries. If a bank could not be used due to sanctions, BAT explained that it would ask the supplier to provide an alternative, permissible bank account; if the supplier could not obtain a compliant account, then BAT would cease trading with that supplier. BAT further stated that it screened the currency invoiced by its group companies or third-party suppliers for supply to sanctioned countries to ensure that all payments comply with U.S. financial sanctions. An employee at a different BAT subsidiary gave this response to at least one other bank, despite knowing that the funds BATM was receiving from the Singapore Company had been, at certain times, transferred in USD through bank accounts controlled by FTB and KKBC, thus causing U.S. financial institutions to process the payments.

Termination of the Joint Venture

In April 2016, shortly after E.O. 13722 was issued, which blocked the property and interests in property of the Government of North Korea and the Workers' Party of Korea, BATM devised a proposal to wind down its North Korean business, and made its last shipment of Kit Sets to the DPRK in July 2016. BAT's Standing Committee at headquarters approved BATM's termination of its business in the DPRK and with the Joint Venture via the Singapore Company in December 2016 given that international sanctions aimed at the DPRK had increased both the overall legal and reputational risks to BAT. The terms and conditions associated with terminating the DPRK-related business were finally agreed upon in May 2017.

BAT's decision to terminate the Joint Venture-related business did not extend to BATM's sales of cigarettes to the DPRK Embassy in Singapore, also conducted via the Singapore Company, which started in or around 2004 and continued until September 14, 2017. On 14 occasions in 2016 and 2017, the Singapore Company remitted payments from the sale of cigarettes to the DPRK Embassy to BATM's account at the foreign branch of a U.S. bank; on one occasion in 2017 the Singapore Company remitted a USD payment for such sales to BATM's account at a non-U.S. bank, causing a U.S. correspondent bank to clear the transaction. In a June 2017 email regarding shipments and supplies to the DPRK Embassy, BATM instructed the Singapore Company generally not to "mention your customer to the [sic] conversation or documentation." In response, the Singapore Company asked BATM if they could conceal the real identity of the DPRK Embassy on its purchase orders by referring to it as "Korean Embassy." BATM then asked the Singapore Company to more effectively conceal the connection and describe the DPRK Embassy in Singapore as "[the Singapore Company's] Customer." The Singapore Company agreed that it could replace any description of the customer so long as BATM knew that the product was bound for the DPRK Embassy.

## IV. TERMS OF SETTLEMENT

OFAC and Respondent agree as follows:

1. In consideration of the undertakings of Respondent in paragraph 2 below, OFAC agrees to release and forever discharge Respondent, without any finding of fault, from any and all civil liability in connection with the Apparent Violations arising under the legal authorities that OFAC administers.

2. In consideration of the undertakings of OFAC in paragraph 1 above, Respondent agrees to a settlement amount of **$508,612,492**. Respondent's obligation to pay OFAC the portion of the settlement totaling $503,263,807 arising from its apparent violation of the WMDPSR shall be deemed satisfied up to an equal amount by payments in satisfaction of penalties assessed by the U.S. Department of Justice arising out of the same conduct, such that Respondent is obligated to pay $5,348,685 to the U.S. Department of the Treasury. Respondent agrees and represents:

A. Within ten (10) days of the date Respondent receives the unsigned copy of this Agreement, to:

i. sign, date, and email to: [redacted], Office of Foreign Assets Control, Freedman's Bank Building, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW, Washington, DC 20220; and

ii. pay or arrange for the payment to the U.S. Department of the Treasury the amount of **$5,348,685**. Respondent's payment must be made either by electronic funds transfer in accordance with the enclosed "Electronic Funds Transfer (EFT) Instructions," or by cashier's or certified check or money order payable to the "U.S. Treasury" and referencing **ENF 54851**. Unless otherwise arranged with the U.S. Department of the Treasury's Bureau of the Fiscal Service, Respondent must either: (1) indicate payment by electronic funds transfer, by checking the box on the signature page of this Agreement; or (2) enclose with this Agreement the payment by cashier's or certified check or money order.

B. To waive (i) any claim by or on behalf of Respondent, whether asserted or unasserted, against OFAC, the U.S. Department of the Treasury, or its officials and employees arising out of the facts giving rise to the enforcement matter that resulted in this Agreement, including but not limited to OFAC's investigation of the Apparent Violations, and (ii) any possible legal objection to this Agreement at any future date.

C. **Compliance Commitments:** Respondent has terminated the apparently violative conduct described above, including but not limited to the direct or indirect exportation of tobacco and tobacco products to the DPRK, and has established and agrees to maintain for at least five years following the date this Agreement is executed, sanctions compliance measures that are designed to minimize the risk of recurrence of similar conduct in the future. Specifically, OFAC and Respondent understand that the following compliance commitments have been made:

a. **Management Commitment:**

i. Respondent commits that senior management has reviewed and approved Respondent's sanctions compliance program.

ii. Respondent commits to ensuring that its compliance unit(s) is (are) delegated sufficient authority and autonomy to deploy its policies and procedures in a manner that effectively controls Respondent's sanctions risk.

iii. Respondent commits to ensuring that its compliance unit(s) receives (receive) adequate resources—including in the form of human capital, expertise, information technology, and other resources, as appropriate—that are relative

to Respondent's breadth of operations, target and secondary markets, and other factors affecting its overall risk profile.

iv. Respondent commits to ensuring that senior management promotes a "culture of compliance" throughout the organization.

v. Respondent's senior management recognizes the seriousness of apparent violations of the laws and regulations administered by OFAC and acknowledges its understanding of the apparent violations at issue, and commits to implementing necessary measures to reduce the risk of recurrence of apparent violations in the future.

b. **Risk Assessment:**

i. Respondent conducts an OFAC risk assessment in a manner, and with a frequency, that adequately accounts for potential risks. Such risks could be posed by its clients and customers, products, services, supply chain, intermediaries, counterparties, transactions, or geographic locations, depending on the nature of the organization.

ii. Respondent has developed a methodology to identify, analyze, and address the particular risks. The risk assessments will be updated to account for the conduct and root causes of any apparent violations or systemic deficiencies identified by Respondent during the routine course of business, for example, through a testing or audit function.

c. **Internal Controls:**

i. Respondent has designed and implemented written policies and procedures outlining its sanctions compliance program. These policies and procedures are relevant to the organization, capture Respondent's day-to-day operations and procedures, are easy to follow, and designed to prevent employees from engaging in misconduct.

ii. Respondent has implemented internal controls that adequately address the results of its sanctions risk assessment and profile. These internal controls should enable Respondent to clearly and effectively identify, interdict, escalate, and report to appropriate personnel within the organization transactions and activity that may be prohibited by OFAC. To the extent information technology solutions factor into Respondent's internal controls, Respondent has selected and calibrated the solutions in a manner that is appropriate to address Respondent's risk profile and compliance needs, and Respondent routinely tests the solutions to ensure effectiveness.

iii. Respondent commits to enforcing the policies and procedures it implements as part of its sanctions compliance internal controls through internal or external audits.

iv. Respondent commits to ensuring that its OFAC-related recordkeeping policies and procedures adequately account for its requirements pursuant to the sanctions programs administered by OFAC.

v. Respondent commits to ensuring that, upon learning of a weakness in its internal controls pertaining to sanctions compliance, it will take immediate and effective action, to the extent possible, to identify and implement compensating controls until the root cause of the weakness can be determined and remediated.

vi. Respondent has clearly communicated the sanctions compliance program's policies and procedures to all relevant staff, including personnel within the sanctions compliance function, as well as relevant gatekeepers and business units operating in high-risk areas (e.g., customer acquisition, payments, sales, etc.) and to external parties performing sanctions compliance responsibilities on behalf of Respondent.

vii. Respondent has appointed personnel to integrate the sanctions compliance program's policies and procedures into Respondent's daily operations. This process includes consultations with relevant business units and confirms that Respondent's employees understand the policies and procedures.

d. **Testing and Audit:**

i. Respondent commits to ensuring that the testing or audit function is accountable to senior management, is independent of the audited activities and functions, and has sufficient authority, skills, expertise, resources, and authority within the organization.

ii. Respondent commits to ensuring that it employs testing or audit procedures appropriate to the level and sophistication of its sanctions compliance program and that this function, whether deployed internally or by an external party, reflects a comprehensive and objective assessment of Respondent's sanctions-related risks and internal controls.

iii. Respondent commits to ensuring that, upon learning of a confirmed negative testing result or audit finding pertaining to its sanctions compliance program, it will take immediate and effective action, to the extent possible, to identify and implement compensating controls until the root cause of the weakness can be determined and remediated.

e. **Training:**

i. Respondent commits to ensuring that its OFAC-related training program provides adequate information and instruction to employees and, as appropriate, stakeholders (for example, clients, suppliers, business partners, and counterparties) in order to support Respondent's sanctions compliance efforts.

ii. Respondent commits to providing OFAC-related training with a scope that is appropriate for the products and services it offers; the customers, clients, and partner relationships it maintains; and the geographic regions in which it operates.

iii. Respondent commits to providing OFAC-related training with a frequency that is appropriate based on its OFAC risk assessment and risk profile and, at a minimum, at least once a year to all relevant employees.

iv. Respondent commits to ensuring that, upon learning of a confirmed negative testing result or audit finding, or other deficiency pertaining to its sanctions compliance program, it will take immediate and effective action to provide training to relevant personnel.

v. Respondent's training program includes easily accessible resources and materials that are available to all applicable personnel.

f. **Annual Certification:** On an annual basis, for a period of five years, starting from 180 days after the date the Agreement is executed, a senior-level executive or manager of Respondent will submit a certification to OFAC confirming that Respondent has implemented and continued to maintain the sanctions compliance measures as committed above.

D. Should OFAC determine, in the reasonable exercise of its discretion, that Respondent appears to have materially breached its obligations or made any material misrepresentations under Subparagraph C (Compliance Commitments) above, OFAC shall provide written notice to Respondent of the alleged breach or misrepresentations and provide Respondent with 30 days from the date of Respondent's receipt of such notice, or longer as determined by OFAC, to determine that no material breach or misrepresentations has occurred or that any breach or misrepresentation has been cured.

E. In the event OFAC determines that a material breach of, or misrepresentation in, this Agreement has occurred due to a failure to perform the Compliance Commitments, OFAC will provide notice to Respondent of its determination and whether OFAC is re-opening its investigation. The statute of limitations applying to the Apparent Violations shall be deemed tolled until a date 180 days following Respondent's

receipt of notice of OFAC's determination that a breach of, or misrepresentation in, this Agreement has occurred.

F. Should the Respondent engage in any violations of the sanctions laws and regulations administered by OFAC—including those that are either apparent or alleged—OFAC may consider Respondent's sanctions history, or its failure to employ an adequate sanctions compliance program or appropriate remedial measures, associated with this Agreement as a potential aggravating factor consistent with the Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501, Appendix A.

3. This Agreement does not constitute a final agency determination that a violation has occurred and shall not in any way be construed as an admission by Respondent that Respondent engaged in the Apparent Violations.

4. This Agreement has no bearing on any past, present, or future OFAC actions, including the imposition of civil monetary penalties, with respect to any activities by Respondent other than those set forth in the Apparent Violations.

5. OFAC may, in its sole discretion, post on OFAC's website this entire Agreement and/or issue a public statement about the factors of this Agreement, including the identity of any entities involved, the settlement amount, and a brief description of the Apparent Violations.

6. The certifications to OFAC required under this Agreement shall be submitted to OFAC by email at OFAC_Compliance_Certification@treasury.gov, addressed to Assistant Director, Enforcement Division, Office of Foreign Assets Control, Freedman's Bank Building, U.S. Department of the Treasury, 1500 Pennsylvania Avenue, NW, Washington, DC 20220.

7. This Agreement consists of 11 pages and expresses the complete understanding of OFAC and Respondent regarding resolution of OFAC's enforcement matter involving the Apparent Violations. No other agreements, oral or written, exist between OFAC and Respondent regarding resolution of this matter.

8. This Agreement shall inure to the benefit of and be binding on each party, as well as its respective successors or assigns.

**ENF 54851**
**British American Tobacco p.l.c.**

Respondent accepts the terms of this Agreement on this 14 day of April, 2023.

[signature]

Signature

Gareth Cooper

Respondent's Printed Name (or in the case of an entity, the name of Respondent's Duly Authorized Representative)

Assistant General Counsel, Marketing, Regulation, Litigation & Intellectual Property

Printed Title of Respondent's Duly Authorized Representative and Name of Entity (if applicable)

X Please check this box if you have not enclosed payment with this Agreement and will instead be paying or have paid by electronic funds transfer (see paragraph 2(A)(ii) and the EFT Instructions enclosed with this Agreement).

Date: April 17, 2023

Andrea M. Gacki Digitally signed by Andrea M. Gacki Date: 2023.04.17 14:21:23 -04'00'

Andrea M. Gacki
Director
Office of Foreign Assets Control