# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **CASE NO.** |
| **v.** | : | |
| | : | **18 U.S.C. §§ 1344, 1349** |
| **BRITISH AMERICAN TOBACCO P.L.C.,** | : | **(Conspiracy to Commit Bank** |
| | : | **Fraud)** |
| **and** | : | |
| | : | **50 U.S.C. § 1705 (Conspiracy to** |
| **BRITISH-AMERICAN TOBACCO** | : | **Violate International** |
| **MARKETING (SINGAPORE) PRIVATE** | : | **Emergency Economic Powers** |
| **LIMITED,** | : | **Act)** |
| | : | |
| **Defendants.** | : | **31 C.F.R. Part 510 (North** |
| | : | **Korean Sanctions Regulations)** |

**I N F O R M A T I O N**

The United States charges that, at all times relevant to this Information,

**COUNT ONE**
**(Conspiracy to Commit Bank Fraud)**

1. These charges arise from a scheme by British American Tobacco p.l.c. and British-American Tobacco Marketing (Singapore) Private Limited, to engage in a conspiracy to commit bank fraud, 18 U.S.C. §§ 1344, 1349, and a conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, through sales of tobacco products to the Democratic People's Republic of Korea ("DPRK" or "North Korea"), between in or around February 2009 until in or around June 2017.

# I. RELEVANT LEGAL BACKGROUND

## *A. SANCTIONS AGAINST NORTH KOREA*

2. The Trading with the Enemy Act ("TWEA") of 1917, codified at 12 U.S.C. § 95 & 50 U.S.C. § 4301 *et seq.*, authorized the President to restrict trade between the United States and countries with which it is adverse. On December 16, 1950, the President designated the North Korea under TWEA. North Korea remained designated as such until June 26, 2008.

3. Under TWEA, U.S. financial institutions were barred from conducting transactions for the benefit of North Korea, to include "[a]ll transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States." 31 C.F.R. § 500.201 (2006 ed.).

## *B. UNITED NATIONS SANCTIONS*

4. In December 1985, North Korea ratified the Nuclear Non-Proliferation Treaty ("NPT"). On January 10, 2003, North Korea withdrew from the NPT. On October 14, 2006, the United Nations ("UN") Security Council passed Resolution 1718 condemning North Korea's first nuclear test and imposed sanctions on North Korea, including the supply of heavy weapons and select luxury goods. After successive nuclear tests by North Korea, the UN Security Council strengthened or imposed additional sanctions in 2009, 2013, 2016 and 2017.

## *C. IEEPA*

5. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, enacted in 1977, authorized the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part

outside the United States, to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

6. The U.S. Departments of the Treasury, Commerce, and State enforce and administer economic sanctions under their respective authorities, to accomplish U.S. foreign policy and national security goals. In particular, the Department of the Treasury publishes a publicly available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions. SDNs' property and interests in property, subject to U.S. jurisdiction or in the possession and control of U.S. persons, are blocked when they are placed on the SDN list. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

7. Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On November 14, 1994, the President issued Executive Order ("EO") 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

8. On June 28, 2005, the President, in order to take additional steps with respect to the national emergency described and declared in EO 12938, issued EO 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") targeting proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13382 authorized the Secretary of the Treasury, in consultation with

the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq*. EO 13382 and the Weapons of Mass Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities placed on the SDN list under those authorities, unless exempt or authorized by the Office of Foreign Assets Control ("OFAC"), which was located in Washington, D.C.

9. On August 11, 2009, the Department of the Treasury designated the North Korean bank Korea Kwangson Banking Corp. ("KKBC") under EO 13382 for providing financial services in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN pursuant to UN Security Council Resolution 1718 for their roles in North Korea's WMD and missile programs. At the time of the designation, the Department of the Treasury's Under Secretary for Terrorism and Financial Intelligence stated, "North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit."

10. On March 11, 2013, the Department of the Treasury designated the Foreign Trade Bank ("FTB"), North Korea's primary foreign exchange bank, pursuant to EO 13382, for providing financial services that assisted in the proliferating of WMD. In the designation, Treasury stated, "North Korea uses FTB to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . .

By designating FTB, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system. FTB is a state-owned bank established in 1959. FTB acts as North Korea's primary foreign exchange bank and has provided key financial support to [KKBC]."

11. On March 15, 2016, the President, in order to take additional steps with respect to the previously described national emergency, issued EO 13722 addressing the Government of North Korea's continuing pursuit of its nuclear and missile programs. EO 13722 imposed a comprehensive blocking of the Government of North Korea and the Workers' Party of Korea. Pursuant to that authority, on March 5, 2018, the Secretary of the Treasury amended the "North Korea Sanctions Regulations." 83 Fed. Reg. 9182 (Mar. 5, 2018)*; see* 31 C.F.R. § 510.101 *et seq*. EO 13722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC. Under these orders, U.S. financial institutions were barred from providing correspondent banking services to North Korea entities.

12. EOs 13466 and 13722, and the North Korea Sanctions Regulations also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these Executive Orders or regulations.

### *D. BANK SECRECY ACT*

13. Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign

financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

14. According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all substantial U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

15. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to avoid sanctions programs administered by OFAC.

16. The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. *See* USA PATRIOT Act § 311, codified at 31 U.S.C. § 5318A. One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial institutions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

17. In June 2016, FinCEN determined that the entire North Korean financial sector was a "primary money laundering concern." 81 Fed. Reg. 35665 (June 3, 2016). On November 9, 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. A second special measure required U.S. financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States. Failure to comply with the special measure resulted in civil and criminal penalties for U.S. financial institutions.

18. As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, in at least March 2016, correspondent banks refused to knowingly process any U.S. dollar wire transactions involving entities in North Korea.

## II. <u>NORTH KOREA BANKING AND USE OF FRONT COMPANIES</u>

19. The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions." 81 Fed. Reg. 78715 (Nov. 9, 2016). These companies are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism controls." *Id.*

20. The United Nations Panel of Experts found that once North Korea registered a front company without overt links to the country through the assistance of foreign nationals, it became

significantly easier for its firms to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts with banks outside of North Korea.

21. North Korean entities used front companies to pay their counterparties in U.S. dollars. The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions influence the decision making of the correspondent banks into processing transactions that they otherwise normally would not.

## III. THE CO-CONSPIRATORS

22. British American Tobacco p.l.c. (“BAT”): BAT, established in 1902, is a multinational entity headquartered in London, United Kingdom, involved in the trade and production of tobacco products around the world.

23. British-American Tobacco Marketing (Singapore) Private Limited (“BATMS”): BATMS is an indirect subsidiary of BAT located in Singapore. During the time period relevant to these offenses, BAT exercised control over BATMS and received income from revenue generated by BATMS through BATMS’s sales of products to North Korea via Company 1.

24. North Korean Tobacco Company (“NKTC”): NKTC is a North Korean trade company that specializes in the production of cigarettes sold in North Korea and other markets. NKTC is owned by the government of North Korea.

25. Joint Venture Tobacco Factory (“JVTF”): JVTF was a joint venture company established in North Korea by BATMS and NKTC. The original joint venture agreement was signed in 2001 with a 20-year operating period.

26. Company 1: Company 1 was a Singaporean conglomerate that supplies a variety of goods to various Asian markets. In 2005, BATMS appointed Company 1 as a distributor of BAT cigarette kitsets in North Korea and other markets in Asia. At the height of the relationship between

BATMS and Company 1, the distribution of BAT products previously accounted for roughly 50% to 60% of Company 1's business.

27. BAT DPRK Subsidiary ("BAT DPRK"): BAT DPRK was owned by a BAT subsidiary and acquired BATMS's shares in the JVTF in 2004. In August 2007, BAT DPRK was sold to Company 1 and thereafter became Company 1 DPRK, a subsidiary of Company 1. BAT DPRK was previously named BAT Holdings DPRK. From August 2007 to May 2017, a BAT subsidiary held a call option to repurchase Company 1 DPRK.

28. The Foreign Trade Bank ("FTB"): As noted above, FTB was a North Korean state-owned bank and was North Korea's primary foreign exchange bank.

29. Korean Kwangson Banking Corporation ("KKBC"): As noted above, KKBC was a North Korean state-owned bank and a subsidiary of FTB.

30. U.S. Bank 1, U.S. Bank 2, U.S. Bank 3, and U.S. Bank 4 (collectively, "the U.S. banks") were U.S. financial institutions then insured by the Federal Deposit Insurance Corporation. During the relevant time period, the U.S. banks unknowingly processed correspondent banking transactions for U.S. dollar transactions originating in North Korea for the benefit of BATMS, and ultimately BAT, which they would not have processed had they known the true nature of the transactions.

## IV. <u>JURISDICTION AND VENUE</u>

31. Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia. Specifically, BAT, BATMS, and their co-conspirators failed to obtain a license from the Department of the Treasury, which is located in Washington, D.C. Pursuant to Title 18, United States Code, Section 3237, venue is proper in the District of Columbia.

32. Additionally, certain of the offenses alleged herein were begun and committed outside the jurisdiction of any particular sate or district of the United States. For those offenses, pursuant to Title 18, United States Code, Section 3238, venue is proper in the District of Columbia.

## V. <u>THE CONSPIRACY</u>

### *A. BACKGROUND*

33. Between at least August 2007 and continuing through at least June 2017 (the "relevant time period"), BAT, BATMS, and others ("the co-conspirators") knowingly engaged in a conspiracy to execute a scheme or artifice (i) to defraud a financial institution, as defined in 18 U.S.C.§ 20; and (ii) to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, as defined in 18 U.S.C. § 20, by means of false and fraudulent pretenses, representations, and promises, *to wit*, the co-conspirators supplied false information to U.S. banks processing U.S. dollar transactions on behalf of North Korean entities, and thus caused the export of financial services from the United States to North Korea.

34. Specifically, during the relevant time period, BAT and BATMS were aware that: (i) U.S. financial institutions, including the U.S. banks, would not process U.S. dollar correspondent banking transactions on behalf of customers located in North Korea to the extent that such transactions violated sanctions placed on North Korea by the United Nations and the United States and (ii) U.S. sanctions prohibited transactions with sanctioned banks and entities that used U.S. dollar wire transfers and U.S. financial institutions.

35. As discussed, JVTF was a joint venture company established in North Korea by BATMS and NKTC. The original joint venture agreement was signed in 2001. To ensure that banks would process JVTF's U.S. dollar transactions, BAT, BATMS and NKTC did two things.

a. First, on June 8, 2007, BAT issued a press release stating that BAT "has agreed in principle to sell its share in [JVTF], a joint venture cigarette business in Pyongyang with [NKTC], a state-owned company." In reality, as described further herein, BATMS maintained significant influence over the JVTF and used Company 1 as a shell company at various points during the relevant time period, and BAT continued to benefit from BATMS's significant influence over the JVTF.

b. Second, on behalf of NKTC, KKBC enacted an elaborate scheme of utilizing a network of front companies located throughout the world to conceal the North Korean nexus of payments it made to Company 1, which subsequently flowed to BATMS and ultimately BAT. Before and after the United States issued sanctions against KKBC and FTB, each North Korean bank employed several Chinese entities to make these types of payments to Company 1 on behalf of NKTC.

36. BATMS's and its co-conspirators' deceptive practices caused U.S. financial institutions, including the U.S. banks, to process transactions that they would not have otherwise processed.

37. Throughout the relevant time period, BAT and BATMS were aware of prohibitions against transacting with sanctioned banks and entities in North Korea through the use of U.S. dollar wire transfers and U.S. financial institutions.

### *B. DETAILS OF THE SCHEME*

38. In furtherance of this conspiracy, and to accomplish its goals, the following overt acts, among other, were committed in the District of Columbia and elsewhere.

***BAT's and BATMS's Artifice to Conceal Its North Korean Business***

39. On or about April 12, 2005, BATMS entered into a "Sale and Purchase Agreement" with Company 1 wherein Company 1 would buy goods from BATMS and would resell those goods strictly to the entities that BATMS designated in the agreement. The contract stated that Company 1 would pay for the goods once they were received by Company 1, however, another part of the contract stated "BATMS shall deliver the Goods to the location designated by BATMS in DPRK." This agreement was the first of many between BATMS and Company 1. BATMS and BAT (by virtue of being BATMS's ultimate parent company) maintained control of all relevant aspects of the North Korean business.

a. According to official meeting minutes, "BAT" and NKTC attended an October 2005 JVTF meeting.[1] At this meeting, the parties discussed remittances related to North Korea: "If the remittance of funds continues to be a problem, the viability of the joint venture will be in question as BAT cannot keep paying suppliers and not get paid from DPRK. [NKTC] will look into getting approvals for BAT to bring cash out of DPRK by end of Oct. 2005."

40. As previously stated, on or about June 8, 2007, BAT issued a press release announcing its agreement in principle to sell its shares in the JVTF to Company 1.

41. On or about August 10, 2007, this press release was followed up by a formal agreement between BATMS, other BAT subsidiaries, and Company 1, which was referred to as the "Umbrella Agreement." The agreement included the following relevant terms:

---

[1] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

a. In the initial JVTF agreement, BAT, through its subsidiary, BATMS, had owned 60% of the JVTF. In January 2004, BATMS had sold its 60% ownership rights to a BAT subsidiary, referred to as "BAT Holdings DPRK." At the time of the 2007 Umbrella Agreement, the outstanding funds owed on this intra-company purchase was $12,521,295.39.

b. In the Umbrella Agreement, (i) BAT Holdings DPRK agreed to shift 10% of its ownership interest in the JVTF to NKTC, resulting in a 50/50 split of the JVTF and (ii) BAT Holdings DPRK (including its 50% interest in the JVTF) was sold to Company 1 for the price of €1.00 (approximately $1.37 at the time), far less than the value of the business stated on BAT's internal records.

c. The Umbrella Agreement included, among other terms, a call option that allowed a BAT subsidiary to repurchase BAT Holdings DPRK (the "Call Option Agreement"). Because BAT Holdings DPRK held a 50% ownership interest in the JVTF, the call option essentially gave a BAT subsidiary the right to repurchase 50% of the JVTF after a two-year period, if it so desired. Under the terms of the Call Option Agreement, BAT Holdings DPRK could not make any material changes to its business without the prior written approval from the BAT subsidiary that owned the call option.

d. BATMS agreed to supply BAT Holdings DPRK with "technical and other related support services to be agreed between the relevant parties for the development of the business of [JVTF]."

42. On or about April 23, 2007, in an email discussing the Umbrella Agreement, a Company 1 executive noted that Company 1 DPRK would be "a vehicle for BAT to bring out the JV money and distribute it to BAT. [Company 1] will have no beneficial interest in [Company 1

DPRK]," showing that the 2007 Umbrella Agreement was a tool for remitting North Korean funds to BATMS, and ultimately BAT.

43. On or about August 23, 2012, a former BATMS employee who had moved to Company 1 sent an email stating, "I am still working for BAT business though BAT is not directly dealing in DPRK. . . . Though the contract is under [Company 1], the business is run under BAT interests. I was long requested by previous BAT senior management to help watch out the JV [sic] as it's BAT interest in the end," showing that BATMS and BAT (by virtue of being BATMS's ultimate parent company) continued to exercise significant influence over the North Korea sales.

44. In or around March 2015, BATMS and BAT drafted a document discussing the arrangement created by the 2007 Umbrella Agreement stated that "to ensure that BAT", through a subsidiary, held "de facto control of [Company 1 DPRK (previously known as BAT Holdings DPRK)] and through [Company 1 DPRK], significant influence over the equity accounted [JVTF]," various restrictions were put in place on Company 1 DPRK as described in the Call Option Agreement. The document went on to state, "The restrictions were also intended to ensure that when BAT reacquired the Holding company it would be fit for purpose. Removal of these restrictions might be perceived as a loss of control over the Holding Company." The document showed that despite the fact that Company 1 and NKTC owned the JVTF, BATMS and BAT (by virtue of being BATMS's ultimate parent company) continued to exercise significant influence over the JVTF and to directly benefit from sales of products to North Korea.

45. During the relevant time period, despite the apparent change in ownership of the JVTF, BATMS and BAT (by virtue of being BATMS's ultimate parent company) displayed to Company 1 employees that BATMS and BAT had significant influence over significant business decisions and the remittance process, and continued to receive profits from North Korea sales.

Company 1 bore no financial risk from the arrangement. Employees of Company 1, who witnessed the business interactions between Company 1, "BAT", BATMS, and NKTC, affirmed the same:

a. Witness 1 stated that "BAT"[2] sold the business to Company 1 but continued to run the business, supplied all the raw materials for the JVTF, and continued to attend annual meetings for the JVTF.

b. Witness 2 stated that "BAT" used Company 1 as an intermediary to create a type of "insurance policy" that provided protection for "BAT," meaning it appeared to the outside world that BAT was no longer operating in North Korea. According to the witness, in truth, "BAT" assumed all liability for North Korean-related business and guaranteed to Company 1 the North Korean payments to Company 1 through 2017. Witness 2 also stated that "BAT" made all the decisions regarding the products supplied to North Korea.

c. Witness 3 stated that "BAT" used Company 1 to appear to be the legal owner of "BAT's" joint venture with North Korea. "BAT" wanted to create distance from the joint venture but did not want to stop its North Korean business. Company 1 was not allowed to make any changes to the joint venture without "BAT's" consent.

***Manner and Means for Movements of Goods and Funds Associated with the North Korean Business***

42. Following the 2005 Sale and Purchase Agreement and 2007 Umbrella Agreement, a system was put in place to move the goods and funds associated with the JVTF, and ultimately to process payments for BATMS, without connection to North Korea.

---

[2] Witnesses 1, 2, and 3 referred to "BAT" without stating whether they meant British American Tobacco p.l.c., BATMS, or another BAT subsidiary. The context indicates that their references to "BAT" may have been to BATMS—not British American Tobacco p.l.c.

a. BATMS shipped goods (primarily cigarette components) to the JVTF, in care of Company 1.

b. BATMS invoiced Company 1 for the amount of the goods.

c. Company 1 sent the invoice to an employee of NKTC.

d. NKTC made payments in U.S. dollars to Company 1 for the amount due on the invoice, often using a Chinese front company to process the payment.

e. Company 1 separately made payments to BATMS in the same amount, minus a small percentage commission.

While the system had some variations over time, in general the use of Company 1 as an intermediary for sales and payment arrangements continued until BATMS ceased its sales to North Korea via Company 1 in July 2016, with payments for such sales concluding in August 2016.

43. BATMS was paid for the goods it sent to the JVTF and North Korea in U.S. dollars until approximately May 2014, when BATMS elected to change all payments it received from Company 1 related to the North Korean business to Singaporean Dollars ("SGD").

44. Beginning in at least 2007, NKTC, through its banks KKBC and FTB, regularly used Chinese front companies to process payments between NKTC and Company 1 in order to disassociate the payments from their North Korean origin.

a. For instance in 2007, after NKTC sent multiple cash payments to Company 1 for BATMS, a new arrangement was set up to use front companies to wire the funds from NKTC to Company 1. This new arrangement was first discussed at the August 2007 JVTF meeting

between NKTC and “BAT”.[3] It was noted in the meeting minutes that, “[g]oing forward, [NKTC] proposed the use of their export earnings to pay Company 1.” The term “export earnings” referred to revenue that North Korea generated by exporting goods from North Korea to countries like China. The payments for these exports, which would typically be remitted to North Korea, were trapped in China due to banking restrictions. Therefore, North Korea used these funds in China to pay parties to which North Korea owed money.

b. On or about October 1, 2007, a Chinese company, Dandong Hongxiang Industrial Development Company (“DHID”), wired roughly $1 million in U.S. dollars to Company 1.

c. Another JVTF meeting was held in January 2008 with NKTC and “BAT”.[4] At this meeting, the parties discussed using DHID to pay Company 1 and then Company 1 remitting the funds to BATMS, as payment for NKTC purchases. The parties decided this arrangement was suitable for future remittances. The parties were aware that DHID had not purchased the goods related to the DHID payments.

d. From 2007 to 2014, DHID sent approximately $125 million to Company 1, which was money intended for BATMS as payment for NKTC purchases.

e. On September 26, 2016, the Department of the Treasury sanctioned DHID and four of its executives for acting for or on behalf of KKBC, which had been sanctioned since August

---

[3] While the meeting minutes included a list of “BAT” attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

[4] While the meeting minutes included a list of “BAT” attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

2009. Treasury also stated that "DHID used an illicit network of front companies, financial facilitators and trade representatives to facilitate transactions on behalf of KKBC."

f. Additionally, approximately 50 other front companies, also not involved with NKTC or JVTC, moved at least approximately $216 million in U.S. dollars to Company 1 over the relevant time period, all of which were remittances intended for BATMS.

### *C. KNOWLEDGE*

#### *Bank Fraud*

45. BATMS and BAT structured BATMS's transactions with the JVTF in order to obfuscate BATMS's sales to North Korea, and therefore caused U.S. financial institutions, including the U.S. banks, to process correspondent U.S. dollar transactions for BATMS's benefit. Had those financial institutions known the transactions originated in North Korea, they would not have processed those transfers.

46. BATMS knowingly executed the aforementioned scheme, with the intent to deceive U.S. financial institutions, including the U.S. banks, in order to obtain the money, through the use of correspondent banking transactions, from the U.S. financial institutions.

47. BAT and BATMS designed the scheme to make it appear that they had divorced themselves from North Korean sales. Specifically, on June 8, 2007, as previously stated, BAT issued a press release stating that BAT "has agreed in principle to sell its share in [JVTF], a joint venture cigarette business in Pyongyang with [NKTC], a state-owned company."

48. NKTC was using front companies to process payments as early as 2007. Furthermore, in response to questions from in-house counsel, who was employed by a BAT subsidiary in Asia, in July 2014, Company 1 noted that the North Korean government traded goods with Chinese companies, mainly exporting coal. Instead of the Chinese companies making

payments for the coal to the appropriate North Korean entity, the Chinese companies made payments for goods that companies, like NKTC, procured from other countries.

49. Contrary to assertions that it was no longer operating in North Korea, BATMS and BAT (by virtue of being BATMS's ultimate parent company) retained significant influence over the JVTF and instructed Company 1 on how to operate the business.

a. For instance, when discussing the issuance of invoices from Company 1 to JVTF, a BATMS employee sent an email on August 27, 2008 to a group of BATMS and Company 1 employees. The email reads, "I received a request from [NKTC] for an invoice to do the remittance on a monthly basis. What [NKTC] needs is an invoice on [Company 1] letterhead and bank details as we are remitting the money to [Company 1] and the details of the remittance. I will need to give you the value once they inform me the total amount of remittance. Can you assist to generate this invoice and forward me a scan copy. I attach a sample for your reference."

b. Additionally, on August 19, 2009, a BATMS employee sent an email to a Company 1 employee, instructing the Company 1 employee to pay certain bills on behalf of the JVTF, stating "The amount is correct. Please pay . . ."

c. A draft memo from August 2010 stated that "any expenditure incurred by [JVTF] has to be approved by both BAT and [NKTC]." This same memo, which showed edits from BATMS employees in track changes, stated in a deleted sentence: "Recently, BAT has sold its investment in [BAT Holdings DPRK] to [Company 1]. Although we have sold the investment, we continue to retain significant control and we are still involved in the day-to-day business operation of the DPRK business." One of the retained sections states, "any expenditure incurred by DPRK JV has to be approved by both BAT and [NKTC]."

50. Employees of the JVTF understood that BATMS continued to run business operations. In September 2012, the JVTF country manager noted that "ex BAT staff [had been] transferred to Company 1," that employees were still being paid under the "BAT standard" rather than the "Company 1 standard," and that the employee believed they were "still working for BAT business though BAT is not directly dealing in DPRK."

51. BATMS continued to attend meetings related to the JVTF despite its alleged separation from the North Korean business. For instance, a group of employees from BATMS and a BAT subsidiary in Asia attended the February 2010 JVTF meeting and dined with Company 1 employees and representatives from NKTC. An employee of Company 1,[5] who witnessed these meetings, stated, "[NKTC], knowing that BAT personnel were sometimes present at the meeting location, would arrange side meetings directly with BAT officials." The employee said that "no meeting minutes were ever taken at the side meetings, and that BAT had directed that no meeting minutes should ever be taken at the side meetings. The employee recalled that, NKTC used BAT's attendance at the meetings as proof that BAT was "still in the game." Another Company 1 employee described Company 1's presence at the meetings as "effectively a middleman."

52. Moreover, BATMS was not selling products generally to Company 1 for sale wherever Company 1 determined. A 2015 document reflects that the specification for tobacco being sold to Company 1 was "DPRK," *i.e.*, the mix that BAT had been producing for North

[5] The witnesses referred to "BAT" without stating whether they meant British American Tobacco p.l.c. or BATMS. The context indicates that their references to "BAT" likely were to BATMS or the BAT subsidiary in Asia—not British American Tobacco p.l.c.

Korean sales since the early 2000s, and thus BAT and BATMS sold to Company 1 products it knew were destined for North Korea.

53. In early 2015, BATMS employees considered whether to enact a more arm's-length relationship with Company 1 and its subsidiary, Company 1 DPRK, by changing the terms of the Call Option Agreement that gave BAT, through a subsidiary, de facto control over Company 1 DPRK. While BATMS assessed the terms of the Call Option Agreement, no immediate changes were made and BAT, through a subsidiary, continued to retain the call option and de facto control over Company 1 DPRK. As part of this assessment, a discussion was held among BATMS and a BAT in-house accountant because, under accounting rules applicable to BAT, BAT had accounted for Company 1 DPRK as a subsidiary and JVTF as a joint venture. The BAT accountant noted in an email to a BATMS employee that Company 1 DPRK "was still under BAT control" per accounting rules, and went on to state, "with the conclusion above (that we controlled [Company 1 DPRK]) led to the conclusion that BAT had significant influence over activity of [JVTF]." The same BAT accountant provided a list of considerations to keep in mind if the current structure of the relationship with Company 1 and Company 1 DPRK were to change, noting "[i]f we were to lose control over [Company 1 DPRK], we must lose 'significant influence' over [JVTF]." The BAT accountant continued, "As a rule of thumb, the more we change the original agreements to 'free up' [Company 1], the more likely it is that we cannot account for [Company 1 DPRK] as a subsidiary and [JVTF] as a joint venture." The BAT accountant then discussed the potential financial impact of such proposed changes. In May 2017, the call option was sold to Company 1, and payments from Company 1 to BATMS for the purchase of the call option were completed in June 2017.

54. During the relevant time period, Company 1 received at least $415,717,848 in U.S. dollar correspondent banking transactions from NKTC to Company 1 in cash and wire transactions that flowed through U.S. correspondent banks, including the U.S. banks. These transactions all originated from NKTC and were paid through NKTC's banks and their front companies to Company 1. Had the U.S. correspondent banks known that these payments originated in North Korea, they would not have processed the transactions.

***IEEPA***

55. BAT and BATMS had knowledge of U.S. sanctions under IEEPA, including the sanctions on designated North Korean entities, and willfully disregarded those sanctions.

56. The September 15, 2005, designation of Banco Delta Asia ("BDA"), a bank based in Macau, by the Department of the Treasury resulted in the freezing of $20 million held by BDA's clients in accounts at BDA. BATMS was using BDA for money transfers related to its North Korean business, and BATMS's funds were frozen as a result.

57. As stated, an October 2005 JVTF meeting was held with NKTC and "BAT".[6] The attendees discussed the Department of the Treasury sanctions, and the "BAT" attendees expressed concern about the ability to be paid by NKTC as a result.

58. BAT decided to sell off its stake in the JVTF in 2007 by selling BAT DPRK to Company 1, at a time when North Korea remained sanctioned under TWEA.

[6] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

***Company 1's Use of Sanctioned Entity KKBC***

59. At various points in time during the relevant time period, BAT and BATMS had knowledge that Company 1 used KKBC to transact business, even after KKBC was designated by the Treasury Department.

60. On January 6, 2006, prior to the imposition of sanctions against KKBC, KKBC made a payment to Company 1 for $361,861.67. It was common for Company 1 to send messages to BATMS stating amounts received from NKTC/JVTF and the front companies making those payments.

61. On April 29, 2014, in-house counsel, who was employed by a BAT subsidiary in Asia, sent a list of questions related to sanctions by email to Company 1 employees and an attorney representing Company 1. One of the attachments to the email was a list of all sanctioned North Korean banks, including KKBC and FTB. On July 3, 2014, the attorney representing Company 1 answered the several questions put forward by the in-house counsel. Included in the email was a statement that added "[NKTC] uses the bank known as Korea Kwangson Bank [KKBC]," which at that point had been sanctioned by the Treasury Department for nearly five years.

62. U.S.-dollar wire transfers from NKTC to Company 1 from the time that KKBC was designated on August 11, 2009 until May 2017, when BAT terminated its interest in the North Korean business, totaled approximately $286,810,910. A portion of these funds were transferred to BATMS until August 2016, by which time BATMS had stopped selling products to the DPRK via Company 1.

***Company 1's Use of Sanctioned Entity FTB***

63. At various points in time during the relevant time period, BAT and BATMS had knowledge that Company 1 used FTB to transact business.

64. Between 2005 and approximately November 2017, NKTC moved approximately $74,420,000 in bulk U.S. dollar cash to Company 1 using FTB, which was subsequently deposited into Company 1's bank account. A portion of such funds was transferred to BATMS by Company 1 in U.S. dollars and, beginning in June 2014, in Singaporean dollars. These transfers to BATMS stopped in August 2016, however, a month after BATMS had stopped selling products to the DPRK via Company 1.

65. On January 31, 2008, months after Company 1 purchased BAT DPRK, a two-day meeting was held in Vietnam. According to the meeting notes, NKTC and "BAT" attendees were at the meeting.[7] No Company 1 representatives were listed as attending the meeting. Fund remittance was one of the topics covered in the meeting. The meeting minutes stated, "Both parties reviewed the fund remittance going forward. The current system of remitting via FTB, [Entity Name] and [Chinese Bank] will continue to be used. Money will only be transferred to FTB when Company 1 received the funds." The meeting minutes also reflected discussion of "another process," noting that the JVTF "could open a Euro account with FTB" and that "there would be an exchange rate risk that BAT has to manage." The minutes stated that "BAT will review [the process] and revert." This process was not pursued.

66. A 2009 presentation on BAT letterhead showed the flow of funds between BATMS, the JVTF, Company 1, and North Korea, and included notations to FTB.

67. After FTB was sanctioned on March 11, 2013, NKTC continued to use FTB to send remittances to Company 1 until approximately 2017. A portion of such remittances was transferred

---

[7] While the meeting minutes included a list of "BAT" attendees, these attendees were at the time employed by BATMS or a BAT subsidiary located in Asia.

from Company 1 to BATMS until August 2016, by which time BATMS had ceased selling products to the DPRK via Company 1. In or about May 2014, employees from BATMS, a BAT subsidiary in Asia, and Company 1 discussed complying with sanctions, and decided that Company 1 would now pay BATMS in SGD, as opposed to U.S. dollars. On or about May 5, 2014, BATMS opened an "SGD account" with its bank and asked Company 1 to change the payments to SGD. Prior to BATMS taking steps to open an "SGD account" (*i.e.*, between March 11, 2013, and May 5, 2014), BATMS caused U.S. financial institutions to process approximately $56,788,034 of transactions from North Korea via NKTC's bank, FTB, all of which were ultimately for the benefit of North Korea.

68. However, despite BATMS attempting to change its dealings with Company 1 to SGD, BAT and BATMS were aware that the arrangement continued to cause U.S. dollar transactions to occur in connection with NKTC's remittances to Company 1. For example, on June 4, 2014, BATMS was informed by Company 1 in an email that Company 1 had received U.S. dollar transfers from NKTC. BATMS then instructed Company 1 to convert the USD to SGD and send the converted sum into BATMS's bank account. Thus, regardless of any measures taken, the arrangement was causing U.S.-dollar transactions between NKTC and Company 1, for the benefit of North Korea, including FTB.

69. Despite the sanctions designations against KKBC and FTB, BATMS and Company 1 failed to change the currency of payments from NKTC to Company 1, and those payments—involving front companies and FTB and/or KKBC at various points in time—remained in U.S. dollars until the end of the relevant time period. Approximately $78,873,081 was paid via wire transfer in U.S. dollars by NKTC to Company 1, where a portion was for the benefit of

BATMS, and ultimately BAT, for sales of products, from May 5, 2014 until August 2016, by which time BATMS had ceased selling products to the DPRK via Company 1.

***Efforts to Conceal Sales to North Korea & Avoid Sanctions***

70. At various points during the relevant time period, BATMS was aware of efforts to conceal its conduct involving North Korea with financial institutions.

71. For example, on or about December 29, 2014, BATMS's bank raised questions to Company 1's bank about a pending wire transfer from Company 1 to BATMS. Company 1's bank subsequently forwarded these questions to Company 1. BATMS conferred by email with Company 1 about how Company 1 should answer questions about the origin of Company 1's funds to be remitted to BATMS and requests for documentation related to the same. A Company 1 employee advised that the sale invoice should be submitted to Company 1's bank, rather than the shipping document, as the former "will not show DPRK." The same Company 1 employee noted that "[n]evertheless, we will be caught under question 4," referring to another question about the origin of the funds, and further suggested that BATMS and Company 1 allow the wire transfer to expire and try it again with a different bank. In response, a BATMS employee advised the Company 1 employee to cancel the wire transfer.

72. In a later response about the same issue, the Company 1 employee, in an email to in-house counsel, who was employed by a BAT subsidiary in Asia, noted that Company 1 used to have an account at BATMS's bank and that bank "knew that Company 1 is involved in the DPRK trade since the start." Further, the bank knew that the money was "paid from a China bank account owned by Chinese / Hong Kong Company" and the bank "used to have the view that as long as the remitter is a Chinese or Hong Kong company they are fine." The Company 1 employee noted that the bank was aware that another bank had been fined by the U.S. government, and thereafter

told Company 1 "to close all bank account relating to DPRK." The in-house counsel asked whether Company 1 thought Company 1's current bank "knows that the funds you are wanting to transfer to BAT are the funds relating to DPRK?" The Company 1 employee replied that it had previously informed its current bank that the money was coming from China. Thus, BATMS and the in-house counsel were on notice that Company 1 was not informing financial institutions regarding the true origin of U.S.-dollar funds it was receiving, and thus causing financial institutions, including U.S. financial institutions, to process U.S. dollar payments.

73. The aforementioned scheme resulted in a gross gain to BAT and BATMS of at least approximately $189,541,115.

### *D. WIND DOWN OF THE NORTH KOREAN BUSINESS*

74. In April 2016, BATMS began winding down its sales of products to Company 1, one month after EO 13722 was issued, and completely ceased such sales in July 2016. The last remittance in connection with such sales from Company 1 to BATMS occurred in August 2016.

75. In May 2017, BAT, through a subsidiary, novated its rights under the Call Option Agreement to Company 1. In exchange, Company 1 made payments to BATMS in May and June 2017.

## VI. SAMPLE WIRE TRANSACTIONS

76. During the relevant time period, NKTC made approximately 280 wire transfers totaling $341,297,848 in U.S. dollars to Company 1, a portion of which was ultimately intended for BATMS. All of the payments were made in the name of companies other than NKTC and in a form that otherwise obscured the payments' connection to North Korea. BAT, BATMS and Company 1 knew that those companies were not true purchasers of BAT and BATMS's products.

77. Below is a sample of U.S. dollar payments made by NKTC to Company 1 related to NKTC's purchases of BAT and BATMS products, a portion of which was thereafter funneled to BATMS (and ultimately BAT) as U.S. dollar wire transfers. NKTC routed these transactions through its banks, FTB and KKBC, both of which were sanctioned by OFAC at the time of the transactions, and thus these payments would have required a license from OFAC. These payments were processed by financial institutions in the United States. The financial institutions, had they known of the true origin of the payments and the lack of a license, would have frozen, blocked, investigated, and/or denied the transactions.

| Date | Originator of Payment | Amount |
|---|---|---|
| 4/29/2013 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | $2,409,300.19 |
| 7/8/2013 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | $2,019,464.79 |
| 7/30/2013 | GOLDEN DRAGON (HONG KONG) INTERNATIONAL TRADING LIMITED | $2,031,457.13 |
| 9/25/2013 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | $2,299,976.99 |
| 11/7/2013 | SHEEN FAIR TRADING LTD | $1,000,383.58 |

(**Conspiracy to Commit Bank Fraud**, in violation of Title 18, United States Code, Sections 1344(a) & (2), 1349)

**COUNT TWO**
(Conspiracy to Violate IEEPA)

78. The allegations in Paragraphs 1 through 77 of this Information are incorporated and re-alleged by reference herein.

79. Between on or about August 11, 2009, until in or around June 2017, Defendants BAT and BATMS, and others known and unknown, within the District of Columbia and elsewhere, did conspire to knowingly and willfully export and cause U.S. persons and entities, *to wit*, financial institutions located in the United Sates, to export goods and services, *to wit*, financial

services, with and for the benefit of the KKBC, FTB, North Korea, and North Korean entities, without prior authorization or a license from the Department of the Treasury.

(**Conspiracy to Violate the International Emergency Economic Powers Act**, Title 50, United States Code, Section 1705)

**FORFEITURE ALLEGATION**

80. The allegations contained in Count One and Count Two of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

81. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of conspiracy to commit bank fraud, Title 18, United States Code, Sections 1344 & 1349, and conspiracy to violate IEEPA, Title 50, United States Code, Section 1705, Defendants BAT and BATMS shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

82. If any of the property described above, as a result of any act or omission of the Defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

MATTHEW M. GRAVES
United States Attorney

By: Karen P.W. Seifert
______________________________
Karen P.W. Seifert
Assistant United States Attorney
N.Y. Bar No. 4742342
National Security Section
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: (202) 252-7527
Email: karen.seifert@usdoj.gov