**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SHIWA NAHADI, et al.,<br><br>           Plaintiffs,<br><br>v.<br><br>BRITISH AMERICAN TOBACCO P.L.C., and<br>BRITISH-AMERICAN TOBACCO MARKETING<br>(SINGAPORE) PRIVATE LIMITED,<br><br>           Defendants. | Case No.: 1:26-cv-274-LMB-WEF |

**REPLY IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.      Defendants Are Not Subject To Personal Jurisdiction In This Court ............................. 2

        A.      Plaintiffs Have Not Satisfied Rule 4(k)(1)(C) Or 4(k)(2) .................................... 2

        B.      The Exercise Of Personal Jurisdiction Would Violate The Fifth
                Amendment ........................................................................................................ 4

                1.      The Complaint Does Not Allege Sufficient Activities Directed At
                        The United States ..................................................................................... 4

                2.      The Complaint Does Not Establish That The Exercise Of Personal
                        Jurisdiction Over Defendants Would Be Constitutionally
                        Reasonable .............................................................................................. 7

                3.      Plaintiffs' Reliance On *Fuld* Is Misplaced .................................................. 8

II.     Plaintiffs' Opposition Does Not Rehabilitate The Complaint's Failings On The
        Merits ............................................................................................................................. 10

        A.      Plaintiffs Fail To Establish A Concrete Nexus Between Tobacco Sales In
                North Korea From 2007 To 2017 And Missile Attacks In Iraq In 2020
                And 2022 ........................................................................................................... 10

                1.      Plaintiffs' Focus On "Hard Currency" Does Not Establish A
                        Concrete Nexus Between Defendants And The Attacks In Iraq .............. 11

                2.      The Complaint Does Not Allege Facts Showing That Defendants
                        "Pervasively" Assisted The IRGC, Hizballah, Or Kataib Hizballah ....... 17

        B.      The Complaint Fails To Allege That Defendants Intended To Facilitate
                The 2020 And 2022 Attacks ............................................................................. 18

CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

CASES

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) ...............................................................................................15

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026).............................................................................................20

*Averbach v. Cairo Amman Bank*,
No. 19-cv-4, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ....................................................17

*Averbach v. Cairo Amman Bank*,
No. 19-cv-4, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022) ..................................................17

*Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"*
283 F.3d 208 (4th Cir. 2002) ..............................................................................................3, 4

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ...............................................................................................16

*Chamblee v. Old Dominion Sec. Co.*,
No. 13-cv-820, 2014 WL 1415095 (E.D. Va. Apr. 11, 2014) ..................................................4

*Cox Commc'ns, Inc. v. Sony Music Ent.*,
146 S. Ct. 959 (2026)...........................................................................................................19

*Daou v. BLC Bank, S.A.L.*,
42 F.4th 120 (2d Cir. 2022) ...................................................................................................6

*In re Diisocyanates Antitrust Litig.*,
No. 18-1001, 2026 WL 522845 (W.D. Pa. Feb. 25, 2026).....................................................10

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943)........................................................................................................19, 20

*Ellicott Mach. Corp. v. John Holland Party Ltd.*,
995 F.2d 474 (4th Cir. 1993) .................................................................................................7

*Finan v. Lafarge S.A.*,
No. 22-cv-7831, 2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025) .............................................10

*Force v. Qatar Charity*,
No. 20-cv-2578, 2025 WL 43163 (E.D.N.Y. Jan. 7, 2025)......................................................6

*Fraenkel v. Standard Chartered Bank*,
Nos. 24-cv-4484, 24-cv-5788, 2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025) .......................14

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025)......................................................................................................1, 9, 10

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ........................................................................................14, 19

*Khashoggi v. NSO Grp. Techs. Ltd.*,
  700 F. Supp. 3d 384 (E.D. Va. 2023) ...................................................................7

*Khashoggi v. NSO Grp. Techs. Ltd.*,
  138 F.4th 152 (4th Cir. 2025) ...........................................................................7

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013)............................................................................5, 6

*Moses v. BNP Paribas, S.A.*,
  802 F. Supp. 3d 567 (S.D.N.Y. 2025)..............................................................16, 17

*Ofisi v. BNP Paribas, S.A.*,
  77 F.4th 667 (D.C. Cir. 2023)..........................................................................14, 15

*Opati v. Republic of Sudan*,
  590 U.S. 418 (2020)..........................................................................................16

*Owens v. Republic of Sudan*,
  864 F.3d 751 (D.C. Cir. 2017)............................................................................16

*Parizer v. AJP Educ. Found., Inc.*,
  No. 24-cv-724, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025) .................................18

*Przewozman v. Qatar Charity*,
  No. 20-cv-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023)..............................6

*Saudi v. Northrop Grumman Corp.*,
  427 F.3d 271 (4th Cir. 2005) ........................................................................4, 7, 9

*Schrier v. Qatar Islamic Bank*,
  632 F. Supp. 3d 1335 (S.D. Fla. 2022) ..............................................................3, 5

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)................................................................................17

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  605 U.S. 280 (2025)..........................................................................................19

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)....................................................2, 10, 15, 16, 17, 18, 19, 20

*UMG Recordings, Inc. v. Kurbanov*,
  963 F.3d 344 (4th Cir. 2020) ..............................................................................7

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
  472 F. Supp. 3d 649 (N.D. Cal. 2020) .................................................................7

*Zobay v. MTN Grp. Ltd.*,
  695 F. Supp. 3d 301 (E.D.N.Y. 2023) ...............................................................14

iii

**STATUTE**

18 U.S.C. § 2334.................................................................................................................3, 9

**RULE**

Fed. R. Civ. P. 4....................................................................................................................3

**TREATISE**

Restatement (Second) of Torts § 433 (1965).......................................................................16

**INTRODUCTION**

The Complaint seeks to hold Defendants liable for aiding and abetting Iranian missile attacks in Iraq in 2020 and 2022 based solely on sales of cigarette components to a North Korean tobacco company between 2007 and 2017. As the Motion to Dismiss explained, that effort fails: The facts alleged in the Complaint neither establish a prima facie case of personal jurisdiction nor make out a valid claim for aiding and abetting the specific acts of terrorism at issue.

Plaintiffs' Opposition solves neither of those problems. As to personal jurisdiction, Plaintiffs do not satisfy the prerequisites of Rules 4(k)(1)(C) or 4(k)(2), or the requirements of due process. Among other things, while Plaintiffs try to establish jurisdiction based on transactions involving U.S. correspondent bank accounts through which BATMS received money from North Korea, Plaintiffs' claims do not arise from those transactions. To the contrary, those transactions involved money flowing *out* of North Korea—and therefore did not fund any missiles. The transactions also occurred years before the attacks at issue. And requiring Defendants to respond without access to key evidence located abroad would not be jurisdictionally reasonable. Contrary to Plaintiffs' argument, *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), did not supply a different Fifth Amendment standard: that cautious ruling was tailored to a "narrow jurisdictional provision" naming specific entities and specific jurisdiction-triggering conduct, *id.* at 21, unlike the broader ATA on which Plaintiffs rely.

Plaintiffs also cannot make up for the Complaint's shortcomings on the merits. Starting with the "nexus" requirement, the Complaint acknowledges that BATMS's sales of cigarette components were separated from the attacks at issue by more than two-and-a-half years, thousands of miles, and numerous intervening entities. Conclusory characterization of the disparate actors identified in the Complaint as parts of a "DPRK-IRGC missile enterprise" cannot paper over that temporal, geographic, and causal attenuation. Plaintiffs seek to connect Defendants to the attacks

1

by arguing that Defendants provided North Korea with "hard currency" critical to missile development, but as discussed above, the Complaint makes clear that the flow of hard currency moved in the opposite direction, *from* North Korea *to* BATMS.  And while the Complaint separately alleges that North Korea used BATMS-provided materials to generate hard currency through cigarette counterfeiting, Defendants' motion showed that those allegations rest on multiple layers of speculation, and Plaintiffs have now abandoned them:  Although the Complaint refers to "counterfeit" or "counterfeiting" dozens of times, the Opposition does not use the word once.

Plaintiffs also fail to show that Defendants sought to facilitate the specific attacks, as the ATA separately requires.  Plaintiffs contend that such a showing is necessary only in "*criminal* aiding-and-abetting cases."  ECF No. 49 ("Opp.") 27.  But in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Court explained that "JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries:  that the defendant consciously and culpably 'participated' in a wrongful act so as to help 'make it succeed.'"  *Id.* at 493 (alteration and citation omitted).  Plaintiffs' inability to allege that "conceptual core" of aiding-and-abetting liability requires dismissal of their claim.

Finally, Plaintiffs alternatively assert that Defendants' assistance was so "[p]ervasive" that they can be held "liable for all the torts of [the] enterprise" without any need for the "attack-specific tracing" that would ordinarily be required.  Opp. 29 (citation omitted).  The Complaint affirmatively disclaims that theory, however, and Plaintiffs cannot revive it here.

**ARGUMENT**

**I.    Defendants Are Not Subject To Personal Jurisdiction In This Court**

**A.    Plaintiffs Have Not Satisfied Rule 4(k)(1)(C) Or 4(k)(2)**

Rule 4(k)(1)(C) does not establish jurisdiction here because it does so only when "authorized by a federal statute," and the statute on which Plaintiffs rely authorizes service or

2

waiver only in the United States, while Defendants waived service abroad. Statutes can provide for "nationwide" or "world-wide" service of process. Fed. R. Civ. P. 4, 1993 Advisory Committee Note. As Plaintiffs admit, Opp. 6, the ATA is only nationwide; it permits service only in a "district," 18 U.S.C. § 2334(a). Thus, in *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1350 (S.D. Fla. 2022), service outside the United States failed to establish jurisdiction under Rule 4(k)(1)(C). The fact that Defendants here waived service changes nothing. A waiver applies "as if a summons and complaint had been served." Fed. R. Civ. P. 4(d)(4). If a summons and complaint had been served in this case, it would have been served outside the United States, meaning no jurisdiction. That is confirmed by the fact that Defendants had 90 days to respond to the Complaint. That time period applies only when waiver "was sent to the defendant outside any judicial district of the United States." Fed. R. Civ. P. 4(d)(3); *see* ECF No. 50 ¶ 6; Opp. 6-7. And Plaintiffs cite no authority for the idea that counsel's U.S. presence is relevant; if it were, the 90-day period would almost never apply. Thus, Rule 4(k)(1)(C) does not establish jurisdiction.[1]

Alternatively, Plaintiffs argue that Rule 4(k)(2) supplies personal jurisdiction because no "single state" has jurisdiction. Opp. 7. But Plaintiffs bear the burden to "*demonstrate* that [a defendant] is not subject to personal jurisdiction in any state," *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory,"* 283 F.3d 208, 215 (4th Cir. 2002) (emphasis added), and their demonstration falls short. Plaintiffs' declaration says only that, "[b]ased on counsel's investigation to date," Plaintiffs "have not identified" a state in which either Defendant would be subject to personal jurisdiction. ECF No. 50 ¶ 15. Plaintiffs then do not address—much less

---

[1] Plaintiffs suggest that Defendants' "extra days" to respond mean the waivers must have jurisdictional effect. Opp. 6-7. But a waiver of service—whether inside or outside the United States—always leads to those "extra days." Fed. R. Civ. P. 4(d)(3). The "extension is intended to serve as an inducement to waive service" and save unnecessary costs, 1993 Advisory Committee Note, but expressly "does not waive any objection to personal jurisdiction," Fed. R. Civ. P. 4(d)(5).

3

explain—why they now believe the Virginia-specific contacts alleged in the original complaint do not support state-court jurisdiction. *See* ECF No. 1 ¶¶ 238, 242-246. Having made those allegations with a good-faith basis under Rule 11, Plaintiffs cannot now pretend they do not exist. That gamesmanship and inconsistency do not meet Plaintiffs' Rule 4(k)(2) burden.[2]

**B.      The Exercise Of Personal Jurisdiction Would Violate The Fifth Amendment**

Plaintiffs acknowledge they also must establish that the exercise of personal jurisdiction complies with Fifth Amendment due process. In the Fourth Circuit, that requires showing that Defendants "purposefully availed [themselves] of the United States" through "contacts" from which "[P]laintiff[s'] claims arise," *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) (citation omitted), and that constitutional "reasonableness" factors are satisfied, *Base Metal*, 283 F.3d at 213-14. *Fuld* did not obviate Plaintiffs' need to make both showings.

**1.      The Complaint Does Not Allege Sufficient Activities Directed At The United States**

In defending the adequacy of their "minimum contacts" allegations, Plaintiffs rely entirely on the "use of U.S. correspondent banking." Opp. 11-12. They have thus abandoned reliance on any other alleged participation in what they call the "DPRK-IRGC-Hizballah joint weapons venture," AC ¶ 240, or the 2007 statement to Forbes, *id.* ¶ 251, as a basis for jurisdiction. *See Chamblee v. Old Dominion Sec. Co.*, No. 13-cv-820, 2014 WL 1415095, at *8 (E.D. Va. Apr. 11, 2014) (noting that when a plaintiff files an opposition addressing only certain arguments raised by the defendant, a court may treat unaddressed arguments as conceded) (collecting cases).

The alleged transactions through correspondent accounts cannot support jurisdiction because they are not contacts from which Plaintiffs' claims arise. *See Saudi*, 427 F.3d at 276. The

---

[2] Citing no authority, Plaintiffs also imply that Rule 4(k)(2) is satisfied whenever federal courts have "exclusive jurisdiction" over a cause of action. Opp. 7. That confuses personal jurisdiction over a defendant with exclusive federal subject-matter jurisdiction over certain causes of action.

key thesis of Plaintiffs' claim is that BATMS's cigarette manufacturing venture with NKTC generated funds that assisted North Korean entities in procuring components for missile development. *See, e.g.*, AC ¶¶ 34, 157-158, 161, 167. But as Plaintiffs admit, the correspondent account transactions went the other way, resulting in money *leaving* North Korea and being "collected *by BAT*." Opp. 13 (emphasis added); *see id.* at 11 (acknowledging that the "transactions originat[ed] in North Korea for BATMS's, and ultimately BAT's, benefit").[3] Thus, those transactions did not generate *any* funds for North Korea, much less funds used for the development of missiles ultimately used in terrorist attacks. Plaintiffs never address the fundamental mismatch between their alleged jurisdictional contacts (Defendants' participation in transactions through which funds *left* North Korea) and their substantive ATA claim (alleged assistance in generating funds *for* North Korea). Because the Complaint does not allege that the funds that "flowed through" correspondent accounts "went to support" North Korea or any FTO, those transactions do not support jurisdiction. *Schrier*, 632 F. Supp. 3d at 1360; *see also* pp. 11-13, *infra*.

These facts also defeat Plaintiffs' assertion that the "use of U.S. correspondent banking" was "an instrument through which BAT delivered its assistance" or "'an instrument to achieve the wrong complained of.'" Opp. 13 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)). To the contrary, the correspondent banking transactions were a means for BATMS to receive money from the commercial tobacco business. *See* ECF No. 45-1, Attach. A ("Statement of Offense") ¶ 46 (cited at Opp. 12) (correspondent banking transactions were used by BATMS "in order to obtain the money" from the tobacco business, not to provide funds or support for any FTO). Those commercial payments to BATMS were not an instrument

---

[3] The Complaint makes that point clear as well. For example, it alleges that "BATMS shipped goods (primarily cigarette components) to Daesong-BAT" and that "NKTC then paid . . . in U.S. dollars" that were "remitted . . . to BAT." AC ¶ 122.

of the attacks in Iraq.  *See Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022) (requiring "an actual, specific transaction through a [U.S.] correspondent account in the course of bringing about the injuries on which the claims are predicated"); *Force v. Qatar Charity*, No. 20-cv-2578, 2025 WL 43163, at *4 (E.D.N.Y. Jan. 7, 2025) (plaintiffs failed to "provide any connection between" the U.S.-dollar transfers and "the terrorist attacks that injured and killed plaintiffs"); *Przewozman v. Qatar Charity*, No. 20-cv-6088, 2023 WL 2562537, at *13 (E.D.N.Y. Mar. 17, 2023) (finding that allegations of "how Hamas and PIJ used money entirely fail[] to show 2015 (or earlier) transfers were used 'in the course of' the 2019 rocket attacks").

Further, even where (unlike here) plaintiffs allege that defendants passed funds through correspondent accounts to terrorists, the transactions must be close in time to the attack causing injury:  where "transactions allegedly routed through the correspondent account, occurred, at latest, in 2015, while the rocket attacks did not happen until 2019," the "temporal gap leaves the nexus between the Defendants' New York-related acts and Plaintiffs' injuries far too attenuated." *Przewozman*, 2023 WL 2562537, at *13; *see id.* at *11-12 (reliance on allegations that money "passed" through correspondent accounts and "ultimately reached" FTOs "c[ame] dangerously close to asserting New York jurisdiction over any financial transaction conducted in U.S. dollars"). So too here, where the last alleged transaction was in 2017, long before the 2020 and 2022 attacks.

Plaintiffs' ATA cases are off point in two key ways:  in each, the financial transactions were themselves alleged to be the underlying wrong; and the transfers moved money *to* an FTO leading up to an attack.  *See Licci*, 732 F.3d at 166, 170-73 (bank made "repeated, intentional" wire transfers to "financial arm" of Hizballah "in order to further Hizballah's terrorist goals"); *Lelchook v. Société Générale de Banque au Liban S.A.L.*, 147 F.4th 226, 232-33, 237, 240-43 (2d Cir. 2025) (allegations were "materially identical" to *Licci* where a bank made "deliberate and

6

recurring use" of a correspondent account to "finance Hizbollah"). Thus, in both cases, the claims arose from the alleged U.S. contacts. Plaintiffs' non-ATA cases are the same. In one, a copyright case, the defendant's forum contacts were the same infringements forming the basis of the claims. *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 353-55 (4th Cir. 2020). So too for a case in which the conduct aimed at the forum was targeting U.S. servers with spyware, the very wrong alleged. *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 671-72 (N.D. Cal. 2020).

Instead, *Saudi* and *Khashoggi* are on point. *See* Opp. 14. In *Saudi*, even though the defendant had some U.S. contacts (contracts with U.S. companies), those contacts were not sufficiently related to the plaintiff's injury. 427 F.3d at 276. Similarly, in *Khashoggi*, conduct was too attenuated where the defendant was not a "'direct actor' who injured" the plaintiff and, instead, sovereign states "directed the targeting." *Khashoggi v. NSO Grp. Techs. Ltd.*, 138 F.4th 152, 161 (4th Cir. 2025). So too here, where Defendants' alleged U.S. contacts (transactions through which BATMS received money) have even less connection to alleged injuries.

### 2. The Complaint Does Not Establish That The Exercise Of Personal Jurisdiction Over Defendants Would Be Constitutionally Reasonable

Plaintiffs say little about the reasonableness factors, *see* Opp. 15-16, but they are a key element of the Fifth Amendment due process analysis.[4] They work as a sliding scale when contacts are light, *see Khashoggi v. NSO Grp. Techs. Ltd.*, 700 F. Supp. 3d 384, 400 (E.D. Va. 2023), and alone can preclude the exercise of personal jurisdiction, *see Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993).

In discussing the burden on Defendants, Plaintiffs wrongly equate this case with the 2023 sanctions matter, contending the "proof already sits in the U.S. record." Opp. 15. But that

---

[4] Plaintiffs concede, Opp. 15, that *Fuld* did not address this question, so existing Fourth Circuit precedent like *Base Metal* remains controlling on this point.

is not remotely so.  The evidence in the sanctions matter was limited to the financial transactions at issue, whereas the evidence in this case would involve—among other things—whether and to what extent NKTC cigarette profits funded the North Korean government's development of missile technology, the nature and extent of North Korean aid to Iran's missile program, the details of Iran's development of *Qiam* and *Fateh*-class missiles, and missile attacks by Iran-aligned terrorists in Iraq.  Much of the proof here would be new, and that new proof would lie largely in places inaccessible to U.S. discovery.  Plaintiffs' observation (Opp. 16) that "[e]very ATA case involves an attack abroad" is no answer, because each assertion of jurisdiction must be assessed individually, and the multi-step allegations here regarding the inner workings of North Korean government finances and Iranian weapons development will require far greater overseas fact-gathering than the typical ATA matter.  Plaintiffs' expectation that there will not be "extensive overseas discovery" and that they will fill the gap with "publicly available materials" and "expert analysis," AC ¶ 14 n.1, illustrates the problem.  Defendants would almost certainly be unable to obtain key factual evidence from primary sources to defend themselves.

The two countervailing interests Plaintiffs invoke, Opp. 15-16—that the attacks harmed U.S. nationals and that Congress enacted the ATA to give them a U.S. forum—are present in every ATA case, so they cannot show that jurisdiction over *these* Defendants is reasonable.  Those interests must be balanced here against (a) the attenuated (at best) link between the correspondent account transactions through which BATMS received payments and the subsequent missile attacks that injured Plaintiffs, and (b) the extent to which the impossibility of gathering relevant evidence will hamstring Defendants' ability to respond to Plaintiffs' claims.  On balance, asserting jurisdiction over Defendants here would not be consistent with fair play and substantial justice.

### 3.    Plaintiffs' Reliance On *Fuld* Is Misplaced

*Fuld* does not salvage jurisdiction here.  Although it found the Fifth Amendment "permits

a more flexible jurisdictional inquiry" than the Fourteenth Amendment, 606 U.S. at 16, *Fuld* was a cautious step, grounded in the tightly drawn boundaries of the relevant statute, the PSJVTA.

*First*, the Court found it significant that the PSJVTA confers jurisdiction on two expressly identified entities, the PLO and PA.  The Court found this specificity to "reflect[] 'delicate judgments' on matters of foreign policy that are in 'the prerogative of the political branches to make.'" *Id.* at 22 (citation omitted).  The Court distinguished the PSJVTA from a statute like the ATA, which applies to "a broader range of potential defendants—each of which presumably would implicate distinct foreign affairs concerns." *Id.*  Thus, the Court's acceptance of jurisdiction over "two *sui generis* foreign entities" that "exercise governmental functions in a geopolitically sensitive region," and with which "the Federal Government has complex, longstanding relationships," does not justify exercising jurisdiction over "run-of-the-mill private defendant[s]" like the commercial enterprises at issue here.[5] *Id.* at 20-22.  In the PSJVTA, the political branches expressly subjected the PLO and PA to personal jurisdiction as part of a "balanced judgment" made after weighing "fairness to these particular defendants." *Id.* at 20.  By contrast, the ATA's generic authorization of suit against "any person," 18 U.S.C. § 2334(a), reflects no such focused judgment.  It therefore requires the case-specific analysis discussed above.[6]

*Second*, the PSJVTA's "jurisdiction triggering predicates are likewise narrow." *Fuld*, 606 U.S. at 21.  The statute subjects the PLO and PA to personal jurisdiction only if they (a) make

---

[5] Plaintiffs point to BAT's ownership of Reynolds American and that subsidiary's importance to the larger group of BAT companies to argue that BAT has sufficient U.S. contacts to support jurisdiction.  Opp. 10 & n.5.  But Reynolds is a non-party whose contacts "cannot impute jurisdiction to its parent entity." *Saudi*, 427 F.3d at 276.  *Fuld* never suggested otherwise; it invoked the PLO's and PA's own "contacts, ties, [and] relations" with the United States to support the narrowness with which Congress drew the PSJVTA.  606 U.S. at 22 (citation omitted).

[6] Plaintiffs' reliance on Defendants' sanctions violations to argue that "BAT is not run-of-the-mill" proves the point.  *See* Opp. 10.  That is a case-specific factor, rather than a deference-earning reflection of express federal policy regarding the scope of personal jurisdiction, as in *Fuld*.

9

specified payments related to acts of terrorism against U.S. nationals or (b) conduct certain activities on U.S. soil. *Id.* at 8-9. Those predicates unquestionably relate to the United States, and it was on that basis that *Fuld* found "[t]he PSJVTA ties federal jurisdiction to conduct closely related to the United States." *Id*. at 18. Because the ATA lacks comparable jurisdiction triggering predicates, *Fuld* does not allow Plaintiffs to bypass a case-specific analysis.

Where, as here, *Fuld* does not dictate the outcome, courts take a "cautious approach" and apply "pre-*Fuld* case law" as part of the overall constitutional analysis, *In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2026 WL 522845, at *5-6 (W.D. Pa. Feb. 25, 2026) (citation omitted), and the existing Fourth Circuit framework continues to govern.[7] Whether under that framework or under *Fuld*, the Complaint does not allege facts sufficient to establish jurisdiction.

## II.    Plaintiffs' Opposition Does Not Rehabilitate The Complaint's Failings On The Merits

If the Court reaches the merits, it should hold that the Complaint fails to establish either the "direct nexus" or "culpable participation through intentional aid" that the Supreme Court focused on in *Taamneh*. 598 U.S. at 506. Plaintiffs' responses on both points are unpersuasive.

### A.    Plaintiffs Fail To Establish A Concrete Nexus Between Tobacco Sales In North Korea From 2007 To 2017 And Missile Attacks In Iraq In 2020 And 2022

Plaintiffs seek to hold Defendants liable for aiding and abetting the IRGC, Hizballah, and Kataib Hizballah in carrying out the 2020 and 2022 missile attacks in Iraq. There is no allegation, however, that Defendants ever interacted in any way with those "primary tortfeasor[s]." *Taamneh*, 598 U.S. at 491. Instead, Plaintiffs' claim rests on allegations that BATMS provided cigarette

---

[7] Plaintiffs do not address, and have no answer for, *In re Diisocyanates*, in which a post-*Fuld* court analyzed case-related contacts with the United States as a whole, as well as constitutional reasonableness factors. *See* ECF No. 44 ("Mot.") 16-17. The only case they cite is *Finan v. Lafarge S.A.*, No. 22-cv-7831, 2025 WL 2504317, at *15-22 (E.D.N.Y. Aug. 29, 2025), but that decision does not control because the court sidestepped the constitutional inquiry. Instead, it focused on the merits and dismissed the aiding-and-abetting claims under Rule 12(b)(6). *See id*.

10

components to NKTC years earlier, and that through a series of intervening transactions by other entities, those cigarette components facilitated the development of North Korean weapons technology that was eventually incorporated into Iranian missiles used in the attacks. As Defendants have explained, Mot. 20-28, that alleged chain of causation is too attenuated to make out the necessary nexus between Defendants' conduct and the attacks at issue.

In response, Plaintiffs argue that "[t]he nexus here is sufficient on either of two independent grounds: [1] BAT's hard currency funded the production of the specific *Qiam* and *Fateh*-class weapons . . . deployed against Plaintiffs; or, alternatively, [2] BAT's assistance to the missile enterprise was so systemic and pervasive as to warrant liability for the only two known terrorist attacks on Americans involving those missiles." Opp. 17-18. The Complaint supports neither ground, and Plaintiffs cannot paper over the attenuation of the alleged causal chain by labeling it an "integrated ballistic-missile venture." *Id.* at 4.

### 1. Plaintiffs' Focus On "Hard Currency" Does Not Establish A Concrete Nexus Between Defendants And The Attacks In Iraq

Plaintiffs focus nearly all their efforts to create a "nexus" on the theory that "BAT's hard currency funded the production of the specific *Qiam* and *Fateh*-class weapons" used in the attacks. Opp. 17. The Opposition thus confirms (as Defendants explained, *see* Mot. 24-26) that the Complaint depends not on flows of money generally, but on flows of "hard currency" specifically. Tying Defendants to the alleged uses of "hard currency" is the linchpin of Plaintiffs' case.

But while Plaintiffs insist that "BAT's dollars flowed into Office 39's missile venture," Opp. 20, the specific facts alleged in the Complaint and its sources show just the opposite: The exchanges of "hard currency" between Defendants and North Korea flowed *out* of accounts allegedly linked to Office 39, not *into* them. *See* p. 5, *supra*. Describing the purported "$415 million in liquidity" generated by the joint venture, for example, the Complaint alleges that money

11

was "*paid to BATMS*."  AC ¶ 123 (emphasis altered).  It further explains that BATMS was paid for its cigarette components using "money NKTC generated abroad that could not be repatriated due to banking restrictions."  *Id.* ¶ 125.  Indeed, it was the act of "*receiving payments* through a complex remittance structure" that led to the sanctions violations.  *Id.* ¶ 152 (emphasis added).[8]

Plaintiffs have no coherent response to that critical point.  They assert that "BATMS pleaded guilty, and BAT admitted, to a conspiracy that caused 'the export of financial services from the United States to North Korea' . . . 'with and for the benefit of KKBC, FTB, North Korea, and North Korean entities.'"  Opp. 21 (quoting Statement of Offense ¶ 30 and AC ¶ 246).  The Statement of Offense explains, though, that the referenced "export of financial services" was not the export of hard currency; it was the use of U.S. banks to allow BATMS's counterparty *to pay BATMS* with dollars originating from North Korean-linked accounts.  *See* Statement of Offense ¶¶ 42-45; *see also id.* ¶ 72 (faulting BATMS for "not informing financial institutions regarding the true origin of U.S.-dollar funds it was *receiving*" (emphasis added)).  Accordingly, while the Opposition rests on the assertions that "BAT's dollars flowed into Office 39's missile venture" and that Defendants "supplied the . . . hard currency the missile program could least obtain," Opp. 20, 29, those assertions contradict both the Complaint and the sources on which it purports to rely.

Plaintiffs also cannot show (and make no meaningful attempt to show) that Defendants generated hard currency for North Korean missile development in any other ways.  As Defendants explained, *see* Mot. 25, BATMS's joint venture with NKTC was intended to "capture the untapped North Korean market," AC ¶ 89, which obviously would not generate foreign currency.  Plaintiffs

---

[8] Defendants' 2023 agreements with the government confirm the direction of those hard-currency flows.  *See*, *e.g.*, Statement of Offense ¶¶ 42-45 (NKTC "*made payments* in U.S. dollars" which were routed "to BATMS" (emphasis added)); *id.* ¶¶ 44-45 (describing "payments . . . for BATMS" and money "intended for BATMS as payment for NKTC purchases").

do not suggest otherwise.   And while the Complaint makes general assertions that materials provided by BATMS "likely" contributed to North Korea's global cigarette counterfeiting efforts, *id.* ¶ 202, Defendants explained that those assertions rely on layer upon layer of impermissible speculation, Mot. 25-26.   Again, Plaintiffs have no response—the Opposition does not mention counterfeiting even once, and has thus waived any reliance on that alternative theory.

Finally, Plaintiffs' "experts" cannot solve the problems with Plaintiffs' hard currency theory.   Those "experts" simply accept as given the speculative and conclusory assertions about hard currency addressed above.   For example, Dr. Greitens's "opinions," AC ¶ 218, rest on the abandoned counterfeiting theory, *see id.* ¶ 218.f.   And Dr. Lewis's "opinions," *id.* ¶ 219, rely on the assertion that Defendants had a role in "freeing more than $400 million," *id.* ¶ 219.b, without addressing the fact that the "more than $400 million" was paid *to BATMS*, not to North Korea.

Beyond their inability to identify flows of hard currency from Defendants to North Korea, Plaintiffs also fail adequately to address numerous other factors attenuating any nexus between Defendants and the attacks in Iraq.   As Defendants explained, the factual allegations in the Complaint make clear that the commercial tobacco business in North Korea was separated from the IRGC, Hizballah, and Kataib Hizballah by a lengthy chain of intervening parties.   Mot. 20-24. Unable to dispute those intervening parties as a factual matter, Plaintiffs instead try to obscure them with conclusory labels, declaring the series of separate actors an "integrated ballistic-missile venture" and asserting that every "link is a defendant, a complicit network partner, or the FTOs themselves."   Opp. 4, 21.   But this Court need not accept Plaintiffs' legal conclusions on a motion to dismiss, and labeling the intervening entities "complicit network partner[s]" does not change the fact that they made independent decisions, which Defendants could not and did not control, about how to use the resources available to them.   This case is thus nothing like the two cases on

which Plaintiffs rely in seeking to discount the attenuation here.  *See* Opp. 21.  In *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the defendant (Hamilton) was the bookkeeper and live-in companion of the primary tortfeasor (Welch), working with him directly to sell burgled goods.  *See id.* at 474-75.  And in *Zobay v. MTN Group Ltd.*, 695 F. Supp. 3d 301 (E.D.N.Y. 2023), the defendant company executed a contract for embargoed military communications equipment "'in Tehran in the presence of one or more notorious IRGC terrorists,'" and the "second floor of [the company]'s Iran offices was allegedly 'populated by military intelligence officials.'"  *Id.* at 346.  In both cases, therefore, the defendants' face-to-face interactions with the primary tortfeasors made it plain that their assistance would directly facilitate the violations that ultimately harmed the plaintiffs.  Here, by contrast, Defendants never interacted with the FTOs, and whether BATMS's cigarette components contributed in any way to the years-later missile attacks in Iraq depended on choices by multiple other parties with whom Defendants also did not interact.

Plaintiffs' other liability-by-label arguments cannot overcome that attenuation, either.  Seeking to distinguish the numerous cases Defendants have identified in which courts rejected even less attenuated causal chains, Plaintiffs insist that "[n]one describes a guilty-pleading sanctions-evader in a bespoke joint venture."  Opp. 22.  But Defendants' acknowledgment that they violated banking sanctions by accepting "pa[yments] for the goods [BATMS] sent to . . . North Korea in U.S. dollars," Statement of Offense ¶ 43, does nothing to address the many steps that separate receipt of North Korean tobacco-related payments from Iranian missile attacks.  While Plaintiffs assert that "[t]his civil case begins where BAT's U.S. criminal case left off," Opp. 1, the reality is that the attacks at issue here are far removed—geographically, temporally, and causally—from those sanctions violations.  And as illustrated by cases like *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667 (D.C. Cir. 2023), and *Fraenkel v. Standard Chartered Bank*, Nos. 24-

cv-4484, 24-cv-5788, 2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025), doing business with sanctioned entities—while punishable in its own right—does not establish liability for aiding-and-abetting specific acts of terrorism perpetrated by terrorist organizations with whom those sanctioned entities may have interacted. *See* Mot. 22. It is not enough "that a defendant have given substantial assistance to a transcendent 'enterprise'" because "the focus must remain on the tort itself"—"an act of international terrorism." *Taamneh*, 598 U.S. at 494-95.

Plaintiffs' attempt to establish a non-speculative nexus to the attacks is further frustrated by the fact that several intervening entities are arms of sovereign governments. *See* Mot. 23-24; *Ofisi*, 77 F.4th at 677. Plaintiffs respond that they "do not allege that BAT assisted North Korea or Iran generally," but instead that Defendants assisted "Office 39." Opp. 23. But the Complaint acknowledges that Office 39 operated as a "branch" of the North Korean government with "global" revenue sources, AC ¶¶ 23, 28, and that it used its funds for various purposes including "regime maintenance" and purchasing "luxury goods" for the Kim family, as well as "housing and cars," *id.* ¶ 80. The conclusory allegation that Office 39 devoted an unspecified "fixed percentage" of its funds for "arms programs," *id.* ¶ 161, does not solve the fact that the funds are fungible. *See Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 444 (2d Cir. 2025) (rejecting a "fungibility theory" of ATA aiding and abetting that "some of the money must have gone to the terrorists' violent activities"). Even if missiles were "prioritized," AC ¶ 80, Office 39's many activities and sources of funds attenuate any inference that funds from Defendants were converted into missile technology used in the attacks, rather than going to other parts of Office 39's budget.

Plaintiffs also fail to account adequately for the fact that all of Defendants' alleged conduct ended years before the attacks. Seeking to downplay that temporal gap, Plaintiffs quote a discussion of negligence in the Restatement (Second) of Torts for the proposition that "[w]here it

15

is evident that the influence of the actor's [conduct] is still a substantial factor, mere lapse of time, no matter how long, is not sufficient to prevent it from being the legal cause of the other's harm." Opp. 24 (quoting Restatement (Second) of Torts § 433 cmt. f (1965)). But this case involves aiding and abetting terrorism, not negligence, and in that context "[t]he key question . . . is whether defendants . . . culpably *participated* in the [2020 and 2022] attack[s]." *Taamneh*, 598 U.S. at 497 (emphasis added). That Defendants halted any relevant conduct by 2017 answers that question.

No authorities support Plaintiffs' contrary argument. The only ATA aiding-and-abetting case Plaintiffs even mention in that paragraph of their brief is *Moses v. BNP Paribas, S.A.*, 802 F. Supp. 3d 567 (S.D.N.Y. 2025), which they describe as "declin[ing] to dismiss JASTA aiding-and-abetting claims at the Rule 12(b)(6) stage where the attacks occurred up to four years after the defendant ceased providing services." Opp. 24.[9] That is a highly misleading description. *Moses* involved claims by "victims of . . . terrorist attacks committed in Israel from 2008 to 2016, and . . . in Iraq from 2006 to 2011." 802 F. Supp. 3d at 573. The court noted that while "Defendant[s] may seek to limit their liability by pointing out . . . that they ceased providing services to Caspian in 2012, and only provided services to the Iranian Oil Company during one year (2009)[,] . . . these arguments are better suited for summary judgment" because "at this stage, it would be improper . . . to delimit the temporal scope of liability without any meaningful discovery." *Id.* at 588-89. There was thus no dispute that *some* of the attacks at issue had occurred while the defendant was allegedly providing assistance, and the court simply put off until a later "stage" any determination

---

[9] Plaintiffs also cite two cases involving claims of material support for terrorism. *See* Opp. 24 (citing *Owens v. Republic of Sudan*, 864 F.3d 751, 796-97 (D.C. Cir. 2017), *vacated sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020); and *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 700 (7th Cir. 2008) (en banc)). But those cases involve different standards that—as with claims for negligence—do not require establishing that the defendant "culpably participated in" specific attacks, *Taamneh*, 598 U.S. at 497. They thus have no bearing here.

16

about which claims would be precluded on that basis.  Here, by contrast, Plaintiffs acknowledge that *none* of the attacks occurred until more than two-and-a-half years after Defendants' conduct had ended.  There is thus no need to wait until summary judgment to conclude that any conceivable "temporal scope of liability" would not extend to Plaintiffs' claims.  *Id.*

As Defendants explained, other courts have dismissed ATA claims on similar temporal grounds.  *See* Mot. 27 (discussing *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019); and *Averbach v. Cairo Amman Bank*, No. 19-cv-4, 2020 WL 486860, at *14 (S.D.N.Y. Jan. 21, 2020)).  Plaintiffs argue that those cases addressed scienter rather than nexus, "treat[ing] a temporal gap as evidence that the defendant lacked 'general awareness' 'that it was playing a role in [the] attack.'" Opp. 24-25 (citations omitted).[10]  But whether viewed through the lens of scienter or nexus, they apply with full force here:  Plaintiffs themselves emphasize that the missiles on which the Complaint is focused had never been used in attacks against Americans prior to 2020, *see* AC ¶ 213, and Defendants therefore cannot have known of their role in such attacks, or have participated in them, when they exited the North Korean tobacco venture years earlier.

### 2.    The Complaint Does Not Allege Facts Showing That Defendants "Pervasively" Assisted The IRGC, Hizballah, Or Kataib Hizballah

Given the difficulty of connecting Defendants to the attacks at issue, Plaintiffs briefly invoke a second "route to liability, one that does not turn on attack-specific tracing." Opp. 29.  In particular, they claim that this case fits within the Supreme Court's recognition that "a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Taamneh*, 598 U.S. at 496.

---

[10] Plaintiffs also note that the plaintiffs in *Averbach* were allowed to proceed after amending their complaint.  Opp. 25 n.7; *see Averbach v. Cairo Amman Bank*, No. 19-cv-4, 2022 WL 2530797, at *8 (S.D.N.Y. Apr. 11, 2022) (noting that "Plaintiffs added significantly more allegations . . . now 248 pages with 1300 numbered paragraphs").  But no amendments here could change the fact that Defendants' allegedly relevant conduct occurred years before the 2020 and 2022 attacks.

That claim contradicts the Complaint, which expressly disclaims any allegation "that BAT's misconduct necessarily enabled all IRGC-sponsored terrorism anywhere in the world at any time."  AC ¶ 213.[11]  The Complaint instead seeks to impose liability for a "discrete subset of IRGC-led attacks."  *Id.*  Having conceded that Defendants' conduct was not so pervasive and systemic as to render them responsible for "*every* wrongful act committed by that enterprise," *Taamneh*, 598 U.S. at 496 (emphasis added), Plaintiffs cannot avoid the need to establish a nexus between Defendants and the specific attacks at issue, *see id.* at 495; *see also Parizer v. AJP Educ. Found., Inc.*, No. 24-cv-724, 2025 WL 2382933, at *23 (E.D. Va. Aug. 15, 2025) ("Under *Taamneh*, allegations of 'systemic' support do not circumvent the necessity to sufficiently allege defendants actually aided and abetted each tort of that enterprise." (internal quotation marks omitted)).  For all of the reasons discussed above, Plaintiffs are unable to do so here.

**B.      The Complaint Fails To Allege That Defendants Intended To Facilitate The 2020 And 2022 Attacks**

The Complaint also fails to allege that Defendants acted with the necessary scienter—*i.e.*, sought "to help 'make [the attacks] succeed.'"  *Taamneh*, 598 U.S. at 493; *see* Mot. 28-30.

Plaintiffs argue that *Taamneh*'s "'make it succeed' language" is specific to "*criminal* aiding-and-abetting cases" and thus does not apply here.  Opp. 27 (citation omitted).  As the Court explained, however, "both JASTA and *Halberstam*'s elements and factors rest on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'"  598 U.S. at 493.  There is no way to read that pronouncement as limited to criminal cases.

*Halberstam* confirms the point.  The court there did not hold that Hamilton could be held

---

[11] Given the Complaint's express disclaimer, Defendants had no obligation to address *Taamneh*'s "every wrongful act" exception in their Motion.

18

liable even if her participation was "knowing" but not intentional. *Contra* Opp. 25. Rather, it held that Hamilton's "knowing" assistance "*evidence*[*d*] *a deliberate long-term intention* to participate in an ongoing illicit enterprise," and that her "continuous participation *reflected her intent and desire* to make the venture succeed." 705 F.2d at 488 (emphases added). In other words, the court highlighted Hamilton's "knowing" participation because it was evidence of her intent, not because it reflected a lower level of mens rea that applies only to civil aiding-and-abetting liability. *See Taamneh*, 598 U.S. at 487 (explaining that "Hamilton had given knowing and substantial assistance to Welch's activities . . . , thereby *intending* to help Welch succeed" (emphasis added)).

More recent decisions point in the same direction. In *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), the Court equated the "make it succeed" standard—which, as noted, applies in civil aiding-and-abetting cases—with the requirement that the defendant "'take an affirmative act in furtherance of [an] offense,'" and "'intend to facilitate the offense's commission.'" *Id.* at 291 (alterations and citation omitted). And in addressing civil claims for aiding and abetting copyright infringement in *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026), Justice Sotomayor explained that under *Taamneh*, "the defendant has to take some affirmative act with the intent of facilitating the offense's commission." *Id.* at 973 (Sotomayor, J., concurring in the judgment) (internal quotation marks omitted).

The Complaint does not (and could not) show that Defendants intended to make the attacks at issue here succeed. The Opposition obliquely suggests that "BAT loses even under that more demanding criminal standard," Opp. 28, but the case on which it relies—*Direct Sales Co. v. United States*, 319 U.S. 703 (1943)—supports the opposite conclusion. The defendant in *Direct Sales* "not only knew of and acquiesced in [the primary actor's] illicit enterprise, but joined both mind and hand with him to make its accomplishment possible." *Smith & Wesson*, 605 U.S. at 293

19

(internal quotation marks and alterations omitted).  Here, in contrast, it cannot be said that Defendants "joined both mind and hand" with the IRGC, Hizballah, and Kataib Hizballah to make possible the 2020 and 2022 attacks in Iraq, where Defendants never interacted with the FTOs and where all of Defendants' conduct occurred years before (and thousands of miles away).  Plaintiffs rely on media reports to assert that Defendants were aware of links between North Korea and Iran, but even alleged "general awareness" of a role in an FTO's "overall scheme" is "not the same" as providing substantial assistance to support a specific attack.  *Taamneh*, 598 U.S. at 503.

For similar reasons, Plaintiffs' extensive reliance on *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026), is also misplaced.  The D.C. Circuit held that the defendants' conduct there was comparable to the conduct at issue in *Direct Sales*, and it even described the comparable conduct as "[p]erhaps the strongest support for the inference of culpable association."  165 F.4th at 610.  That conclusion makes sense given that the "defendants paid illegal cash bribes *directly* to the [terrorist group Jaysh al-Mahdi] and supplied extra, off-the-books batches of valuable medical goods that Jaysh al-Mahdi monetized on the black market to fund its operations against Americans."  *Id.* at 596 (emphasis added).  Nothing remotely similar took place here, and thus *Atchley* provides no basis for finding that Defendants acted with the state of mind necessary to support the claim that they aided and abetted the 2020 and 2022 attacks.[12]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction or, in the alternative, under Rule 12(b)(6) for failure to state a claim.

---

[12] To the extent that *Atchley*'s assertion that "*Taamneh* did not read a specific intent requirement into the ATA," 165 F.4th at 608, meant to disclaim the "make it succeed" language, that assertion is incorrect for the reasons discussed above.  In any event, that statement was dictum unnecessary to the resolution of the case, given that the defendants' conduct, like the conduct in *Direct Sales*, showed that they had "join[ed] both mind and hand with" the terrorists at issue.  319 U.S. at 713.

Dated:  July 7, 2026.

Gary A. Bornstein (*pro hac vice*)
David H. Korn (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY  10001
(212) 474-1000
gbornstein@cravath.com
dkorn@cravath.com

Respectfully submitted,

<u>*/s/ Craig C. Reilly*</u>
Craig C. Reilly (VSB # 20942)
LAW OFFICE OF CRAIG C. REILLY
429 North Saint Asaph Street
Alexandria, VA  22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com

John Buretta (*pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
(212) 318-6000
johnburetta@paulhastings.com

Benjamin W. Snyder (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
bensnyder@paulhastings.com


*Counsel for Defendants*

21

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 7, 2026, I caused the foregoing to be served by this Court's

CM/ECF system on all counsel of record.

*/s/ Craig C. Reilly*
Craig C. Reilly
